# EXHIBIT 1

# SAVILLE & CO

—— SCRIVENER NOTARIES ——

One Carey Lane
London EC2V 8AE
Tel: +44 (0)20 7776 9800
Fax: +44 (0)20 7776 9801
www.savillenotaries.com
mail@savillenotaries.com

Sophie Milburn
Nicholas Thompson
Robert Kerss
Andrew MacNab
Christopher Higgins
(General Notary)

Eleonora Ceolin
(General Notary)
Richard Saville
(Consultant)

KINGDOM OF ENGLAND }
CITY OF LONDON } SS

TO ALL TO WHOM THESE PRESENTS SHALL COME, I CHRISTOPHER GERARD HIGGINS of the City of London NOTARY PUBLIC by royal authority duly admitted and sworn DO HEREBY CERTIFY the genuineness of the signature of SEAMUS RONALD ANDREW subscribed at foot of the **certification** hereunto annexed, such signature having been subscribed today in my presence in London, England by the said Seamus Ronald Andrew, whose personal identity and capacity I attest, a solicitor of the Senior Courts of England and Wales and designated member and the managing partner of the law firm styled **SCA ONTIER LLP** of London, England;

AND I DO FURTHER CERTIFY THAT the said SCA ONTIER LLP is a limited liability partnership duly organised and existing in accordance with the laws of England and Wales, registered with the Registrar of Companies for England and Wales under number OC327289 and with registered office at One New Ludgate, 60 Ludgate Hill, London, EC4M 7AW, England.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this fourteenth day of March two thousand and eighteen.



My Commission expires at Death

 

SCRIVENER
NOTARIES

Regulated by the Faculty Office of the Archbishop of Canterbury

 **SCA ONTIER**

SCA Ontier LLP
One New Ludgate
5th Floor
60 Ludgate Hill
London EC4M 7AW
T: +44(0)20 7183 1701
F: +44(0)20 7183 1702
DX248 London/Chancery Lane
www.scaontier.com

## CERTIFICATION

I, the undersigned Seamus Ronald Andrew, English solicitor and Managing Partner of SCA Ontier LLP, hereby certify that the attached document consisting of one covering page and 19 numbered pages is, to the best of my information and belief, a true, faithful, and complete photocopy of a Gas Supply and Processing Agreement for Accelerated Gas Development, entered into on or about January 11, 2010, by the Ministry of Petroleum Resources of the Federal Republic of Nigeria and Process and Industrial Developments Limited. This certification is made on information and belief as counsel instructed by Process and Industrial Developments Limited to represent it in an arbitration proceeding arising out of the attached Gas Supply and Processing Agreement for Accelerated Gas Development.

Seamus Ronald Andrew

14 March 2018

SCA Ontier LLP is a limited liability partnership registered in England
Registered No.OC327289. A list of the members is open to inspection at the registered office

Authorised and Regulated by the Solicitors Regulation Authority



**GAS SUPPLY AND PROCESSING AGREEMENT**

**FOR**

**ACCELERATED GAS DEVELOPMENT**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA**

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**DATED THE 11TH DAY OF JANUARY 2010**

*Ministry of Petroleum Resources*

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND INTERPRETATIONS.................................... 3

ARTICLE 2 OBJECTIVE ................................................................ 6

ARTICLE 3 SCOPE OF WORK ........................................................ 6

ARTICLE 4 FUNDING ................................................................. 7

ARTICLE 5 DURATION OF THE AGREEMENT........................................ 7

ARTICLE 6 RESPONSIBILITIES OF THE GOVERNMENT .......................... 7

ARTICLE 7 RESPONSIBILITIES OF P&ID ............................................ 8

ARTILCE 8 COMMERCIAL TERMS.................................................... 8

ARTICLE 9 JOINT OPERATING COMMITTEE ...................................... 10

ARTICLE 10 NIGERIAN CONTENT.................................................. 10

ARTICLE 11 FORCE MAJEURE ...................................................... 11

ARTICLE 12 CONFIDENTIALITY..................................................... 11

ARTICLE 13 PROPRIETARY INFORMATION ........................................ 12

ARTICLE 14 INDEMNITY ............................................................. 13

ARTICLE 15 CHANGES TO AGREEMENT........................................... 13

ARTICLE 16 ASSIGNMENT .......................................................... 13

ARTICLE 17 THIRD PARTIES ........................................................ 13

ARTICLE 18 LANGUAGE ............................................................. 14

ARTICLE 19 WRITTEN PRESS RELEASES ......................................... 14

ARTICLE 20 APPLICABLE LAW AND DISPUTE RESOLUTION.................... 14

ARTICLE 21 ENTIRE UNDERSTANDING ........................................... 15

ARTICLE 22 WARRANTIES........................................................... 15

ARTICLE 23 NOTICES ............................................................... 16

APPENDIX A .......................................................................... 18

APPENDIX B .......................................................................... 19

**THIS GAS SUPPLY AND PROCESSING AGREEMENT** is entered into this 11th day of January 2010.

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES FOR AND ON BEHALF OF THE FEDERAL GOVERNMENT OF NIGERIA (FGN)** (hereinafter referred to as "the Government") whose office address is situated at the 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria hereby represented by ........................................, the Honourable Minister of Petroleum Resources, which expression shall where the context so admits includes its assigns and successors in office of the first part.

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED** a corporation organised and existing under the laws of the British Virgin Islands and it's assignees (which expression shall, where the context so permits means and include any successors or permitted assigns) hereby represented by..... MICHAEL QUINN (hereinafter referred to as "P&ID") of the other part.

Each of the Parties may be referred to individually as "Party" or collectively as "the Parties".

**WHEREAS:**

a)  The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

b)  The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves, developed gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators.

c)  The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allocated to the international operators.

d) The Government desires to develop and utilise it's gas resources at optimal capacity to meet the growth in gas demand at the various sectors of the economy including domestic, regional and export markets;

e) The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

f) The Government has explored viable structures that could be used to meet the highlighted objectives and considered P&ID as capable of implementing and executing the Project;

g) The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic uses.

h) P&ID possesses the requisite finance, technology and competence for the fast track development of the Project.

i) P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the project in accordance with the terms of this Agreement.

j) The Parties are entering into this Agreement to ensure the fastrack implementation of the Project and to ensure the timely provision of pipeline quality Lean Gas for power generation.

**IN CONSIDERATION OF THE MUTUAL RIGHTS, INTERESTS, COVENANTS AND OBLIGATIONS CONTAINED HEREIN IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:**

1. **DEFINITIONS AND INTERPRETATIONS**

   i. "Affiliate" means with respect to a Party, any company or legal entity that Controls, or is controlled by, such Party or is controlled by a company or legal entity that also controls such Party. For purposes of this Agreement, "control" means the right, directly or indirectly, to exercise fifty percent (50%) or more of the voting rights in the election of directors, or if there are no such voting

rights, ownership of fifty percent (50%) or more of the equity share capital or other ownership interests, and "controls and "controlled shall be construed accordingly;

ii.    "Agreement" means this Gas Processing Agreement;

iii.   "CDM Project" means a clean development project as provided for in the Kyoto Convention and a CDM Project is duly authorised to engage in approved market based mechanisms in relation the Carbon Credits;

iv.    "Effective Date" means the date of signing of this Agreement;

v.     "GPFs" means the Gas Processing Facilities to be constructed and operated at the Site and off-shore from the Site where applicable;

vi.    "Lean Gas" means pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane;

vii.   "MMSCuFD" means Millions of Standard Cubic Feet per Day;

viii.  "NGLs" means all hydrocarbons remaining after processing the Wet Gas removing the Lean Gas;

ix.    "Parties" means the Ministry of Petroleum Resources of the Federal Government of Nigeria represented by the Honourable Minister of Petroleum Resources and Process and Industrial Developments Limited;

x.     "Pioneer Status" means tax free status in Nigeria for P&ID and its assignees in relation to the Project encompassing the provision of equipment and materials for the project and as operators of the plant for the first 5 years of operations.

xi.    "Project" means the establishment of the GPFs and the supply of Wet Gas thereto and the delivery of Lean Gas and their successful operation by the Parties as set out in this Agreement;

xii    Project Team" means the management team appointed by P&ID to carry out the implementation of the Project and shall include the P&ID nominees to the Joint Operating Committee.

xiii.  "Proprietary Information" means all data and information generated pursuant to the work carried out by the parties including but not limited to reports, documents, drawings and graphs, and any patentable inventions made during and as a

Page 4 of 19

result of all work carried out by the P&ID Project Management Team for this project, inclusive of any and all patents or patent applications with regard thereto;

xiv. "Site" means the land in Calabar on which the GPFs are located.

xv. "Start Date" means the earliest date on which the Government commences the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site;

xvi. "Wet Gas" means associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site;

Except where expressly provided to the contrary in this Agreement:

the Schedules and the Appendices form part of this Agreement and in the event of any conflict between the main body of this Agreement and a Schedule the main body of this Agreement shall prevail;

reference to any Party or any Person includes that Party's or that Person's successors and permitted assigns;

reference to any consent not to be unreasonably withheld is deemed to be qualified by the requirement that such consent shall not be unreasonably conditioned or delayed;

reference to include and including is deemed to be qualified by the additional term without limitation;

reference to any publication, statute, rule, regulation, instrument or standard means the same as amended, supplemented or replaced from time to time;

reference to any agreement means the same as amended, supplemented or replaced from time to time;

in the computation of periods of time from a specified day or Day to a later specified day or Day:

(i)     from means from and including and until and to means to and including; and



(ii)   any requirement that an action may or shall be taken within a specified number of Days means that such action may or shall be taken within the number of Days so specified starting at 00:00 hours local Nigerian time on the Day on which the requirement to take such action arose;

## 2.   OBJECTIVE

The objective of this Agreement is to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of Wet Gas by the Government and the processing of the said Wet Gas by P&ID utilising two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner.

## 3.   SCOPE OF THE WORK

The scope of works of this Agreement is as follows:

a.   P&ID shall construct GPFs on the Site allocated to them by Cross River State Government with related ancillary plant and equipment off-shore as required. The GPFs shall be constructed on a timely basis to ensure the earliest possible delivery to the Government, or its nominees, of approximately 340 MMSCuFD Lean Gas for power generation and industrial use by third parties.

b.   To ensure this fastrack is achieved P&ID will construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD together with all utilities, maintenance and support facilities at the Site in accordance with the schedule of works forming Appendix B hereto.

c.   The Government shall make available at the P&ID Site boundary, 400 MMSCuFD Wet Gas (free of water) in the manner set out in Appendix A having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8% mol from OMLs 123 and OML 67 or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of this Agreement as defined under Article 5 of this Agreement.

Page 6 of 19

    d.   P&ID will process the Wet Gas to be supplied by the Government and shall provide to the Government or its nominees approximately 85% of the wet gas feedstock molecular volume In the form of Lean Gas at the Site boundary.

## 4.    FUNDING

a. Save as otherwise provided in this Agreement, each Party shall bear the costs and expenses of its own personnel during the period of this Agreement.

## 5.    DURATION OF THE AGREEMENT

This Agreement shall come into being on the Effective Date being the date of signing of the Agreement as defined in Article 1 herein and shall remain in force for a period of twenty (20) years with effect from the Start Date of the Agreement after which it shall automatically terminate without prior notice to the Parties except where extended by a mutual agreement of the Parties or until the Capital Cost of the Project is fully repaid whichever occurs latest subject to the Government at all times having the right to audit the Accounts of the P&ID .

## 6.    RESPONSIBILITIES OF THE GOVERNMENT

a)    The Government shall deliver to the Site boundary the agreed quantities and quality of gas as defined under Article 3c and in the manner set out in Appendix A of this Agreement;

b)    The Government shall ensure that all necessary pipelines and associated infrastructure are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.

c)    The Government agrees to assist P&ID, and where necessary intercede with the relevant Government agencies, to obtain all requisite permits, licenses and approvals required from the relevant Government agencies or others for the fastrack implementation of this project.



d) If the Government or any of its agencies changes or amends any statute, rule, regulation, instrument or standards, and such change or amendment adversely affects the rights of P&ID under this Agreement, the Parties shall amend the terms of this Agreement in a manner that will restore the rights of P&ID. The Government shall grant to P&ID all such waivers and exemptions necessary to ensure that the rights of P&ID are not adversely affected by any change or amendment to statute, rule, regulation, instrument or standards.

7. **RESPONSIBILITIES OF P&ID**

a) P&ID shall use best endeavours to ensure the fastrack implementation of this Project to construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD together with all utilities maintenance and support facilities at the Site. Thereafter P&ID shall maintain and operate the GPFs on a professional basis to ensure a regular supply of Lean Gas (approximately 340 MMSCuFD) for power generation;

b) c) P&ID shall, during the Project implementation period, submit to the JOC as set out in Article 9 updated work programs or such other documentation as may be necessary to enhance the development of the Project;

c) P&ID shall do all that is necessary to obtain relevant approvals required for the success of the Project.

8. **COMMERCIAL TERMS**

a) The Government shall deliver to the Site boundary, 400 MMSCuFD of Wet Gas as set out in Article 3 c) and in Appendix A of this Agreement having a minimum C3 (Propane) content of 3.5% mol and C4 (Butane) of 1.8% mol at No Cost to P&ID.

b) P&ID will process the Wet Gas, recompress the residual Lean Gas, representing approximately 85% of the Wet Gas feed, and make it available, for power generation or other Industrial usage at the discretion of the Government, at the Site boundary at No Cost to the Government.

c) Title to and ownership of the Wet Gas to be delivered by the Government to the Site shall remain vested in the Government and shall be delivered back to the Government at the Site boundary



Page 8 of 19

after processing in the form of Lean Gas but the NGLs removed from the Wet Gas during processing shall be retained by P&ID and shall be deemed the sole property of P&ID and the said NGLs may be sold by P&ID either domestically within Nigeria or exported in accordance with commercial criteria.

d) P&ID shall provide all funding necessary for the timely construction, implementation and efficient operation of the GPFs and the said GPFs will be the sole property of P&ID and may be sold or otherwise disposed of by P&ID subject always to the provisions of this Agreement PROVIDED that Government shall be given the right of first refusal.

e) As further consideration P&ID shall transfer to the Government or its nominee a total of ten percent (10%) of the Equity of P&ID in the following manner:

    (i)    P&ID shall transfer to the Government or it's nominee five percent (5%) the Equity of P&ID upon the commencement of the delivery of not less than 150 MMSCuFD of Wet Gas to the Site as set forth as Phase 1 in Appendix A

    (ii)    P&ID shall transfer to the Government or its nominee a further five percent (5%) of the Equity of P&ID the said Equity to be transferred pro rata as the delivery of the remaining 250 MMSCuFD is successfully implemented as set forth as Phase 2 in Appendix A.

    (iii)    All of the Equity to be transferred under this Article 8 (f) shall consist of fully paid Ordinary Shares free of all liens and charges and no sums whatsoever shall be payable by the Government in respect of the Equity so transferred.

f) Following the initial transfer of five percent (5%) Equity to the Government or its nominee as provided for at Article 8 (e) above no new shares whether Ordinary, Preference or otherwise may be issued without the written agreement of the Government such agreement not to be unreasonably withheld and the Government shall be entitled to representation on the Board of P&ID in proportion to the Equity held by the Government at any given time.

g) The Parties are aware that the 24inch Adanga pipeline presently  under construction from the Addax operated OML 123 directly to  Calabar and due for completion in 2010 will have a throughput capacity of 600 MMSCUFD and can adequately provide the required first delivery of 150 MMSCuFD of Wet Gas to the Site and that an additional pipeline of up to 70km in length may be required to link up to the Adanga pipeline in order to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas to the Site from other sources to be



chosen by the Government. It such a requirement is necessary, P&ID undertakes to build and install the said additional pipeline to provide for the delivery of the remaining 250 MMSCuFD of Wt Gas to the Site, at no cost to the Government, and P&ID will retain the ownership and provide the maintenance for the pipeline.

h) P&ID shall enjoy Pioneer Status with no import duties, clearance charges or taxes payable within Nigeria in respect of all equipment and materials utilised in the construction and commissioning of the GPFs and with no taxes payable in respect ot the operation of the  GPFs for a period of five (5) years from the commencement of commercial operations at the GPFs.

i) The Government will actively support the designation of the Project    as a CDM Project and P&ID will take all necessary steps to achieve such designation. All earnings or revenues arising from the Project status as a CDM Project will accrue 50% (fifty percent) to P&ID and 50 (fifty percent) to the Government.

9.     **JOINT OPERATING COMMITTEE**

a)     The Joint Operating Committee (JOC) established by the Parties under the previous Memorandum of Understanding dated 22nd July 2009 and comprising of two representatives from the Ministry of Petroleum Resources and two representatives from NNPC nominated by the Government and two representatives nominated by P&ID, shall meet at regular intervals during the Project implementation period to discuss in detaii the implementation progress of the Project. Where deemed necessary by any JOC member of the Government or P&ID shall nominate such other expert support from other agencies as may be necessary to ensure that Project timelines are maintained.

b)     The JOC shall carry out further activities as may be determined by the Parties.

c)     Any cost that may accrue from the JOC activities shall be borne equaliy by the Parties.

10.     **NIGERIAN CONTENT**

a)     The Nigerian content of project development, construction and operation shall be maximised to the extent reasonably possible without detracting from the fastrack implementation schedule.

11. **FORCE MAJEURE**

    a)   Any failure or delay on the part of either Party in the performance of its obligations or duties under this Agreement, shall be excused to the extent attributable to force majeure save for obligations to pay sums due and payable. A force majeure situation includes delays, defaults or inability to perform under this Agreement due to any event beyond the reasonable control of either Party. Such event may be, but is not limited to, any act, event, happening, or occurrence due to natural causes, acts or perils of navigation, fire, hostilities, war (declared or undeclared), blockage, labour disturbances, strikes, riots, insurrection, civil commotion, quarantine restrictions, epidemics, storms, floods, earthquakes, accidents, blowouts, lightning, and, acts of or orders of the Government. If activities under this Agreement are delayed, curtailed or prevented by force majeure, then the time for carrying out the obligation and duties thereby affected, and rights and obligations hereunder, shall be extended for a period equal to the period of such delay.

    b)   The Party who is unable to perform its obligations as a result of the force majeure event shall promptly notify the other Party thereof not later than forty-eight (48) hours after becoming aware of the establishment of the force majeure event, stating the cause, and both Parties shall do all that is reasonably within their powers to remove such cause.

12. **CONFIDENTIALITY**

Each of the Parties, their employees, agents and representatives hereby undertake that they shall not, whether during the period of this Agreement or at any time after the expiration or termination thereof, disclose any information acquired by it, from or through the other Party (either directly or indirectly, oral or written) to any person, firm or company. Such information shall include all information, data, designs, drawings, computer programmes, recordings, writings, correspondences and any other technical, commercial or operational information relating to the other Party's business and activities or any of its Affiliate companies ("Confidential Information").

The above provisions shall not extend to information which:

(i)    Prior to the time of disclosure or acquisition has become lawfully in the public domain or was obtained by the Party disclosing it without any confidentiality obligations, or was obtained from a third party who is lawfully entitled to be in possession of such information;

(ii)    Any Party shall disclose, where such disclosure is demanded by an order of a court of competent jurisdiction, or a tax authority, or a lawfully constituted commission of inquiry, provided that prior to making such disclosure, written notification of the demand received by such Party has been given to the other Party and thereafter the Party being compelled to make the disclosure can do so.

## 13.   PROPRIETARY INFORMATION

(i)    All intellectual property and other proprietary rights in and to the Proprietary Information shall be the joint property of the Parties;

(ii)    The Parties and their Affiliates shall only be entitled to use the Proprietary Information in the evaluation, pursuit and development of the project and for no other purpose.

(iii)    The Parties agree that Proprietary information shall be confidential and that no Party or its Affiliates shall use, copy, sell, trade, publish or otherwise disclose the Proprietary information to anyone save as otherwise provided in this Agreement or with the written approval of the other Party. Notwithstanding the foregoing, a Party may disclose Proprietary information if and to the extent:

(a)    that such information is already in the public domain, other than as a result of a breach of the obligation with respect to Proprietary information and Confidential information under this Agreement by any of the Parties;

(b)    required to be disclosed under applicable laws including rules of applicable stock exchange, tax authority, Governmental authorities or courts or competent panel of enquiry;

Page 12 of 19

    (c)   such disclosure is to be made to its Affiliates and the directors agents, officers and employees of the Party and their Affiliates; and

    (d)   such disclosure to professional advisers and consultants of any Party and its Affiliates on a need to know basis.

## 14. INDEMNITY

Each Party shall be responsible for any claims made by or injury to its representative(s) and in respect of damage to such Party's property while such representative is providing services arising from the activities under this Agreement. In that regard, each Party agrees to indemnify, defend and hold harmless the other Party from and against any claims, or causes of action arising out of or in connection with such personal injury or damage to property.

## 15. CHANGES TO AGREEMENT

No amendments, modifications or changes to this Agreement shall be valid unless approved in writing by both Parties.

## 16. ASSIGNMENT

Either Party may assign its rights and obligations to an Affiliate as defined in this Agreement or to a designated financial institution where such an assignment comprises an integral constituent element of the financing structure of the Project but assignment to a non-affiliate shall not be permitted without the written consent of the other party such consent not to be unreasonably withheld but in all cases of assignment the assignor shall not be released of any of its liabilities and responsibilities under this Agreement.

## 17. THIRD PARTIES

a)   This Agreement is intended for the Parties hereto, and nothing contained in this Agreement shall be construed to create any duty to, standard of care with reference to, or rights in any person not a Party to this Agreement. This Agreement shall not confer any right to any third party claiming the right to entitlement or benefits under this Agreement.

Page 13 of 19

b)   No Partnership: None of the provisions of this Agreement shall be deemed to constitute a Partnership between the Parties, and no Party shall have the authority to bind or shall be deemed to be the agent of the other Parties in any way.

## 18.   LANGUAGE

The language for the purposes of administering this Agreement shall be English.

## 19.   WRITTEN PRESS RELEASES

The Parties shall consult, coordinate and agree on the release of any written press releases, announcements or responses to media enquiries concerning this Agreement in advance of any such announcement. If a Party or its Affiliate wishes to issue or make a press release, it shall not do so unless prior to its release, such Party furnishes to the other Party a copy of such press release for its review and written approval (which approval shall not be unreasonably withheld).

The Party shall provide a copy of such press release and related background information to the other Party within a minimum of seven (7) days, if practical, but in any event not less than seventy-two (72) hours, prior to its planned release.

## 20.   APPLICABLE LAW and DISPUTE RESOLUTION

The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.

The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal. In the event that the arbitrators do not agree on the



Page 14 of 19

appointment of such third arbitrator within the aforementioned fifteen (15) days, or any extension of such deadline that the Parties may mutually agree, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce ("ICC") in accordance with the relevant ICC rules on the application of either Party (notice of the intention to apply having been duly issued to the other) and, when appointed, the third arbitrator shall convene meetings of the arbitration panel, act as chairman thereof and decide the differences or dispute should the arbitrators fail to reach a unanimous decision. No arbitrator shall be appointed if such person has been employed or contracted by either of the Parties or their respective Affiliates within five (5) years prior to the notice of arbitration.

When an arbitrator refuses or neglects to act, or is incapable of acting or dies, a new arbitrator shall be appointed in his place and the above provisions of appointing arbitrators shall, mutatis mutandis, govern the appointment of such arbitrator.

The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties. The costs of the arbitration shall be borne equally by the Parties. Each Party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language.

The Parties shall agree to appropriate arbitration terms to exclusively resolve any disputes arising between them from this Agreement.

21.  **ENTIRE UNDERSTANDING**

This Agreement including Appendix A and Appendix B comprises the full and complete understanding of the Parties hereto with respect to all the matters addressed in this Agreement and the said Appendix A and Appendix B shall form an integral part of this Agreement.

22.  **WARRANTIES**

Each Party represents and warrants that it has the right and authority to enter into this Agreement and to perform and observe all of its

Page 15 of 19

obligations under this Agreement and that the execution, delivery and performance of this Agreement has been duly and validly authorised by all necessary corporate or other action, and that by entering into this Agreement, it will not violate, conflict with, or cause a material default under any other contract, agreement, indenture, decree, judgement, undertaking, conveyance, lien, or encumbrance to which it is a party or by which it may become subject.

23.  **NOTICES**

Any notice, request, demand or other correspondence required under this Agreement or any notice which either Party may desire to give to the other Party shall be in writing and shall be hand-delivered, sent by facsimile, or similar means of delivery to the Party intended to receive the same, as the case may be, and shall be effective upon receipt at the following addresses:

**If to Government:** Honourable Minister of Petroleum Resources
NNPC Towers
Herbert Macaulay Way
Abuja, Nigeria

**If to: Process and Industrial Developments Limited (P&ID)**

The Chairman
Process and Industrial Developments Limited
15B Buchanan Crescent,
Off Aminu Kano Crescent
Wuse II, Abuja
FCT, Nigeria

Attention: Mr. Neil C. Hitchcock, Projects Director

**IN WITNESS** whereof the Parties have executed this AGREEMENT by their duly authorised signatories effective the day and year first above written:

**SIGNED, SEALED AND DELIVERED**

By the within named .............................................................

**HON. MINISTER OF PETROLEUM RESOURG**

In the presence of:

Name: ...... GRACE  E. O. TAIGA ..............

Address: MINISTRY  OF  PETROLEUM  RESOURCES

Occupation: ...... DIRECTOR  LEGAL ..................

Signature: ..............................................

**SIGNED, SEALED AND DELIVERED**

By the within named .............................................................

**PROCESS AND INDUSTRIAL DEVELOPMENTS LTD**

In the presence of:

Name: ...... MUHAMMAD  KUCHAZI ..............

Address: ...43  MADEIRA  ST.  IMANI ESTATE  MAITAMA  ABUJA

Occupation: ...... BUSINESS ......................

Signature: ..............................................

Page **17** of **19**

# APPENDIX A

**Delivery of Wet Gas to P&ID**

Phase 1    During or before the last quarter of 2011 a continuous supply of 150 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

Phase 2    On or before the third quarter of 2012 a further additional continuous supply of 250 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

**Delivery of Lean Gas to the Government**

Phase 1    During the last quarter of 2011 following supply of the 150 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.

Phase 2    On or before the third quarter of 2012 following supply of the additional 250 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site boundary, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.



*Ministry of Petroleum Resources*

# APPENDIX B

## SCHEDULE OF WORK

*Ministry of Petroleum Resources*