# EXHIBIT 3

## IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND & WALES)

## AND

## IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:-

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

**Claimant**

- and -

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

**Respondent**

---

## STATEMENT OF CASE

---

*The Parties*

1.      The Claimant ("P&ID") is an engineering and project management company registered at Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British Virgin Islands with a Nigerian office at 12 Vaal Street, off Rhine Street, Ministers Hill, Maitama, Abuja.

2.      P&ID is represented in this arbitration by Harcus Sinclair, 3 Lincoln's Inn Fields, London WC2A 3AA, United Kingdom.

3.      The Respondent ("the Government" or "the Ministry") is a Ministry of the Federal Government of the Federal Republic of Nigeria whose office address is at 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria.   For all purposes material to this arbitration, the Government was represented by and acted through the Minister of Petroleum Resources ("the Minister").

4.     The Government is represented in this arbitration by Ajumogobia & Okeke, 2nd Floor, Sterling Towers, 20 Marina, Lagos, Nigeria.

*The Arbitration Agreement*

5.     P&ID brings this claim under a Gas Supply and Processing Agreement for Accelerated Gas Development dated 11 January 2010 ("the Definitive Agreement").   A copy of the Definitive Agreement appears at Exhibit C-1 hereto.

6.     Article 20 of the Definitive Agreement contains the arbitration agreement.   It provides (so far as may now be presently relevant):

"*The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. ...*

*The venue of the arbitration shall be London, England ....*"

7.     As will be made clear in the submissions to follow, a difference or dispute concerning the performance of the Definitive Agreement has arisen between the parties.   Further details of that dispute, and the unsuccessful efforts that P&ID has made to settle the dispute amicably, are given below.

*Applicable Law*

8.     Article 20 of the Definitive Agreement further provides that the Definitive Agreement "*shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.*"

*Summary of the Claim*

9.     There are two distinct types of Natural Gas [1] with which this arbitration is concerned, both of which occur within conventional oil fields:

---

[1] *"Natural Gas" is used in this Statement of Claim to mean the mixture of hydrocarbon gases that occurs with petroleum deposits, principally Methane together with varying quantities of Ethane, Propane, Butane, and other gases.*

9.1   "Associated Gas" (or Wet Gas) is the Natural Gas which escapes from an oil well during the process of extraction of the oil. Associated Gas contains, in addition to Methane and Ethane, quantities of Natural Gas Liquids ("NGLs"), principally Propane, Butane and Condensates;

9.2   "Non-Associated Gas" (or Lean Gas) is the Natural Gas which exists in other parts of a typical oilfield and is not associated with oil production[2].

10.   The principal difference of relevance to the arbitration is that Non-Associated Gas, the principal constituents of which are Methane and Ethane, is suitable as a fuel for power generation, whereas Associated Gas, which, as stated above, contains NGLs, is not suitable for power generation. Lean Gas, suitable for power generation, can be produced by stripping the NGLs from Associated Gas.

11.   The objective of the Definitive Agreement was for P&ID to construct and operate a gas processing facility in the Calabar region of Nigeria in order to refine Associated Gas so that the Methane/Ethane content of the Associated Gas (the Lean Gas) could be used for power generation to supplement the National Grid ("the Project").

12.   The Government was to supply to P&ID Wet Gas via a Government pipeline to the proposed P&ID production facility at no cost. P&ID was, at no cost to the Government, to construct and operate the facility necessary to process the Wet Gas by removing the NGLs contained within it and to return the remainder at no cost to the Government as Lean Gas suitable for use in power generation.

13.   P&ID was to be entitled to dispose of the NGLs stripped from the Wet Gas as it chose and this was to constitute its remuneration for performing the Definitive Agreement.

14.   The Definitive Agreement was to run for 20 years from the date of first regular supply of gas by the Government and was to proceed in two phases: Phase 1 envisaged the continuous supply by the Government of 150 MMSCuFD[3] of Wet

---

[2] "Wet gas" was defined in the Definitive Agreement as "associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site", and "Lean Gas" was defined as "pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane": art. 1. The mol or mole percent of a substance in a mixture is the quantity of moles of that substance as a percentage of the total number of moles in the mixture. A mole is the base unit of an amount in a substance.
[3] Millions of standard cubic feet per day.

Gas by the end of 2011; Phase 2 envisaged the continuous supply by the Government of a further 250 MMSCuFD by the end of September 2012.

15.     Subsequent to the signing of the Definitive Agreement P&ID incurred significant costs in its attempts to implement the Project.

16.     Notwithstanding its obligation to source and supply the contractual quantities of Associated Gas to P&ID, the Government has failed to source and supply any Associated Gas to P&ID.

17.     After numerous meetings and attempts to resolve matters amicably, P&ID terminated the Definitive Agreement on account of the Government's repudiatory breaches thereof on 20 March 2013. P&ID now seeks to recover in this arbitration the losses it has incurred as a result of the Government's conduct, specifically the net profits it would have earned had the Definitive Agreement been performed.

*Background to the Definitive Agreement*

18.     There is and has been for some years an acute shortage of electricity to power Nigeria's economy. Nigeria does have a number of Natural Gas-fuelled power generating stations, built at substantial cost, but has not been able to supply sufficient Natural Gas for domestic electricity production. Power is available only approximately 40% of the time from the Nigerian National Grid and as a result the potential growth of the economy of Nigeria is severely handicapped.

19.     In May 2008 President Yar'Adua stated publicly that Natural Gas was of critical importance to the national economy, and that Nigeria was unlikely to generate enough electricity for its population until at least 2015[4]. In fact electricity production has remained between approximately 2,000 and 4,000 MW per annum since then[5]. This is far below Nigeria's requirements[6], notwithstanding that Nigeria has the eighth largest Natural Gas reserves in the world at over 5 trillion m³ (as stated by OPEC).

---

[4] *BBC News online article, 30 May 2008*
[5] *According to World Bank statistics Nigeria produced 2,111 MW of electricity in 2008, 1,977 MW in 2009 and 2,612 MW in 2010.*
[6] *A Reuters article in May 2013 reported potential demand of 140,000 megawatts and rising, and noted that "Despite being Africa's top oil producer and holding the world's ninth largest gas reserves, Nigeria's power output is a tenth of South Africa's for a population three times the size"*

20.     There are two main reasons why Nigeria's reserves of Natural Gas are not adequately applied to the Nigerian domestic power grid to produce much-needed electricity for industrial and domestic usage:

  20.1    Historically the large International Oil Companies ("IOCs") have shown little interest in the natural gas which sits alongside the oil inside their respective oil concessions. It has been far more profitable to focus on extraction and export of the oil. Such Natural Gas as has been released as a by-product of the extraction of oil ( the Associated Gas) has by and large simply been allowed to burn into the atmosphere, a process known as "flaring" [7]. Flaring is now technically outlawed but continues regardless: the official website of the National Petroleum  Investment Management Services[8] ("NAPIMS") states that currently about 63% of Associated Gas produced in Nigeria is being flared;

  20.2    To the extent that the IOCs have shown an interest in extracting Associated Gas as a product separate from oil, it is far more profitable for them to freeze the Methane and Ethane content of the gas and convert it into Liquid Natural Gas ("LNG"), in which form it can be transported by sea and sold on the international LNG markets for a better price than could be achieved domestically. In 1998 a consortium of IOCs in conjunction with the National Nigerian Petroleum Corporation ("NNPC"), which is the owner of all of Nigeria's petroleum resources, set up a US$6 billion LNG production facility in Nigeria to process Lean Gas into liquid form for export.

21.     The profits on these exports of LNG are substantial and no doubt this is why so relatively little Lean Gas makes its way to the domestic market for industrial power generation and domestic usage. The current exports of LNG are in excess of 22 million metric tonnes per annum, just 10% of which could almost double the present domestic power output.

22.     This is despite the fact that, under the terms of the relevant concession agreements between the Nigerian Government and the respective IOCs, the Nigerian Government has the right to the majority of the Natural Gas within Nigeria, whether Associated or Non-Associated.

---

[7] *Associated Gas has also sometimes been "re-injected" by the IOCs in order to maintain or increase the pressure inside an oil well. The process of reinjection allows some, but not all, of the re-injected gas to be extracted later.*
[8] *A subsidiary of the National Nigerian Petroleum Corporation charged with the responsibility of managing investment in the upstream sector of the Nigerian oil and gas industry.*

23. Such concession agreements are of two main types:

    23.1 Joint Ventures between the Nigerian Government and an IOC, pursuant to which, traditionally, the Nigerian Government would take a majority interest of between 50 and 60%, and the joint venturers would share the costs and profits according to their percentage ownership of the joint venture; and

    23.2 Production Sharing Contracts ("PSCs"), pursuant to which a PSC contractor will typically bear the cost of development, and in return will be entitled to a share of the oil thereby produced or the revenue therefrom.

24. In the case of a joint venture, the Government will typically be entitled to the relevant percentage of the Natural Gas in the oilfield. In the case of a PSC, the Government will typically be entitled to all of the Natural Gas in the oilfield.

25. Overall the Government is entitled to approximately 57% of all Natural Gas in Nigeria.

*P&ID*

26. P&ID is an engineering and project management company incorporated in the British Virgin Islands on 30 May 2006 with the principal objective of undertaking and participating in the development of the Nigerian gas industry including the production of petrochemicals and, in particular, in relation to power generation.

27. The founding principals of P&ID have been engaged in major engineering projects in Nigeria for more than 30 years in a wide variety of sectors, including the fields of oil and gas, and have accumulated a great deal of specialised engineering, design and detailed process planning knowledge and expertise for a variety of gas processing technologies.

28. Against the background of power shortages and flaring of Associated Gas in Nigeria by the IOCs, described above, the principals of P&ID perceived an opportunity for a project which would take a quantity of the otherwise wasted Associated Gas, construct in Nigeria a state-of-the-art gas stripping plant to remove the NGLs, and return Lean Gas to the Government in a state suitable for power generation. P&ID would not charge the Nigerian Government for the

Lean Gas thereby produced, or for the very substantial cost of the necessary infrastructure. P&ID's revenue would come from the sale by P&ID of the NGLs harvested from the Associated Gas. This was to be an accelerated (or "Fast Track") project.

29.     In addition:

29.1    The Nigerian Government would be able to sell the Lean Gas thereby produced to domestic and business consumers in Nigeria at a minimum subsidized price of approximately US$2.00 per MMBtu[9]. This would result in revenues to the Government over the 20 year life span of the Project of approximately US$5 billion[10] arising from the delivery to them of 340 MMSCuFD of Lean Gas refined from Associated Gas which is currently producing no revenue for the Nigerian Government because it is being flared; and

29.2    The power output available to the Nigerian economy would be boosted by over 2,000 megawatts, with the attendant increase in Government revenue.

30.     In or about 2008 P&ID identified a suitable site at Calabar, in the South East of Nigeria, for the implementation of the Project. Off the coast of Nigeria near Calabar, within a distance of 154 km, are the fields of 2 substantial offshore oil concessions, being Oil Mining Lease ("OML") 123, and OML 67. Exxon Mobil is the operator of OML 67, and Addax Petroleum ("Addax") is the operator of OML 123.

31.     On 7 August 2008 P&ID presented a proposal to the late President Yar'Adua (who was also acting Minister for Petroleum Resources at that time) asking him to consider a fast track solution towards the provision of enough Lean Gas to create an additional 2,165 megawatts for the National Grid within a three year period at no monetary cost to the State.

32.     The proposal envisaged that 400 MMSCuFD of Wet Gas from OML 123 operated by Addax and OML 67 operated by Exxon Mobil, or other sources, which were at the time, and still are, simply being flared, would be processed by P&ID, who would strip the NGLs from the gas for its own use and make the

_____

[9] *One Million British Thermal Units, a traditional unit of energy.*
[10] *Using an approximate conversion rate of 1 cubic foot to 1,000 British Thermal Units.*

resultant Lean Gas (340 MMSCuFD) available in Calabar to the Government, free of charge.

33.     Pursuant to the proposal, all of the investment to create the infrastructure for the Gas Processing Facilities ("GPFs") to achieve this goal would be provided by P&ID which would gain a return on this investment from the sale of NGLs removed at Calabar from the Associated Gas provided by the Government which was otherwise being flared.

34.     The Project would take three years to complete and would be constructed in two 200 MMSCuFD phases, with the 150 MMSCuFD gas from Addax Petroleum in OML 123 or other sources coming on stream first within a two year period and the 250 MMSCuFD of gas from Exxon Mobil in OML 67 or other sources coming on stream one year later.

35.     The initial proposal envisaged the addition of a propylene plant to process, in Calabar, the Propane to be stripped from the Associated Gas by the GPFs. This part of the proposal, which was not essential to the stripping of the Associated Gas and the delivery to the Government of Lean Gas free of charge, was in the event deferred by P&ID as the Ministry felt that it might delay the construction of the GPFs.

36.     On 18 December 2008 Dr Rilwanu Lukman, a former Secretary General of OPEC[11], was appointed Minister of Petroleum Resources by President Yar'Dua. Dr Lukman was aware of the oil and gas sector construction expertise of the principals of P&ID due to their leading role in the "Butanization Project", some 15 years previously, pursuant to which a manufacturing facility had been established by them in Lagos, for the first time in Nigeria, to engineer pressurised vessels capable of storing Liquid Petroleum Gas (Butane and Propane) for distribution and installation in various retail depot locations throughout Nigeria. Dr Lukman had been responsible for the Butanization Project in his capacity as Special Adviser to the President on Petroleum and Energy Matters and Chairman of NNPC.

37.     The President directed that P&ID's proposal be examined by the Ministry of Petroleum Resources. The Technical Working Team to the Ministry duly reviewed the proposal.

---

[11] *Dr Lukman, who is also a Knight of the British Empire, an Officer of the Legion d'Honneur of France, and a Fellow of Imperial College London, was and remains a leading expert in the problems of gas flaring and power production in Nigeria.*

38.   Following several meetings and exchanges of information, on 22 July 2009 a Memorandum of Understanding was executed by the Minister, Dr Rilwanu Lukman, and P&ID.

39.   The Ministry requested that the Memorandum of Understanding, at Articles 2, 3 b. and 7 (a), should include "two process streams", meaning that the GPFs to be constructed by P&ID would now entail 2 separate and distinct lines of production within the constructed facilities, such that if either stream were to be interrupted, the other production line within the GPFs would continue to supply Lean Gas to the Government.

40.   P&ID commenced making all arrangements necessary to expedite the immediate implementation of the Project. A Joint Operating Committee was set up, in accordance with Article 8 of the Memorandum of Understanding.

41.   The Ministry approached Addax to commence discussions as to access to the target fields within OML123. A stakeholders' meeting, involving Addax and P&ID as well as the Ministry, was held on 23 September 2009.

42.   A further stakeholder's meeting was convened by the Minister for 24 November 2009, in order "*to review the actions taken so far by all stakeholders*".

43.   In 2008, when P&ID first approached the President, the Government had already awarded a contract for the construction of a 24 inch pipeline from OML123 at Adanga to Calabar in Cross River State ("the Adanga Pipeline"). The Adanga Pipeline would be able to transfer the Wet Gas from OML 123 to Calabar for processing at the GPFs to be built there by P&ID.

44.   In order for the Wet Gas within the fields of OML 67 to be accessed, a further pipeline would be required to extend the Adanga Pipeline to OML 67 or other sources.

45.   On 8 December 2009, at Ministry's request, an associate company of P&ID, Industrial Consultants (International) Limited ("ICIL") provided to the Ministry a Letter of Comfort recording stating that:

45.1   The Adanga Pipeline with a throughput capacity of up to 600 MMSCuFD was "*presently being constructed*" by the Government from the Addax Field at OML 123 to Calabar, and would be completed in the second quarter of 2010, which would enable the Government to deliver the first 150 MMSCuFD of Wet Gas to the designated site at Calabar;

45.2    A further pipeline would be required to access and transport the remaining 250 MMSCuFD to join up the Adanga Pipeline;

45.3    ICIL had entered into a contractual arrangements with P&ID whereby ICIL would provide the finance for the installation of a further pipeline of up to 70 km in length and of sufficient size to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas from the sources chosen by the Government to link up with the Adanga Pipeline and deliver the Wet Gas to the designated site at Calabar subject to the execution of the proposed contract between the Government and P&ID; and

45.4    The Letter of Comfort would come into effect immediately upon the execution of the proposed Contract, and would remain operative for a period of three years thereafter, or until the completion of the installation of the additional pipeline for the transmission of the 250 MMSCuFD of Wet Gas to the designated sites, whichever was the soonest.

46.    Shortly thereafter, on 11 January 2010, and following further discussions between the Parties, a Definitive Agreement was signed with P&ID by the then Minister Dr Rilwanu Lukman on behalf of the Nigerian Government.

*The Express Terms of the Definitive Agreement*

47.    P&ID will rely on the full terms of the Definitive Agreement. It is sufficient for present purposes, however, to summarise the key elements.

48.    It was the responsibility of the Government:

48.1    to ensure that all necessary pipelines and infrastructure were installed and that all requisite arrangements with agencies and/or third parties were in place to ensure the supply and delivery of the Wet Gas so as to facilitate the timely implementation of gas processing by the GPFs as provided for in the Definitive Agreement: Article 6 (b); and

48.2    to deliver the agreed quantities and quality of Wet Gas to the Site boundary at no cost to P&ID: Articles 6(a) and 8(a).

49.    P&ID was to use its best endeavours "*to ensure the fasttrack implementation of this Project*" and thereafter to maintain and operate the GPFs on a professional basis so as to ensure a regular supply of Lean Gas to the Government for power generation at no cost to the Government: Articles 7(a) and 8(b).

50.    The scope of works to be performed under the Definitive Agreement was defined in Article 3 and Appendix A as follows:

    50.1    P&ID was to construct GPFs on "*the Site*" (land to be allocated to them in Calabar by the Cross Rivers State Government) with related ancillary on- and off-shore plant and equipment with capacity to receive and process 400 MMSCuFD of Wet Gas and to return approximately 85% by volume of that gas (i.e. 340 MMSCuFD) as Lean Gas to the Government at the Site boundary;

    50.2    The Government was to make available to P&ID at the Site boundary 400 MMSCuFD of Wet Gas (free of water) having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8% mol from OMLs 123 and 67 or such other locations as the Government might decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of the Definitive Agreement;

    50.3    The supply, processing and return of the gas was to take place in two phases. Phase 1 required the continuous supply by the Government to the Site of 150 MMSCuFD of Wet Gas "*during or before the last quarter of 2011*". Phase 2 required the continuous supply by the Government to the Site of a further 250 MMSCuFD of Wet Gas "*on or before the third quarter of 2012*". P&ID was to process the Wet Gas received and return the corresponding quantity of Lean Gas to the Government at the Site boundary.

51.    The Agreement came into being on the date of signature, being 11 January 2010, and was to remain in force for 20 years "*commencing on the date on which the Government commenced the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site*" ("*the Start Date*"), unless extended by agreement, or if P&ID's capital costs had not yet been recouped, whichever was the latest (Article 5).

52.    The Government was to retain title to and ownership of the gas at all times, however, the NGLs removed from the Wet Gas were to be retained by P&ID and were to be deemed to be its sole property either to be sold by it domestically or exported (Article 8 (c)).

53.     The GPFs were to be the sole property of P&ID and it was entitled to sell or otherwise dispose of them subject to the Government having a first right of refusal (Article 8 (d)).

54.     Article 8(g) stipulated that the parties were aware that "*the 24inch Adanga pipeline presently under construction from the Addax operated OML 123 directly to Calabar and due for completion in 2010*" would have sufficient throughput capacity to provide for delivery of the Phase 1 Wet Gas to the Site. Article 8(g) further stipulated that, if an additional pipeline of up to 70km was required to link the Adanga pipeline to facilitate delivery of the Phase 2 Wet Gas to the Site "*from other sources to be chosen by the Government*", P&ID undertook to build and install the additional pipeline of up to 70 km at no cost to the Government.

55.     Article 8(h) granted P&ID "Pioneer Status" meaning that it would enjoy tax-free status in Nigeria for the Project in relation to the provision of equipment and materials and as operators for the first five years of operations.

*Events following the signing of the Definitive Agreement*

56.     The day after the signing of the Definitive Agreement, P&ID wrote to the Minister to inform him that P&ID wished to commence work at once, and wished "*to put in place all necessary modalities as soon as possible, with both Addax and Exxon Mobil, in order to ensure the timely delivery of the currently flared Wet Gas for the project*". Accordingly, P&ID requested the support and co-operation of NNPC, NAPIMS, and the Director of Petroleum Resources to assist in finalising these arrangements with the oil companies.

57.     On 15 January 2010, shortly after execution of the Definitive Agreement, the Legal Director of the Ministry forwarded a copy thereof to the Director of the Department of Petroleum Resources ("DPR"), recording that the Minister, Dr Rilwanu Lukman, had approved the agreement, and directing the DPR to "*ensure implementation*".

58.     On the same day, the Legal Director of the Ministry sent a copy of the Definitive Agreement to the Group General Manager of NAPIMS, and indicated to the Group General Manager of NAPIMS that the Minister had approved the Agreement.

59.     A stakeholders' meeting took place on 9 February 2010, chaired by the Minister.

60.    On 17 February 2010 a copy of the Definitive Agreement was sent once again to the Director of the Department of Petroleum Resources by the Legal Director of the Ministry, requesting that he should comment upon the Definitive Agreement with a view to its implementation with the relevant IOCs.

61.    On 14 May 2010, P&ID wrote to NNPC to update it on what had been achieved in respect of, among other things, project financing, completion of engineering designs and the allocation of land. P&ID requested NNPC to authorise NAPIMS to oversee the arrangements between P&ID and Addax in order to ensure the successful and timely implementation of the Project.

62.    NNPC so instructed NAPIMS.

63.    NAPIMS failed to make headway with Addax and the Ministry then convened a meeting on 10 August 2010 to resolve matters. The meeting was chaired by the Permanent Secretary of the Ministry (see Annex 4) and was attended by representatives of P&ID, NAPIMS and NNPC, among others.

64.    The Permanent Secretary directed that NAPIMS and Addax were to "*re-commit themselves to the Project and to ensure that the Project [was] expedited*".

65.    To that end, the Permanent Secretary directed that NAPIMS should:

65.1    issue a letter of undertaking to P&ID confirming that 150 MMSCuFD of Associated Wet Gas from OML 123 would be made available to P&ID "*in conformity with the Government's obligations under the terms of the Definitive Agreement*"; and

65.2    obtain a letter of undertaking from Addax confirming that 150 MMSCuFD of Associated Wet Gas from OML 123 would be made available to P&ID.

These letters were to be provided "*forthwith*" and prior to any agreement on technical matters and/or any necessary Government approvals or authorisations.

66.    Accordingly NAPIMS was instructed by the Ministry on 18 October and again on 9 November 2010 to issue a letter of undertaking to P&ID, and to obtain a letter of undertaking from Addax, confirming that 150 MMSCuFD of Wet Gas from OML 123 be made available to P&ID in conformity with the Government's obligations under the terms of the Definitive Agreement.

67.     Neither letter of undertaking was ever provided to P&ID.

68.     In the meantime, the site for the on-shore plant at Calabar had been selected and secured from the Government of Cross River State for the construction of the GPFs and gas storage facilities. On 16 February 2010 approval was granted to P&ID for the allocation of Parcels 1 & 2 of the Energy City (Industrial) at Adiabo in Odukpani Local Government Area, containing an area of about 50.662 hectares of land, for the industrial use of P&ID.

69.     On 10 March 2011 P&ID wrote to the Group Managing Director of NNPC to solicit his assistance in expediting the implementation of the Definitive Agreement. P&ID pointed out, *inter alia*, that it was unable to finalise a number of critical decisions in relation to engineering and plant issues until the modalities of the gas supply arrangements, including final gas composition, had been more clearly defined and resolved.

70.     At this point, and as at the date of this Statement of Claim, the Adanga Pipeline had not, in fact, been completed by the Government, as had been envisaged at the time of the Definitive Agreement.

71.     Subsequent to its letter of 10 March 2011, P&ID discovered that Addax was unable to supply the required amount of 150 million MMSCuFD of Associated Gas from OML 123, because of Addax's need to use 50 MMSCuFD of Associated Gas for reinjection in OML 123, and that Addax had informed NAPIMS of this during a meeting on 2 December 2010. According to Addax, it was only in a position to supply 100 MMSCuFD of currently flared Associated Gas to P&ID from OML 123.

72.     At the meeting of 2 December 2010 Addax had also suggested to NAPIMS that it would be willing to open a Non-Associated Gas well from within OML 123. This would have been of no benefit to P&ID, as under the Definitive Agreement its remuneration consisted entirely of the NGLs to be found only within Associated Gas.

73.     In an effort to resolve the Addax problem, P&ID indicated to NNPC in a letter dated 21 April 2011 that it would be prepared in principle to contemplate a deviation from Phase 1 of the Definitive Agreement that would allow Addax to re-inject 50 million MMSCuFD of Lean Gas into the oil reservoir at OML 123 instead of injecting Wet Gas for this purpose. This would entail a different method of achieving the Phase 1 Lean Gas supply to Government, as follows:

73.1    P&ID would strip the Associated Gas from OML 123, which P&ID understood to comprise approximately 180 MMSCuFD offshore, within the OML 123 field area, rather than onshore;

73.2    P&ID would return sufficient Lean Gas thereby produced to Addax to meet Addax's need for reinjection of 50 MMSCuFD of Gas into OML 123; and

73.3    P&ID would return the balance of the Lean Gas through the Adanga Pipeline to Calabar for the use of the Marubeni Power Plant or other industrial consumers chosen by the Government.

74.    This alternative proposal did not result in any variation to the Definitive Agreement.

75.    Subsequently, in about May 2011, P&ID was informed by Addax that the volume of Wet Gas available from OML 123 would reduce from 100 MMSCuFD to less than 45 MMSCuFD by 2016.

76.    P&ID engaged in extensive discussions with NNPC to try to find a practical and viable solution to the impasse. Arising from these efforts it was suggested by NNPC that, as there was a very significant and totally undeveloped Non-Associated Gas deposit in OML 123, P&ID should examine the possibility of adapting Phase 1 of the Project so as to process the Non-Associated Gas and thereby supply the Lean Gas to Government while still continuing with the Wet Gas from Phase 2.

77.    These efforts culminated in a meeting on 16 May 2012 between senior NNPC management headed by Dr David Ige, the Group Head of Gas of NNPC, and the senior managements of Addax and P&ID. At this meeting Addax formally confirmed that it would be prepared to supply the necessary Non-Associated Gas to P&ID as part of an amended project.

78.    Instead of achieving its remuneration from the NGLs harvested from Associated Gas, such a variation would have required that P&ID were remunerated in some other way for Phase 1. P&ID met Dr Ige on 18 May and 17 June 2011 respectively. Dr Ige explained that it would be possible for P&ID to be rewarded for supplying Lean Gas to the Government from Non-Associated, instead of Associated, Gas, during Phase 1, by receiving payment for the Lean Gas supplied at $2.00 per MMBtu from 2013 onwards instead of supplying it free of charge.

79.     Although such a variation would have entailed a radical departure from Phase 1 of the Definitive Agreement, and would inevitably have involved writing off much of the expenditures thus far invested, P&ID agreed in principle to examine immediately the feasibility of the Project amended in this way.

80.     However, in or about the final week of June 2012 Addax informed P&ID by way of a telephone call that even the possibility of P&ID using the Non-Associated Gas was no longer possible as Addax had now unilaterally decided to "*undertake the development of the NAG themselves*".

81.     On 27 June 2012 P&ID wrote to the Group Managing Director of NNPC to express its shock and dismay at the decision of Addax to withdraw its cooperation and support from the Project, and to undertake the development of the Non-Associated Gas on its own account. P&ID asked that immediate action be taken by NNPC to resolve the issues.

82.     In the absence of any signs of progress, on the 27 July 2012 P&ID wrote to the Ministry placing a time limit upon P&ID's continuing willingness to contemplate an alternative solution. The letter stated, inter alia: "*Therefore, P&ID's offer in principle to enter into an amendment [to the Definitive Agreement] will be regretfully withdrawn on 10 August 2012 if, by that time and date, no formal amendment has been agreed and executed between the Government and P&ID*"

83.     Again in the absence of any progress, P&ID wrote to the Minister on 22 August 2012 formally referring the dispute in relation to the performance of the Project to arbitration in accordance with Article 20 of the Definitive Agreement and on 19 September 2012 P&ID wrote to the Minister nominating its choice of Arbitrator.

84.     In response the Ministry wrote to P&ID on 19 September 2012 suggesting that the Arbitration was premature and proposing a stakeholders' meeting on 12 October 2012 at the office of the Ministry. P&ID accepted the invitation and attended the meeting.

85.     On the 14 January 2013 P&ID again wrote to the Ministry seeking, *inter alia*, that the Ministry procure certain undertakings and provide certain information on or before 28 February 2013 so as to enable P&ID to proceed with Phase 2 of the Project. P&ID further stated that in the event that the requested undertakings and information were not provided by the specified date then P&ID would

consider all of its options including accepting the Government's conduct as amounting to a repudiation of the Definitive Agreement.

86.     As no response was received, P&ID wrote to the Ministry on 20 March 2013 accepting the repudiation of the Definitive Agreement by the Ministry and terminating the Definitive Agreement.

*The Claim*

87.     The Government failed to meet its obligations:

87.1     under Phase 1 to provide a continuous supply of 150 MMSCuFD of Wet Gas to the Site boundary by the end of 2011; and

87.2     under Phase 2 to provide a continuous supply of a further 250 MMSCuFD of Wet Gas by the end of September 2012.

88.     The Government in fact provided no Wet Gas at all to the Site, nor did it identify or secure a source for the Wet Gas to be supplied to the Site.

89.     In particular, the Government failed to procure satisfactory binding commitments from the operators of OMLs 123 (Addax) and 67 (Exxon-Mobil) to make available the required quantities of Wet Gas or to identify and develop alternative sources of Wet Gas in order to fulfill its supply obligations under the Definitive Agreement.

90.     Furthermore, notwithstanding the obvious importance of the Adanga Pipeline to the Project, and the Government's obligation pursuant to the Definitive Agreement to ensure that all necessary pipelines and associated infrastructure were installed, the Government failed to procure the completion of the pipeline, which remains incomplete as at the date of this Statement of Claim.

91.     By reason of the failures identified, the Government was in breach of the Definitive Agreement.

92.     In January 2013, P&ID gave the Government a final opportunity to indicate its intention to perform the Definitive Agreement by 28 February 2013 and noted that if it did not do so, P&ID would consider itself entitled to terminate the Definitive Agreement. The Government did not take up that opportunity.

93.     By March 2013, at the latest, the Government's breaches of the Definitive Agreement were repudiatory in that they evidenced an unwillingness or inability

on the part of the Government to perform its fundamental obligations under the Definitive Agreement.

94.    P&ID was entitled to elect to treat the Government's conduct, including the breaches identified, as repudiatory, and as entitling it to terminate the Definitive Agreement. P&ID they terminated the Definitive Agreement by giving the Government written notice to that effect on 20 March 2013.

*P&ID's Losses*

95.    By reason of the Government's failure to perform the Definitive Agreement and P&ID's lawful termination of it, P&ID has suffered loss and damage. In particular, P&ID has been unable to earn the expected profits to be derived from the sale of the NGLs resulting from the processing of the Wet Gas to have been supplied by the Government.

96.    P&ID has calculated its loss of profits suffered in consequence of the Ministry's breach of contract as follows:

96.1    Phase 1: US$2,303,504,462

96.2    Phase 2: US$3,656,721,771

97.    The basis of calculation of these amounts is set out on the attached schedules for Phase 1 and Phase 2 respectively. In calculating its loss of profit, P&ID has made the following assumptions which it believes to be well founded and conservative:

97.1    Net Production (Metric Tonnes per Annum): The basis on which projected annual 'Net Production' of Propane, Butane and Condensate for Phase 1 and Phase 2 has been calculated, and is summarised in the two attached schedules 'Phase 1: Gas Analysis – 150 MMSCuFD Throughput – Contractual Composition Percentages' and 'Phase 2: Gas Analysis – 250 MMSCuFD Throughput – Contractual Composition Percentages';

97.2    Product Values (Metric Tonne): The projected 'Product Values' for Years 1 to 8 are based on reference prices and for Years 9 to 20 on Year 8 reference prices. From these projected amounts US$30 per tonne for shipping and a fixed 10% marketing expense provision have been deducted;

97.3 <u>Product Revenues</u>: Annual projected 'Product Revenues' have been calculated by multiplying 'Net Production (Metric Tonnes per Annum)' by 'Product Values (Metric Tonne)';

97.4 <u>Operating Costs (OPEX)</u>: Onshore OPEX, Offshore OPEX (inc. FBSO Charter) and Pipeline OPEX are estimated at US$49,225,600 per annum and have been apportioned between Phase 1 and Phase 2 on the basis of the respective contractual continuous supply to P&ID of Wet Gas (i.e., <u>Phase 1</u>: 150MMSCuFD / 400MMSCuFD x US$49,225,600 = US$18,459,600; and <u>Phase 2</u>: 250MMSCuFD / 400MMSCuFD x US$49,225,600 = US$30,766,000);

97.5 <u>Capital Expenditure (CAPEX)</u>: CAPEX is estimated at US$515,516,520 and has been apportioned between Phase 1 and Phase 2 on the basis of the respective contractual continuous supply to P&ID of Wet Gas (i.e., <u>Phase 1</u>: 150MMSCuFD / 400MMSCuFD x US$515,516,520 = US$193,318,695; and <u>Phase 2</u>: 250MMSCuFD / 400MMSCuFD x US$515,516,520 = US$322,197,825).

98. Further, P&ID claims interest on such sums as may be due at such rate and for such period as the Tribunal consider appropriate.

*Prayer for Relief*

99. For the reasons set out above, P&ID claims:

(1) Damages in the sum of US$5,960,226,233, or such other sum as the Tribunal may determine;

(2) Interest on such sums as are awarded at such rate and with such compounding as the Tribunal may determine;

(3) Interest on pre-award profits which would have been enjoyed by P&ID at such rate as the Tribunal deems appropriate;

(4) Further or other relief.

Harry Sinclair.

Served this 28th day of June 2013 by Harcus Sinclair, solicitors for the Claimant.