# EXHIBIT 5

<u>**IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND & WALES)**</u>

<u>**AND**</u>

<u>**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)**</u>

**BETWEEN:-**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

<u>**Claimant**</u>

**- and -**

**THE MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA**

<u>**Respondent**</u>

---

**FIRST WITNESS STATEMENT OF MICHAEL QUINN**

---

I, **MICHAEL QUINN**, of Process and Industrial Developments Limited ("P&ID"), whose registered address is Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British Virgin Islands, and whose office is at 12, Vaal Street, Off Rhine Street, Ministers Hill, Maitama, Abuja, FCT, Nigeria, WILL SAY as follows:

**Introduction**

1.      I am the Chairman of the Claimant, P&ID. I make this witness statement in support of P&ID's arbitration commenced by a Request for Arbitration dated 22 August 2012.

2.      By its Request for Arbitration P&ID claims damages for loss of profit and/or other relief arising out of breach by the Ministry of Petroleum Resources of the Federal Republic of Nigeria ("the Government", or "the Ministry") of a Gas Supply and Processing Agreement dated 11 January 2012 ("the GSPA").

3.    I am fully authorised to make this statement in support of P&ID's claims in the arbitration commenced against the Government.  I make this statement on the basis of my own knowledge of the events I describe, whether that be from my direct participation in them or from discussing them contemporaneously with my colleagues, and in particular Neil Hitchcock, the Project Director of P&ID, and my business partner Brendan Cahill.

4.    The GSPA represented a substantial infrastructure project involving anticipated profits of $5 to $6 billion for P&ID over a 20 year period. It was the culmination of years of research by my team of engineers into the production of clean energy from natural gas. I believe that it was also a ground-breaking venture of great significance to the Nigerian economy which would have benefited millions of ordinary Nigerians by boosting the domestic electricity supply by the productive utilization of existing natural gas reserves.  Had the GSPA been implemented in accordance with its terms the national power output would have increased by over 2,000 MW. To place this increase in context, to my knowledge the highest peak power output ever recorded in Nigeria was 4,349.7 MW, on 17 December 2012[1].

5.    The GSPA would also have been the high point of my own career in Nigerian business which spans in excess of 30 years and encompasses dozens of large scale projects

6.    In this witness statement I wish to explain how the GSPA came about, and why P&ID was ultimately prevented from implementing it.

7.    Annexed to this Witness Statement is a paginated bundle of copy documents labelled "MQ1" to which I shall refer by page number.

8.    Since I use a number of abbreviations in this statement, for convenience I attach a glossary of the terms I have used to the end of the statement. However I shall also mention in the text of my witness statement any abbreviations I have adopted. Where I refer to dollars I mean US dollars.

9.    I wish to refer to P&ID's Statement of Case of 28 June 2013, the contents of which I confirm to be true to the best of my knowledge, information and belief.

---

[1]    As at 18 December 2012 - see press release dated 18 December 2012 from the Presidential Task Force on Power at page 1 of MQ1.

**Experience in Nigerian Infrastructure Projects**

10.     I and the other founding principals of P&ID have been engaged in major engineering projects in Nigeria for more than 30 years in a wide variety of sectors.

11.     I first became involved in Nigerian business during the 1970s through my association with Leon Levy, a Swiss-based major exporter of commodities to Nigeria. My initial business dealings in Nigeria were quite diverse and included the upgrading of the infrastructure of the ports of Lagos and Calabar. As a result I gained a detailed knowledge of both Lagos and Calabar and their respective environs.

12.     By the mid 1980's the bulk of my activity related to engineering, construction and project management, principally in Nigeria. I built my current team of expert engineers over a period of years. Our forte is conceiving and developing projects which are technically challenging but which are of obvious benefit to the country, as well as being profitable. I believe that this approach is an important reason for our success. Our work has included significant projects on behalf of the National Nigerian Petroleum Corporation ("NNPC"), which is in effect the state-owned oil company of Nigeria.

13.     Over the years my team and I have successfully executed a wide range of substantial and challenging engineering projects in a wide range of areas. I shall focus here on some of the projects we have executed in the oil and gas industry and which include the following:

13.1     The establishment of the first gas pressure vessel manufacturing facility in Africa. This entailed the manufacture and installation of bulk storage vessels for liquid petroleum gas ("LPG") of 1,000 to 5,000 metric tonne capacity at nine sites throughout Nigeria. This was known as the "Butanization Project" and the cost of the project was about $108 million;

13.2     The mechanical, engineering and instrumentation installation and commissioning for the onshore aspect of the NNPC Bonny Island Export Terminal at Port Harcourt Refinery. The value of our contract was $57 million;

13.3     The design, procurement, construction, installation, burial, commissioning and start-up of the Odidi Submarine Power (33 & 11 kV) and Fibre Optic

Cable (36 Fibre Bundle) for Shell Western Division. The work entailed 33 km of 33 kV cable and 76 km of 11 kV cable laid through Niger Delta Swamps at depths of between 4 and 36 metres. The value of our contract was $53 Million;

13.4    The engineering, procurement and construction work for the refurbishment of all fiscalisation, pumping and out loading facilities of Shell-Western Division's Crude Loading Platform off the coast of Warri, including the replacement of all utilities fire and safety facilities and equipment together with the complete rebuilding of the accommodation and communications module. The value of the our contract was $18 Million;

13.5    Acting as the technical partner in a close-out audit on the Bonga Field Development on behalf of NNPC and Shell. The object of the technical audit is to determine the reasons for time and cost overruns of more than US$1 Billion on the project and to make recommendations as to how similar future major projects can be more effectively controlled, from Management, Decision Making, Reporting and daily control standpoints to preclude similar overrun scenarios. The Bonga Field Development itself was a $2.97 Billion project. The value of our contract for the Technical Close-out Audit is $16.73 Million.

14.    Due to our track record in projects of this nature, we have also been awarded numerous feasibility studies in relation to oil and gas projects subsequently undertaken by others. These include the following:

14.1    A feasibility and build-ability study for the Cawthorne Channel Gas Gathering Project and the associated cable and fibre-optics network. This work was performed by Shell Eastern Division. The value of this project was $69 million.

14.2    A feasibility and build-ability study for the cable and fibre-optics network for the Ubie Gbaran Gas Gathering Project, including the conceptual design of hybrid land and swamp handling, transport, lay and burial equipment. This work was performed by Shell Western Division. The value of this project was $92 million.

14.3    A feasibility and build-ability study for the cable and fibre-optics network for the South Forcados Gas Gathering Project with special emphasis on

4

overcoming shallow water conditions and narrow waterway channels. The value of this project was $78 million.

14.4   A build-ability study for the cable and fibre-optics network for the Shell Albatross Gas Gathering Project in Gabon, West Africa, including the provision of design services for specialist cable handling and lay equipment and subsequent construction supervision of the local contractor. This work was performed by Shell E&P Aberdeen (who also chose the local contractor). The value of this project was $84 million.

15.   In relation to all of these studies the recommendations contained within the respective study findings were taken up and the specialist facilities proposed were constructed. All installations were successfully completed.

16.   It is also noteworthy that we have acted as advisers to Power Holding Company of Nigeria ("PHCN"), which was the national electricity company (now in the course of privatisation).

**Process and Industrial Developments Limited**

17.   By the early years of the new millennium it was becoming increasingly clear to me that there would be major opportunities in the natural gas sector in Nigeria – a sector largely ignored by the International Oil Companies ("IOCs"). There was an increasing demand for electricity in the Nigerian economy, and, importantly, the Government was strengthening its resolve to solve the problem by making natural gas available as a feedstock for electric power generation. My fellow principals and I caused P&ID to be incorporated in the British Virgin Islands on 30th May 2006 with a view to undertaking a suitable natural gas project.

18.   Shortly thereafter, on 21 July 2006, we also caused to be incorporated a Nigerian company, Process and Industrial Developments (Nigeria) Ltd ("P&ID Nigeria"). The intention was to use P&ID Nigeria as our Nigerian operating company "on the ground". Ultimately it was P&ID, the BVI-incorporated company, which became the contracting party to the GSPA.

19.   Copies of the respective Certificates of Incorporation of P&ID, and P&ID Nigeria, are at pages 2 – 3 of MQ1.

20.   In light of the contents of the Government's Notice of Preliminary Objection, I should point out that the choice of the BVI entity as the party to the GSPA was not

5

at all contentious. In fact I understood from the Government that they actually preferred this to be the case, principally because they were themselves a 10% shareholder in the project. This was expressly stated in the GSPA  as follows at clauses 8 e and f:

*"8 e)   As further consideration P&ID shall transfer to the Government or its nominee a total of ten percent (10%) of the Equity of P&ID in the following manner:*

(i)    *P&ID shall transfer to the Government or it's nominee five percent (5%) the Equity of P&ID upon the commencement of the delivery of not less than 150 MMSCuFD of Wet Gas to the Site as set forth as Phase 1 in Appendix A*

(ii)    *P&ID shall transfer to the Government or its nominee a further five percent (5%) of the Equity of P&ID the said Equity to be transferred pro rata as the delivery of the remaining 250 MMSCuFD is successfully implemented as set forth as Phase 2 in Appendix A.*

(iii)    *All of the Equity to be transferred under this Article 8 (f) shall consist of fully paid Ordinary Shares free of all liens and charges and no sums whatsoever shall be payable by the Government in respect of the Equity so transferred.*

*f)    Following the initial transfer of five percent (5%) Equity to the Government or its nominee as provided for at Article 8 (e) above no new shares whether Ordinary, Preference or otherwise may be issued without the written agreement of the Government such agreement not to be unreasonably withheld and the Government shall be entitled to representation on the Board of P&ID in proportion to the Equity held by the Government at any given time."*

21.    I believe that the Government regarded the involvement of a BVI entity as a contracting party, rather than a Nigerian entity, to be commercially beneficial, especially from the perspective of the sale of NGLs on the international markets. I understood that this enhanced, in the Government's view, the value of the interest it would acquire in the project.

22.    P&ID Nigeria was involved in the negotiations leading to the GSPA, and much of the pre-contract correspondence was written on the headed notepaper of P&ID Nigeria. Hereafter, I shall refer simply to "P&ID" in this witness statement, whether referring to P&ID or P&ID Nigeria. In effect the two companies were being run in

parallel with one another and neither company had any commercial interest outside the project described below.

**Natural Gas and Power Generation**

23.     As described in the Statement of Claim, there is a relevant distinction between two types of natural gas which are found in conventional oil fields. "Associated gas" (referred to hereafter as "Wet Gas") is the natural gas which is discharged from an oil well together with the oil during the process of extraction of the oil. It is to be contrasted with "non-associated gas", which exists in other parts of a typical oilfield. The principal difference is that Wet Gas contains Natural Gas Liquids "NGLs", principally propane and butane together with some heavier hydro-carbons known as condensate, whereas non-associated gas consists almost entirely of methane and ethane.

24.     Wet Gas is not suitable for power generation. However, the NGLs can be stripped from Wet Gas and the remaining dry gas ("Lean Gas"), which consists of methane/ethane, is suitable for power generation because it can be used as a feedstock for electricity generators. The NGLs stripped from Wet Gas can be sold on international markets.

25.     Even non-associated gas, which consists almost entirely of methane/ethane, requires a degree of processing before use as a feedstock for power generation. However, it does not yield significant quantities of NGLs.

**The Nigerian Power Crisis**

26.     There is a chronic shortage of electric power capacity in Nigeria. Without power the growth of Nigerian industry, and therefore the Nigerian economy, is severely constrained. This is reflected in mass unemployment and very poor economic performance outside the pure oil and gas sector.

27.     As set out in P&ID's Statement of Case of 28 June 2013, one of the main problems in addressing the Nigerian power shortage has been the unwillingness of the IOCs to supply Lean Gas for the electricity market in Nigeria. A number of gas turbine power generating plants have been built around the country as a Government initiative but many of these facilities stand unused for want of lean feedstock gas.

28. This has been the case, despite the fact that Nigeria has vast reserves of natural gas. As at the end of 2010, Nigeria's proven gas reserves stood at 186 trillion ft.³, making Nigeria's natural gas reserves the eighth largest in the world[2].

29. Historically this shortage of Lean Gas for domestic power generation arose because of the self-interest of the oil majors who for decades were focussed only on the vast profits available from the production of oil and who regarded the Wet Gas produced during oil production as an inconvenient by-product which they simply flared in vast quantities. To a significant extent this practice has continued in spite of various laws and regulations introduced by Government over the years to reduce flaring and to put the valuable natural gas to productive use. IOC's occasionally reinject some of the Wet Gas to maintain or increase the pressure required for the production of oil or as a mode of storage for the gas. The use of Wet Gas to maintain oil production before removal of the valuable NGLs is inherently wasteful.

30. A further factor which has exacerbated the shortage of Lean Gas for Government is that historically it has been more profitable for the IOCs to freeze the Methane and Ethane in Lean Gas and convert it into Liquid Natural Gas ("LNG"), for transportation and sale on the international LNG markets. This has obtained for the IOCs a much higher price than could be achieved domestically. In 1998 a US$6 billion LNG production facility in Nigeria was constructed to process Lean Gas for the international LNG markets. NNPC participated in this project.

31. The profits on these exports of LNG have been enormous and in my view this has been one of the main reasons why there was resistance to sending this natural gas to the domestic market at a much lower price than could be obtained on the international market. The current exports of LNG are in excess of 22 million metric tonnes per annum.

32. The shortage of Lean Gas also affects the viability and development of heavy industry, for instance, the manufacture of petrochemicals. Such industries could potentially employ large numbers of Nigerians and provide a significant boost to the economy.

---

[2]    BP Statistical Review of World Energy, June 2011

33. The position was described in "The National Domestic Gas Supply and Pricing Policy", written by the Government of the Federal Republic of Nigeria and published in the Federal Republic of Nigeria Official Gazette on 19 February 2008, (pages 4 to 21 of MQ1) as follows:

"*Given the abundance of Nigeria's gas resources, Government has identified the **_accelerated_** development of the domestic gas sector as a focal strategy for achieving the national aspiration of aggressive GDP growth (10% per annum)...*

*Gas export (LNG and pipeline) provide high returns to government through tax receipts and dividends for equity stake. However, it is recognised that beyond economic rent, there are broader strategic benefits to the economy that may be obtained from the domestic utilisation and value addition to natural gas. In essence, in addition to exporting natural gas, Nigeria must develop strategies to ensure increased domestic utilisation.*

*Rising gas prices in key international markets however continues to create a preferential pull for export. Consequently, there is a disproportionate focus by gas supplies in the country for LNG projects. This is creating an anomaly in Nigeria where there is now sufficient shortfall in the availability of gas for domestic utilisation. The continued shortfall directly threatens the economic aspirations of the nation which if unchecked may result in Nigeria supporting the development of the economies of the industrialised nations at the expense of its own economy.*

*The energy requirement to sustain an aggressive GDP growth is enormous. Currently, total demand (export and domestic) for natural gas far outstrips supply. The demand is driven by growth in the Power sector and other gas-based industries such as Fertiliser, Methanol, LNG etc. Gas demand is forecast to grow from the current level of 4 bcf/d to about 20 bcf/d by 2010. In the short term, the growth in the domestic sector is particularly most aggressive, growing from less than 1 bcf/d in 2006 to about 7 bcf/d by 2010. This demand growth is underpinned largely by the power sector and by an increasing requirement by large industries such as fertilizer and methanol that require gas in high quantities. These industries which are unable to compete in high gas cost locations have expressed strong interest in relocating to Nigeria.*

*Nigeria needs to demonstrate availability and affordability of gas or else risk losing these industries to competing nations like Egypt, Trinidad etc. The scale of demand growth relative to supply growth creates an immediate availability challenge. In addition, is the challenge of price affordability and hence gas pricing.*

9

*The domestic demand sectors such as electric power, fertiliser, methanol etc have varying capacity to bear gas prices. For example, the Nigerian Power sector has a lower gas price threshold than a Methanol industry. Government is however keen to stimulate the growth of all these sectors. Timely availability, affordability and commerciality of supply of natural gas is a critical precondition for realising the government's aspiration for the domestic economy.*" (emphasis supplied)

34.     I also note that the National Domestic Gas Supply and Pricing Regulations, also published on 19 February 2008 (pages 22-27 of MQ1), defines "*Ministry*" as "*the ministry charged with responsibility for energy*" and "*Minister*" as "*the Minister for the time being charged with responsibility for matters relating to Gas resources*" (page 27 of MQ1).

**The Nigerian Gas Master Plan**

35.     As is apparent from the statement of policy quoted in the foregoing paragraph, the Nigerian Government was keenly aware of the problem. In November 2007 the Government had unveiled the "Gas Master Plan". The main stated objectives of the Gas Master Plan were (i) to deliver Lean Gas to the domestic and light commercial power generation market; (ii) to grow gas-based industries such as fertiliser, petrochemicals and methanol manufacturing; and (iii) to deliver Lean Gas for power generation to heavy industrial users such as cement and steel manufacturers.

36.     The Federal Ministry of Energy and NNPC undertook an international "roadshow" for the Gas Master Plan in 2008 aimed at potential investors. A copy of the presentation from the roadshow is at pages 28 to 66 of MQ1. In the presentation the Government stated its policy to "*fully exploit the potential in gas for **accelerated** economic development, in pursuit of the 10% GDP growth aspiration*" (emphasis supplied) (page 39 of MQ1).

37.     As can also be seen from the presentation, the Gas Master Plan included an "Infrastructure Blueprint" (see pages 15 to 24 of the presentation) whereby the country would be split into three central gas processing hubs. The map at page 24 of the presentation (page 51 of MQ1) shows the Western Franchise Area (Warri/Forcados), the Central Franchise Area (North Port Harcourt), and the Eastern Franchise Area (Akwa-Ibom/Calabar area).

38.     In addition, the Gas Master Plan envisaged a gas pricing and supply framework, pursuant to which the IOCs would be obliged to physically supply a minimum amount of Lean Gas to the Nigerian market ("Domestic Gas Supply Obligation"),

10

and minimum prices would be stipulated for such supply ("Gas Pricing Framework").

39.     The National Gas Supply and Pricing Regulations 2008, passed into law on 16 October 2008, established a new Department of Gas with power to regulate the gas sector and to implement, inter-alia, the Gas Master Plan, including the Gas Pricing Framework and the Domestic Gas Supply Obligation.

40.     As I understand the position, pursuant to the Gas Pricing Framework the Government has approved a pricing regime for Lean Gas supplied to the power sector of $1.00 per mmbtu[3] from the end of 2010, $1.50 per mmbtu from the end of 2011, and $2.00 per mmbtu from the end of 2013. I mention this by way of context, although I should point out that, as will become apparent, pursuant to the GSPA P&ID agreed to supply to the Government processed Lean Gas for use in the power sector free of charge.

**The Project**

41.     It was against this background, in 2006, that P&ID and P&ID Nigeria were incorporated and that we started to work in earnest on a gas project ("the Project").

42.     We set about the necessary preparatory engineering work required to construct a gas stripping plant capable of processing 400 MMSCuFD[4] of Wet Gas and a polymer grade propylene plant capable of producing 250,000 metric tonnes per annum of polymer grade propylene.

43.     The idea was that we would obtain Wet Gas and process it to remove the NGLs (principally propane and butane). The propane would be used as feedstock for the polymer grade polypropylene plant, and the remaining NGLs could be sold, either domestically or on international markets. The Lean Gas could be sold for domestic power generation.

44.     The Project at this point was not location-specific although as explained below the Lagos area was initially regarded as an attractive location. This was not only

---

[3]      mmbtu = 1 million British Thermal Units.

[4]      A million cubic feet per day.

because of the existence of a number of natural gas fields both on and off the coast but because of the existence of a ready domestic market in Lagos for the Lean Gas.

45. The Project would return a high percentage of the Wet Gas as Lean Gas – about 85% by volume. By contrast, the process of liquefaction of Lean Gas would leave much less of the Wet Gas as residue Lean Gas. The Project was designed to produce Lean Gas for the national grid within 2 years of Government approvals, whereas a typical liquefied natural gas solution would take much longer to produce Lean Gas.

46. As we worked on the Project, we developed the concept of taking advantage of the inherent value in the NGLs typically found in Wet Gas as the principal source of revenue. This came to coincide with an important policy principle for the Nigerian Government known as the "Liquids Based Pricing Approach". This is described in the Government's National Domestic Gas Supply and Pricing Policy as follows (page 10 of MQ1):

*"(C) GAS PRICING REFORM - LIQUIDS BASED PRICING APPROACH*

*A widely known characteristic of Nigerian gas is its relative richness in liquids i.e. NGLs. NGLs continue to attract a high price in international markets (similar trend in crude oil pricing). As a result of the potential high revenue that comes from NGLs produced in conjunction with residue dry gas, it is possible for a gas supply project to accommodate a relatively lower price for the residue dry gas and still be a profitable supply project. Residue dry gas is used mostly in the domestic market.*

*This gas pricing policy aims to exploit this intrinsic value of NGLs in deriving a relatively low gas price for the strategic domestic sector - Power. It is recognized that not all gas resources in the country are rich in NGLs, consequently, it is intended that this philosophy be applied selectively - especially in the short term as the Power sector is currently unable to pay higher price for gas (in view of the low end user power tariff that currently obtains in Nigeria). It is however the expectation that in the medium term, power tariff will be more commercial and a higher gas price will be achievable."*

47. During the course of the next two years, we made good progress and reached a very advanced stage of the preparatory engineering work necessary to implement such a project on the ground. I would estimate that the total costs sunk into the preparatory work during that period were in excess of $40 million, including initial feasibility studies, the cost of licences for the technology required to operate the gas stripping

plant and the propylene plant respectively, the production of detailed engineering drawings and our own internal project management costs.

48.  By way of example, extensive work was commissioned from various specialist engineering companies such as CB&I Lummus Technology Group in New Jersey, KRAN Developments in Johannesburg and ABB Limited in the UK. The cost of the work of these 3 companies alone was about $29 million. In addition our own internal costs were significant. I would say that, from the commencement of our work on the Project in mid-2006, substantially the whole of our internal resource was devoted full-time to the Project.

49.  By the end of the first 2 years of our work on the Project, we had put together a completed engineering package ready for actual permit applications, procurement and construction, which comprised about 100 volumes of documentation, together with a 3-D software model of the plant which was in such high detail that it would have enabled the training of the plant staff even before completion of construction. An electronic copy of a video from the 3-D software model is enclosed with MQ1.

**Location**

50.  When we first started to work on the Project, we had envisaged that we might build the Gas Processing Facilities in the Lagos area. There are a number of natural gas fields off the coast of Nigeria in the area adjacent to Lagos, which could easily have supplied more than enough Wet Gas for the Project.

51.  As in the case of the Lagos area, there were numerous natural gas fields off the coast of Calabar, such as those contained in concessions, OML (meaning "Oil Mining Licence") 123 and OML 67.  OML 123 is operated by Addax Petroleum and OML 67 is operated by Exxon Mobil.

52.  From information available in the public domain and from our own researches it was clear that there was more than enough Wet Gas off the coast of Calabar to support a gas stripping and propylene plant operation in the Calabar area processing a Wet Gas throughput of 400 MMSCuFD We also became aware that the Government had initiated the building of a pipeline from OML 123 to Calabar (the Adanga Pipeline).

**Proposal to Government**

13

53. At this stage we felt that we were in an excellent position to make a persuasive case to the Government to enter into an agreement to implement the Project.

54. The President of Nigeria at that time was the late President Yar'Adua. He was also the Minister of Petroleum Resources, although he later appointed a separate Minister.

55. I first broached the Project with the then Permanent Secretary to Government at the State House. He was very impressed by the Project and suggested we should put forward a proposal to the President in his capacity as Minister of Petroleum Resources. The Permanent Secretary also proposed that I should seek a meeting with the President.

56. At the time of our proposal the Special Adviser to the President on Energy and Strategic Matters was Dr Rilwanu Lukman[5]. I also approached Dr Lukman and discussed the project with him. He was very supportive of the Project and endorsed our decision to put the project to the President.

57. Thus on 7 August 2008 P&ID wrote to the late President Yar'Adua with a formal proposal for the Project to be implemented (pages 67 to 69 of MQ1).

58. I was subsequently invited to meet the President. At our meeting I explained the problems and the proposed solution presented by the Project. The President was favourably disposed towards the Project. As a result it was arranged a presentation would be made to the Minister of State at the Ministry of Petroleum Resources, who was the President's No 2 in the Ministry. We made the presentation to Mr Odusina and the Ministry, as directed, in October 2008.

59. The Special Adviser, Dr Lukman, was aware of the oil and gas sector construction expertise of the principals of P&ID, due to our leading role in the Butanization Project, some 15 years previously, which is referred to at paragraph 13 above.

---

[5] Dr Rilwanu Lukman was and remains extremely knowledgeable about the problems of power generation and gas flaring in Nigeria. He is a renowned oil and gas expert, and served 8 consecutive terms as the President of OPEC from 1986. Dr Rilwanu Lukman was the Secretary General of OPEC between 1994 and 2000. He is also a Knight of the British Empire, an Officer of the Legion d'Honneur of France, and a Fellow of Imperial College London.

14

60.   Our role in the Butanization Project involved the construction of a manufacturing facility in Lagos in order to engineer and build, for the first time in Nigeria, very large high-pressure vessels capable of storing Liquid Petroleum Gas (Butane and Propane). These vessels would then be utilised to establish 9 distribution depots around the country. Importantly, Dr Lukman had been responsible for the Butanization Project, prior to his second term as the Minister of Petroleum Resources, in his capacity as Special Adviser to the President on Petroleum and Energy Matters.

61.   Pressure vessels capable of safely storing pressurised natural gas must be precision engineered to extremely high standards, with no margin for error. A small area of weakness in design or construction could lead to a catastrophic explosion (as in the Bhopal disaster). The challenges of manufacturing such vessels in Nigeria were manifest, and had not been attempted previously not least because of the acute shortage of highly trained staff and in particular the lack of high pressure vessel technologists and specialist welders. In the end my engineers brought in teams of specialists from the North East of England, who both worked on the pressure vessels and trained local Nigerian technicians to their own standards. In the end we surmounted the difficulties. There now exists, in Nigeria, a multi-billion dollar pressure vessel manufacturing industry involving a number of companies, which also includes the manufacture of most of the associated equipment used in the natural gas industry in Nigeria. Prior to the Butanization Project all such pressure vessels and associated equipment were imported.

62.   As a result of Dr Lukman's prior experience of me and my engineers during the Butanization Project, I believe that he, and therefore the Government, were confident in our abilities to undertake and complete complex Natural Gas-related projects.

63.   On 18 December 2008 Dr Lukman was for the second time appointed the Honourable Minister of Petroleum Resources. In early 2009 the Minister directed that P&ID's proposal be further examined by the Government, and we were requested by Engineer Taofiq Tijani, the Special Technical Adviser to the Minister, to bring the proposal to the office of the Honourable Minister for Petroleum Resources (see letter from Engineer Tijani at pages 70 to 71 of MQ1).

64.   We made several further presentations. A copy of the presentation, as forwarded to the Minister, Dr Lukman, by letter dated 24 February 2009 (72-73 of MQ1), is at pages 74 to 94 of MQ1.

15

65.   In summary our proposal was that we would take Wet Gas free of charge from the Government, process it to produce Lean Gas, and return the Lean Gas to the Government free of charge to be fed into the national power grid, with the capacity to generate over 2,000 additional megawatts of electricity for the economy. The idea was for P&ID to generate revenue (and profit) from the NGLs.

66.   There would be 2 phases. Phase 1 would be the construction by P&ID of the gas stripping plant which would separate the NGLs from Wet Gas, at the end of which process would emerge, amongst other by-products, propane, butane, condensate and Lean Gas. The propane, butane and condensate would be sold on the international markets for P&ID's account, and the Lean Gas delivered to the Government free of charge. Phase 1 was planned to take 2 years to implement after the grant of the necessary approvals by the Government.

67.   Phase 2 would be the construction by P&ID of the polymer grade propylene plant. Once constructed it would use the propane produced by the gas stripping plant as a feedstock for the propylene plant to produce polymer grade propylene for sale on international markets. Polymer grade propylene is a valuable industrial feedstock for the manufacture of various different products, and would be expected to achieve a significantly higher price than the Propane. Lean Gas would continue to be delivered to the Government free of charge. Phase 2 was planned to take an additional 15 months to implement.

68.   The reason for the 2 phases set out in the Proposal was to ensure the earliest possible date for the commencement of delivery to the Government of Lean Gas.

**Review by Technical Working Team**

69.   On 31 March 2009 we were invited for discussions with the technical working team to the Ministry ("the Technical Working Team"). The Technical Working Team set about a review of P&ID's proposal.

70.   During the review P&ID was required to attend meetings with the Technical Working Team. For instance, P&ID was invited to a meeting on 1 April 2009 (page 95 of MQ1) and a further meeting on 9 June 2009 (page 96 of MQ1). The Technical Working Team was interested, in particular, to learn about P&ID's accumulated knowledge of the precise engineering and technical requirements of the various technologies and engineering solutions required to implement the Project. P&ID had already examined, and satisfied itself as to, the feasibility of the Project, and was therefore well advanced in its thinking and detailed engineering

16

development. I wrote to Dr Ibrahim, the Ministry's Head of Policy, on 11 June 2009 about this and other matters arising from the meetings with the Technical Working Team (pages 97 to 98 of MQ1).

71.   It was agreed that the Project would be limited, for the time being, to the construction of a gas stripping plant. It was felt that this would expedite the Project, thereby leading to the earliest supply to Government of Lean Gas. We also discussed with the Technical Working Team the concept of 2 separate production trains. As I stated in my letter of 11 June 2009 (pages 97 to 98 of MQ1), this had been provided for in the engineering designs for the Project in order to achieve "time of the essence" implementation. It was perceived also that this would ensure continued supply of Lean Gas to the Government if 1 of the 2 trains was for any reason put out of action for a period of time.

72.   The use of 2 process trains also enabled the delivery of Wet Gas by the Government to be staggered into 2 phases. It was envisaged at this time that each phase would comprise about 180-200 MMSCuFD although in the event the GSPA provided that Phase 1 was 150 MMSCuFD and Phase 2 was 250 MMSCuFD.

73.   There were discussions about the possible locations from which to source Wet Gas for the Project. On 15 June I wrote to the Honourable Minister to explain the potential benefits of using, for Phase 1, the 180-200 MMSCuFD of Wet Gas which was at that time being flared by Addax Petroleum off the coast of the Calabar in a concession known as OML 123 (page 99 of MQ1).

**Memorandum of Understanding**

74.   The outcome of the review by the Technical Working Team was positive, and on 22 July 2009 a Memorandum of Understanding ("MOU") was executed by the Minister, Dr Lukman, and P&ID (pages 100 to 110 of MQ1).

75.   The recitals to the MOU read as follows:

(a)   The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

(b)   The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves, developed gas reserves

17

and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators.

(c)     The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allocated to the international operators.

(d)     The Government desires to develop, construct and operate gas resources at optimal capacity to meet the growth in gas demand at the various level of the economy including domestic, regional and export market.

(e)     The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

(f)     The Government shall procure that NNPC shall work with Process and Industrial Developments Limited (P&ID) in the implementation and execution of the Accelerated Gas development Project (hereinafter referred to as the Project);

(g)     The Government has explored viable structures that could be used to meet the highlighted objectives and considered Process and Industrial Developments Limited as capable of implementing and executing the Project;

(h)     The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic use.

(i)     P&ID hereby undertakes to possess the requisite technology and competence for the fast track development of the gas project, thereby assisting in the realization of the Government's objectives;

(j)     P&ID has undertaken all necessary studies, including the identification of suitable associated and non-associated gas fields and is ready to commence a fast track development campaign to produce gas as stated herein.

(k)    The Parties are entering into this MOU to establish the framework and set out the principles under which the Parties intend to enter into a definitive agreement to carry out the desired objectives of the Parties.

76.    The MOU did not oblige either party to go ahead with the Project, but envisaged (as per recital (k) above) a subsequent "definitive agreement to carry out the desired objectives of the Parties".

77.    Clause 3 b. of the MOU provided for 2 process streams: "*P&ID will construct and incorporate two process streams with a total capacity of 400 MMSCuFD together with all utilities and storage facilities at Calabar.*"

78.    I should point out that it was in fact the Nigerian P&ID entity which was a party to the MOU. However, clause 15 of the MOU provided that any Party could assign its rights and obligations to an "*Affiliate*". An "*Affiliate*", as defined in the MOU, was not limited to Nigerian entities.

**Events between the MOU and the Execution of the GSPA**

79.    The execution of the MOU accelerated the preparations for the implementation of the Project.

80.    A Joint Operating Committee ("JOC") was set up pursuant to Clause 8 a) of the MOU. By letter dated 5 August 2009 (page 111 of MQ1), P&ID nominated Mohammed Kuchazi and I as the P&ID representatives on the JOC. The representatives of the Ministry were MM Ibrahim, Head of Policy, and Grace Taiga, Legal Director. NNPC were also represented on the JOC.

81.    By letter dated 11 August 2009 (pages 112 to 113 of MQ1) the Government invited P&ID's representatives to an inaugural meeting of the JOC to be held on 18 August 2009. The Government's letter stated that "*The JOC will be expected to issue firm terms of reference including commercial terms and timelines required to pursue all activities towards the successful implementation of the project*".

82.    On 12 August 2009 P&ID wrote to the Office of the Honourable Minister, accepting the invitation to attend the inaugural meeting of the JOC, and reiterating the "Commercial Terms" as follows: "*the Government shall deliver to the Calabar site boundary, 400 MMSCuFD of Associated Gas having a minimum C3 (Propane) content of 3.5% mol and C4 (Butane) of 1.8% mole at No Cost, other than a nominal transmission fee (to be agreed). In turn, P&ID will process the gas,*

*recompress the residual C1 and C2 (pipeline quality lean gas), representing approximately 85% of the wet gas feed, and make it available, for power generation, at the Calabar site boundary at No Cost to the Government.*" (pages 114 to 115 of MQ1)

83.   By letter dated 2 September 2009 Neil Hitchcock of P&ID notified NNPC that Mohammed Kuchazi and I had been nominated to the Joint Operations Committee (page 116 of MQ1).

84.   A series of meetings commenced, some of which included "*stakeholders*", such as P&ID, the Government and Addax, some of which were between P&ID and Addax, and, I believe, some of which were between the Government and Addax. For instance, a stakeholders' meeting, involving Addax, P&ID and the Government, was held on 23 September 2009, and P&ID subsequently met with Addax Petroleum on 14 October 2009.

85.   By letter dated 6 November 2009 Engineer Taofiq Tijani, technical adviser to the Ministry, invited me to a further meeting on 12 November 2009 with Addax Petroleum and the Government to "*progress discussions on the subject matter to enable you commence implementation of the project soonest*" (page 117 of MQ1). At that meeting (which actually took place on 13 November 2009) Engineer Tijani, Dr Jones Ogwu and Mrs Grace Taiga attended on behalf of the Government, Debo Spaine attended on behalf of Addax, and Neil Hitchcock and I attended on behalf of P&ID. Neil Hitchcock's note of that meeting (which actually took place on Friday 13 November 2009) is at pages 118 to 119 of MQ1.

86.   The meeting of 13 November 2009 was chaired by Engineer Tijani. At the meeting:

86.1   Engineer Tijani intimated to Addax Petroleum that the domestic obligation to supply to Government of 100 MMSCuFD of gas would be taken up by P&ID;

86.2   Addax Petroleum confirmed their willingness to deliver 100 MMSCuFD of natural gas from the 168 MMSCuFD of Wet Gas that they were currently flaring to the P&ID site at Calabar via pipeline presently being constructed offshore from Adanga (in OML 123) to comply with its domestic obligations;

86.3   Dr Ogwu Jones, of the Department of Petroleum Resources, asked if Addax Petroleum would voluntarily increase its domestic obligations to 150

MMSCuFD, but Addax Petroleum replied that they needed the remaining gas for reinjection and utility power;

86.4    P&ID pointed out that it would now be necessary for Addax Petroleum to reconfirm their own data to P&ID in order to clarify the composition quality and volumes of the presently flared gas from OML123;

86.5    P&ID pointed out that the agreement with the Government was based on a supply of Wet Gas with a minimum propane content of 3.5% mol and a minimum Butane content of 1.8% mol. A copy of the draft GSPA was given by the Director of Legal of the Ministry to Addax Petroleum in order to show Addax Petroleum the specifications for the Wet Gas to be supplied;

86.6    It was agreed that Engineer Tijani would set up a meeting the following week with NAPIMS and Addax Petroleum to inform them of the developments and receive their inputs.

87.    Just prior to the meeting of 13 November 2009, by letter dated 10 November 2009, Dr Ibrahim informed me that Dr Lukman had directed that the stakeholders should reconvene at a meeting on 24 November 2009 (page 120 of MQ1). The letter stated: "*Your organisation is expected to send two high-level nominees as [a] very important and crucial decision will be taken*".

88.    The Government sent a first draft of the GSPA to us on 18 November 2009 (see letter dated 18 November 2009 from Mrs Grace Taiga, the Legal Director for the Honourable Minister, at page 121 of MQ1). The draft was subjected to further negotiations, during the course of which, amongst many other changes, the BVI P&ID entity replaced P&ID Nigeria as the contracting party.

89.    A further stakeholders' meeting took place on 24 November 2009.

90.    On 1 December 2009 Dr Ibrahim wrote on behalf of the Government stating that the Honourable Minister, Dr Lukman, had "*directed that all stakeholders FastTrack the processes to enable the signing of Definitive Agreements leading to commencement of projects*". Dr Ibrahim added: "*It is imperative to stress once again the importance of these projects to the socio-economic development of our beloved nation, hence the absolute necessity to ensure adherence by all parties to the agreed deadline*" (page 122 of MQ1).

**The Adanga Pipeline and Further Pipeline Requirements**

21

91.   As at the date of execution of the GSPA, the Government had commenced construction of a 24 inch pipeline from OML123 directly to Calabar ("the Adanga Pipeline"). This pipeline would have a throughput capacity of 600 MMSCuFD and was due for completion in 2010. It was envisaged that the Government would be able to pipe enough Wet Gas necessary to satisfy Phase 1 through the Adanga Pipeline from OML 123, although ultimately it was for government to determine from where to source the necessary Wet Gas to meet its supply obligations to P&ID.

92.   In this context, one of the issues which was discussed between Government and P&ID prior to the execution of the GSPA was how Wet Gas for Phase 2, which the Government was likely to source from elsewhere than OML 123, would be brought onshore to Calabar. Although, as stated above, the source of Wet Gas to be supplied was to be a matter for the Government, it was anticipated that the 250 MMSCuFD of Wet Gas necessary to satisfy Phase 2 would be sourced by the Government from the concession OML 67, operated by Exxon Mobil, which was situated further to the West and would not be reached by the Adanga Pipeline.

93.   Therefore, a further pipeline would be required to link up the Adanga Pipeline with OML 67 (or such other sources as the Government chose to utilize). Consequently, during the negotiations P&ID agreed that it would build, free of charge to the Government, a pipeline of up to 70 km in length in order to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas from the sources chosen by the Government, and this was reflected in the GSPA as executed.

94.   At the request of the Government, a Letter of Comfort dated 8 December 2009 was obtained by P&ID from an associated company, Industrial Consultants (International) Limited, to remain in effect for 3 years from the date of execution of a final contract, pursuant to which ICIL undertook to provide the finance for the construction of further pipeline of up to 70 km to join up to the Adanga Pipeline. (pages 123 to 1824 of MQ1).

95.   On or around 17th December 2010 Dr Ibrahim sent his final observations on the draft GSPA to the Minister. A copy of these observations was subsequently provided to me (pages 125 to 126 of MQ1) in order to obtain my comments upon them. In those observations there was no mention of any objection to the use of the BVI company as the contracting party. Nor was any such objection made during the negotiations prior to that point.

96.     On 11 January 2010, the GSPA was executed by me on behalf of P&ID and Dr Lukman on behalf of the Government (pages 127 to 146 of MQ1).

**Obtaining Data from Addax**

97.     During the period between the MOU and the execution of the final GSPA, Neil Hitchcock of P&ID made efforts to obtain directly from Addax Petroleum up to date data relating to the precise composition of the Wet Gas then being flared in OML 123. This data was relevant to the final detailed engineering for the Project, and to the question of whether the Wet Gas supplied would still meet the contractual requirement of a minimum content of propane and butane respectively. Mr Hitchcock expressly requested such data at the meeting of 13 November 2009 referred to at paragraph 84 above.

98.     On 18 November 2009 Debo Spaine of Addax Petroleum provided figures purporting to reflect the "Gas Composition Range" of the Wet Gas in OML 123 (pages 147 to 148 of MQ1). However, as pointed out in Neil Hitchcock's response by letter dated 19 November 2009 (page 149 of MQ1), the data provided appeared to relate to "*stripped lean gas*". Mr Hitchcock pointed out in his letter that the data that had been requested at the meeting of 13 November 2009 was for the "*current compositions of the wet associated gas currently being produced by each of the individual fields in OML 123*".

99.     However, Addax Petroleum were not prepared to provide the information requested and Mr Spaine responded by email of 19 November 2009 by stating "*I suggest you approach DPR and/or NAPIMS for the data you have requested in your attached letter. I am not obliged to provide them directly to you*" (page 150 of MQ1).

100.    Consequently Mr Hitchcock wrote a letter 19 November 2009 to Engineer Tijani requesting the gas compositions for the individual fields in OML 123(page 151 of MQ1). We did not receive a reply to this letter with up to date composition data.

**Phase 1 and Phase 2 of the GSPA**

101.    As stated above, the use of 2 process trains also enabled the delivery of Wet Gas by the Government to be staggered into 2 phases. In the GSPA as executed Phase 1 involved the continuous supply by the Government of 150 MMSCuFD of Wet Gas commencing or before the last quarter of 2011, and Phase 2 involved the supply by the Government of 250 MMSCuFD of Wet Gas commencing on or before the third quarter of 2013.

**Implementation of the GSPA**

102. The day after the signing of the GSPA, on 12 January 2010, I wrote to the Minister on behalf of P&ID to inform him that P&ID wished to commence work at once, and wished "*to put in place all necessary modalities as soon as possible, with both Addax Petroleum and Exxon Mobil, in order to ensure the timely delivery of the currently flared Wet Gas for the project*" (page 152 of MQ1). Given that P&ID had no contractual relationship with the IOCs, I requested the support and co-operation of NNPC, NAPIMS[6], and the Director of the DPR to assist in finalising these arrangements with the IOCs.

103. I was keen to implement the GSPA as soon as possible. Moreover, although I was aware, of course, that the Government had, to all intents and purposes, access to virtually unlimited supplies of Natural Gas in the vicinity of Calabar, I wished to minimise any delay which might be caused by the operators of the 2 concessions that had been identified as likely sources of Wet Gas for the project. P&ID required from the Government certain up to date information which would be critical to the construction of the gas processing facility which P&ID would be building in Calabar to strip the Wet Gas. For instance, the precise make-up of the Wet Gas (which was also relevant to the Government's contractual obligations to supply Wet Gas with a minimum propane and butane content) and the pressure at which it would be delivered into the gas pipeline which would transport it to Calabar. Therefore I thought that it would be important for the Government to ensure that NNPC, DPR and NAPIMS engage with Addax Petroleum and Exxon Mobil as soon as possible in order to get things moving.

104. The Legal Director to the Minister wrote to the Director of the DPR on 15 January 2010, just a few days after the execution of the GSPA , stating that the Minister, Dr Lukman, had approved the agreement, and directing the DPR to "*ensure implementation*" (page 153 of MQ1).

105. On the same day, 15 January 2010, the Legal Director of the Ministry sent a copy of the GSPA to the Group General Manager of NAPIMS, and indicated to the

---

[6]    National Petroleum Investment Management Services, a directorate of NNPC responsible for managing the Government's interests in the oil and gas industry.

Group General Manager of NAPIMS that the Minister had approved the Agreement (page 254 of MQ1).

106. Copies of these 2 letters of 15 January 2010 were provided to P&ID by the Ministry in order to keep us informed of the Government's steps to implement the GSPA.

107. On 28 January 2010 the Ministry convened a stakeholders' meeting for 9 February 2010, to be chaired by the Minister (page 155 of MQ1). I attended on behalf of P&ID.

108. On 16 February 2010 I received a letter from the Ministry seeking my written acceptance of a minor change to the GSPA  relating to the "*Pioneer Status*" of the project, to which I responded affirmatively by my letter of the following day (page 156 of MQ1).

109. In the meantime, the site for the onshore plant at Calabar for the construction of the gas stripping plant and gas storage facilities had been selected by P&ID and secured from the Government of Cross River State. On 1 February 2010 Mr Hitchcock wrote to the Governor of Calabar requesting the formal allocation of the land upon which the plant would be constructed (pages 157 to 158 of MQ1). On 16 February 2010 approval was granted, by the Government of Cross River State, to P&ID, for the allocation of Parcels 1 & 2 of the Energy City (Industrial) at Adiabo in Odukpani Local Government Area, containing an area of about 50.662 hectares of land, for the industrial use of P&ID (pages 159 to 160 of MQ1).

110. On 14 May 2010, I wrote to NNPC to update it on the progress made by P&ID. I pointed out that all of the project finance was in place, 90% of the engineering designs had been completed, a 50 hectare site had been allocated to P&ID by the Cross Rivers State Government, and that Addax Petroleum had confirmed to the DPR its readiness to supply to P&ID the Wet Gas that it was at that time flaring in OML 123 in time for Phase 1 of the Project as set out in the GSPA. I asked the Group Managing Director of NNPC to authorise NAPIMS to oversee and conclude the necessary arrangements between P&ID and Addax, by which I meant the engineering logistics of delivery of the Wet Gas for Phase 1 from Addax, to enable work to proceed on the gas processing facility.

111. I understand, from a copy of my letter endorsed in manuscript on 14 May 2010 by Shehu Ladan, the then Group Managing Director of NNPC, that NNPC so instructed NAPIMS straight away. The annotation states: "*Please proceed as prayed and appraise me subsequently*". A copy of this letter, as endorsed, is at

pages 161 to 162 of MQ1. This was provided to us by the Group Managing Director himself, in order to assure us that NNPC were taking steps to implement the GSPA.

112. I was therefore surprised when an article in the edition of the "*This Day*" newspaper of 6 June 2010 (page 163 of MQ1) stated that the Government were set to sign another gas supply agreement with Addax Petroleum in respect of the Calabar/Adanga pipeline gas. I wrote to the Minister on 21 July 2010 and copied in the Special Adviser to the President on Petroleum Matters, Dr. Emmanuel Egbogah, highlighting the media reports and seeking specific assurance in view of the confusion these reports were creating with our shareholders and suppliers (pages 164 to 165 of MQ1).

113. The Government responded by calling a Ministerial Stakeholders Meeting on 10 August 2010 to address the specific matters raised in my letter of 21 July 2010 and the overall lack of satisfactory progress in implementing the GSPA.

114. This meeting was very much a "summit" meeting of all concerned in order to bring matters to a head in light of the difficulties to date in implementing the GSPA. Present at the meeting were Engineer Goni Sheikh, the Permanent Secretary to the Minister, Mrs Grace Taiga, the Legal Director of the Ministry, Mr Tijani, who was at this stage the Technical Assistant to the Minister, Engineer Ikejlani, the Special Technical Adviser to the Minister, Dr Labi Ajibade, the Manager of Gas of NAPIMS, Dr David Ige, the Group General Manager/Special Technical Adviser to NNPC, Mr Sunday Babalola of the DPR, Mrs  Uno Adeniji, the General Manager of Planning, Gas and Petroleum of NNPC, Mr Umar, Manager Gas and Petroleum, NNPC, Mr Nuhu Tizhe, the Technical Adviser to the Group Managing Director of NNPC, Mrs Belgore, the Assistant Legal Adviser to the Minister, and Mr Debo Spaine of Addax. Mohammed Kuchazi and I attended on behalf of P&ID. A copy of the Minutes of the Meeting as provided by the Ministry is at pages 166 to 169 of MQ1.

115. At the meeting I emphasised that, although NAPIMS had been of great assistance, there remained an urgent need to complete the modality arrangements for the take-off of Phase 1 of the project. NAPIMS pointed out that they were themselves working hard to ensure that the project took off "*very soon*", and that they did not envisage any problem because OML 123 was a PSC and therefore the Government owned 100% of the gas within it.

116.    As recorded in the minutes, "*Addax Petroleum expressed support for the project and promised to make the Associated Gas available to P&ID*". The Permanent Secretary directed that NAPIMS and Addax Petroleum were to "*re-commit themselves to the Project and to ensure that the Project [was] expedited*". At paragraph 2.2 of the minutes of the meeting 10 August 2010, it is recorded that "*NAPIMS was requested by the Chairman to cooperate and contribute in response, the representative of NAPIMS said that they were working hard to see that P & ID project takes off very soon and that they do not envisage any problem because the PSC gas is 100% owned by government who have total control over it. The only constraint is cost control and profit-sharing and so NAPIMS is trying to ensure that the technical proposal progresses with the commercial aspect.*"

117.    The Permanent Secretary directed that NAPIMS should:

117.1    issue a letter of undertaking to P&ID confirming that 150 MMSCuFD of Associated Wet Gas from OML 123 would be made available to P&ID "*in conformity with the Government's obligations under the terms of the GSPA* "; and

117.2    obtain a letter of undertaking from Addax Petroleum confirming that 150 MMSCuFD of Associated Wet Gas from OML 123 would be made available to P&ID.

These letters were to be provided "*forthwith*" and prior to any agreement on technical matters and/or any necessary Government approvals or authorisations.

118.    NAPIMS was instructed by the Government by letter of 9 November 2010 to issue a letter of undertaking to P&ID, and to obtain a letter of undertaking from Addax, confirming that 150 MMSCuFD of Wet Gas from OML 123 would be made available to P&ID in conformity with the Government's obligations under the terms of the GSPA. A copy of this letter, which was provided to P&ID, in order to assure us that the Government was taking steps to implement the agreement, is at pages 170 to 171 of MQ1.

119.    I confirm however, that neither letter of undertaking (either from Addax Petroleum or NAPIMS) was ever provided to P&ID.

120.    On 10 March 2011, on behalf of P&ID, I wrote to the newly appointed Group Managing Director of NNPC to solicit his assistance in expediting the implementation of the GSPA (pages 172 to 173 of MQ1). I pointed out, inter alia,

that P&ID was unable to finalise a number of critical decisions in relation to engineering and plant issues until the modalities of the gas supply arrangements, including final gas composition, had been more clearly defined and resolved. I requested a meeting with NNPC, but I was not offered any meeting.

121.   Subsequent to my letter of 10 March 2011, I was informed by NAPIMS that Addax Petroleum was now apparently unwilling or unable to supply the required amount of 150 MMSCuFD of Wet Gas from OML 123 for Phase 1 of the project, because, according to Addax, they required  50 MMSCuFD of Wet Gas for reinjection in OML 123. I was also told that Addax Petroleum had informed NAPIMS of this during a meeting on 2 December 2010. According to Addax, it was only in a position to supply 100 MMSCuFD of currently flared Wet Gas to P&ID from OML 123. I was also told that, at the meeting of 2 December 2010, Addax Petroleum had indicated that it was now prepared to open a non-associated well in OML 123. Given the terms of the GSPA this would have been of no benefit to P&ID, because under the GSPA P&ID's remuneration consisted entirely of the NGLs to be found within Wet Gas.

122.   P&ID gave considerable thought to how best to respond to this development. We were entitled under the GSPA to the quantities of Wet Gas contracted for, and although the Government should have been able to procure it from one or other source of Wet Gas owned by them. Nonetheless, P&ID devised a possible solution to the Government's problem.

123.   I wrote to the newly appointed General Executive Director, Power and Gas, NNPC, Dr David Ige, on 21 April 2011 (pages 174 to 178 of MQ1) to explain that P&ID would be prepared in principle to contemplate a deviation from Phase 1 of the GSPA that would allow Addax Petroleum to re-inject 50 million MMSCuFD of Lean Gas into the oil reservoir at OML 123 instead of injecting Wet Gas for this purpose. This would entail a different method of achieving the Phase 1 Lean Gas supply to Government, as follows:

123.1    P&ID would strip the Wet Gas from OML 123, which P&ID understood to comprise approximately 180 MMSCuFD offshore, within the OML 123 field area, rather than onshore;

123.2    P&ID would return sufficient Lean Gas thereby produced to Addax Petroleum if required to meet Addax's need for reinjection of Gas into OML 123; and

28

123.3    P&ID would return the balance of the Lean Gas through the Adanga Pipeline to Calabar for the use of the Marubeni Power Plant or other industrial consumers chosen by the Government.

124.    Neil Hitchcock, the Projects Director of P&ID, (and a highly experienced engineer) and I engaged in extensive discussions with Dr Ige. However our proposal did not recommend itself to Dr Ige. Instead, at a meeting on 18 May 2011, Dr Ige suggested a different alternative, based upon the non-associated gas in OML 123.

125.    Dr Ige suggested that, as there were very significant and totally undeveloped non-associated gas fields in OML 123, P&ID should examine the possibility of adapting Phase 1 of the Project to bring that gas on stream, process it and supply it to Government as Lean Gas while still proceeding with Phase 2 using Wet Gas, as planned.

126.    Instead of achieving its remuneration from the NGLs harvested from Wet Gas, such a variation would have required that P&ID should be remunerated in some other way for Phase 1 of the project. I met with Dr Ige on 18 May and 17 June 2011 respectively. Dr Ige explained that it would be possible for P&ID to be rewarded for supplying Lean Gas to the Government from non-associated gas instead of Wet Gas, during Phase 1, by receiving payment for the Lean Gas supplied to the Government at a minimum of $2.00 per MMBtu from 2013 onwards instead of supplying the Lean Gas free of charge.

127.    Once again, P&ID was in principle prepared to contemplate a solution along these lines, if it assisted in achieving the implementation of the project in some form which was still commercially acceptable to us. Although such a variation would have entailed a radical departure from Phase 1 of the GSPA, and would inevitably have involved writing off much of the expenditure invested up to that point, P&ID agreed in principle to examine immediately the economic feasibility of the Project if amended in this way.

128.    Therefore, P&ID wrote on 19 May 2011 to Dr Ige attaching a list of information required by P&ID in order to enable meaningful economic data to be produced for the "*gas gathering*" proposal suggested by Dr Ige (pages 179 to 180 of MQ1).

129.    Although P&ID were keen to assess and progress this potential solution, we encountered much difficulty in doing so, not least because we were not provided by

29

NNPC with the data which we had requested. Nonetheless, after a further meeting with Dr Ige on 17 June 2011 we embarked on an evaluation of the economic viability of adopting Dr Ige's proposal. Ultimately we concluded that, subject to the formal verification by Government of a number of issues, and the need for certain further technical and economic data, Dr Ige's proposal represented a potentially workable solution to the Government's problem in relation to Phase 1.

130.  Facing continuing difficulty in moving forward, on 10 February 2012 I took the step of writing directly to the newly elected President, Mr Goodluck Jonathan, to try to secure his backing for this potential solution. In my letter, dated 10 February 2012 (pages 181 to 183 of MQ1), I provided a brief overview of the purpose of the project and its benefits to the Government. I also indicated P&ID's willingness to agree to an alteration to the project to now utilize non-associated gas for Phase 1 of the GSPA. I pointed out the need for a variation of the GSPA and asked the President to instruct NNPC to ensure the respective cooperation of Addax Petroleum (in respect of Phase 1) and Exxon Mobil (in respect of Phase 2).

131.  In May 2012, pursuant to P&ID's ongoing discussions with Dr. Ige, I wrote to the newly appointed Honourable Minister of Petroleum Resources, Mrs Alison Madueke, and emphasized the need for the GSPA to be formally varied to achieve the contemplated solution in relation to Phase 1. A copy of my letter of 10 May 2012 is at pages 184 to 185 of MQ1.

132.  The ongoing discussions resulted in a meeting on 16 May 2012 between myself, Neil Hitchcock, senior NNPC management headed by Dr David Ige, and the senior managements of Addax Petroleum and P&ID. At this meeting Addax Petroleum confirmed their full cooperation with and support for the amended project.

133.  However, in or about the final week of June 2012 Mr Debo Spaine of Addax Petroleum telephoned me. He informed me that Addax's headquarters in Switzerland had unilaterally decided to withdraw their cooperation and wished to "*undertake the development of the NAG* [non-associated gas] *themselves*".

134.  On 27 June 2012 I wrote on behalf of P&ID to the Group Managing Director of NNPC to express P&ID's shock and dismay at the decision of Addax Petroleum to withdraw their cooperation and support from the Project, and to undertake the development of the non-associated gas in OML 123 on their own account (pages 186 to 188 of MQ1). I asked that immediate action be taken by NNPC to resolve the issues. No action was taken as far as I know.

**Other Business Placed on Hold**

135.   Such was the size and potential of the Project that other opportunities inevitably suffered as work on the Project accelerated. I am advised that, although P&ID is not advancing any damages claim based upon the opportunity cost of its continued attempts to implement the Project, it may be relevant to provide at least some information to the Tribunal as to the impact of all of this upon the rest of our business.

136.   There were various substantial opportunities which we were unable to pursue once we had focused our resources and attention on the Project. By way of example, in 2005 we had incorporated a mining company called EcoPhoenix Ltd ("EcoPhoenix"). We intended to obtain exploration licenses from the Government for the mining of precious metals, to perform the necessary exploration, and then to float the company on an internationally recognised stock exchange once actual mineral resources had been proven.

137.   By way of brief background, between the two world wars, Nigeria had produced significant quantities of gold and tin, as well as coal and other commodities. However, after independence the mineral industry fell into neglect. In 2005, the Government was planning a change in policy towards the development of the solid mineral sector. In 2007 the government passed the Minerals and Mines Act, which made the Nigerian mining sector more attractive and transparent for foreign investors.

138.   Between 2005 and 2007 EcoPhoenix secured (and still holds) 11 exclusive exploration licenses in different parts of Northern Nigeria covering a total of 1695.8 square miles. The licenses prospectively relate to precious metal, industrial and energy minerals and base metals, including gold, zinc, copper, silver, uranium, niobium, tantalum and cryolite.

139.   Our initial tests and research, which included input from independent geological consultants, was encouraging, and indicated the potential for profits over time in the hundreds of millions, if not billions, of dollars. An Information Memorandum dated April 2008 indicates the progress we had made in the early years of Ecophoenix (pages 189 to 228 of MQ1).

140.   In order to advance to the stage of proof of the existence of mineral resources, very considerable expenditure was required, including geological mapping, soil sampling and other geochemical tests, and geophysical analysis involving

helicopter-borne electromagnetic techniques to locate buried conductors. However, as stated at paragraph 47 above, from mid-2006, substantially the whole of the time and resources of my team became fully engaged on the Gas Processing Project. Therefore, the EcoPhoenix venture was largely placed on hold after our initial work, the team of mining-specific experts reduced to a skeleton staff and no substantial exploration progress made.

141.   Furthermore, although, as the time taken for the Gas Processing Project to be implemented had stretched, we had reduced overhead to reflect the fact that as we were not receiving any revenue from the Project, it was necessary for us to maintain a minimum team of engineers and other specialists so as to be ready for the implementation of the GSPA as soon as the Government was able to move forward. The inevitable financial burden of this stalemate was not something we could carry indefinitely.

**Bringing the GSPA to an End**

142.   In mid-2012, six years after we had started our work on the Project in earnest, we decided that we could not wait indefinitely for the Government to fulfil its obligations under the GSPA, and that a time limit would have to be imposed in order to give the Government one last chance to commit to perform its side of the bargain.

143.   Therefore, on the 27 July 2012, I wrote to the Government placing a time limit upon P&ID's continuing willingness to contemplate an alternative solution (pages 229 to 230 of MQ1). My letter stated, inter alia: "*Therefore, P&ID's offer in principle to enter into an amendment [to the GSPA] will be regretfully withdrawn on 10 August 2012 if, by that time and date, no formal amendment has been agreed and executed between the Government and P&ID*".

144.   Again in the absence of any progress, on 22 August 2012 I wrote on behalf of P&ID to the Honourable Minister for Petroleum Resources formally referring the dispute in relation to the performance of the Project to arbitration in accordance with Article 20 of the GSPA (pages 231 to 234 of MQ1). The Request for Arbitration claimed damages for breach of Phase 1 of the GSPA, which required the Government to commence the supply to P&ID of 150 MMSCuFD of Wet Gas on or before the last quarter of 2011. In its Request for Arbitration, P&ID expressly stated that there was no intention to bring the contract to an end, and that P&ID wished to proceed with Phase 2 of the GSPA.

145.   On 19 September 2012 I wrote to the Honourable Minister for Petroleum Resources nominating P&ID's choice of Arbitrator, the Honourable Sir Anthony Evans (page 235 of MQ1).

146.   On the same day the Government wrote to P&ID in response to the Notice of Arbitration suggesting that the Arbitration was premature and proposing a stakeholders' meeting on 12 October 2012 at the office of the Government (pages 236 to 237 of MQ1). I accepted the invitation on behalf of P&ID by letter dated 3 October (pages 238 to 239 of MQ1) and I attended the meeting, without prejudice to the parties' respective positions under the GSPA and the validity of P&ID's Notice of Arbitration of 22 August 2012. As the meeting was without prejudice I shall not say what was discussed.

147.   On 29 November 2012, in the continuing absence of any appointment by the Government of an arbitrator pursuant to Clause 20 of the GSPA, I gave notice, pursuant to Section 17 of the English Arbitration Act 1996, of the appointment of the proposed appointment of P&ID's nominated Arbitrator, the Honourable Sir Anthony Evans, within 7 days, unless the Government made the required appointment and notified P&ID that they had done so (pages 240 to 241 of MQ1).

148.   On 30 November 2012 the Government wrote to P&ID to inform P&ID of the appointment of Chief Bayo Ojo as the Government's arbitrator (pages 242 to 243 of MQ1).

149.   On 14 January 2013 I wrote to the Government on behalf of P&ID seeking, *inter alia*, that the Government procure certain undertakings and provide certain information on or before 28 February 2013 so as to enable P&ID to proceed with Phase 2 of the GSPA (pages 244 to 248 of MQ1). I further stated that in the event that the requested undertakings and information were not provided by the specified date then P&ID would consider all of its options, including accepting the Government's conduct as amounting to a repudiation of the GSPA.

150.   As no response was received, I wrote to the Government on 20 March 2013 accepting on behalf of P&ID the repudiation of the GSPA by the Government and terminating the GSPA (pages 249 to 250 of MQ1).

**Conclusion**

151.   So far as I can tell, the Gas Master Plan appears to remain a part of Government policy. In this regard I refer to a presentation made by Mr Ige, the  Group Executive

Director, Gas & Power NNPC on 5 June 2013, in Lagos (pages 251 to 284 of MQ1), in which the Gas Master Plan was reaffirmed. In that presentation, Mr Ige said, at page 13 of the presentation: "*A second wave of supply project is being developed with the planned capacity of 2150 mmcfd between 2015 and 2019 effectively doubling the domestic gas market. A total of six projects are being progressed at various stages of development*".

152.  However, at page 17 of the presentation, I note that the map entitled "Proposed Gas Pipeline Network" makes no reference to the Adanga Pipeline, which now appears to have been abandoned.

153.  I cannot say with any certainty why the Government failed to honour the GSPA. In my view the influence of the IOCs was likely a significant factor. In any event, I very much regret that we were prevented from implementing the GSPA, which I firmly believe would have been of significant benefit to the nation.

I believe the facts stated in this statement to be true

.......................................

Signed

.....10TH FEB. 2014.

Dated