# EXHIBIT 6

IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND & WALES)

AND

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION
AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:-

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

Claimant

- and -

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

Respondent

---

### STATEMENT OF HON. JUSTICE S.M.A. BELGORE

---

#### Introduction

1.  I, Justice S.M.A. Belgore, CON, GCON, FNIALS, LLD (Hon) Igbinedion University, LLD
    (Hon) University of Abuja, Juris Consult and Arbitrator, am a legal consultant based in
    Abuja, Nigeria. I was called to the Bar in January 1964 by the Honorable Society of
    the Inner Temple and I have been in active legal practice for over 50 years majority
    of which have been spent in the Judiciary. I spent 21 years as a Justice of the
    Supreme Court of Nigeria between 1986 and 2007. I was the Chief Justice of Nigeria,
    the highest post in the Judiciary between 2006 and 2007. I am currently the Vice
    President of the Administrative Tribunal of the African Development Bank. Details of
    my qualifications and experience are set out in Appendix 1.



2.    I have been instructed on behalf of Process and Industrial Developments Limited ("P&ID"), a company incorporated in the Territory of the Virgin Islands ("BVI"), to prepare a statement addressed to the Arbitral Tribunal in answer to the questions put to me by P&ID in connection with this arbitration.

3.    I have been provided by P&ID's solicitors, Harcus Sinclair LLP, with the following materials:

-    Respondent's Notice of Preliminary Objection dated 3 October 2013 (**"Respondent's Notice"**);

-    Respondent's Submissions in relation to the Preliminary Objection and the Preliminary Issue dated 24 January 2014 (**"Respondent's Submissions"**);

-    Memorandum of Understanding of 22 July 2009 for the Processing of Natural Gas and in the Production of Products from Associated Gas between the Ministry of Petroleum Resources of the Federal Republic of Nigeria and Process and Industrial Development Limited (a Nigerian entity) ("the MOU");

-    Gas Supply and Processing Agreement for Accelerated Gas Development between the Ministry of Petroleum Resources of the Federal Republic of Nigeria and P&ID dated 11 January 2010 ("GSPA");

-    the First Witness Statement of Michael Quinn, the Chairman of the Claimant.

4.    [In the course of preparing this statement, I have also considered a number of texts, statutes and case reports as well as evidence and material produced to me in connection with/related to these proceedings. A full list of the principal documents and other materials that I have reviewed and/or relied upon for the purpose of this statement appears at Appendix 2.]

5.    This report has been prepared solely for the use of this arbitration. I understand that the report will be made available to the Arbitral Tribunal, the Ministry of Petroleum Resources of the Federal Republic of Nigeria, and their respective legal advisers and other witnesses or experts.

**Conflicts of Interest**

6.     I have no conflict of interest in accepting these instructions. Although I have acted and still act as an adviser to the Government of the Federal Government of Nigeria on several issues I have neither advised nor do I have relevant confidential information relating to the Ministry of Petroleum Resources of the Federal Republic of Nigeria. Indeed I have never had any cause to advise the Ministry of Petroleum Resources of the Federal Republic of Nigeria or P&ID in any matter, including the present matter. From time to time the Government of the Federal Republic of Nigeria has, via its various ministries and other organs, appeared before me as a party, in a case or litigation in my capacity as a judge, while I was on the bench. None of such possible appearances has any relevance whatsoever to the current case.

**My Duties as Expert**

7.     I understand my duty to the Court and have complied and will continue to comply with my duty to the English Courts, the duties of an expert witness as set out in Part 35 and Practice Direction 35 of the Civil Procedure Rules, Appendix 11 to the Commercial Court Guide, and the protocol for the instructions of experts to give evidence in civil claims (the Protocol).

8.     My experience and expertise is appropriate for the evidence required in this matter, I have set out at Appendix 1 of this report, details of my qualifications, experience and expertise.

9.     The specific questions asked of me, as a matter of Nigerian law, are as follows:

    9.1     Whether or not the Ministry lacked legal and/or contractual capacity to validly enter into the GSPA as alleged, and whether or not the GSPA is void as a result.

    9.2     Whether or not the Claimant failed to comply with the provisions of section 54 of the Companies and Allied Matters Act, Cap C20 Laws of the Federation of Nigeria 2004 (**"CAMA"**), as alleged, and if so whether the GSPA is void, and/or affected by illegality, as a result.

**Question 1: Whether or not the Ministry lacked legal and/or contractual capacity to validly enter into the GSPA as alleged, and whether or not the GSPA is void as a result.**

10. As a matter of Nigerian constitutional law, the Ministry of Petroleum Resources of the Federal Republic of Nigeria is an organ of the Government of the Federal Republic of Nigeria, and is perfectly able to enter into a contract, and perform other executive acts of Government, in the name of the Ministry. When it does so, it does not act as an entity separate from Government – rather, it acts *as* Government.

11. This state of affairs is reflected in the Constitution of the Federal Republic of Nigeria 1999 (the "CFRN"). Section 5 (1) of the CFR and states:

    "*Subject to the provisions of this Constitution, the executive powers of the Federation:*

    (a) *shall be vested in the President and may subject as aforesaid and to the provisions of any law made by the National Assembly, be exercised by him **either directly or through the Vice-President and Ministers of the Government of the Federation** or officers in the public service of the Federation: and*

    (b) *shall extend to the execution and maintenance of this Constitution, all laws made by the National Assembly and to all matters with respect to which the National Assembly has, for the time being, power to make laws." (emphasis supplied)*

12. In addition, section 147 of the CFRN empowers the President of Nigeria to establish "*offices of Ministers of the Government of the Federation*", and section 148 of the CFRN provides that the President may, in his discretion, "*assign to the Vice President or any Minister of the Government of the Federation responsibility for any business of the Government of the Federation, including the administration of any department of government*".

13. There can be no doubt, in my view, that the Minister of Petroleum Resources is so empowered, and that when he or she executes a contract within the Ministry's sphere of responsibility, the contract is binding on the Government. Indeed, if this were not the case, the business of Government would grind to a halt.

14. [In **Nigerian Reinsurance Corporation v. Cudjoe** [2008] All FWLR (Pt. 414) 1455 at 1551 E-F the Court of Appeal (per Adekeye JCA) addressed the question of "*When an organisation is a Federal Government agency*" and held:

*"An agency can be seen as an organ of the Federal Government. Military Administrator of Benue State & 2 Others v. Abayilo [2001] 5 NWLR (Pt. 705) 19 at 35. However, the factors which determine whether or not an organization is an agent of the Federal Government are:-*

*(1) Control or*

*(2) Whether the functions of the organization are aimed at effecting the policy of the Federal Government."*

15.   In **E.A Industries Limited v. NERFUND** [2009] 8 NWLR (Pt. 1144) 535 at 575 F-G the Court of Appeal (per Aboki, JCA) stated thus: *"...an agency of the Federal Government is defined to cover all organs established by law through which the Federal Government carries out its functions."*]

16.   In **NNPC v. Okwor** [1998] 7 NWLR (Pt. 559) 637 at 651 E, the Court of Appeal (per Ubaezonu, JCA) came to the conclusion that because the Chairman of the Nigerian National Petroleum Corporation by virtue of Sec 1 (3) of the Nigerian National Petroleum Corporation Act, was to be known as styled as the *"Minister of Petroleum Resources"*, NNPC was an organ of the Federal Government.

17.   The fact that the Ministry signed the GSPA as an organ of the Government is also clear from the terms of the GSPA itself. It is said to be entered into by the Ministry *"for and on behalf of the Federal Government of Nigeria"*. This does not mean that the Ministry is an agent in the private law sense. This is a matter of Nigerian public law, and reflects the fact that the Ministry is an organ of Government. I note also that the contracting party is referred to as the *"Government"* throughout the GSPA, which is entirely consistent with the Nigerian constitutional law position.

18.   I agree with the proposition advanced in the Respondent's Submissions, that the Ministry of Petroleum Resources of the Federal Republic of Nigeria does not have a separate legal personality. To place this point in context, it is right to say that certain organs of the Nigerian Government are actually incorporated entities. By way of example, the Nigerian National Petroleum Corporation ("NNPC") was established as a Corporation by section 1 (1) of the Nigerian National Petroleum Corporation Act Cap N123 Laws of the Federation of Nigeria 2004. NNPC is charged, inter-alia, with duties relating to the exploitation, marketing, transport and sale of oil and natural gas on behalf of the Government.

19.   By contrast, the Ministry of Petroleum Resources is an unincorporated organ of the Federal Government. For the reasons given above, when the Minister enters into a

contract relating to petroleum resources, he does so *qua* Government, and the Government is bound by the contract. It is irrelevant that the Ministry does not have its own separate legal personality.

20. In my opinion Nigerian constitutional law as it applies to unincorporated ministries follows the position set out in the English House of Lords case of ***Town Investments Ltd V Department of the Environment*** [1978] A.C. 359, where Lord Diplock said:

"*My Lord, the fallacy in this argument* [that when the Secretary of State for the Environment signed a lease, he personally became the tenant] *is that it is not private law but public law that governs the relationships between Her Majesty acting in her political capacity, the government departments in which the work of Her Majesties government is distributed, the ministers of the Crown in charge of the various departments and civil servants of all grades who are employed in those departments....I believe that some of the more Athanasian-like features of the debate in your Lordship's House could have been eliminated if instead of speaking of "the Crown" we were to speak of "the government" – a term appropriate to embrace both collectively and individually all of the ministers of the Crown and Parliamentary secretaries under whose direction the administrative work of government is carried on by the civil servants employed in the various government departments.... Executive acts of government that are done by any of them are acts done by "the Crown" in the fictional sense in which that expression is now used in English public law*." (emphasis supplied).

21. In this regard I note that Section 32 of the Interpretation Act Cap 123 Laws of the Federation of Nigeria 2004 (the "Interpretation Act") provides that:

"*32. Law in force with respect to Federal matters*

(1) *Subject to the provisions of this section and except in so far as other provision is made by any Federal law, the common law of England and the doctrines of equity, together with the statutes of general application that were in force in England on the first day of January, 1900, shall insofar as they relate to any matter within the legislative competence of the federal legislature, be in force in Nigeria*".

22. Given that I agree that the Ministry of Petroleum Resources is not a separate legal entity, but has entered into the GSPA as an organ of the Federal Government, much of the case law cited in the Respondent's Submissions is, to my mind, besides the

point. Nevertheless I shall comment upon the Respondent's authorities in relation to this question as follows.

23.  *OKUBULE V. OYAGBOLA (1990) 4 NWLR PT. 147 72.*

This Authority is cited for the proposition that "*Under Nigerian law... Legal capacity to contract is one of the essential ingredients of a contract. The courts have held that a contract cannot be formed if any of the ingredients is absent.*"

24.  In fact, this case has nothing to do with legal capacity at all. It is primarily concerned with the contractual rules as to offer and acceptance, and also contains comments in relation to the requirement that the minds of the parties be "*ad idem*". The case involved the trustees of a church in Lagos negotiating with the executors of a deceased tenant, and the question which arose was whether, during negotiations between the executors and the trustees, a new agreement had been reached.

25.  *ORIENT BANK (NIG.) V. BILANTE INT'L LTD. (1997) 8 NWLR PT.515.*

This case is cited in support of the same proposition. However, it is also a case about offer and acceptance. The headnote states:

"*There are five ingredients that must be present in a valid contract. They are offer, acceptance, consideration, intention to create legal relationship and capacity to contract. All these five ingredients are autonomous units in the sense that a contract cannot be formed if any of them is absent. In other words for a contract to exist in law, all the five ingredients must be present. **The instant appeal raises only two of the ingredients. They are offer and acceptance. The appeal has nothing to do with the other three ingredients.***" (emphasis added)

26.  At page 76 of the *Orient Bank* case, Tobi J.C.A. of the Nigerian Court of Appeal (Enugo Division) stated:

"*The appeal involves the law of contract. It is elementary law that five ingredients must be present in a valid contract. They are offer, acceptance, consideration, intention to create legal relationship and capacity to contract. All these five ingredients are autonomous units in the sense that a contract cannot be formed if any of them is absent. In other words for a contract to existing law, all the five ingredients must be present. The appeal deals with only two of the ingredients. They*

*are offer and acceptance. The appeal has nothing to do with the other three. Accordingly, I shall confine myself only to the first two ingredients"*

27. I respectfully agree with the learned Justice Tobi J.C.A. However, as I understand the position, P&ID is not contesting any of this. It is accepted that a party must have a capacity to contract - for the reasons given above, it is my opinion that the Ministry of Petroleum Resources *did* have capacity to contract, on behalf of the Government.

28. *ET & EC (NIG) LTD V. NEVICO LTD (2004) 3 NWLR PT. 860 327.*

    This is a case about a pre-incorporation contract. It does not appear to me to be relevant to the question of a Government's capacity to contract.

29. *CARLEN NIGERIA LIMITED V UNIJOS* (1994) 1 NWLR Pt. 323 631.

    This Supreme Court decision analyses the different sorts of "non-natural" person who possess capacity to sue or to be sued. The decision is relied upon in the Respondent's Submissions as support for the proposition that "*The legal personality of a statutory corporation is conferred upon it either expressly or impliedly by the statute creating same*". The case is also relied upon in the Respondent's Submissions to say "*The legal consequence of the above-mentioned principal is that only natural persons and juristic persons can validly enter into a contract under Nigerian law*".

30. I observe, first of all, that this case relates to a strictly different point from the "*capacity to contract*" point which is raised in the Respondent's Submissions. However, and for the avoidance of doubt, to the extent that it is suggested that the Ministry of Petroleum Resources does not have capacity to be sued, then I respectfully disagree. In my opinion it is clear that the Ministry of Petroleum Resources *can* be named as a defendant to a breach of contract claim relating to a contract which it signed as an organ of the Government. The effect of this is that it is, in effect, the Government that is being sued, in the same way that, when the Ministry entered into the contract, it did so *qua* Government.

31. I note that the case concerned a construction contract entered into between Carlen and the University of Jos. Carlen sued for breach of contract, and named both the University Jos and the "*Council of the University of Jos*" as defendants. One of the questions that arose was whether the <u>Council</u> (an unincorporated body) was a legal person that could sue and be sued in its own name.



32. The Supreme Court held, essentially, that a non-natural person could only sue and be sued in its own name if a statute, or the common law, endowed that person with such a right. This could apply not just to a conventional company, but also to, for example, partnerships, trade unions, friendly societies and foreign institutions authorised by their law to sue and be sued.

33. I respectfully agree with the reasoning in the case, that the Council of the University of Jos, not being a separate legal entity, does not have capacity to be sued. However, this is not relevant to the position of the Ministry of Petroleum Resources, which, as explained above, is an organ of the Government and has been sued as such.

34. *ANOZIA V. AG, LAGOS [2010] 15 NWLR PT. 1216 PG. 238 at p. 240.*

    This case is cited in support of the proposition that unincorporated ministries of government do not have a separate legal personality. As stated above, I agree, but this is besides the point.

35. The facts of the Anozia case relate to a suit brought against the judiciary of the state of Lagos, in the course of which the judiciary brought a counterclaim in libel. The main question which came before the Court of Appeal, (Lagos Division) was whether the named organs of the judiciary (including the Attorney General, the Chief Judge and the Chief Registrar) had capacity to sue for libel.

36. The Court of Appeal ultimately decided in favour of the Lagos judiciary. The Court of Appeal made the point that "*juristic corporate bodies*" in Nigeria obtained their legal personality either expressly or impliedly by the statute creating the relevant body.

37. The Court of Appeal also said:

    "*It's indeed right, that the Government of the Federation or other State is constitutionally endowed with a corporate entity. Thus, it can Sue or be sued. See sections 6 (6) (b), 36 (1), (2), 232 (1) of the 1999 Constitution. Contrariwise, the same cannot be said of the various incorporated ministries and functionaries, etc of government. Such incorporated government functionaries cannot therefore sue or be sued...*"

38. I respectfully agree with the Court of Appeal in Anozia, when they say that unincorporated ministries cannot be sued <u>in their own right</u>. However, that is entirely different from suing an unincorporated Ministry <u>as an organ of Government</u>.

As I have stated at paragraph 30 above, when a Ministry issued as an organ of Government, it is in effect the Government that is being sued. The judiciary in Anozia were suing in their own right, and not as an organ of Government.  As a matter of Nigerian constitutional law, the judiciary is not an organ of Government.

39.    *AGBOOLA V SAIBU [1991] 2 NWLR PT 175 566.*

This case is relied upon in the Respondent's Submissions simply to say that an unincorporated Ministry is not a juristic person capable of being sued. As stated above, I agree that an unincorporated Ministry cannot be sued *in its own right*, but this does not mean that it cannot be named as a Defendant, or bring proceedings as a Claimant, in its capacity as an organ of Government.

40.    The facts of this case are worthy of brief consideration. This was a case where two night-watchmen were suing for wrongful dismissal. They were employed by the Nigerian Stored Products Research Institute, and were actually guarding the house of the Director of the Research Institute at the time of the incident which led to their dismissal. They therefore sued the Director, Mr Agboola, as First Defendant, the Research Institute itself, as Second Defendant, and they also named as Third Defendant the Ministry of Science and Technology. Like the Ministry of Petroleum Resources, the Federal Ministry of Science and Technology is an unincorporated Ministry.

41.    The Court of Appeal held that it was not possible for the night-watchmen to sue the Ministry of Science and Technology, because it was not a juristic person.

42.    By way of distinction, it is important to note that no question arose, in this case, as to whether the Ministry of Science and Technology *could be sued, on the facts of the case, in its capacity as an organ of Government.* Rather, the ministry was sued on the basis that it owned the research facility and was in a sense the employer. However, as the Court of Appeal pointed out at page 576 of the decision in Agboola, this was simply not the position. The Nigerian Stored Products Research Institute was itself a separate legal entity established under the National Science and Technology Act, 1980. It was the Research Institute which owned the research facility and which employed the night-watchmen. Hence the Court of Appeal said: "*Therefore, an employee of an Institute, like the respondents, who is aggrieved by anything done or omitted to be done by the Institute or its employee in relation to his employment may, if he so desires, sue the Institute or its employee in question.*"

43.    It is therefore my opinion that the GSPA entered into by the Ministry of Petroleum Resources on behalf of the Federal Government of Nigeria is in fact a contract entered into by the Federal Government of Nigeria, the contractual capacity of which is not in doubt.

44.    Finally I note that the Respondent represented and warranted at clause 22 of the GSPA that it had the right and authority to enter into, perform and observe all of its obligations under the GSPA. It seems quite extraordinary that the same Respondent is now setting up its lack of capacity as a defence to a contractual claim against it under the same GSPA.

45.    Alternatively, and to the extent that the Ministry argues that the Minister had no authority to enter into the GSPA, it is my opinion that the Minister had ostensible authority to enter into the GSPA.

46.    As a matter of Nigerian law, ostensible authority arises where a person, by words or conduct, represents or permits it to be represented that another person has authority to act on his behalf[1]. It seems to me that the appointment, by the President, of Dr Rilwanu Lukman as the Minister of Petroleum Resources, in and of itself, and without more, clearly supports a conclusion that Dr Lukman had ostensible authority to sign the GSPA, being a contract of a type clearly within the bailiwick of the Ministry of Petroleum Resources.

47.    This conclusion is supported in my opinion by the Government's own official pronouncements as to the authority and areas of responsibility of the Minister, and the Ministry, respectively, of Petroleum Resources. In particular, I would draw the Tribunal's attention to the official Federal Government publication "The National Domestic Gas Supply and Pricing Policy Regulations", published in the Federal Republic of Nigeria Official Gazette on 19 February 2008. In these regulations, "Ministry" is defined as "the ministry charged with responsibility for energy" and "Minister" as "the Minister for the time being charged with responsibility for matters relating to Gas resources". I note also that under the Petroleum Act 1990, it is the Minister of Petroleum Resources who is authorized to grant licences in relation to petroleum products (including natural gas), and to exercise general supervision over all operations carried on under licenses and leases granted under the Petroleum Act.

---

[1] Raccah v Standard Co of Nigeria Ltd. Nigeria Law Reports Vol. IV 48; Nasidi v Mercury Assurance Co. Ltd (1971) 1 All NLR 523 at 527-528. 387; Jalico Ltd. v. Owoniboys Tech. Serv. Ltd. [1995] 4 NWLR (Pt.391) 534

48.    In addition, the facts set out in the First Witness Statement of Michael Quinn, which I have seen, would support a conclusion that the Minister had specific authority to negotiate and conclude the GSPA on behalf of Government.

**Question 2: Whether or not the Claimant failed to comply with the provisions of section 54 of the Companies and Allied Matters Act, Cap C20 Laws of the Federation of Nigeria 2004 ("CAMA"), as alleged, and if so whether the GSPA is void, and/or affected by illegality, as a result.**

49.   Section 54 (1) states:

"**Foreign companies intending to carry on business in Nigeria**

(1) Subject to sections 56 to 59 of this Act, every foreign company which before or after the commencement of this Act was incorporated outside Nigeria, and having the intention of carrying on business in Nigeria, shall take all steps necessary to obtain incorporation as a separate entity in Nigeria for that purpose, but until so incorporated, the foreign company shall not carry on business in Nigeria or exercise any of the powers of a registered company and shall not have a place of business or an address for service of documents or processes in Nigeria for any purpose other than the receipt of notices and other documents, as matters preliminary to incorporation under this Act.

(2) Any act of the company in contravention of subsection (1) of this section shall be void.

(3) Nothing in this section shall affect the status of

(a) any foreign company which before the commencement of this Act was granted exemption from compliance with Part X of the Companies Act 1968;

(b) any foreign companies exempted under any treaty to which Nigeria is a party."

50.   Before turning to the relevant law, I should point out I am instructed that P&ID was incorporated in the BVI on 30 May 2006, and that on 1 July 2006 a separate Nigerian company, Process & Industrial Developments (Nigeria) Ltd, was incorporated under the provisions of CAMA. Therefore, it would appear that the strict requirements of Section 54 (1) (that is, the incorporation of a separate Nigerian company) were met long before the GSPA was entered into - no doubt in anticipation of one day implementing, in Nigeria, the project contemplated by the GSPA. Although this

disposes of the Section 54 (1) point on the facts, I shall nevertheless explain why, even if this had not been the case, I disagree with the Respondent's submissions.

51. In my opinion Section 54 is designed to ensure that foreign companies which wish to carry on business in Nigeria incorporate a Nigerian company before actually carrying on that business. As I understand the Respondent's Submissions, it is suggested that a breach of Section 54 occurred merely by reason of P&ID, a foreign company, entering into the GSPA.

52. I respectfully disagree. In my opinion, the requirement in Section 54 is to incorporate a Nigerian entity, not before entering into a contract to do business in Nigeria, but before the commencement of that business in Nigeria. The date of the commencement of the business contemplated by the GSPA must be determined according to the terms of the GSPA. I note that the concept of a "*Start Date*" is used in the GSPA to determine when the 20 year duration of the GSPA will commence. In my view the Section 54 requirement to incorporate a Nigerian entity would not arise before this point. If I were to identify an earlier point, in the context of the GSPA, at which the Section 54 obligation might conceivably arise, it would certainly be no earlier than the point at which P&ID were to commence construction of the "*Gas Processing Facilities*" contemplated by the GSPA. It would certainly not, in my view, arise at the point of execution of the contract.

53. In this regard I note that Section 60 of CAMA states (as relevant):

"**Application of certain sections to foreign companies**
For the avoidance of doubt, it is hereby declared that-
...(b) nothing in this Chapter shall be construed as affecting the rights or liability of a foreign company to sue or be sued in its name or in the name of its agent"

54. In the case of ***Watanmal (Singapore) v. Liz Olofin & Co*** (1998)1 NWLR (PT 533) 311 AT 319, the Nigerian Court of Appeal (Lagos Division) said:

*"I wish to emphasize that as pointed out in the leading judgment, section 54 of the Companies and Allied Matters Act, 1990 does this not apply to the present case. It deals with the conditions a foreign company must fulfill before carrying on business in Nigeria. Section 60(b) makes it clear that a foreign company can sue or be sued in Nigeria in its name or in the name of its agent. Had the learned trial judge's attention been drawn to that provision, he would no doubt have come to the conclusion that*



*the plaintiff/appellant, a foreign company, is entitled to sue here in its name" (per Uwaifo, J.C.A. at page 320, paras F-G)*

55.    The Court of Appeal went on to say:

*"To say that the appellant cannot sue to recover, its money because it is not a company registered in Nigeria is to turn our companies doing business with foreign companies abroad into potential advance fee fraudsters. International trade or commerce is based on trust hence credit is normally extended to the domestic buyers. When he becomes indebted to the foreign creditors who later sued, he decides to take shelter under the umbrella of truncated construction of section 54 of CAMA then it is good-bye to business in Nigeria. That will be cheating. The appeal is allowed" (per Pats-Acholonu, J.C.A. at page 321, paras A-B)*

*"The intent and meaning of the provisions of Section 54 of CAMA is clear precise and unambiguous. It is only to prohibit a foreign company from running business in Nigeria without first going through the process of registration or after obtaining an exemption certificate." (per Musdapher, J.C.A. at page 319 para D).*

56.    In ***Ritz & Co. KG v. Techno Ltd*** (1999) 4 NWLR (Pt 598) 298 at 300, it was held by the Court of Appeal (Abuja Division) that:

*"A foreign company not registered in Nigeria can sue in its name without necessarily suing in the name of its agents in Nigeria. It can never be just and fair approach to say that a foreign company cannot sue to claim its legitimate right in Nigeria because it has not yet been registered. Suing or being sued in Nigeria does not mean "carrying on business" in Nigeria"*

57.    Muntake Coomassie J.C.A. went on to say, in the *Ritz & Co* case:

*"I think there is a fundamental misapprehension of the particular section relied upon by both the trial court and learner counsel for the respondents. The relevant law to my understanding, is that a foreign company which has not been registered in Nigeria under the Act supra, cannot carry on business in Nigeria unless and until it has taken steps to incorporate same...I must state clearly that whatever happens "carry on business" cannot be the same as capacity to sue and be sued. Section 54 is concerned with "carry on business". I have gone through the whole chapter but cannot lay my hand on the definition of carry on business, this may be due to some legislative lapses on the part of the draftsman. However the fifth edition of Black's Law Dictionary P. 194 has defined same as:*



*"To conduct, prosecute or continue a particular application or business as a continuous operation or permanent occupation. The repetition of acts may be sufficient." It goes on to add thus: "to hold one's self out to others as engaged in the selling of goods or services"*

58.     In ***Nigerian Bank for Commerce and Industry Ltd v Europa Traders (UK) Ltd*** [1990] 6 NWLR 36 it was said (Ademola JCA):

"*In as much as a Nigerian who goes to Harrods to buy goods on credit can be sued by Harrods in Nigerian Courts, so also can a British company from whom a British Nigerian has bought goods and has not paid be sued in Nigerian court. There is basis for reciprocity in international relations and no nationalistic feelings rule in international relations*".

59.     On the facts of the *Watanmal* case, a contract had been entered into between the foreign company to supply goods to the Nigerian defendant, and these goods had been delivered to Nigeria. In the *Ritz & Co* case, it was submitted by the Respondent's counsel that a contract had been entered into in Germany and executed in Nigeria between 1982 and 1983, and that this was not contested. It would appear, therefore, that entering into a contract to do business in Nigeria is not *per se* "carrying on business", and that such contracts are not automatically rendered void by Section 54.

60.     Clearly, in my opinion, the fact of entering into a contract with a Nigerian entity, without more, does not constitute "carrying on business" within the meaning of Section 54 (1). It follows that in my opinion the GSPA was neither void nor tainted by illegality. I note the reference in the Respondent's Submissions to the cases of ***Oyeneyin v Akinkugbe*** (2010) 4 NWLR Pt. 1184, ***Thirwell v Oyewumi*** (1990) 4 NWLR Pt 144 and ***Solanke v Adeb*** (1962) All NLR 230. None of these cases relates to Section 54 of CAMA. They are more general decisions relating to voidness and illegality, and I say no more about them.

61.     I also note that in the case of ***Pawa Complex International Inc. v Petroleum (Special) Trust Fund*** (2008) 9 CLRN, which is relied upon in the Respondents Submissions, the Course of Appeal (Abuja Division), held that "carrying on business" meant "*to conduct, prosecute or continue a particular vocation or business as a continuous operation or permanent occupation.*" I also note that, on the facts of the *Pawa Complex* case, the foreign Corporation in question had not just entered into a

contract, but it had taken up an appointment as a consultant to an agency of the Federal Government. In addition, the Court of Appeal cited with approval the case of *Ritz & Co KG v Techno Ltd* as authority for the proposition that "*suing or being sued*" in Nigeria does not mean "*carrying on business*" in Nigeria.

62.   Further, The GSPA states clearly on its face that P&ID, the contracting party to the GSPA, was a BVI company. In my opinion, even if it were the case, as a matter of Nigerian law, that merely entering into a contract amounts to "*carrying on business*" within the meaning of Section 54 (1), then in any event, upon the instant facts, the Respondent's efforts to rely upon the section would be negated by the concepts of waiver and/or estoppel.

63.   The doctrine of waiver is well established in Nigerian law, as more fully appears from *Auto Import Export v. Adebayo [2005] 19 NWLR (Pt.959) 44 at 123 E-F* where, the Nigerian Supreme Court, relying on the decisions in *Ariori & Ors. v. Elemo & Ors. [1983] NSCC Vol. 14, 1* and *Odu' a Investment Co. Ltd. v. Talabi [1997] 10 NWLR (Pt.523) 1* defined waiver as follows

*"... waiver - the intentional and voluntary surrender or relinquishment of a known privilege and a right, it therefore, implies a dispensation or abandonment by a party waiving of a right or privilege which at his option, he could have insisted upon."*

64.   The Supreme Court went on to describe the operation of waiver as follows:

*"Waiver is an abandonment of a right. However, to amount to a waiver, express or implied, two elements must co-exist:*

*a.   the party against whom the doctrine is raised must have knowledge or be aware of the act or omission which constitutes the waiver; and*

*b.   he must do some unequivocal act adopting or recognising the act or omission[2]*

*...*

*The exercise has to be a voluntary act. Thus, a man not under any legal disability, should be the best judge of his interest. If therefore, having full knowledge of the rights, interests, profits or benefits conferred upon him or accruing to him by and under the law, he intentionally decides to give up some or all of them, he cannot be heard to complain afterwards that he has not been permitted the exercise of his*



*rights. He should be held to have waived those rights. He is estopped from raising the issue."*

65.     In my opinion, by entering into the Definitive Agreement, the Respondent waived any right it may have had to insist upon compliance by the Claimant with sections 54 of CAMA.

66.     Furthermore, the concept of estoppel is well known to Nigerian law.

67.     The Supreme Court case of **West Construction Company Ltd. v. Batalha** *[2006] 9 NWLR (Pt. 986) 595 at 620-621 H-A*, involved a situation where the appellant, as employer of the respondent, a Portuguese national, raised the defence of illegality on the basis of breach of the Immigration Act in response to the respondent's claim for outstanding salaries. The illegality defence was rejected by the Court in terms as follows:

*"A defence to an action which is ignoble on its face and tainted or besmirched with an oddity that is inherently dubious, dishonest, and reprehensible does violence to a principle of equity and good conscience ought not in my view win the support of this Court. This Court should not lend itself to a defence for breach of contract which is embarrassing to any conscientious being and is an affront to civilized behaviour and decency."*

68.     In **Oyegoke v. Iriguna** *[2002] 5 NWLR (Pt. 760) 417*, the parties traded in foreign exchange. When the cheques for Pounds Sterling, which were drawn by the appellant on a London bank in favour of the respondent were dishonoured, the respondent filed suit. The appellant raised a defence of illegality based on alleged breaches of Nigerian foreign exchange control laws. That defence was rejected by the Court of Appeal as follows:

*"However, I feel that it is the highest degree of dishonesty for a party who has knowledge or is presumed to have knowledge of the existence of illegality in a transaction to enter into a transaction, draw benefit therefrom, and then turn back to transform such a transaction, label it as illegal and raise illegality as a defence. Equity shall not condone that as one cannot approbate and reprobate. It is both morally and legally despicable. Once the element of illegality is noticed in a transaction, it should from the outset be abhorred and avoided not when benefits are drawn from it by a party.[3]"*

---

[3] *at 440-441 H-A*

69. In *Achu v. Civil Service Commission of Cross River State & Anor*. *[2009] 3 NWLR (Pt. 1129) 475*, in response to a claim for wrongful termination of employment, the respondent employer raised a defence of illegality based on a transfer of service in contravention of certain civil service rules. Supreme Court made the following statement:

    *"It is strange that the illegalities and ultra vires acts on which the respondents made heavy weather were in fact perpetuated by the respondents. It was the respondents who originated or perpetuated the illegalities or ultra vires acts, can they now rely on it as a defence."[4]*

70. Relying upon its decision in *Oyegoke v. Iriguna*, the Supreme Court in *Achu* answered the question in the negative and resolved the issue of illegality against the respondents.

71. The unreported decision of the Nigerian Federal High Court in *Suit No. FHC/ABJ/CS/36/2005, Nigerian Telecommunications Plc & 2 Ors. v Pentascope International B.V. Private Ltd* ("Pentascope") delivered on the 4th day of May 2007 seems to me to be directly on point.

72. The facts in *Pentascope* were as follows. On 18 March 2003, a Management Contract was entered into between (i) Nigerian Telecommunication PLC, (ii) Nigerian Mobile Telecommunication Ltd, and (iii) the Bureau of Public Enterprise ("BPE") on the one hand and (iv) Pentascope International B.V. Private Ltd on the other. At the time the Management Contract was entered into, Pentascope was a foreign company incorporated under the laws of the Netherlands. The Management Agreement was executed pursuant to a successful tender issued by the Government of the Federal Republic of Nigeria through the BPE inviting qualified telecom companies and consortia to manage the administrative, financial, technical, human resources and operate as parts of NITEL and M-TEL[5] through an open bidding process conducted by BPE. The Management Contract was signed after the plaintiffs had conducted their due diligence and satisfied themselves that Pentascope was qualified technically and operationally. Pentascope was accommodated on the plaintiff's premises, and upon signing the Management Agreement Pentascope immediately went to NITEL and started work. It was some two years later, on the 31st of January, 2005 that this action was brought in which the plaintiffs sought to avoid the Management

---

[4] *at 500 G*

[5] NITEL is Nigeria Telecommunications Limited; M-TEL, Mobile Telecommunications Limited



Agreement on the basis of illegality for want of compliance by Pentascope with section 54 of CAMA.

73.  The Court cited with approval the comments of the Court of Appeal in *Oyegoke*, referred to above and went on to cite, with approval the following dicta:

*Sosan v H.F.P. Eng. (Nig) Ltd (2004) 3 NWLR (Pt 861) 546*

*"Public policy demands that a person who has enjoyed benefits for an illegal transaction is disallowed from raising, because of the clear words of the relevant statutes, the omission in an otherwise lawful transaction. The duty on any court of equity is not to allow a party to profit from his own wrongful act in the transaction or to take undue advantage of the other party by his wrongful act in a transaction and to contend that the transaction is unenforceable or to use the court to perpetuate the wrongful act."*[6]

*Adedeji v National Bank (Nig Ltd) (1989) 1 NWLR (Pt 96) 212*

*"Apart from the principle of law involved in this case it is morally despicable for a person who has benefited from an agreement to turn around and say that the agreement is null and void. In pursuance of the principle that law should serve public interest, the courts have evolved the technique of construction in bona partem. One of the principles evolved from such construction in the interpretation of statutes is that no one should be allowed to benefit from his own wrong (nollus commodum capere potest de juria sua propria) As Widgery L.J. said in Buswell v Goodwin (1971) All E.R. 418 at page 421: "the proposition that a man not be allowed to take advantage of his own wrong is no doubt in a very salutary one and one which the court would wish to endorse." The effect is usually that the literal meaning of the enactment is departed from where it would result in wrongful self-benefit."*

74.  The court in *Pentascope* held that the plaintiffs were estopped from raising the issue of illegality. In doing so, it identified the following facts as relevant:

74.1  the plaintiffs knew that Pentascope was a foreign company not registered in Nigeria, that notwithstanding;

74.2  the plaintiffs entered into the Management Agreement with Pentascope, and

---

[6] 439 - 440



74.3 The plaintiffs gave Pentascope their own premises as a platform to commence business.

75. Therefore, in summary, my answer to the two questions of Nigerian law asked of me are as follows:

75.1 **Question 1: Whether or not the Ministry lacked legal and/or contractual capacity to validly enter into the GSPA as alleged, and whether or not the Definitive Agreement is void as a result.**

In my opinion the Ministry entered into the GSPA as an organ of Government. As such the GSPA is binding on the Government and the Ministry is correctly named as a defendant in its capacity as an organ of Government.

75.2 **Question 2: Whether or not the Claimant failed to comply with the provisions of section 54 of the Companies and Allied Matters Act, Cap C20 Laws of the Federation of Nigeria 2004 ("CAMA"), as alleged, and if so whether the GSPA is void, and/or affected by illegality, as a result.**

In my opinion there was no breach of section 54 of the Companies and Allied Matters Act because: (i) a separate Nigerian corporation was set up on 21 July 2006, in compliance with section 54; (ii) in any event, P&ID was not "carrying on business" by entering into the GSPA; and (iii) even if the execution of the GSPA had constituted "carrying on business" within the meaning of section 54, the Ministry has waived its right to rely upon section 54 and/or is estopped from so relying.



**APPENDIX 1**

CURRICULUM VITAE

1. **NAME**       SALIHU MODIBBO ALFA BELGORE

2. **DATE OF BIRTH**    17TH JANUARY, 1937

3. **PLACE OF BIRTH**    ILORIN

4. **PARENTAGE**
   - I)    FATHER              YUSUFU BELGORE, AN ALKALI (DIED 02/11/1960)
   - II)   MOTHER              AISHATU BELGORE (DIED 13/04/2006)

5. **ADDRESS**
   16 UKPABI ASIKA STREET,
   OFF YAKUBU GOWON CRESCENT,
   ASOKORO, ABUJA

6. **SCHOOLS ATTENDED**
   - I)    OKESUNA ELEMENTARY SCHOOL, ILORIN      1945 – 1948
   - II)   ILORIN MIDDLE SCHOOL             1949 – 1951
   - III)  ILESHA GRAMMAR SCHOOL           1952 – 1956

7. **PROFESSIONAL TRAINING**
   - I)    INNS OF COURT SCHOOL OF LAW, LONDON AND THE HONOURABLE SOCIETY OF THE INNER TEMPLE
   - II)   CALLED TO THE UTTER BAR AT THE INNER TEMPLE IN FEBRUARY, 1964

8. **JUDICIAL APPOINTMENTS**
   - I)    APPOINTED ASSOCIATE MAGISTRATE IN THE JUDICIARY OF THE NORTHERN NIGERIA IN JULY, 1964. SERVED IN VARIOUS PARTS OF FORMER NORTHERN NIGERIA AND LATER IN NOTH CENTRAL STATE (NOW KADUNA STATE) VARIOUSLY AS MAGISTRATE, CHIEF MAGISTRATE AND CHIEF REGISTRAR UP TO 1973
   - II)   APPOINTED ACTING JUDGE OF THE HIGH COURTS OF NORTH CENTRAL AND KWARA STATES. KANO AND NORTH–WESTERN

STATES, BENUE, PLATEAU AND NORTH–EASTERN STATES, 1974 (FEBRUARY - JULY).

III) APPOINTED SUBSTANTIVE JUDGE OF THE HIGH COURTS OF BENUE, PLATEAU AND NORTH – EASTERN STATES: 2ND JULY, 1974

IV) APPOINTED A JUDGE OF PLATEAU AND KWARA STATES, 1976 – 1977.

V) APPOINTED CHIEF JUDGE OF PLATEAU STATE ON 1ST MARCH, 1977

VI) APPOINTED JUSTICE OF COURT OF APPEAL ON 1ST SEPTEMBER, 1979 – VIDE OFFICIAL GAZETTE NO 44 VOL 67 OF 18/09/80

VII) APPOINTED JUSTICE OF THE SUPREME COURT OF NIGERIA 26TH JUNE, 1986

VIII) CHAIRMAN, NIGERIAN INSTITUTE FOR ADVANCED LEGAL STUDIES; HIGHEST LEGAL THINK THANK IN NIGERIA, ESTABLISHED UNDER A FEDERAL GOVERNMENT STATUTE. 1999 – 2007

IX) VICE-CHAIRMAN, NATIONAL JUDICIAL COUNCIL, 2001-2006

X) MEMBER OF BOARD OF GOVERNORS, NATIONAL JUDICIAL INSTITUTE, 2002-2006

XI) CHAIRMAN NATIONAL ARCHIVES

XII) LIFE MEMBER, BODY OF BENCHERS

XIII) MEMBER, LEGAL PRACTITIONERS PRIVILEGES COMMITTEE, 1998-2002

XIV) APPOINTED THE HONOURABLE CHIEF JUSTICE OF NIGERIA ON THE 14TH DAY OF JUNE, 2006

XV) CHAIRMAN, NATIONAL JUDICIAL COUNCIL

XVI) CHAIRMAN, FEDERAL JUDICIAL SERVICE COMMISSION

XVII) CHAIRMAN, LEGAL PRACTITIONER PRIVILEGES COMMITTEE

XVIII) CHAIRMAN BOARD OF GOVERNORS, NATIONAL JUDICIAL INSTITUTE

XIX) ELECTED A BENCHER OF HONOURABLE SOCIETY OF THE INNER TEMPLE, LONDON, 2007

XX) VICE PRESIDENT CHARTERED INSTITUTE OF ARBITRATORS

XXI) JUDGE, ADMINISTRATIVE TRIBUNAL OF THE AFRICAN DEVELOPMENT BANK

## 12. **HONORARY AWARDS**

A. GRAND COMMANDER OF THE ORDER OF THE NIGER (GCON)

B.   COMMANDER OF THE ORDER OF THE NIGER (CON)

C.   LLD (HONORIS CAUSA), IGBENEDION UNIVERSITY, OKADA

D.   LLD (HONORIS CAUSA), UNIVERSITY OF ABUJA, GWAGWALADA

13. **LANGUAGES SPOKEN APART FROM MOTHER TONGUE**

YORUBA, HAUSA, ENGLISH, SOME FRENCH AND ARABIC

14. **LANGUAGE UNDERSTOOD**

IGBO

15. **HOBBIES**

HISTORY, SCIENCES, PHYSICS, MATHEMATICS AND TO SOME EXTENT MEDICINE

16. AS A JUDICIAL OFFICER FOR ABOUT FORTY-TWO YEARS, I SERVED ALL OVER THE FEDERAL REPUBLIC OF NIGERIA IN VARIOUS JUDICIAL CAPACITIES. MY DUTY CARRIED ME TO THE NORTH EAST AND WEST, NOW CALLED GEOPOLITICAL ZONES OF THE COUNTRY. THEREFORE I ALWAYS FEEL AT HOME ANYWHERE IN THIS GREAT COUNTRY.

17. **ON RETIREMENT**

a. MEMBER NATIONAL COUNCIL OF STATE

b. JUDGE, ADMINISTRATIVE TRIBUNAL OF AFRICAN DEVELOPMENT BANK

c. CHAIRMAN, TRIPARTITE COMMITTEE ON MINIMUM WAGE

d. CHAIRMAN, CENTRAL WORKING GROUP OF NIGERIA VISION 20:2020

e. CHAIRMAN, NIGERIAN NATIONAL HONOURS AWARD COMMITTEE

18. APPOINTED A MASTER BENCHER OF THE HONOURABLE SOCIETY OF THE INNER TEMPLE IN JANUARY 2007.  FIRST NIGERIAN SO APPOINTED.

# APPENDIX 2

1.  **Respondent's Notice of Preliminary Objection dated 3 October 2013**
2.  **Respondent's Submission in relation to the Preliminary Objection and the Preliminary Issue dated 24 January 2014**
3.  **Memorandum of Understanding dated 22 July 2009**
4.  **Gas Supply and Processing Agreement for Accelerated Gas Development dated 11 January 2013**
5.  **Frist Witness Statement of Michael Quinn dated 10 February 2014**
6.  **Constitution of the Federal Republic of Nigeria 1999**
7.  **Nigerian Reinsurance Corporation v. Cudjoe [2008]** All FWLR (Pt. 414) 1455 at 1551 E-F
8.  **E.A Industries Limited v. NERFUND [2009]** 8 NWLR (Pt. 1144) 535 at 575 F-G
9.  **NNPC v. Okwor [1998]** 7 NWLR (Pt. 559) 637 at 651 E
10. **Town Investments Ltd v Department of the Environment [1978]** A.C. 359
11. **Interpretation Act 1964**
12. **Okubule v Oyagbola [1990]** 4 NWLR PT. 147 72
13. **Orient Bank (Nig.) v Bilante Intl Ltd [1997]** 8 NWLR PT.515
14. **ET & EC (NIG) Ltd v Nevico Ltd [2004]** 3 NWLR PT. 860 327
15. **Carlen Nigeria Limited v Unijos [1994]** 1 NWLR Pt. 323 631
16. **Anozia v AG, Lagos [2010]** 15 NWLR PT. 1216 PG. 238 at p. 240
17. **Agboola v Saibu [1991]** 2 NWLR PT 175 566
18. **Raccah v Standard Co of Nigeria Ltd.** Nigeria Law Reports Vol. IV 48
19. **Nasidi v Mercury Assurance Co. Ltd [1971]** 1 All NLR 523 at 527-528. 387
20. **Jalico Ltd. v Owoniboys Tech. Serv. Ltd. [1995]** 4 NWLR (Pt. 391) 534
21. **Chapter 3 of the Companies and Allied Matters Act 2004**
22. **Watanmal Ltd v. Liz Olofin & Co [1998]** 1 NWLR (PT 533) 311 at 319
23. **Ritz KG v. Techno Continental Ltd [1999]** 4 NWLR (Pt 598) 298 at 300
24. **NBCI Ltd v Europa Traders (UK) Ltd [1990]** 6 NWLR 36
25. **Oyeneyin v Akinkugbe [2010]** 4 NWLR Pt. 1184
26. **Thirwell v Oyewumi [1990]** 4 NWLR Pt 144
27. **Solanke v Abed [1962]** All NLR 230
28. **Pawa Complex Intl. Inc. & Pawa Associates (Nig.) Ltd. v Petroleum Special Trust Fund [2008]** 9 CLRN
29. **Auto Import Export v. Adebayo & Ors [2005]** 19 NWLR (Pt.959) 44 at 123 E-F
30. **Ariori v Elemo [1983]** NSCC Vol. 14, 1
31. **Odu' a Investment Co. Ltd. v. Talabi [1997]** 10 NWLR (Pt.523) 1

32. **WCC Ltd. v. Batalha [2006]** 9 NWLR (Pt. 986) 595 at 620-621 H-A

33. **Oyegoke v. Iriguna [2002]** 5 NWLR (Pt. 760) 417

34. **Achu v. Civil service commission of Cross river State & anor. [2009]** 3 NWLR (Pt. 1129) 475

35. **NITEL Plc v Pentascope** - Judgement