# EXHIBIT 8

**IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)**

**AND**

**AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT 1988**

**BETWEEN:**

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

<u>**Claimant**</u>

**and**

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

<u>**Respondent**</u>

---

## PART FINAL AWARD

---

Tribunal:

Lord Hoffmann (Presiding Arbitrator)

Chief Bayo Ojo, SAN

Sir Anthony Evans

!7   July 2015

1

## A.   THE PARTIES AND THEIR LAWYERS

1.      The Claimant ("P&ID") is an engineering and project management company registered at Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British Virgin Islands with a Nigerian office at 12 Vaal Street, off Rhine Street, Ministers Hill, Maitama, Abuja.   It is represented by SC Andrew LLP of Napier House, 24 High Holborn, London WC1V 6AZ, United Kingdom.

Contact: Mr Seamus Andrew
Telephone +44(0) 20 7183 1701
E-mail seamus.andrew@scaontier.net

2.      The Respondent ("the Government" or "the Ministry") is the Ministry of Petroleum Resources of the Federal Government of the Federal Republic of Nigeria whose office address is 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria.  It is represented by Mr Olasupo Shashore SAN of counsel and Twenty Marina Solicitors LLP, 2nd Floor, Sterling Towers, 20 Marina, Lagos, Nigeria (Ms Lateefat Hakeem-Bakare).

Contacts:
Mr Olasupo Shashore SAN
olasupo@shashore.com
Ms Lateefat Hakeem-Bakare
lateefat.hakeem-bakare@tmslip.com

## B.   SUMMARY OF THE DISPUTE

3.      On 11 January 2010 P&ID and the Government ("the Parties") entered into a written Gas Supply and Processing Agreement ("GSPA") whereby the Government agreed that for a term of 20 years it would make to available to P&ID 400 MMScuFD of Wet Gas and P&ID agreed to process the gas and return approximately 85% by volume to the Government in the form of Lean Gas.  The relevant terms of the GSPA (other than the governing law and arbitration clause set out in paragraph 7 hereafter) are in the Annexure to this Award.

4.      For the purpose of enabling the Wet Gas to be processed, P&ID agreed to construct two or more process streams with ancillary facilities.

5.      The supply of Wet Gas by the Government was to take place in two phases. In Phase 1, the Government was to supply 150 MMScuFD "during or before the last quarter of 2011".  In Phase 2, the remaining 250 MMScuFD were to be supplied "on or before the third quarter of 2012".

6.      There is no dispute that the Government never supplied any Wet Gas.  On 20 March 2013 P&ID wrote to the Government alleging that it had repudiated the GSPA and accepting the repudiation.  It claims about  US$ 6 billion damages for lost profits. The Government alleges that the agreement was on various grounds invalid or subsequently frustrated, varied or discharged by force majeure.

### C.      GOVERNING LAW AND ARBITRATION CLAUSE

7.      Clause 20 of the GSPA, so far as relevant, provides:

> "The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.
>
> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act 1988 which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement.  Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal…
>
> The arbitration award shall be final and binding upon the Parties.  The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties.  The costs of the arbitration shall be borne equally by the Parties.  Each party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as agreed by the Parties.  The arbitration proceedings and record shall be in the English language…"

### D.      PROCEDURAL HISTORY

8.      The arbitration was commenced by a Notice of Arbitration served by the P&ID on 22 August 2012.  By letter dated 19 September 2012 P&ID appointed Sir Anthony Evans as arbitrator and by letter dated 30 November 2012 the Ministry, acting by Ibrahim H Dikko, its Legal Adviser, appointed Chief Bayo Ojo S.A.N. as arbitrator.  On 29 January 2013 Sir Anthony Evans and Chief Bayo Ojo appointed Lord Hoffmann as Presiding Arbitrator.

9.    On 9 May 2013 the parties agreed a procedural timetable by which P&ID was to serve a Statement of Claim on or before 28 June 2013 and the Government was to serve a Statement of Defence on or before 31 July 2013.  By e-mail dated 14 May 2013 the Presiding Arbitrator approved the timetable on behalf of the Tribunal as Procedural Order No 1.

10.     P&ID served a Statement of Case on 28 June 2013.

11.     On 14 September 2013, no Statement of Defence having been served, the Tribunal made Procedural Order No 2 which directed that the Government serve a Statement of Defence by 4 October 2013 and that in default of such pleading the

3

Tribunal would be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act 1990.

12.     On 3 October 2013 the Government served a Notice of Preliminary Objection in which it alleged that the GSPA was void under Nigerian law because the Ministry lacked legal capacity to contract and because P&ID had failed to comply with section 54 of the Companies and Allied Matters Act Cap 20 LFN 2004.  It also alleged that the arbitration agreement was itself void for lack of capacity and that the Tribunal therefore lacked jurisdiction.

13.     On 7 January 2014 the Tribunal by consent made Procedural Order No 3 by which it directed that the following questions shall be decided as preliminary issues:

> (a)     Whether the Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration;
> (b)     If the answer to question (a) is yes, whether it has jurisdiction to decide whether the contract is valid and binding upon the parties;
> (c)     If the answer to question (b) is yes, whether the contract is void for any of the reasons stated in the Notice of Preliminary Objection.

14.     On 3 July 2014 the Tribunal issued a Part Final Award in which it ruled that it had jurisdiction to decide the matters in issue in the arbitration, that it had jurisdiction to decide whether the contract was valid and binding and that the contract was not void for any of the reasons stated in the Notice of Preliminary Objections.

15.     On 21 July 2014 the Tribunal issued Procedural Order No 5, directing that the Government serve its Statement of Defence by 19 September 2014.

16.     On 14 February 2015 P&ID tendered the witness statement of Michael Quinn and the documents exhibited thereto as the factual evidence upon which it intended to rely in support of its Statement of Claim.

17.     On 16 February 2015, the Government not having served a Statement of Defence, the Tribunal made by Procedural Order No 6 a peremptory order within the meaning of section 42 of the Arbitration Act 1996 (UK) directing the Government to serve its Statement of Defence by 27 February 2015.

18.     On 27 February 2015 the Government served a Statement of Defence.

19.     On 6 March 2015 P&ID served a Reply to the Government's Statement of Defence.

20.     On 9 April 2015, by Procedural Order No 7, the Tribunal directed that –
(a)     the Government should by 17 April 2015 serve upon P&ID and the Tribunal the documents and other evidence upon which it intended to rely in support of its Statement of Defence;

(b)      Nigerian law should be treated as a question of law and not required to be proved as a question of fact but that the parties should be at liberty to adduce evidence of Nigerian law by 1 May 2015.

21.      On 22 April 2015, the Government not having served its documents and evidence according to Procedural Order No 7, the Tribunal made Procedural Order No 8 by which it ordered it to do so by 1 May 2015.

22.      On 1 May 2015 P&ID served an expert report of the Hon. Justice Belgore on Nigerian law.

23.      On 4 May 2015 the Government served the witness statement of Mr Ikechukwu Oguine in support of its Statement of Defence.

24.      On 4 May 2015, after consultation with the parties, the Tribunal directed that there should be a Case Management Conference on 6 May 2015 at 10 am BST. On the same date the Presiding Arbitrator sent an e-mail to the parties in the following terms:

> Dear colleagues
>
> The Tribunal would be grateful if the parties would send it, by 6 pm BST tomorrow Tuesday 5 May, an agenda for the Case Management Conference, preferably agreed but otherwise with each party's list of the matters to be discussed.  Presumably these will include (a) bifurcation of liability and damages (b) requests for documents, if any (c) payment of the deposit (d) hearing date and arrangements for the hearing (e) timing of delivery of bundles and written submissions (f) cross-examination of witnesses, if any.
>
> Yours sincerely
>
> Leonard Hoffmann

25.      On 5 May 2015 P&ID's lawyers replied to the Presiding Arbitrator's e-mail:

> Dear Lord Hoffmann,
> Further to your emails of yesterday, the Claimant proposes the following agenda for discussion at the Case Management Conference tomorrow morning:
>
> (a) bifurcation of liability and damages;
> (b) payment of the deposit;
> (c) hearing date and arrangements for the hearing;
> (d) timing of delivery of bundles and written submissions.
>
> The Claimant has written to the Respondent's lawyers to seek agreement to the above agenda, although none has yet been forthcoming.

26.      This proposal omitted discussion of requests for documents or the cross-examination of witnesses.  On 5 May 2015 Mr Shashore on behalf of the Government replied:

> Dear Presiding Arbitrator
>
> Respondent agrees with the proposed agenda for tomorrow's meeting....

27.      On 6 May there was a Case Management Conference by telephone at which P&ID was represented by Mr Seamus Andrew and the Respondent by Mr Olasupo Shashore.  Neither side requested the attendance of a witness for cross-examination at the hearing.

28.      On 6 May 2015 the Tribunal made Procedural Order No 9 by which it ordered that –

> (a)      the proceedings should bifurcated and that there should first be a hearing on liability and then, if P&ID was successful, a hearing on damages;
> (b)      the Government should serve by 8 May 2015 a statement of any primary facts in the witness statement of Michael Quinn which were challenged and of any other facts alleged to be relevant to the question of liability.

29.      On 12 May 2015 the Government served a notice pursuant to Procedural Order No 9 stating the six facts in Mr Quinn's witness statement which it challenged.

30.      On 25 May 2015 P&ID served a written skeleton argument stating the arguments which it intended to advance at the oral hearing on 2 June 2015.

31.      On 28 May 2015 the Government served a written statement of the arguments which it intended to advance on the oral hearing on 2 June 1015.

32.      On 31 May 2015 P&ID served a written statement in reply to the Government's statement of 28 May 2015.

33.      On 1 June 2015 the Tribunal held a hearing at the International Disputes Resolution Centre, 70 Fleet Street London.  Mr Seamus Andrew made submissions on behalf of P&ID and Mr Olasupo Shashore made submissions on behalf of the Government.

34.      At the hearing the Government applied for leave to cross-examine Mr Quinn and Justice Belgore.  The Tribunal refused leave on the following grounds:

> (a)      both parties had been invited by the Presiding Arbitrator on 4 May 2015 to discuss at the Case Management Conference on 6 May 2015 the question of whether any witnesses should be cross-examined and the Government had made no application at that stage;

(b)     The provision in Procedural Order No 9 requiring the Government to serve notice of any primary facts in the witness statement of Mr Quinn that it challenged was intended to enable the parties to know which, if any, relevant facts were in dispute.  In the event, P&ID said that none of the six disputed facts were essential to their claim and they did not intend to rely upon them. It followed that there was nothing upon which cross-examination was required.

(c)     Mr Quinn had died since making his witness statement and, as Justice Belgore had not been notified of any wish to cross-examine him, he was not in attendance.

35.     P&ID did not cross-examine Mr Ikechukwu Oguine on witness statement and the Government has submitted that the Tribunal is therefore "duty bound to accept the evidence of Mr Ikechukwu Oguine as the truth in this arbitral dispute and to find in favour of the Respondent".[1]  The Tribunal rejects this submission.  First, there is no rule that a court or tribunal is bound to accept the evidence of a witness who has not been cross-examined.  There is only a general principle of fairness which requires a court or tribunal, if asked to reject the evidence of a witness, to take into account whether he or the party calling him has been given a fair opportunity, by cross-examination or otherwise, to deal with the grounds upon which it is said that his evidence should be rejected. Secondly, although Mr Ikechukwu Oguine made what was called a witness statement, he gave no relevant evidence.  His statement consisted of references to documents on the record and submissions in similar terms to those made by Mr Shashore.  Accordingly, he has not deposed to any facts which the Tribunal is being invited to reject.

36.     On 12 June 2015 the Government served a written Response to P&ID's reply of 28 May 2015.  We shall call this the "Final Submission" or "FS".

## E.     EVENTS PRECEDING THE GSPA

37.     The following is an account of the events which formed the background to the GPSA.  It is taken from those parts of the witness statement of Mr Michael Quinn which have not been contested by the Government. Footnote references are to the paragraphs of this statement.

(a)     Besides producing oil, an oil well also discharges gas, called "associated gas" or "Wet Gas".  Wet Gas consists of natural gas combined with liquids (condensate and a mixture of propane and butane, called "Natural Gas Liquids" or "NGLs").  Wet Gas is not suitable for power generation but the NGLs can be stripped out of the gas stream and sold as condensate and Liquid Petroleum Gas, while the remaining dry or lean gas can be supplied to power stations or for commercial use.[2]

---

[1] Final Submission paragraph 43.
[2] 23-24

7

(b)     There is a chronic shortage of electric power in Nigeria, causing unemployment and poor economic performance outside the pure oil and gas sector.[3]

(c)     Although the Government has built a number of gas turbine power plants, many stand unused for lack of lean gas feedstock.  International oil companies ("IOCs") have for various reasons been unwilling to produce lean gas.[4]

(d)     The Government was anxious to increase the supply of lean gas to the domestic market.  In November 2007 it published a Gas Master Plan, designed to encourage investment in the supply and use of gas for power generation and industry.[5]

(e)     P&ID put to the Government a proposal which, shortly stated, was that the Government should supply it with Wet Gas free of charge.  It would then process the gas and return the resulting Lean Gas to the Government free of charge and retain the NGLs for its own account.[6]  This proposal was in principle accepted by the Government.

(f)     During the negotiation of the GSPA, there was discussion of where the Government would obtain the Wet Gas which it was contracting to supply.  Part was expected to come from OML (Oil Mining Lease) 123, which was being operated by Addax Petroleum ("Addax").[7]  At the time of execution of the GSPA the Government was constructing the Adanga Pipeline from OML 123 to Calabar, with a throughput capacity of 600 MMSCuFD.  It contemplated that this would be sufficient capacity to carry the 150 MMSCuFD required for Phase 1.  For Phase 2, some other source was needed.  OML 67, operated by Exxon Mobil ("Exxon"), appeared to be a likely source, but would require the construction of an additional length of pipeline.  P&ID agreed that if this was needed, it would at its own expense construct a pipeline up to 70 km in length.[8]

## F.     EVENTS SUBSEQUENT TO THE GSPA

38.     The following account of events which followed the signature of the GSPA is again taken from the uncontested parts of the affidavit of Michael Quinn:

(a)     In March 2011 Mr Quinn was informed that Addax was unwilling to supply more than 100 MMSCuFD as it needed 50 MMSCuFD for reinjection to maintain pressure.[9]  Mr Quinn wrote to NNPC proposing variation by which P&ID would receive the 150 MMSCuFD of wet gas from the Addax field and return 50 MMSCuFD of *lean gas* to Addax for reinjection.  It would thereby still be able to secure the NGLs from 150 MMSCuFD.[10]

---

[3] 26
[4] 27
[5] 35
[6] 65
[7] 86
[8] 92-93
[9] 121
[10] 123

(b)      This proposal was not acceptable to NNPC, which suggested instead that P&ID should be supplied with gas from a non-associated gas field.  As such gas would not yield NGLs, the proposal was that P&ID should instead be paid for the lean gas supplied to the Government.[11]

(c)      P&ID was in principle willing to enter into such an arrangement but negotiations progressed slowly.[12]

(d)      Addax (on whose OML the associated gas would be found) was at first willing to agree but in June 2012 withdrew its support.[13]

(e)      On 27 July 2012 Mr Quinn wrote to the Government saying unless a formal amendment had been agreed and executed by 10 August 2012, the offer to amend the GSPA would be withdrawn.[14] No formal amendment was executed.

(f)      On 22 August 2012 P&ID delivered the Request for Arbitration.


## G.      THE ISSUES

39.      The issues raised by the Government in its Statement of Defence, the written submissions ("WS") supplied to the Tribunal by Mr Shashore for the purposes of the hearing, and the Final Submission are as follows:

(a)      Did the Government have authority to enter into the GSPA?[15]

(b)      Was the Government's obligation to supply Wet Gas limited to such as Addax and Exxon were willing to provide?[16]

(c)      Did the Government have any obligations under the GSPA before it commenced the supply of Wet Gas?[17]

(d)      Was the Government's obligation to supply Wet Gas conditional upon the Claimant having previously constructed the gas processing facilities?[18]

(e)      Was the GSPA vitiated by a misrepresentation by P&ID or a mistaken belief on the part of both Parties that the OMLS contained 250 MMSCuFD[19] or 400MMSCuFD[20] of Wet Gas?

(f)      Was the GSPA frustrated by the refusal of Addax to provide Wet Gas?[21]

---

[11]  126
[12]  130
[13]  133
[14]  149
[15]  Defence paragraphs 1 and 2; WS paragraphs 8-16; FS paragraphs 2-36.
[16]  Defence paragraphs 4 and 14; WS 37-49; FS paragraphs 44-45.
[17]  Defence paragraph 6; WS paragraphs 70-74
[18]  Defence paragraph 7; WS paragraphs 17-36 and 75; FS paragraphs 46-49.
[19]  Defence paragraphs 8-9; WS paragraphs 50-58
[20]  Defence paragraph 10, WS paragraphs 59-64
[21]  Defence paragraph 12.

(g)     Was the Government discharged by force majeure?[22]

(h)     Is the validity of the GSPA affected by the P&ID's alleged motives for entering into it?[23]

(i)     Is the validity of the GSPA affected by the P&ID's alleged lack of a legitimate expectation that the Government would be able to perform its obligations?[24]

(j)     Was the GSPA void as illegal or contrary to public policy?[25]

(k)     Did the GSPA become extinct by the P&ID's acceptance of a bilateral offer?[26]

40.     We shall discuss each of these issues in turn.


## H     DISCUSSION

### (a)     Capacity

41.     It was clear from the argument at the oral hearing on 2 June 2015 and even clearer from the Government's subsequent written Response that great stress is laid upon the lack of capacity of the Minister of Petroleum Resources to enter into the GSPA on behalf of the Government.  The Government's submission described the holder of the office at the time of the GSPA as having been a "friendly" Minister who purported to commit the Government to obligations and concessions which exceeded his powers.

42.     The question of capacity to enter into the GSPA was raised by way of preliminary objection and considered by the Tribunal in its first Part Final Award. At that stage, however, the objection took a rather different form.  It was argued that the Ministry of Petroleum Resources was not a juristic person and therefore unable to enter into contracts. The Tribunal decided that the contracting party was the Federal Government of Nigeria, on whose behalf the GSPA said the Minister was acting. The Government was admittedly a juristic person capable of entering into contracts.  The powers being exercised were the executive powers of the Government, vested in the President but exercisable on his behalf in accordance with sections 5(1) and 147 of the Constitution.

43.     Mr Andrew submitted that, as a result of the first Part Final Award, the question of the Minister's capacity to enter into the GSPA on behalf of the Government was *res judicata* or, alternatively, that the present form of objection should have been raised at the time and that it would be an abuse of process to take

---

[22]  Defence paragraphs 13-14, WS 65-69
[23]  Defence paragraphs 15
[24]  Defence paragraphs 17 and 18; WS paragraphs 86-91
[25]  Defence paragraph 21; WS paragraphs 92-101
[26]  Defence paragraph 20; WS paragraphs 82-85

the point now.  We think that the argument now put forward is not the same as that which the Tribunal considered in the first Part Final Award and therefore not *res judicata*.  As for abuse of process, we would agree that if the first Part Final Award had been intended to deal with all questions of capacity, the Government should not be allowed to raise the question of capacity again.  But the Preliminary Objections with which the Tribunal dealt at that stage were only points which the Government had selected as providing it with a defence which did not involve looking into the merits and we do not think that they precluded the Government from raising different points later.

44.     Mr Shashore's submission was that the Minister of Petroleum Resources lacked the capacity to commit the Government to the sale of gas and the other privileges and concessions granted by the GSPA.  Prima facie, it would appear to us that dealing with natural gas from Nigerian oil fields was a matter within the remit of the Minister of Petroleum Resources.  Section 1(1) of the Petroleum Act[27] provides that "the entire ownership and control of all petroleum in, under or upon any lands to which this section applies shall be vested in the State."  Petroleum is defined to include natural gas and the section applies to Nigeria and the sea offshore. The power to grant licences to prospect for and develop oil and gas and to sell or otherwise deal in oil and gas is vested in the Minister of Petroleum Resources.[28] As we have seen, recitals (b) and (c) to the GSPA explained the Government's access to the gas it was proposing to supply to P&ID:

> b)     The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators

> c)     The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allotted to the international operators.

45.     It appears to us that *prima facie* it was a matter for the Government acting by the Minister of Petroleum Resources to deal with these gas resources which belonged to the State under section 1 of the Petroleum Act.

46.     It is of course true that if there was legislation which specifically allocated exclusive responsibility for entering into contracts for the supply of such gas to some other body or Ministry, it would not be within the power of the Minister of Petroleum Resources to enter into a contract such as the GSPA.  Mr Shashore referred us to a number of cases in support of this proposition,[29] which we accept. He also cited in support *Knight, Frank Rutley* v *Attorney General of Kano State*[30]*,* in which the Court

---

[27] 1990, Chap P10.
[28] Sections 2(1) and 4(1).
[29] *Eleso* v *Government of Ogun State* [1990] 2 NWLR at 443; *P.H.M.B.* v *Ejitagha* [2000] 11 NWLR (Pt. 677) at pp. 163-70; *Oikherhe* v *Inwanfero* [1997] 7 NWLR (Pt. 512) at p. 247; *Emuze* v *Chancellor* [2003] 8 M.J.S.C. at p. 16.
[30]  [1990] 4 NWLR (Pt. 142) 210

of Appeal decided that upon the true construction of the Constitution, the exclusive power to value tenements for rates was vested in the Local Government Council.  It was therefore *ultra vires* for the Kano State Government to contract with Knight, Frank Rutley to carry out such a valuation.

47.     In Mr Shashore's first written submissions, his candidate for a body with "the exclusive right to possess and supply gas" was the Nigerian National Petroleum Corporation ("NNPC")".

48.     Before entering into question of whether statute had conferred such exclusive rights on the NNPC, we should observe that the objection is technical in the highest degree.  Pursuant to a Memorandum of Understanding which preceded the GSPA[31], a Joint Operating Committee ("JOC") was established to "discuss in detail regarding the implementation of the Project."  The Legal Director of the NNPC was a member of the JOC.[32]  Dr Lukman, the Minister of Petroleum Resources who signed the GSPA, was chairman of the NNPC.[33]  The Board of Directors of the NNPC were members of or appointed by the Government.[34]  If the Minister thought (as he must have done) that the GSPA was in the public interest, there would have been no difficult in making the NNPC a party.

49.     Be that as it may, and looking at the technicalities of the matter, we do not think there is anything in the constitution and powers of the NNPC to prevent the Government from entering into a contract to provide Wet Gas. Section 5 of the Nigerian National Petroleum Corporation Act sets out the *duties* of the Corporation:

> **5.**  (1)     Subject to the provisions of this Act, the Corporation shall be charged with the duty of-
>
> (a)     exploring and prospecting for, working, winning or otherwise acquiring, possessing and disposing of petroleum;
> (b)     refining, treating, processing and generally engaging in the handling of petroleum for the manufacture and production of petroleum products and its derivatives;
> (c)     purchasing and marketing petroleum, its products and by-products;
>
> (d)     providing and operating pipelines, tanker-ships or other facilities for the carriage or conveyance of crude oil, natural gas and their products and derivatives, water and any other liquids or other commodities related to the Corporation's operations;
> (e)     constructing, equipping and maintaining tank farms and other facilities for the handling and treatment of petroleum and its products and

---

[31] Article 8 a)
[32] Quinn Witness Statement, paragraph 80.
[33] Nigerian National Petroleum Company Act, section 1(3).
[34] Ibid., section 1(2).

derivatives;

(f)        carrying out research in connection with
petroleum or anything derived from it and promoting
activities for the purpose of turning to account the
results of such research;

(g)        doing anything required for the purpose of
giving effect to agreements entered into by the Federal
Government with a view to securing participation by
the Government or the Corporation in activities
connected with petroleum;

(h)        generally engaging in activities that would
enhance the petroleum industry in the overall interest
of Nigeria;  and

(i)        undertaking such other activities as are
necessary or expedient for giving full effect to the
provisions of this Act.

50.     None of these duties can be regarded as conferring exclusive powers.  In fact,
sub-paragraph (g) specifically contemplates that the Government will be entering into
contracts within the scope of the NNPC's remit.

51.     In his oral submissions and written Final Submission, Mr Shashore submitted
that the body with exclusive powers was the Ministry of Energy. These powers, he
said, were derived from the National Gas Supply and Pricing Policy, published by the
Government in 2008, and the National Domestic Gas Supply and Pricing Regulations
2008.

52.     The main object of the Policy was to make more gas available for the
"strategic domestic sector", including in particular the generation of electricity. The
policy document points out that Nigerian (wet) gas is rich in liquids –

"such that the residue (lean) gas can be delivered at
relatively little or no cost as the project remains profitable
to the supplier on the strength of the liquids contract alone."

53.     This of course was the business model which P&ID was proposing to the
Government.  The Policy proposes legislation by way of implementation (a
"Downstream Gas Act"), but there is nothing in the document which allocates
responsibility to any particular Ministry.[35]  The Regulations create Department of Gas
within the Ministry of Energy and confer upon it certain regulatory powers but
nothing to suggest that it will enter into the business of selling gas, still less that it will
have the exclusive power to do so.

54.     It therefore appears to us that the Ministry of Petroleum Resources was an
appropriate entity to enter into the GSPA on behalf of the Government and we reject
the submission that it lacked the authority to do so.

---

[35] It is interesting to notice that the Regulations were made by the President as Minister of Energy under a
rule-making power conferred by section 9 of the Petroleum Act upon the Minister of Petroleum
Resources.

**(b)      Specific or unascertained Wet Gas?**

55.      Mr Shashore submits that the contract was for the supply of Wet Gas from OML 123 (Addax) and OML 67 (Exxon).  He draws attention to Recital (i), which states that P&ID had "undertaken all necessary studies, including the identification of suitable associated gas fields".  These were OML 123 and OML 67.  P&ID located its proposed plant in a place convenient for receiving Wet Gas from OML 123 and offered to construct a new length of pipeline to bring gas from OML 67. In the course of negotiations P&ID wrote letters to the Minister of Petroleum Resources identifying OML 123 and OML 67 as fields from which its requirements of Wet Gas could be satisfied.  It follows, he says, that the contract was for the supply of Wet Gas from OML 123 and 67.

56.      The difficulty is that this is not what the GSPA says.  Article 6 a) says that the responsibility of the Government is to deliver to the Site boundary "the agreed quantities and quality of gas as defined under Article 3c and in the manner set out in Appendix A…"  Appendix A specifies quantities and quality but says nothing about where the gas should come from. Article 3c, under the heading "Scope of the Work" says that the gas would be from OMLs 123 and OML 67 "or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements…"

57.      It is clear from these provisions that although the parties regarded OML 123 and 67 as the most likely source of Wet Gas for P&ID's plant, there was no contractual term that it should have to come from those fields and nowhere else. The Government was at liberty to discharge its obligation to supply Wet Gas from any of the substantial sources which recital b) said were at its disposal.

58.      It is therefore unnecessary for us to decide whether, if the contract had been for the supply of Wet Gas specifically from those two fields, the unco-operative attitude of Addax and Exxon would have excused the Government from performance throughout the life of the agreement.  That may have been a large question on which we have little evidence.  In our opinion, however, this was a contract for the supply of unascertained Wet Gas and therefore the Government's inability to obtain it from OML 123 or OML 67 is not relevant.

**(c)      When did the Government's obligations begin?**

59.      Article 5 says "the Agreement shall come into being on the Effective Date".  The duration of the Agreement is (subject to extension) 20 years "with the effect from the Start Date", which is defined to mean the earliest date on which the Government starts to deliver the Phase 1 quantities of 150 MMSCuF of Wet Gas.

60.      The Government obligations which P&ID says it has failed to perform and which constituted a repudiatory breach are those in Article 6 a) and b): to deliver the gas to the Site boundary and to ensure that all the necessary pipelines and infrastructure and arrangements with Third Parties are in place to "facilitate the timely implementation of gas processing".

61.     Mr Shashore submits that the Government's obligations commenced only at the "Start Date", that is, when it first started to deliver gas.  In other words, it was under no obligation to deliver gas until it had started to deliver gas.

62.     This extraordinary proposition is in our opinion the result of a misunderstanding about the significance of the term "Start Date".  Its sole function is to determine the duration of the contract and to ensure that P&ID's 20 year franchise is not to be reduced by the Government's delay in starting to deliver gas.  But the obligations of the Government under Article 6 b) began on the Effective Date, when the contract took effect.  That was the date on which it was signed.

**(d)     Did the Government not have to do anything till the GPFs had been built?**

63.     Mr Shashore submits that the Government had no obligation to deliver gas until there was a plant to receive it.  That, no doubt is true, but the Government's obligations were not confined to the delivery of gas.  By Article 6 b) it was also obliged to –

> "ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement."

64.     There is nothing in the GSPA to suggest that these obligations were conditional upon the completion by P&ID of the construction of the GPFs. It would have been commercially absurd for P&ID to go to the expense of building GPFs when the Government had done nothing to make arrangements for the supply of the Wet Gas.

65.     In his oral argument and written Final Submission, Mr Shashore put forward a modified version of this argument. Article 3(c) said that the Government was to deliver the gas at "the Site Boundary".  The "Site" was defined as "the land at Calabar on which the GPFs are located".  Mr Shashore says that the Government could not have complied with this obligation until P&ID had a site.  It had, it is true, been allocated and offered a site but had not yet bought it.  So there was no possibility of compliance with an obligation to deliver to the Site boundary until P&ID has a Site.

66.    We think this argument takes the matter no further than the first version.  Of course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it.  But that does not excuse the Government's failure to comply with 6 b).  There is no suggestion that its failure to comply with those obligations was caused by uncertainty as to where the Site was going to be. It was assumed by everyone that it would be on the land allocated in Calabar.

**(e)      Misrepresentation or mistake**

67.      The Government next submits that it was induced to enter into the GSPA by a
false representation that OML 123 had at least 180 – 200 MMSCuFD or at any rate
over 150 MMSCuFD or alternatively that it was the subject of a common mistake and
that "the GSPA was therefore void and unenforceable from inception."[36]

68.      One of the difficulties about these defences is that the Government has called
no evidence to support them.  The only witness statement submitted on behalf of the
Government is that of Mr Ikechukwu Oguine, a lawyer who works for NNPC and
who does not claim to have first-hand knowledge of any of the relevant events.  All he
says is that he has read the documents. His reading of the documents appears to have
been somewhat imperfect because, in alleging misrepresentation, he had read the
statement in Article 8 g) that "the Adanga pipeline…will have a throughput capacity
of 600 MMSCuFD" to mean that "OML 123 [will] contain…600 MMSCuFD", which
he says was untrue.  Perhaps it was, but that was not what Article 8 g) said.

69.      The allegations of misrepresentation (and reliance thereon by the GSPA)
therefore depend upon such inferences as can be drawn from the documents and the
evidence of Mr Quinn.

70.      Mr Quinn said in his witness statement:

> "51.…[T]here were numerous natural gas fields off the
> coast of Calabar, such as those contained in [OML 123 and
> OML 67]…
>
> "52.  From information available in the public domain and
> from our own researches it was clear that there was more
> than enough Wet Gas off the coast of Calabar to support a
> gas stripping and propylene plant operation in the Calabar
> area processing a Wet Gas throughput of 400
> MMSCuFD…
>
> 73.   There were discussions about the possible locations
> from which to source Wet Gas for the Project.  On 15 June
> I wrote to the Honourable Minister to explain the potential
> benefits of using, for Phase 1, the 180-200 MMSCuFD of
> Wet Gas which was at that time being flared by Addax
> Petroleum off the coast of Calabar in a concession known
> as OML 123.
>
> 84.   [In September 2009] a series of meetings
> commenced, some of which included *"stakeholders"* such
> as P&ID, the Government and Addax, some of which were
> between P & ID and Addax, and, I believe, some of which
> were between the Government and Addax.

---

[36] Shashore Written Submissions paragraph 51.

> 86.   [At a meeting chaired by Engineer Tijani, technical
> adviser to the Ministry, on 13 November 2009] …Addax
> Petroleum confirmed their willingness to deliver 100
> MMSCuFD of natural gas from the 168 MMSCuFD Wet
> Gas that they were currently flaring to the P&ID site…to
> comply with its domestic obligations."

71.    It appears from this evidence that in June 2009 Mr Quinn wrote to the
Minister saying that Addax were flaring 180-200 MMSCuFD and that in November
Addax said they were flaring 168 MMSCuFD.   Both of these may have been right,
but even if Mr Quinn's estimate was wrong, we cannot infer that the Government
relied upon it when entering into the contract.  Addax was the concessionaire and best
placed to know how much gas was available. It was making regular returns to the
NNPC.  The Government had been having meetings with Addax and other
stakeholders and at the 13 November meeting Addax provided its own estimates.
Accordingly, the evidence does not support the conclusion that the Government relied
upon a misrepresentation by P&ID as to the gas which could be obtained from OML
123.

72.    For the same reasons, there is no evidence to support the conclusion that the
Government made a mistake. As a result of its meetings with Addax, it is likely that it
knew exactly how much gas was available.  It is therefore unnecessary to decide
whether the mistake was such as to vitiate the contract or one of which the
Government took the risk.  Prima facie we think that it is the obligation of a party
who offers to provide something to ensure that it is there to be provided and that he
cannot rely upon his mistake if this turns out not to be the case.

**(f)     Frustration**

73.    The Government next says that the contract became impossible of
performance when Addax refused to provide the necessary 150 MM SCuFD of Wet
Gas.   But there is no evidence that the contract was incapable of performance. All we
know is that Addax and Exxon were unco-operative. But there is nothing to show that
upon suitable terms the Government could not have obtained gas from their fields, as
provided for an contemplated in Article 3 c) under the heading "Scope of the Work".
In any case, our finding that the GSPA, upon its true construction, was for the supply
of specified quantities and qualities of unascertained gas, must be fatal to a claim of
frustration. There is nothing to show that the Government could not have obtained the
gas from the other sources mentioned in recitals b) and c).

**(g)     Force majeure**

74.    In its first written submissions the Government relied upon the *force majeure*
clause but Mr Shashore abandoned this submission at the hearing.  We think he was
right to do so.

**(h)    The profit motive**

75.    The Government said, in its Statement of Defence[37], and Mr Oguine said in his witness statement[38] that P&ID was motivated by the wish to make a profit. It is unusual for anyone to enter into a business transaction for any other purpose and Mr Shashore said at the hearing that he did not rely upon this feature as a defence.

**(i)    Legitimate expectation**

76.    The Government's submissions contain numerous references to the concept of legitimate expectations. It is said that P&ID could not have had a legitimate expectation that the Government would do all the things it had promised to do in the GSPA. Some of these (such as the ability to obtain gas from OMLs operated by Addax and Exxon) are irrelevant once it is appreciated that the contract was for the supply of Wet Gas from any source and not from any particular OML. Others, like the grant of "Pioneer status", are not presently in issue and the Government's powers in that respect have not been investigated. But we think that the references to legitimate expectations and the citation of public law cases on the subject demonstrate a serious confusion between public and private law. A body exercising public law functions may have a duty in public law, enforceable by public law remedies, to act in accordance with the legitimate expectations of persons who may be affected by its acts or omissions. But although one party to the GSPA was the Government, it was nevertheless a contract, enforceable as a matter of private law. P&ID's rights are rights to the enforcement of the contract or compensation for its breach, exactly as if the other party had been a private person. In this situation, the concept of legitimate expectations has no role to play.

**(j)    Illegality and public policy**

77.    Finally, the Government claims that the GSPA was illegal and contrary to public policy. The grounds appear to be that the Government promised various permits, licences and approvals and "Pioneer status" (carrying exemption from various taxes and duties) for 5 years which were not within the remit of the Ministry of Petroleum Resources. However, as we explained in our first Part Final Award, the GSPA was not a contract with the Ministry of Petroleum Resources. It was a contract with the Federal Government of Nigeria. It may at some stage become an issue as to whether the Government can avoid liability for such matters as the grant of Pioneer status on the ground that some approval or consent internal to the Government had not been obtained. But no such issue arises at the moment. We do not think that the Government has demonstrated any ground upon which it can be said that the GSPA was unlawful or contrary to public policy.

**Conclusion**

78.    We therefore reject all the defences put forward by the Government and find that it repudiated its obligations under the GSPA. P&ID was entitled to terminate the

---

[37] Paragraph 2
[38] Paragraph 24

contract on 20 March 2013 and claim damages for the Government's failure to perform.

## I.    COSTS

79.    Article 20 of the GSPA provides that in the event of an arbitration, each party shall bear its own lawyers' fees but that the costs of the arbitration (i.e. fees of the tribunal, hire of the arbitration room, shorthand writers' fees and other such administrative costs of the parties) shall be borne equally by the parties.

## J.  DISPOSITION

80.    We, Leonard, Lord Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans, having read the parties' written evidence, pleadings and submissions and having heard their oral submissions, and having carefully considered the same and for the reasons stated above, make our second Part Final Award as follows:

(1)    We declare that –

   (a)    The Government repudiated the GSPA by failure to perform its obligations under Articles 6 a) and b) thereof;

   (b)    P&ID was entitled to and did accept the Government's repudiation on 20 March 2013;

   (c)    P&ID is entitled to damages (in an amount to be assessed) for the Government's repudiation of the GSPA;

   (d)    The parties are jointly and severally liable for the unpaid costs of the arbitration and that a party which has paid or pays more than an equal share of such costs is entitled to recover the excess from the other party.

(2)    We order the parties to consult with each other and the Tribunal to agree upon a procedure and date for hearing to determine the amount of damages to which P&ID is entitled;

(3)    We reserve to ourselves for later decision all other matters in dispute in the reference.

Place of arbitration:  London, United Kingdom.

Signed:

Leonard, Lord Hoffmann

Chief Bayo Ojo SAN

Sir Anthony Evans

## ANNEXURE

**THIS GAS SUPPLY AND PROCESSING AGREEMENT** is entered into this 11th day of January 2010

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES FOR AND ON BEHALF OF THE FEDERAL GOVERNMENT OF NIGERIA (FGN)** (hereinafter referred to as "the Government")...of the first part

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED** (hereinafter referred to as "P&ID") of the other part

**WHEREAS:**

a)     The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

b)     The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators

c)     The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allotted to the international operators.

d)     The Government desires to develop and utilize [its] gas resources at optimal capacity to meet the growth in gas demand at the various sectors of the economy including domestic, regional and export markets;

e) The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

f) The Government has explored viable structures that could be used to meet the highlighted objectives and considered P&ID as capable of implementing and executing the Project;

g) The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic uses.

h) P&ID possesses the requisite finance, technology and competence for the fast track development of the Project.

i) P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the [Project] in accordance with the terms of this Agreement.

j) The Parties are entering into this Agreement to ensure the fast track implementation of the Project and to ensure the timely provision of pipeline quality Lean Gas for power generation.

**IN CONSIDERATION OF THE MUTUAL RIGHTS, INTERESTS, COVENANTS AND OBLIGATIONS CONTAINED HEREIN IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:**

1. **DEFINITIONS AND INTERPRETATIONS**

iv. "Effective Date" means the date of signing of this Agreement;

v. "GPFs" means the Gas Processing Facilities to be constructed and operated at the Site and off-shore from the Site where applicable;

vi. "Lean Gas" means pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane.

vii.   "MMSCuFD" means Millions of Standard Cubic Feet per Day

xi.   "Project" means the establishment of the GPFs and the supply of Wet Gas thereto and the delivery of Lean Gas and their successful operation by the Parties as set out in this Agreement

xiv.   "Site" means the land in Calabar on which the GPFs are located

xv.   "Start Date" means the earliest date on which the Government commences the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site;

xvi.   "Wet Gas" means associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site.

## 2.   **OBJECTIVE**

The objective of this Agreement is to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of Wet Gas by the Government and the processing of the said Wet Gas by P&ID utilising two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner.

## 3.   **SCOPE OF THE WORK**

The scope of works of this Agreement is as follows:

a.   P&ID shall construct GPFs on the Site allocated to them by Cross River State Government…   The GPFs shall be constructed on a timely basis to ensure the earliest possible delivery to the Government, or its nominees, of approximately 340 MMSCuFD Lean Gas for power generation and industrial use by third parties.

b.      To ensure this [fast track] is achieved P&ID will construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD…in accordance with the schedule of works forming Appendix B hereto.

c.      The Government shall make available at the P&ID Site boundary, 400 MMScuFD Wet Gas (free of water) in the manner set out in Appendix A having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8 mol from OMLs 123 and OML 67 or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of this Agreement as defined under Article 5 of this Agreement.

d.      P&ID will process the Wet Gas to be supplied by the Government and shall provide to the Government or its nominees approximately 85% of the wet gas feedstock molecular volume in the form of Lean Gas at the Site Boundary.

## 5.      DURATION OF THE AGREEMENT

This Agreement shall come into being on the Effective Date being the date of signing of the Agreement as defined in Article 1 herein and shall remain in force for a period of twenty (20) years with effect from the Start Date of the Agreement…

## 6.      RESPONSIBILITIES OF THE GOVERNMENT

a)      The Government shall deliver to the Site boundary the agreed quantities and quality of gas defined under Article 3c and in the manner set out in Appendix A to this Agreement;

b)      The Government shall ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.

c)      The Government agrees to assist P&ID, and where necessary to intercede with the relevant Government agencies, to obtain all requisite permits, licences and

approvals required from the relevant Government agencies
and others for the [fast track] implementation of this
[Project].

### 7.    RESPONSIBILITIES OF P&ID

a)    P&ID shall use best endeavours to ensure the [fast
track] implementation of this Project to construct and
incorporate two or more process streams with a total
capacity of 400 MMSCuFD…   Thereafter P&ID shall
maintain and operate the GPFs on a professional basis to
ensure a regular supply of Lean Gas (approximately 340
MMSCuFD) for power generation.

### 8.    COMMERCIAL TERMS

a)    The Government shall deliver to the Site boundary
400 MMScuFD of Wet Gas as set out in Article 3 c) and in
Appendix A of this Agreement having a minimum of $C_3$
(Propane) content of 3.5% mol and $C_4$ (Butane) of 1.8%
mol at No Cost to P&ID.

b)    P&ID will process the Wet Gas, recompress the
residual Lean Gas, representing approximately 85% of the
Wet Gas feed, and make it available, for power generation
or other industrial usage at the discretion of the
Government, at the Site boundary at No Cost to the
Government.

e)    As further consideration P&ID shall transfer to the
Government or its nominee a total of ten percent (10%) of
the Equity of P&ID…

g)    The Parties are aware that the 24 inch Adanga
pipeline presently under construction from the Addax
operated OML 123 directly to Calabar and due for
completion in 2010 will have a throughput capacity of 600
MMSCuFD  and can adequately provide the first required
delivery of 150 MMSCuFD of Wet Gas to the Site and that
an additional pipeline of up to 70 km in length may be
required to link up the Adanga pipeline in order to
facilitate the delivery of the remaining 250 MMSCuFD of
Wet Gas to the site from other sources to be chosen by the
Government.  If such a requirement is necessary, P&ID
undertakes to build and install the said additional pipeline
to provide for the delivery of the remaining
250MMSCuFD of Wet Gas to the Site, at no cost to the
Government, and P&ID will retain the ownership and
provide the maintenance for the pipeline.

## 11.   FORCE MAJEURE

a)     Any failure or delay on the part of either Party in the performance of its obligations or duties under this Agreement, shall be excused to the extent attributable to force majeure save for obligations to pay sums due and payable.  A force majeure situation includes delays, defaults or inability to perform under this Agreement due to any event beyond the reasonable control of either Party. Such event may be, but is not limited to, any act, event, happening, or occurrence due to natural causes, acts or perils of navigation, fire, hostilities, war (declared or undeclared), blockage, labour disturbances, strikes, riots, insurrection, civil commotion, quarantine restrictions, epidemics, storms, floods, earthquakes, accidents, blowouts, lightning, and acts of or orders of the Government.  If activities under this Agreement are delayed, curtailed or prevented by force majeure, then the time for carrying out the obligation and duties thereby affected, and rights and obligations hereunder, shall be extended for a period equal to the period of such delay.

b)     The Party who is unable to perform its obligations as a result of the force majeure event shall promptly notify the other Party thereof not later than forty-eight (48) hours after becoming aware of the establishment of the force majeure event, stating their cause, and both parties shall do all that is reasonably within their powers to remove such cause.

## 15.   CHANGES TO AGREEMENT

No amendments, modifications or changes to this Agreement shall be valid unless approved in writing by both parties.

## 21.   ENTIRE UNDERSTANDING

This Agreement including Appendix A and Appendix B comprises the full and complete understanding of the Parties hereto with respect to all the matters addressed in this Agreement and the said Appendix A and Appendix B shall form an integral part of this Agreement.

### APPENDIX A

**Delivery of Wet Gas to P&ID**

Phase 1        During or before the last quarter of 2011 a continuous supply of 150 MMSCuFD of Wet

Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

Phase 2    On or before the third quarter of 2012 a further additional continuous supply of 250 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

**Delivery of Lean Gas to the Government**

Phase 1    During the last quarter of 2011 following supply of the 150 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided.  The Lean Gas will be compressed to 92 bar G.

Phase 2    On or before the third quarter of 2011 following supply of the additional 250 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.