# EXHIBIT 9



# Claim Form
## (arbitration)

NOT FOR SERVICE OUT OF THE JURISDICTION

| In the | COMMERCIAL COURT |
|---|---|

| | *for court use only* |
|---|---|
| Claim No. | CL - 2018 - 000917 |
| Issue date | 23 12 18 |

*[SEAL — HIGH COURT OF JUSTICE / 2 3 DEC 2018 / ADMIRALTY AND COMMERCIAL COURT]*

## In an arbitration claim between

**Claimant**

The Ministry of Petroleum Resources of the Federal Republic of Nigeria
Block D, 11th Floor, NNPC Towers
Herbert Macaulay Way, Central Business District
Abuja, Nigeria

**Defendant(s)**

Process and Industrial Developments Limited
Trident Chambers, P.O. Box 146, Road Town
Tortola, British Virgin Islands
Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria.

## In the matter of an [intended] arbitration between

**Claimant**

The Ministry of Petroleum Resources of the Federal Republic of Nigeria

**Respondent**(s)   *Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

Process and Industrial Developments Limited (Claimant in the arbitration proceedings)
Trident Chambers, P.O. Box 146, Road Town
Tortola, British Virgin Islands
Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria.

Other persons required to be served with this Claim Form pursuant to CPR Part 62:

(1) Lord Leonard Hoffman (Presiding arbitrator in the arbitration proceedings)
Brick Court Chambers, 7-8 Essex Street, London WC2R 3LD. U.K. (leonard.hoffman@brickcourt.co.uk)

(2) Sir Anthony Evans (Party-appointed arbitrator in the arbitration proceedings)
24 Lincoln's Inn Fields, London WC2A 3EG. U.K. (atighe@essexcourt.net)

(3) Chief Bayo Ojo (Party appointed arbitrator in the arbitration proceedings)
ITF House, 4th Floor, No. 6 Adetokunbo Ademola Crescent, Wuse 2, Abuja, Nigeria. (cabayoojo@aol.com)

| Defendant's name and address | Process and Industrial Developments Limited (Claimant in the arbitration proceedings) Trident Chambers, P.O. Box 146, Road Town Tortola, British Virgin Islands Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria. *Service address:* SC Andrew LLP |
|---|---|

| [  ] This claim will be heard on: |
|---|
| at        am/pm |
| [  ] This claim is made without notice. |

The court office at
When corresponding with the court, please address forms or letters to the Court Manager and quote the case number

N8 Claim form (arbitration)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v1.0

Napier House,
24 High Holborn
London WC1V 6AZ
UK
DX 248 London/Chancery Lane

| Claim No. | |
|-----------|---|
| | |

Remedy claimed and grounds on which claim is made

REMEDY CLAIMED

1.

An order under Part 62.9(1) of the Civil Procedure Rules extending the 28-day time period under section 70(3) of the Arbitration Act 1996 in which to apply to the Court under section 68 of the Arbitration Act. (Draft order attached). The Claimant seeks the extension of time on the grounds that:

    a. As an arm of the Federal State of Nigeria, during a period of Governmental transition between March 2015 and November 2015, the Claimant was unable promptly to progress the consideration of and preparation for the current application within the 28 day period

    b. Once the internal impediments arising from a change of administration over the summer of 2015 were dealt with (and a new Attorney General in post at at 11 November 2015) the Claimant has moved expeditiously to bring the current application.

    c. If the extension were granted, the Defendant would not suffer any or any irremediable prejudice if this application proceeded (in particular, given that the Claimant is co-operating fully with the ongoing preparations for the future quantum hearing (which hearing is unlikely to come on prior to the disposal of the current application - assuming permission were granted); and/or

    d. Given the size of the sums at stake (and their further substantial growth since the making of the Award), it would be unjust to the Claimant for it to be denied the opportunity of having the application determined, above all by reason of the fact that there is merit in its application and/or that the amount claimed against the Claimant (which was already substantial at the date of the Award and (since the Award) has increased from US$ 6.7 bn to US$ 8.6 bn.

2. An order setting aside and/or remitting for further consideration all or part of the arbitration award of Lord Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated July 2015(the "**Award**") under section 68(2)(d), alternatively under section 68(2)(f) of the Arbitration Act 1996, as further set out in detail below, together with, or otherwise such order under the Arbitration Act 1996, as may be appropriate, on the grounds identified below:

In brief severally or in combination, the said irregularities identified below amount to serious irregularities within the meaning of s 68(1) of the 1996 Act, in that they either (i) make the difference between a finding of liability or not or (ii) (at the least) fundamentally alter the nature and scope of the damages enquiry. The magnitude of the financial seriousness of the implications of each of the above challenges is clear. Equally, in terms of the arbitral process, the subject-matter of each of the proposed challenges goes to issues of principle (not detail), which are central to critical findings of liability, ie what breach, seriousness of breach, and rescission. As to quantum, the critical point is whether the breach was of a provision which did not of itself bring a liability to deliver gas (ie cl. 6(b)) or one that did (ie Cl 6(a)). The point here is that if there was (as the Tribunal found – at least at one point – no breach of Cl. 6(a)), any quantum enquiry regarding a cl 6(b) breach would in the first instance turn on (*inter alia*) whether or not (or when) a plant would have been successfully built by the Defendant. On that basis, it may be that no loss and damage at all was suffered.

The detailed grounds are as follows: [see separate sheets]

| Claim No. | |
|---|---|

### Relief claimed, in detail and in the alternative

1    In the event that the application succeeds in one or more respects, the following orders are sought:

2    Insofar as the application succeeds on Ground A, the Award should (i) be set aside in part – namely the contents of dispositive paragraph [80](1)(a) of the Partial Final Award (save for the conclusion that there was a breach by the Ministry of cl 6(b)) [ 'the Conclusion']; (ii) alternatively, the Conclusion (save for holding in respect of the cl 6(b) breach) should be declared to be of no effect; (iii) (in the further alternative) the Award should be remitted for further consideration of the Conclusion.

3    Insofar as the application succeeds on Ground B, the Award should be remitted for further consideration of the issue of fact as to whether the Ministry had authority as a matter of fact (as opposed to capacity as a matter of law) to conclude the alleged contract.

4    Insofar as the application succeeds on Ground C , the like relief is sought as under Ground A above.

5    Together with such further or other order as is just, including an order for costs.

Statement of Truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name _____ Kamal Rasiklal Shah
_____

Name of claimant's solicitor's firm _____ Stephenson Harwood LLP
_____

signed _____ position or office held _____Partner
_____
*(Claimant)(Claimant's solicitor)                     (if signing on behalf of firm or company)

*delete as appropriate

Stephenson Harwood LLP                    Claimant's or claimant's solicitor's address to
1 Finsbury Circus                          which documents should be sent if different
London                                     from overleaf. If you are prepared to accept
EC2M 7SH                                   service by DX, fax or e-mail, please add details.
Attn: Kamal Shah, Stephen Ashley, Jide
Adesokan

**GROUNDS**

**Introduction**

1    The Defendant (hereinafter **"PIDL"**) alleges the existence of a Gas Supply and
     Processing Agreement dated 11 January 2010 (the **"GSPA"**) with the Ministry of
     Petroleum Resources of the Federal Republic of Nigeria ['the Ministry'] whereby
     the Ministry allegedly agreed to construct certain infrastructure in Nigeria, with a
     view to using it to make available to PIDL 400 MMScuFD of Wet Gas for a term of
     20 years in return for which PIDL agreed to construct Gas Processing Facilities
     (**"GPFs"**) at a delivery site in Nigeria order to receive delivery of and then to process
     the Wet Gas and to return approximately 85% by volume to the Ministry in the form
     of Lean Gas, being at liberty to dispose of the balance    This was essentially a barter
     transaction, allegedly made directly by a Federal Nigerian Ministry and a BVI
     registered company.

2    By Notice of Arbitration dated 22 August 2012, PIDL commenced arbitration (the
     **"Arbitration"**) against the Ministry alleging that the Ministry was in breach of the
     GSPA repudiated the GSPA. The allegation of repudiatory conduct was one based
     on a failure to perform.

3    As of today, the damages claimed by the Defendant are alleged to be US$
     8,627,000,000.

4    On 1 June 2015, a hearing took place at the International Disputes Resolution Centre
     in London.   The hearing was restricted to issues of liability.  Issues of quantum (if
     any) were postponed.

5    On 17 July 2015, the Tribunal issued the Award.  The reference to "July 2014" on
     the front page of the Award is incorrect. The Award was issued to the Claimant by
     email on the date of issue.

6    In the dispositive part of its Award, the Tribunal declared, *inter alia*, that PIDL was
     entitled to damages (in an amount to be assessed) in respect of certain specified
     breaches by the Ministry of the GSPA, which breaches it also held to be
     cumulatively repudiatory, and thus entitling PIDL to rescind

7       The following three heads of challenge each disclose a serious irregularity within the meaning of s 68 of the 1996 Act.

Ground A: internal inconsistency, successful defence not acknowledged in dispositive paragraph

8       The dispositive paragraph (para [80]) of the Award is *ex facie* inconsistent with the conclusions of the Tribunal in the related passages of its reasoning.  The focus is specifically on the following sentence of the dispositive paragraph, namely '*We declare that (a) the Government repudiated the GSPA by its failure to perform its obligations under Article 6 a) and b) thereof.*'.

9       The Tribunal set out the two clauses referred to therein in the attachment to the Award).  They were (respectively):

10      Art. 6(a): an obligation on the part of the Government to deliver certain agreed quantities of gas to the Site boundary;

11      Art. 6(b): an obligation on the part of the Government to ensure that all necessary pipelines and associated infrastructures were in place to facilitate performance of the Claimant's obligation to supply and deliver Wet Gas in accordance with Art. 3

12      A breach of each clause was alleged.  In both cases, the alleged breaches were denied.

13      The issue of possible breaches, and of which provision (or sub-provision) any such breaches may have been, was dealt with by the Tribunal at paras [63]-[66] of the Award, under the heading: '*(d) Did the Government  not have to do anything till the GPFs had been built?*'.

14      In those paragraphs, the Tribunal reached a conclusion to the effect that the Government did in fact have to do something before the gas processing facilities had been built, namely that it was obliged to construct the necessary pipelines and associated infrastructure as contemplated by Art. 6(b), and that (not having done so) it was accordingly in breach of cl 6(b).  That conclusion is clear and is not the subject of this Application.

15    However, in those paragraphs, the Tribunal did not reach a similar conclusion as to the allegation of breach of cl 6(a) of the contract. The allegation of breach of that clause was resisted by the Government on the grounds (*inter alia*) that (as the Tribunal put it, at para [63], referring to the Government's submissions): '*Mr Shashore submits that the Government had no obligation to deliver gas until there was a plant to receive it.*' In the next sentence, the Tribunal concludes: '*That, no doubt is true, but the Government's obligations were not confined to the delivery of gas.*' It then went onto the cl 6(b) point, noted above.

16    At para [66], the Tribunal reiterated its acceptance of the part of Mr Shashore's argument referred to in the first sentence of para [63] (quoted above). It said (of another version of the Government's argument): '*We think this argument takes the matter no further than the first version. Of course the Government could not actually deliver gas until there was a Site and, as we have said until there was a plant to receive it. But that does not excuse the Government's failure to comply with 6 b).*'

17    Accordingly, it would appear clearly that the Tribunal did not conclude that there was a breach of Art. 6(a). Certainly, no such words appear in paras [63]-[66]. On the contrary, what is said in those paragraphs, as just quoted, would be inconsistent with the Tribunal's having found a breach of Art. 6(a), since the only actual breach of that article could be by a failure to make delivery to the Site boundary – and the Tribunal has rightly held that until there was a plant to which to deliver the gas, there could have been no delivery. The Claimant takes this to mean that there was not yet any obligation to deliver. If the obligation had not arisen, it could not be broken.

18    The Tribunal did not return to the point, or otherwise dilute or contradict its understandable conclusion that there could, in effect, have been no breach of cl 6(a) in the circumstances prevailing.

19    Accordingly, it is presumed that the presence of a reference to cl 6(a) in paragraph [80] was a slip.

20    Whatever the explanation, the terms of the Award are ambiguous, given the internal inconsistency above-mentioned. Further, it may be that the (apparently successful)

defence on cl. 6(a) was not independently recalled or considered when it came to drafting the dispositive paragraph [80].

21    The Tribunal has been asked to acknowledge the need for a correction (by letter dated 18th November 2015) and to give an opportunity for submissions to be made as to the consequence of correcting the above-mentioned internal inconsistency. However, given the lapse of time since the making of the Award, this application is made out of an abundance of caution.

22    <u>Ground B: lack of factual authority defence not separately dealt with from legal capacity defence</u>

23    Two of the defences put forward by the Ministry were that it neither had (i) legal capacity nor (ii) actual (factual) authority to perform the GSPA

24    The two issues, i.e. capacity and authority are and have always been obviously discrete. However, the Tribunal, in its Award, appears in its reasoning only to have dealt with its views on the first (the legal) issue (see Award [41]-[54]). It mentioned 'capacity' 10 times in its reasoning. That said, in its concluding paragraph to that section, it made a parting reference not to capacity, but used the word 'authority' [54]. However, given the use of the word 'capacity' throughout the prior paragraphs, and the clear legal focus of the analysis therein, it appears that no separate consideration was given by the Tribunal to the issue of factual, actual authority. What is clear, is that there is no separate reasoning on the point. It may be that the Tribunal erroneously assumed that the issue of authority was just another way of putting the legal (capacity) point, in which case it will have failed, by mistake, to deal with the distinct issue of factual capacity.

25    At best, this is a point of ambiguity, which should be revisited, and distinctly dealt with. Alternatively, it is a failure to deal distinctly or at all, with a free-standing factual defence. To have conflated both issues, addressing them interchangeably both in description and in substance as issues of law, would have been in effect not to decide the factual, actual authority point.

26    The above analysis is confirmed by the fact that the Tribunal based its decision on prima facie findings which are more closely connected with capacity than authority. Further, it should be noted that the sole heading for the relevant part of the Award in

section H of the Award (page 10) as "capacity" (rather than authority).  Further, at paragraph 53 of the Award, (while considering whether another Ministry (the Ministry of Energy) may have had exclusive powers to enter into agreements similar to the GSPA), the Tribunal found that there "*was nothing to suggest that [the Ministry of Energy] will enter into the business of selling gas.*" As there was similarly nothing to suggest that the Ministry would enter into the business of selling gas, the Tribunal's statement at paragraph 53 strongly suggests that the Tribunal did not consider the lack of authority defence put forward by the Ministry.

27    Importantly, in the final paragraph of the section, which purportedly addresses the defence of lack of authority, the statement that "*the [Ministry] was an appropriate entity **to enter** into the GSPA…*" (addedemphasis) is entirely indicative of a Tribunal considering capacity rather than authority.

Ground C

28    This Ground focusses on the defence raised at para 7 of the Ministry's defence.  This is a denial that the alleged conduct of the Ministry was repudiatory.  This denial survives a finding of breach and raises the question of the seriousness of the breach. Although the Tribunal made findings as to the existence of breaches of contract on the Ministry's part (see above), it did not expressly discuss or evaluate the nature of those findings in terms of their being repudiatory or otherwise. Further, nowhere did it consider whether a breach solely of cl 6(b) was or could in the circumstances have been repudiatory. The only statement on the point is to be found in the dispositive paragraph (quoted above).   No express reasoning appears.  This suggests that the Tribunal did not consider the issue, or at least did not consider the Ministry's argument in that paragraph as an independent point (ie, even if there were a breach, was it repudiatory?).

29    The point here is that the consequences of a breach of cl 6(b) alone are not necessarily repudiatory.   The creation of infrastructure by the Ministry was not an end in itself.  It is commercially significant only if that infrastructure has to be used to deliver gas (and only if that infrastructure was the only means to do so).  Given the express findings that there was no active obligation to deliver gas until the Defendant carried out its part of the bargain and built the plant, the effect of the failure to build infrastructure by any particular date (though a serious breach) did not

on any view deprive the Defendant of its bargain.  That could only happen when it had brought into existence the means to accept delivery – which it never did.

30      This point was not considered, along with any separate repudiation analysis based solely on the breach of cl 6(b).

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**                                    Claim No.[          ]

Before the Honourable Mr Justice
**In an arbitration claim**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

                                                                    **Claimant**

- and -

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

                                                                    **Defendant**

**In the matter of an arbitration**

**BETWEEN**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

                                                    **Claimant in the arbitration**

- and –

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

                                                    **Respondent in the arbitration**

---

**Draft Order**

---

UPON the Claimant's application under section 68 of the Arbitration Act 1996 to challenge the Part Final Award of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated 17 July 2015 (the "**Part Final Award**")

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015

AND UPON HEARING Counsel for the Claimant and Counsel for the Defendant

LONLIVE\23230424.1

IT IS ORDERED THAT:

1. In respect of <u>Ground A,</u> the Award should (i) be set aside in part – namely the contents of dispositive paragraph [80](1)(a) of the Partial Final Award (save for the conclusion that there was a breach by the Ministry of cl 6(b)) ['the Conclusion']; (ii) alternatively, the Conclusion (save for holding in respect of the cl 6(b) breach) should be declared to be of no effect; (iii) (in the further alternative) the Award should be remitted for further consideration of the Conclusion.

2. In respect of <u>Ground B</u>, the Award should be remitted for further consideration of the issue of fact as to whether the Ministry had authority as a matter of fact (as opposed to capacity as a matter of law) to conclude the alleged contract.

3. In respect of <u>Ground C</u>, the like relief is granted as is granted under Ground A above.

4. Further, or alternatively, there be such other order under the Arbitration Act as is just.

5. The Claimant's costs of and occasioned by the Claimant's Application be paid by the Defendant to the Claimant, such costs to be referred to detailed assessment by the Court if not agreed.


Dated:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**                                    Claim No.[            ]

Before the Honourable Mr Justice

**In an arbitration claim**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

Claimant

– and –

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Defendant**

**In the matter of an arbitration**

**BETWEEN**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Claimant in the arbitration**

– and –

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

**Respondent in the arbitration**

---

**Draft Order**

---

UPON the Claimant's application under Part 62.9 of the Civil Procedure Rules to extend the 28-day time period in which to apply to challenge the Part Final Award of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated 17 July 2015 (the **"Part Final Award"**)

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015

IT IS ORDERED THAT:

1. The Claimant's application under Part 62.9 of the Civil Procedure Rules be allowed.

2. The time period, set out in section 70(3) of the Arbitration Act 1996, in which the Claimant may apply to challenge the Part Final Award be extended to 23 December 2015.

3. No order as to costs.


Dated:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**


**BETWEEN**

**THE MINISTRY OF PETROLEUM**
**RESOURCES OF THE FEDERAL REPUBLIC**
**OF NIGERIA**

**Claimant**

**And**


**PROCESS AND INDUSTRIAL**
**DEVELOPMENTS LIMITED**

**Defendant**

---

**Draft Order**

---


**Stephenson Harwood LLP**
**1 Finsbury Circus**
**London EC2M 7SH**
**Tel:      +44 20 7809 2384**
**Fax:      +44 20 7003 8240**
**Ref:      []\01-54-03644**

**Solicitors for the Claimant**

**Folakemi Adelore**
**Claimant**
**First**
**22 December 2015**
**Exhibit "FA1"**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**IN AN ARBITRATION CLAIM AND**
**IN THE ARBITRATION**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

**Claimant/Respondent in the Arbitration**

**And**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Defendant/Claimant in the Arbitration**

---

**FIRST WITNESS STATEMENT OF FOLAKEMI ADELORE**

---

1      I, Folakemi Adelore of the Federal Ministry of Petroleum Resources, Block D, 11th Floor, NNPC Towers, Herbert Macaulay Way Central Business District Abuja will say as follows:

2      I am the Director of Legal Services at the Claimant, which I shall hereinafter refer to as the "**Ministry**". I make this witness statement in support of:

2.1      the Ministry's application for an extension of time in which to challenge the Part Final Award on liability dated 17 July 2015 (the "**Award**") of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans (the "**Tribunal**"); and

2.2      the Ministry's application to challenge the Award under section 68 of the Arbitration Act 1996 (both applications hereinafter referred to as the "**Applications**".

3        I make this witness statement from facts and matters within my own knowledge. Where they are not within my knowledge they are true to the best of my knowledge and belief.

4        There is now produced and shown to me a paginated bundle of documents entitled "Exhibit FA1" which is exhibited to this witness statement. All references in this document are to Exhibit FA1 unless otherwise stated.

## Background

5        The Defendant (hereinafter **"PIDL"**) alleges the existence of a Gas Supply and Processing Agreement dated 11 January 2010 (the **"GSPA"**) with the Claimant (hereinafter the **"Ministry"**) whereby the Ministry allegedly agreed to make available to PIDL 400 MMScuFD of Wet Gas for a term of 20 years and PIDL agreed to construct Gas Processing Facilities (**"GPFs"**) to process the Wet Gas and return approximately 85% by volume to the Ministry in the form of Lean Gas [**P.1-20**].

6        By Notice of Arbitration dated 22 August 2012, PIDL commenced arbitration (the **"Arbitration"**) against the Ministry alleging that the Ministry had repudiated the GSPA [**P.21-24**].

7        On 1 June 2015, a hearing took place at the International Disputes Resolution Centre in London.

8        On 17 July 2015, the Tribunal issued the Award to the Claimant by email on the same date [**P.25-50**].

9        In its Award, the Tribunal declared, *inter alia*, that PIDL is entitled to damages (in an amount to be assessed) in respect of breaches by the Ministry of the GSPA, which it also held PIDL was entitled to rescind.

## Out of time: explanation of the political situation in Nigeria at the time the Award was issued

10       This proposed claim is brought 4 months, 8 days out of time (the relevant period was 28 days from the date of the Award on 17 July 2015, i.e. 14 August 2015).   This delay was not in any way deliberate or calculated.   As explained below, the explanation is to be found in the nature of the Ministry as part of the central government machinery, in a post-election period, where no Government had yet been formed (and the chief law officer - the Attorney General of the Federation had not been appointed).   Furthermore, as explained below, since it does not normally trade in products, the Ministry has little or no experience in responding to international arbitral proceedings – such matters usually involve the State

Corporation, the Nigerian National Petroleum Corporation (the "**NNPC**"), which, in that capacity, operates separately from the Ministry.

11    In order to properly understand the Ministry's inability to challenge the Award on time, it is necessary to briefly address the political situation in Nigeria at the time the Award was issued.

12    The President Goodluck Jonathan administration had been in power from 2 May 2010 to 29 May 2015. Following general elections on 28 and 29 March 2015, the new president, President Muhammadu Buhari of the opposition party, was declared winner and was sworn in as president on 29 May 2015. This was the first time that an incumbent party had lost a general election in democratic Nigeria. This was acclaimed as historic by the world media (http://www.bbc.co.uk/news/world-africa-32139858, http://www.independent.co.uk/news/world/africa/nigeria-2015-election-apc-declares-victory-for-muhammadu-buhari-10146740.html) [**P.51-61**].

13    I mention the historic and surprising nature of the opposition party winning the presidential election because it may explain the functioning of government ministries in the period immediately following the swearing in of the new President: although it is to be expected that any new government, particularly the government of a new political party would take time to settle into office, this was even more so in circumstances where the election results were particularly surprising.

14    Although the President was sworn in on 29 May 2015, it was not until 11 November 2015 that ministers, including the Attorney-General of the Federation ("**AGF**"), were appointed.

**Chain of command at the Ministry with regard to the Arbitration**

15    As stated above, the Ministry does not normally trade in products, and therefore has little or no experience in responding to international arbitral proceedings. Furthermore, and importantly, the AGF as the chief law officer is responsible for the conduct of all dispute resolution involving all governmental agencies or ministries. As a matter of practice and law in Nigeria, the AGF is always made a party to all disputes involving the Federal Government of Nigeria or its ministries.

16    The conduct of disputes involving the Federal Government of Nigeria or its ministries and instructions to external counsel to represent the government or its ministries can only be given by the AGF as a matter of Nigerian law and practice.

17    The present arbitral proceedings between PIDL and the Ministry is no exception. Instructions to represent the Ministry in the arbitration were given to Mr. Olasupo Shasore, SAN of TMS by the former AGF Mr. Bello Adoke.

18     Thus, the chain of command for the conduct and directives pertaining to the arbitral proceedings has always been from the AGF to the Ministry.

19     However, due to the elections in March 2015, the tension generated by it and the attendant dissolution of cabinet on 28th May 2015 by the immediate past President of Nigeria, it was impossible for TMS or the Ministry to get necessary directives from the AGF in respect of this arbitration.

20     With elections out of the way and the appointment of a new AGF, lawful instructions and directives have now emanated from the office of the AGF with respect to the conduct of this arbitration.

**Difficulty in initiating challenge of the Award**

21     As set out above, the Award was issued on 17 July 2015 and was immediately reviewed by the Ministry and its legal representatives in Nigeria, Twenty Marina Solicitors ("**TMS**").

22     On 21 July 2015, TMS advised me as to whether the Award failed completely and/or clearly to address the issues presented by the Respondent and as to whether or not it should be challenged accordingly. The Ministry understood that in order to challenge the Award, it would need to instruct a firm of solicitors in the U.K. given that any such challenge would have had to be before the English courts under the English Arbitration Act 1996. (Nothing set out in this statement shall constitute a waiver of privilege.)

23     This presented an issue for the Ministry because an application to challenge the Award in the U.K. constituted a new legal action which, together with the need to appoint foreign legal representatives, required approval of the AGF. The Constitution of the Federal Republic of Nigeria 1999 stipulates that "there shall be an Attorney General of the Federation who shall be the chief law officer and a Minister of the government of the Federation". In addition several Nigerian cases have held that the AGF is responsible in law for government's actions and misactions.  In the case **Guardian Newspapers Ltd v. AG Fed (1995) 5 NWLR (Pt. 398) 703 – CA,** the court held that "Both at common law and by virtue of our constitution, the Federal Attorney-General is the Chief Law Officer of the Republic and the conscience of the people. He represents the state in all actions against the state; this he can do in person or through the other law officers in his ministry. The office of the Attorney General is so unique that in the exercise of his functions as the Chief Law officer, he **cannot even take a dictation from the Head of State**".

24     In  **AG Rivers State v. AG Akwa Ibom State (2011) 8 NWLR (Pt. 1248) 31 ,** the main functions of the Attorney General  was explained as  – "...........advising the

Federal or State government including their parastatals on legal matters and prosecuting or defending court cases for or against their respective governments".

25    However, as I have set out above, at the relevant time, the AGF's office was vacant. The office of the AGF is a political appointment.

26    It is necessary to explain that it is Nigerian administrative and government practice in all Federal Government Ministries when it comes to dispute resolution, particularly highly contentious matters involving huge financial exposure to the nation (such as was the case in the Arbitration) to always operate through the AGF. The Ministry's legal department had been able to continue its oversight of the Arbitration during the period that the office of the AGF was vacant because TMS had extant instructions from the previous AGF to act in that matter. However, the Ministry did not have the authority to unilaterally approve a new legal action albeit connected with the Arbitration. This was even more so given that the amount potentially in issue was in the billions of dollars.

27    On 11 November 2015, after a five and a half month period, the Government finally appointed Mr Abubakar Malami SAN as AGF.

28    Despite having to deal with other challenges associated with his new role, one of the first matters the new AGF addressed upon assumption of office was this matter. He and his team had to be briefed on the details of the matter, the outcome of the Arbitration and to take advice on the available options and suggested next steps.

29    Following his review of the relevant documents in the Arbitration and TMS' opinion, the AGF gave his approval for the Ministry to instruct U.K. solicitors.

30    Accordingly on 13 November 2015, TMS asked Stephenson Harwood to assess the merits of the English Court Applications.

31    Later on 13 November 2015, Stephenson Harwood confirmed that they had cleared conflicts and were therefore able to act on behalf of the Ministry. Stephenson Harwood also recommended that Counsel be instructed on the matter.

32    Since 13 November 2015, the Ministry and its legal representatives have sought to progress this matter with expedition. All relevant documents from the arbitration (amounting to five lever arch files) had to be gathered and sent to Stephenson Harwood in London. Most of the documents could only be sent on 23 November 2015 and Stephenson Harwood only received them on 25 November 2015. The remaining documents were sent over the following weeks.

33    Since receipt of the documents on 25 November 2015, Stephenson Harwood and Leading Counsel have been considering the merits of the Applications, advising the

Ministry on the same and preparing the Applications. The issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered, in particular given the differing headings on the various procedural orders and the Part Final Award dated June 2014 [**P.62-77**].

34    To conclude, the permanent staff at the Ministry did all in its power to obtain the necessary approval to challenge the Award within the 28 day period after issuance. After expiry of that period, the Ministry continued to apply all its efforts to obtain approval. Unfortunately, the Ministry was unable to obtain approval on time. The Ministry tried all that was possible legally to obtain the necessary approval, including attempting to seek directives from the Vice President of the Federation in November, notwithstanding the fact that the only person that had the power to instruct counsel was the AGF. The delay was not out of choice but was forced on the Ministry by circumstances beyond its control.

35    It is important to understand the limitations on the Ministry's capabilities in this matter:

35.1    The Ministry is seldom involved in arbitration proceedings and therefore lacks experience of the distinct features of international arbitration, including its cross-border nature and strict short time limits. Further its legal department is not accustomed to dealing with disputes of the type that the Arbitration was concerned with. The legal department at the Ministry (like the Ministry itself) is accustomed to dealing with the activities that the Ministry was expressly set up for and authorised to undertake, predominantly the licensing of petroleum exploration and production.

35.2    These are the normal strategic and regulatory activities that the Ministry has been undertaking since 1975 when it was established and can therefore undertake without the need for external approval or interference. The situation would have been different if the arbitration involved the NNPC, which is the state oil corporation established in 1977 with the power to enter into commitments similar to those in the GSPA. Unlike the Ministry, the NNPC is a commercial entity which is regularly involved in, and therefore accustomed to dealing with international arbitration.

35.3    Lastly, it is important to understand that the Nigerian Government has never been faced with a situation where it has had to operate for a long period without an AGF. The length of time without an AGF was unprecedented in the nation's history.

36      As a result of the above circumstances, it would be unfair for the Ministry to be
        denied the opportunity of having the Applications determined, particular that each of
        them impacts on the existence or extent of the considerable sum now claimed.

**The proposed s 68 Arbitration Act 1996 challenges**

37      I understand that the Ministry has potentially good grounds to challenge the Award
        on the grounds of serious irregularity. While I understand that the Court would not
        be conducting a detailed inquiry at this stage, it is worth setting out briefly why the
        Ministry submits there is a serious irregularity affecting the Award, in that the
        Tribunal may have failed to deal (or deal distinctly) with all the issues put to it.

37.1    Capacity/authority: two of the defences put forward by the Ministry were
        that it neither had (i) legal capacity nor (ii) actual (factual) authority to
        perform the GSPA [**P.78**]. The two issues, i.e. capacity and authority are
        and have always been obviously discrete. However, the Tribunal, in its
        Award, appears in its reasoning only to have dealt with its views on the first
        (the legal) issue (see Award [41]-[54]). It mentioned 'capacity' 10 times in
        its reasoning. That said, in its concluding paragraph to that section, it made
        a parting reference not to capacity but used the word authority [54].
        However, given the use of the word 'capacity' throughout the prior
        paragraphs, and the clear legal focus of the analysis therein, it appears that
        no separate consideration was given by the Tribunal to the issue of factual,
        actual authority. What is clear, is that there is no separate reasoning on the
        point. It may be that the Tribunal erroneously assumed that the issue of
        authority was just another way of putting the legal (capacity) point, in which
        case it will have failed, by mistake, to deal with the distinct issue of factual
        capacity. At best, I am advised, it is a point of ambiguity, which should be
        revisited, and distinctly dealt with. To have conflated both issues,
        addressing them interchangeably both in description and in substance as
        issues of law, would have been in effect not to decide the factual, actual
        authority point.

37.1.1   See for example the sole heading for the relevant part of the Award
         in section H of the Award (page 10) as "capacity".

37.1.2   I also understand that the Tribunal based its decision on prima
         facie findings which are more closely connected with capacity than
         authority.

37.1.3   At paragraph 53 of the Award, in considering whether another
         Ministry (the Ministry of Energy) may have had exclusive powers to
         enter into agreements similar to the GSPA, the Tribunal found that

there "*was nothing to suggest that [the Ministry of Energy] will enter into the business of selling gas.*" As there was similarly nothing to suggest that the Ministry will enter into the business of selling gas, the Tribunal's statement at paragraph 53 strongly suggests that the Tribunal did not consider the lack of authority defence put forward by the Ministry.

37.1.4   Importantly, in the final paragraph of the section, which purportedly addresses the defence of lack of authority, the statement that "*the [Ministry] was an appropriate entity **to enter** into the GSPA...*" (my emphasis) is entirely indicative of a Tribunal considering capacity rather than authority.

**No breach of Article 6a**

37.2   In the second place, the Award is internally inconsistent, and therefore ambiguous, as to whether one of the Ministry's defences was successful. Two distinct breaches of contract were alleged against the Ministry. I set out the two clauses:

"**6. RESPONSIBILITIES OF THE GOVERNMENT**

*a) The Government shall deliver to the Site boundary the agreed quantities and quality of gas defined under Article 3c and in the manner set out in Appendix A to this Agreement;*

*b) The Government shall ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.*"

37.3   The first, of clause 6(a) of the contract, was an alleged failure actually to deliver product. It was the centre-piece of PIDL's pleaded case on breach (see PIDL's Statement of Case, paragraphs [87]-[89] [**P.100**]).   The second, of clause 6(b) was an alleged failure to ensure that infrastructure was in place. (See PIDL's Statement of Case, paragraph [90] [**P.100**]).

37.4   The Ministry defended the first allegation on the basis that the obligation to deliver product could not have arisen until PIDL had constructed its treatment plant.   This, it never did.   The Ministry's defence on this point succeeded.   Specifically, at paragraph 63 of the Award, the Tribunal appears to accept that "*the Government had no obligation to deliver gas*

*until there was a plant to receive it*", in other words confirming that the Government was not in breach of Article 6(a) of the GSPA.

37.5    Furthermore, at paragraph 66 of the Award, the statement that: "*[o]f course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it.*"

37.6    However, in the "Disposition" section, at paragraph 80(1)(a), the Tribunal declares that "*[t]he Government repudiated the GSPA by failure to perform its obligations under Articles 6a and 6b thereof.*"

37.7    This apparent internal contradiction is of great importance. Not only does the nature of the breach go fundamentally to the extent and nature of damages recoverable, it also goes to the very basis of the Tribunal's finding of repudiatory conduct.    That finding (see above and see Award at paragraph [80]) "*The Government repudiated the GSPA by failure to perform its obligations under Articles 6a) and b) thereof*" is made on a dual-breach basis, ie of clauses 6(a) & (b).    The two are interwoven as a combined basis for the conclusion of repudiation.    What the Tribunal appears to have done is give as one half of its basis for concluding that there was repudiatory conduct a breach of a provision which it had earlier held not to have been broken or even fallen due for performance.    I am advised that the Tribunal appears not to have afforded any alternative basis for its conclusion that there was a repudiation (e.g. on the basis of just a breach of clause 6(b).  Nor should it be assumed.

38    The above point on breach of Article 6a goes to quantum and is therefore critical to the Ministry's preparation for the damages stage of the arbitration. It is worth noting that having initially estimated in August 2012 that its loss of profit would be no less than USD1.9bn **[P.24]**, under a year later, PIDL put its damages claim at around USD5.9bn **[P.102]**, however, PIDL now appears to be claiming damages in the amount of around USD8.6bn **[P.225]**. Given this creeping astronomical figures, the Parties and the process would undoubtedly benefit from certainty and clarity on the key issues. Therefore the ambiguity caused by the Award could lead to complications and potential injustice at the damages stage. Although the Court would not be conducting a detailed enquiry into the merits of the challenge at this stage, I think it is necessary for the Court to bear in mind the above facts in order to assess the unfairness that would be done to the Ministry if it were allowed to go into the damages stage without having the key issues properly considered and determined.

**No prejudice to PIDL or to the future conduct of the arbitration**

39      Further, it does not follow that (if permission were granted) the Applications would have a detrimental effect on the Arbitration, particularly given that any hearing on quantum will be substantial, and is unlikely to occur within 12 months.  Of course, the Ministry intends to co-operate fully with the preparations of that hearing.  The below are the major steps ordered by the Tribunal in Procedural Order No. 10 dated 27 October 2015 [**P.261-263**]:

39.1      PIDL was ordered to serve upon the Ministry and the Tribunal on or before 4 December 2015, all documents and evidence upon which it intends to rely in relation to the amount of damages to which PIDL is entitled;

39.2      The Ministry was ordered to serve upon PIDL and the Tribunal, within 6 weeks of service by PIDL of the above documents, all documents and evidence upon which the Ministry intended to rely in relation to the amount of damages to which PIDL is entitled;

39.3      PIDL was ordered to serve its documents and evidence in Reply (if any) within 4 weeks of service by the Ministry of the above documents.

39.4      It was ordered that there is to be a procedural conference on a date to be fixed by the Tribunal after service by PIDL of its documents and evidence in Reply at which, *inter alia*, the issue of a date and any necessary directions for the hearing on quantum is to be determined.

40      The Ministry has made several attempts to engage professional consultants to provide assistance in the damages stage of the arbitration. Unfortunately, for the same reasons affecting the Ministry's inability to engage foreign counsel, the Ministry has not been able to engage professional consultants. TMS advised the Ministry on the need to appoint experts to provide an evaluation of damages with regard to the claim. The Ministry agreed with the advice and informed TMS on the need to get approval from the AGF. However because an AGF was yet to be appointed, the Ministry was unable to secure the approval. Consequently, the Ministry has been unable to prepare for the damages stage of the arbitration as well as is required for an arbitration of this size.

41      On 4 December 2015, PIDL served a very substantial report of four experts in various disciplines as evidence it intends to rely on in relation to the amount of damages claimed ("**PIDL's Damages Evidence**") in the Arbitration. PIDL's Damages Evidence amounts to 126 pages and over 40 megabytes of material. As indicated above, the figures are quite different from those mentioned in the Statement of Case at [95]-[97], but there is no sign of any application for any

amendment being lodged, which leaves the Ministry in an unnecessarily difficult situation. That is compounded by the lack of any supporting disclosure or additional factual evidence.

42    Even leaving aside the Ministry's inability to engage professional consultants on time, the size and content of PIDL's Damages Evidence, the disconnect with the pleadings, the lack of any supporting factual evidence, and the lack of disclosure, are all such that more than six weeks would be required for the Ministry to properly consider all the material and prepare its own supporting documents in relation to damages.

43    I anticipate an application will be made shortly to the Tribunal to (i) oblige PIDL to regularise its pleadings and (ii) serve any factual evidence it needs to serve.

44    As a result of the above, TMS on behalf of the Ministry, have applied to the Tribunal for an extension of time in which to serve the documents and evidence it intends to rely on in relation to the amount of damages to which PIDL is entitled.

45    Therefore, on any view, the quantum stage is likely to be protracted. Consequently, it is unlikely that the Applications (and the Court's determination of the same) would have a detrimental effect on the arbitration.

**Absence of irremediable prejudice to PIDL**

46    Further, PIDL is unlikely to suffer any irremediable prejudice as a result of the Applications or the Court's determination of the same. The Ministry has not dissipated any assets as a result of the award. Being a ministry of the Government, the Ministry is extremely unlikely to dissipate any assets or put the same out of reach of a judgement creditor in a way that a private entity might.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed.........................................

Mrs. Folakemi Adelore

Dated this 22nd day of December 2015

**Folakemi Adelore**
**Claimant**
**First**
**22 December 2015**
**Exhibit "FA1"**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**IN AN ARBITRATION CLAIM AND IN THE**
**ARBITRATION**

**BETWEEN**

**THE MINISTRY OF PETROLEUM**
**RESOURCES OF THE FEDERAL REPUBLIC**
**OF NIGERIA**

   **Claimant/Respondent in the Arbitration**

**and**

**PROCESS AND INDUSTRIAL**
**DEVELOPMENTS LIMITED**

   **Defendant/Claimant in the Arbitration**

---

**FIRST WITNESS STATEMENT OF**
**FOLAKEMI ADELORE**

---

**Stephenson Harwood LLP**
**1 Finsbury Circus**
**London EC2M 7SH**
**Tel:**   **+44 20 7809 2384**
**Fax:**   **+44 20 7003 8240**
**Ref:**   **1543**

**Solicitors for the Claimant**