# EXHIBIT 11

## IN THE FEDERAL HIGH COURT
## IN THE LAGOS JUDICIAL DIVISION
## HOLDEN AT LAGOS

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A.18 LAWS OF THE FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER**

**IN THE MATTER OF AN ARBITRATION**

**BEFORE**

| | |
|---|---|
| **LORD LEONARD HOFFMANN** | **PRESIDING ARBITRATOR** |
| **SIR ANTHONY EVANS** | **ARBITRATOR** |
| **CHIEF BAYO OJO, SAN** | **ARBITRATOR** |

**BETWEEN**

| | |
|---|---|
| **THE MINISTER OF PETROLEUM RESOURCES** | |
| **(For and on behalf of the Ministry of Petroleum Resources)** | **APPLICANT** |

**AND**

| | |
|---|---|
| **PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED BVI** | **RESPONDENT** |

### ORIGINATING MOTION

### Brought Pursuant to Sections 29, 30 & 48 of the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004, and under the Inherent Jurisdiction of this Honourable Court

**TAKE NOTICE** that this Honourable Court will be moved on ……………… the …… day of ……………… 2016 at 9 o'clock in the forenoon or so soon thereafter as Counsel may be heard on behalf of the Applicant for the following reliefs:

1. **AN ORDER** enlarging the time within which the Applicant may apply to set aside the arbitration award of the tribunal on liability dated 17 July 2015 ("the Award") in the above-mentioned arbitration proceedings.

2. **AN ORDER** setting aside and/or remitting for further consideration all or part of the arbitration Award of Lord Leonard Hoffmann, Chief Bayo Ojo, SAN and Sir Anthony Evans and for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

## GROUNDS OF THE APPLICATION

1. The arbitration proceedings were commenced pursuant to Clause 20 of the Gas Supply and Processing Agreement dated 11 January 2010 ("the Agreement").

2. The substantive law of the contract is Nigerian law.

3. The arbitration proceedings was initiated under the rules of the Arbitration and Conciliation Act, CAP A18 LFN 2004 ("ACA").

4. Parties agreed and the arbitration proceedings were indeed conducted in accordance with the ACA.

5. The parties have effectively agreed that the seat of arbitration is Nigeria and consequently Nigerian law is the *lex arbitri*.

6. Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings.

7. London is not the seat of the arbitration. It is only the venue for hearings in the arbitration; a geographically convenient place hence the High Court of England cannot exercise supervisory or any jurisdiction in relation to the arbitration proceedings.

8. The period within which to apply to set aside the arbitral Award has expired hence leave of this Honourable Court is required to bring an application to set aside the Award.

9. By virtue of section 30 of the ACA, a court may on the application of a party, set aside an arbitral award where the arbitrator(s) has misconducted himself.

10. The Applicant seeks to set aside the Award on the ground that the tribunal misconducted itself to wit:

    i.   The tribunal in making the Award breached the rules of natural justice.

    ii.  The Award is inconsistent and ambiguous.

    iii. A party to the arbitration was under some incapacity.

    iv.  The Award contains decision on a point not put forward by the parties.

v.   The Award consists of mistake of fact which is admitted to by the Tribunal and clear beyond any reasonable doubt

Dated this 24th of February 2016



Olasupo Shasore, SAN
Bello Salihu
Lateefat Hakeem-Bakare ✓
Safiat Kekere-Ekun
**Applicant's Counsel**
**Twenty Marina Solicitors LLP**
Sterling Towers
20 Marina Lagos
Telephone: 01-2719368-9
E-mail: ao@ajumogobiaokeke.com

"This Originating Motion is to be served out of Lagos State and in the British Virgin Islands"

**For Service on:**

**The Respondent**
Process and Industrial Developments Limited
Trident Chambers
P.O Box 146
Road Town
Tortola
British Virgin Islands



IN THE FEDERAL HIGH COURT
IN THE LAGOS JUDICIAL DIVISION
HOLDEN AT LAGOS

IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A.18 LAWS OF THE FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER

IN THE MATTER OF AN ARBITRATION

BEFORE

| | |
|---|---|
| **LORD LEONARD HOFFMANN** | **PRESIDING ARBITRATOR** |
| **SIR ANTHONY EVANS** | **ARBITRATOR** |
| **CHIEF BAYO OJO, SAN** | **ARBITRATOR** |

BETWEEN

**THE MINISTER OF PETROLEUM RESOURCES**
**(For and on behalf of the Ministry of Petroleum Resources)**        **APPLICANT**

AND

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED BVI**        **RESPONDENT**

## AFFIDAVIT IN SUPPORT

I, **Safiat Kekere-Ekun,** female Nigerian citizen of 20 Marina Lagos, do hereby make oath and state as follows:

1. I am a legal practitioner in the law firm of Twenty Marina Solicitors LLP, counsel to the Applicant herein and I have the consent of the Applicant and my employers to depose to this affidavit.

2. Unless otherwise stated, the facts deposed to herein derive from my personal knowledge of the facts and circumstances of this case by virtue of my position as stated in Paragraph 1 above.
   <u>The Arbitration Agreement</u>

3. The parties herein entered into a Gas Supply and Processing Agreement dated 11th January 2010 ("the GSPA").  Clause 20 of the GSPA contains parties' agreement on Applicable Law and Dispute Resolution.

4. By the said Clause 20, parties agreed that the GSPA shall be governed by and construed in accordance with the laws of the Federal Republic of Nigeria. With

respect to dispute resolution and the initiation of same, parties agreed that in the event of failure to amicably settle any dispute or difference arising from the GSPA, either party may serve on the other party a Notice of Arbitration in accordance with the Rules of the Arbitration and Conciliation Act, CAP A18 Laws of the Federation of Nigeria 2004 ("ACA").

5. It was also agreed at Clause 20 that the **_venue_** of the arbitration shall be London, England or as otherwise agreed by the parties. The Contract did not contain any express agreement as to the **_"seat"_** of arbitration. Attached and marked **Exhibit A** is a copy of the Agreement.

The Arbitration Proceedings

6. A dispute arose between the parties and by a Notice of Arbitration dated 22nd August 2012 ("Notice of Arbitration"), the Respondent commenced arbitration proceedings against the Applicant. The Notice of Arbitration was issued pursuant to the Rules of the ACA as agreed by the parties in Clause 20 of the Agreement. Attached and marked **Exhibit B** is a copy of the Notice of Arbitration.

7. Documents filed in the arbitration proceedings including the Procedural Orders issued by the tribunal were headed in accordance with clause 20 of the Agreement to wit: **_IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE ARBITRATION AND CONCILIATION ACT OF NIGERIA._**  Attached and marked Exhibits **C, D, E** and **F** respectively is a copy each of Procedural Orders Nos 1-4 issued by the tribunal in the arbitration proceedings.

_Lex arbitri_

8. In the course of the arbitration proceedings specifically on 7th August 2013, the Presiding Arbitrator sent an e-mail to the parties. By the e-mail, the tribunal expressed concern about the Applicant's failure to serve its Statement of Defence within the time stipulated by the tribunal. The tribunal therefore proposed a telephone hearing with the parties to discuss the future progress of the arbitration proceedings. Parties subsequently agreed on the date and time for the telephone conference.

9. Few days before the agreed date for the telephone hearing (16th August 2013), Applicant's counsel sent an e-mail to the tribunal and the Respondent expressing its inability to provide proper representation at the telephone hearing. This according to Applicant's counsel was due to incomplete instructions from the Applicant. Applicant requested a postponement of the telephone hearing.  By the same e-mail, the Applicant also sought an extension of time within which to submit its Statement of Defence.

10. In reaction to Applicant's e-mail referred to in paragraph 9 above, Respondent's counsel by its e-mail of 19th August 2013 to the tribunal and the Applicant proposed that the tribunal should issue Procedural Order No. 2 in the terms of the draft produced and circulated by the Respondent.

11. The draft Procedural Order No. 2 prepared by the Respondent's counsel was adopted and issued by the tribunal on 14th September 2013 (**Exhibit D**).

12. Although parties did not expressly agree on the law that would govern the arbitration proceedings (external *lex arbitri*), in a manifestation of the parties' intention with respect to the *lex arbitri* , at paragraph 4 of its Procedural Order No. 2 (the draft of which was prepared by Respondent's counsel), the tribunal notified the parties that it shall enforce the provisions of section **21 (b) of the ACA** should the Respondent ( Applicant herein) default in filing its Statement of Defence within the time stipulated by the tribunal.

13. Specifically, at paragraph 4 of Procedural Order No. 2 (**Exhibit D**), the tribunal directed as follows:

> *"WITH THE CONSENT OF THE PARTIES..................*
> *In the event that the Respondent ( Applicant herein) fails to serve its Statement of Defence in accordance with Paragraph 2 above, the tribunal shall be entitled to continue the proceedings in accordance with section 21 (b) of the Nigerian Arbitration and Conciliation Act, 1990". (Underlining is for emphasis)*

14. Apart from the Rules of the ACA, there was no reference to any other law (*lex arbitri*) in the GSPA or in the course of the arbitral proceedings. However, at the commencement of the proceedings, Applicant raised a preliminary objection to the jurisdiction of the tribunal and by its letter dated 11th October 2013, Respondent's counsel sought the consent of the Applicant to the determination of the preliminary objection in accordance with the English Arbitration Act 1996. Applicant in its response dated 14th October 2013 maintained its position on the law to govern the arbitration proceedings and stated that the preliminary objection must be determined in accordance with the ACA as agreed by the parties.

15. The Respondent in further response to Applicant's letter argued in favour of the English Arbitration Act 1996 stating that the juridical (or legal) seat of the arbitration is London as a consequence of which the English Arbitration Act 1996 is the *lex arbtri* (the law that would govern the arbitration proceedings) and that where the seat of arbitration is England, certain mandatory provisions of the English Arbitration Act would apply to the proceedings notwithstanding any agreement of the parties to the contrary. Copies of these letters were delivered to the tribunal. Attached and marked **Exhibits G, H** and **I** respectively is a copy each of the letters.

16. Surprisingly however, the tribunal on its own and without the consent or agreement of the parties or a ruling on whether the English Arbitration Act 1996 is the *lex arbitri* introduced the English Arbitration Act to the proceedings. Specifically, subsequent procedural orders of the tribunal (Procedural Orders Nos 5 – 11) were headed as follows:

*"IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND & WALES)*
*IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN*
*ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)"*

### The Award

17.   The arbitration proceedings progressed and on 1st June 2015, a hearing took place at the International Dispute Resolution Center in London. The proceedings having been bifurcated, the hearing of 1st June 2015 was restricted to issues of liability. Attached and marked **Exhibits J, K, L, M** and **N** are copies of the Witness Statement of Ikechukwu Oguine, Statement of Facts challenged with regards to the Witness Statement of Michael Quinn and other facts relevant to the question of liability, Applicant's Written Submissions, Applicant's Response to the Claimant's submission in Reply and the National Domestic Gas Supply and Pricing Regulations, which forms part of the evidence relied on by the Applicant at the hearing of 1st June 2015.

18.   On 17th July 2015, the tribunal issued its award on liability ("the Award"). Attached and marked **Exhibit O** is a copy of the Award.

19.   The Applicant was desirous of challenging the Award on the ground that the tribunal misconducted itself but the process of instructing counsel for that purpose was seriously hampered by the political situation in Nigeria at the time. It was a post-election period and a new government had not been formed.  The Chief Law Officer of the Federal Government, the Attorney General and Minister of Justice had not been appointed.

20.   The Award was issued barely two months after the conclusion of general elections in Nigeria and the subsequent inauguration of a new federal government in Nigeria. The term of office of Ministers in the immediate past administration expired on or about 29th May 2015 and new Ministers were not appointed until 11th November 2015.

### Seat of Arbitration/Nigerian Courts have Exclusive Supervisory Jurisdiction

21.   Mr. Olasupo Shasore, SAN was the Applicant's lead counsel on record throughout the proceedings leading to the Award.

22.   Upon the appointment of Nigeria's Federal Ministers, the Applicant on the advice of Mr. Shasore, SAN promptly instructed English counsel to take necessary steps to apply to set aside the Award.

23.   On the basis of the advice received from counsel, Applicant instructed its English Counsel to make necessary application to English court for extension of time to challenge the Award. The application was filed on 23rd December 2015.

24.   In its ruling of 10th February 2016, the English court refused the application. Attached and marked **Exhibits J and K** respectively is a copy each of the Application and the ruling.

Seat of arbitration is Nigeria /Nigerian Courts Have Exclusive Supervisory Jurisdiction

25.   At a telephone conference on 11th February 2016 between Applicant's Nigerian counsel and English solicitors in which I participated, the English solicitors informed us (i.e. Nigerian counsel) of the details of the ruling of the English court on the Applicant's application for extension of time to challenge the Award.

26.   Immediately after the telephone conference, we (i.e. the team of Applicant's Nigerian counsel led by Mr. Shasore, SAN) embarked on a careful and comprehensive review of the entire case file of the arbitration proceedings.  This was followed by series of brainstorming sessions particularly with respect to the seat of the arbitration.

27.   All of these exercise revealed that apart from the reference to London as the venue of the arbitration proceedings, the Agreement has no other connection with England.  None of the parties to the Agreement is English, the Agreement was to be performed in Nigeria, the Agreement is to be construed in accordance with Nigerian law and the arbitration proceedings were commenced pursuant to the ACA and the ACA rules. All of these culminated in the manifestation of the parties implied agreement to select Nigerian law as the *lex arbitri* in Procedural Order No. 2 (**Exhibit D**) which was drafted by Respondent's counsel.

28.   Mr. Shasore, SAN who was lead counsel on record throughout the proceedings leading to the Award then recalled that he had participated in all procedural matters before the arbitral tribunal wherein the dispute was by consent order affirmed to be heard pursuant to the Nigerian ACA

29.   The Respondent (Arbitration claimant) counsel had at a subsequent time suggest a change to the English Arbitration Act when Mr Shasore SAN leading for the Ministry firmly rejected the offer to change the *lex arbitri* with the Respondent.

30.   From the foregoing facts, I am of the belief that the Agreement is more closely connected to Nigeria than any other country including England.

31.   I am also of the belief that the seat of the arbitration is Nigeria, the *lex arbitri* of the arbitration proceedings subject matter of this action is the ACA and the courts that have exclusive supervisory jurisdiction in matters relating to the arbitration are Nigerian courts. As a consequence the present Applicant's reference to the English courts was as an inadvertence.

32.   I was informed by Mr. Shasore, SAN at about 1.15pm on Tuesday 23rd February 2016 at 20 Marina, Lagos and I verily believe him that the Applicant and present

Respondent never agreed nor participated in any proceedings for the change of the *lex arbitri*.

<u>Extension of Time to Set Aside an award under the ACA</u>

33.    The ACA prescribes the period within which a party aggrieved with an award must apply to court to set it aside.

34.    By the stipulation of the ACA, the time within which the Applicant may apply to set aside the award on ground of misconduct expired on or about 17th October 2016.  In view of this, leave of this Honourable Court is now required to extend the time within which to apply to set aside the Award.

35.    The default in bringing this application within the prescribed period was not out of disrespect to this Honourable Court but was occasioned by the inadvertence of counsel.

36.    The grounds for seeking to set aside the Award as stated on the motion paper are substantial and arguable.

37.    The Applicant is committed to having the Award set aside in order to properly defend the Respondent's claims particularly in view of the significant financial exposure of the Applicant to any award of damages that may be made thereafter.

38.    The Respondent will not be prejudiced by the grant of this application, as the Applicant makes this application in order that serious issues arising from the Award which touch on the financial and public interest of the Applicant are properly presented before this Honourable Court.

39.    The interest of justice will be better served by the grant of this application.

40.    I depose to this affidavit in good faith and in accordance with the Oaths Act of the Federal Republic of Nigeria.

**DEPONENT**

Sworn to at the Federal High Court Registry,

Lagos, this ............ day of ................, 2016.

BEFORE ME

COMMISSIONER FOR OATHS
FEDERAL HIGH COURT
LAGOS.
ADAKA
COMMISSIONER FOR OATHS

FEDERAL HIGH COURT
Cashier's Office
Date 2.4.7.16
LAGOS



**GAS SUPPLY AND PROCESSING AGREEMENT**

**FOR**

**ACCELERATED GAS DEVELOPMENT**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA**

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**DATED THE 11TH DAY OF JANUARY 2010**

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND INTERPRETATIONS....................................... 3

ARTICLE 2 OBJECTIVE ............................................................... 6

ARTICLE 3 SCOPE OF WORK ......................................................... 6

ARTICLE 4 FUNDING ................................................................ 7

ARTICLE 5 DURATION OF THE AGREEMENT........................................... 7

ARTICLE 6 RESPONSIBILITIES OF THE GOVERNMENT ............................. 7

ARTICLE 7 RESPONSIBILITIES OF P&ID .......................................... 8

ARTILCE 8 COMMERCIAL TERMS...................................................... 8

ARTICLE 9 JOINT OPERATING COMMITTEE ............................................ 10

ARTICLE 10 NIGERIAN CONTENT...................................................... 10

ARTICLE 11 FORCE MAJEURE ........................................................ 11

ARTICLE 12 CONFIDENTIALITY........................................................ 11

ARTICLE 13 PROPRIETARY INFORMATION ............................................. 12

ARTICLE 14 INDEMNITY ............................................................. 13

ARTICLE 15 CHANGES TO AGREEMENT.................................................. 13

ARTICLE 16 ASSIGNMENT ........................................................... 13

ARTICLE 17 THIRD PARTIES ......................................................... 13

ARTICLE 18 LANGUAGE ............................................................. 14

ARTICLE 19 WRITTEN PRESS RELEASES ............................................... 14

ARTICLE 20 APPLICABLE LAW AND DISPUTE RESOLUTION................... 14

ARTICLE 21 ENTIRE UNDERSTANDING ................................................ 15

ARTICLE 22 WARRANTIES............................................................. 15

ARTICLE 23 NOTICES ............................................................... 16

APPENDIX A ....................................................................... 18

APPENDIX B ....................................................................... 19

**THIS GAS SUPPLY AND PROCESSING AGREEMENT** is entered into this 11th day of January 2010.

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES FOR AND ON BEHALF OF THE FEDERAL GOVERNMENT OF NIGERIA (FGN)** (hereinafter referred to as "the Government") whose office address is situated at the 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria hereby represented by .DR.......R.I.G.ɷ.ʍ.ɷ.......I.U.ʙ.ʍ.A.ʀ.I........., the Honourable Minister of Petroleum Resources, which expression shall where the context so admits includes its assigns and successors in office of the first part.

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED** a corporation organised and existing under the laws of the British Virgin Islands and it's assignees (which expression shall, where the context so permits means and include any successors or permitted assigns) hereby represented by.....M.I.CHAEL..Ǫ.ʊ.ɪ.ɴɴhereinafter referred to as "P&ID") of the other part.

Each of the Parties may be referred to individually as "Party" or collectively as "the Parties".

**WHEREAS:**

a)   The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

b)   The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves, developed gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators.

c)   The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allocated to the international operators.

Page **2** of 19

d) The Government desires to develop and utilise it's gas resources at optimal capacity to meet the growth in gas demand at the various sectors of the economy including domestic, regional and export markets;

e) The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

f) The Government has explored viable structures that could be used to meet the highlighted objectives and considered P&ID as capable of implementing and executing the Project;

g) The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic uses.

h) P&ID possesses the requisite finance, technology and competence for the fast track development of the Project.

i) P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the project in accordance with the terms of this Agreement.

j) The Parties are entering into this Agreement to ensure the fastrack implementation of the Project and to ensure the timely provision of pipeline quality Lean Gas for power generation.

**IN CONSIDERATION OF THE MUTUAL RIGHTS, INTERESTS, COVENANTS AND OBLIGATIONS CONTAINED HEREIN IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:**

1. **DEFINITIONS AND INTERPRETATIONS**

I. "Affiliate" means with respect to a Party, any company or legal entity that Controls, or is controlled by, such Party or is controlled by a company or legal entity that also controls such Party. For purposes of this Agreement, "control" means the right, directly or indirectly, to exercise fifty percent (50%) or more of the voting rights in the election of directors, or if there are no such voting

rights, ownership of fifty percent (50%) or more of the equity share capital or other ownership interests, and "controls and "controlled shall be construed accordingly;

ii. "Agreement" means this Gas Processing Agreement;

iii. "CDM Project" means a clean development project as provided for in the Kyoto Convention and a CDM Project is duly authorised to engage in approved market based mechanisms in relation the Carbon Credits;

iv. "Effective Date" means the date of signing of this Agreement;

v. "GPFs" means the Gas Processing Facilities to be constructed and operated at the Site and off-shore from the Site where applicable;

vi. "Lean Gas" means pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane;

vii. "MMSCuFD" means Millions of Standard Cubic Feet per Day;

viii. "NGLs" means all hydrocarbons remaining after processing the Wet Gas removing the Lean Gas;

ix. "Parties" means the Ministry of Petroleum Resources of the Federal Government of Nigeria represented by the Honourable Minister of Petroleum Resources and Process and Industrial Developments Limited;

x. "Pioneer Status" means tax free status in Nigeria for P&ID and its assignees in relation to the Project encompassing the provision of equipment and materials for the project and as operators of the plant for the first 5 years of operations.

xi. "Project" means the establishment of the GPFs and the supply of Wet Gas thereto and the delivery of Lean Gas and their successful operation by the Parties as set out in this Agreement;

xii Project Team" means the management team appointed by P&ID to carry out the implementation of the Project and shall include the P&ID nominees to the Joint Operating Committee.

xiii."Proprietary Information" means all data and information generated pursuant to the work carried out by the parties including but not limited to reports, documents, drawings and graphs, and any patentable inventions made during and as a

Page 4 of 19

result of all work carried out by the P&ID Project Management Team for this project, inclusive of any and all patents or patent applications with regard thereto;

xiv.  "Site" means the land in Calabar on which the GPFs are located.

xv.   "Start Date" means the earliest date on which the Government commences the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site;

xvi. "Wet Gas" means associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site;

Except where expressly provided to the contrary in this Agreement:

the Schedules and the Appendices form part of this Agreement and in the event of any conflict between the main body of this Agreement and a Schedule the main body of this Agreement shall prevail;

reference to any Party or any Person includes that Party's or that Person's successors and permitted assigns;

reference to any consent not to be unreasonably withheld is deemed to be qualified by the requirement that such consent shall not be unreasonably conditioned or delayed;

reference to include and including is deemed to be qualified by the additional term without limitation;

reference to any publication, statute, rule, regulation, instrument or standard means the same as amended, supplemented or replaced from time to time;

reference to any agreement means the same as amended, supplemented or replaced from time to time;

in the computation of periods of time from a specified day or Day to a later specified day or Day:

(i)     from means from and including and until and to means to and including; and

**Page 5 of 19**

(ii) any requirement that an action may or shall be taken within a specified number of Days means that such action may or shall be taken within the number of Days so specified starting at 00:00 hours local Nigerian time on the Day on which the requirement to take such action arose;

## 2. OBJECTIVE

The objective of this Agreement is to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of Wet Gas by the Government and the processing of the said Wet Gas by P&ID utilising two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner.

## 3. SCOPE OF THE WORK

The scope of works of this Agreement is as follows:

a. P&ID shall construct GPFs on the Site allocated to them by Cross River State Government with related ancillary plant and equipment off-shore as required. The GPFs shall be constructed on a timely basis to ensure the earliest possible delivery to the Government, or its nominees, of approximately 340 MMSCuFD Lean Gas for power generation and industrial use by third parties.

b. To ensure this fastrack is achieved P&ID will construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD together with all utilities, maintenance and support facilities at the Site in accordance with the schedule of works forming Appendix B hereto.

c. The Government shall make available at the P&ID Site boundary, 400 MMSCuFD Wet Gas (free of water) in the manner set out in Appendix A having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8% mol from OMLs 123 and OML 67 or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of this Agreement as defined under Article 5 of this Agreement.

Page 6 of 19

*Ministry of Petroleum Resources*

    d.   P&ID will process the Wet Gas to be supplied by the Government and shall provide to the Government or its nominees approximately 85% of the wet gas feedstock molecular volume in the form of Lean Gas at the Site boundary.

## 4.  FUNDING

a. Save as otherwise provided in this Agreement, each Party shall bear the costs and expenses of its own personnel during the period of this Agreement.

## 5.  DURATION OF THE AGREEMENT

This Agreement shall come into being on the Effective Date being the date of signing of the Agreement as defined in Article 1 herein and shall remain in force for a period of twenty (20) years with effect from the Start Date of the Agreement after which it shall automatically terminate without prior notice to the Parties except where extended by a mutual agreement of the Parties or until the Capital Cost of the Project is fully repaid whichever occurs latest subject to the Government at all times having the right to audit the Accounts of the P&ID .

## 6.  RESPONSIBILITIES OF THE GOVERNMENT

a)   The Government shall deliver to the Site boundary the agreed quantities and quality of gas as defined under Article 3c and in the manner set out in Appendix A of this Agreement;

b)   The Government shall ensure that all necessary pipelines and associated infrastructure are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.

c)   The Government agrees to assist P&ID, and where necessary intercede with the relevant Government agencies, to obtain all requisite permits, licenses and approvals required from the relevant Government agencies or others for the fastrack implementation of this project.



d) If the Government or any of its agencies changes or amends any statute, rule, regulation, instrument or standards, and such change or amendment adversely affects the rights of P&ID under this Agreement, the Parties shall amend the terms of this Agreement in a manner that will restore the rights of P&ID. The Government shall grant to P&ID all such waivers and exemptions necessary to ensure that the rights of P&ID are not adversely affected by any change or amendment to statute, rule, regulation, instrument or standards.

## 7. RESPONSIBILITIES OF P&ID

a) P&ID shall use best endeavours to ensure the fastrack implementation of this Project to construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD together with all utilities maintenance and support facilities at the Site. Thereafter P&ID shall maintain and operate the GPFs on a professional basis to ensure a regular supply of Lean Gas (approximately 340 MMSCuFD) for power generation;

b) c) P&ID shall, during the Project implementation period, submit to the JOC as set out in Article 9 updated work programs or such other documentation as may be necessary to enhance the development of the Project;

c) P&ID shall do all that is necessary to obtain relevant approvals required for the success of the Project.

## 8. COMMERCIAL TERMS

a) The Government shall deliver to the Site boundary, 400 MMSCuFD of Wet Gas as set out in Article 3 c) and in Appendix A of this Agreement having a minimum C3 (Propane) content of 3.5% mol and C4 (Butane) of 1.8% mol at No Cost to P&ID.

b) P&ID will process the Wet Gas, recompress the residual Lean Gas, representing approximately 85% of the Wet Gas feed, and make it available, for power generation or other Industrial usage at the discretion of the Government, at the Site boundary at No Cost to the Government.

c) Title to and ownership of the Wet Gas to be delivered by the Government to the Site shall remain vested in the Government and shall be delivered back to the Government at the Site boundary



Page 8 of 19

after processing in the form of Lean Gas but the NGLs removed from the Wet Gas during processing shall be retained by P&ID and shall be deemed the sole property of P&ID and the said NGLs may be sold by P&ID either domestically within Nigeria or exported in accordance with commercial criteria.

d) P&ID shall provide all funding necessary for the timely construction, implementation and efficient operation of the GPFs and the said GPFs will be the sole property of P&ID and may be sold or otherwise disposed of by P&ID subject always to the provisions of this Agreement PROVIDED that Government shall be given the right of first refusal.

e) As further consideration P&ID shall transfer to the Government or its nominee a total of ten percent (10%) of the Equity of P&ID in the following manner:

    (i)    P&ID shall transfer to the Government or it's nominee five percent (5%) the Equity of P&ID upon the commencement of the delivery of not less than 150 MMSCuFD of Wet Gas to the Site as set forth as Phase 1 in Appendix A

    (ii)    P&ID shall transfer to the Government or its nominee a further five percent (5%) of the Equity of P&ID the said Equity to be transferred pro rata as the delivery of the remaining 250 MMSCuFD is successfully implemented as set forth as Phase 2 in Appendix A.

    (iii)    All of the Equity to be transferred under this Article 8 (f) shall consist of fully paid Ordinary Shares free of all liens and charges and no sums whatsoever shall be payable by the Government in respect of the Equity so transferred.

f) Following the initial transfer of five percent (5%) Equity to the Government or its nominee as provided for at Article 8 (e) above no new shares whether Ordinary, Preference or otherwise may be issued without the written agreement of the Government such agreement not to be unreasonably withheld and the Government shall be entitled to representation on the Board of P&ID in proportion to the Equity held by the Government at any given time.

g) The Parties are aware that the 24inch Adanga pipeline presently under construction from the Addax operated OML 123 directly to Calabar and due for completion in 2010 will have a throughput capacity of 600 MMSCUFD and can adequately provide the required first delivery of 150 MMSCuFD of Wet Gas to the Site and that an additional pipeline of up to 70km in length may be required to link up to the Adanga pipeline in order to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas to the Site from other sources to be

chosen by the Government. It such a requirement is necessary, P&ID undertakes to build and install the said additional pipeline to provide for the delivery of the remaining 250 MMSCuFD of Wt Gas to the Site, at no cost to the Government, and P&ID will retain the ownership and provide the maintenance for the pipeline.

h) P&ID shall enjoy Pioneer Status with no import duties, clearance charges or taxes payable within Nigeria in respect of all equipment and materials utilised in the construction and commissioning of the GPFs and with no taxes payable in respect of the operation of the GPFs for a period of five (5) years from the commencement of commercial operations at the GPFs.

i) The Government will actively support the designation of the Project as a CDM Project and P&ID will take all necessary steps to achieve such designation. All earnings or revenues arising from the Project status as a CDM Project will accrue 50% (fifty percent) to P&ID and 50 (fifty percent) to the Government.

9. **JOINT OPERATING COMMITTEE**

a) The Joint Operating Committee (JOC) established by the Parties under the previous Memorandum of Understanding dated 22nd July 2009 and comprising of two representatives from the Ministry of Petroleum Resources and two representatives from NNPC nominated by the Government and two representatives nominated by P&ID, shall meet at regular intervals during the Project implementation period to discuss in detail the implementation progress of the Project. Where deemed necessary by any JOC member of the Government or P&ID shall nominate such other expert support from other agencies as may be necessary to ensure that Project timelines are maintained.

b) The JOC shall carry out further activities as may be determined by the Parties.

c) Any cost that may accrue from the JOC activities shall be borne equally by the Parties.

10. **NIGERIAN CONTENT**

a) The Nigerian content of project development, construction and operation shall be maximised to the extent reasonably possible without detracting from the fastrack implementation schedule.

**Page 10 of 19**

## 11.   FORCE MAJEURE

a)   Any failure or delay on the part of either Party in the performance of its obligations or duties under this Agreement, shall be excused to the extent attributable to force majeure save for obligations to pay sums due and payable. A force majeure situation includes delays, defaults or inability to perform under this Agreement due to any event beyond the reasonable control of either Party. Such event may be, but is not limited to, any act, event, happening, or occurrence due to natural causes, acts or perils of navigation, fire, hostilities, war (declared or undeclared), blockage, labour disturbances, strikes, riots, insurrection, civil commotion, quarantine restrictions, epidemics, storms, floods, earthquakes, accidents, blowouts, lightning, and, acts of or orders of the Government. If activities under this Agreement are delayed, curtailed or prevented by force majeure, then the time for carrying out the obligation and duties thereby affected, and rights and obligations hereunder, shall be extended for a period equal to the period of such delay.

b)   The Party who is unable to perform its obligations as a result of the force majeure event shall promptly notify the other Party thereof not later than forty-eight (48) hours after becoming aware of the establishment of the force majeure event, stating the cause, and both Parties shall do all that is reasonably within their powers to remove such cause.

## 12.   CONFIDENTIALITY

Each of the Parties, their employees, agents and representatives hereby undertake that they shall not, whether during the period of this Agreement or at any time after the expiration or termination thereof, disclose any information acquired by it, from or through the other Party (either directly or indirectly, oral or written) to any person, firm or company. Such information shall include all information, data, designs, drawings, computer programmes, recordings, writings, correspondences and any other technical, commercial or operational information relating to the other Party's business and activities or any of its Affiliate companies ("Confidential Information").

The above provisions shall not extend to information which:

(i)    Prior to the time of disclosure or acquisition has become lawfully in the public domain or was obtained by the Party disclosing it without any confidentiality obligations, or was obtained from a third party who is lawfully entitled to be in possession of such information;

(ii)   Any Party shall disclose, where such disclosure is demanded by an order of a court of competent jurisdiction, or a tax authority, or a lawfully constituted commission of inquiry, provided that prior to making such disclosure, written notification of the demand received by such Party has been given to the other Party and thereafter the Party being compelled to make the disclosure can do so.

## 13.   PROPRIETARY INFORMATION

(i)    All intellectual property and other proprietary rights in and to the Proprietary Information shall be the joint property of the Parties;

(ii)   The Parties and their Affiliates shall only be entitled to use the Proprietary Information in the evaluation, pursuit and development of the project and for no other purpose.

(iii)  The Parties agree that Proprietary Information shall be confidential and that no Party or its Affiliates shall use, copy, sell, trade, publish or otherwise disclose the Proprietary Information to anyone save as otherwise provided in this Agreement or with the written approval of the other Party. Notwithstanding the foregoing, a Party may disclose Proprietary Information if and to the extent:

(a)   that such information is already in the public domain, other than as a result of a breach of the obligation with respect to Proprietary Information and Confidential Information under this Agreement by any of the Parties;

(b)   required to be disclosed under applicable laws including rules of applicable stock exchange, tax authority, Governmental authorities or courts or competent panel of enquiry;

Page 12 of 19

      (c)  such disclosure is to be made to its Affiliates and the directors agents, officers and employees of the Party and their Affiliates; and

      (d)  such disclosure to professional advisers and consultants of any Party and its Affiliates on a need to know basis.

## 14.  INDEMNITY

Each Party shall be responsible for any claims made by or injury to its representative(s) and in respect of damage to such Party's property while such representative is providing services arising from the activities under this Agreement. In that regard, each Party agrees to indemnify, defend and hold harmless the other Party from and against any claims, or causes of action arising out of or in connection with such personal injury or damage to property.

## 15.  CHANGES TO AGREEMENT

No amendments, modifications or changes to this Agreement shall be valid unless approved in writing by both Parties.

## 16.  ASSIGNMENT

Either Party may assign its rights and obligations to an Affiliate as defined in this Agreement or to a designated financial Institution where such an assignment comprises an integral constituent element of the financing structure of the Project but assignment to a non-affiliate shall not be permitted without the written consent of the other party such consent not to be unreasonably withheld but in all cases of assignment the assignor shall not be released of any of its liabilities and responsibilities under this Agreement.

## 17.  THIRD PARTIES

a)    This Agreement is intended for the Parties hereto, and nothing contained in this Agreement shall be construed to create any duty to, standard of care with reference to, or rights in any person not a Party to this Agreement. This Agreement shall not confer any right to any third party claiming the right to entitlement or benefits under this Agreement.

b) No Partnership: None of the provisions of this Agreement shall be deemed to constitute a Partnership between the Parties, and no Party shall have the authority to bind or shall be deemed to be the agent of the other Parties in any way.

## 18. LANGUAGE

The language for the purposes of administering this Agreement shall be English.

## 19. WRITTEN PRESS RELEASES

The Parties shall consult, coordinate and agree on the release of any written press releases, announcements or responses to media enquiries concerning this Agreement in advance of any such announcement. If a Party or its Affiliate wishes to issue or make a press release, it shall not do so unless prior to its release, such Party furnishes to the other Party a copy of such press release for its review and written approval (which approval shall not be unreasonably withheld).

The Party shall provide a copy of such press release and related background information to the other Party within a minimum of seven (7) days, if practical, but in any event not less than seventy-two (72) hours, prior to its planned release.

## 20. APPLICABLE LAW and DISPUTE RESOLUTION

The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.

The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal. In the event that the arbitrators do not agree on the

appointment of such third arbitrator within the aforementioned fifteen (15) days, or any extension of such deadline that the Parties may mutually agree, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce ("ICC") in accordance with the relevant ICC rules on the application of either Party (notice of the intention to apply having been duly issued to the other) and, when appointed, the third arbitrator shall convene meetings of the arbitration panel, act as chairman thereof and decide the differences or dispute should the arbitrators fail to reach a unanimous decision. No arbitrator shall be appointed if such person has been employed or contracted by either of the Parties or their respective Affiliates within five (5) years prior to the notice of arbitration.

When an arbitrator refuses or neglects to act, or is incapable of acting or dies, a new arbitrator shall be appointed in his place and the above provisions of appointing arbitrators shall, mutatis mutandis, govern the appointment of such arbitrator.

The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties. The costs of the arbitration shall be borne equally by the Parties. Each Party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language.

The Parties shall agree to appropriate arbitration terms to exclusively resolve any disputes arising between them from this Agreement.

## 21. ENTIRE UNDERSTANDING

This Agreement including Appendix A and Appendix B comprises the full and complete understanding of the Parties hereto with respect to all the matters addressed in this Agreement and the said Appendix A and Appendix B shall form an integral part of this Agreement.

## 22. WARRANTIES

Each Party represents and warrants that it has the right and authority to enter into this Agreement and to perform and observe all of its

Page 15 of 19

obligations under this Agreement and that the execution, delivery and performance of this Agreement has been duly and validly authorised by all necessary corporate or other action, and that by entering into this Agreement, it will not violate, conflict with, or cause a material default under any other contract, agreement, indenture, decree, judgement, undertaking, conveyance, lien, or encumbrance to which it is a party or by which it may become subject.

23.  **NOTICES**

Any notice, request, demand or other correspondence required under this Agreement or any notice which either Party may desire to give to the other Party shall be in writing and shall be hand-delivered, sent by facsimile, or similar means of delivery to the Party intended to receive the same, as the case may be, and shall be effective upon receipt at the following addresses:

**If to Government:** Honourable Minister of Petroleum Resources
NNPC Towers
Herbert Macaulay Way
Abuja, Nigeria

**If to: Process and Industrial Developments Limited (P&ID)**

The Chairman
Process and Industrial Developments Limited
15B Buchanan Crescent,
Off Aminu Kano Crescent
Wuse II, Abuja
FCT, Nigeria

Attention: Mr. Neil C. Hitchcock, Projects Director

**Page 16 of 19**

IN WITNESS whereof the Parties have executed this AGREEMENT by their duly authorised signatories effective the day and year first above written:

SIGNED, SEALED AND DELIVERED

By the within named ................................................................

**HON. MINISTER OF PETROLEUM RESOURCE**

In the presence of:

Name: GRACE E. O. TAIGA

Address: MINISTRY OF PETROLEUM RESOURCES

Occupation: DIRECTOR LEGAL

Signature: ................................................................

SIGNED, SEALED AND DELIVERED

By the within named ................................................................

**PROCESS AND INDUSTRIAL DEVELOPMENTS LTD**

In the presence of:

Name: MUHAMMAD KUCHAZI

Address: 43 MADEIRA ST. IMANI ESTATE MAITAMA ABUJA

Occupation: BUSINESS

Signature: ................................................................

Page 17 of 19

# APPENDIX A

**Delivery of Wet Gas to P&ID**

Phase 1        During or before the last quarter of 2011 a continuous supply of 150 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

Phase 2        On or before the third quarter of 2012 a further additional continuous supply of 250 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

**Delivery of Lean Gas to the Government**

Phase 1        During the last quarter of 2011 following supply of the 150 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.

Phase 2        On or before the third quarter of 2012 following supply of the additional 250 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site boundary, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.

**Page 18 of 19**

# APPENDIX B

## SCHEDULE OF WORK

Page 19 of 19



39

*P&ID*

22 AUG 2012

**Process and Industrial Developments Limited**

*Engineers, Consultants and Managing Contractors*

OFFICE OF THE DIRECTOR
HUMAN RESOURCE
MINISTRY OF ...
23 AUG 2012

LIAISON OFFICE: 12, VAAL STREET,
OFF RHINE STREET,
MINISTERS HILL, MAITAMA,
ABUJA, FCT, NIGERIA
TEL: +234 9 413 4098
EMAIL: INFO@PANDID.NET

OFFICE OF THE
PERMANENT SECRETARY
MIN. OF PETROLEUM
2 3 AUG 2012
**R E C E I V E D**
Block D, NNPC Towers, Abuja
Sign

The Honourable Minister of Petroleum Resources,
Federal Ministry of Petroleum Resources,
Block D, 11th Floor,
NNPC Towers,
Herbert Macaulay Way,
Central Business District,
P.M.B. 449, Abuja.

22nd August 2012

Honourable Minister,

Re:   Gas Supply and Processing Agreement for Accelerated Gas Development between the Ministry of Petroleum Resources of the Federal Republic of Nigeria and Process and Industrial Developments Limited dated 11 January 2010 - Notice of Arbitration

We refer to the above-referenced agreement dated 11 January 2010 ("the Agreement"). As you will be aware, a dispute has arisen between the parties in respect of the performance of the Agreement concerning the failure of the Government of Nigeria ("the Government") to make available to Process and Industrial Developments Ltd ("P&ID") the quantity of wet gas stipulated in clause 3(c) and Appendix A of the Agreement for Phase 1 of the Project.

P&ID have sought to resolve this matter amicably with the Government. We have written to you and to other Government departments and officials on a number of occasions identifying the Government's failure to comply with its obligations under the Agreement, seeking assistance and intervention with other parties, and, more recently, making proposals for the amendment of the Agreement so as to permit the parties to work together to progress the implementation of the Project. We appreciate that you, your department, and many others, have taken steps to resolve the issues that have

TRIDENT CHAMBERS, P.O. BOX 146, ROAD TOWN, TORTOLA,
BRITISH VIRGIN ISLANDS.
EMAIL: INFO@PANDID.NET

arisen. Unfortunately, however, the Government remains in breach of its obligations to P&ID under the Agreement.

In the circumstances, P&ID is compelled to refer this dispute to arbitration in accordance with clause 20 of the Agreement and would respectfully ask that you treat this letter as its Notice of Arbitration for those purposes.

For convenience, we set out the terms of clause 20 in full:

### "20. APPLICABLE LAW and DISPUTE RESOLUTION

*The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.*

*The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to compete the tribunal. In the event that the arbitrators do not agree on the appointment of such third arbitrator within the aforementioned fifteen (15) days, or any extension of such deadline that the Parties may mutually agree, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce ("ICC") in accordance with the relevant ICC rules on the application of either Party (notice of the intention to apply having been duly issued to the other) and, when appointed, the third arbitrator shall convene meetings of the arbitration panel, act as chairman thereof and decide the differences or dispute should the arbitrators fail to reach a unanimous decision. No arbitrator shall be appointed if such person has been employed or contracted by either of the parties or their respective Affiliates within five (5) years prior to the notice of arbitration.*

*When an arbitrator refuses or neglects to act, or is incapable of acting or dies, a new arbitrator shall be appointed in his place and the above provisions of appointing arbitrators shall, mutatis mutandis, govern the appointment of such arbitrator.*

*The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the parties. The costs of the arbitration shall be borne equally by the Parties. Each Party shall, however, bear its own lawyers' fees.*

*The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language.*

*The Parties shall agree to appropriate arbitration terms to exclusively resolve any disputes arising between them from this Agreement."*

In accordance with the provisions of Article 3 of Schedule 1 to the Nigerian Arbitration and Conciliation Act:

(1) Please accept this letter as P&ID's demand that any and all disputes concerning the interpretation or performance of the Agreement be referred to arbitration, including but not necessarily limited to the dispute identified above in respect of the Government's breach(es) of clause 3 and Appendix A of the Agreement.

(2) The names and address of the parties are:

(a) (for the Ministry of Petroleum Resources (for an on behalf of the Federal Government of Nigeria)

> The Honourable Minister of Petroleum Resources
> NNPC Towers
> Herbert Macaulay Way
> Abuja
> Nigeria

(b) (for P&ID)

> The Chairman
> Process and Industrial Developments Ltd
> 15B Buchanan Crescent
> Off Aminu Kanu Cresent
> Wuse II, Abuja, FCT
> Nigeria

> Attn: Mr. Neil C. Hitchcock, Projects Director

(c) Please note that the current address of P&ID is as follows:

> 12, Vaal Street,
> off Rhine Street, Ministers Hill,
> Maitama,
> Abuja,
> FCT, Nigeria

(3) The arbitration agreement is contained in clause 20 of the Agreement set out above.

Page **3** of **4**

(4) The dispute arises out of the Agreement.

(5) The claim is for breach of contract as described above. P&ID reserves the right to make such further or alternative claims as it may be advised to make in relation to the matters referred to above. At present, P&ID estimates its loss of profit as a result of the matters referred to above over the 20 year term of Phase 1 of the Project to be not less than US$1,991,816,709 (one billion nine hundred and ninety one million eight hundred and sixteen thousand seven hundred and nine US Dollars). P&ID reserves the right to modify the amount of its claim, including so as to claim in respect of other losses and/or in respect of expenses. P&ID will also claim interest on such sums as may be awarded to it as well as its legal costs and the costs of the arbitration.

(6) P&ID will be seeking damages and/or other relief.

(7) Clause 20 of the Agreement provides for the constitution of the arbitral tribunal. P&ID shall appoint its arbitrator within 30 days of the date of receipt by the Government of this notice. P&ID calls on the Government to appoint its arbitrator also within 30 days of the date of receipt of this notice.

For the avoidance of doubt, nothing in this letter is intended to amount to an acceptance on the part of P&ID of any repudiatory breach of the Agreement on the part of the Government. So far as P&ID is concerned, the Agreement remains in full force. In particular, P&ID intends notwithstanding the present dispute and the commencement of arbitration to proceed with Phase 2 of the Agreement.

As with our letter of 27 July 2012, the necessity of writing to you in these terms and that it has been necessary to give this notice of commencement of arbitration is very much regretted. Notwithstanding that, it remains our earnest hope that the present difficulties can be resolved to the satisfaction of both parties so that the Project can be implemented for the benefit of all concerned as originally envisaged.

Yours respectfully,

Neil C. Hitchcock
Projects Director

**IN THE MATTER OF AN ARBITRATION UNDER**
**THE RULES OF THE ARBITRATION AND**
**CONCILIATION ACT OF NIGERIA**

**BETWEEN**


**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Claimant**

**-and-**

**MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF**
**NIGERIA**

**Respondent**

---

**DRAFT / PROCEDURAL DIRECTION No 1**

---

1. The Claimant shall serve a Statement of Claim complying with Article 18 of the Rules of the Nigerian Arbitration and Conciliation Act 1990 ("the Rules") on or before 31 May 2013.



2. The Respondent shall serve a Statement of Defence complying with Article 19 of the Rules on or before 30 June 2013.

3. There shall be a Procedural Conference on the earliest convenient date after 30 June 2013.

4. For the purpose of Article 2 of the Rules all timings shall be at London, United Kingdom.

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
ARBITRATION AND CONCILIATION ACT OF NIGERIA


BETWEEN


PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED


<u>Claimant</u>


-and-


MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF
NIGERIA


<u>Respondent</u>

---

PROCEDURAL ORDER No 2

---

Lord Hoffmann (Presiding Arbitrator)

Sir Anthony Evans

Chief Bayo Ojo

14 September 2013

UPON the Respondent having failed to serve any Statement of Defence on or before 31 July 2013;

AND UPON the Respondent having failed, on or before 31 July 2013, to show sufficient cause for such failure, as required by Article 28 of the Arbitration Rules set out in the First Schedule to the Arbitration and Conciliation Act of Nigeria ("the Rules")

IT IS ORDERED BY CONSENT THAT

1. The arbitral proceedings shall continue;

2. The Respondent shall serve a Statement of Defence complying with Article 19 of the Rules on or before Friday 4 October 2013;

3. There shall be a Procedural Conference on a date to be fixed by the Tribunal after Friday 4 October 2013;

4. In the event that the Respondent fails to serve a Statement of Defence in accordance with paragraph 2 above, the Arbitral Tribunal shall be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act 1990;

5. For the purpose of Article 2 of the Rules all timings shall be at London, United Kingdom.

Place of arbitration:  London, United Kingdom

Signed on behalf of the Tribunal

Lord Hoffmann

(Presiding Arbitrator)

14 September 2013

<u>**IN THE MATTER OF AN ARBITRATION UNDER**</u>
<u>**THE RULES OF THE ARBITRATION AND**</u>
<u>**CONCILIATION ACT OF NIGERIA**</u>

<u>**BETWEEN**</u>

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

<u>**Claimant**</u>

**-and-**

**MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA**

<u>**Respondent**</u>

---

**PROCEDURAL DIRECTION No 3**

---

UPON the Respondent having served upon the Arbitral Tribunal on 4 October 2013 a Notice of Preliminary Objection;

IT IS ORDERED BY CONSENT THAT:

1. The arbitral proceedings shall continue;

2. The following questions shall be decided as preliminary issues ("the Prelimary Issues"):

    (a)     Whether the Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration;

    (b)     If the answer to question (a) is yes, whether it has jurisdiction to decide whether the contract is valid and binding upon the parties;

    (c)     If the answer to question (b) is yes, whether the contract is void for any of the the reasons stated in the Notice of Preliminary Objection;

3. The Respondent shall serve its submissions in relation to the Preliminary Objection and the Preliminary Issue with documents and evidence in support on or before Friday 24 January 2014;

4. The Claimant shall serve its Response to the Respondent's submissions with documents and evidence in support on or before Friday 14 February 2014;

5. The Respondent shall serve its Reply to the Claimant's Response with documents and evidence in support on or before Friday 28 February 2014;

6. There shall be a telephone conference upon a date to be arranged not later than 25 January 2014 to fix a date for an oral hearing on the preliminary issues and to deal with any other procedural matters.

7. The parties shall exchange skeleton arguments and serve them upon the Tribunal four clear days before the date of the oral hearing.

8. For the purpose of Article 2 of the Rules all timings shall be at London, United Kingdom.

9. The parties have leave to apply to vary the provisions of this Order.

Place of arbitration:

London

Signed on behalf of the Tribunal.

pp   Lord Hoffmann

(Presiding Arbitrator)

**IN THE MATTER OF AN ARBITRATION UNDER**
**THE RULES OF THE ARBITRATION AND**
**CONCILIATION ACT OF NIGERIA**

**BETWEEN**

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

<u>**Claimant**</u>

**-and-**

### MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA

<u>**Respondent**</u>

---

### PROCEDURAL DIRECTION No 4

---

The Tribunal having consulted the parties in a telephone conference held on Monday 10 February 2014 and subsequently by e-mail

IT IS ORDERED THAT:

1. The hearing for the purpose of deciding the questions ordered by paragraph 2 of Procedural Order No. 3 to be preliminary issues shall take place on 14 May 2014 at the International Disputes Resolution Centre, 70 Fleet Street, London EC4Y 1EU.

2. The parties shall co-operate in making the necessary arrangements for the hearing and will in the first instance share equally the cost of the hearing and any associated expenses such as a shorthand writers, subject to any order as to costs which may subsequently be made by the Tribunal.

3. Each of the parties shall on or before **21 March 2014** deposit the sum of £25,000 in an account with the LCIA as follows:

   Account Name:        London Court of International Arbitration
   IBAN Account No:     GB64MIDL40062921375962

| | |
|---|---|
| Swift Code: | MIDLGB2107P |
| Account No: | 21375962 |
| Bank: | HSBC, Fleet Street Branch, 165 Fleet Street, London EC4A 2DY |
| Sort Code: | 40-06-29 |
| Reference: | **142626F** |

4. Each Party shall address all communications, notifications, submissions and documents directly to each member of the Arbitral Tribunal, with a copy to the other Party.

5. All communications, notifications, submissions and documents in this arbitration shall be deemed properly served provided they are made:

   a. if to the Arbitral Tribunal, by e-mail to each member at the addresses set out in paragraph 6 below or notified later in this arbitration;

   b. if to the Parties, by e-mail to their respective Counsel at the addresses set out in paragraph 7 below or notified later in this arbitration.

6. The email addresses for the Arbitrators are:

   leonard.hoffmann@brickcourt.co.uk
   deborah.anderson@brickcourt.co.uk
   AEvans@essexcourt.net
   atighe@essexcourt.net
   cabayoojo@aol.com

7. The email addresses for the Parties are:

   *Claimant*:

   henry.hickman@harcus-sinclair.co.uk

laura.chesham@harcus-sinclair.co.uk

*Respondent*:

lateefat.hakeem-bakare@tmsllp.com
alegeh@yahoo.com

8. A document which is sent via a link to "Dropbox" or an equivalent mode of file sharing, which link is sent by email to the relevant email address or addresses above, shall be deemed to have been properly served.

9. A party may, but is not obliged to, require an electronic "Read Receipt" when sending a communication, notification, submission or document by email. In the event that a Read Receipt is required the receiving party shall within 2 working days acknowledge receipt. For the avoidance of doubt a working day shall be a working day in London England.

10. Each Party may also, at its option, provide communications, notifications, submissions and documents in written form, or on CD-Rom or memory stick or other electronic media, as the case may be, PROVIDED THAT in the event that a Party chooses not to do so this shall not constitute any sort of default and shall not invalidate deemed good service by email described above.

11. The date and time that communications, notifications, submissions and documents are sent by e-mail shall determine whether or not any applicable time limits have been complied with, regardless of when in fact received, PROVIDED THAT a party to whom an email communication as described above has been sent, who has not in fact received that email, may seek appropriate relief or forbearance from the Tribunal.

Place of arbitration:

London

Signed on behalf of the Tribunal.

Lord Hoffmann

(Presiding Arbitrator)

# HARCUS SINCLAIR

3 Lincoln's Inn Fields
London WC2A 3AA
Telephone 020 7242 9700
Fax 020 7539 4701

Our Reference:     DJP/HH/2211.1

DX 340 London/Chancery Lane
www.harcus-sinclair.co.uk
e-mail: henry.hickman@harcus-sinclair.co.uk
direct line telephone no: 020 7539 4738
direct line fax no: 020 7539 4703

11 October 2013

Olasupo Shasore SAN
Respondent's Counsel
Twenty Marina Solicitors LLP
Sterling Towers
20 Marina Lagos
P O Box 9945 Lagos
Nigeria

And by e-mail to: tms@tmsllp.com; lateefat.hakeem-bakare@tmsllp.com; safiat.kekere-ekun@tmsllp.com; olasupo@shasore.com

Dear Sirs

**Process and Industrial Developments Limited v Ministry of Petroleum Resources of the Federal Republic of Nigeria**

We refer to your letter to the Tribunal dated 4 October 2013 enclosing the Respondent's Notice of Preliminary Objection. The letter and its enclosure were not copied to us, and so we only became aware of them on Tuesday, when they were forwarded to us by Ms Anderson, the Clerk to Lord Hoffmann. In future please copy us into all correspondence with the Tribunal.

Although our client considers the points raised in the Respondent's Preliminary Objection to be misconceived and devoid of merit, it considers that they should be determined as soon as possible. Therefore we invite you to agree that the issues raised be ruled upon by the Tribunal pursuant to Section 31 (4) of the Arbitration Act 1996 ("the 1996 Act"), which provides that if the parties agree that the Tribunal should rule upon its own jurisdiction in an award as to jurisdiction, then the Tribunal shall proceed accordingly.

Subject to the above, the Claimant reserves all of its rights in relation to the Respondent's Notice of Preliminary Objection, including the right to contend that the point has not been raised in good time after the commencement of the Arbitration, and to make such applications to the Tribunal as it may consider appropriate.

We look forward to receipt of your client's confirmation of its agreement that the Tribunal should rule on its own jurisdiction in an award as to jurisdiction pursuant to Section 31 (4) of

Partners: Keith Bruce-Smith  Damon Parker  Lucy Gibson  Roger Cobden-Ramsay  Alison Meek  Kathryn Peat  Jon Beresford  Jonathan Burt
Associates:  Henry Hickman  Naomi O'Higgins  Hannah Southon
Consultant: James Harcus
Harcus Sinclair is authorised and regulated by the Solicitors Regulation Authority (SRA Number 360773)

the 1996 Act, at which stage we would hope to be able to agree with you directions for the timely determination of your Client's Preliminary Objection.

Yours faithfully

**Harcus Sinclair**

Cc:  The Arbitrators (Lord Hoffmann; Sir Anthony Evans, Chief Bayo Ojo) by e-mail only

# TWENTY MARINA SOLICITORS LLP

BARRISTERS & SOLICITORS

STERLING TOWERS
20 MARINA LAGOS
P.O. BOX 9945 LAGOS

TELEPHONE: 2912225
FAX: 2719882, 4622686
E-MAIL: TMS@TMSLLP.COM
WWW.TMSLLP.COM

14th October 2013

Mr. Henry Hickman
Applicant's Counsel
Harcus Sinclair
3 Lincoln's Inn Field's
London
WC2A 3AA

**By email only: henry.hickman@harcus-sinclair.co.uk**

**RE: PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED v MINITRY OF PETROLEUM RESOURCES**

Dear Mr. Hickman,

We write further to your letter of 11th of October 2013.

The Respondent responds to your said letter as follows;

- The Respondent accepts the Claimant's request that the tribunal should rule on its own jurisdiction in an award as to jurisdiction; and
- The Respondent will be proceeding as contemplated by the parties under the Nigerian Arbitration and Conciliation Act, Cap A18 LFN 2004.

Yours sincerely,

**TWENTY MARINA SOLICITORS LLP**
TWENTY MARINA SOLICITORS LLP



Cc: The Arbitrators (Lord Hoffman; Sir Anthony Evans, Chief Bayo Ojo) by email only

# HARCUS SINCLAIR

Our Reference:      DJP/HH/2211.1

3 Lincoln's Inn Fields
London  WC2A 3AA
Telephone 020 7242 9700
Fax 020 7539 4701

DX 340 London/Chancery Lane
www.harcus-sinclair.co.uk
e-mail:  henry.hickman@harcus-sinclair.co.uk
direct line telephone no:  020 7539 4738
direct line fax no:  020 7539 4703

24 October 2013

Olasupo Shasore SAN
Respondent's Counsel
Twenty Marina Solicitors LLP
Sterling Towers
20 Marina Lagos
P O Box 9945 Lagos
Nigeria

And by e-mail to: tms@tmsllp.com; lateefat.hakeem-bakare@tmsllp.com; safiat.kekere-ekun@tmsllp.com; olasupo@shasore.com

Dear Sirs

**Process and Industrial Developments Limited v Ministry of Petroleum Resources of the Federal Republic of Nigeria**

Thank you for your letter 14 October 2013.

The parties appear to be in agreement that the Arbitral Tribunal should rule on its own jurisdiction in an award as to jurisdiction. For the ayoidance of doubt, we referred to Section 31 (4) of the Arbitration Act 1996 in our letter of 11 October 2013 because it is one of the Mandatory provisions of the 1996 Act, and the juridical seat of this arbitration is London. However, and for the further avoidance of doubt, we acknowledge that the parties have agreed to arbitrate "under the rules of the Nigerian Arbitration and Conciliation Act", and we therefore accept that the rules governing the internal procedure of the arbitration are those to be found in the Nigerian Arbitration and Conciliation Act 2004, principally in the rules set out in the First Schedule thereto ("the Nigerian Arbitration Rules"), but also in sections 14 to 23 inclusive of the 2004 act, headed "Conduct of Arbitral Proceedings". In this regard we note that Article 21 of the Nigerian Arbitration Rules provides that the Arbitral Tribunal shall have the power to rule on an objection that it has no jurisdiction, including any objections with respect to the existence of validity of the arbitration clause or of a separate arbitration agreement.

It seems to us that nothing turns upon this clarification for present purposes, save for this: our understanding of Section 31 (4) of the 1996 act is that if the parties agree that the Arbitral Tribunal should rule upon an objection taken to the substantive jurisdiction of the Tribunal in

564880v1

Partners: Keith Bruce-Smith  Damon Parker  Lucy Gibson  Roger Cobden-Ramsay  Alison Meek  Kathryn Peat  Jon Beresford  Jonathan Burt
Associates:  Henry Hickman  Naomi O'Higgins  Hannah Southon
Consultant: James Harcus
Harcus Sinclair is authorised and regulated by the Solicitors Regulation Authority (SRA Number 360773)

an award as to jurisdiction, then the Tribunal "shall proceed accordingly" (emphasis added), whereas Article 21 of the Nigerian Arbitration Rules is not quite so prescriptive.  To the extent there is any distinction, we would respectfully suggest that Section 31 (4) must prevail as it is a Mandatory provision.

In any event, it seems to us that it is now a matter for the Arbitrators to confirm whether or not they intend to rule on their own jurisdiction in an award as to jurisdiction, as the parties have suggested, at which stage we shall write to you, copying the Arbitrators, with a suggested timetable.

Yours faithfully

*Harcus Sinclair*

**Harcus Sinclair**

Cc:  The Arbitrators (Lord Hoffmann; Sir Anthony Evans, Chief Bayo Ojo) by e-mail only

IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT (NIGERIA)

AND

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN
ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:

PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

**Claimant**

- and -

THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL
REPUBLIC OF NIGERIA                    **Respondent**

---

## WITNESS STATEMENT OF IKECHUKWU OGUINE

---

I, Ikechukwu Oguine of Nigeria National Petroleum Corporation, whose
office is at NNPC Towers, Herbert Macaulay Way, Abuja, Nigeria, give my
testimony in support of the Respondent's Statement of Defence dated 27th
February 2015 as follows:

**Introduction**

1.   I am the Coordinator, Legal Services & Secretary to the Nigerian
     National Petroleum Corporation a statutory corporation of the
     Federal Republic of Nigeria. I was admitted to the Nigerian bar
     in 1985 I have over 25 years of experience as counsel in the
     Nigerian oil and gas industry; by virtue of my current position I
     have become aware of the Claimant in this arbitration. I have

1

sighted the documents submitted in this arbitration, including the Claimant's Statement of Case.

2. Respondent is a Ministry of the Federal Republic of Nigeria with executive responsibilities in formulating government policy.

3. The Respondent's scope of duties does not bestow or confer on it the authority to represent the Federal Government of Nigeria in any capacity except as may be authorised by a Statutory Instrument or an Act of the National Assembly of Nigeria.

4. I have read the Claimant's Statement of Case in this arbitration and give this testimony based on my personal knowledge of the current dispute in respect of the Gas Supply and Processing Agreement ("GSPA") dated 11 January 2010 between Claimant and Respondent ("the Parties").

5. The GSPA was for the supply of Wet or Associated Gas to Claimant from Oil Mining Licence (OML) 123 and OML 67, (jointly referred to as ("OML's") which are owned and under license to third parties.

6. It was a condition of the GSPA that Claimant is to construct, operate and maintain a Gas Processing Facility of which the Wet Gas are to be supplied.

7. Respondent's role in the GSPA was facilitatory in nature and without any consideration or benefit passing to Respondent. Respondent was involved in ensuring that the accelerated gas development projects become a reality and signing of the definitive agreements. However, Respondent had no role in the implementation of the GSPA, save for convening meetings and performing a mediatory role between Claimant and the owners of the OML's, namely Addax Petroleum ("Addax") and Mobil Producing Nigeria Unlimited.

2

**Efforts by Respondent towards actualizing the GSPA**

8. To this end, various meetings were held between Respondent, Claimant, owners of the OML's and other governmental agencies for the purposes of piggy backing Claimant over the hurdles of the oil and gas industry and creating a hitch free atmosphere for negotiating and implementation of the GSPA.

9. A first of such meetings was held on ***10th August 2010***. In attendance were officials of Respondent, representatives of various investors and Claimant, National Petroleum Investment Management Services ("NAPIMS"), Nigerian National Petroleum Corporation ("NNPC"), Addax and Nigerian Gas Company Limited ("NGC"). The purpose of this meeting was to discuss issues impeding implementation of various agreements between Respondent and investors in respect of the Accelerated Gas Development Projects.

10. At the meeting, it was agreed that Addax was to supply the required Wet Gas for the first phase of the GSPA from its operations of OML 123 and as part of the *albeit* wrongful and illegal facilitatory role of Respondent, it directed NAPIMS and Addax to expedite the actualization of the GSPA. Astonishingly, Respondent further directed NAPIMS to obtain a Letter of Undertaking from Addax confirming that the required volume of Wet Gas for the first phase of the GSPA will be made available to Claimant. A copy of the minutes from the meeting is attached and marked MPR1.

11. A second meeting was convened on ***10th October 2012*** between Respondent and the principal officers of Claimant, wherein Claimant informed Respondent of the uncooperative attitude of various agencies of the Federal Government of Nigeria; and importantly, that it had been informed by Addax sometime in April 2011 that it could only supply 100MMSCuF instead of the expected 150 MMSCuFD for Phase 1.

3

12. The variance in volume of the expected Wet Gas to be supplied to the gas processing facility as part of phase 1 of the GSPA was agreed to by Claimant.

13. Claimant further made known to Respondent that even the 100MMSCuF expected Wet Gas could only be made available to it in year 2014 and as a result of this time frame, Claimant was offered non-associated gas by Addax as an alternative to the Wet Gas envisaged by the GSPA, an offer which Claimant agreed to without prior knowledge or consultation of Respondent (a fact which was duly noted at the meeting by the Permanent Secretary to Respondent). It was the failure of Addax (a party not privy to the GSPA) to supply Claimant with non-associated gas, which led to the initiation of this arbitral proceedings. A copy of the Minutes from the meeting is attached and marked MPR2.

**Parties' inability to implement the GSPA**

14. The Parties at all material times agreed and knew that the Wet Gas was not within the ownership and control of Respondent and as such, the non-supply of Wet Gas as envisaged by the GSPA and the non-supply of non-associated gas as contemplated in the new agreement between Claimant and Addax cannot be attributed to Respondent.

15. The contractual obligation of Respondent, was simply to facilitate the timely implementation of the GSPA, an obligation which became incapable of being performed due to circumstances beyond the control of Respondent and contemplation of the Parties. In other words Respondent's obligation was frustrated by acts of third parties and that of Claimant.

16. Respondent could not supply any gas to Claimant if none was available and if there was no site to deliver the said gas to. The preamble of the GSPA stipulates that:

> "P&ID has undertaken all necessary studies, <u>including the</u> <u>identification of suitable associated gas fields</u> and is ready to commence a fast track development of the project in accordance with the terms of this Agreement"

17. Further, Article 8(g) of the GSPA states that OML 123 will have a 'throughput capacity of 600 MMSCuFD and <u>can adequately provide</u> <u>the required first delivery of 150 MMSCuFD of Wet Gas to the Site...'</u> (Emphasis supplied).

18. However and contrary to the aforementioned Article 8(g), OML 123 did not contain the expected 600 MMSCuFD of Wet Gas or the required 150 MMSCuFD of Wet Gas for the first phase of the project; a fundamental condition of the agreement and a prerequisite condition to the fulfilment of the alleged Respondent's obligation to supply.

19. In fact, Respondent was induced into entering and executing the GSPA by Claimant by misrepresenting to Respondent the volume of Wet Gas available for supply in the identified OML's.

20. As a result of the inaccurate information supplied by Claimant, Respondent was under the misapprehension of fact that the OML's jointly had a volume of 400 MMSCUFD of Wet Gas readily available for supply and therefore Respondent's obligation to supply Wet Gas to Claimant could only have been possible if the OML's produced the required levels of gas envisaged by both Parties.

21. It was based on the strong belief of Claimant that the OML's jointly had a volume of 400 MMSCUFD of Wet Gas readily available for supply that Claimant chose to construct its Gas

5

Processing Facilities site at Calabar Cross River State, due to its close proximity to the OML's.

22. By virtue of Article 8(a), 8(b) and Appendix A of the GSPA, the delivery of Wet Gas for phase 1 of the project by Respondent was required to be done *'during or before the last quarter of 2011'*. However, as at April 2011 (long before the last quarter) only 100 MMSCuFD was available from OML 123 for the project and this quantity was forecasted to reduce further to 45 MMSCuFD by 2014. A fact that was revealed to Claimant by Addax at the 10th October 2012 meeting.

23. The specific OML's for the supply of Wet Gas were identified and chosen by Claimant, based on its alleged knowledge and expertise within the oil and gas industry. (see paragraph 10 of First Witness statement of Michael Quinn).

24. The objective of the GSPA was solely for the profit-making of Claimant with no benefit to Respondent or the Federal Government of Nigeria who is enriched with abundance of Gas. As at January 2015, Nigeria has at least an estimated 180 trillion cubic feet (Tcf) of proven natural gas reserves making Nigeria the ninth-largest natural gas reserve holder in the world and the largest in Africa (attached and marked as MPR 3) according to the Oil & Gas Journal (Worldwide Look at Reserves and Production published December 2012, volume 110, Issue 12).

25. Knowing fully well and at all material times prior to executing the GSPA, that the required Wet Gas from the identified OML's are owned and under license to third parties Addax and Exxon Mobil to Claimant rather than entering into agreement with the rightful owners of the identified OML's chose to induce Respondent into entering this agreement in order to:

6

i.   avoid complying with statutory requirements necessary in the oil and gas industry as required by various Nigerian laws;

ii.  avoid paying for the cost of obtaining licence for natural gas;

iii. avoid cost of purchasing natural gas;

iv. avoid the remittance of tax to the Nigerian government;

v.  avoid compliance with both Federal and State laws; and

vi. gain undue advantage over other potential suppliers of gas in the country.

26. The appropriate parties for Claimant to have entered into the GSPA with are the owners of the respective OML's or the NNPC, which is a corporate and separate entity from Respondent and is the legal owner of all oil pipelines and petroleum resources in Nigeria.

27. It is evident that Claimant's claims are not founded on any legitimate expectation, in fact the Claimant at all material times knew that Respondent:

i.   could not authorise the use of NNPC pipelines for supply of natural gas to its site without entering into a contract of supply with NNPC;

ii.  does not have the statutory power to grant it a "Pioneer Status" and in any event Respondent could only be granted a "Pioneer Status" upon applying for same with the relevant authority. "Pioneer status" can only be granted if its class of work or services falls under the category of work listed as "Pioneer Status";

iii. does not have the power to waive a statutory requirement to procure the required statutory licence for its nature of work (both engineering and gas processing); and

iv. is not vested with ownership of Petroleum and Natural gas.

7

28. Claimant was also fully aware that supply of the Wet Gas is dependent on the volume of Wet Gas available in the OML's and that Respondent could not possibly have an idea of the volume of Wet Gas produced and stored in the OML's belonging to third parties who were in full control of the OML's and solely responsible for the drilling and exploration exercise pertaining to their respective OML's.

29. The inability of Respondent to supply any volume of Wet Gas to Claimant was not due to any failing on the part of Respondent as it was not in control of the OML's.

30. The availability of the initial 150 MMSCUFD of Wet Gas for phase 1 of the project was undertaken by Addax (the licensed holder of OML 123) not by the Respondent.

31. The objective of the GSPA was to provide for the construction of Gas Processing Facilities by Claimant and to operate and maintain the facilities in an efficient manner. Parties did not contemplate the supply of Lean Gas by Claimant to Respondent for the purposes of Power Generation in Nigeria, as alleged or at all.

32. In my understanding the GSPA was to run for a period of 20 years *from the date of first regular supply of gas by the* Respondent whereas the date of first regular supply of gas is not stipulated in the GSPA contrary to the Claimant's contentions time was not of the essence.

33. However and in my experience GSPA delays, defaults or inability to perform obligations due to a wide range of uncontemplated events and matters beyond the control of either of the Parties is not unknown in the oil and gas industry I am aware that the Respondent did everything *within its power* to ensure that the project was duly performed by the relevant third parties including calling several meetings and

8

attempting to persuade Addax into supplying gas to the Claimant.

34. I am aware that Nigeria has an untapped reserve of natural gas at its disposal and it is wrong to suggest that Claimant's proposed gas processing plant alone could have supplied Respondent with continuous and uninterruptable natural gas for the production of uninterruptible electricity supply to the 36 states of the Federal Republic of Nigeria and its Federal Capital Territory.

35. I have been advised on the applicable legal principles and given my experience and knowledge I am aware from all the culminating facts that the GSPA is illegal.

36. Furthermore the Respondent is not in breach of any of the terms of the GSPA, nor is Respondent liable for the quantum of damages alleged by Claimant or for any damages at all.

I believe the facts stated in this statement to be true.

Signed

Dated

9

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT (NIGERIA)**

**AND**

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)**

**BETWEEN:**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

<u>**Claimant**</u>

**- and -**

**THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA**                    <u>**Respondent**</u>

---

**RESPONDENT'S STATEMENT OF FACTS CHALLAENGED WITH REGARD TO THE WITNESS STATEMENT OF MICHAEL QUINN AND OTHER FACTS RELEVANT TO THE QUESTION OF LIABILITY**

---

Respondent does not admit and challenges following factual assertions:

1. Claimant became aware in 2008 that the Nigerian Government had initiated the building of a pipeline from OML 123 to Calabar (the Adanga Pipeline) (paragraph 50 - 57 of the Witness Statement of Michael Quinn (MQ).

2. The Lagos area was initially regarded by the claimant as an attractive location for the project and Claimant had envisaged that it might build the Gas Processing Facilities in the Lagos area (paragraph 44 – 50 of MQ's Witness Statement).

3. The GSPA was entered into for the purpose of taking Wet Gas free of charge from Respondent / the delivery of Wet Gas by Respondent to Claimant (paragraph 65, 67 & 101 of MQ's Witness Statement).

4. The Government had access to unlimited supplies of Natural gas in the vicinity of Calabar (paragraph 103 of MQ's Witness Statement). See paragraph 3 of Ikechuwkwu Oguine's Witness statement.

5. Phase 1 was planned to take two years to implement after the grant of necessary approvals by the Government (paragraph 66 of MQ's Witness Statement).

6. Respondent was obliged to deliver the wet gas free of charge to Claimant's project site (alleged in paragraph 65, 66 & 67 of MQ's Witness Statement).

Respondent reserves all rights.


Served this ....12TH.... day of May 2015 by Olasupo Shasore SAN, solicitor for Respondent.

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT (NIGERIA)**

**AND**

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)**

**BETWEEN:**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

<u>Claimant</u>

- and -

**THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL
REPUBLIC OF NIGERIA**                                        <u>Respondent</u>

**RESPONDENT'S WRITTEN SUBMISSIONS**

**Introduction**

1.  This is Respondent's written submissions for the hearing of 1st and 2nd June 2015, on Liability.

2.  This arbitration arose from a dispute in respect of the performance of a Gas Supply and Processing Agreement ("GSPA") dated 11 January 2010 between Process and Industrial Developments Limited, a company incorporated in the British Virgin Islands ("Claimant") and the Ministry Of Petroleum Resources of the Federal Government of Nigeria ("Respondent").

1

**Factual Background**

3.  By virtue of the GSPA, Claimant was to construct and operate a gas processing facility
    (GPF) in Calabar for the purpose(s) of refining Associated Gas (or Wet Gas) in order that
    the dissociated contents from the Wet Gas i.e. Methane/Ethane Gas (the "Lean Gas" or
    "Non Associated Gas") could be used for power generation to supplement the National
    Grid. Respondent was to supply an agreed volume of Wet Gas from identified Oil Mining
    Lease's ("OML"): OML 123 (operated by Addax Petroleum); and OML 67 (operated by
    Exxon Mobil), via a Government pipeline to Claimant's proposed production facility in
    Calabar at no cost to Respondent. Claimant was also to remove the Natural Gas Liquids,
    which comprises of Propane, Butane and Condensates from the Associated Gas and
    utilize it for its own benefit and subsequently return the remainder (Lean Gas) to
    Respondent for use in power generation ("the Project").

4.  Respondent's role in the implementation of the GSPA was solely facilitatory in nature
    i.e. convening meetings / performing a mediatory role between Claimant and the
    owners of the OML's, namely Addax Petroleum and Mobil Producing Nigeria Unlimited,
    as well as relevant governmental agencies.

5.  At the various meetings convened for the purpose of actualizing the Project, it was
    discovered that the required volume of Wet Gas necessary for the implementation of
    the first (1st) phase of the Project was unavailable from the OML 123 which had been
    identified by Claimant and which was owned by Addax Petroleum. Nevertheless,
    Respondent did all it could to expedite the actualization of the GSPA. This included inter
    alia, directing the National Petroleum Investment Management Services ("NAPIMS") to
    obtain a Letter of Undertaking from Addax Petroleum for the purpose of ensuring that
    the required volume of Wet Gas for the first (1st) phase of the Project was made
    available to Claimant. Despite all Respondent's efforts to ensure the implementation of
    the GSPA, Addax Petroleum maintained that it was unable to supply the required

2

volume of Wet Gas. Thus, the failure of Addax Petroleum (a party not privy to the GSPA) to supply Claimant with Wet Gas was the reason the GSPA was never performed.

6. Claimant filed a Notice of Arbitration on 22 August 2012 relying on the Arbitration clause in the GSPA and claims estimated damages in the sum of US$ **5,960,226,233 (Five Billion, Nine Hundred and Sixty Million, Two Hundred and Twenty Six Thousand, Two Hundred and Thirty Three United States Dollars)** for loss of profits suffered in consequence of Respondent's alleged breach of contract. Claimant also claims interest on sums awarded at such rate, to be determined by the Tribunal.

7. Claimant subsequently filed its Statement of Case dated 28 June 2013. Thereafter Respondent filed a Notice of Preliminary Objection dated 4th October 2013 and filed its written subjections on the Notice of Preliminary Objection on the 24th of January 2014. A part final award was issued by the Tribunal on the 3rd of July 2014 dismissing Respondents Preliminary Objection. Claimant thereafter filed the witness Statement of Michael Quinn and exhibits in support of the witness statement on 14 February 2014. Subsequently Respondent filed its Statement of Defence dated 27th February 2015 and Claimant filed a Reply to Respondents Statement of defence dated 6 March 2015. The witness statement of Mr. Ikechukwu Oguine was filed on 4 May 2015. Respondent also filed a Statement of Facts challenged with regard to the witness statement of Michael Quinn and other facts relevant to the question of liability, dated 12th May 2015.

**Lack of Respondents Authority to enter into an agreement for the supply of Wet Gas with Claimant on behalf of the Federal Government of Nigeria.**

8. The aforementioned raised in Respondent's Preliminary objection is vividly different and distinguishable to Respondent's contention of its lack of authority and capacity to enter into the specific contract to supply Wet Gas to Claimant for the following reasons:

3

- Respondent is a Ministry of the Federal republic of Nigeria with designated executive responsibilities to formulate government policy within the petroleum industry;

- Respondent can only act within the scope of its authorized duties as prescribed by law and as such Respondent cannot arrogate to itself the power to supply Wet Gas or indeed any gas to anyone, as the exclusive right to possess and supply gas is vested in the Nigerian National Petroleum Corporation ("NNPC"), a juristic entity which was created *interalia* for purposes of commercial transactions and entering into contracts such as the GSPA. .

9. Respondent relies on the Nigerian Court of Appeal's decision in ***Knight, Frank & Rutley v Attorney General of Kano State [1990] 4 NWLR, (Pt. 142) P.210*** where it was held that:

> *"If a person or a public body is entrusted by the legislature with certain powers and duties expressly or impliedly for public purposes, such person or public body cannot divest himself or itself of such power or take any action incompatible with the due exercise of their powers or the discharge of their duties."*

10. In the *Knight Frank & Rutley* case, the Commissioner of Finance, Kano State on behalf of the Kano State Government entered into a contract with the appellants to prepare a list of rateable hereditaments within Kano municipality. The purpose of the valuation was to enable the Kano state government to charge and collect tenement rates of which the government of Kano state made an initial payment of ₦100,000.00 (One Hundred Thousand Naira) to the appellants. The appellants partly performed the contract by preparing and submitting provisional valuation list.

11. Kano State government was however subsequently advised by the Attorney General of Kano State that the responsibility and the statutory duty to prepare the valuation list

4

and to collect tenement rates is vested in the Local Government Councils. Consequently, the contract was repudiated by the Kano State Government.

12. The Claimant's claim for breach of contract against the Kano State government at the High Court failed as the contract was declared void and unenforceable. On appeal to the superior court, the Court of Appeal unanimously dismissing the Appeal held as follows:

> "Once the State promulgates a legislation assigning the function of valuation of tenememt rates to the local government ... only the local government council has the power to deal with the subject-matter. Consequently, the state government has no power to deal with the matter and the local government council cannot, even if it wants to, divest itself of the power vested in it.........since the Kano state government has no power of the assessment of tenement rates, it has no competence or power to enter into an agreement with anybody or person for the valuation of rateable hereditaments". (see P.220 -221, paras C-D).

13. The Court of Appeal further went on to hold that: "this transaction between the parties which is void from its inception as opposed to being void in consequence of supervening illegality. The combined effect of section 7 of the Constitution of the Federal Republic of Nigeria, 1979 and section 76 of the Kano State Local Government Edict No. 5 of 1977 invests every Local Government with rating powers, and constitutes it the rating authority for the area. While these provisions remain valid and operative any pretended claim by anybody or authority, be it even the State Government itself, where it arrogates to itself the right to perform functions subsumed under the above provisions will be ineffectual."(page 223, paras E-F).

14. Respondent submits that the GSPA was void from inception as Respondent lacked the authority and legal capacity/ability to enter into the GSPA with Claimant. Article 22 of the GSPA which states as follows:

> "Each party represents and warrants that it has the right and authority to enter into this Agreement and to perform and observe all of its obligations under this Agreement and that the execution, delivery and performance of this Agreement has been duly and validly authorized by all necessary corporate or other action, and that by entering into this Agreement, it will not violate, conflict with, or cause a material default under any other contract, agreement, indenture, decree, judgment, undertaking, conveyance, lien, or encumbrance to which it is a party or by which it may become subject"

15. Respondent further refers the Tribunal to the decision of the Court of Appeal of Nigeria in *Knight Frank & Rutley at page 221 -222* where it held that the contract was void regardless of the fact that the Kano State government held itself out to the appellants as having the authority to execute and award the contract and the honest reliance of the appellant on the ostensible authority of the Kano State Government.

16. The Supreme Court of Nigeria in ***Menakaya v Menakaya [2001] 16 NWLR (Pt. 783) P.252*, Paras. D-F** further emphasized on the above point when it held:

> "The parties cannot by conduct or consent alter the Constitution or a Statute... a mandatory statutory provision directing a procedure to be followed in the performance of any duty is not a party's personal right to be waived. Therefore, one cannot resort to estoppel to compromise a statutory provision of a public nature.[1]

---

[1] This principle was also recently reiterated by the Federal High Court of Nigeria in *Saipem Contracting Nigeria Ltd v Federal Inland Revenue Service: Suit No: FHC/L/CS/1081/2009*

6

**Construction of Gas Processing Facilities at Calabar, Cross Rivers State as a pre-condition of supply of Wet Gas by Respondent.**

17. Respondent submits that the tribunal should interpret the terms of the agreement in its clear and unequivocal terms. Article 3 (a) of the GSPA states as follows: *"P&ID **shall construct** GPFs on the Site allocated to them by Cross Rivers State Government with related ancillary plant and equipment off-shore as required. The GPFs shall be constructed on a **timely basis**[2] to **ensure** the earliest **possible delivery** to the Government..."* (emphasis ours).

18. Article 8(d) of the GSPA also states that: *"P&ID shall provide all funding necessary for the timely construction, implementation and efficient operation of the GPFs..."*. Furthermore Article 7(a) of the GSPA provides that: *"P&ID shall use best endeavours to ensure the **fastrack** implementation of this Project to construct and incorporate two or more process streams..."* (emphasis ours).

19. Applying the aforementioned well-known principle of the interpretation of contract to the provisions of articles 3(a), 8(d) and 7(a) of the GSPA above, it is clear that the GPF's or site is an essential requirement for the implementation of the Project and must have been physically constructed and functioning before Respondent is obliged to supply Wet Gas to Claimant at the site. Without a site there could be no place for delivery.

20. Respondent submits that the failure of Claimant to construct the GPF's timeously or at all as agreed by parties, is a fundamental breach of the GSPA on the part of Claimant. Without a site there could be no GPF.

21. Claimant at paragraph 74 of its skeletal argument for the hearing on liability 1 and 2 June 2015, invites the Tribunal to rely on facts or events prior to and necessitating the

---

[2] Time is of the essence

execution of the GSPA. One of such undisputed facts or events is the execution of a Memorandum of Understanding ("MoU") between the Ministry of Petroleum Resources and Claimant on 22nd July, 2009.

22. As a result, Respondent respectfully draws the attention of the Tribunal to Paragraph 3(a) of the MoU which states as follows: *"P&ID shall construct a Natural Gas Processing Plant on the waterside Site, Calabar, allocated by Cross River State Government. The Plant shall be constructed on a 'time of the essence' basis to ensure the earliest possible delivery to NNPC..."*

23. Paragraph 3(a) of the MoU undoubtedly reveals that at all material times, it has always been parties' intention that the GPF's will be constructed timeously and as a condition precedent to the supply and delivery of Wet Gas by Respondent.

24. Contrary to Claimants assertion, Respondent submits that the provisions of article 3(a) of the GSPA contains a condition clause to the effect that gas cannot be delivered to Claimant without Claimant having fulfilled its obligation of constructing the GPF's, which is the delivery site for the Wet Gas. That is, the GPF was required to have been constructed in order for Respondent to fulfill its obligation under article 6(b) of the GSPA.

25. Without the construction of the GPF's/Site Respondent could not possibly deliver the required gas for processing as there would have been no site to deliver to.

26. The use of the word **ensure** in article 3(a) of the GSPA we submit, contemplates the construction of the GPF's is a condition precedent to the supply of gas.

27. Respondent submits that the provision of article 6(b) of the GSPA which Claimant relies on in forming in framing the argument that Respondent obligations arose in advance of

and as a prerequisite to Claimant's obligation under article 3(a) has been misconstrued. Article 6(b) of the GSPA states as follows: *"The Government shall ensure that all necessary pipelines and associated infrastructure are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement".*

28. Article 6(b) of the GSPA makes specific reference to Claimants obligation in article 3(a) which indicates that contrary to Claimant assertions Claimant was obliged to construe the GPF under article 3(a) of the GSPA which arises in advance of, as a prerequisite to article 6(b) of the GSPA. Simply put, Respondent is only required to ensure delivery of Wet Gas in accordance with article 3(a) of the GSPA which is delivery to a constructed GPF / Site.

29. Particularly since article 3(a) of the GSPA which provides for the scope of work under the GSPA makes no reference to Respondent's obligations under article 6 of the GSPA.

30. Respondent submits that Claimant breached the provisions of article 3(a) of the GSPA by failing to construct the site timeously as prescribed by the GSPA. By so doing it made further performance of the contract impossible.

31. In addition, Claimant failed to obtain relevant approvals required for the success of the Project such as requisite licences from the relevant government agencies.

32. Respondent submits that the above are condition precedents to the fulfillment of Respondent's obligations (if at all) to supply Claimant with Wet Gas at the site, as envisaged by the GSPA.

33. In *Best (Nig) Ltd v B.H (Nig) Ltd, [2011] 5 NWLR (Part 1239)*, the Nigerian Supreme Court provided some guidance by holding that where a contract is made subject to the fulfillment of certain specific terms and conditions, the contract is not formed and not binding unless and until those terms and conditions are complied with or fulfilled.

34. Claimant proffers no reason for its failure to construct the GPF's but seeks to enforce the GSPA where Claimant has not performed any of its own obligations.

35. Respondent submits that the failure of Claimant to fulfil its part of the contract is a breach of the contract and Claimant cannot enforce any terms of the contract.

36. Under Nigerian law, a party which seeks to enforce a contract can only do so if it has fulfilled all its obligations under the contract. In *Lagos State Government v Toluwase [2013] 1 NWLR (Pt. 1336),* the Court of Appeal held that a party wishing to enforce a contract must show that he has performed all the terms which ought to be performed by him. A party who fails to perform his own obligation under a binding contract to the detriment of the other party is in breach of the contract.

**The GSPA is for the supply of ascertained Wet Gas from specific OML's (OML 123 and OML 67)**

37. At all material times, it was parties understanding that the supply of Wet Gas was to be procured from specific OML's identified by Claimant. Claimant unilaterally bore the responsibility and identified (following its extensive studies), OML 123 and OML 67 for the supply of the Wet Gas.

38. It was upon the above understanding that parties executed the GSPA. In recognition of the supply of the Wet Gas from ascertained OML's or gas fields. paragraph i of the recital of the GSPA states as follows:

10

*"P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the project in accordance with the terms of this Agreement."* (emphasis ours).

39. The above provision is a clear term of the GSPA and clear revelation of parties' intention and understanding that the supply of Wet Gas is from ascertained gas fields. The Claimants in support of its assertions that Respondent breached its contractual obligations to supply Wet Gas to its proposed site relied heavily, in addition to the GSPA, on other extrinsic evidence such as the Memorandum of Understanding between Respondent and Claimant and various letters between the Parties.

40. One of such letters was written by Claimant on the 11th of June 2009 to the Minister of Petroleum Resources of Nigeria ("the Minister") (see page 97 of MQ1) wherein Claimant disclosed as follows: *"we also refer to our letter to his Excellency the President dated the 7th of August 2008, wherein we identified our interest in procuring 50% of the associated wet gas we require for the project from OML 123 owned by NNPC and operated by Addax Petroleum. Enclosed also is a copy of a letter from his Excellency Governor Liyel Imoke in respect of the site where we intend to build the plant in Calabar. The balance of approximately 200 MMSCuFD of associated wet gas that we require could come from a number of other offshore operators currently flaring wet gas in the Offshore Calabar region, a list of which will be forwarded separately"*.

41. Another letter was written by Claimant to the Minister on 15th June 2009 (see page 99 of MQ1) Claimant put forward its intention to procure the balance of the Wet gas from Exxon Mobil as follows: *"In respect of the remaining 180-220 MMSCUFD of associated wet gas required we would respectfully suggest that associated wet gas from Exxon Mobil in OML 67 would fulfil the balance of our needs"*

11

42. Yet another letter was written by Claimant to the Minister of Petroleum resources on the 12th January 2010 wherein it was stated by Claimant as follows: *"For this reason we wish to put in place all necessary modalities as soon as possible, with* **both Addax and Exxon Mobil***, in order to ensure the timely delivery of the currently flared Wet Gas for the Project. To this end we should like to solicit the support and co-operation of NNPC, Napims and DPR to assist in finalizing these arrangements with the oil companies "*

43. Particularly, the most telling evidence of Claimant's intention that the required Wet Gas was to be procured from OML 123 and OML 67 is the letter of 21st July 2010 (see page 165 of MQ1), written by Claimant to the Minister, Claimant stated as follows: *"****The terms of our Agreement of 11th January 2010 provide that the gas from OML 123 and OML 67 be allocated to our Processing Plant at Calabar*** *and NAPIMS are already engaged in progressing the project"* (emphasis ours). Indeed paragraph 1.2 of the minutes of the meeting between ministerial stakeholders, of 10th August 2010 (at page 167 of MQ1) also supports this fact.

44. Article 8(g) of the GSPA further sheds light on the fact that the Wet Gas are to be sourced from identified and ascertained  gas fields. It states as follows: *"the parties are aware that the 24 inch Adanga pipeline presently under construction from the Addax operated* **OML 123 directly to Calabar** *and due for completion in 2010 will have a throughput capacity of 600 MMSCuFD* **and can adequately provide the required first delivery of 150MMSCuFD of wet Gas** *to the site…"*

45. At every moment leading to the execution of the GSPA and post execution of the GSPA, parties have been *adidem* as to the source of the Wet Gas. It is inconceivable that reference would be made specifically to OML's 123 and 67 in the MoU, several correspondence with Respondents and third parties, which includes Claimant's proposal letter to Respondent, Claimant's letter to the Governor of Cross River State and the GSPA, if the above OML's were never the intended specific sources of the Wet Gas.

12

*of such evidence for other purposes such as; to establish that a fact which may be relevant as background was known to the parties".*

49. Claimant in paragraph 74 of its skeletal argument for the hearing on liability 1 and 2 June 2015, appears to be in agreement with this position on previous communications in the *Chartbrook* case as it invites the Tribunal to consider documents/correspondence evidencing the pre-contractual negotiations or understanding between parties prior to the execution of the GSPA.

**Misapprehension of fact and misrepresentation by Claimant**

50. The Tribunal will see that the very notion of the GSPA was the sole idea of Claimant. Being motivated by profit, claimant inter alia undertook feasibility studies which encompasses studies and research on the amount of Wet Gas available in the identified OML's, particularly OML 123.  It is against this backdrop that Claimant approached Respondent and represented that OML 123 had at least 180 – 200 MMSCuFD. It now appears that Claimant was wrong.

51. The Tribunal will also see that the parties acted on Claimants 'findings' and executed the GSPA.  The GSPA was therefore void or unenforceable from inception.

52. Clearly at best there was a mutual mistake between parties as to the existence and availability of over 150 MMSCuFD of Wet Gas in OML 123 for execution of phase of the first phase of the Project.

53. Parties at all material times believed that OML 123 contained over 150 MMSCuFD of Wet Gas for execution of phase 1 of the project and the unavailability of this volume of Wet Gas in OML 123 was the mistake of Claimant that became common to both parties

14

in the GSPA. This is evident from the various correspondence and minutes of meetings being relied on by Claimant in MQ 1.

54. Parties only became aware of the non-availability of the required volume of gas for execution at the meeting of 2nd December 2010 over 11 months after the execution of the GSPA.

55. In *Knight, Frank & Rutley (Supra) (P.221, para.G)*, it was held that: *"where the subject matter of the contract has, without the knowledge of either party, ceased to exist (res extincta) before the contract was made the contract may be void on the ground of mistake..."* Similar principle applies where the property has never existed even though the parties believe otherwise.

56. The Nigerian court further relied on the English case of *Sheik Bros. Ltd v Ochsner (1957) A.C. 136* where an agreement for sisal cutting licence was held void because the land was found to be incapable of producing the stipulated quantity (P.221, Para F).

57. See also the case of *Abraham v Chief Oluwa (1944), 17 N.L.R. (at page 123)* - *"if parties enter into an agreement with reference to a supposed state of things and it turns out that by the mutual mistake of the parties, the supposed actual state of things does not in fact subsist, the consideration for the agreement fails and the agreement is consequently void."*

58. As parties were of the mistaken view that OML 123 contained at least 150 MMSCuFD for the commencement of phase 1 of the project, the GSPA is consequently void.

15

**Parties' inability to implement the GSPA - Fundamental Change**

59. 150 MMSCuFD required for phase one of the Project is solely operated and controlled by Addax Petroleum. The storage of the Wet Gas and delivery of Wet Gas to Respondent for onward supply to Claimant is within the sole purview of Addax Petroleum.

60. Consequently Respondent can only supply to Claimant the volume, if any of Wet Gas delivered or made available to it for supply to Respondent by Addax Petroleum.

61. Addax Petroleum at the meeting of 2nd December 2010 notified parties that it could not supply the required 150 MMSCuFD of Wet Gas needed for commencement of phase 1 of the Project as it needed 50 MMSCuFD of Wet Gas for reinjection into the wells at OML 123 to maintain and increase oil production.[3]

62. At the meeting of 16th May 2012 Addax Petroleum further informed parties that it could supply any volume of Wet Gas to Respondent or Claimant in line with the GSPA.

63. The Tribunal will see that the refusal, failure or inability of Addax Petroleum to make available the required 150 MMSCuFD for supply to Claimant was an event that caused a fundamental change that was beyond the control of Respondent.

64. In Nigerian law and as decided in the case of *Lagos State Government v Toluwase (supra) see P. 574, paras. B-C)* the concept of intervening events is the premature determination of an agreement between the parties lawfully entered into and in course of operation of the time of its premature determination, owing to the occurrence of an intervening event or change of circumstance so fundamental as to be regarded by law both as striking at the root of the agreement and as entirely beyond what was

---

[3] See page 174, paragraph 3 of MQ 1

contemplated by the parties when they entered into the agreement. *See also [*Mazin **Eng Ltd v. Tower Aluminium (1993) 5 NWLR (Pt. 295).**

65. Article 11(b) of the GSPA requires that a party who is unable to perform its obligations as a result of the force majeure or frustration should notify the other party no later than 48 hours after becoming aware of the establishment of the force majeure event.

66. Respondent however submits that the provisions of article 11(b) of the GSPA will not be applicable in this instance; this is because the force majeure/ frustrating event was communicated expressly and directly to parties at a formal meeting of 2nd December 2010 and 16th May 2012 respectively.

67. In any event the right contained in Article 11(b) of the GSPA can be waived.

68. Under Nigerian law and as decided in the case of ***N.U.B. Ltd v Samba Pet. Co. Ltd [2006] 12 NWLR (Pt. 993) P.122, paras. G-H)*** *"waiver carries some element of abandonment of a known legal right, which by conduct a person gives a clear impression that he is not ready to pursue his legal right in the matter. He may not say so in specific words. He may not say so at all, but once his conduct shows that trend, a court of law will hold that he has waived his right."*

69. Claimant was aware of its legal rights under article 11(b) of the GSPA but nevertheless chose to waive its rights.[4]

**The Commencement/Start Date and duration of the GSPA.**

70. The GSPA is expressly clear on the commencement date and the life span of the GSPA – a period of twenty (20) years. The only question is, when did the contract commence?

---

[4] See page 176, paragraph 4 0f MQ1 and paragraphs 122 and 127 of first witness statement of Micheal Quinn

71. Article 1(iv) of the GSPA defines the effective date of the contract to simply mean the date the GSPA was signed and no more. The plain and literal meaning of the effective date can mean nothing more than the date parties appended their signature to indicate and acknowledged their commitment to supply and process Wet Gas from the start date of the contract thereon.

72. The start date of the GSPA is defined under article 1 (xv) of the GSPA as the earliest date on which the government commences regular supply and delivery of not less than150 MMSCuFD of Wet Gas to the site.

73. Parties being fully aware  of the peculiar nature  of the transaction and the circumstantial situation in procuring the Wet Gas from the specific OML's agreed to the start date of the GSPA as stipulated in article 1 (xv) of the GSPA. There could be no breach of supply of Wet Gas on the part of Respondent if the period and condition precedent to kick start the agreement has not occurred.

74. Respondent submits that the condition precedent that kick starts the GSPA is the supply of Wet Gas which is what Claimant now alleges there has been a breach of. Could there be a breach of supply of Wet Gas if the date of supply is yet to be determined by Respondent? We believe there could be no such breach. Respondents will give fuller argument at the hearing on Remedy.

75. Furthermore the supply of Wet Gas as identified by article 1 (xv) of the GSPA requires the construction of the GPF's and availability of the site.

76. It is important to draw Tribunal's attention to the fact that as the date of commencement of this arbitral proceedings, Respondent is still committed and did

indicate to Claimant its willingness to supply to Claimant the required volume of Wet Gas upon its availability, in order to kick start the GSPA.[5]

77. It is also not a disputed fact that the Adanga pipeline chosen by parties for the supply of the Wet Gas has been under construction prior to the execution of the GSPA and Claimants proposal to Respondent.

78. The construction of the pipeline was contracted to a third party and owned by a third party.

79. The installation of the pipelines was never an issue between parties as the construction of the Adanga pipeline was very much underway and to the extent that the construction was stopped or impeded by either the contractor or the third party owner, this will amount to a force majeure thereby rendering it unenforceable.

80. Claimant in its Statement of claim have not complained of Respondents failure to ensure requiste agreements with agencies or third parties are in place as required under article 6(b) of the GSPA or that the construction or installation of the Adanga pipeline was stopped thereby making the contract unenforceable. Rather Claimant complains solely of Respondent's failure to supply Wet Gas.

81. Without prejudice to the aforementioned arguments, Respondent restates the position of Nigerian law above i.e. it cannot arrogate to itself the statutory power of the Nigerian National Petroleum Corporation to supply petroleum products or make use of the Adanga pipelines.

---

[5] Page 236 of MQ1

**Termination of Phase 1 of the GSPA and acceptance of a Counter Offer**

82. As a result of the non-availability of the anticipated volume of 150 MMSCuFD of Wet Gas from OML 123, Claimant proposed and entered into new terms of contract with Respondent. The facts leading to and the terms of this contract are contained in paragraphs 122 – 127 of Micheal Quinn's witness statement and pages 174 -178 of MQ1.

83. Consequently, Claimants action should have been predicated on breach of terms of this new contract if any.

84. It is trite law that a contract although evidenced in writing can be rescinded by oral agreement *(see U.A.C v Argo (1958)14 N.L.R.105)*. Under Nigerian law, section 128 (d) the Evidence Act 2011 also permits the admissibility of oral agreement to proof variation, rescission or modification to a written agreement under the following circumstances:

> *"Provided that any of the following matters may be proved –*
> *(a) Fraud, intimidation, illegality, want of execution, the fact that it is wrongly dated, existence or want or failure, of construction, mistake in fact or law; want of capacity in any contracting party, or the capacity in which a contracting party acted when it is not inconsistent with the terms of the contract, or any other matter which, if proved would produce any effect upon the validity of any document, or of any part of it, or which would entitle any person to any judgement, decree or order relating to it;*
> *(b) The existence of any separate oral agreement as to any matter on which a document is silent and which is not inconsistent with its terms, if from the circumstances of the case the courts infers that the parties did not intend the*

20

> document to be a complete and final statement of the whole of the
> transaction between them;
>
> (c) The existence of any separate oral agreement, constituting a condition
> precedent to the attaching of any obligation under any such contract, grant
> or disposition of property;
>
> (d) The existence of any distinct subsequent oral agreement to rescind or modify
> any such contract, grant or disposition of property;
>
> (e) Any usage or custom by which incidents not expressly mentioned in any
> contract are annexed to contracts of the description; unless the annexing of
> such incident to such contract would be repugnant to or inconsistent with the
> express terms of the contract".

85. In view of the above provisions and admissions of Micheal Quinn to the effect of a
separate agreement in his witness statement, we submit that there is no basis for this
current arbitral proceedings.

**Legitimate Expectation**

86. Assuming but without conceding that Respondent did make representations to Claimant
to the effect that it will freely give and supply Wet Gas to Respondent using the Adanga
Pipelines, that would be suggesting to the Tribunal that Respondent had authority under
Nigerian law to occupy multiple roles or that Respondent:

- Is the owner and in control of the OML's which are legitimately owned by third
parties;

- It can act beyond the scope of its designated or statutory powers;

- It can give gas owned by others freely in return for non-associated gas;

21

- It can grant at will Pioneer status to a company which doesn't meet the statutory requirement and  without following due process;

- It can waive tax requirements which is beyond its expertise;

- It can take decisions without considering the economic impacts on Nigeria and the Nigeria Government; and

- It can occupy multiple statutory positions and act as it pleases

87. Tribunal can only find in favor of Claimant if the above were legitimate expectations of Claimant.

88. With dearth of cases on the issue of legitimate expectation, Respondent relies on English Judicial decisions as persuasive authorities.[6]

89. The doctrine of legitimate expectation is based on the principles of natural justice and fairness, and seeks to prevent authorities from abusing power and In order to be legitimate an expectation must be consistent with the terms of the statute under which the public body is empowered to act as the law recognizes no legitimate expectation that a public authority will act unlawfully.[7]

---

[6] English judicial authorities though not binding in Nigeria can be persuasive.

[7] Richard Moules; Actions against Public Officials: Legitimate Expectations, Misstatements and Misconduct; Sweet & Maxwell, 2009, page 72, paragraph 2-042

90. Furthermore, a person who ought to have known that an assurance could only be obtained in a particular way cannot rely on a purported assurance that it can be obtained a different way as no legitimate expectation will arise.[8]

91. While Respondent does not concede that the expectation of Claimant is legitimate, we submit that any action arising from the GSPA will be considered ultra vires.

## Illegality and Public Policy

92. A cursory glance at the GSPA instantly reveals that the GSPA contains onerous provisions which are contrary to public policy and illegal in nature.

93. Claimant claims to be knowledgeable and experienced in engineering projects within the Nigerian petroleum industry. Claimant also conducted appropriate research and feasibility studies and knew fully well the appropriate avenue and governmental agencies to enter the GSPA with and to obtain relevant licences, approvals and Pioneer status as stated in the GSPA.

94. Despite Claimant's contrary law and public policy, it contracted with Respondent to yield and abuse its prerogative powers to obtain without due process all requisite permits, licenses and approvals required from other relevant governmental parastatals in order for Claimant to gain undue advantage and to fast-track the project.[9]

95. Claimant also contracts with Respondent to grant exemptions and waive any requirement of the law which may have adverse effect on Claimant at a future date as a

---

[8] *Matrix Securities Ltd v Inland Revenue Commissioners [1994] 1 W.L.R. 334*

[9] Article 6(c) f the GSPA

23

result of change in government policy or change in the law or prescribed standards within the industry.[10]

96. Respondent is also required under the GSPA to grant Pioneer Status (which is solely within the prerogative powers of the National Office for Technology Acquisition and Promotion (NOTAP) and not the Respondent, with no import duties, clearance charges and taxes payable under Nigeria law, in respect of all equipment and materials utilized in the construction and commissioning of the GPFs/Site.

97. Under the GSPA, Respondent is also required to assist Claimant in evading tax by contracting not to pay tax in respect of the operation of the GPFs for a period of five (5) years.[11]

98. The above contractual provisions are undoubtedly illegal under Nigerian law and are contrary to public policy. They are also contrary to international law.[12]

99. In addition, in *Ajayi v Total Nigeria Plc [2013] 15 NWLR (Pt. 1378.) 427*, it was held that: *"where a court of law, in the course of a matter finds an illegality punishable under the law, it must take cognizance of the illegality, even if not triable in that court but in another tribunal without prejudice to its referring the matter to that tribunal."* In other words, once a transaction is illegal, it is void and any matter emanating from the transaction is a nullity.

100. The court also defined illegality of a contract as where the consideration or promise involves the doing of something illegal or contrary to public policy or if the intention of the

---

[10] Article 6 (d) of the GSPA

[11] Article 8 (h) of the GSPA

[12] An example is the Bribery Act 2010 (laws of England & Wales)

24

parties in making the contract is illegal or contrary to public policy. *(see Ajayi v Total Nigeria Plc [2013] 15 NWLR (Pt. 1378.) 427.*

101. In light of the above submission, Respondent respectfully submits that the GSPA is riddled with illegality and therefore void.

**Conclusion**

Respondent submits that the terms of the GSPA have not been breached by Respondent and therefore it is not liable to Claimant. The GSPA for the reasons argued above is void in its entirety and Respondent urges the Tribunal to find that:

- Respondent lacked the authority to enter into the GSPA with Claimant on behalf of the Federal Government of Nigeria for the supply of Wet Gas;

- Claimant failed to fulfil its obligations under the GSPA;

- The construction of Gas Processing Facilities at Calabar, Cross Rivers State was a pre-condition of the supply of Wet Gas by Respondent;

- The GSPA is for the supply of ascertained Wet Gas from OML 123 and OML 67;

- There was a misrepresentation by Claimant that OML 123 contained over 150 MMSCuFD of Wet Gas for execution for phase 1 of the project;

- The unavailability of Wet Gas from OML 123 brought about a fundamental change in the GSPA that was beyond the control of Respondent ;

- The Commencement/Start Date of the GSPA was the earliest date on which the government commenced regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to Claimants site at Calabar;

- Phase 1 of the GSPA was terminated by the acceptance of a Counter Offer from Respondent;

- The GSPA is Illegal under Nigerian law and contrary to Public Policy.


**Olasupo Shasore, SAN**

**Lateefat Hakeem-Bakare**

**Abiodun Anibaba**

**Twenty Marina Solicitors LLP**

**Sterling Towers**

**20 Marina, Lagos**


Served this 28th day of May 2015 by Twenty Marina Solicitors LLP, Solicitors for the Respondent.

**IN THE MATTER OF ARBITRATION AND CONCILIATION ACT (NIGERIA)**

**AND**

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)**

**BETWEEN:-**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

<b><u>Claimant</u></b>

**- and -**

**THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA**                                **<u>Respondent</u>**

---

### RESPONDENT'S RESPONSE TO CLAIMANT'S SUBMISSIONS IN REPLY

---

**Introduction**

1.  The Respondent's submissions in response to Claimant's written submissions of 31 May 2015 for the hearing on liability.

**National Domestic Gas Supply and Pricing Policy/ GSPA**

2.  Claimant has consistently and copiously referenced the National Domestic Gas Supply and Pricing Policy ("the Policy") (written and enacted by the Minister of Energy) / National Gas Supply and Pricing Regulations 2008 ("the 2008 Regulations") made pursuant to the Petroleum Act, CAP P10, Laws of the Federation of Nigeria, 2010.

3.  Claimant strongly relies on the Policy/Regulations in support of its assertion that Respondent's role in the GSPA is beyond that of a facilitator and Respondent had the authority and capacity to enter into the GSPA with Respondent.

4.  Claimant entered into the GSPA fully aware that the Ministry responsible for the supply of Gas is the Federal Ministry for Energy in Nigeria not the Respondent. The Claimant's assertion is obvious from its submissions, its Statement of Claim and Michael Quinn's witness Statement.

1

That is, as a result of the Policy and Regulations, Respondent is the statutorily designated authority to enter into the GSPA with and it is the designated statutory authority to supply gas.

5. Could the contractual obligations contained in the GSPA be legitimate expectations of Respondent, based on Claimant's alleged reliance on the Policy and Regulations?

   *Respondent submits that the answer to this question is in the negative.*

6. The Ministry with the statutory responsibility and authority to engage in any gas related transaction is the Ministry of Energy and specifically the Department of Gas. A fact which is well known to Claimant (see paragraphs 34 and 36 of Michael Quinn's Witness Statement).

7. The Department of Gas is statutorily vested with the power to, *inter alia*:

   i.   act as an intermediary between suppliers and purchasers of gas in the domestic market and ensure the supply of gas to the strategic sectors;

   ii.  mandate persons or company licensed to produce petroleum to supply a specific volume of gas to a purchaser in accordance with a Gas purchase Order issued by the Domestic Gas Aggregator; and

   iii. pay compensation to any purchaser for any loses suffered as a result of default to supply gas in compliance with the order of the Domestic Gas Aggregator.[1]

8. The above powers of the Department of Gas are the only legitimate expectations Claimant can expect in any transaction.

   **Legitimate Expectations**

9. Aware that the powers to fulfil any obligations in the GSPA was by law vested in the Ministry of Energy, it is inconceivable that Claimant could legitimately expect *this* Respondent to:

   i.   supply gas, free of charge to it which is vested in other parties and regulated by a completely different ministry as prescribed by law;

   ii.  unilaterally redesignate the use of a newly constructed gas pipeline from supplying gas to the calabar power plant for power generation for Nigeria as a whole, to a single supply of 150mmscuf gas for Claimant, thereby breaching other contractual obligations and crippling economic activities;

   iii. compel third parties to supply gas to Claimant without remuneration or compensation;

   iv.  act beyond its powers and grant tax holidays and pioneer status (which can only be granted by the President and through the Minister of Industry)[2];

---

[1] See also sections 2, 4, 5 and 6 of the 2008 Regulations
[2] Section 2 of Industrial Development (Income Tax Relief Act)

2

10. Claimant's expectations listed above are not only illegal but also against public policy and could therefore not be legitimate expectations.

11. In *R v Dpp, Ex p. Kebilene [2000] 2 A.C. 326,* "it was held that in order to be legitimate, an expectation must be consistent with the terms of the **statute under which the public body is empowered to act** and that the law recognizes no legitimate expectation that a public authority will act unlawfully."

12. In *Birkdale District Electricity Supply Co. Ltd v Southport Corporation [1926] A.C. 355 at 364,* Lord Birkenhead held that a public body cannot contract out of its statutory duties. The dictum of Lord Birkenhead was also relied upon by Lord Denning M.R. in R v Liverpool Corporation, Ex p. Liverpool Taxi Fleet Operators' Association [1972] 2 Q.B. 299, at 308, when held that public body could not act incompatibly with the exercise of its powers or the discharge of its duties.

13. The Learned author Richard Moules in his book titled: Actions against Public officials: Legitimate Expectations, Misstatements and Misconduct[3] also succinctly states that:

> *"The law does not recognize as legitimate an expectation based on an ultra vires promise or practice. A public body will be absolved from ultra vires promise or practice.*[4]
>
> *It will be lawful for a public authority to resile from legitimate expectation: first where there are countervailing considerations which justify not giving effect to the legitimate expectation in the public interest; and secondly, where it would be unlawful for the public authority to give effect to the legitimate expectation".*[5]

14. Section 5 (1) (a) of the Constitution of the Federal Republic of Nigeria also stipulates that subject to the provisions of this Constitution, the executive powers of the federation shall be vested in the President and may, **subject as aforesaid and to the provisions of any law made by the National Assembly**, be exercised by him either directly or through the Vice-president and the Ministers of the Government of the Federation or officers in the public service of the Federation.

15. From the above provision it is clear that a Minister can only act within the confines of the law. In *A.G Federation v Abubakar [2007] 8 NWLR, pt. 1035, page 147, para G,* it was held that *"all agencies of government are organs of initiative whose powers are derived either directly from the Constitution or from laws enacted thereunder. They therefore stand in relationship to the Constitution as it permits their existence and functions"*

16. The Minister of Petroleum Resources is not vested with any power under the constitution, his powers are provided for under the Petroleum Act to grant oil prospecting and exploration

---

[3] Richard Moules; (2003) Actions against Public officials: Legitimate Expectations, Misstatements and Misconduct: Sweet and Maxwell.

[4] Page 97, para. 2-077

[5] Page 80, para. 2-053

licences, mining lease and to exercise general supervision over all operations carried under licences and leases granted under the Petroleum Act[6] and not as alleged by Claimant at paragraph 17 of Claimant's submissions in reply wherein it stated that that: " the Nigerian Petroleum Act empowers the Minster of Petroleum Resources to grant licences for oil and gas concessions".

17. The 2008 Regulations of the Petroleum Act vests in the Minister of Energy the power to deal with and allocate gas to various demand sectors. Therefore, if the National Assembly of Nigeria intended for the Minister of Petroleum Resources to deal with gas related matters it would have vested that Minister with powers under the Petroleum Act and not the Minister for Energy.

18. It is in view of the law i.e. the Petroleum Act, the Nigerian National Petroleum Corporation Act ("NNPC"), cap N123, Laws of the Federation of Nigeria, 2010 and the distinguishable separation of roles and powers between the two aforementioned ministries and the NNPC that the Respondent submits that the obligations under the GSPA are contrary to law and are therefore void. This is because the Minister of Petroleum Resources in entering and executing the GSPA has acted beyond its recognized statutory powers.

19. Nigerian courts have consistently held that: *"a government is bound by the law which it itself has made[7] and that in exercise of his powers as a matter of order, peace and good government, the Governor must have recourse to law. The Governor is certainly not there to seize power of other functionaries nor is he there to rule in dictatorship in disregard of established laws of the land. That would not bring order, nor peace nor good government.... For the Government to step in and approve appointment of one of the candidates without any backing of law, when the provisions of the law are there, clear straight-forward and binding is to introduce arrogance into governance."*

20. In the Supreme Court of Nigeria, Honourable Justice Nnaemeka-Agu held further in *Eleso v Government of Ogun State [1990] 2 NWLR at page 443, paras. F-H that: "the full implication of our system in which we have opted for a rule of law is that every functionary of government including its Chief Executive must, in the execution of his functions, at all times act under and in accordance with law. He cannot rightly take over the function which the law allocates to another. If a Governor, in the execution of the functions of his high office, comes face to face with a situation which is not covered by the law as it is, or in which a particular function is intended to be performed by another functionary, his solution does not lie in his riding rough shod over the problem in the name of expediency. Rather he should seek an amendment of the law by the competent legislative authority... I therefore agree that the role played by the Governor which led to the approval of the appellants the Balogun of Ijaiye and Are Egba is invalid and unlawful".*

21. The Supreme Court of Nigeria further held in the case of *P.H.M.B. v Ejitagha [2000] 11 NWLR (Pt. 677) at pages 163 -170 that: "A public body or authority invested with statutory powers must act within the law and take care not to exceed or abuse its power. It must keep within the limits of the authority committed to it. It must act in good faith and reasonably. In the instant*

---

[6] Sections 2 and 8 of the Petroleum Act.
[7] See also the case of *Alapiki v Governor of Rivers State [1991] 8 NWLR (Pt.211) at page 606, paras. E-F*

*case, the appellant purported to exercise power which it has not got... not even the Minister could do that under section 4(2) of the Pensions Act..."*

22. *"Where a person, body or authority claims to have acted pursuant to power granted by statute, such person, body or authority must justify the act, if challenged, by showing that the statute applied in the circumstances and that he or it was empowered to act under it."*[8]

23. In **Oikherhe v Inwanfero [1997] 7 NWLR (Pt.512) at page 247, para A,** it was also held that *"it is a well settled principle of our jurisprudence and an important requirement of our administration of justice that where the exercise of a power (or "part", as found by the trial court), is statutory, then it ought to be exercised by the party in whom the power (or the "part", as found by the court below), is vested".*

24. The above principle was further reiterated by the Supreme Court of Nigeria in **Emuze v Chancellor [2003]8 M.J.S.C.  at page 16, paras. C-D** where the court held that: *"where a statute confers specific or special powers on any person or authority for the performance of certain acts or duties, it is only that person or authority and no other person that is contemplated in the performance of such acts or duties under the relevant law. He must also act in strict accordance with the powers vested in him by the relevant statute and may not exceed such powers".*

25. The position of Nigerian law is undoubtedly clear that a person or authority cannot act beyond its scope of power. The Minister of Sports cannot without authority enter into an agreement pertaining to petroleum or agriculture just because he is an executive of the government and neither can the Minister for Petroleum Resources enter into an agreement on areas designated to the Ministry of Energy or NNPC (a statutory corporation which affairs are conducted by a Board of Directors, under the NNPC Act of 1977.

26. Execution of the GSPA with Respondent is by no means accidental, it is a deliberate attempt by Claimant to circumvent laid down procedures and legal requirements. Claimant was aware of the Nigerian Gas Master Plan Investors Road Show 2008 organized by the Ministry of Energy. The purpose of the road show was to present an overview of Nigeria's huge gas potential and opportunities to participate in the evolving gas sector, present an overview of the measures in place to guarantee/secure investments and to provide a platform for investor networking and syndication (see page 30 of MQ1).

27. The Gas Master Plan was comprehensive and highlights the government proposed plan to have three gas gathering and processing facilities constructed in specific areas within south eastern Nigeria and three gas pipeline transmissions systems and compressor stations for gas treatment and LPG extractions.[9] The gas master plan also draws out the purchase and extraction of wet gas for domestic and international consumers (Claimant's proposed under the GSPA).[10]

---

[8] See also the case of *Ogieva v Igbinedion [2004] 14 NWLR (Pt.894) P.846, para. B* that "where a statutory requirement for exercise of a legal authority is laid down, it is expected that the public body invested with the authority would follow the requirement to the details".

[9] Page 44 – 46 of MQ 1

[10] Page 52 - 57 of MQ 1

28. The Gas Master plan further identifies tax incentives available to investors under the Companies Income Tax Act, which essentially is a tax free period of three years renewable for two more years (Claimant however contracted for an immediate tax free period of five years with Respondent without the need to consider if it is qualified for tax breaks). [11]

29. Persons or companies willing to participate and invest in either the gas pipeline networks or gas gathering and processing facilities were required to indicate their interest by submitting their bid proposals by 15th July 2008.[12] Claimant could have submitted its proposal to the Ministry of Energy as required by the Gas Master Plan but failed to do so. Claimant also knew that any agreement for sale and supply of gas shall commence with an application to the Domestic Gas Aggregator as required under section 7(1) of the 2008 Regulations.

30. Respondent submits that in order to avoid the competitive and rigorous bidding process, Claimant decided to approach its 'friendly' Ministry of Petroleum Resources to entering the GSPA and to preclude or prevent other investors from venturing into the gas processing market. This approach and the subsequent execution of the GSPA is an abuse of due process, illegal and contrary to public policy.

31. Consequently, Claimant's expectation of Respondent in the GSPA cannot qualify as a legitimate expectation of Respondent. A legitimate expectation cannot be based on an ultra vires exercise of power; a public body will be absolved from giving effect to any expectation if it is required to act contrary to statute.[13] It has also been held to be "wrong in principle" for a decision maker to be bound by a legitimate expectation engendered by the representation of another person or body.[14]

**Applicability of *Knight Frank & Rutley v Attorney General of Kano State* [15]**

32. Respondent submits that the ***Knight Frank Case (Supra)*** is applicable to the facts of this case.

33. In the ***Knight Frank case (supra)***, the executive acted beyond the scope of its statutory power. The court held it was ultra vires for the Commissioner of Finance of Kano State to enter into a contract for the collection or valuation rates as the power to do so is vested in another public authority and that it is irrelevant if parties were mistaken as to their capacity or ability to engage in such contract.

34. Claimant attempts to distinguish the Knight Frank case from the present dispute on the basis that the contract in which the state entered into is one which is expressly reserved in another public authority by law and that there is no law prohibiting Respondent in this present dispute from entering into the GSPA.

---

[11] Page 59 – 61 of MQ 1

[12] Page 64 of MQ 1

[13] R. (X) v Head Teacher and Governors of Y school [2008] 1 All E.R 249 at [115] per Silber J.

[14] R v Secretary of State for the Home Department, Ex P. Mapere [2001] Imm. A.R 89, at 36

[15] [1990] 4 NWLR, (Pt. 142) at 120

35. Respondent submits that there were no provision in the 1979 constitution of the Federal Republic of Nigeria or the Kano State Local Government Edict, No. 5 of 1977 which expressly or strictly reserves the collection of rates in the Local Government Councils in the *Knight Frank's case* nor was there any law or thing prohibiting the Kano State Government or the Commissioner for Finance from entering into a contract for valuation or collection of rates in the *Knight Frank's case* just as this present dispute. Rather, what the court was concerned with is whether the Kano State Government or the Commissioner for Finance had the statutory power to enter into such contract and as rightly decided by the Supreme Court in ***Knight Frank & Rutley (Nig) v A.G Kano State [1998] 7 NWLR (Pt.556) at 19, paras. E-G per Uwais,*** C.J.N: "there is no legislation which empowers Kano State Government to dabble in or interfere with the compilation of valuation list for the purpose of assessing or collecting rates on private properties in Kano State. Therefore, the Government acted ultra vires in entering into contract with the appellants to do what only the Local Government Councils concerned were entitled to do under the 1979 Constitution and the Local Government Edict, 1977."

36. Applying the above principle to the present facts, is Respondent empowered under any statute to enter or perform any of the obligations under the GSPA? The answer can only be in the *NEGATIVE.* The appropriate authority or persons empowered by statute to enter into agreements such as the GSPA is the Ministry of Energy, the NNPC and third party owners of the OML's and one cannot do without the order.

**FRUSTRATION AND PAYMENT FOR GAS**

37. The GSPA is for the supply and processing of gas. It was therefore never within parties contemplation that Respondent will pay for gas and in turn supply the gas; any suggestion of purchase of gas by Respondent as a result of the frustrating event or lack of gas in OML 123 would amount to the performance of another contract and not the GSPA. This is because the GSPA only stipulates for the supply of gas and not payment for gas. For the Respondent to pay for the supply of gas in order to construe the supervening event as not amounting to a frustrating event will be to create a new contract for the parties. Respondent submits that the absence of gas supply in OML 123 was an event of frustration.

**INABILITY OF RESPONDENT TO CROSS EXAMINE CLAIMANT WITNESSES**

38. At the proceedings of 1st June 2015, Respondent requested and applied to cross examine Claimant's two witnesses namely: Michael Quinn and Honourable Justice Belgore. Respondent application was however refused by the tribunal due to the unavailability of Honourable Justice Belgore and the shocking revelation on the day that Michael Quinn has since passed away. The effect of the unavailability of Claimant witnesses prevented Respondent from testing the veracity and accuracy of the Claimant witnesses and particularly the conclusions reached by the expert (the Tribunal was also deprived this opportunity); the tribunal will also note that Respondent filed a statement of facts challenged with regard to the Witness Statement of Michael Quinn and other facts relevant to the question of liability, challenging essentially all facts alluded to by Michael Quinn in his witness statement and therefore needed to cross examine him on all his alleged facts as contained in his witness statement.

39. Under Nigerian Law, *"before the opinion of an expert can be admitted in evidence, he must be called as a witness and he is expected to state his qualifications, experience and the reasons for*

7

*his opinion he should be cross-examined with a view to discrediting him as an expert and the conclusions reached by him".[16]* Consequently, Claimant is unable to rely on the opinion of Honourable Justice Belgore as evidence in this arbitration and we urge the tribunal to discountenance the opinion of Honourable Justice Belgore in its findings.

## ADMISSIBILITY OF THE RESPONDENT'S WITNESS EVIDENCE AS THE TRUE AND CORRECT VERSION OF EVENTS.

40. Claimant was asked at the proceedings of 1st June, 2015 if it intends to cross examine Respondent's only witness, Ikechukwu Oguine and Claimant responded in the negative. The effect of this is that Claimant accepts evidence of Ikechukwu Oguine as the truth in these proceedings. In other words failure to cross-examine a witness upon a particular matter is a tacit acceptance of the evidence of the witness.[17]

41. The Supreme Court of Nigeria in *Cameroon Airlines v Otutuizu [2011] 4 NWLR (Pt.1238) at 545, paras. A-H* that: *"where a party testifies on a material point, the adverse party ought to cross-examine him or show that the testimony is untrue. Where neither is done, the court would readily conclude that the adverse party does not dispute the fact..."*

42. Where evidence given by a party in a proceeding is not challenged by the adverse party who had the opportunity to do so, the court ought to act positively on the unchallenged evidence before it.[18]

43. We therefore submit that the tribunal is duty bound to accept the evidence of Ikechukwu Oguine as the truth in this arbitral dispute and to find in favour of Respondent.

## GSPA is for the supply of ascertained Wet Gas

44. Respondent repeats its earlier submissions made in its skeleton argument and further directs the tribunals attention to various facts pointing to the specificity of the source of the wet gas as follows:

- Claimant's proposal to the then President of Nigeria where Claimant identified  OML 123 and 67 as the specific source of wet gas (Page 67 and 68 of MQ 1);
- Claimants research and confirmation of availability of wet gas in OML 123 and interest in providing onshore pipeline facilities from OML 123 (Page 98,186 and 185 of MQ 1);
- Claimants allusion in its letter dated 11th June, 2009 to Respondent that the source of wet gas for  phase 1 of the project is  OML 123 and that a subsequent list  of the source of wet gas for phase 2 of the project will be forwarded shortly (Page 97 of MQ 1);

---

[16] *Shell Development Company limited v Otoko [1990] 6 NWLR at 713, paras. A-B; Sowemimo v State [2004] 11 NWLR, (Pt.885) at 532, paras, D-E; Wambai v Kano Native Authority (1965) NMLR 15; Tuah v Michael [2010] 10 NWLR,at 534, paras.A-C*
[17] *Gaji v Paye [2003] 12 M.J.S.C. at 91, paras. D-E; Adesule v Mayowa [2011] 13 NWLR (Pt. 1263), P. 170, paras. E-F*
[18] *See also Okoebor v IGP [2003] 6 M.J.S.C. at 28, para. G; and Oikherhe v Inwanfero [1997] 7 NWLR (Pt.512), at* 242, paras. E-F, where it was held that "where the evidence of a party is unchallenged and unrebutted, the party is entitled to judgment.

- Identification of OML 67 as the source of wet gas for phase two of the GSPA in Claimant's letter dated 15th June, 2009 (Page 99 of MQ 1).
- Confirmation of OML 123 as the source of wet gas for phase 1 of the project by Industrial Consultants International Limited (Claimant's associated company)   at page 123 of MQ 1;
- Reference in the GSPA  to OML 123  and 67 as the source of wet gas for phase 1 of the project (Article  3(c) and 8 (g) of the GSPA);
- Reference to OML 123 in Claimants letter to Addax Petroleum dated 19th November, 2009,  and Claimant's  letter to Respondent dated 12th January, 2010 (page 152 of MQ 1);
- Specific reference to OML 123 and 67 as the specific source of wet gas in your letter to Respondent dated 21st July, 2010 (page 164 -165 of MQ 1);
- Specific reference to OML's 123 and 67 and third party owners   in Claimant's letter dated 21st April 2011, to NNPC  Group Executive director ( Gas & Power) (page 174 – 177 MQ 1);
- Reference to the OML's in the minutes of meeting  held 10th August, 2010 between Respondent representatives, Claimant representatives and third parties (page 166 -169 of MQ 1);
- Claimant's letter dated 10th February, 2012  to former President of Nigeria (Goodluck) (page 181 -183 of MQ 1), and
- Claimants letters of 10th May 2012 (page 184 -185 of MQ 1) and 27th June 2012 (page 186 – 187)  written to Respondent  and Group Managing Director of NNPC respectively.

45. A total of 13 documents make specific reference to OML 123 and/or OML 67.

**LAND ALLOCATION/SITE OF DELIVERY**

46. Claimant failed to procure land and construct a site for delivery as required by the GSPA and the letter of allocation issued by the Cross Rivers State Government dated 16th February, 2010 was an offer for land and not a contract for sale of land. The letter of offer for land was subject to Claimant making relevant payments, upon which it will be issued a legal title (page 159 of MQ1).

47. the Claimant did not accept Cross River State Government offer for land, therefore no  legal title was issued to the Claimant and consequently the Claimant did not own and was not in possession of any land in Cross River State upon which to commence the construction of the gas processing facility which it was contractually bound to construct under the GSPA.

48. Respondent failed to fulfil the conditions in the letter and therefore never had a site for delivery as no legal title was granted or given to Claimant as evidence of allocation of land by the Governor of Cross Rivers State as required by the Land Use Act, Cap. L5, laws of the Federation of Nigeria, 2010.

9

49. Respondent failed to secure the land to be used for the site and also failed to construct the site as set out in schedule B of the GSPA [*we note that Claimant omitted to Exhibit schedule B as part of MQ 1*].  As prescribed in the GSPA and schedule B of the GSPA, construction of the site is a condition precedent to delivery of the wet gas.

**Olasupo Shasore, SAN**

**Lateefat Hakeem-Bakare**

**Abiodun Anibaba**

**Twenty Marina Solicitors LLP**

**Sterling Towers**

**20 Marina, Lagos**

Served this 12th Day of June 2015 by Twenty Marina Solicitors, LLP, Solicitors for the Respondent.

**Conclusion**

The National Domestic Gas Supply and Pricing Policy therefore aims to fully align the gas sector with the economic growth aspiration of the nation. This policy will be applied in conjunction with the Gas Pricing regulations and modifications thereto.

## CHAPTER 

### PETROLEUM ACT

# SUBSIDIARY LEGISLATION

---

*List of Subsidiary Legislation*

**NATIONAL DOMESTIC GAS SUPPLY AND PRICING REGULATIONS**

---

## NATIONAL DOMESTIC GAS SUPPLY AND PRICING REGULATIONS

**Under Section 9 of the Petroleum Act and Paragraph 34 of the First Schedule to the Petroleum Act.**

### THE DEPARTMENT OF GAS

**1. Establishment of the Department of Gas**

There is hereby established a Department within the Ministry of Energy to be known as the Department of Gas

**2. Powers of the Department of Gas**

12

The Department of Gas shall have the power to do the following: -

(1) regulate the gas sector in accordance with these Regulations, the National Gas Master plan and national policies as may be issued in respect for the gas sector from time to time by the Federal Government;

(2) maintain constant surveillance over indices relevant to gas pricing, identify macro-economic factors with relation to the price of Gas and advice the Federal Government on appropriate strategies:

(3) at the beginning of each year to announce the annual Domestic Gas Demand Requirement;

(4) allocate a Domestic Gas Supply Obligation to every person licensed to produce petroleum at the beginning of every year;

(5) establish an Aggregate Price which shall be used by the Domestic Gas Aggregator as a basis for gas supply to the domestic sector:

(6) establish the guidelines and codes of conduct for all operators in the downstream gas sector;

(7) ensure equitable and transparent access to the gas transportation network;

(8) subject to the approval of the Minister, determine the Domestic and Export Saturation Indices for all sectors;

(9) arbitrate on all issues of conflict between purchasers, suppliers and the Domestic Gas Aggregator.

## THE DOMESTIC GAS AGGREGATOR

3. Establishment of the Domestic Gas Aggregator

(a) A Domestic Gas Aggregator shall be established by the Department of Gas in consultation with suppliers of gas.

4. Functions of the Domestic Gas Aggregator

The Domestic Gas Aggregator shall:

13

**17**

(1) implement a Gas Management Model through which the demand and supply of gas for utilization within Nigeria shall be monitored;

(2) operate a nominations and balancing mechanism for equitable curtailment of gas production whenever demand and supply expediencies require;

(3) ensure transparency of dealings between gas suppliers and purchasers; and

(4) act as an intermediary between suppliers and purchasers of gas in the domestic market and ensure the supply of gas to the Strategic Sectors in accordance with the approved national gas pricing framework.

**5. Powers of the Domestic Gas Aggregator**

The Domestic Gas Aggregator shall have the power:

a) to ensure that the Domestic Gas Demand Requirement is achieved through the implementation of the Domestic Gas Supply Obligation;

b) ensure a balanced growth of domestic gas projects through the availability of adequate volumes of gas to the Strategic Sectors;

c) to open and manage an Escrow Account with an Escrow Agent approved by the Department of Gas;

d) to direct purchasers of gas to make payment for gas supply into the Escrow Account in accordance with the payment schedules agreed by the gas suppliers, gas purchasers and the Domestic Gas Aggregator;

e) to make payment to gas suppliers in accordance with the minimum Aggregate Price and appropriate indexation for the gas supplied;

f) to prepare and provide annually, a detailed audit report of the Escrow Account, to all suppliers of gas, and

g) do all such things as are necessary for or incidental to the carrying out of its functions and duties under these Regulations.

**6. Domestic Gas Demand Requirement**

Every person or company licensed to produce petroleum shall –

14

18

a) submit a gas production and supply plan consistent with its obligations under the Domestic Gas Demand Requirement to the Department of Gas;

b) when required, supply a specific volume of gas to a purchaser in accordance with a Gas Purchase Order issued by the Domestic Gas Aggregator;

c) pay compensation to any purchaser for any losses suffered as a result of default to supply gas in compliance with the order of the Domestic Gas Aggregator.

### 7. Penalties for Non Compliance with Gas Supply Obligation

From the commencement of these Regulations, any supplier who does not comply with its Domestic Gas Supply Obligations as specified by the Department of Gas shall:

1. pay for the volumes not supplied based on the take or pay provisions of the executed GSPA or at a price of US$3.50/MScf, whichever is higher. (this is an after tax penalty, not cost recoverable)

2. not supply gas to any export project in addition to any other penalties that the Minister may deem fit.

### 8. Procedure for Gas Supply

(1) The sale and supply of gas shall commence with an application by the purchaser to the Domestic Gas Aggregator for a Gas Purchase Order.

(2) Upon receipt of the application, the Domestic Gas Aggregator shall conduct due diligence on the purchaser with a view to determining its ability to engage in wholesale purchase of gas.

(3) Upon a satisfactory due diligence, the Domestic Gas Aggregator shall issue a Gas Purchase Order to the purchaser.

(4) The Gas Purchase Order shall specify the gas supplier expected to supply the required gas, the quantity of the gas to be supplied to the purchaser, the price payable in respect of the gas to be supplied, the delivery schedule, revenue due to the gas supplier and other details as may be determined by the Domestic Gas Aggregator.

(5) The issuance of a Gas Purchase Order by the Domestic Gas Aggregator shall be sufficient evidence that a quantity of gas has been

15

**19**

allocated for supply to a purchaser in accordance with the Domestic Gas Demand Requirement.

(6) The Domestic Gas Aggregator shall attach to the Gas Purchase Order, a master gas sales and purchase agreement which will contain the operational and commercial issues relevant to the transaction.

## 9.  Power of the Minister

**The Minister shall have the power to:**

(a) review or amend, alter, add to or delete any provision of these Regulations as he may deem fit.

(b) consult with the representatives of relevant stakeholders, prior to the review and amendments pursuant to subsection (a) of this Section.

(c) in reviewing or amending these Regulations, the Minister may take into consideration the findings of the consultative process carried out pursuant to subsection (b) of this Section.

(d) allocate gas to the various domestic demand sectors

(e) from time to time identify and prioritize specific export projects that have strategic impact on the development of domestic gas market for consideration and inclusion in the Domestic Gas Demand Requirement

(f) impose any other penalties for non compliance pursuant to Section 7 of this regulation.

## 10. Interpretation

In these Regulations, unless the context otherwise requires –

**"Aggregate Price"** means the price for the supply of gas which shall be reflective of the average cost of gas supply in Nigeria for the Domestic Gas Demand Requirement;

**"Domestic Gas Demand Requirement"** means an aggregate of the volume of gas required to meet the gas demand for strategic sectors within the domestic economy for a specific period of time;

**"Domestic Gas Supply Obligation"** means the obligation of every person licensed to produce petroleum to dedicate a specific volume of gas towards the Domestic Gas Demand Requirement and to deliver the gas to a purchaser in accordance with a specified nominations procedure;

16

**20**

**"Domestic Saturation Index"** means the point at which the sector production capacity fully meets an aspired domestic requirement for that sector.

**"Escrow Account"** means the account referred to in regulation 5 of these Regulations

**"Export Saturation Index"** means the point at which the price of gas in for sale to any domestic project would be allowed to compete with the price of gas at the international market.

**"Gas Management Model"** means a model for managing the gas reserves held by every person licensed to produce petroleum in Nigeria and in addition, monitor the demand and supply of gas to the Strategic Sectors and other domestic projects.

**"Gas Purchase Order"** means the Gas Purchase Order referred to in regulation 8 of these regulations.

**"Minister"** means the Minister for the time being charged with responsibility for matters relating to Gas resources;

**"Ministry"** means the ministry charged with the responsibility for Energy;

**"National Gas Master Plan"** means the gas master plan developed by the Federal Government from time to time for the sustainable development and utilization of Nigeria's natural gas resources.

**"Strategic Sectors"** means the Strategic Domestic Sectors as defined by the Federal Government in the National Domestic Gas Supply and Pricing Policy as strategic to the attainment of its economic policy aspirations.

**"These Regulations"** means the National Domestic Gas Supply and Pricing Regulations.

## 11. Short Title

These Regulations may be cited as the National Domestic Gas Supply and Pricing Regulations.

*Extraordinary*



# Federal Republic of Nigeria
# Official Gazette

| No. 10 | Lagos - 19th February, 2008 | Vol. 95 |

*Government Notice No. 23*

The following are published as Supplement to this Gazette :

## CONTENT

The National Domestic Gas Supply and Pricing Policy ........ *Page* 7-15

*S. I. No.*            *Short Title*          *Page*

4     National Gas Supply and Pricing Regulations, 2008 ..    **B 11-15**

Printed and Published by The Federal Government Printer, Lagos, Nigeria

FGP 14/32008/650 (OL 04)

Annual Subscription from 1st January, 2008 is Local : ₦15,000.00 Overseas ; ₦21,500.00 [Surface Mail] ₦24,500.00 [Second Class Air Mail]. Present issue ₦500.00 per copy. Subscribers who wish to obtain *Gazette* after 1st January should apply to the Federal Government Printer, Lagos for amended Subscriptions.

S. I.       of 2008

## PETROLEUM ACT
### (CAP. P10. LFN. 2004)

### National Domestic Gas Supply and Pricing Regulations 2008

*Commencement*

In exercise of the powers conferred upon me by section 9 of the Petroleum Act and Paragraph 34 of the First Schedule to the Act and all other powers enabling me in that behalf, I, UMARU MUSA YAR'ADUA, President Federal Republic of Nigeria/ Minister of Energy, hereby makes the following Regulations:-

## PART 1 – THE DEPARTMENT OF GAS

### 1.   Establishment of the Department of Gas

There is hereby established, a Department within the Ministry of Energy, to be known as the Department of Gas.

### 2.   Powers of the Department of Gas

The Department of Gas shall, have the power to:

(a) regulate the gas sector, in accordance with these Regulations, the National Gas Master Plan and national policies, as may be issued in respect of the gas sector from time to time by the Federal Government.

(b) maintain constant surveillance over indices relevant to gas pricing, identifying macro-economic factors with relation to the price of Gas and advice the Federal Government on appropriate strategies;

(c) at the beginning of each year, announce the annual Domestic Demand Requirement;

(d) allocate a Domestic Gas Supply Obligation to every person licensed to produce petroleum, at the beginning of every year;

(e) establish an Aggregate Price, which shall be used by the Domestic Gas Aggregator, as a basis for gas supply to the domestic sector.

(f) establish the guidelines and codes of conduct for all operators in the downstream gas sector;

(g) ensure equitable and transparent access to the gas transportation network.

1

**23**

(h) subject to the approval of the Minister, determine the Domestic and Export Saturation Indices for all sectors;

(i) arbitrate on all issues of conflict between purchasers, suppliers and the Domestic Gas Aggregator.

3.   **Establishment of the Domestic Gas Aggregator**

A Domestic Gas Aggregator shall be established by the Department of Gas, in consultation with suppliers of gas to -

(a) implement a Gas Management Model, through which the demand and supply of gas for utilization within Nigeria shall be monitored;

(b) operate a nominations and balancing mechanism for equitable curtailment of gas production, whenever demand and supply expediencies require;

(c) ensure transparency of dealing between gas suppliers and purchasers; and

(d) act as an intermediary, between suppliers and purchasers of gas in the domestic market and ensure the supply of gas to the Strategic Sectors, in accordance with the approved national gas pricing framework.

4.   **Powers of the Domestic Gas Aggregator**

The Domestic Gas Aggregator shall have the power to

(a) ensure that the Domestic Gas Demand Requirement is achieved, through the implementation of the Domestic Gas Supply Obligation;

(b) ensure a balanced growth of domestic gas project, through the availability of adequate volumes of gas to the Strategic Sectors;

(c) open and manage an Escrow Account with an Escrow Agent, approved by the Department of Gas;

(d) direct purchasers of gas to make payment for gas supply into the Escrow Account, in accordance with the payment schedules agreed by the gas suppliers, gas purchasers and the Domestic Gas Aggregator;

(e) make payment to gas suppliers, in accordance with the minimum Aggregate Price and appropriate indexation for the gas supplied;

(f) prepare and provide annually, a detailed audit report of the Escrow Account, to all suppliers of gas; and

(g) do all such things as are necessary for or incidental to the carrying out of its functions and duties under these Regulation.

5.      **Domestic Gas Demand Requirement**

Every person or company licensed to produce petroleum shall

(a)     submit a gas production and supply plan, consistent with its obligations under the Domestic Gas Demand Requirement, to the Department of Gas

(b)     when required, supply a specific volume of gas to a purchaser, in accordance with a Gas Purchase Order, issued by the Domestic Gas Aggregator;

(c)     pay compensation to any purchaser, for any losses suffered as a result of default to supply gas, in compliance with the order of the Domestic Gas Aggregator

6.      **Penalties for non compliance with Gas Supply Obligation**

As from the commencement of these Regulations, any supplier who does not comply with its Domestic Gas Supply Obligations as specified by the Department of Gas shall -

(a)     pay for the volumes not supplied, based on the take or pay provisions of the executed GSPA or at a Price of US$3.50/MScf, whichever is higher, the penalty of which shall be reviewed whenever the Minister deems fit, and

(b)     not supply gas to any export project, in addition to any other penalties that the Minister may deem fit.

7.      **Procedure for gas supply**

(1) The sale and supply of gas shall, commence with an application by the Purchaser to the Domestic Gas Aggregator, for a Gas Purchase Order

(2) Upon receipt of the application, the Domestic Gas Aggregator shall, conduct due diligence on the purchaser, with a view to determining its ability to engage in wholesale purchase of gas.

(3) Upon a satisfactory due diligence, the Domestic Gas Aggregator shall issue a Gas Purchase Order to the purchaser

(4) The Gas Purchase Order shall specify the gas supplier expected to supply the required gas, the quantity of the gas to be supplied to the purchaser, the price payable in respect of the gas to be supplied, the delivery schedule, revenue due to the gas supplier, and other details as may be determined by the Domestic Gas Aggregator

(5) The issuance of a Gas Purchase Order by the Domestic Gas Aggregator shall, be sufficient evidence that a quantity of gas has been allocated for supply to a purchaser. in accordance with the Domestic Gas Demand Requirement

(6) The Domestic Gas Aggregator shall attach to the Gas Purchase Order, master gas sales and purchase agreement, which will contain the operational and commercial issues relevant to the transaction.

8.  **Powers of the Minister**

The Minister shall have the power to

(a)  review or amend, alter, add to or delete any provision of these Regulations, as he may deem fit;

(b)  consult with the representatives of relevant stakeholders, prior to the review and amendments, pursuant to sub-regulation (a) of this Regulation;

(c)  in reviewing or amending these Regulations, take into consideration, the findings of the consultative process, carried out pursuant to sub-regulation (b) of this Regulation;

(d)  allocate gas to the various domestic demand sectors;

(e)  from time to time, identify and prioritize specific export projects, that have strategic impact on the development of domestic gas market, for consideration and inclusion in the Domestic Gas Demand Requirement; and

(f)  impose any other penalties for non compliance, pursuant to Regulation 7 of these regulations.

9.  **Interpretation**

In these Regulations, unless the context otherwise requires

**"Aggregate Price"** means the price for the supply of gas, which shall be reflective of the average cost of gas supply in Nigeria, for the Domestic Gas Demand Requirement;

**"Domestic Gas Demand Requirement"** means an aggregate of the quantity of gas required to meet the gas demand for strategic sectors within the domestic economy, for a specific period of time;

**"Domestic Gas Supply Obligation"** means the obligation of every person licensed to produce petroleum, to dedicate a specific volume of gas towards the Domestic Gas Demand Requirement and to deliver the gas to a purchaser, in accordance with a specified nomination procedure

**26**

**"Domestic Saturation Index"** means the point at which the sector production capacity fully meets an aspired domestic requirement for that sector;

**"Escrow Account"** means the account referred to in regulation 4 of these Regulations;

**"Export Saturation Index"** means the point at which the price of gas for sale to any domestic project, would be allowed to compete with the price of gas at the international market;

**"Gas Management Model"** means a model for managing the gas reserves held by every person licensed to produce petroleum in Nigeria and in addition, monitor the demand and supply of gas to the Strategic Sectors and other domestic projects;

**"Gas Purchase Order"** means the Gas Purchase Order referred to in regulation 7 of these Regulations;

**"Minister"** means the Minister, for the time being, charged with responsibility for matters relating to gas resources.

**"Ministry"** means the Ministry of Energy.

**"National Gas Master Plan"** means the gas master plan, developed by the Federal Government from time to time, for the sustainable development and utilization of Nigeria's natural gas resources; and

**"Strategic Sectors"** means the Strategic Domestic Sectors, as defined by the Federal Government in the National Domestic Gas Supply and Pricing Policy as strategic to the attainment of its economic policy aspirations;

10.     Citation

These Regulations may be cited as the National Domestic Gas Supply and Pricing Regulations, 2008.

MADE at Abuja this 16ᵗʰ day of October, 2008

UMARU MUSA YAR'ADUA

*President of the Federal Republic of Nigeria/Minister of Energy*

**27**

IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)

AND

AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT 1988

BETWEEN:

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

**<u>Claimant</u>**

**and**

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

**<u>Respondent</u>**

---

## PART FINAL AWARD

---

Tribunal:

Lord Hoffmann (Presiding Arbitrator)

Chief Bayo Ojo, SAN

Sir Anthony Evans

!7   July 2015

### A.    THE PARTIES AND THEIR LAWYERS

1.    The Claimant ("P&ID") is an engineering and project management company registered at Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British Virgin Islands with a Nigerian office at 12 Vaal Street, off Rhine Street, Ministers Hill, Maitama, Abuja.   It is represented by SC Andrew LLP of Napier House, 24 High Holborn, London WC1V 6AZ, United Kingdom.

Contact: Mr Seamus Andrew
Telephone +44(0) 20 7183 1701
E-mail seamus.andrew@scaontier.net

2.    The Respondent ("the Government" or "the Ministry") is the Ministry of Petroleum Resources of the Federal Government of the Federal Republic of Nigeria whose office address is 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria.  It is represented by Mr Olasupo Shashore SAN of counsel and Twenty Marina Solicitors LLP, 2nd Floor, Sterling Towers, 20 Marina, Lagos, Nigeria (Ms Lateefat Hakeem-Bakare).

Contacts:
Mr Olasupo Shashore SAN
olasupo@shashore.com
Ms Lateefat Hakeem-Bakare
lateefat.hakeem-bakare@tmslip.com

### B.    SUMMARY OF THE DISPUTE

3.    On 11 January 2010 P&ID and the Government ("the Parties") entered into a written Gas Supply and Processing Agreement ("GSPA") whereby the Government agreed that for a term of 20 years it would make to available to P&ID 400 MMScuFD of Wet Gas and P&ID agreed to process the gas and return approximately 85% by volume to the Government in the form of Lean Gas.  The relevant terms of the GSPA (other than the governing law and arbitration clause set out in paragraph 7 hereafter) are in the Annexure to this Award.

4.    For the purpose of enabling the Wet Gas to be processed, P&ID agreed to construct two or more process streams with ancillary facilities.

5.    The supply of Wet Gas by the Government was to take place in two phases. In Phase 1, the Government was to supply 150 MMScuFD "during or before the last quarter of 2011".  In Phase 2, the remaining 250 MMScuFD were to be supplied "on or before the third quarter of 2012".

6.    There is no dispute that the Government never supplied any Wet Gas.  On 20 March 2013 P&ID wrote to the Government alleging that it had repudiated the GSPA and accepting the repudiation.  It claims about US$ 6 billion damages for lost profits. The Government alleges that the agreement was on various grounds invalid or subsequently frustrated, varied or discharged by force majeure.

## C.  GOVERNING LAW AND ARBITRATION CLAUSE

7.  Clause 20 of the GSPA, so far as relevant, provides:

> "The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.
>
> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act 1988 which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal...
>
> The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties. The costs of the arbitration shall be borne equally by the Parties. Each party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language..."

## D.  PROCEDURAL HISTORY

8.  The arbitration was commenced by a Notice of Arbitration served by the P&ID on 22 August 2012. By letter dated 19 September 2012 P&ID appointed Sir Anthony Evans as arbitrator and by letter dated 30 November 2012 the Ministry, acting by Ibrahim H Dikko, its Legal Adviser, appointed Chief Bayo Ojo S.A.N. as arbitrator. On 29 January 2013 Sir Anthony Evans and Chief Bayo Ojo appointed Lord Hoffmann as Presiding Arbitrator.

9.  On 9 May 2013 the parties agreed a procedural timetable by which P&ID was to serve a Statement of Claim on or before 28 June 2013 and the Government was to serve a Statement of Defence on or before 31 July 2013. By e-mail dated 14 May 2013 the Presiding Arbitrator approved the timetable on behalf of the Tribunal as Procedural Order No 1.

10.  P&ID served a Statement of Case on 28 June 2013.

11.  On 14 September 2013, no Statement of Defence having been served, the Tribunal made Procedural Order No 2 which directed that the Government serve a Statement of Defence by 4 October 2013 and that in default of such pleading the

Tribunal would be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act 1990.

12.     On 3 October 2013 the Government served a Notice of Preliminary Objection in which it alleged that the GSPA was void under Nigerian law because the Ministry lacked legal capacity to contract and because P&ID had failed to comply with section 54 of the Companies and Allied Matters Act Cap 20 LFN 2004.  It also alleged that the arbitration agreement was itself void for lack of capacity and that the Tribunal therefore lacked jurisdiction.

13.     On 7 January 2014 the Tribunal by consent made Procedural Order No 3 by which it directed that the following questions shall be decided as preliminary issues:

> (a)     Whether the Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration;
> (b)     If the answer to question (a) is yes, whether it has jurisdiction to decide whether the contract is valid and binding upon the parties;
> (c)     If the answer to question (b) is yes, whether the contract is void for any of the reasons stated in the Notice of Preliminary Objection.

14.     On 3 July 2014 the Tribunal issued a Part Final Award in which it ruled that it had jurisdiction to decide the matters in issue in the arbitration, that it had jurisdiction to decide whether the contract was valid and binding and that the contract was not void for any of the reasons stated in the Notice of Preliminary Objections.

15.     On 21 July 2014 the Tribunal issued Procedural Order No 5, directing that the Government serve its Statement of Defence by 19 September 2014.

16.     On 14 February 2015 P&ID tendered the witness statement of Michael Quinn and the documents exhibited thereto as the factual evidence upon which it intended to rely in support of its Statement of Claim.

17.     On 16 February 2015, the Government not having served a Statement of Defence, the Tribunal made by Procedural Order No 6 a peremptory order within the meaning of section 42 of the Arbitration Act 1996 (UK) directing the Government to serve its Statement of Defence by 27 February 2015.

18.     On 27 February 2015 the Government served a Statement of Defence.

19.     On 6 March 2015 P&ID served a Reply to the Government's Statement of Defence.

20.     On 9 April 2015, by Procedural Order No 7, the Tribunal directed that –
(a)     the Government should by 17 April 2015 serve upon P&ID and the Tribunal the documents and other evidence upon which it intended to rely in support of its Statement of Defence;

4

(b) Nigerian law should be treated as a question of law and not required to be proved as a question of fact but that the parties should be at liberty to adduce evidence of Nigerian law by 1 May 2015.

21. On 22 April 2015, the Government not having served its documents and evidence according to Procedural Order No 7, the Tribunal made Procedural Order No 8 by which it ordered it to do so by 1 May 2015.

22. On 1 May 2015 P&ID served an expert report of the Hon. Justice Belgore on Nigerian law.

23. On 4 May 2015 the Government served the witness statement of Mr Ikechukwu Oguine in support of its Statement of Defence.

24. On 4 May 2015, after consultation with the parties, the Tribunal directed that there should be a Case Management Conference on 6 May 2015 at 10 am BST. On the same date the Presiding Arbitrator sent an e-mail to the parties in the following terms:

> Dear colleagues
>
> The Tribunal would be grateful if the parties would send it, by 6 pm BST tomorrow Tuesday 5 May, an agenda for the Case Management Conference, preferably agreed but otherwise with each party's list of the matters to be discussed. Presumably these will include (a) bifurcation of liability and damages (b) requests for documents, if any (c) payment of the deposit (d) hearing date and arrangements for the hearing (e) timing of delivery of bundles and written submissions (f) cross-examination of witnesses, if any.
>
> Yours sincerely
>
> Leonard Hoffmann

25. On 5 May 2015 P&ID's lawyers replied to the Presiding Arbitrator's e-mail:

> Dear Lord Hoffmann,
> Further to your emails of yesterday, the Claimant proposes the following agenda for discussion at the Case Management Conference tomorrow morning:
>
> (a) bifurcation of liability and damages;
> (b) payment of the deposit;
> (c) hearing date and arrangements for the hearing;
> (d) timing of delivery of bundles and written submissions.
>
> The Claimant has written to the Respondent's lawyers to seek agreement to the above agenda, although none has yet been forthcoming.

26.     This proposal omitted discussion of requests for documents or the cross-examination of witnesses. On 5 May 2015 Mr Shashore on behalf of the Government replied:

>    Dear Presiding Arbitrator
>
>    Respondent agrees with the proposed agenda for
>    tomorrow's meeting....

27.     On 6 May there was a Case Management Conference by telephone at which P&ID was represented by Mr Seamus Andrew and the Respondent by Mr Olasupo Shashore.  Neither side requested the attendance of a witness for cross-examination at the hearing.

28.     On 6 May 2015 the Tribunal made Procedural Order No 9 by which it ordered that –

>    (a)     the proceedings should bifurcated and that there
>    should first be a hearing on liability and then, if P&ID was
>    successful, a hearing on damages;
>    (b)     the Government should serve by 8 May 2015 a
>    statement of any primary facts in the witness statement of
>    Michael Quinn which were challenged and of any other
>    facts alleged to be relevant to the question of liability.

29.     On 12 May 2015 the Government served a notice pursuant to Procedural Order No 9 stating the six facts in Mr Quinn's witness statement which it challenged.

30.     On 25 May 2015 P&ID served a written skeleton argument stating the arguments which it intended to advance at the oral hearing on 2 June 2015.

31.     On 28 May 2015 the Government served a written statement of the arguments which it intended to advance on the oral hearing on 2 June 1015.

32.     On 31 May 2015 P&ID served a written statement in reply to the Government's statement of 28 May 2015.

33.     On 1 June 2015 the Tribunal held a hearing at the International Disputes Resolution Centre, 70 Fleet Street London.  Mr Seamus Andrew made submissions on behalf of P&ID and Mr Olasupo Shashore made submissions on behalf of the Government.

34.     At the hearing the Government applied for leave to cross-examine Mr Quinn and Justice Belgore.  The Tribunal refused leave on the following grounds:

>    (a)     both parties had been invited by the Presiding
>    Arbitrator on 4 May 2015 to discuss at the Case
>    Management Conference on 6 May 2015 the question of
>    whether any witnesses should be cross-examined and the
>    Government had made no application at that stage;

(b)      The provision in Procedural Order No 9 requiring the
Government to serve notice of any primary facts in the
witness statement of Mr Quinn that it challenged was
intended to enable the parties to know which, if any,
relevant facts were in dispute.  In the event, P&ID said that
none of the six disputed facts were essential to their claim
and they did not intend to rely upon them. It followed that
there was nothing upon which cross-examination was
required.
(c)      Mr Quinn had died since making his witness
statement and, as Justice Belgore had not been notified of
any wish to cross-examine him, he was not in attendance.

35.      P&ID did not cross-examine Mr Ikechukwu Oguine on witness statement and
the Government has submitted that the Tribunal is therefore "duty bound to accept the
evidence of Mr Ikechukwu Oguine as the truth in this arbitral dispute and to find in
favour of the Respondent".[1]  The Tribunal rejects this submission.  First, there is no
rule that a court or tribunal is bound to accept the evidence of a witness who has not
been cross-examined.  There is only a general principle of fairness which requires a
court or tribunal, if asked to reject the evidence of a witness, to take into account
whether he or the party calling him has been given a fair opportunity, by cross-
examination or otherwise, to deal with the grounds upon which it is said that his
evidence should be rejected.  Secondly, although Mr Ikechukwu Oguine made what
was called a witness statement, he gave no relevant evidence.  His statement consisted
of references to documents on the record and submissions in similar terms to those
made by Mr Shashore.  Accordingly, he has not deposed to any facts which the
Tribunal is being invited to reject.

36.      On 12 June 2015 the Government served a written Response to P&ID's reply
of 28 May 2015.  We shall call this the "Final Submission" or "FS".

## E.      EVENTS PRECEDING THE GSPA

37.      The following is an account of the events which formed the background to the
GPSA.  It is taken from those parts of the witness statement of Mr Michael Quinn
which have not been contested by the Government. Footnote references are to the
paragraphs of this statement.

(a)      Besides producing oil, an oil well also discharges gas, called "associated gas"
or "Wet Gas".  Wet Gas consists of natural gas combined with liquids (condensate
and a mixture of propane and butane, called "Natural Gas Liquids" or "NGLs").  Wet
Gas is not suitable for power generation but the NGLs can be stripped out of the gas
stream and sold as condensate and Liquid Petroleum Gas, while the remaining dry or
lean gas can be supplied to power stations or for commercial use.[2]

---

[1] Final Submission paragraph 43.

[2] 23-24

(b)     There is a chronic shortage of electric power in Nigeria, causing unemployment and poor economic performance outside the pure oil and gas sector.[3]

(c)     Although the Government has built a number of gas turbine power plants, many stand unused for lack of lean gas feedstock. International oil companies ("IOCs") have for various reasons been unwilling to produce lean gas.[4]

(d)     The Government was anxious to increase the supply of lean gas to the domestic market. In November 2007 it published a Gas Master Plan, designed to encourage investment in the supply and use of gas for power generation and industry.[5]

(e)     P&ID put to the Government a proposal which, shortly stated, was that the Government should supply it with Wet Gas free of charge. It would then process the gas and return the resulting Lean Gas to the Government free of charge and retain the NGLs for its own account.[6] This proposal was in principle accepted by the Government.

(f)     During the negotiation of the GSPA, there was discussion of where the Government would obtain the Wet Gas which it was contracting to supply. Part was expected to come from OML (Oil Mining Lease) 123, which was being operated by Addax Petroleum ("Addax").[7] At the time of execution of the GSPA the Government was constructing the Adanga Pipeline from OML 123 to Calabar, with a throughput capacity of 600 MMSCuFD. It contemplated that this would be sufficient capacity to carry the 150 MMSCuFD required for Phase 1. For Phase 2, some other source was needed. OML 67, operated by Exxon Mobil ("Exxon"), appeared to be a likely source, but would require the construction of an additional length of pipeline. P&ID agreed that if this was needed, it would at its own expense construct a pipeline up to 70 km in length.[8]

## F.     EVENTS SUBSEQUENT TO THE GSPA

38.     The following account of events which followed the signature of the GSPA is again taken from the uncontested parts of the affidavit of Michael Quinn:

(a)     In March 2011 Mr Quinn was informed that Addax was unwilling to supply more than 100 MMSCuFD as it needed 50 MMSCuFD for reinjection to maintain pressure.[9] Mr Quinn wrote to NNPC proposing variation by which P&ID would receive the 150 MMSCuFD of wet gas from the Addax field and return 50 MMSCuFD of *lean gas* to Addax for reinjection. It would thereby still be able to secure the NGLs from 150 MMSCuFD.[10]

---

[3] 26
[4] 27
[5] 35
[6] 65
[7] 86
[8] 92-93
[9] 121
[10] 123

8

(b)     This proposal was not acceptable to NNPC, which suggested instead that P&ID should be supplied with gas from a non-associated gas field.  As such gas would not yield NGLs, the proposal was that P&ID should instead be paid for the lean gas supplied to the Government.[11]

(c)     P&ID was in principle willing to enter into such an arrangement but negotiations progressed slowly.[12]

(d)     Addax (on whose OML the associated gas would be found) was at first willing to agree but in June 2012 withdrew its support.[13]

(e)     On 27 July 2012 Mr Quinn wrote to the Government saying unless a formal amendment had been agreed and executed by 10 August 2012, the offer to amend the GSPA would be withdrawn.[14] No formal amendment was executed.

(f)     On 22 August 2012 P&ID delivered the Request for Arbitration.

## G.     THE ISSUES

39.     The issues raised by the Government in its Statement of Defence, the written submissions ("WS") supplied to the Tribunal by Mr Shashore for the purposes of the hearing, and the Final Submission are as follows:

(a)     Did the Government have authority to enter into the GSPA?[15]

(b)     Was the Government's obligation to supply Wet Gas limited to such as Addax and Exxon were willing to provide?[16]

(c)     Did the Government have any obligations under the GSPA before it commenced the supply of Wet Gas?[17]

(d)     Was the Government's obligation to supply Wet Gas conditional upon the Claimant having previously constructed the gas processing facilities?[18]

(e)     Was the GSPA vitiated by a misrepresentation by P&ID or a mistaken belief on the part of both Parties that the OMLS contained 250 MMSCuFD[19] or 400MMSCuFD[20] of Wet Gas?

(f)     Was the GSPA frustrated by the refusal of Addax to provide Wet Gas?[21]

---

[11] 126
[12] 130
[13] 133
[14] 149
[15] Defence paragraphs 1 and 2; WS paragraphs 8-16; FS paragraphs 2-36.
[16] Defence paragraphs 4 and 14; WS 37-49; FS paragraphs 44-45.
[17] Defence paragraph 6; WS paragraphs 70-74
[18] Defence paragraph 7; WS paragraphs 17-36 and 75; FS paragraphs 46-49.
[19] Defence paragraphs 8-9; WS paragraphs 50-58
[20] Defence paragraph 10; WS paragraphs 59-64
[21] Defence paragraph 12.

(g)    Was the Government discharged by force majeure?[22]

(h)    Is the validity of the GSPA affected by the P&ID's alleged motives for entering into it?[23]

(i)    Is the validity of the GSPA affected by the P&ID's alleged lack of a legitimate expectation that the Government would be able to perform its obligations?[24]

(j)    Was the GSPA void as illegal or contrary to public policy?[25]

(k)    Did the GSPA become extinct by the P&ID's acceptance of a bilateral offer?[26]

40.    We shall discuss each of these issues in turn.

## H    DISCUSSION

### (a)    Capacity

41.    It was clear from the argument at the oral hearing on 2 June 2015 and even clearer from the Government's subsequent written Response that great stress is laid upon the lack of capacity of the Minister of Petroleum Resources to enter into the GSPA on behalf of the Government. The Government's submission described the holder of the office at the time of the GSPA as having been a "friendly" Minister who purported to commit the Government to obligations and concessions which exceeded his powers.

42.    The question of capacity to enter into the GSPA was raised by way of preliminary objection and considered by the Tribunal in its first Part Final Award. At that stage, however, the objection took a rather different form. It was argued that the Ministry of Petroleum Resources was not a juristic person and therefore unable to enter into contracts. The Tribunal decided that the contracting party was the Federal Government of Nigeria, on whose behalf the GSPA said the Minister was acting. The Government was admittedly a juristic person capable of entering into contracts. The powers being exercised were the executive powers of the Government, vested in the President but exercisable on his behalf in accordance with sections 5(1) and 147 of the Constitution.

43.    Mr Andrew submitted that, as a result of the first Part Final Award, the question of the Minister's capacity to enter into the GSPA on behalf of the Government was *res judicata* or, alternatively, that the present form of objection should have been raised at the time and that it would be an abuse of process to take

---

[22] Defence paragraphs 13-14, WS 65-69
[23] Defence paragraphs 15
[24] Defence paragraphs 17 and 18; WS paragraphs 86-91
[25] Defence paragraph 21; WS paragraphs 92-101
[26] Defence paragraph 20; WS paragraphs 82-85

the point now. We think that the argument now put forward is not the same as that which the Tribunal considered in the first Part Final Award and therefore not *res judicata*. As for abuse of process, we would agree that if the first Part Final Award had been intended to deal with all questions of capacity, the Government should not be allowed to raise the question of capacity again. But the Preliminary Objections with which the Tribunal dealt at that stage were only points which the Government had selected as providing it with a defence which did not involve looking into the merits and we do not think that they precluded the Government from raising different points later.

44.     Mr Shashore's submission was that the Minister of Petroleum Resources lacked the capacity to commit the Government to the sale of gas and the other privileges and concessions granted by the GSPA. Prima facie, it would appear to us that dealing with natural gas from Nigerian oil fields was a matter within the remit of the Minister of Petroleum Resources. Section 1(1) of the Petroleum Act[27] provides that "the entire ownership and control of all petroleum in, under or upon any lands to which this section applies shall be vested in the State." Petroleum is defined to include natural gas and the section applies to Nigeria and the sea offshore. The power to grant licences to prospect for and develop oil and gas and to sell or otherwise deal in oil and gas is vested in the Minister of Petroleum Resources.[28] As we have seen, recitals (b) and (c) to the GSPA explained the Government's access to the gas it was proposing to supply to P&ID:

> b)     The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators

> c)     The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allotted to the international operators.

45.     It appears to us that *prima facie* it was a matter for the Government acting by the Minister of Petroleum Resources to deal with these gas resources which belonged to the State under section 1 of the Petroleum Act.

46.     It is of course true that if there was legislation which specifically allocated exclusive responsibility for entering into contracts for the supply of such gas to some other body or Ministry, it would not be within the power of the Minister of Petroleum Resources to enter into a contract such as the GSPA. Mr Shashore referred us to a number of cases in support of this proposition,[29] which we accept. He also cited in support *Knight, Frank Rutley v Attorney General of Kano State*[30], in which the Court

---

[27] 1990, Chap P10.
[28] Sections 2(1) and 4(1).
[29] *Eleso v Government of Ogun State* [1990] 2 NWLR at 443; *P.H.M.B. v Ejitagha* [2000] 11 NWLR (Pt. 677) at pp. 163-70; *Oikherhe v Inwanfero* [1997] 7 NWLR (Pt. 512) at p. 247; *Emuze v Chancellor* [2003] 8 M.J.S.C. at p. 16.
[30] [1990] 4 NWLR (Pt. 142) 210

of Appeal decided that upon the true construction of the Constitution, the exclusive power to value tenements for rates was vested in the Local Government Council. It was therefore *ultra vires* for the Kano State Government to contract with Knight, Frank Rutley to carry out such a valuation.

47.     In Mr Shashore's first written submissions, his candidate for a body with "the exclusive right to possess and supply gas" was the Nigerian National Petroleum Corporation ("NNPC")".

48.     Before entering into question of whether statute had conferred such exclusive rights on the NNPC, we should observe that the objection is technical in the highest degree. Pursuant to a Memorandum of Understanding which preceded the GSPA[31], a Joint Operating Committee ("JOC") was established to "discuss in detail regarding the implementation of the Project." The Legal Director of the NNPC was a member of the JOC.[32] Dr Lukman, the Minister of Petroleum Resources who signed the GSPA, was chairman of the NNPC.[33] The Board of Directors of the NNPC were members of or appointed by the Government.[34] If the Minister thought (as he must have done) that the GSPA was in the public interest, there would have been no difficult in making the NNPC a party.

49.     Be that as it may, and looking at the technicalities of the matter, we do not think there is anything in the constitution and powers of the NNPC to prevent the Government from entering into a contract to provide Wet Gas. Section 5 of the Nigerian National Petroleum Corporation Act sets out the *duties* of the Corporation:

> 5.   (1)      Subject to the provisions of this Act, the Corporation shall be charged with the duty of-
>
> (a)         exploring and prospecting for, working, winning or otherwise acquiring, possessing and disposing of petroleum;
> (b)         refining, treating, processing and generally engaging in the handling of petroleum for the manufacture and production of petroleum products and its derivatives;
> (c)         purchasing and marketing petroleum, its products and by-products;
>
> (d)         providing and operating pipelines, tanker-ships or other facilities for the carriage or conveyance of crude oil, natural gas and their products and derivatives, water and any other liquids or other commodities related to the Corporation's operations;
> (e)         constructing, equipping and maintaining tank farms and other facilities for the handling and treatment of petroleum and its products and

---

[31] Article 8 a)
[32] Quinn Witness Statement, paragraph 80.
[33] Nigerian National Petroleum Company Act, section 1(3).
[34] Ibid., section 1(2).

derivatives;

(f)      carrying out research in connection with petroleum or anything derived from it and promoting activities for the purpose of turning to account the results of such research;

(g)      doing anything required for the purpose of giving effect to agreements entered into by the Federal Government with a view to securing participation by the Government or the Corporation in activities connected with petroleum;

(h)      generally engaging in activities that would enhance the petroleum industry in the overall interest of Nigeria; and

(i)      undertaking such other activities as are necessary or expedient for giving full effect to the provisions of this Act.

50.    None of these duties can be regarded as conferring exclusive powers. In fact, sub-paragraph (g) specifically contemplates that the Government will be entering into contracts within the scope of the NNPC's remit.

51.    In his oral submissions and written Final Submission, Mr Shashore submitted that the body with exclusive powers was the Ministry of Energy. These powers, he said, were derived from the National Gas Supply and Pricing Policy, published by the Government in 2008, and the National Domestic Gas Supply and Pricing Regulations 2008.

52.    The main object of the Policy was to make more gas available for the "strategic domestic sector", including in particular the generation of electricity. The policy document points out that Nigerian (wet) gas is rich in liquids –

"such that the residue (lean) gas can be delivered at relatively little or no cost as the project remains profitable to the supplier on the strength of the liquids contract alone."

53.    This of course was the business model which P&ID was proposing to the Government. The Policy proposes legislation by way of implementation (a "Downstream Gas Act"), but there is nothing in the document which allocates responsibility to any particular Ministry.[35] The Regulations create Department of Gas within the Ministry of Energy and confer upon it certain regulatory powers but nothing to suggest that it will enter into the business of selling gas, still less that it will have the exclusive power to do so.

54.    It therefore appears to us that the Ministry of Petroleum Resources was an appropriate entity to enter into the GSPA on behalf of the Government and we reject the submission that it lacked the authority to do so.

---

[35] It is interesting to notice that the Regulations were made by the President as Minister of Energy under a rule-making power conferred by section 9 of the Petroleum Act upon the Minister of Petroleum Resources.

**(b)      Specific or unascertained Wet Gas?**

55.     Mr Shashore submits that the contract was for the supply of Wet Gas from OML 123 (Addax) and OML 67 (Exxon).  He draws attention to Recital (i), which states that P&ID had "undertaken all necessary studies, including the identification of suitable associated gas fields".  These were OML 123 and OML 67.  P&ID located its proposed plant in a place convenient for receiving Wet Gas from OML 123 and offered to construct a new length of pipeline to bring gas from OML 67.  In the course of negotiations P&ID wrote letters to the Minister of Petroleum Resources identifying OML 123 and OML 67 as fields from which its requirements of Wet Gas could be satisfied.  It follows, he says, that the contract was for the supply of Wet Gas from OML 123 and 67.

56.     The difficulty is that this is not what the GSPA says.  Article 6 a) says that the responsibility of the Government is to deliver to the Site boundary "the agreed quantities and quality of gas as defined under Article 3c and in the manner set out in Appendix A…"  Appendix A specifies quantities and quality but says nothing about where the gas should come from.  Article 3c, under the heading "Scope of the Work" says that the gas would be from OMLs 123 and OML 67 "or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements…"

57.     It is clear from these provisions that although the parties regarded OML 123 and 67 as the most likely source of Wet Gas for P&ID's plant, there was no contractual term that it should have to come from those fields and nowhere else. The Government was at liberty to discharge its obligation to supply Wet Gas from any of the substantial sources which recital b) said were at its disposal.

58.     It is therefore unnecessary for us to decide whether, if the contract had been for the supply of Wet Gas specifically from those two fields, the unco-operative attitude of Addax and Exxon would have excused the Government from performance throughout the life of the agreement. That may have been a large question on which we have little evidence.  In our opinion, however, this was a contract for the supply of unascertained Wet Gas and therefore the Government's inability to obtain it from OML 123 or OML 67 is not relevant.

**(c)      When did the Government's obligations begin?**

59.     Article 5 says "the Agreement shall come into being on the Effective Date". The duration of the Agreement is (subject to extension) 20 years "with the effect from the Start Date", which is defined to mean the earliest date on which the Government starts to deliver the Phase 1 quantities of 150 MMSCuF of Wet Gas.

60.     The Government obligations which P&ID says it has failed to perform and which constituted a repudiatory breach are those in Article 6 a) and b): to deliver the gas to the Site boundary and to ensure that all the necessary pipelines and infrastructure and arrangements with Third Parties are in place to "facilitate the timely implementation of gas processing".

61.     Mr Shashore submits that the Government's obligations commenced only at the "Start Date", that is, when it first started to deliver gas. In other words, it was under no obligation to deliver gas until it had started to deliver gas.

62.     This extraordinary proposition is in our opinion the result of a misunderstanding about the significance of the term "Start Date". Its sole function is to determine the duration of the contract and to ensure that P&ID's 20 year franchise is not to be reduced by the Government's delay in starting to deliver gas. But the obligations of the Government under Article 6 b) began on the Effective Date, when the contract took effect. That was the date on which it was signed.

**(d)     Did the Government not have to do anything till the GPFs had been built?**

63.     Mr Shashore submits that the Government had no obligation to deliver gas until there was a plant to receive it. That, no doubt is true, but the Government's obligations were not confined to the delivery of gas. By Article 6 b) it was also obliged to –

> "ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement."

64.     There is nothing in the GSPA to suggest that these obligations were conditional upon the completion by P&ID of the construction of the GPFs. It would have been commercially absurd for P&ID to go to the expense of building GPFs when the Government had done nothing to make arrangements for the supply of the Wet Gas.

65.     In his oral argument and written Final Submission, Mr Shashore put forward a modified version of this argument. Article 3(c) said that the Government was to deliver the gas at "the Site Boundary". The "Site" was defined as "the land at Calabar on which the GPFs are located". Mr Shashore says that the Government could not have complied with this obligation until P&ID had a site. It had, it is true, been allocated and offered a site but had not yet bought it. So there was no possibility of compliance with an obligation to deliver to the Site boundary until P&ID has a Site.

66.     We think this argument takes the matter no further than the first version. Of course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it. But that does not excuse the Government's failure to comply with 6 b). There is no suggestion that its failure to comply with those obligations was caused by uncertainty as to where the Site was going to be. It was assumed by everyone that it would be on the land allocated in Calabar.

**(e)    Misrepresentation or mistake**

67.    The Government next submits that it was induced to enter into the GSPA by a false representation that OML 123 had at least 180 – 200 MMSCuFD or at any rate over 150 MMSCuFD or alternatively that it was the subject of a common mistake and that "the GSPA was therefore void and unenforceable from inception."[36]

68.    One of the difficulties about these defences is that the Government has called no evidence to support them.  The only witness statement submitted on behalf of the Government is that of Mr Ikechukwu Oguine, a lawyer who works for NNPC and who does not claim to have first-hand knowledge of any of the relevant events.  All he says is that he has read the documents.  His reading of the documents appears to have been somewhat imperfect because, in alleging misrepresentation, he had read the statement in Article 8 g) that "the Adanga pipeline…will have a throughput capacity of 600 MMSCuFD" to mean that "OML 123 [will] contain…600 MMSCuFD", which he says was untrue.  Perhaps it was, but that was not what Article 8 g) said.

69.    The allegations of misrepresentation (and reliance thereon by the GSPA) therefore depend upon such inferences as can be drawn from the documents and the evidence of Mr Quinn.

70.    Mr Quinn said in his witness statement:

> "51.…[T]here were numerous natural gas fields off the coast of Calabar, such as those contained in [OML 123 and OML 67]…
>
> "52.  From information available in the public domain and from our own researches it was clear that there was more than enough Wet Gas off the coast of Calabar to support a gas stripping and propylene plant operation in the Calabar area processing a Wet Gas throughput of 400 MMSCuFD…
>
> 73.    There were discussions about the possible locations from which to source Wet Gas for the Project.  On 15 June I wrote to the Honourable Minister to explain the potential benefits of using, for Phase 1, the 180-200 MMSCuFD of Wet Gas which was at that time being flared by Addax Petroleum off the coast of Calabar in a concession known as OML 123.
>
> 84.    [In September 2009] a series of meetings commenced, some of which included *"stakeholders"* such as P&ID, the Government and Addax, some of which were between P & ID and Addax, and, I believe, some of which were between the Government and Addax.

---

[36] Shashore Written Submissions paragraph 51.

> 86.    [At a meeting chaired by Engineer Tijani, technical
> adviser to the Ministry, on 13 November 2009] …Addax
> Petroleum confirmed their willingness to deliver 100
> MMSCuFD of natural gas from the 168 MMSCuFD Wet
> Gas that they were currently flaring to the P&ID site…to
> comply with its domestic obligations."

71.    It appears from this evidence that in June 2009 Mr Quinn wrote to the
Minister saying that Addax were flaring 180-200 MMSCuFD and that in November
Addax said they were flaring 168 MMSCuFD.   Both of these may have been right,
but even if Mr Quinn's estimate was wrong, we cannot infer that the Government
relied upon it when entering into the contract.   Addax was the concessionaire and best
placed to know how much gas was available. It was making regular returns to the
NNPC.  The Government had been having meetings with Addax and other
stakeholders and at the 13 November meeting Addax provided its own estimates.
Accordingly, the evidence does not support the conclusion that the Government relied
upon a misrepresentation by P&ID as to the gas which could be obtained from OML
123.

72.    For the same reasons, there is no evidence to support the conclusion that the
Government made a mistake.  As a result of its meetings with Addax, it is likely that it
knew exactly how much gas was available.  It is therefore unnecessary to decide
whether the mistake was such as to vitiate the contract or one of which the
Government took the risk.  Prima facie we think that it is the obligation of a party
who offers to provide something to ensure that it is there to be provided and that he
cannot rely upon his mistake if this turns out not to be the case.

**(f)     Frustration**

73.    The Government next says that the contract became impossible of
performance when Addax refused to provide the necessary 150 MM SCuFD of Wet
Gas.   But there is no evidence that the contract was incapable of performance. All we
know is that Addax and Exxon were unco-operative.  But there is nothing to show that
upon suitable terms the Government could not have obtained gas from their fields, as
provided for an contemplated in Article 3 c) under the heading "Scope of the Work".
In any case, our finding that the GSPA, upon its true construction, was for the supply
of specified quantities and qualities of unascertained gas, must be fatal to a claim of
frustration. There is nothing to show that the Government could not have obtained the
gas from the other sources mentioned in recitals b) and c).

**(g)     Force majeure**

74.    In its first written submissions the Government relied upon the *force majeure*
clause but Mr Shashore abandoned this submission at the hearing.  We think he was
right to do so.

**(h)     The profit motive**

75.     The Government said, in its Statement of Defence[37], and Mr Oguine said in his witness statement[38] that P&ID was motivated by the wish to make a profit. It is unusual for anyone to enter into a business transaction for any other purpose and Mr Shashore said at the hearing that he did not rely upon this feature as a defence.

**(i)     Legitimate expectation**

76.     The Government's submissions contain numerous references to the concept of legitimate expectations. It is said that P&ID could not have had a legitimate expectation that the Government would do all the things it had promised to do in the GSPA. Some of these (such as the ability to obtain gas from OMLs operated by Addax and Exxon) are irrelevant once it is appreciated that the contract was for the supply of Wet Gas from any source and not from any particular OML. Others, like the grant of "Pioneer status", are not presently in issue and the Government's powers in that respect have not been investigated. But we think that the references to legitimate expectations and the citation of public law cases on the subject demonstrate a serious confusion between public and private law. A body exercising public law functions may have a duty in public law, enforceable by public law remedies, to act in accordance with the legitimate expectations of persons who may be affected by its acts or omissions. But although one party to the GSPA was the Government, it was nevertheless a contract, enforceable as a matter of private law. P&ID's rights are rights to the enforcement of the contract or compensation for its breach, exactly as if the other party had been a private person. In this situation, the concept of legitimate expectations has no role to play.

**(j)     Illegality and public policy**

77.     Finally, the Government claims that the GSPA was illegal and contrary to public policy. The grounds appear to be that the Government promised various permits, licences and approvals and "Pioneer status" (carrying exemption from various taxes and duties) for 5 years which were not within the remit of the Ministry of Petroleum Resources. However, as we explained in our first Part Final Award, the GSPA was not a contract with the Ministry of Petroleum Resources. It was a contract with the Federal Government of Nigeria. It may at some stage become an issue as to whether the Government can avoid liability for such matters as the grant of Pioneer status on the ground that some approval or consent internal to the Government had not been obtained. But no such issue arises at the moment. We do not think that the Government has demonstrated any ground upon which it can be said that the GSPA was unlawful or contrary to public policy.

**Conclusion**

78.     We therefore reject all the defences put forward by the Government and find that it repudiated its obligations under the GSPA. P&ID was entitled to terminate the

---

[37] Paragraph 2
[38] Paragraph 24

contract on 20 March 2013 and claim damages for the Government's failure to perform.

## I.   COSTS

79.     Article 20 of the GSPA provides that in the event of an arbitration, each party shall bear its own lawyers' fees but that the costs of the arbitration (i.e. fees of the tribunal, hire of the arbitration room, shorthand writers' fees and other such administrative costs of the parties) shall be borne equally by the parties.

## J.  DISPOSITION

80.     We, Leonard, Lord Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans, having read the parties' written evidence, pleadings and submissions and having heard their oral submissions, and having carefully considered the same and for the reasons stated above, make our second Part Final Award as follows:

(1)     We declare that –

    (a)     The Government repudiated the GSPA by failure to perform its obligations under Articles 6 a) and b) thereof;

    (b)     P&ID was entitled to and did accept the Government's repudiation on 20 March 2013;

    (c)     P&ID is entitled to damages (in an amount to be assessed) for the Government's repudiation of the GSPA;

    (d)     The parties are jointly and severally liable for the unpaid costs of the arbitration and that a party which has paid or pays more than an equal share of such costs is entitled to recover the excess from the other party.

(2)     We order the parties to consult with each other and the Tribunal to agree upon a procedure and date for hearing to determine the amount of damages to which P&ID is entitled;

(3)     We reserve to ourselves for later decision all other matters in dispute in the reference.

Place of arbitration:  London, United Kingdom.

Signed:

Leonard, Lord Hoffmann

19

Chief Bayo Ojo SAN

Sir Anthony Evans

## ANNEXURE

**THIS GAS SUPPLY AND PROCESSING AGREEMENT** is entered into this 11th day of January 2010

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES FOR AND ON BEHALF OF THE FEDERAL GOVERNMENT OF NIGERIA (FGN)** (hereinafter referred to as "the Government")…of the first part

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED** (hereinafter referred to as "P&ID") of the other part

**WHEREAS:**

a) The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

b) The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators

c) The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allotted to the international operators.

d) The Government desires to develop and utilize [its] gas resources at optimal capacity to meet the growth in gas demand at the various sectors of the economy including domestic, regional and export markets;

e)      The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

f)      The Government has explored viable structures that could be used to meet the highlighted objectives and considered P&ID as capable of implementing and executing the Project;

g)      The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic uses.

h)      P&ID possesses the requisite finance, technology and competence for the fast track development of the Project.

i)      P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the [Project] in accordance with the terms of this Agreement.

j)      The Parties are entering into this Agreement to ensure the fast track implementation of the Project and to ensure the timely provision of pipeline quality Lean Gas for power generation.

**IN CONSIDERATION OF THE MUTUAL RIGHTS, INTERESTS, COVENANTS AND OBLIGATIONS CONTAINED HEREIN IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:**

**1.      DEFINITIONS AND INTERPRETATIONS**

iv.     "Effective Date" means the date of signing of this Agreement;

v.      "GPFs" means the Gas Processing Facilities to be constructed and operated at the Site and off-shore from the Site where applicable;

vi.     "Lean Gas" means pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane.

vii.   "MMSCuFD" means Millions of Standard Cubic Feet per Day

xi.   "Project" means the establishment of the GPFs and the supply of Wet Gas thereto and the delivery of Lean Gas and their successful operation by the Parties as set out in this Agreement

xiv.   "Site" means the land in Calabar on which the GPFs are located

xv.   "Start Date" means the earliest date on which the Government commences the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site;

xvi.   "Wet Gas" means associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site.

## 2.   OBJECTIVE

The objective of this Agreement is to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of Wet Gas by the Government and the processing of the said Wet Gas by P&ID utilising two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner.

## 3.   SCOPE OF THE WORK

The scope of works of this Agreement is as follows:

a.   P&ID shall construct GPFs on the Site allocated to them by Cross River State Government...   The GPFs shall be constructed on a timely basis to ensure the earliest possible delivery to the Government, or its nominees, of approximately 340 MMSCuFD Lean Gas for power generation and industrial use by third parties.

b.    To ensure this [fast track] is achieved P&ID will construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD...in accordance with the schedule of works forming Appendix B hereto.

c.    The Government shall make available at the P&ID Site boundary, 400 MMScuFD Wet Gas (free of water) in the manner set out in Appendix A having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8 mol from OMLs 123 and OML 67 or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of this Agreement as defined under Article 5 of this Agreement.

d.    P&ID will process the Wet Gas to be supplied by the Government and shall provide to the Government or its nominees approximately 85% of the wet gas feedstock molecular volume in the form of Lean Gas at the Site Boundary.

## 5.    DURATION OF THE AGREEMENT

This Agreement shall come into being on the Effective Date being the date of signing of the Agreement as defined in Article 1 herein and shall remain in force for a period of twenty (20) years with effect from the Start Date of the Agreement...

## 6.    RESPONSIBILITIES OF THE GOVERNMENT

a)    The Government shall deliver to the Site boundary the agreed quantities and quality of gas defined under Article 3c and in the manner set out in Appendix A to this Agreement;

b)    The Government shall ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.

c)    The Government agrees to assist P&ID, and where necessary to intercede with the relevant Government agencies, to obtain all requisite permits, licences and

approvals required from the relevant Government agencies and others for the [fast track] implementation of this [Project].

## 7.   RESPONSIBILITIES OF P&ID

a)     P&ID shall use best endeavours to ensure the [fast track] implementation of this Project to construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD...   Thereafter P&ID shall maintain and operate the GPFs on a professional basis to ensure a regular supply of Lean Gas (approximately 340 MMSCuFD) for power generation.

## 8.   COMMERCIAL TERMS

a)     The Government shall deliver to the Site boundary 400 MMScuFD of Wet Gas as set out in Article 3 c) and in Appendix A of this Agreement having a minimum of $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) of 1.8% mol at No Cost to P&ID.

b)     P&ID will process the Wet Gas, recompress the residual Lean Gas, representing approximately 85% of the Wet Gas feed, and make it available, for power generation or other industrial usage at the discretion of the Government, at the Site boundary at No Cost to the Government.

e)     As further consideration P&ID shall transfer to the Government or its nominee a total of ten percent (10%) of the Equity of P&ID...

g)     The Parties are aware that the 24 inch Adanga pipeline presently under construction from the Addax operated OML 123 directly to Calabar and due for completion in 2010 will have a throughput capacity of 600 MMSCuFD  and can adequately provide the first required delivery of 150 MMSCuFD of Wet Gas to the Site and that an additional pipeline of up to 70 km in length may be required to link up the Adanga pipeline in order to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas to the site from other sources to be chosen by the Government.  If such a requirement is necessary, P&ID undertakes to build and install the said additional pipeline to provide for the delivery of the remaining 250MMSCuFD of Wet Gas to the Site, at no cost to the Government, and P&ID will retain the ownership and provide the maintenance for the pipeline.

24

## 11. FORCE MAJEURE

a)     Any failure or delay on the part of either Party in the performance of its obligations or duties under this Agreement, shall be excused to the extent attributable to force majeure save for obligations to pay sums due and payable.  A force majeure situation includes delays, defaults or inability to perform under this Agreement due to any event beyond the reasonable control of either Party. Such event may be, but is not limited to, any act, event, happening, or occurrence due to natural causes, acts or perils of navigation, fire, hostilities, war (declared or undeclared), blockage, labour disturbances, strikes, riots, insurrection, civil commotion, quarantine restrictions, epidemics, storms, floods, earthquakes, accidents, blowouts, lightning, and acts of or orders of the Government.  If activities under this Agreement are delayed, curtailed or prevented by force majeure, then the time for carrying out the obligation and duties thereby affected, and rights and obligations hereunder, shall be extended for a period equal to the period of such delay.

b)     The Party who is unable to perform its obligations as a result of the force majeure event shall promptly notify the other Party thereof not later than forty-eight (48) hours after becoming aware of the establishment of the force majeure event, stating their cause, and both parties shall do all that is reasonably within their powers to remove such cause.

## 15.   CHANGES TO AGREEMENT

No amendments, modifications or changes to this Agreement shall be valid unless approved in writing by both parties.

## 21.   ENTIRE UNDERSTANDING

This Agreement including Appendix A and Appendix B comprises the full and complete understanding of the Parties hereto with respect to all the matters addressed in this Agreement and the said Appendix A and Appendix B shall form an integral part of this Agreement.

### APPENDIX A

**Delivery of Wet Gas to P&ID**

Phase 1      During or before the last quarter of 2011 a continuous supply of 150 MMSCuFD of Wet

Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

Phase 2    On or before the third quarter of 2012 a further additional continuous supply of 250 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

**Delivery of Lean Gas to the Government**

Phase 1    During the last quarter of 2011 following supply of the 150 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided.  The Lean Gas will be compressed to 92 bar G.

Phase 2    On or before the third quarter of 2011 following supply of the additional 250 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.



# Claim Form
## (arbitration)

NOT FOR SERVICE

**In the**
COMMERCIAL COURT

| | for court use only |
|---|---|
| **Claim No.** | CL - 2015 - 000917 |
| **Issue date** | 23 | 12 | 15 |

SEAL
2 3 DEC 2015

## In an arbitration claim between

**Claimant**

The Ministry of Petroleum Resources of the Federal Republic of Nigeria
Block D, 11th Floor, NNPC Towers
Herbert Macaulay Way, Central Business District
Abuja, Nigeria

**Defendant(s)**

Process and Industrial Developments Limited
Trident Chambers, P.O. Box 146, Road Town
Tortola, British Virgin Islands
Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria.

## In the matter of an [intended] arbitration between

**Claimant**

The Ministry of Petroleum Resources of the Federal Republic of Nigeria

**Respondent(s)** *Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

Process and Industrial Developments Limited (Claimant in the arbitration proceedings)
Trident Chambers, P.O. Box 146, Road Town
Tortola, British Virgin Islands
Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria.

Other persons required to be served with this Claim Form pursuant to CPR Part 62:

(1) Lord Leonard Hoffman (Presiding arbitrator in the arbitration proceedings)
Brick Court Chambers, 7-8 Essex Street, London WC2R 3LD. U.K. (leonard.hoffman@brickcourt.co.uk)

(2) Sir Anthony Evans (Party-appointed arbitrator in the arbitration proceedings)
24 Lincoln's Inn Fields, London WC2A 3EG. U.K. (atighe@essexcourt.net)

(3) Chief Bayo Ojo (Party appointed arbitrator in the arbitration proceedings)
ITF House, 4th Floor, No. 6 Adetokunbo Ademola Crescent, Wuse 2, Abuja, Nigeria. (cabayoojo@aol.com)

| Defendant's name and address | Process and Industrial Developments Limited (Claimant in the arbitration proceedings) Trident Chambers, P.O. Box 146, Road Town Tortola, British Virgin Islands Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria. *Service address:* SC Andrew LLP | [ ]  This claim will be heard on:<br><br>at      am/pm<br><br>[ ]  This claim is made without notice. |
|---|---|---|

The court office at
When corresponding with the court, please address forms or letters to the Court Manager and quote the case number

N8 Claim form (arbitration)
This form is reproduced from http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v1.0

Napier House,
24 High Holborn
London WC1V 6AZ
UK
DX 248 London/Chancery Lane

| Claim No. | |
|---|---|

Remedy claimed and grounds on which claim is made

REMEDY CLAIMED

1.

An order under Part 62.9(1) of the Civil Procedure Rules extending the 28-day time period under section 70(3) of the Arbitration Act 1996 in which to apply to the Court under section 68 of the Arbitration Act. (Draft order attached). The Claimant seeks the extension of time on the grounds that:

    a. As an arm of the Federal State of Nigeria, during a period of Governmental transition between March 2015 and November 2015, the Claimant was unable promptly to progress the consideration of and preparation for the current application within the 28 day period

    b. Once the internal impediments arising from a change of administration over the summer of 2015 were dealt with (and a new Attorney General in post at at 11 November 2015) the Claimant has moved expeditiously to bring the current application.

    c. If the extension were granted, the Defendant would not suffer any or any irremediable prejudice if this application proceeded (in particular, given that the Claimant is co-operating fully with the ongoing preparations for the future quantum hearing (which hearing is unlikely to come on prior to the disposal of the current application - assuming permission were granted); and/or

    d. Given the size of the sums at stake (and their further substantial growth since the making of the Award), it would be unjust to the Claimant for it to be denied the opportunity of having the application determined, above all by reason of the fact that there is merit in its application and/or that the amount claimed against the Claimant (which was already substantial at the date of the Award and (since the Award) has increased from US$ 6.7 bn to US$ 8.6 bn.

2. An order setting aside and/or remitting for further consideration all or part of the arbitration award of Lord Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated July 2015(the **"Award"**) under section 68(2)(d), alternatively under section 68(2)(f) of the Arbitration Act 1996, as further set out in detail below, together with, or otherwise such order under the Arbitration Act 1996, as may be appropriate, on the grounds identified below:

In brief severally or in combination, the said irregularities identified below amount to serious irregularities within the meaning of s 68(1) of the 1996 Act, in that they either (i) make the difference between a finding of liability or not or (ii) (at the least) fundamentally alter the nature and scope of the damages enquiry. The magnitude of the financial seriousness of the implications of each of the above challenges is clear. Equally, in terms of the arbitral process, the subject-matter of each of the proposed challenges goes to issues of principle (not detail), which are central to critical findings of liability, ie what breach, seriousness of breach, and rescission. As to quantum, the critical point is whether the breach was of a provision which did not of itself bring a liability to deliver gas (ie cl. 6(b)) or one that did (ie Cl 6(a)). The point here is that if there was (as the Tribunal found – at least at one point – no breach of Cl. 6(a)), any quantum enquiry regarding a cl 6(b) breach would in the first instance turn on (*inter alia*) whether or not (or when) a plant would have been successfully built by the Defendant. On that basis, it may be that no loss and damage at all was suffered.

The detailed grounds are as follows: [see separate sheets]

| Claim No. | |
|---|---|

Relief claimed, in detail and in the alternative

1   In the event that the application succeeds in one or more respects, the following orders are sought:

2   Insofar as the application succeeds on Ground A, the Award should (i) be set aside in part – namely the contents of dispositive paragraph [80](1)(a) of the Partial Final Award (save for the conclusion that there was a breach by the Ministry of cl 6(b)) [ 'the Conclusion']; (ii) alternatively, the Conclusion (save for holding in respect of the cl 6(b) breach) should be declared to be of no effect; (iii) (in the further alternative) the Award should be remitted for further consideration of the Conclusion.

3   Insofar as the application succeeds on Ground B, the Award should be remitted for further consideration of the issue of fact as to whether the Ministry had authority as a matter of fact (as opposed to capacity as a matter of law) to conclude the alleged contract.

4   Insofar as the application succeeds on Ground C, the like relief is sought as under Ground A above.

5   Together with such further or other order as is just, including an order for costs.

**Statement of Truth**

~~*(I believe)~~(The Claimant believes) that the facts stated in these particulars of claim are true.

\* I am duly authorised by the claimant to sign this statement

Full name _____ Kamal Rasiklal Shah

Name of claimant's solicitor's firm _____ Stephenson Harwood LLP

signed _____ position or office held _____Partner

_____~~*(Claimant)~~(Claimant's solicitor)          (if signing on behalf of firm or company)

*delete as appropriate

Stephenson Harwood LLP
1 Finsbury Circus
London
EC2M 7SH
Attn: Kamal Shah, Stephen Ashley, Jide Adesokan

Claimant's or claimant's solicitor's address to which documents should be sent if different from overleaf. If you are prepared to accept service by DX, fax or e-mail please add details.

## GROUNDS

### Introduction

1   The Defendant (hereinafter **"PIDL"**) alleges the existence of a Gas Supply and Processing Agreement dated 11 January 2010 (the **"GSPA"**) with the Ministry of Petroleum Resources of the Federal Republic of Nigeria ['the Ministry'] whereby the Ministry allegedly agreed to construct certain infrastructure in Nigeria, with a view to using it to make available to PIDL 400 MMScuFD of Wet Gas for a term of 20 years in return for which PIDL agreed to construct Gas Processing Facilities (**"GPFs"**) at a delivery site in Nigeria order to receive delivery of and then to process the Wet Gas and to return approximately 85% by volume to the Ministry in the form of Lean Gas, being at liberty to dispose of the balance    This was essentially a barter transaction, allegedly made directly by a Federal Nigerian Ministry and a BVI registered company.

2   By Notice of Arbitration dated 22 August 2012, PIDL commenced arbitration (the **"Arbitration"**) against the Ministry alleging that the Ministry was in breach of the GSPA repudiated the GSPA. The allegation of repudiatory conduct was one based on a failure to perform.

3   As of today, the damages claimed by the Defendant are alleged to be US$ 8,627,000,000.

4   On 1 June 2015, a hearing took place at the International Disputes Resolution Centre in London.   The hearing was restricted to issues of liability.  Issues of quantum (if any) were postponed.

5   On 17 July 2015, the Tribunal issued the Award.  The reference to "July 2014" on the front page of the Award is incorrect. The Award was issued to the Claimant by email on the date of issue.

6   In the dispositive part of its Award, the Tribunal declared, *inter alia*, that PIDL was entitled to damages (in an amount to be assessed) in respect of certain specified breaches by the Ministry of the GSPA, which breaches it also held to be cumulatively repudiatory, and thus entitling PIDL to rescind

7       The following three heads of challenge each disclose a serious irregularity within the meaning of s 68 of the 1996 Act.

Ground A: internal inconsistency, successful defence not acknowledged in dispositive paragraph

8       The dispositive paragraph (para [80]) of the Award is *ex facie* inconsistent with the conclusions of the Tribunal in the related passages of its reasoning.  The focus is specifically on the following sentence of the dispositive paragraph, namely '*We declare that (a) the Government repudiated the GSPA by its failure to perform its obligations under Article 6 a) and b) thereof.*'.

9       The Tribunal set out the two clauses referred to therein in the attachment to the Award).  They were (respectively):

10     Art. 6(a): an obligation on the part of the Government to deliver certain agreed quantities of gas to the Site boundary;

11     Art. 6(b): an obligation on the part of the Government to ensure that all necessary pipelines and associated infrastructures were in place to facilitate performance of the Claimant's obligation to supply and deliver Wet Gas in accordance with Art. 3

12     A breach of each clause was alleged.  In both cases, the alleged breaches were denied.

13     The issue of possible breaches, and of which provision (or sub-provision) any such breaches may have been, was dealt with by the Tribunal at paras [63]-[66] of the Award, under the heading: '*(d) Did the Government  not have to do anything till the GPFs had been built?*'.

14     In those paragraphs, the Tribunal reached a conclusion to the effect that the Government did in fact have to do something before the gas processing facilities had been built, namely that it was obliged to construct the necessary pipelines and associated infrastructure as contemplated by Art. 6(b), and that (not having done so) it was accordingly in breach of cl 6(b).  That conclusion is clear and is not the subject of this Application.

15    However, in those paragraphs, the Tribunal did not reach a similar conclusion as to
      the allegation of breach of cl 6(a) of the contract.   The allegation of breach of that
      clause was resisted by the Government on the grounds (*inter alia*) that (as the
      Tribunal put it, at para [63], referring to the Government's submissions):   '*Mr
      Shashore submits that the Government had no obligation to deliver gas until there
      was a plant to receive it.*'  In the next sentence, the Tribunal concludes: '*That, no
      doubt is true, but the Government's obligations were not confined to the delivery of
      gas.*'  It then went onto the cl 6(b) point, noted above.

16    At para [66], the Tribunal reiterated its acceptance of the part of Mr Shashore's
      argument referred to in the first sentence of para [63] (quoted above).   It said (of
      another version of the Government's argument):  '*We think this argument takes the
      matter no further than the first version.   Of course the Government could not
      actually deliver gas until there was a Site and, as we have said until there was a
      plant to receive it. But that does not excuse the Government's failure to comply with
      6 b).*'

17    Accordingly, it would appear clearly that the Tribunal did not conclude that there
      was a breach of Art. 6(a).   Certainly, no such words appear in paras [63]-[66].   On
      the contrary, what is said in those paragraphs, as just quoted, would be inconsistent
      with the Tribunal's having found a breach of Art. 6(a), since the only actual breach
      of that article could be by a failure to make delivery to the Site boundary – and the
      Tribunal has rightly held that until there was a plant to which to deliver the gas,
      there could have been no delivery.   The Claimant takes this to mean that there was
      not yet any obligation to deliver.   If the obligation had not arisen, it could not be
      broken.

18    The Tribunal did not return to the point, or otherwise dilute or contradict its
      understandable conclusion that there could, in effect, have been no breach of cl 6(a)
      in the circumstances prevailing.

19    Accordingly, it is presumed that the presence of a reference to cl 6(a) in paragraph
      [80] was a slip.

20    Whatever the explanation, the terms of the Award are ambiguous, given the internal
      inconsistency above-mentioned.   Further, it may be that the (apparently successful)

defence on cl. 6(a) was not independently recalled or considered when it came to drafting the dispositive paragraph [80].

21     The Tribunal has been asked to acknowledge the need for a correction (by letter dated 18th November 2015) and to give an opportunity for submissions to be made as to the consequence of correcting the above-mentioned internal inconsistency. However, given the lapse of time since the making of the Award, this application is made out of an abundance of caution.

22     <u>Ground B: lack of factual authority defence not separately dealt with from legal capacity defence</u>

23     Two of the defences put forward by the Ministry were that it neither had (i) legal capacity nor (ii) actual (factual) authority to perform the GSPA

24     The two issues, i.e. capacity and authority are and have always been obviously discrete. However, the Tribunal, in its Award, appears in its reasoning only to have dealt with its views on the first (the legal) issue (see Award [41]-[54]). It mentioned 'capacity' 10 times in its reasoning. That said, in its concluding paragraph to that section, it made a parting reference not to capacity, but used the word 'authority' [54]. However, given the use of the word 'capacity' throughout the prior paragraphs, and the clear legal focus of the analysis therein, it appears that no separate consideration was given by the Tribunal to the issue of factual, actual authority. What is clear, is that there is no separate reasoning on the point. It may be that the Tribunal erroneously assumed that the issue of authority was just another way of putting the legal (capacity) point, in which case it will have failed, by mistake, to deal with the distinct issue of factual capacity.

25     At best, this is a point of ambiguity, which should be revisited, and distinctly dealt with. Alternatively, it is a failure to deal distinctly or at all, with a free-standing factual defence. To have conflated both issues, addressing them interchangeably both in description and in substance as issues of law, would have been in effect not to decide the factual, actual authority point.

26     The above analysis is confirmed by the fact that the Tribunal based its decision on prima facie findings which are more closely connected with capacity than authority. Further, it should be noted that the sole heading for the relevant part of the Award in

section H of the Award (page 10) as "capacity" (rather than authority). Further, at paragraph 53 of the Award, (while considering whether another Ministry (the Ministry of Energy) may have had exclusive powers to enter into agreements similar to the GSPA), the Tribunal found that there *"was nothing to suggest that [the Ministry of Energy] will enter into the business of selling gas."* As there was similarly nothing to suggest that the Ministry would enter into the business of selling gas, the Tribunal's statement at paragraph 53 strongly suggests that the Tribunal did not consider the lack of authority defence put forward by the Ministry.

27    Importantly, in the final paragraph of the section, which purportedly addresses the defence of lack of authority, the statement that *"the [Ministry] was an appropriate entity to enter into the GSPA..."* (addedemphasis) is entirely indicative of a Tribunal considering capacity rather than authority.

Ground C

28    This Ground focusses on the defence raised at para 7 of the Ministry's defence. This is a denial that the alleged conduct of the Ministry was repudiatory. This denial survives a finding of breach and raises the question of the seriousness of the breach. Although the Tribunal made findings as to the existence of breaches of contract on the Ministry's part (see above), it did not expressly discuss or evaluate the nature of those findings in terms of their being repudiatory or otherwise. Further, nowhere did it consider whether a breach solely of cl 6(b) was or could in the circumstances have been repudiatory. The only statement on the point is to be found in the dispositive paragraph (quoted above).   No express reasoning appears.   This suggests that the Tribunal did not consider the issue, or at least did not consider the Ministry's argument in that paragraph as an independent point (ie, even if there were a breach, was it repudiatory?).

29    The point here is that the consequences of a breach of cl 6(b) alone are not necessarily repudiatory.   The creation of infrastructure by the Ministry was not an end in itself.  It is commercially significant only if that infrastructure has to be used to deliver gas (and only if that infrastructure was the only means to do so). Given the express findings that there was no active obligation to deliver gas until the Defendant carried out its part of the bargain and built the plant, the effect of the failure to build infrastructure by any particular date (though a serious breach) did not

on any view deprive the Defendant of its bargain.  That could only happen when it had brought into existence the means to accept delivery – which it never did.

30    This point was not considered, along with any separate repudiation analysis based solely on the breach of cl 6(b).

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Claim No.[          ]

Before the Honourable Mr Justice

**In an arbitration claim**

**BETWEEN**

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

Claimant

- and -

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

Defendant

**In the matter of an arbitration**

**BETWEEN**

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

Claimant in the arbitration

- and –

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

Respondent in the arbitration

---

### Draft Order

---

UPON the Claimant's application under section 68 of the Arbitration Act 1996 to challenge the Part Final Award of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated 17 July 2015 (the "**Part Final Award**")

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015

AND UPON HEARING Counsel for the Claimant and Counsel for the Defendant

IT IS ORDERED THAT:

1. In respect of <u>Ground A,</u> the Award should (i) be set aside in part – namely the contents of dispositive paragraph [80](1)(a) of the Partial Final Award (save for the conclusion that there was a breach by the Ministry of cl 6(b)) ['the Conclusion']; (ii) alternatively, the Conclusion (save for holding in respect of the cl 6(b) breach) should be declared to be of no effect; (iii) (in the further alternative) the Award should be remitted for further consideration of the Conclusion.

2. In respect of <u>Ground B,</u> the Award should be remitted for further consideration of the issue of fact as to whether the Ministry had authority as a matter of fact (as opposed to capacity as a matter of law) to conclude the alleged contract.

3. In respect of <u>Ground C ,</u> the like relief is granted as is granted under Ground A above.

4. Further, or alternatively, there be such other order under the Arbitration Act as is just.

5. The Claimant's costs of and occasioned by the Claimant's Application be paid by the Defendant to the Claimant, such costs to be referred to detailed assessment by the Court if not agreed.

Dated:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**                                    Claim No.[            ]

Before the Honourable Mr Justice

**In an arbitration claim**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

                                                                 **Claimant**


- and -


**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

                                                                 **Defendant**

**In the matter of an arbitration**

**BETWEEN**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

                                                **Claimant in the arbitration**


- and –


**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

                                            **Respondent in the arbitration**

---

**Draft Order**

---

UPON the Claimant's application under Part 62.9 of the Civil Procedure Rules to extend the 28-day time period in which to apply to challenge the Part Final Award of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated 17 July 2015 (the **"Part Final Award"**)

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015

IT IS ORDERED THAT:

1. The Claimant's application under Part 62.9 of the Civil Procedure Rules be allowed.

2. The time period, set out in section 70(3) of the Arbitration Act 1996, in which the Claimant may apply to challenge the Part Final Award be extended to 23 December 2015.

3. No order as to costs.

Dated:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**


**BETWEEN**

**THE MINISTRY OF PETROLEUM**
**RESOURCES OF THE FEDERAL REPUBLIC**
**OF NIGERIA**

**Claimant**

**And**


**PROCESS AND INDUSTRIAL**
**DEVELOPMENTS LIMITED**

**Defendant**

---

**Draft Order**

---


**Stephenson Harwood LLP**
**1 Finsbury Circus**
**London EC2M 7SH**
**Tel:      +44 20 7809 2384**
**Fax:      +44 20 7003 8240**
**Ref:      []\01-54-03644**
**Solicitors for the Claimant**

Folakemi Adelore
Claimant
First
22 December 2015
Exhibit "FA1"

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**IN AN ARBITRATION CLAIM AND**
**IN THE ARBITRATION**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

**Claimant/Respondent in the Arbitration**

**And**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Defendant/Claimant in the Arbitration**

---

### FIRST WITNESS STATEMENT OF FOLAKEMI ADELORE

---

1        I, Folakemi Adelore of the Federal Ministry of Petroleum Resources, Block D, 11th Floor, NNPC Towers, Herbert Macaulay Way Central Business District Abuja will say as follows:

2        I am the Director of Legal Services at the Claimant, which I shall hereinafter refer to as the **"Ministry"**. I make this witness statement in support of:

    2.1        the Ministry's application for an extension of time in which to challenge the Part Final Award on liability dated 17 July 2015 (the **"Award"**) of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans (the **"Tribunal"**); and

    2.2        the Ministry's application to challenge the Award under section 68 of the Arbitration Act 1996 (both applications hereinafter referred to as the **"Applications"**.

3       I make this witness statement from facts and matters within my own knowledge. Where they are not within my knowledge they are true to the best of my knowledge and belief.

4       There is now produced and shown to me a paginated bundle of documents entitled "Exhibit FA1" which is exhibited to this witness statement. All references in this document are to Exhibit FA1 unless otherwise stated.

**Background**

5       The Defendant (hereinafter **"PIDL"**) alleges the existence of a Gas Supply and Processing Agreement dated 11 January 2010 (the **"GSPA"**) with the Claimant (hereinafter the **"Ministry"**) whereby the Ministry allegedly agreed to make available to PIDL 400 MMScuFD of Wet Gas for a term of 20 years and PIDL agreed to construct Gas Processing Facilities (**"GPFs"**) to process the Wet Gas and return approximately 85% by volume to the Ministry in the form of Lean Gas [**P.1-20**].

6       By Notice of Arbitration dated 22 August 2012, PIDL commenced arbitration (the **"Arbitration"**) against the Ministry alleging that the Ministry had repudiated the GSPA [**P.21-24**].

7       On 1 June 2015, a hearing took place at the International Disputes Resolution Centre in London.

8       On 17 July 2015, the Tribunal issued the Award to the Claimant by email on the same date [**P.25-50**].

9       In its Award, the Tribunal declared, *inter alia*, that PIDL is entitled to damages (in an amount to be assessed) in respect of breaches by the Ministry of the GSPA, which it also held PIDL was entitled to rescind.

**Out of time: explanation of the political situation in Nigeria at the time the Award was issued**

10      This proposed claim is brought 4 months, 8 days out of time (the relevant period was 28 days from the date of the Award on 17 July 2015, i.e. 14 August 2015).   This delay was not in any way deliberate or calculated.   As explained below, the explanation is to be found in the nature of the Ministry as part of the central government machinery, in a post-election period, where no Government had yet been formed (and the chief law officer - the Attorney General of the Federation had not been appointed).   Furthermore, as explained below, since it does not normally trade in products, the Ministry has little or no experience in responding to international arbitral proceedings – such matters usually involve the State

Corporation, the Nigerian National Petroleum Corporation (the **"NNPC"**), which, in that capacity, operates separately from the Ministry.

11    In order to properly understand the Ministry's inability to challenge the Award on time, it is necessary to briefly address the political situation in Nigeria at the time the Award was issued.

12    The President Goodluck Jonathan administration had been in power from 2 May 2010 to 29 May 2015. Following general elections on 28 and 29 March 2015, the new president, President Muhammadu Buhari of the opposition party, was declared winner and was sworn in as president on 29 May 2015. This was the first time that an incumbent party had lost a general election in democratic Nigeria. This was acclaimed as historic by the world media (http://www.bbc.co.uk/news/world-africa-32139858, http://www.independent.co.uk/news/world/africa/nigeria-2015-election-apc-declares-victory-for-muhammadu-buhari-10146740.html) [**P.51-61**].

13    I mention the historic and surprising nature of the opposition party winning the presidential election because it may explain the functioning of government ministries in the period immediately following the swearing in of the new President: although it is to be expected that any new government, particularly the government of a new political party would take time to settle into office, this was even more so in circumstances where the election results were particularly surprising.

14    Although the President was sworn in on 29 May 2015, it was not until 11 November 2015 that ministers, including the Attorney-General of the Federation (**"AGF"**), were appointed.

## Chain of command at the Ministry with regard to the Arbitration

15    As stated above, the Ministry does not normally trade in products, and therefore has little or no experience in responding to international arbitral proceedings. Furthermore, and importantly, the AGF as the chief law officer is responsible for the conduct of all dispute resolution involving all governmental agencies or ministries. As a matter of practice and law in Nigeria, the AGF is always made a party to all disputes involving the Federal Government of Nigeria or its ministries.

16    The conduct of disputes involving the Federal Government of Nigeria or its ministries and instructions to external counsel to represent the government or its ministries can only be given by the AGF as a matter of Nigerian law and practice.

17    The present arbitral proceedings between PIDL and the Ministry is no exception. Instructions to represent the Ministry in the arbitration were given to Mr. Olasupo Shasore, SAN of TMS by the former AGF Mr. Bello Adoke.

18      Thus, the chain of command for the conduct and directives pertaining to the arbitral proceedings has always been from the AGF to the Ministry.

19      However, due to the elections in March 2015, the tension generated by it and the attendant dissolution of cabinet on 28th May 2015 by the immediate past President of Nigeria, it was impossible for TMS or the Ministry to get necessary directives from the AGF in respect of this arbitration.

20      With elections out of the way and the appointment of a new AGF, lawful instructions and directives have now emanated from the office of the AGF with respect to the conduct of this arbitration.

## Difficulty in initiating challenge of the Award

21      As set out above, the Award was issued on 17 July 2015 and was immediately reviewed by the Ministry and its legal representatives in Nigeria, Twenty Marina Solicitors ("**TMS**").

22      On 21 July 2015, TMS advised me as to whether the Award failed completely and/or clearly to address the issues presented by the Respondent and as to whether or not it should be challenged accordingly. The Ministry understood that in order to challenge the Award, it would need to instruct a firm of solicitors in the U.K. given that any such challenge would have had to be before the English courts under the English Arbitration Act 1996. (Nothing set out in this statement shall constitute a waiver of privilege.)

23      This presented an issue for the Ministry because an application to challenge the Award in the U.K. constituted a new legal action which, together with the need to appoint foreign legal representatives, required approval of the AGF. The Constitution of the Federal Republic of Nigeria 1999 stipulates that "there shall be an Attorney General of the Federation who shall be the chief law officer and a Minister of the government of the Federation". In addition several Nigerian cases have held that the AGF is responsible in law for government's actions and misactions.  In the case **Guardian Newspapers Ltd v. AG Fed (1995) 5 NWLR (Pt. 398) 703 – CA,** the court held that "Both at common law and by virtue of our constitution, the Federal Attorney-General is the Chief Law Officer of the Republic and the conscience of the people. He represents the state in all actions against the state; this he can do in person or through the other law officers in his ministry. The office of the Attorney General is so unique that in the exercise of his functions as the Chief Law officer, he **cannot even take a dictation from the Head of State**".

24      In **AG Rivers State v. AG Akwa Ibom State (2011) 8 NWLR (Pt. 1248) 31 ,** the main functions of the Attorney General  was explained as  – "...........advising the

Federal or State government including their parastatals on legal matters and prosecuting or defending court cases for or against their respective governments".

25    However, as I have set out above, at the relevant time, the AGF's office was vacant. The office of the AGF is a political appointment.

26    It is necessary to explain that it is Nigerian administrative and government practice in all Federal Government Ministries when it comes to dispute resolution, particularly highly contentious matters involving huge financial exposure to the nation (such as was the case in the Arbitration) to always operate through the AGF. The Ministry's legal department had been able to continue its oversight of the Arbitration during the period that the office of the AGF was vacant because TMS had extant instructions from the previous AGF to act in that matter. However, the Ministry did not have the authority to unilaterally approve a new legal action albeit connected with the Arbitration. This was even more so given that the amount potentially in issue was in the billions of dollars.

27    On 11 November 2015, after a five and a half month period, the Government finally appointed Mr Abubakar Malami SAN as AGF.

28    Despite having to deal with other challenges associated with his new role, one of the first matters the new AGF addressed upon assumption of office was this matter. He and his team had to be briefed on the details of the matter, the outcome of the Arbitration and to take advice on the available options and suggested next steps.

29    Following his review of the relevant documents in the Arbitration and TMS' opinion, the AGF gave his approval for the Ministry to instruct U.K. solicitors.

30    Accordingly on 13 November 2015, TMS asked Stephenson Harwood to assess the merits of the English Court Applications.

31    Later on 13 November 2015, Stephenson Harwood confirmed that they had cleared conflicts and were therefore able to act on behalf of the Ministry. Stephenson Harwood also recommended that Counsel be instructed on the matter.

32    Since 13 November 2015, the Ministry and its legal representatives have sought to progress this matter with expedition. All relevant documents from the arbitration (amounting to five lever arch files) had to be gathered and sent to Stephenson Harwood in London. Most of the documents could only be sent on 23 November 2015 and Stephenson Harwood only received them on 25 November 2015. The remaining documents were sent over the following weeks.

33    Since receipt of the documents on 25 November 2015, Stephenson Harwood and Leading Counsel have been considering the merits of the Applications, advising the

Ministry on the same and preparing the Applications. The issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered, in particular given the differing headings on the various procedural orders and the Part Final Award dated June 2014 [**P.62-77**].

34   To conclude, the permanent staff at the Ministry did all in its power to obtain the necessary approval to challenge the Award within the 28 day period after issuance. After expiry of that period, the Ministry continued to apply all its efforts to obtain approval. Unfortunately, the Ministry was unable to obtain approval on time. The Ministry tried all that was possible legally to obtain the necessary approval, including attempting to seek directives from the Vice President of the Federation in November, notwithstanding the fact that the only person that had the power to instruct counsel was the AGF. The delay was not out of choice but was forced on the Ministry by circumstances beyond its control.

35   It is important to understand the limitations on the Ministry's capabilities in this matter:

   35.1   The Ministry is seldom involved in arbitration proceedings and therefore lacks experience of the distinct features of international arbitration, including its cross-border nature and strict short time limits. Further its legal department is not accustomed to dealing with disputes of the type that the Arbitration was concerned with. The legal department at the Ministry (like the Ministry itself) is accustomed to dealing with the activities that the Ministry was expressly set up for and authorised to undertake, predominantly the licensing of petroleum exploration and production.

   35.2   These are the normal strategic and regulatory activities that the Ministry has been undertaking since 1975 when it was established and can therefore undertake without the need for external approval or interference. The situation would have been different if the arbitration involved the NNPC, which is the state oil corporation established in 1977 with the power to enter into commitments similar to those in the GSPA. Unlike the Ministry, the NNPC is a commercial entity which is regularly involved in, and therefore accustomed to dealing with international arbitration.

   35.3   Lastly, it is important to understand that the Nigerian Government has never been faced with a situation where it has had to operate for a long period without an AGF. The length of time without an AGF was unprecedented in the nation's history.

36    As a result of the above circumstances, it would be unfair for the Ministry to be denied the opportunity of having the Applications determined, particular that each of them impacts on the existence or extent of the considerable sum now claimed.

**The proposed s 68 Arbitration Act 1996 challenges**

37    I understand that the Ministry has potentially good grounds to challenge the Award on the grounds of serious irregularity. While I understand that the Court would not be conducting a detailed inquiry at this stage, it is worth setting out briefly why the Ministry submits there is a serious irregularity affecting the Award, in that the Tribunal may have failed to deal (or deal distinctly) with all the issues put to it.

   37.1   Capacity/authority: two of the defences put forward by the Ministry were that it neither had (i) legal capacity nor (ii) actual (factual) authority to perform the GSPA [**P.78**]. The two issues, i.e. capacity and authority are and have always been obviously discrete. However, the Tribunal, in its Award, appears in its reasoning only to have dealt with its views on the first (the legal) issue (see Award [41]-[54]). It mentioned 'capacity' 10 times in its reasoning. That said, in its concluding paragraph to that section, it made a parting reference not to capacity but used the word authority [54]. However, given the use of the word 'capacity' throughout the prior paragraphs, and the clear legal focus of the analysis therein, it appears that no separate consideration was given by the Tribunal to the issue of factual, actual authority. What is clear, is that there is no separate reasoning on the point. It may be that the Tribunal erroneously assumed that the issue of authority was just another way of putting the legal (capacity) point, in which case it will have failed, by mistake, to deal with the distinct issue of factual capacity. At best, I am advised, it is a point of ambiguity, which should be revisited, and distinctly dealt with. To have conflated both issues, addressing them interchangeably both in description and in substance as issues of law, would have been in effect not to decide the factual, actual authority point.

      37.1.1   See for example the sole heading for the relevant part of the Award in section H of the Award (page 10) as "capacity".

      37.1.2   I also understand that the Tribunal based its decision on prima facie findings which are more closely connected with capacity than authority.

      37.1.3   At paragraph 53 of the Award, in considering whether another Ministry (the Ministry of Energy) may have had exclusive powers to enter into agreements similar to the GSPA, the Tribunal found that

there "*was nothing to suggest that [the Ministry of Energy] will enter into the business of selling gas.*" As there was similarly nothing to suggest that the Ministry will enter into the business of selling gas, the Tribunal's statement at paragraph 53 strongly suggests that the Tribunal did not consider the lack of authority defence put forward by the Ministry.

37.1.4   Importantly, in the final paragraph of the section, which purportedly addresses the defence of lack of authority, the statement that "*the [Ministry] was an appropriate entity **to enter into the GSPA**...*" (my emphasis) is entirely indicative of a Tribunal considering capacity rather than authority.

## No breach of Article 6a

37.2   In the second place, the Award is internally inconsistent, and therefore ambiguous, as to whether one of the Ministry's defences was successful. Two distinct breaches of contract were alleged against the Ministry.  I set out the two clauses:

> "**6. RESPONSIBILITIES OF THE GOVERNMENT**
>
> *a) The Government shall deliver to the Site boundary the agreed quantities and quality of gas defined under Article 3c and in the manner set out in Appendix A to this Agreement;*
>
> *b) The Government shall ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.*"

37.3   The first, of clause 6(a) of the contract, was an alleged failure actually to deliver product. It was the centre-piece of PIDL's pleaded case on breach (see PIDL's Statement of Case, paragraphs [87]-[89] [**P.100**]).   The second, of clause 6(b) was an alleged failure to ensure that infrastructure was in place. (See PIDL's Statement of Case, paragraph [90] [**P.100**]).

37.4   The Ministry defended the first allegation on the basis that the obligation to deliver product could not have arisen until PIDL had constructed its treatment plant.   This, it never did.   The Ministry's defence on this point succeeded.    Specifically, at paragraph 63 of the Award, the Tribunal appears to accept that "*the Government had no obligation to deliver gas*

*until there was a plant to receive it*", in other words confirming that the Government was not in breach of Article 6(a) of the GSPA.

37.5    Furthermore, at paragraph 66 of the Award, the statement that: "*[o]f course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it.*"

37.6    However, in the "Disposition" section, at paragraph 80(1)(a), the Tribunal declares that "*[t]he Government repudiated the GSPA by failure to perform its obligations under Articles 6a and 6b thereof.*"

37.7    This apparent internal contradiction is of great importance. Not only does the nature of the breach go fundamentally to the extent and nature of damages recoverable, it also goes to the very basis of the Tribunal's finding of repudiatory conduct.   That finding (see above and see Award at paragraph [80]) "*The Government repudiated the GSPA by failure to perform its obligations under Articles 6a) and b) thereof*" is made on a dual-breach basis, ie of clauses 6(a) & (b).   The two are interwoven as a combined basis for the conclusion of repudiation.     What the Tribunal appears to have done is give as one half of its basis for concluding that there was repudiatory conduct a breach of a provision which it had earlier held not to have been broken or even fallen due for performance.   I am advised that the Tribunal appears not to have afforded any alternative basis for its conclusion that there was a repudiation (e.g. on the basis of just a breach of clause 6(b).  Nor should it be assumed.

38    The above point on breach of Article 6a goes to quantum and is therefore critical to the Ministry's preparation for the damages stage of the arbitration. It is worth noting that having initially estimated in August 2012 that its loss of profit would be no less than USD1.9bn **[P.24]**, under a year later, PIDL put its damages claim at around USD5.9bn **[P.102]**, however, PIDL now appears to be claiming damages in the amount of around USD8.6bn **[P.225]**. Given this creeping astronomical figures, the Parties and the process would undoubtedly benefit from certainty and clarity on the key issues. Therefore the ambiguity caused by the Award could lead to complications and potential injustice at the damages stage. Although the Court would not be conducting a detailed enquiry into the merits of the challenge at this stage, I think it is necessary for the Court to bear in mind the above facts in order to assess the unfairness that would be done to the Ministry if it were allowed to go into the damages stage without having the key issues properly considered and determined.

**No prejudice to PIDL or to the future conduct of the arbitration**

39    Further, it does not follow that (if permission were granted) the Applications would have a detrimental effect on the Arbitration, particularly given that any hearing on quantum will be substantial, and is unlikely to occur within 12 months.  Of course, the Ministry intends to co-operate fully with the preparations of that hearing.   The below are the major steps ordered by the Tribunal in Procedural Order No. 10 dated 27 October 2015 [**P.261-263**]:

   39.1    PIDL was ordered to serve upon the Ministry and the Tribunal on or before 4 December 2015, all documents and evidence upon which it intends to rely in relation to the amount of damages to which PIDL is entitled;

   39.2    The Ministry was ordered to serve upon PIDL and the Tribunal, within 6 weeks of service by PIDL of the above documents, all documents and evidence upon which the Ministry intended to rely in relation to the amount of damages to which PIDL is entitled;

   39.3    PIDL was ordered to serve its documents and evidence in Reply (if any) within 4 weeks of service by the Ministry of the above documents.

   39.4    It was ordered that there is to be a procedural conference on a date to be fixed by the Tribunal after service by PIDL of its documents and evidence in Reply at which, *inter alia*, the issue of a date and any necessary directions for the hearing on quantum is to be determined.

40    The Ministry has made several attempts to engage professional consultants to provide assistance in the damages stage of the arbitration. Unfortunately, for the same reasons affecting the Ministry's inability to engage foreign counsel, the Ministry has not been able to engage professional consultants. TMS advised the Ministry on the need to appoint experts to provide an evaluation of damages with regard to the claim. The Ministry agreed with the advice and informed TMS on the need to get approval from the AGF. However because an AGF was yet to be appointed, the Ministry was unable to secure the approval. Consequently, the Ministry has been unable to prepare for the damages stage of the arbitration as well as is required for an arbitration of this size.

41    On 4 December 2015, PIDL served a very substantial report of four experts in various disciplines as evidence it intends to rely on in relation to the amount of damages claimed (**"PIDL's Damages Evidence"**) in the Arbitration. PIDL's Damages Evidence amounts to 126 pages and over 40 megabytes of material. As indicated above, the figures are quite different from those mentioned in the Statement of Case at [95]-[97], but there is no sign of any application for any

amendment being lodged, which leaves the Ministry in an unnecessarily difficult situation. That is compounded by the lack of any supporting disclosure or additional factual·evidence.

42    Even leaving aside the Ministry's inability to engage professional consultants on time, the size and content of PIDL's Damages Evidence, the disconnect with the pleadings, the lack of any supporting factual evidence, and the lack of disclosure, are all such that more than six weeks would be required for the Ministry to properly consider all the material and prepare its own supporting documents in relation to damages.

43    I anticipate an application will be made shortly to the Tribunal to (i) oblige PIDL to regularise its pleadings and (ii) serve any factual evidence it needs to serve.

44    As a result of the above, TMS on behalf of the Ministry, have applied to the Tribunal for an extension of time in which to serve the documents and evidence it intends to rely on in relation to the amount of damages to which PIDL is entitled.

45    Therefore, on any view, the quantum stage is likely to be protracted. Consequently, it is unlikely that the Applications (and the Court's determination of the same) would have a detrimental effect on the arbitration.

**Absence of irremediable prejudice to PIDL**

46    Further, PIDL is unlikely to suffer any irremediable prejudice as a result of the Applications or the Court's determination of the same. The Ministry has not dissipated any assets as a result of the award. Being a ministry of the Government, the Ministry is extremely˙ unlikely to dissipate any assets or put the same out of reach of a judgement creditor in a way that a private entity might.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed...........................................

Mrs. Folakemi Adelore

Dated this 22nd day of December 2015

**Folakemi Adelore**
**Claimant**
**First**
**22 December 2015**
**Exhibit "FA1"**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**IN AN ARBITRATION CLAIM AND IN THE**
**ARBITRATION**

**BETWEEN**

**THE MINISTRY OF PETROLEUM**
**RESOURCES OF THE FEDERAL REPUBLIC**
**OF NIGERIA**

**Claimant/Respondent in the Arbitration**

**and**

**PROCESS AND INDUSTRIAL**
**DEVELOPMENTS LIMITED**

**Defendant/Claimant in the Arbitration**

---

**FIRST WITNESS STATEMENT OF**
**FOLAKEMI ADELORE**

---

**Stephenson Harwood LLP**
**1 Finsbury Circus**
**London EC2M 7SH**
**Tel:      +44 20 7809 2384**
**Fax:     +44 20 7003 8240**
**Ref:      1543**

**Solicitors for the Claimant**

IN THE HIGH COURT OF JUSTICE                      CL-2015-000917
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BEFORE THE HON MR JUSTICE PHILLIPS

In an arbitration claim

BETWEEN



THE MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA

Claimant

- and -

PROCESS AND INDUSTRIAL DEVELOPMENTS LTD

Defendant

In the matter of an arbitration

BETWEEN

PROCESS AND INDUSTRIAL DEVELOPMENTS LTD

Claimant in the Arbitration

- and -

THE MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA

Respondent in the arbitration

**ORDER AND REASONS**

**ORDER**

Upon the Claimant's application under Part 62.9 of the Civil Procedure Rules to extend the 28-day time period in which to apply to challenge the Part Final Aware of Lord Leonard Hoffmann, Chief Bayo Ojo and Sir Anthony Evans dated 17 July 2015 (the "**Part Final Award**")

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015 and the witness statement of Ian David Sellars dated 31 December 2015:

IT IS ORDERED THAT the Claimant's application be dismissed

10 February 2016

## REASONS

1. The application under s.68 of the Arbitration Act is made more than 4 months after the expiry of the 28 day time limit. Compelling reasons would have to be shown to justify an extension of over four times the statutory time limit. In this case the delay is said to have been caused by the fact that the new President of the Federation of Nigeria, sworn in on 29 May 2015, did not appoint an Attorney General until 11 November 2015 with the result that London solicitors were not instructed in relation to the application until 13 November 2015.

2. Even if the absence of an Attorney General was an insuperable obstacle to instructing London solicitors (which is far from clear in view of the evidence filed by the defendant), the claimant could and should have prepared all documentation in readiness so as to proceed with expedition once London solicitors were instructed, not least in view of the fact that the claimant continued to participate in the arbitration proceedings throughout the period with the benefit of external counsel. In the event documentation was not provided to London solicitors until 25 November and the application under s.68 was not issued until 40 days after London solicitors were first instructed, a period in excess of the statutory time limit. No good explanation is given for that further excessive period of delay. In those circumstances it is not appropriate to extend time.

3. In refusing to extend time I further take into account that the grounds of appeal have no merit. As to ground (A), it is incorrect to say that the Tribunal found that the clamant was not in breach of art 6(a): the finding was that the claimant had put itself in a position where it was impossible for it to comply with art 6(a) by virtue of its own breach of art 6(b). There was no internal inconsistency in the Tribunal's reasons. As to ground (B), the Tribunal clearly addressed the actual authority of claimant to enter and perform the GSPA, holding that that was the *prima facie* position and rejecting the claimant's arguments to displace that starting point. There was no ambiguity or confusion in its findings between the concepts of capacity and authority. As to ground (C), there was a clear and sufficient finding that the breach of art 6(b), rending it impossible to perform art 6(a), was a repudiatory breach. The contention that separate consideration should have been given to a breach of art 6(b) alone is misconceived.

SEP

10.2.16

**IN THE FEDERAL HIGH COURT**
**IN THE LAGOS JUDICIAL DIVISION**
**HOLDEN AT LAGOS**

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A.18 LAWS OF THE FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER**

**IN THE MATTER OF AN ARBITRATION**

**BEFORE**

| | |
|---|---|
| **LORD LEONARD HOFFMANN** | **PRESIDING ARBITRATOR** |
| **SIR ANTHONY EVANS** | **ARBITRATOR** |
| **CHIEF BAYO OJO, SAN** | **ARBITRATOR** |

**BETWEEN**

**THE MINISTER OF PETROLEUM RESOURCES**
**(For and on behalf of the Ministry of Petroleum Resources)**          **APPLICANT**

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED BVI**          **RESPONDENT**

**WRITTEN ADDRESS IN RESPECT OF THE ORIGINATING MOTION**

**1.0     INTRODUCTION**

1.1     This written address is delivered by the Applicant in support of the Originating Motion by which the Applicant is praying this Honourable court for the following reliefs:

   1. **AN ORDER** enlarging the time within which the Applicant may apply to set aside the arbitration award of the tribunal on liability dated 17 July 2015 in the above-mentioned arbitration proceedings.

   2. **AN ORDER** setting aside and/or remitting for further consideration all or part of the arbitration award of Lord Leonard Hoffmann, Chief Bayo Ojo, SAN and Sir Anthony Evans and for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

**GROUNDS UPON WHICH THIS APPLICATION IS MADE**

    i.    The arbitration proceedings were commenced pursuant to Clause 20 of the Gas Supply and Processing Agreement dated 11 January 2010 ("the GSPA").

    ii.    The substantive law of the contract is Nigerian law.

    iii.    The arbitration proceedings was initiated under the rules of the Arbitration and Conciliation Act, CAP A18 LFN 2004 ("ACA").

    iv.    Parties agreed and the arbitration proceedings were indeed conducted in accordance with the ACA.

    v.    The parties have effectively agreed that the seat of arbitration is Nigeria and consequently Nigerian law is the *lex arbitri*.

    vi.    Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings.

    vii.    London is not the seat of the arbitration. It is only the venue for hearings in the arbitration; a geographically convenient place hence the High Court of England cannot exercise supervisory or any jurisdiction in relation to the arbitration proceedings.

    viii.    The period within which to apply to set aside the arbitral award has expired hence leave of this Honourable Court is required to bring an application to set aside the award.

    ix.    By virtue of section 30 of the ACA, a court may on the application of a party, set aside an arbitral award where the arbitrator(s) has misconducted himself.

    x.    The Applicant seeks to set aside the award on the ground that the tribunal misconducted itself to wit:

        a.  The tribunal in making the Award breached the rules of natural justice.

        b.  The award is inconsistent and ambiguous.

        c.  A party to the arbitration was under some incapacity.

        d.  The Award contains decision on a point not put forward by the parties.

        e.  The Award consists of  mistake of fact which is admitted to by the Tribunal  and  clear beyond any reasonable doubt

**2.0    BRIEF FACTS OF THE CASE**

2.1    This arbitration proceedings arose from a dispute in respect of the performance of a Gas Supply and Processing Agreement dated 11th January 2010 between the parties herein ("the Agreement"). The Respondent is a company incorporated in the British Virgin Islands and the Applicant is a Ministry of the Federal Government of Nigeria.

2.2.    The Respondent commenced arbitration proceedings pursuant to Clause 20 of the Agreement. As agreed by the parties, the arbitration was held in London, England.

2.3    After a bifurcated hearing, the tribunal delivered the Award on 17th July 2015. The Applicant was of the view that the tribunal has misconducted itself and desirous of applying to court to set aside the Award. The facts and circumstances leading to the inability of the Applicant to apply to set aside the Award within time and the eventual decision to apply to the English court for leave to extend time to set aside the Award are as explained in the Affidavit in Support of this application.

**3.0    ISSUES FOR DETERMINATION**

3.1    Applicant respectfully submits that the issues for determination in this matter are as follows:

      i.    Whether Nigeria is the juridical (legal) seat of the Arbitration thereby vesting Nigerian courts with exclusive jurisdiction with respect to matters arising from the arbitration?

      ii.    Whether the Court ought to extend time within which to set aside the arbitral award dated 17 July, 2015 ("the Award")?

      iii.    Whether the tribunal has misconducted itself such that the Award ought to be set aside?

**4.0    ARGUMENTS**

    **ISSUE 1**

      i.    Whether Nigeria is the juridical (legal) seat of the Arbitration thereby vesting Nigerian courts with exclusive jurisdiction with respect to matters arising from the arbitration?

4.1    Applicant submits that the seat of the arbitration, subject matter of this matter is Nigeria. As a consequence, Applicant humbly submits that the *lex arbitri* is the ACA therefore Nigerian courts have exclusive supervisory jurisdiction with respect to matters arising from the arbitration proceedings.

**Seat of arbitration (Legal/Juridical seat)**

4.2     The concept of seat in international arbitration is that it gives an established legal framework to an international commercial arbitration so that, instead of "floating in the transactional firmament, unconnected with any municipal system of law, the arbitration is firmly anchored in a given legal system".[1]  Although sometimes used interchangeably with "place", the "seat" is a state or territory with a recognisable and distinct system of law.

4.3     It is usually agreed by the parties. In the absence of parties' agreement however, the "seat" will be the territory of the chosen law (the *lex arbitri*). As will be demonstrated later in this written address, temporary presence in a particular location does not convert that location to the seat of arbitration. **See James Miller & Partners Limited v. Whitworth Street Estates (Manchester) Limited (1970) AC 583.** In the same vein, "venue" is not the same as the (legal) "seat".

4.4     Furthermore, the "seat" of arbitration is of vital importance in that it is the courts of the seat that have supervisory jurisdiction over the arbitral process. As Cooke J. stated in **C v D [2007] APP L.R 06/28**

> *"...the seat of the arbitration and the choice of procedural law will almost inevitably coincide..." and the procedural law will dictate things such as: whether a dispute is 'arbitrable'; the constitution of and challenge to the arbitral tribunal; the powers of the arbitral tribunal including entitlement to rule on its own jurisdiction and to act as amiable compositeurs; equal treatment of the parties; freedom to agree on rules of procedure; interim measures; written pleadings; hearings and the form, validity and finality of the award <u>including the right to challenge in the national courts</u>".*

4.5     It has also been held that agreement as to the "seat" of arbitration brings with it the law of that country as the curial law (*lex arbitri*) and is analogous to an exclusive jurisdiction clause.  See **Shashoua v Sharma [2009] EWHC 957.**

*Lex arbitri*

4.6     *Lex arbitri* is the law governing the arbitration. It is found within the national law of each state.  Just as the law of contract helps to ensure that contracts are performed as they should be, and are not mere social engagements, so the *lex arbitri* helps to ensure that the arbitral process works as it should.[2] Lex arbitri usually follows the seat. See **Enercon (India) Limited & Ors v. Enercon GMBH 891 & Anor (2014) 2 SCR.**

---

[1] Redfern and Hunter on International Arbitration Fifth Edition, Oxford University Press p. 191

4.7     *Lex arbitri* is the set of laws applicable to the arbitration – internal procedures of the arbitration and the external relationship of the arbitration with courts at the seat of the arbitration. The *lex arbitri* is literally known as the law governing the procedure of international arbitration or the mandatory procedural law. It has been described as "a body of rules which sets a standard external to the arbitration agreement, and the wishes of the parties, for the conduct of the arbitration". **See Paul Smith Ltd v. H & S International holding Incorporation (1991) 2 Llyods Rep 127, see Blackaby, N., et al at Pg.130.**

### Venue

4.8     Venue in international arbitration is the geographically convenient place for holding arbitration hearings. It is not and cannot take the place of "juridical seat" unless parties so agree. **See Naviera Amazonica Peruana S.A v. Compania Internacional De Seguros Del Peru 1988 (1) Lloyd's Rep. 116.**

### Arguments

4.9     The contention of the Applicant with respect to the "seat"[3] of arbitration is that Nigeria and **NOT** England is the "seat" of arbitration.  Although the Agreement states the "venue" of the arbitration to be London, there is no express agreement as to the "seat". The courts have however consistently pointed out the distinction between the seat and the necessity not to confuse the seat of international arbitration with the venue, which is merely a geographically convenient place or places for holding hearings. While the seat of arbitration is a legal concept, hearings may be held in any location.

4.10    With respect to the *lex arbitri* (internal and external procedural law governing the arbitration), the parties expressly selected the Rules of the ACA as (internal) *lex arbitri* however there is no express agreement as to the (external) *lex arbitri*. In addition, Parties selected Nigerian law as the substantive law of the Agreement. The determination of the present application, we respectfully submit, will turn on the appreciation of the following concepts in international commercial arbitration in relation to the present proceedings:

       i.     Substantive law (the law governing the subject and merits of the dispute. It is sometimes described as the 'applicable law', 'governing law' or 'law of the contract');

      ii.    Internal *lex arbtri* (The law that will govern matters internal to the arbitration e.g. initiation of arbitration proceedings, composition of the tribunal, requirement to treat the parties equally and allow them to present their case);

---

[3] Reference to "seat" in this written address means legal/juridical seat of the arbitration.

iii. External *lex arbitri ( the law that will govern matters external to the arbitration e.g. relationship between the arbitration and the court, validity and challenge/setting aside of award);*

iv. Seat (a state or territory with a recognisable and distinct system of law); and

v. Venue (geographically convenient place for holding arbitration hearings).

4.11 The peculiarity of the instant case however is that, of the above-mentioned concepts, only three were expressly agreed by the parties (i, ii and v). Parties did not expressly agree on external *lex arbitri* and the seat. The gravamen of the Applicant's case is that the (external) *lex arbitri* is Nigerian law and that Nigeria is the seat of the arbitration hence, proceedings in relation to the challenge of the Award ought to have been referred to Nigerian courts for determination.

**Determination of Seat of Arbitration in the absence of Express Agreement**

4.12 It is now a well-established principle that an arbitration agreement is severable from the substantive contract in which it is contained. It is also not unusual for the two agreements (i.e. the substantive contract and the arbitration agreement) to be governed by different laws. In the same vein, while contracts often include an express choice of law governing the substantive contract (substantive law), there are instances where contracts are silent as to the law governing the arbitration agreement (*lex arbitri*) and the seat. The courts have however laid down the test to be applied in determining the seat in the absence of an express agreement to that effect.

4.13 In the recent case of **Enercon (India) Limited & Ors v. Enercon GMBH** (supra), the Supreme Court of India had to determine the seat of an arbitration so as to determine the courts that will have exclusive jurisdiction to oversee the arbitration proceedings. The circumstances of the Enercon case are similar to that of the present case. In that case as in the present case, parties selected London as the **venue** of the arbitration but there was no express agreement as to **"seat"**. In the *Enercon* case, the *lex arbitri* (law governing the arbitration) was Indian law, substantive law of the contract was Indian Law, the subject matter of the contract was to be acted upon in India and none of the parties was English.

4.14 The court was of the view that the foregoing are very strong indicators to suggest that the parties always understood that the seat of arbitration would be India and London would only be the *"venue"* to hold the arbitration proceedings. The court in applying the *"closest and intimate connection test"* as laid down **in Naviera Amazonica Peruana S.A v. Compania Internacional De Seguros Del Peru ( supra)** held that in the circumstances of the case, the parties have made a choice that the

seat of arbitration would be in India. The court at page 920 of the report remarked as follows;

> *"We are fortified in taking the aforesaid view since all the three laws applicable in arbitration proceedings are Indian laws. The law governing the contract, the law governing the arbitration agreement and the law of arbitration/Curial law are all stated to be Indian. In such circumstances, the observation in Naviera Amazonica Peruana S.A (Supra) would become fully applicable."*

4.15   Applying the ratio in the *Enercon* case to the present case, we submit that the seat of the arbitration is Nigeria for the following reasons:

  i.      The substantive law of the Agreement is Nigerian law;[4]

  ii.     the (internal) *lex arbitri* is the Rules of the Nigerian Arbitration and Conciliation Act ;[5]

  iii.    the contract was to be performed in Nigeria; [6]

  iv.    The parties had always intended and understood the external (*lex arbitri*) to be Nigerian law; [7] and

  v.     Neither of the parties to the Agreement is English.[8]

4.16   In view of the foregoing, we submit that the country with the "**closest and intimate connection**" with the Contract is Nigeria. As noted in the *Enercon* case relying on the decision of the court in *Naviera Amazonica*, seat of arbitration should not be confused with the geographically convenient place or places for holding hearings.

4.17   On the  basis of  the foregoing judicial authority, we submit that Nigeria is the seat of the arbitration and as a consequence, Nigerian courts have exclusive supervisory jurisdiction with respect to all matters arising from the arbitration.  As a consequence, the proceedings before the English court is a nullity as same was

---

[4] See Clause 20 of the Contract
[5] See Clause 20 of the Contract
[6] See generally Clause 8 of the Contract
[7] See reference to Arbitration and Conciliation Act in **Procedural Order No. 2. Exhibit D** attached to the Affidavit in Support
[8] See page 2 of the Contract.

without jurisdiction. See the **Supreme Court decision in Vab Petroleum Inc v Momah [2013] 14 NWLR (Pt 1374) 284 at 326, paras. G-H).** We urge your lordship to so hold.

**ISSUE 2**

*Whether this Honourable Court ought to extend the time within which the Applicant may apply to set aside the Award*

4.18    The reasons for the delay in bringing this application within the time prescribed by the ACA are contained in paragraph 18-28 of the Affidavit in Support. The delay in bringing the application to set aside the Award was not in any way deliberate, calculated or intended. The explanation is to be found in the formation of the Applicant as part of the central government machinery, in a post-election period, where no Government had yet been formed and the chief law officer - the Attorney General of the Federation and Minister of Justice had not been appointed. It is the office of the Attorney General of the Federation and Minister of Justice that is saddled with the responsibility of making legal representation or instructing counsel for that purpose, in cases ( litigation/arbitration) affecting the interest of the Federal Government of Nigeria or any of its Ministries, Department or Agency.

4.19    Furthermore, as the Applicant does not normally trade in products, the Applicant has little or no experience in responding to international arbitral proceedings – such matters usually involve the State Corporation, the Nigerian National Petroleum Corporation (the "**NNPC**"), which, operates separately from the Applicant.

4.20    It was only upon the appointment of Ministers and obtaining clear instructions from the office of the Attorney General of the Federation and Minister of Justice to challenge the Award that the Applicant was able to take steps in that regard.

4.21    Applicant submits that the delay in making this application was not deliberate and the further delay in bringing this application was as a result of the reasons stated above.

4.22    We urge your lordship to grant the reliefs sought by the Applicant as the law is now settled that it is the practice of Courts not to punish litigants for the mistake of counsel. **(See Emmanuel S. Danlang v. Teachers Service Commission (19996) 5 NWLR (pt. 446) page 97; Iroegbu v. Okwordu (1990) 6 NWLR (pt. 159) page 643 at 648 - 649; Nigerian Hotels Ltd v. Nzekw (1990) 5 NWLR (pt.) page 189 and Princewill v. Usman (1990) 5 NWLR (pt. 150).**

4.23    The ground for seeking to set aside the Award is that the tribunal misconducted itself. Specifically, the Applicant will contend (*inter alia*) that the Award was reached in violation of the principles of natural justice and we submit that this Honourable Court is vested with powers to extend the time within which the Applicant may apply

to set aside the Award. We respectfully refer your lordship to the decision in **Alhaji Albishir & Sons Ltd v B.U.K [1996] 9 NWLR ( Pt. 470)**, where the Court of Appeal held *inter alia* as follows:

> *"......since section 29 (1) of the Arbitration and Conciliation Act does not specifically prohibit the making of an application to set aside an arbitration award after the three months period, the court has the power to extend the period for deserving applicants who can show good reasons for their failure to apply within time and who can also show substantial grounds for wanting to set aside an arbitration award. In other words, although the position of the law with regard to an arbitration award is quite clear that parties take arbitration for better or for worse, both as to the decision of fact and decision of law, however by virtue of provisions of section 29 of the Arbitration and Conciliation Act, where an arbitrator or umpire has misconducted himself or an arbitration award has been improperly procured, the court has the power to set aside the award."*

4.24    Applicant contends that the tribunal has misconducted itself for several reasons (as discussed below) such as failing to afford the Applicant fair hearing and by determining issues not submitted for arbitration. We therefore urge this Honourable Court to exercise its discretion in favour of the Applicant and extend the time within which the Applicant may apply to set aside the Award.

**Issue 3**

**Whether the tribunal has misconducted itself such that the Award ought to be set aside?**

4.25    Section 30 of the ACA provides as follows;

> *"(1) where an arbitrator has misconducted himself, or where the arbitral proceedings, or award has been improperly procured, the court may on the application of a party set aside the award."*

4.26    We submit respectfully that this provision will also apply to proceedings conducted by a tribunal. Although the Act does not define misconduct, the Court of Appeal in **Mutual Life & General Insurance Ltd v Iheme [2014] 1 NWLR (Pt. 1389) 698 at para A** defined misconduct as "a dereliction of duty; unlawful or improper behaviour." In **Taylor Woodrow (Nig) Ltd v S.E. GMBH[1993] 4 NWLR (Pt.286) 127** the Supreme Court held *inter alia* that the expression "misconduct" is of wide import and that an arbitrator will be guilty of misconduct if he makes an award which on grounds of public policy ought not to be enforced. Other conduct which the court held to constitute misconduct for the purposes of setting aside an award includes:

     i.     Where the tribunal in making the Award breached the rules of natural justice.

     ii.     Where the award is inconsistent and ambiguous.

     iii.     Where a party to the arbitration was under some incapacity.

     iv.     Where the Award contains decision on a point not put by the parties.

     v.     ***Where there is mistake of fact which mistake must be either admitted or at least clear beyond any reasonable doubt***

4.27    In each of the above cases, the arbitrator or tribunal has misconducted himself and the court has power to set aside his award." **See also Kano State Urban Development Board v. Fanz Construction Company Ltd. (1986) 5 NWLR (Pt.39) 77.** In addition to this, section 48 also contains the circumstances in which a court will set aside an arbitral award. These include where the party making the application can provide proof that a party to the arbitration agreement was under some incapacity or where the court finds that the award is against public policy of Nigeria. The Applicant has set out the grounds upon which it contends that the tribunal misconducted itself. Each of the grounds are discussed below.

## Breach of the rules of natural justice

4.28    The Respondent was to call two witnesses in proof of its claim at arbitration- a factual and an expert witness. Mr. Michael Quinn was the factual witness and Honourable Justice S.M.A Belgore (CJN Rtd) was the expert witness. Hon. Justice Belogre (CJN Rtd) gave expert opinion on Nigerian law. At the hearing of the arbitration on 1st June 2015, leading to the Award, the Applicant requested and applied to cross examine Respondent's two witnesses. This application was refused by the tribunal in the case of Honourable Justice Belgore ( CJN Rtd) for the flimsy reason ( amongst others) that the learned jurist was unavailable and in the case of Mr. Quinn that the gentleman had since passed away after making his witness statement. Mr. Quinn's death was only announced to the Applicant's counsel upon the request to cross-examine him.[9]

4.29    The unavailability of Respondent's witnesses prevented the Applicant from testing the veracity and accuracy of the evidence of the Respondent's witnesses. The conduct of the tribunal in denying the Applicant the opportunity to cross-examine the Respondent's witnesses, we submit, is a breach of the rules of natural justice – the Applicant was not given full opportunity to present its case.

4.30    We further submit that under Nigerian Law, in order for the opinion of an expert to be admitted in evidence, he must be called as a witness and he is expected to state his qualifications, experience and the reasons for his opinion; he should be cross-

---

[9] See pages 6-7 of the Award.

examined with a view to discrediting him as an expert and the conclusions reached by him.[10] None of these conditions were met in this arbitration as the Respondent's expert witness was absent and the tribunal refused Applicant's request for leave to cross -examine the Respondent's expert witness.

### Ambiguity and inconsistency in the Award.

(a) The dispositive paragraph (paragraph 80) of the Award is inconsistent with the conclusions of the tribunal in related passages of its reasoning.

4.31   In one vain the tribunal at paragraph 80 of its Award finds that the Applicant had breached its obligation to deliver certain agreed quantities of wet gas to the site boundary under clause 6(a) of the Agreement and failed to ensure that all necessary pipelines and associated infrastructures were in place to facilitate the performance of the Respondent's obligation to process and deliver non associated gas to the Applicant under clause 6(b) of the Agreement. However at paragraphs 63 – 66 of the Award, particularly paragraph 66 of the Award, the tribunal also finds that the Applicant had no obligation to deliver wet gas pursuant to clause 6(a) of the Agreement until the Respondent has constructed a gas processing plant to receive the wet gas as envisaged by the Agreement.

4.32   Accordingly, it would appear that the Tribunal did not conclude that there was a breach of clause 6(a) of the Agreement and it is therefore presumed that the presence of a reference to clause 6(a) in paragraph 80 of the Award was a slip and amounts to an inconsistency of the Award.

(b) Lack of factual authority defence not separately dealt with from legal capacity defence.

4.33   The Applicant raised two separate defences that it neither had the legal capacity to enter the Agreement nor the actual authority to perform the Agreement. The two issues, i.e. capacity and authority are and have always been obviously discrete. However the tribunal, in its Award appears in its reasoning only to have dealt with the issue of capacity and not authority.[11] The tribunal made reference to capacity ten (10) times in its reasoning but nevertheless concluded with the word "authority".

4.34   However, given the use of the word "capacity" throughout the prior paragraphs and the clear legal focus of the analysis therein, it appears that no separate consideration was given by the tribunal on the issue of factual, actual authority.

---

[10] Shell Development Company limited v Otoko [1990] 6 NWLR at 713, paras. A-B; Sowemimo v State [2004] 11 NWLR, (Pt.885) at 532, paras, D-E; Wambai v Kano Native Authority (1965) NMLR 15; Tuah v Michael [2010] 10 NWLR,at 534, paras.A-C

[11] see paragraphs 41-54 of the Award

4.35    What is clear is that there is no separate reasoning on the point of authority and therefore the Award appears to be ambiguous.

**The Applicant was under some incapacity (Section 48 (a) (i) of ACA)**

4.36    Applicant submits that the Agreement is vitiated for want of capacity in that the Applicant lacked the legal capacity to enter the Agreement. Applicant is a Ministry of the Federal Government of Nigeria with designated executive responsibilities to formulate government policy within the petroleum industry. The Applicant can only act within the scope of its authorized duties as prescribed by law and as such cannot arrogate to itself the power to supply Wet Gas or indeed any gas to anyone, as the exclusive right to possess and supply gas is vested in the Nigerian National Petroleum Corporation ("NNPC"), a juristic entity which was created *interalia* for purposes of commercial transactions and entering into contracts such as the Agreement.

4.37    In the same vein, the Applicant does not have the capacity to enter into any agreement for the resolution of dispute arising from an agreement or arrangement to supply Wet Gas. The power to sell or direct third parties to sell and supply gas such as that contemplated in the Agreement and the powers to enter into an arbitration agreement in respect thereof is vested in the Department of Gas, a department of the Ministry of Energy pursuant to the National Domestic Gas Supply and Pricing Regulations 2008 ("the Regulations"), a subsidiary legislation to the Petroleum Act, CAP P20 Laws of the Federation of Nigeria 2004.

4.38    The Department of Gas pursuant to the Regulations is statutorily vested with the power to, *inter alia*:

    i.    act as an intermediary between suppliers and purchasers of gas in the domestic market and ensure the supply of gas to the strategic sectors;

    ii.    mandate persons or company's licensed to produce petroleum to supply a specific volume of gas to a purchaser in accordance with a Gas Purchase Order issued by the Domestic Gas Aggregator; and

    iii.    pay compensation to any purchaser for any loses suffered as a result of default to supply gas in compliance with the order of the Domestic Gas Aggregator.[12]

4.39    In *Knight, Frank & Rutley v Attorney General of Kano State [1990] 4 NWLR, (Pt. 142) P.210*, the court held *inter alia* that:

> *"If a person or a public body is entrusted by the legislature with certain powers and duties expressly or impliedly for public purposes, such person or public body cannot divest himself or*

---

[12] See also paragrpahs  2, 4, 5 and 6 of the 2008 Regulations

> *itself of such power or take any action incompatible with the due*
> *exercise of their powers or the discharge of their duties."*

4.40    In the *Knight Frank & Rutley* case, the Commissioner of Finance, Kano State on behalf
of the Kano State Government entered into a contract with the appellants to prepare
a list of rateable hereditaments within Kano municipality. The purpose of the
valuation was to enable the Kano state government to charge and collect tenement
rates of which the government of Kano state made an initial payment of
₦100,000.00 (One Hundred Thousand Naira) to the appellants. The appellants partly
performed the contract by preparing and submitting provisional valuation list.

4.41    Kano State government was however subsequently advised by the Attorney General
of Kano State that the responsibility and the statutory duty to prepare the valuation
list and to collect tenement rates is vested in the Local Government Councils.
Consequently, Kano State Government repudiated the contract. The Claimant's claim
for breach of contract against the Kano State government at the High Court failed as
the contract was declared void and unenforceable. On appeal to the Court of Appeal,
the Court of Appeal unanimously dismissing the Appeal held *inter alia* as follows:

> *"Once the State promulgates a legislation assigning the function*
> *of valuation of tenememt rates to the local government ... only the*
> *local government council has the power to deal with the subject-*
> *matter. Consequently, the state government has no power to deal*
> *with the matter and the local government council cannot, even if it*
> *wants to, divest itself of the power vested in it.........since the Kano*
> *state government has no power of the assessment of tenement*
> *rates, it has no competence or power to enter into an agreement*
> *with anybody or person for the valuation of rateable*
> *hereditaments". (see P.220 -221, paras C-D).*

4.42    The above decision was affirmed by the Supreme Court in ***Knight Frank & Rutley***
***(Nig) v A.G Kano State [1998] 7 NWLR (Pt.556)*** where the apex court per Uwais
C.J.N (rtd) held as follows:

> *"there is no legislation which empowers Kano State Government*
> *to dabble in or interfere with the compilation of valuation list for*
> *the purpose of assessing or collecting rates on private properties in*
> *Kano State. Therefore, the Government acted ultra vires in*
> *entering into contract with the appellants to do what only the*
> *Local Government Councils concerned were entitled to do under*
> *the 1979 Constitution and the Local Government Edict, 1977."*

4.43    In view of the foregoing, we submit that the Agreement upon which the arbitration and therefore the Award was predicated is void for want of legal capacity. Applicant submits further that the lack of legal capacity to enter into the Agreement cannot be cured by the fact that the Applicant held itself out to have the capacity to enter into the Agreement. See *Knight Frank & Rutley ( supra) at page 221 -222* where it held that the contract was void regardless of the fact that the Kano State government held itself out to the appellants as having the authority to execute and award the contract and the honest reliance of the appellant on the ostensible authority of the Kano State Government. Same cannot also be cured by estoppel. See **Menakaya v Menakaya [2001] 16 NWLR (Pt. 783) P.252**.

### Repudiation

4.44    The Applicant also raised at paragraph 7 of its defence that its conduct did not amount to a repudiatory breach. This denial it is submitted, survives a finding of breach and raises the question of the seriousness of the breach. Although the tribunal made findings as to the existence of breaches of contract on the Applicant's part, it did not discuss or evaluate the nature of those findings in terms of their being repudiatory or otherwise.

The Tribunal failed to consider the Applicant's point that the consequence of a breach of clause 6(b) of the Agreement alone is not necessarily repudiatory.

### The Award contains decision on a point not put forward by the parties.

4.45    The Tribunal at paragraphs 44 and 45 of the Award was of the view that *"Prima facie"*, dealing with natural gas from Nigeria Oil fields was a matter within the remit of the Minister of Petroleum Resources and that the power to grant licenses to prospect for, develop and sell oil and gas is vested in the Minister of Petroleum Resources by virtue of section 2(1) and 4(1) of the Petroleum Act. The Tribunal was also of the view that it was a matter for the minister of petroleum resources, acting on behalf of the government to deal with these gas resources which belonged to the State.

4.46    However, contrary to the tribunals view, the Minister of Petroleum Resources is only empowered to grant licenses to any person who intends to **prospect** for, develop and sell oil and gas. The Minister of Petroleum Resources is not empowered to sell or supply gas as "the Minister". This was strictly within the purview of the Department of Gas/ Ministry for Energy as stipulated in the Regulations.

4.47    Furthermore, and contrary to the tribunal's decision, the power to grant licenses to prospect for, develop and sell **gas** by the minister for petroleum resources is limited to lean or non-associated gas and not Wet Gas or Associated Gas, subject matter of the Agreement.

4.48    Petroleum as defined by the Petroleum Act means *"mineral oil (or any related hydrocarbon) or **natural gas as it exists in its natural state in strata** and does not include coal or bituminous shales or other stratified deposits from which oil can be extracted by destructive distillation".* Therefore natural gas as envisaged by the

Petroleum Act is purely lean gas or non-associated gas as it exists in its natural form and not associated or Wet Gas which is discharged from an oil well, together with oil during the process of extraction of oil. In other words, Wet Gas is a bye product of fracking or drilling.

4.49    The issue of Non-associated gas was not within the contemplation or included in the agreement for reference to arbitration and neither was it a **point put forward by the parties to the Tribunal** and as such the tribunal ought not to make findings on it.

*The Award consists of mistake of fact which is admitted to by the Tribunal and clear beyond any reasonable doubt*

4.50    The tribunal at paragraph 35 (page 7) of its Award concluded that the Applicant's Witness Mr. Ikechukwu Oguine gave no relevant evidence as his statement consisted of references to documents on the record.   The tribunal failed to take into cognizance Mr. Oguine's statement at paragraph 4 of his witness statement to the effect that his testimony "was based on his personal knowledge of the current dispute in respect of the GSPA".

4.51    In other words the tribunal finding was to the effect that the Applicant called no evidence to support its claim on the basis that its only witness did not have first-hand-hand knowledge of the facts leading to the dispute between parties.

4.52    We further submit that the Tribunal's failure to admit the undisputed evidence of the Applicants witness whom the Respondent chose not to cross examine (see paragraph 35, Page 7 of the Award is glaring mistake of fact and Nigerian Law which is clear beyond reasonable doubt.

## 5.    CONCLUSION

5.1    In light of the foregoing arguments, we humbly urge this Honourable Court to resolve the above issues in favour of the Applicant, and grant the reliefs sought by the Applicant.

Dated this 24th of February 2016





Olasupo Shasore, SAN
Bello Salihu
Lateefat Hakeem-Bakare
Safiat Kekere-Ekun
**Applicant's Counsel**
**Twenty Marina Solicitors LLP**
Sterling Towers
20 Marina Lagos
Telephone: 01-2719368-9

E-mail: ao@ajumogobiaokeke.com

**For Service on:**

**The Respondent**
Process and Industrial Developments Limited
Trident Chambers
P.O Box 146
Road Town
Tortola
British Virgin Islands