# EXHIBIT 18

IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)

AND

AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:

        PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED     Claimant

And

THE MINISTRY OF PETROLEUM RESOURCES         Respondent

OF THE FEDERAL REPUBLIC OF NIGERIA

DISSENTING FINAL AWARD OF BAYO OJO, SAN

## INTRODUCTION

This is a Minority Dissenting Final Award. I have read the Majority Award of my co-arbitrators. I am unable to agree with the conclusions reached therein. I hereby issue the following dissenting award. To avoid repetition, I adopt the following that relate to: introduction, the parties and their lawyers, the governing law and arbitration clause, procedural history and the finding on liability as contained in the majority award. I shall now proceed to the measure of damages which is where I differ.

## DAMAGES

The points of contention on damages relate to four broad issues namely:

    a. Mitigation

    b. Capital Expenditure (Capex)

    c. Operating Expenditure (Opex) and

    d. Yield.

This award will address those issues.

**MITIGATION**

The majority opinion treated the issue of mitigation in a dismissive manner, by holding that Respondent did not suggest what other investment Claimant could have undertaken.[1] Claimant conceded at paragraph 28 of its 'Claimant's Written Submission in Reply' (on the issue of damages) the duty to mitigate by stating that **'it is accepted that P&ID was under a duty to mitigate its loss whether as a matter of Nigerian or English law'**, but claimed that it was a unique opportunity so there was no need to mitigate.

1. See also paragraph 59 of Claimant's Written Submission in Reply for the Hearing on Quantum on 30-31 August 2015, where it stated that **'During the 6 years from the conception of the project until the commencement of the arbitration in mid-2012 other potential projects had been put on hold'.**

2. Claimant argued that the Respondent had a duty to show that the Claimant as a reasonable person could have found alternative work. This argument in my view is misconceived. Having admitted the duty, Claimant bore the burden of proving that it has discharged the duty.

3. What is the scope of a duty to mitigate? The obligation is on the innocent party to lessen the financial loss to which it is exposed by seeking alternative means of income.

4. Claimant is an international engineering and project management company, capable of undertaking the kind of project envisaged under the agreement (GSPA) in Nigeria and other kinds of related works/projects in any other part of the world. There is no suggestion that the company was incorporated for the sole purpose of the GSPA. There is no evidence of any attempt made by Claimant to mitigate. Besides, the burden to mitigate is something that has to be taken into account throughout the period of 20 years. Indeed, by making an award without taking into account the duty to mitigate, the Respondent by implication will be subrogated to any fees or other remuneration that the Claimant might subsequently earn.

5. The purpose of damages under Nigerian law is not to give the innocent party a windfall, but to put the party in the position he would have been had the breach not occurred. Claimant is a new company that was incorporated in 2006. While not denying the fact that the Claimant is entitled to be compensated, to demand for general damages of $8.6 billion dollars is like asking for a reward for services not rendered.

6. Respondent argued that Claimant is not entitled to damages for more than three years from the date of breach. In the circumstance I think the three year period is not unreasonable, especially given the background of the project and the admitted existence of other projects which the Claimant had put on hold and to which it can easily return.

7. The majority opinion appeared to have set up a case better than, and different from that canvassed by the Claimant by suggesting that the Claimant had the capacity to do more than one work at a time. It was stated that 'An employee who is dismissed can find another full time job. But there is no reason why P&ID should not have pursued more than one investment opportunity'. See

---

[1] Paragraph 103 Final Award

2

paragraph 103, page 29 of the final award. The issue of the ability to do more than one work is at variance with the Claimant's case. It is on record that Claimant stated that it devoted, "substantially the whole of the time and resources" of the team on this project and that it placed on hold another project. This is clear admission that Claimant lacked the capacity to pursue more than one investment opportunity at the same time. See paragraph 59 of Claimant's written submission in reply on the hearing on quantum on 30-31 August 2016.

8. Should the Claimant get a windfall for twenty years because of a breach, or is it obligated to reduce and ameliorate the impact of the breach by finding an alternative, even if not equivalent engagement of its kind? In the case of **Kosile v. Folarin (1989) 3 NWLR (Part 107) 1 at 16 Supreme Court, KAWU, JSC** on the duty of plaintiff to mitigate damages held that:

> *It is, of course, a well settled principle of law that a plaintiff is required to take all reasonable steps to mitigate the loss resulting from the defendant's wrong as no damages will be awarded in respect of any part of the loss which he could have averted by taking reasonable steps to do so.*
> See also the case of **Momodu v. NULGE (1994) 8 NWLR (PT 362) 336 AT 353 Appeal Court.**

9. Mitigation aims at reduction of the impact of loss and not a provision of necessarily 'equivalent' work. Again, it is on record that Claimant put some projects on hold in order to undertake the instant contract. This was stated in paragraph 59 of Claimant's written submission on the hearing on quantum that 'During the six years from the conception of the project until the commencement of the arbitration in mid 2012, other potential projects had been put on hold'. So on the record there is evidence and/or admission of a project to which Claimant could return.

10. As I earlier stated, contrary to the suggestion of the majority, the Claimant clearly admitted its duty to mitigate by stating in paragraph 28 of the Claimant's written reply on the issue of damages that "it is accepted that P&ID was under a duty to mitigate its loss whether as a matter of Nigerian or English law." This admission cannot be disregarded. In the case of **NIMASA v. Hensmor (Nig) Ltd. (2015) 5 NWLR (Part 1452) 322 Court of Appeal,** the court held that, 'A plaintiff has the onus to mitigate damages of his cause of action rather than rush to file an action in court'. The Claimant having admitted that it was under a duty to mitigate loss, and yet failed to continue with any of the projects it had put on hold; it is my considered view that the Respondent no longer had the burden to proof same.

11. The general and fundamental rule of the law of evidence is that the court can only base its decision in any litigation on facts that are proved to exist by evidence. However section 123 of the Nigerian Evidence Act, 2011, provides that no fact needs to be proved in any civil proceeding which the parties to the proceeding or their agents agree to admit at the hearing, or which, before the hearing, they agree to admit by any writing under their hands, or which by any rule or pleading in force at the time they are deemed to have admitted by their pleadings. **<u>Joseph Mangtup Din v. African Newspapers of Nigeria Ltd delivered on 25<u>th</u> day of May, 1990 Suit No. 44/1986 Supreme Court.</u>** The Claimant, having admitted the duty to mitigate is bound by it. See **SUNDAY ADEGBITE TAIWO v. SARAH ADEGBORO** delivered by the Supreme Court o 20<u>th</u> May 2011.

3

12. It is not tenable to award damages on the supposition that the Claimant will not be able to find an alternative work or project for twenty years. The crucial issue is for what part of the 20 years it is reasonable to compensate Claimant bearing in mind the admitted duty to mitigate and the fact that it had put other projects on hold and which it can return to immediately. Considering that the breach occurred in 2013, and that the project could not have started yielding proceeds earlier than 2015, it means that the Claimant had from 2013 to attempt the mitigation of its damage or loss. Therefore a period of three years from 2015 to 2018 is reasonable. See again the Supreme Court case of ***Kosile v Folarin***.

13. In the related field of employment law, a plaintiff who cannot find reasonable alternative employment has a further duty to lower his or her sight, and the measure of damages would then be the difference between his previous earning and current earning. Mitigation of damages entails reduction or amelioration of the loss occasioned by the breach. The majority opinion seems to misconceive and misplace the duty to mitigate having been admitted by the Claimant. In the instant matter, there is admission by Claimant that it put other projects on hold in order to undertake the project contemplated under the GSPA. Two unassailable conclusions can be drawn from that admission.

14. The first is the inability of Claimant 'to pursue more than one investment opportunity' at the same time. The second is the availability of another work to which Claimant could return thereby undercutting the indulgence of the majority opinion to Claimant on this point. In any event, it is absurd or anomalous for Claimant to admit the existence of a duty on itself, and then, without any evidence by way of a discharge of that duty, for the majority opinion to state that the Respondent has not proved what other work claimant would have undertaken. The party that has the duty has the burden to prove the discharge of that duty under Nigerian law. The Claimant clearly bore the duty to prove its effort at mitigation.

15. It is inconceivable, untenable and indefensible for Claimant to fold its hands and ask for damages for twenty years. Again, as I earlier stated, assuming the Claimant is paid for twenty years, does the respondent become subrogated to any income that claimant might earn from subsequent work within the twenty year period?

16. In view of all the above, I find that the Claimant is not entitled to damages for loss from the breach for more than three years.

17. **CAPEX AND OPEX**

18. Claimant's experts put the CAPEX at $514, 100,000 while Respondent's state that that figure should be upped by 40%. It would appear that Claimant's estimates are rather very conservative, especially when juxtaposed with the purported expected proceeds from the project. A project that Claimant argued would yield **$8.6 billion** in profit in 20 years would cost, in the claimant's experts' opinion **$514.1million**, meaning that the cost of building the plant is recoverable in only about a year or two.

19. I am of the view that the Claimant's estimates on CAPEX and OPEX are grossly understated and that the Respondent's estimates are preferable. The points of divergence are that the Respondent added forty percent (40%) to the figure projected by the Claimant for CAPEX, and also added

4

twenty five percent (25%) to the suggested figure for OPEX. Unfortunately, by their very nature, the estimates can only be projections. This is especially so because Claimant did not build the plant. Although the award on liability held that the Claimant was not liable in failing to construct the plant, that omission certainly has impacted on the calculation of CAPEX and OPEX. Thus, the experts were all over the map on the figures. The challenge therefore is to essentially know which of the two competing speculations is more tenable.

20. The Claimant's estimates are overly conservative and failed to take into account local circumstances. Calabar the proposed location for the plant is in the Niger-Delta and certainly is not immune from the challenges encountered by oil and oil related facilities in the region, and no reasonable investor will proceed with an investment in that area without paying regard to those challenges. On this score, the Respondent's estimates are, on the balance of probabilities, more tenable. This analysis is without prejudice to my earlier decision on the effect of the duty to mitigate.

21. It will be a travesty to ignore the evidence of the Respondent on CAPEX simply because it didn't follow the same methodology adopted by the Claimant. The burden is always on the Claimant to establish their case.

22. The majority award suggested that Respondent offered no evidence on this issue. The evidence of the Respondent's expert on CAPEX spans several pages of the record. The Respondent was provided with the Claimant's expert report on the issue of CAPEX. He, the Respondent's expert, testified to the fact that the Claimant's estimates, as contained in the Claimant's expert's report, were understated by about 40%. This was maintained by that witness throughout cross examination. He testified that the figures on CAPEX should be raised to 40%.

23. This was after looking at the item by item estimates made by Claimant's expert. It would be grossly unfair to characterise such evidence as irrational. Certainly, by using a broad percentage, the Respondent was saved the task of testifying item by item. But this does not affect the probative value of the evidence, since he reviewed the underlying item by item estimates and found them to be understated by that percentage. It is not absurd for an expert who has reviewed the detailed figure of another expert to point out that those estimates were understated and to testify to the extent of the understating.

24. It is also worthy to note that, in addition to Respondent's witness' expertise, he also has a working knowledge of the area where the project would have been sited. In answer to cross examination on the issue of 40% he stated clearly'

> "So there is the BRG opinion of what a class 5 estimate will provide, there is the Upstream opinion on that, and there is the opinion which is the estimate you get at finally (sic) investment decision point. They didn't have that. We don't have that. So this is a range, an uncertainty range, so you take your pick based on how familiar you are with what you expect will happen. I happen to have a working knowledge of the Niger Delta on all sides, including Calabar, and that's where that has come from. So I think the CAPEX expectation is understated, and a factor of 40 per cent definition of what project is about, yeah, is reasonable".(pages 93-94 Day1 PID 1.1 30 AUGUST 2016)

5

25. It is really inaccurate for the majority opinion to suggest that on CAPEX the tribunal had no evidence at all to contradict Mr. Wolf's estimate. Mr. Dare, a competent expert witness, testified clearly and succinctly that Mr. Wolf's estimate is understated by 40 per cent plus.

26. The Respondent's witness clarified the issue of OPEX in his oral testimony. Although the initial paper submission alluded to 2.5% of CAPEX as baseline, the witness stated clearly that that is a rule of thumb applicable to projects of the value of $1 billion and above, and further that he attempted to withdraw that earlier statement when he discovered that it was not applicable to the project at hand, but that could not be done because it had already been filed. There could have been a procedural snafu on the part of counsel in not properly substituting such filing. This does not detract from the evidence and explanation of the witness. The witness addressed the issue of the Niger Delta security challenge at pages 111 to 113, providing details of the issues and items that would raise the OPEX by 25%.

27. He also specifically stated the provision of fence in CAPEX would not be sufficient to meet such challenges as the need for provision of government security agents, engagement with the community, etc. See pages 111 to 113 of the record. It is curious to suggest that there is need to show why it is prudent to employ government security personnel. Mr. Dare's evidence alluded to these challenges.

28. The majority opinion cannot aprobate and reprobate at the same time. It cannot complain that there is no evidence on these security challenges and other Niger Delta issues while at the same time observing that the Claimant had no opportunity to comment on Mr. Dare's evidence on these same matters.

29. Claimant did not object to Mr. Dare's evidence on these matters, indeed some of the matters were raised in cross examination by Claimant. A refusal on the part of the majority opinion to apply probative value to such evidence elicited in cross examination by Claimant on the ground that Claimant did not have opportunity to comment on them, will be absurd and unfair.

30. **NGL YIELDS**

31. In relation to the yields, there are two major disagreements. The first relates to the probable times that the plant could operate. Claimant's experts argued that the Claimant should allow for only 10% of downtime (meaning 90% of uptime), whereas the Respondent's experts put the probable down time at about 50%. Again the difference owes to the respective assumptions of the parties and their experts. The Claimant assumes that there would be minimal interruption, and the Respondent assumes that significant disruptions would have arisen from the Niger-Delta challenges and other intervening factors.

32. I have already stated that a reasonable investor must contemplate the Niger-Delta issue. This can be two pronged; first, as stated above, Calabar being in the Niger-Delta is not immune from the crisis that often manifest in that region and so it is not outside the realm of imagination or possibility that operations of the plant could be affected by such disturbances. The second aspect of such manifestation is the possibility of a disruption in the supply of wet gas to the plant in Calabar. This disruption can occur either at the plant in Calabar or even far away from Calabar depending on the location from where the wet gas is to be supplied to the plant.

6

33. In this second instance, the argument was made that it is the responsibility of the Respondent to ensure the supply of gas to the Claimant at the plant. That may well be so, but where the Respondent is prevented, by factors beyond its control from delivering such gas, certainly a claim of *force majeure* would avail the Respondent and therefore it is not unreasonable in estimating the frequency and regularity with which wet gas can be supplied to the plant over a period of time to consider the possibility, and indeed the probability, of disruption owing to such events. The combination of these possibilities will certainly reduce the uptime, and this is in addition to the normal maintenance time and such other periods or time that the plant may not be in operation.

34. The flaw with the Claimant's expert's analysis is that they do not make allowance for these possibilities. They confine the probable periods that the plant will not operate to those times for maintenance and therefore discount any possibility of interruptions arising from other sources. In the circumstances, I am left with the Respondent's estimate in relation to these factors, and therefore accept the Respondent's estimates and hold that a period of uptime should be about sixty percent (60%).

35. The second major difference in the analysis of the experts for the parties is in relation to the proceeds in monetary term accruable to Claimant from the NGL. Both parties agree that the price of NGL tracks the price of crude oil; however Claimant states that the reference point of a projection of a cost of the NGL should be March 2013 being the date on which the breach occurred.
Since the price of crude oil was relatively high on that date, it would tend to have affected the estimates in an upward manner. Thus Claimant's expert puts the average price at over $100 per barrel.

36. On the other hand, Respondent's experts would rather take into account the significant fall in the price of crude oil between 2014 and 2015 with the result that their estimates are less rosy than the Claimant's. Similarly, because of the divergence in the estimate on uptime, the estimated yearly output by both sides differs in material respects. Claimant's figures are higher because they have the higher percentage of estimated uptime whereas Respondent's figures are lower because they have a lower percentage of estimated uptime.

37. It seems to me that while it may be appropriate to relate back to the date of the breach for the purposes of damages, it will be inappropriate for me to close my eyes to the evidence that the price of oil has fallen significantly and that future outlook may not be as positive as it was in 2013. To do otherwise will amount to playing the Ostrich. I am therefore persuaded that the projections of the Respondent's experts are more in consonance with reality and therefore more tenable. I therefore find that were it necessary to find the price of crude for 2015-2035 the estimates of the Respondent's experts would be a better forecast of such price.

38. However in view of my decision on the obligation of the Claimant to mitigate damage, I hold that the relevant period is three years from (2015-2018). This is because although the breach occurred in 2013, if the contract had not been broken, the Claimant wouldn't have started enjoying the fruit thereof until 2015.

39. The totality of the evidence reveals that the issue of Niger Delta crisis as affecting the facility uptime was clearly raised by the Respondent. Claimant's position on this is that Calabar is insulated

7

from the phenomenon of the Niger Delta crisis and that the Respondent has not particularised incidents of disruption in Calabar as opposed to other parts of the Niger Delta region. Again the evidence of Mr. Dare proves the existence of that problem. It also indicates that the facility such as was envisaged by GSPA is not common in Nigeria let alone Calabar. In other words, it is essentially a trail blazer.

40. To nitpick on whether the Niger Delta militants would have absolved a gas plant from its disruptions would be to ascribe to them a level of rationality and consideration inconsistent with their overarching campaign. Besides, it is clearly admitted that Calabar is in the Niger Delta region and to assume that the facility, if it had been established, would somehow be insulated from the social upheaval that has characterised that region, is not realistic. Again, it is to be noted that Mr. Dare testified to his factual knowledge of that area.

41. The other issue in relation to the exact percentage of uptime or downtime is just a storm in a tea cup. Mr. Dare gave three figures of 40, 55 and 60 percent (all within the same ball-park). Certainly these are estimates by their very nature; it will be pretentious to assume that they would be exact. It is not a testimony on fact but a projection of what could have happened and so, necessarily, cannot be scientifically precise. His evidence clearly shows that the Niger Delta crisis would have had a significant impact on the operations of the plant. Certainly that evidence is preferable to that of the Claimant's experts which assumes that, and indeed wishes away, a phenomenon as pervasive and disruptive as the Niger Delta militancy and crisis in that region of which Calabar is a part.

42. I find that the uptime or downtime as the case maybe is at a percentage equivalent to any of the figures (all of which are within the same ball-park) or their average. The Respondent certainly cross examined Mr. Melling on the issue of down time and uptime.

43. **SUMMARY**
44. In summary, I am of the considered view that justice and fairness in this reference dictate that I hold as follows:

    1. I hold that the Claimant ought to have mitigated its loss and cannot sit and fold its hands for twenty years expecting a windfall from the Respondent. As a result, I hold that the Claimant is entitled to damages for only three years.
    2. I hold that subject to 1 above, the operating expenditure (OPEX) that the Claimant could have incurred had the breach not occurred should not be less than $75million US dollars.
    3. I hold that subject to 1 above, the capital expenditure (CAPEX) should not be less than $US11, 986,000 US dollars
    4. I hold that had the project proceeded, the plant would operate for not more that 60% of the time in a year.

45. **FINAL AWARD**
46. Having considered the relevant contract, correspondence and other documents put before me, and having carefully considered the written submissions of the parties, I **HEREBY FIND, AWARD AND DECLARE** as follows:

The Respondent shall pay the Claimant the sum of $250million (250,000,000) US Dollars as damages for breach within ninety days from the date of this award. Since Article 20 of the GSPA which contained

8

the arbitration clause provides that the cost of this reference should be born equally by the parties and each party shall bear its own lawyer's fees, I make no order as to cost except for any amount paid by the Claimant which the Respondent failed to pay; in which case such sum shall be refunded to the Claimant.

**Place of Arbitration: London, United Kingdom**

**Dated the 31st Day of January 2017**

*[signature]*

**Bayo Ojo, SAN**

**Arbitrator**