# EXHIBIT 1

David H. Fromm (DF 9334)
BROWN GAVALAS & FROMM LLP
369 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500

Attorneys for Defendants Federal Republic of Nigeria
And Nigerian Ministry of Petroleum Resources

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

MALABU OIL and GAS LIMITED,

                          Plaintiff,                        02 Civ. 6162 (TPG)

        v.
                                                            **NOTICE OF MOTION**

FEDERAL REPUBLIC OF NIGERIA, NIGERIAN
MINISTRY OF PETROLEUM RESOUCES,
SHELL NIGERIA EXPLORATION AND
PRODUCTION COMPANY LIMITED, SHELL
PETROLEUM DEVELOPMENT COMPANY OF
NIGERIA LIMITED, ROYAL DUTCH
PETROLEUM COMPANY and SHELL
TRANSPORT & TRADING COMPANY, PLC,

                          Defendants.

----------------------------------------------------------X

S I R S:

        **PLEASE TAKE NOTICE**, that upon the annexed Declaration of Idenyehim Stella

Omiyi, dated April 10, 2003, the exhibits attached thereto, the accompanying Memorandum

of Law, and upon all of the pleadings and proceedings heretofore had herein, the undersigned

will move this Court before the Hon. Thomas P. Griesa, Coutroom 26 B, at the Courthouse

located at 500 Pearl Street, New York, New York 10007 on the 15th day of May, 2003, at

9:30 o'clock in the forenoon of that day or as soon thereafter as counsel can be heard for an

R E C E I V E D
APR 1 8 2003
CHAMBERS OF
JUDGE GRIESA

Order, pursuant to Fed. R. Civ. P. 12(b)(1), dismissing plaintiff's complaint on the grounds

that the Court lacks subject matter jurisdiction by virtue of the Foreign Sovereign Immunities

Act, 28 U.S.C. § 1602 <u>et seq</u>. and for such other and further relief as the Court deems just and

proper.

Dated: New York, New York
       April 15, 2003

        Yours, etc.

        BROWN GAVALAS & FROMM LLP
        Attorneys for Defendants
        Federal Republic of Nigeria
        And Nigerian Ministry of Petroleum Resources

        David H. Fromm (DF 9334)
        A Member of the Firm
        369 Lexington Avenue
        New York, New York 10017
        (212) 983-8500

TO:

WECHSLER HARWOOD LLP
Attorneys for Plaintiff
488 Madison Avenue, 8th Floor
New York, New York 10022
Attn: Scott Kamber, Esq.
(212) 935-7400


CRAVATH, SWAINE & MOORE
Attorneys for Defendants
Royal Dutch Petroleum Company
and The "Shell" Transport &
Trading Company, P.L.C.
825 Eighth Avenue
New York, New York 10019-7475
(212) 474-1000

RECYCLED

David H. Fromm (DF 9334)
BROWN GAVALAS & FROMM LLP
369 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500

Attorneys for Defendants Federal Republic of Nigeria
And Nigerian Ministry of Petroleum Resources

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MALABU OIL and GAS LIMITED,

                              Plaintiff,                         02 Civ. 6162 (TPG)

          v.
                                                                **<u>DECLARATION</u>**

FEDERAL REPUBLIC OF NIGERIA,
NIGERIAN MINISTRY OF PETROLEUM
RESOUCES, SHELL NIGERIA
EXPLORATION AND PRODUCTION
COMPANY LIMITED, SHELL PETROLEUM
DEVELOPMENT COMPANY OF NIGERIA
LIMITED, ROYAL DUTCH PETROLEUM
COMPANY and SHELL TRANSPORT &
TRADING COMPANY, PLC,

                              Defendants.

-------------------------------------------------------------X

          IDENYEMIH STELLA OMIYI, declares as follows:

          1.      I have been employed by the Nigerian Government for more than 25

years.  I am the Director of the International & Comparative Law Department of the

Federal Ministry of Justice.  I am also an attorney duly admitted to practice law in

Nigeria.

          2.      I am familiar with the Ministry of Petroleum Recourses ("MPR") of the

Federal Republic of Nigeria ("FRN") and its status under Nigerian law.

3.    The MPR is not a separate or distinct entity under Nigerian Law. It is not a legal entity under Nigerian Law.

4.    The function of the MPR is the formulation and implementation of policies and programs for the petroleum industry on behalf of the FRN.

5.    Neither the FRN nor any person or entity owns any shares in the MPR. The MPR does not issue shares in itself or any other form of equity evidencing an ownership interest in the MPR. The MPR cannot and does not own any property. The MPR cannot sue or be sued in its own name and there is no enabling statute with respect to the MPR.

I declare under the laws of the penalty of perjury under the law of the United States that the foregoing is true and correct and that this declaration was executed on the 10th day of April, 2003 at Abuja, Nigeria.

_____
Idenyemih Stella Omiyi

2



Scott A. Kamber (SK-5794)
Dana B. Rubin (DR-8451)
Wechsler Harwood LLP
488 Madison Avenue
New York, N.Y. 10022
Tel: (212) 935-7400

Attorneys for Plaintiff


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MALABU OIL and GAS, LIMITED,

      Plaintiff,

    v.

FEDERAL REPUBLIC OF NIGERIA,
NIGERIAN MINISTRY OF PETROLEUM
RESOURCES, SHELL NIGERIA
EXPLORATION AND PRODUCTION
COMPANY LIMITED, SHELL PETROLEUM
DEVELOPMENT COMPANY OF NIGERIA
LIMITED, ROYAL DUTCH PETROLEUM
COMPANY, and SHELL TRANSPORT &
TRADING COMPANY, PLC,

      Defendants.

02 Civ. 6162 (TPG)


AMENDED COMPLAINT



Plaintiff, by its undersigned attorneys, brings this amended complaint (the "Amended Complaint") against defendants named herein and alleges as follows:

SUMMARY OF ACTION

1.    This is a complaint for damages caused by defendants' wrongful actions to deprive plaintiff Malabu Oil and Gas Limited ("Malabu") of its Oil Prospecting License ("OPL") for Block 245, offshore of the Federal Republic of

Nigeria.   Malabu was awarded long-term oil prospecting rights for Block 245 in 1998, in accordance with all applicable laws.  Seismic studies on Block 245 indicate that it contains oil reserves of almost three billion barrels of oil, making Block 245 one of the largest offshore oil blocks in Africa.

2.      Shell Petroleum Development Company Of Nigeria Limited, with the knowledge, acquiescence and active participation of its wholly owned subsidiary Shell Nigeria Exploration And Production Company Limited, and its parent entities, Royal Dutch Petroleum Company, and Shell Transport & Trading Company, plc (collectively, "Shell" or "the Shell Defendants") engaged in a pattern of conduct to surreptitiously influence the Federal Republic of Nigeria and the Nigerian Ministry of Petroleum Resources (collectively, the "Government" or "Nigeria") to breach its legal commitments to Malabu and illegally take from it OPL 245.  The object of Shell's scheme was to wrest control of OPL 245 for its own financial benefit and continue its efforts to limit the role of indigenous companies in the Nigerian petroleum industry.

3.      The pattern of conduct engaged in by Shell took place in Nigeria, the United States, and Spain.  Shell's conduct included the improper use of its economic influence in Nigeria through the payment of bribes to senior Nigerian officials as well as improper campaign contributions.   Shell further sought to encourage Nigeria to wrongfully take the duly awarded license from Malabu by promising Nigeria, *inter alia*: (i) a signing bonus $190 million more than that paid by Malabu;

and (ii) a form of agreement that was more favorable than that which had been entered into with Malabu.

4.  After months of pressure, Nigeria gave Shell what it had illicitly bargained for beginning in January 2001.  On July 2, 2001, the President of Nigeria asked a Special Assistant on Petroleum and Energy Matters to direct the Director for Petroleum Resources to immediately take OPL 245 from Malabu and revoke the title deed that had been issued barely a month earlier.  The Director for Petroleum Resources immediately followed the directive and sent a letter to Malabu that same day effectuating the taking.  In violation of Nigerian and international law, Nigeria has never given Malabu a basis or justification for the taking.

5.  The present Nigerian government stated in 2000 that all bidding for oil leases is required to be done in an open and transparent manner.  Further, no bidding was to be entertained for any oil blocks during 2002 due to the fact that elections are scheduled for 2003.  Nonetheless, Nigeria completed its bargain with Shell by having a secret bidding process for the "allocation of Block 245."  Not only was the bidding kept from the public, only two oil companies were permitted to bid. Not surprisingly, Shell was invited to bid and Malabu was not.  The second company invited to bid was Esso Exploration and Production Nigeria (Deepwater East) Limited, a subsidiary of ExxonMobil ("ExxonMobil").

6.  The bidding for Block 245 took place in the spring of 2002.  While the bidding was labeled as "competitive," the award of Malabu's Block to Shell was a *fait accompli*.  Shell, by reason of its technical partnership with Malabu, was privy

to information that was not available to its only competitor for the Block. With access to the seismic study, and therefore inside information on the value of the Block, Shell was in a position to submit a bid that went far beyond anything that had ever been proposed for an OPL. In consultation with Shell, the Nigerian Government failed to provide any data on the Block to ExxonMobil.

7.    As promised months earlier, Shell's proposal included a $210 million signing bonus as well as a licensing structure more favorable to the Nigerian Government than that which was originally bargained for between Nigeria and Malabu. Shortly thereafter, Shell Nigeria Exploration And Production Company Limited was allocated Block 245.

### JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1330, 1605(a)(2) and (a)(3) (Foreign Sovereign Immunities Act), and 28 U.S.C. § 1331 (federal question jurisdiction).

9.    In addition, Plaintiff invokes the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over claims based upon state or common law.

10.    Personal jurisdiction over the Federal Republic of Nigeria and the Ministry of Petroleum Resources is proper under the Foreign Sovereign Immunities Act ("FSIA").

11.    Personal jurisdiction over Shell Nigeria Exploration and Production Company Limited, Shell Petroleum Development Company of Nigeria Limited, Royal Dutch Petroleum Company, and Shell Transport and Trading Company, plc is

founded upon both specific and general jurisdiction.   Specific jurisdiction exists because the Shell Defendants purposely availed themselves of the privilege of conducting activities in New York, and the causes of action alleged herein arise out of those activities.   General jurisdiction exists because each of the Shell defendants has extensive business contacts with the State of New York.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3), (d), or (f)(1).  The basis for venue is: (i) at least one defendant can be found in New York; (ii) all Shell defendants are alien corporations; and/or (iii) a substantial part of the acts and omissions giving rise to the alleged claims regarding Nigeria occurred in New York.

## PARTIES

### PLAINTIFF

13.     Plaintiff Malabu Oil & Gas Limited ("Malabu") is a company organized under the laws of the Federal Republic of Nigeria.  Its corporate headquarters and offices are located at 35 Kingsway Road, Ikoyi, Lagos, Nigeria.

14.     Malabu was formed in April 1998 for the purpose of acquiring oil prospecting license(s) in Nigeria under the Nigerian Petroleum Act as an indigenous corporation.

15.     On April 29, 1998, Malabu was granted a 100% interest in a license to prospect for petroleum in, upon and under the deep water area known as Block 245 ("OPL 245").

16.     Malabu was granted OPL 245 in accordance with all governing laws and regulations.

17.     The Title Deeds for OPL 245 were signed by the Ministry of Petroleum Resources on May 15, 2001, and a copy was delivered to Malabu on May 24, 2001.

<u>NIGERIA DEFENDANTS</u>

18.     Defendant Federal Republic of Nigeria ("Nigeria" or "FRN") is a foreign nation located on the west coast of Africa.  Nigeria is the world's eighth largest exporter of petroleum, producing approximately 1.8 million barrels of oil per day.  Over 40% of Nigeria's oil is exported to the United States.

19.     Oil revenues provide approximately 80% of Nigeria's federal government budget and over 90% of total foreign exchange revenue.  Upon information and belief, almost all of the funds generated by the government from oil production are deposited into J.P. Morgan Chase in New York.  Upon information and belief, Nigeria utilizes J.P. Morgan Chase in New York as a central bank and almost all government transactions are done in U.S. dollars and these transactions are done through J.P. Morgan Chase.

20.     Since 1999, the President of Nigeria has been Olusegun Obasanjo ("Obasanjo" or the "President") and the Vice President has been Atiku Abubakar ("Abubakar" or the "Vice President").  The next presidential elections are scheduled for Spring 2003.  President Obasanjo is currently facing impeachment proceedings.

21.     Defendant Ministry of Petroleum Resources (the "Ministry" or "MPR") is an executive agency of the FRN and takes direction from the President.  The

Ministry is in charge of the day-to-day government involvement with the petroleum industry. In particular, the Ministry is responsible for joint ventures in which the FRN is a principal, management of production sharing contracts, as well as all issues regarding Oil Exploration Licenses, Oil Prospecting Licenses, and Oil Mining Leases and other matters arising from the operation of the Petroleum Act cap 350 Laws of the Federation of Nigeria 1990.

22.    The position of Minister of Petroleum Resources is currently unfilled, and was unfilled at the time that Block 245 was illegally revoked by the FRN. President Obasanjo has been illegally acting in the capacity of Minister, and is currently being investigated by the Nigerian legislature for his actions in that regard.

23.    The Department of Petroleum Resources ("DPR") is the technical arm of the MPR. Its responsibilities include supervising all petroleum industry operations to ensure compliance with the applicable laws and regulations and processing all applications for licenses to ensure compliance with the guidelines prior to making recommendations to the MPR.

24.    At all times herein relevant, M.A. Ofurhie was the Director of Petroleum Resources, Dr. Zhawa was the Permanent Secretary to the MPR, and Rilwanu Lukman was a Petroleum Advisor to President Obasanjo.

25.    At all times herein relevant, the National Security Advisor was Aliyu Gusau.

26.    The Nigerian National Petroleum Company ("NNPC") is the representative of the Nigerian government in the oil industry of the country.  The NNPC is involved with the business of oil and gas exploration and production, refining, and petrochemicals. The NNPC has an economic interest in all joint ventures and production sharing contracts providing for oil and gas exploration and production, refining, and petrochemicals.  The Managing Director of NNPC is Jackson Gaius-Obaseki.

<u>SHELL DEFENDANTS</u>

**Shell Nigeria**

27.    Defendant Shell Nigeria Exploration and Production Company Limited ("SNEPCO"), is a corporation organized under the laws of the FRN.  Its corporate headquarters are located at 21/22 Marine, Lagos, Nigeria.  SNEPCO is a wholly owned subsidiary of Shell Petroleum Development Company of Nigeria Limited ("SPDC").

28.    Upon information and belief, SNEPCO was incorporated to operate deepwater blocks, which were granted to SPDC.

29.    Defendant SPDC is a corporation organized under the laws of the FRN.  Its corporate headquarters are located at 21/22 Marine, Lagos, Nigeria. SPDC is a wholly owned subsidiary of Royal Dutch Petroleum Company ("Royal Dutch") and Shell Transport and Trading Company, plc ("Shell Transport").

30.    Upon information and belief, at all times herein relevant, Mr. Ron Van Den Berg was the Chairman and/or Managing Director of SPDC and SNEPCO.  All

allegations contained herein referencing Ron Van Den Berg reference the actions he, or his representatives, took in his capacity as Chairman and/or Managing Director of SPDC and SNEPCO ("Van Den Berg").

31.     Upon information and belief, at all times herein relevant, Dr. Kisito Okpere was an officer or director of SPDC and SNEPCO.

32.     Upon information and belief, Shell Deepwater Services ("SDS") is a division of Shell International Exploration and Production Inc. ("Shell International"), which actively participates in the deepwater exploration operations in Nigeria for SNEPCO.  Shell International Exploration and Production Inc. is a Delaware corporation with offices located in Houston, Texas.  Shell International is a wholly owned subsidiary of Royal Dutch and Shell Transport ("Shell Transport").

33.     Block 245, like many of Shell's Nigerian petroleum operations necessitates significant know-how regarding the exploration and recovery of oil from deep water.  The expertise of the Royal Dutch/Shell Group in such operations is primarily centered in and around Shell International's drilling efforts in the Gulf of Mexico.  Through staff exchanges and other forms of training and personnel rotation, SPDC and SNEPCO had substantial contacts with the United States regarding their deep water exploration.  This expertise directly impacted on their ability to gain control of Block 245.  Shell will also be relying on its Houston affiliates for tanker support in its exploration of Block 245.

34.     In addition, officials of SPDC and SNEPCO frequently traveled to the United States for conferences as well as consultations regarding deepwater

exploration operations. In May 2001, a conference was held in Houston Texas and attended by most of the Nigerian oil industry including government officials and senior officers of SPDC and SNEPCO (the "Houston Conference"). At the Houston Conference, representatives of each of the defendants met to further plan their actions to wrest control of Block 245 from Malabu. Further allegations regarding the Houston Conference are contained herein.

35.    Shell Nigeria Ultra Deep Company Limited ("SNUD") is a corporation organized under the laws of the Federal Republic of Nigeria. Its corporate headquarters are located at 21/22 Marine, Lagos, Nigeria. Upon information and belief, SNUD is a wholly owned subsidiary of SPDC.

36.    During March 2001, SNUD entered into a set of agreements to become Malabu's technology partner for the development of Block 245. The disposition of these contracts is presently the subject of an arbitration before the ICC in London. SNUD's arbitration claim and Malabu's arbitration counterclaim arise solely from the relationships created by the contracts and necessarily exclude the disputes set forth in this Complaint, disputes that did not arise out of or in connection with these contracts. Further, the allegations of this Complaint arise from the actions of third parties that are not parties to the contracts.

**Royal Dutch/Shell Group**

37.    Defendant Royal Dutch is a corporation organized under the laws of the Netherlands. Its corporate headquarters are in the Hague, Netherlands.

38.     Defendant Shell Transport is a corporation organized under the laws of the United Kingdom.  Its corporate headquarters are located in London, England.

39.     Defendants Royal Dutch and Shell Transport are holding companies, which together operate and control the Royal Dutch/Shell Group ("Royal Dutch/Shell").

40.     Royal Dutch/Shell, through its wholly owned subsidiaries, is a major investor in Nigeria and explores for, produces, and sells energy products derived from Nigerian oil and natural gas.

41.     Royal Dutch/Shell wholly owns Shell Petroleum, Inc, a holding company, incorporated and organized under the laws of the State of Delaware with offices in Houston, Texas, which in turn wholly owns Shell Oil Company (Shell USA), a corporation incorporated in Delaware with offices in Houston, Texas, and doing business in New York, New York.

42.     Royal Dutch/Shell maintains offices in New York City, staffed with its employees.

43.     Shell USA was formed by Royal Dutch/Shell for corporate finance purposes to conduct its business in the United States and, as such, Shell USA is the agent of Royal Dutch/Shell.

44.     Upon information and belief, Royal Dutch/Shell controls the activities of Shell USA, including the offices maintained in New York.

45.     Royal Dutch/Shell wholly owns The Shell Petroleum Company, Ltd., a holding company that in turn wholly owns SPDC, which in turn wholly owns SNEPCO.

46.     Upon information and belief, at all times herein material, Defendant Royal Dutch/Shell dominated and controlled SPDC and SNEPCO, and each was the alter ego of the other.

47.     Upon information and belief, petroleum operations in Nigeria account for approximately 14% of Royal Dutch/Shell's global oil production.

## STATEMENT OF FACTS

### GENERAL BACKGROUND

48.     Royal Dutch/Shell began oil production in Nigeria in or about 1958, as the only concessionaire in the country.  Following the discovery of oil in Nigeria in 1958, other foreign companies were given exploration rights in the areas adjoining the Niger Delta.

49.     In 1977, Nigeria established the Nigerian National Petroleum Company ("NNPC").  The NNPC has a large stake in the oil fields through joint venture agreements with major international corporations and production sharing contracts.

50.     Under Joint Venture arrangements, one or more foreign oil companies enter into an agreement with NNPC for joint development of jointly held oil mining licenses and facilities.  Each partner in the joint venture contributes to the costs and shares the benefits or losses of the operation.  The NNPC holds between 55 and 60% in each of the joint ventures.  One company is designated as the operator and is responsible for the day-to-day running of the venture.

51.     More recently, the NNPC introduced Production Sharing Contracts ("PSC").  Under a PSC, the NNPC hires a contractor to carry out petroleum operations on acreage wholly owned by the NNPC.  The contractor undertakes the initial exploration risks and recovers his costs if and when oil is discovered in commercial quantities.   Presently, FRN encourages all new licensing and production agreements to be in the form of a PSC.

52.   In 1990, the FRN offered for bidding a number of new concessions in the deep outer shelf of the Delta area. The concessions were awarded to local and international oil companies. The exploration and development campaign began in 1995.

53.   The acquisition and disposition of oil acreages is governed exclusively by the Petroleum Act CAP 350 Laws of the Federation of Nigeria 1990. The Ministry of Petroleum Resources is the regulatory authority responsible for the concession interests, and has discretionary powers in some matters.

54.   Provisions of the Petroleum Act (Articles 23 to 29) strictly govern the revocation and withdrawal of Oil Prospecting Licenses (OPL). OPLs can only be revoked in accordance with those provisions, and only after the affected party has been put on notice of the grounds on which the revocation is contemplated and then invited to explain or rectify the matter complained of.

ALLOCATION OF OPL 245 TO MALABU

55.   In 1998, the government created 25 new deepwater oil concessions. As a result of advances in oil exploration and drilling in deep water, these deepwater oil concessions were now commercially viable.

56.   In April 1998, blocks 245 and 246 were made available for allocation by the FRN and the Ministry of Petroleum Resources. In accordance with all operative laws, Malabu was awarded OPL 245 and OPL 246. At the time of the bidding for the rights to Block 245, only very preliminary seismic studies had been completed

14

and limited information was available as to the overall potential production capacity of the block.

57.    On or about April 29, 1998, the FRN approved the allocation of OPL 245 to Malabu.  In accordance with governmental regulation, Malabu paid an application fee of N50,000 and a bidding fee of US$10,000 for the allocation of OPL 245.  As part of its bid, Malabu agreed to pay the Nigerian Defendants a signature bonus of US$20 million.  Signature bonuses were a standard item for payment after an allocation of an oil-prospecting license, although the amount of the signature bonus may vary by bidder and block.  As standard procedure, the Government required such payments to be made in US dollars and payable to J.P. Morgan Chase in New York.

58.    On May 25, 1999, Malabu paid the Nigerian Defendants US$2 million of the required US$20 million signature bonus.  The remainder was not yet due.

59.    President Obasanjo was elected in 1999.  After taking office President Obasanjo reviewed the award of concessions by the prior government and cancelled 16 of the concessions granted during the 1998 licensing round on the basis of improprieties in the bidding process.  The Ministry of Petroleum Resources announced these cancellations in early 2000.  The grant of OPLs 245 and 246 to Malabu were not revoked.

60.    In late 1999 and early 2000, Malabu worked to complete a 2D seismic analysis of Block 245.  A 2D seismic study is crucial to estimating the total reserves that may exist in a particular area.  Through seismic study and expert

interpretation, a 2D study can provide an early glimpse into the potential reserves available and begin to give insight into how difficult it may be to recover the reserves. Completion of the 2D study was a condition of the award of OPL 245 to Malabu. Malabu completed the 2D study in February 2000.

61.     Malabu informed the MPR of the completion of a 2D seismic survey on February 2, 2000. As a result of the revocation of a number of licenses, Malabu also sought clarification on the status of OPL 245.

62.     On March 9, 2000, the MPR sent Malabu a letter stating that OPL 245 was not among the Blocks that were revoked by the FRN and advised Malabu that, "You are therefore free to go ahead with plans to develop it in accordance with the provisions of the Petroleum Decree No. 51 of 1969."

63.     Based upon the representations of the MPR, Malabu moved ahead with developing its plans for the exploration of Block 245, including seeking an international technology partner, further analysis of the 2D seismic study, and plans for the completion of a 3D seismic study. A 3D seismic study provides an even more detailed estimation of potential reserves and particularly detailed maps of where deposits of oil are located. Such planning and studies were expensive and time consuming.

64.     During this time period, the 2D Seismic study was reviewed by the Nigerian Defendants and also potential technical partners, including the Shell Defendants. The 2D seismic studies indicated that Block 245 was not just another

deep-water block, but rather one of the largest deep-water blocks ever found in Africa, with potential reserves of almost 3 billion barrels.

65.    In addition to completing its planning, from March 2000 through January 2001, Malabu sought a partnership with an oil company with expertise in deep underwater exploration.  During early 2001, Malabu negotiated with SNEPCO regarding a Shell company becoming the technology partner for Malabu.  In March 2001, Malabu entered into a set of agreements with SNUD regarding the operation of OPL 245.

66.    Generally, the agreements between Malabu and SNUD provided that SNUD would pay US$165 million to Malabu for a 40% interest in block 245.  In addition, SNUD would have primary responsibility for the operation of the block. Of the US$165 million to be paid to Malabu, US$18 million was earmarked for payment to the Nigerian Defendants for the balance of the signature bonus owed by Malabu.  The US$18 million was due to the Nigerian Government within ten days of the signing of the definitive agreements and was not contingent upon the consent to the assignment of interest in OPL 245.  An additional US$57 million was payable to Malabu upon the consent of the Government to the assignment.

67.    On or about April 6, 2001, SNUD purported to pay the remaining $17,960,000 of the signature bonus, and informed the MPR that the check was being given with the condition that the FRN would consent to the assignment documented in the farm-in agreement and the deed of assignment.

THE SHELL DEFENDANTS ENGINEER THE TAKING OF
BLOCK 245 FROM MALABU

68.     Since January 2001, even while SNUD was apparently negotiating to

become Malabu's partner in Block 245, Van Den Berg, the managing director of

SPDC, had begun a series of meetings with officials of the Government that would

eventually result in the illegal taking of Block 245 and its reallocation to Shell as a

result of a corrupt and illegal closed bidding process.

69.     Prior to April 6, 2001, Van Den Berg, had several meetings with senior

officials of the Government, including with the President and Vice President.  Upon

information and belief, at these meetings, defendants discussed the possibility of

taking the block from Malabu.  Further, the Nigerian Defendants, through the office

of the President, agreed to stall the cashing of any monies that would be paid to the

MPR by SNUD on behalf of Malabu until a final determination was made on

whether the Government would revoke Malabu's block.

70.     On or about April 9, 2001, Mr. Ofurhie sent Malabu a letter

authorizing the commencement of operation for OPL 245, and informed Malabu of

its obligations under the OPL.  Ironically, the letter welcomed Malabu to the

country's petroleum prospecting sector.  Upon information and belief, Mr. Ofurhie,

Director of Petroleum Resources, was not fully apprised of the possible taking of

Block 245 as of April 9, 2001.

71.     On or about May 24, 2001, Mr. Ofurhie wrote Malabu to inform it that

the title deeds to OPL 245 were signed, and a copy of the title deed was forwarded

to Malabu for its records.  The license is for a renewable ten-year term beginning on

April 29, 1998.  Upon information and belief, Mr. Ofurhie, Director of Petroleum Resources, was not fully apprised of the possible taking of Block 245 as of May 24, 2001.

72.     In late May 2001, the Managing Director of SPDC as well as officers from each of the other Shell Defendants traveled to Houston to attend a Petroleum Conference.  Also in attendance were officials of the Nigerian Defendant, including one of the President's Special Assistants for Petroleum and Energy.  In Houston, the Defendants engaged in more detailed negotiations regarding the fate of Block 245.  Upon information and belief, at these meetings, it was resolved that Shell would seek the taking of Block 245 by offering the government a far greater signature bonus than that paid by Malabu and, in addition, seek further influence as necessary by paying monies for the personal benefit of Government officials, including President Obasanjo, by way of bank transfers and campaign contributions.  Upon information and belief, Defendants discussed Shell's desire to keep indigenous oil companies from being awarded any more licensing and development contracts.

73.     Shortly after his return from Houston, in June 2001, Van Den Berg traveled to Spain as the guest of Mr. Gabriel Volpi, a long time business associate of the Vice President.  Upon information and belief, Van Den Berg had discussions with Mr. Volpi and his associate Mr. Baggi regarding the possibility of Nigeria taking OPL 245 from Malabu and awarding the rights to Block 245 to Shell.  During these discussions, Volpi and Baggi were both acting as representatives of the Vice

President and the Government.   Upon information and belief, the positions expressed by Van Den Berg had been agreed to by the Shell Defendants at the Houston Conference.   Upon information and belief, Van Den Berg reached a preliminary understanding with Volpi and Baggi that OPL 245 would be taken from Malabu before the Malabu agreements with SNUD became effective.  Once OPL 245 was taken from Malabu, Shell would be given an opportunity to negotiate compensation to Nigeria and certain government officials to facilitate the awarding of the Block to Shell.

## THE BLOCK WAS TAKEN FROM MALABU AND GIVEN TO SHELL

74.    On the morning of July 2, 2001, President Obasanjo asked his special assistant for Petroleum and Energy to contact Mr. Ofurhie, Director of Petroleum Resources, immediately and advise him that OPL 245 was to be taken from Malabu. Mr. Ofurhie was told to effectuate the taking that same day.  Thus, by letter of July 2, 2001, Mr. Ofurhie advised Malabu that OPL 245 has been withdrawn and the title revoked.  OPL 246, which was assigned to Malabu at the same time and under the same conditions as OPL 245, was not revoked by the FRN.

75.    President Obasanjo acted beyond his power in ordering the revocation.

76.    Neither in that letter, nor at any time since was any explanation or legal basis provided to Malabu for the taking of OPL 245.  Malabu was never put on notice of grounds for revocation, and was not given the opportunity to explain or rectify the matter complained of as is required by Nigerian law.

77.   Although Malabu sent numerous letters to the MPR questioning the revocation of OPL 245, and requesting consent to the Deed of Assignment with SNUD, they were all to no avail.

78.   During the summer of 2001, Volpi again invited Van Den Berg to Spain.  Upon information and belief, this individual had further discussions with Volpi regarding the disposition of Block 245.  Upon information and belief, Volpi was acting on behalf of the Vice President and the Government.  Upon information and belief, during these discussions and several subsequent meetings, Van Den Berg and the Government came to an understanding that if a Shell subsidiary company was awarded Block 245, Shell would pay the Government a signature bonus of US$210 million and pay certain officials of the Nigerian Government, including the President and Vice President, substantial sums of monies both personally and through campaign contributions.  Such payments are in violation of Nigerian law.

79.   On or about April 3, 2002, the FRN invited two companies to bid on OPL 245.   SNEPCO (in SNUD's name) and Esso Exploration and Production Nigeria (Deepwater East) were invited to bid for a PSC on Block 245.

80.   Prior to the submission of bids by either Esso or Shell, Malabu sent a letter to SNUD informing it that the cancellation of its license was a violation of Malabu's rights, that Malabu was aware that the FRN invited Shell to bid on the license, and that Malabu intended to file suit against the FRN and anyone who

interferes with its contractual relationship with FRN. Malabu also placed a public

notice in Nigeria's *THISDAY* newspaper stating the same information.

81.    The rebidding process for Block 245 was particularly unusual in that it

was in violation of almost every government regulation on the allocation of oil

blocks.    Unlike the required process of open and transparent bidding, a process

followed for the rebidding on the 16 blocks revoked in 2000, the rebidding for Block

245 was never made public.    Further, neither Malabu nor any other indigenous

company was invited to bid.    Finally, the Government had previously committed

itself to not having any further bidding until after the 2003 elections. Even today,

the government has refused all public comment on the disposition of Block 245.

82.    Upon information and belief, SNEPCO/SNUD was recently awarded a

PSC for Block 245, and, in return, Shell has seemingly kept its part of the bargain

with the Government.    As part of its bid, SNEPCO/SNUD indeed promised the

payment of a US$210 million signature bonus.    Upon information and belief,

SNEPCO/SNUD is still negotiating the terms of payment of the signature bonus.  In

addition, since SNEPCO/SNUD was awarded the PSC for Block 245, Shell has

made payments to officials of the Government as well as begun making the

promised campaign contributions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Expropriation of Property In Violation of International Law Against Federal Republic of Nigeria and Nigerian Ministry of Petroleum Resources**

83.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 82 as if fully set forth herein.

84.     In April 1998, in accordance with all operative laws, Malabu was awarded OPL 245.  The Government approved the award, and Malabu fulfilled all obligations and conditions of the award.

85.     An oil-prospecting license is a license for the exploration and production of oil, a natural resource.  OPL 245 is such a license and is an interest in real property and is the type of property that is protected under international law from illegal government takings.

86.     Following revocation of several concessions by the Government for alleged improprieties in the allocation process, Malabu sought to clarify the status of OPL 245.  Malabu was informed by the MPR that OPL 245 was not among the Blocks being revoked, and that Malabu was free to go ahead with plans to develop the block.

87.     Based upon the above representations, Malabu moved ahead with its plans to develop OPL 245.  Malabu invested time and money into the study and analysis of seismic reports on the acreage.  Malabu also entered into negotiations for a technical partner with expertise in deep underwater exploration.

88.   In accordance with governmental regulations, Malabu provided the Nigerian Defendants with the 2D seismic study of Block 245. The 2D study showed indicated that Block 245 was one of the largest deep-water blocks found in Africa.

89.   In May 2001, the Nigerian Defendants informed Malabu that the title deeds to OPL 245 had been signed, and forwarded a copy of the deed for Malabu's records.

90.   Less than two months later, on the direction of President Obasanjo, and in violation of Nigerian law, the MPR informed Malabu that OPL 245 had been withdrawn and the title revoked. No explanation was given for the revocation.

91.   Malabu was not given notice of the revocation and was not given the opportunity to explain or rectify any matter complained of as is required by Nigerian law.

92.   Malabu was not given prompt adequate and effective compensation as required by international law. Malabu has never been compensated for the initial payments it made on OPL 245, the additional money it invested in the property, or the discovered value of the property. In further violation of international law, the actions of the Government violated universally recognized principles and norms that prohibit government expropriation without legal basis or for reasons other than public utility or security.

93.   Following the expropriation, the Nigerian Defendants conducted a secret and improper bidding "competition" for the rights to OPL 245. Under

Nigerian law, all bidding for oil leases is to be done in an open and transparent manner. Further, no bidding was to be entertained for oil blocks in 2002.

94.   Not only was the bidding on OPL 245 kept from the public, but only two companies were permitted to bid on the property. Malabu was not given the opportunity to participate in this bidding competition.

95.   The Government directly benefited economically from the taking of OPL 245 from Malabu as a result of the revenues that will flow to the Government under the PSC as well as the $210 million signature bonus owed by Shell.

96.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer damage and injury to its business and reputation, with a resulting serious loss of revenue and profits

97.   The foregoing conduct of the Government is expressly excepted from immunity by the Foreign Sovereign Immunities Act.

98.   The Act of State Doctrine does not bar consideration of this matter.

<u>SECOND CAUSE OF ACTION</u>
**Tortuous Interference with Contractual and Business Relations Against Shell Defendants**

99.   Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 82 as if fully set forth herein.

100.   Malabu entered into a business relationship with Nigeria in or about April 1998 when Malabu bid on, and the Government approved the allocation of OPL 245. Malabu, in accordance with Nigerian law, paid its fees, and fulfilled its obligations under the terms of the allocation.

101.   Malabu undertook expensive and time consuming seismic testing and analysis of OPL 245 after assurances from the Government that the Block would not be revoked.

102.   In early 2001, Shell began meeting with the Government in an attempt to coerce the Government into illegally taking OPL 245 from Malabu and reallocating it to Shell.

103.   Shell used its considerable resources and economic influence to thwart the prospering business relationship between Malabu, an indigenous oil company, and the Government.

104.   Shell met with officials of the Nigerian Defendants on several occasions in an attempt to interfere with Malabu's relationship with the Government.

105.   After meeting with the Shell Defendants, the Government suddenly, and without explanation, changed its position regarding OPL 245.   Months earlier, Malabu had been informed that OPL 245 was not among the blocks that the Government was seeking to revoke.

106.   Shortly after illegally revoking the title deed to OPL 245, and following an improper, secret bidding process, the Government allocated OPL 245 to Shell.

107.   Shell obtained OPL 245 through bribery and promises of economic gain for officials of the Government.

108.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer damage and injury to its business and reputation, with a resulting serious loss of revenue and profits.

### THIRD CAUSE OF ACTION
**Unjust Enrichment Against Shell Defendants**

109.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 82 and 99 through 108 as if fully set forth herein.

110.   Malabu was the rightful owner of OPL 245.  The Government approved the allocation of OPL 245 to Malabu, and Malabu fulfilled all of its duties and obligations under the laws and regulations of Nigeria.

111.   Following an extensive 2D seismic study of Block 245, it was determined that Block 245 was one of the largest known blocks in Africa.  The perceived value of OPL 245 went up considerably following the 2D seismic study.

112.   When they learned of the value of OPL 245, the Shell Defendants, as set out in detail above, engaged in a pattern of conduct to illegally influence the Government to wrongfully take the duly awarded license from Malabu.

113.   As a result of the Shell Defendants' actions, it was able to procure the rights to OPL 245.  These rights are worth a substantial amount of money

114.   Due to the actions of the Shell Defendants, including the bribing of government officials, the Plaintiff lost not only its original investment, but also future earnings on the production of almost 3 billion barrels of oil.

115.   The actions of the Shell Defendants were illegal, immoral, and unjust. The Shell Defendants should not be allowed to benefit from these actions at the expense of Plaintiff.

116.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer damage and injury to its business and reputation, with a resulting serious loss of revenue and profits.

FOURTH CAUSE OF ACTION
**Civil Conspiracy Against Shell Defendants**

117.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 116 as if fully set forth herein

118.   Beginning in or about January 2001, the Shell Defendants held a number of meetings with officials of the Nigerian Defendants to formulate a plan to wrest control of OPL 245 away from Malabu.  The Shell Defendants discussed the potential value of OPL 245, and what they would be willing to do to obtain the rights to the Block.

119.   Furthermore, the Shell Defendants offered to make payments for the personal benefit of Government officials, as well as make campaign contributions for President Obasanjo's reelection campaign.

120.   As a result of the promises and agreements made between the Defendants, the Government illegally, and without explanation, revoked OPL 245 from Malabu.

121.   Following the revocation, the Government, in furtherance of the conspiracy, held a secret and improper "bidding competition" for the rights to OPL

28

245. Only two companies were permitted to bid for the Block. Shell was invited to bid, Malabu was not. Moreover, the Government rigged the bidding so that the other company, a subsidiary of ExxonMobil, did not have access to the same data as the Shell Defendants. This ensured that Shell would be able to offer the highest bid.

122. By reason of the foregoing, Plaintiff has suffered and will continue to suffer damage and injury to its business and reputation, with a resulting serious loss of revenue and profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant Federal

Republic of Nigeria and Ministry of Petroleum Resources, for:

(a)   For injunctive relief, including but not limited to:

    i.    Declaratory Judgment that the July 2, 2001, letter withdrawing the allocation of OPL 245 and revoking the title for Block 245 was invalid and without legal effect;

    ii.    Declaratory Judgment that the Plaintiff has exclusive legal and equitable interests in the concession license; and

    iii.    An order of injunction restraining the Defendants by themselves, their servants and privies from allocating the Plaintiff's legal and equitable interests in OPL 245 to any other person, individual or corporate.

(b)   For compensatory damages in an amount to be determined at trial, but believed to be in excess of $1 billion;

(c)   For costs of suit, attorneys fees and such other relief as the Court deems just and proper.

Plaintiff further prays for judgment against the Shell Defendants, jointly and

severally, for:

(a)   Compensatory damages in an amount to be determined at trial, but believed to be in excess of $1 billion;

(b)   For punitive damages;

(c)   For injunctive relief, including but not limited to:

    i.    For the imposition of a constructive trust on any profits realized on OPL 245; and

ii.  An order of injunction restraining the Shell Defendants by themselves, their servants and privies from further interfering with the Plaintiff's legal and equitable interests in OPL 245.

(d)  For costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:  November 7, 2002
        New York, New York

Respectfully submitted,

By: _____
    Scott A. Kamber (SK-5794)

    Dana B. Rubin (DR-8451)
    Wechsler Harwood LLP
    488 Madison Avenue
    New York, NY 10022
    Tel: (212) 935-7400
    Fax: (212) 202-6364

1
2
3      ...CONSTITUTES NOTICE OF ENTRY
4      ...REQUIRED BY FRCP, RULE 77(d).



5
6
7
8                    UNITED STATES DISTRICT COURT
9                 FOR THE CENTRAL DISTRICT OF CALIFORNIA
10                          WESTERN DIVISION
11

12  ATLANTIC SALT and CHEMICAL          )        No.    95-5358-CBM (VAPx)
    COMPANY, a California Corporation,   )
13                                       )
14              Plaintiff,               )        ORDER RE: DEFENDANT'S
                                         )        MOTION TO DISMISS
15         v.                            )
                                         )
    THE FEDERAL MILITARY                 )
16  GOVERNMENT OF THE FEDERAL            )
    REPUBLIC OF NIGERIA,                 )
17                                       )
                Defendant.               )
18  _____ )



19         The matter before this Court, the Honorable Consuelo B. Marshall, United States District

20  Judge, presiding, is Defendant The Federal Military Government of the Federal Republic of Nigeria's

21  Motion to Dismiss Plaintiff Atlantic Salt and Chemical Company's Second Amended Complaint, or

22  in the Alternative to Stay Pending Arbitration, and to Strike Plaintiff's Jury Demand.   Upon

23  consideration of the papers and the argument of Counsel, this Court issues the following Order.

24  I.     JURISDICTION

25         This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1330.

26  II.    BACKGROUND

27         Plaintiff Atlantic Salt and Chemical Company ("Plaintiff") entered into negotiations with

28  Defendant The Federal Military Government of the Federal Republic of Nigeria ("Defendant") to

1  develop a salt manufacturing and processing plant in Nigeria.  Defendant's representatives met with

2  Plaintiff in California in 1971.  Thereafter, the remaining negotiations took place in Lagos, Nigeria.

3  In 1973, an agreement was reached between Plaintiff and Defendant, in Nigeria, which allowed

4  Plaintiff to form the National Salt Company of Nigeria ("Agreement").  The Agreement also provided

5  that the National Salt Company of Nigeria ("National") was to be formed under the laws of Nigeria,

6  and National would operate a salt manufacturing plant to produce salt to be sold to Nigerian citizens.

7  Later, Defendant removed Plaintiff's president from his position as managing director of National.

8  In 1979, Defendant made National a government controlled company.

9      Plaintiff commenced this action in 1995, alleging claims for breach of contract, fraud and

10  deceit, negligent misrepresentation, intentional interference with prospective economic advantage,

11  negligent interference with prospective economic advantage, unjust enrichment and imposition of

12  constructive trust, accounting, and breach of implied covenant good faith and fair dealing/bad faith

13  denial of existence of a contract.  On March 11, 1997, this Court dismissed Plaintiff's claims except

14  the breach of contract claim.

15      Defendants now move to dismiss this action.  Defendant contends that this Court has neither

16  personal jurisdiction nor subject matter jurisdiction over Defendant, that this action is barred by the

17  act of State Doctrine, and that venue is improper.  Defendant also contends that Plaintiff is not a

18  proper party to this action, and that his claims should be dismissed because of the prior decision

19  issued by the High Court.  Furthermore, Defendant contends that Plaintiff's jury demand should be

20  stricken.

21  **III.    DISCUSSION**

22      Subject Matter Jurisdiction

23      "The Foreign Sovereign Immunities Act ("FSIA") is the exclusive basis for federal jurisdiction

24  over a suit involving an agent or instrumentality of a foreign state.  *Export Group v. Reef Industries,*

25  54 F.3d 1466, 1469 (9th Cir. 1995).  Federal jurisdiction does not attach until it is determined that the

26  foreign sovereign lacks immunity under the provisions of the FSIA."  Randolph v. Budget Rent-A-

27  Car, 97 F.3d 319, 323 (9th Cir. 1996).  The FSIA creates a statutory presumption that a foreign state

28  is immune from jurisdiction unless one of the enumerated exceptions applies.  Adler v. Federal

- 2 -

1  *Republic of Nigeria*, 107 F.3d 720, 723 (9th Cir. 1997).  The party seeking immunity has the burden

2  of showing that it is a foreign state under the FSIA.  *Meadows v. Dominican Republic*, 817 F.2d 517,

3  523-24 (9th Cir. 1987).  Once the party seeking immunity makes a prima facie showing that it is a

4  foreign state under the FSIA, the burden shifts to the opposing party to prove that an exception

5  applies.  *Id.* at 522-23.

6         In previous cases, Defendant has been found to be a foreign state within the meaning of the

7  FSIA.  *See Adler v. Federal Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997); *Hester Int'l Corp. v.*

8  *Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989).  Furthermore, Plaintiff does not dispute

9  that Defendant is a foreign state as defined by the FSIA.  Thus, the burden shifts to Plaintiff to show

10  that an exception under the FSIA is applicable.

11         Plaintiff argues that the commercial activities exception under the FSIA applies, and that this

12  Court has subject matter jurisdiction based thereon.  The commercial activities exception provides

13  subject matter jurisdiction to the courts of the United States when the action is based on commercial

14  activities carried on by the foreign state in the United States; or an act taking place in the United

15  States related to the commercial activities of the foreign state; or an act outside of the United States

16  in connection with the commercial activities of the foreign state that has a direct effect in the United

17  States.  28 U.S.C. § 1605(a)(2).  When a foreign state acts as a private player, and not as a market

18  regulator, the foreign state's actions are commercial within the meaning of the FSIA.  *Republic of*

19  *Argentina v. Weltover, Inc.*, 112 S.Ct. 2160, 2166 (1992).  The commercial character of the act is

20  to be determined by reference to its "nature" rather than its "purpose."  The central question is

21  "whether the activity is of a kind in which a private party might engage."

22         Plaintiff claims that the entire transaction was commercial in nature because the purpose of

23  the Agreement was to provide Defendant with the means of processing salt in Nigeria.  Plaintiff

24  argues that this transaction could be exercised by a private player, and not only by a foreign state.

25  The purpose of the Agreement was to exploit and regulate salt,  a natural resource.  The right to

26  regulate imports and exports, as well as the right to regulate natural resources is a sovereign function.

27  *Mol, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1329 (9th Cir. 1984), *cert. denied* 105

28  S.Ct. 513 (1984).  Moreover, Plaintiff alleges in its Second Amended Complaint that Defendant

1    entered into the Agreement in order to "arrest the drain of its foreign exchange in the importation of

2    consumer salt in Nigeria." Fromm Decl., Ex. 1 at 2. A private player would not enter an agreement

3    to stop the flow of foreign exchange from Nigeria, thus Defendant entered the Agreement as a market

4    regulator and not as a private player.

5          Further, the Agreement also indicates that Defendant was acting as a "market regulator." The

6    Agreement required Plaintiff to use only local crude salt when it was available in sufficient quantity,

7    despite the availability of cheaper imported crude salt. Kannike Decl., Ex. 9 at 4. A private player

8    in the market would seek out and use the cheapest available raw materials. Moreover, Article Eleven

9    of the Agreement required Defendant to "provide all reasonable protection to the salt industry when

10   in production." Kannike Decl., Ex. 9 at 5. This included "the possibility and desirability of creating

11   such other fiscal environment as may be conducive to the economic viability of the project." Id. The

12   creation of an economic environment to protect a particular industry is not within the power of a

13   private player in the market. Hence, Defendant was not engaged in a commercial activity when it

14   entered the Agreement with Plaintiff, so the commercial activities exception does not convey subject

15   matter jurisdiction.

16         Even if Defendant was engaged in commercial activities, this action is not based on acts

17   performed in the United States nor upon acts performed outside of the United States that caused a

18   direct effect in the United States. Plaintiff contends that procuring the salt, obtaining machinery and

19   equipment, and training Nigerians for work at National were all acts performed in the United States

20   causing a direct effect in the United States. As defined by FSIA, "commercial activity carried on in

21   the United States by a foreign state means commercial activity carried on by such state and having

22   substantial contact with the United States." Blake v. The Republic of Argentina, 965 F.2d 699, 709

23   (9th Cir. 1992); 28 U.S.C. §1603(e). Under this definition, the foreign state need not engage in

24   commercial activity in the United States on a regular basis. Id. (citing Shapiro v. Republic of Bolivia,

25   930 F.2d 1013, 1018 (2nd Cir. 1991.) Instead, the critical inquiry is whether there is "a nexus between

26   the defendant's commercial activity in the United States and the plaintiff's grievance." Plaintiff does

27   not establish that commercial activities performed in the United States created a nexus between

28   Defendant's conduct in Nigeria, which is the basis for this action. Blake v. Republic of Argentina,

- 4 -

1  965 F.2d 699, 709 (9th Cir. 1992) ("A plaintiff must demonstrate a causal connection between a

2  sovereign's actions in the United States and those abroad giving rise to the plaintiff's claims, . . .")

3  Here, Plaintiff brings this cause of action for breach of contract, alleging that Defendant breached the

4  Agreement when it made National a government controlled company, and when it removed Plaintiff's

5  president from the position of managing director of National.  The commercial activities in which

6  Defendant participated, procuring salt, obtaining machinery and equipment, meeting once with

7  Plaintiff in the United States, do not have a causal connection, nor do they create a nexus with

8  Plaintiff's breach of contract claim.

9          Furthermore,  Plaintiff does not demonstrate that Defendant's acts outside of the United

10  States had a direct effect in the United States.  Plaintiff contends that the direct effect in the United

11  States was the requirement that payment was to be made in the United States pursuant to the

12  Agreement.  Claims for breach of a contract which provide that payment be made in the United States

13  cause a direct effect under the commercial activities exception.  Id. at 710.  The Agreement, however,

14  does not state that payments were to be made in the United States.  "'[M]ere financial loss' suffered

15  by a person, whether individual or corporate, in the United States is not, in itself, sufficient to

16  constitute 'direct effect.'" Siderman de Blake, 965 F.2d at 710 (citing America West Airlines, Inc.

17  v. GPA Group, Ltd., 877 F.2d 793, 799-800 (9th Cir. 1989)).  Since the Agreement did not call for

18  payments to be made in the United States, the commercial activities exception does not apply.

19  Therefore, this Court does not have subject matter jurisdiction over Defendant.

20          Proper Party to the Lawsuit

21          Defendant also contends that Plaintiff does not have the capacity to sue for breach of contract

22  because Defendant's former president owned the shares in National which were allegedly

23  expropriated by Defendant.  Defendant provides the declaration of Mr. Musa Kannike, former

24  president of Atlantic Salt, who declared that he owned the 35% equity interest in National.  Fromm

25  Decl., Ex. 6 at ¶ 17.  However, the Agreement states that Plaintiff, who was a technical partner

26  pursuant to the Agreement, would be allocated 45% of the share holding in National. Plaintiff's Ex.

27  9.  Plaintiff's share holding was reduced to 35% by National's Board of Directors in a special

28  ///

1  resolution. Id. at Ex. 10.  Based on the Agreement, Plaintiff was the holder of the 35% equity interest

2  in National, and therefore is a proper party to this lawsuit.

3  **IV.    CONCLUSION**

4          For the foregoing reasons, this Court GRANTS Defendant's Motion to Dismiss for lack of

5  subject matter jurisdiction.  Since this Court lacks subject matter jurisdiction, the Court does not

6  address the Act of State Doctrine, personal jurisdiction, venue, comity or striking the jury demand.

7  Defendant's Motion to Stay Pending Arbitration is now moot.

8

9  **IT IS SO ORDERED.**

10

11  DATED:  June 5, 1998

12                                              CONSUELO B. MARSHALL
                                                United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK       )
                                           )ss.:
COUNTY OF NEW YORK   )

      JOSE MANUEL RAMIREZ, being duly sworn, deposes and says:

      1.      That he is an employee in the office of BROWN GAVALAS & FROMM LLP. attorneys herein.

      2.      That deponent is not a party to the action or proceeding, is over eighteen (18) years of age, and resides in Bronx, New York.

      3.      That on April 15, 2003 he served the within **NOTICE OF MOTION** by delivering the same personally to the persons and at the address indicated below:

WECHSLER HARWOOD LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

CRAVATH, SWAINE & MOORE
825 Eighth Avenue
New York, New York 10019-7475

JOSE MANUEL RAMIREZ

Sworn to before me
this 15th day of April, 2003

Notary Public

FRANK J. RUBINO, JR.
Notary Public, State of New York
Qualified in Queens County
No. 02RU6051122
Commission Expires Nov. 20 2006