**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,

                              Petitioner,

        v.                                                    Case No. 18-cv-00594-CRC

FEDERAL REPUBLIC OF NIGERIA AND                ORAL ARGUMENT REQUESTED
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,

                              Respondents.

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS**
**FOR LACK OF JURISDICTION UNDER THE FSIA**

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
Joseph D. Pizzurro
(D.C. Bar No. 468922)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.:  (202) 452-7373
Fax:  (202) 452-7333
Email:  jpizzurro@curtis.com

-and-

Kevin A. Meehan (*pro hac vice* pending)
Juan O. Perla (*pro hac vice* pending)
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax:  (212) 697-1559
Email: kmeehan@curtis.com
Email: jperla@curtis.com

Dated: Washington, D.C.                 *Attorneys for Respondents Federal*
        August 27, 2018                 *Republic of Nigeria and Ministry of*
                                        *Petroleum Resources of the Federal*
                                        *Republic of Nigeria*

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 3

    I.     The Underlying Dispute Giving Rise to the Arbitration...................................3

    II.    The Arbitration Proceedings Resulting in a Liability Award .........................4

    III.   The Judicial Proceedings to Set Aside the Award and Enjoin the Arbitration ................7

    IV.   The Tribunal Continues the Arbitration and Issues a Damages Award........................10

ARGUMENT ................................................................................................................. 12

    I.     The Court Lacks Jurisdiction as Nigeria Is Entitled to Immunity under the FSIA.........13

        A.    The Arbitration Exception Does Not Apply ......................................... 13

            1.    Nigeria is the Country "under the Law of which" the Award Was Made ... 15

            2.    This Court is "Obliged to Respect" the Nigerian Court's Judgment Setting Aside the Award ....................................................... 17

            3.    The Choice of an Arbitral "Venue" Does Not Affect the Nigerian Court's Judgment ........................................................ 19

        B.    The Waiver Exception Does Not Apply .............................................. 23

    II.    Nigeria Is Entitled to a Conclusive Determination of Its Sovereign Immunity Without Waiving Its Substantive Defenses on the Merits ...............................30

CONCLUSION................................................................................................................ 33

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Agrocomplect, AD v. Republic of Iraq,*
 524 F. Supp. 2d 16 (D.D.C. 2007) ........................................................................ 30

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,*
 179 F.3d 1279 (11th Cir. 1999) ............................................................................ 23

*Argentine Republic v. Amerada Hess Shipping Corp.,*
 488 U.S. 428 (1989) ..................................................................................... 12, 28

*Baker Marine (Nigeria) v. Chevron (Nigeria),*
 191 F.3d 194 (2d Cir. 1999) ....................................................... 15, 16, 18, 22

*Belize Soc. Dev., Ltd. v. Government of Belize,*
 668 F.3d 724 (D.C. Cir. 2012) ..................................................................... passim

\* *Blue Ridge Invs., L.L.C. v. Republic of Argentina,*
 735 F.3d 72 (2d Cir. 2013) ........................................................... 13, 28, 32

\* *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
 137 S. Ct. 1312 (2017) ................................................................. 13, 14, 31

\* *Chevron Corp. v. Republic of Ecuador,*
 795 F.3d 200 (D.C. Cir. 2015) ................................................. 12, 13, 14, 15

*Chevron Corp. v. Republic of Ecuador,*
 949 F. Supp. 2d 57 (D.D.C. 2013) ........................................................... 14

\* *Creighton v. Qatar,*
 181 F.3d 118 (D.C. Cir. 1999) ..................................................................... passim

*Diag Human S.E. v. Czech Republic-Ministry of Health,*
 64 F. Supp. 3d 22 (D.D.C. 2014), *rev'd on other grounds*, 824 F.3d 131 (D.C. Cir. 2016) ..... 26

*Dixilyn-Field Drilling, Ltd. v. Mobil Oil Corp.,*
 No. 83 CIV 9308 (LBS), 1984 U.S. Dist. LEXIS 17992 (S.D.N.Y. Apr. 2, 1984) ........... 16, 22

*EM Ltd. v. Banco Cent. De La República Argentina,*
 800 F.3d 78 (2d Cir. 2015) .................................................................... 31

*Fed. Ins. Co. v. Richard I. Rubin & Co.,*
 12 F.3d 1270 (3d Cir. 1993) .................................................................... 31

*Figueiredo Ferraz E Engenharia de Projeto Ltda v. Republic of Peru,*
 665 F.3d 384 (2d Cir. 2011) .................................................................... 32

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
    905 F.2d 438 (D.C. Cir. 1990) ........................................................................ 24, 31

*Frolova v. Union of Soviet Socialist Republics,*
    761 F.2d 370 (7th Cir. 1985) ..................................................................... 24, 25, 28

*Halim v. Great Gatsby's Auction Gallery, Inc.,*
    516 F.3d 557 (7th Cir. 2008) ................................................................................ 32

*Hardy Expl. & Prod. (India) v. Government of India,*
    Civ. No. 16-140 (RC), 2018 U.S. Dist. LEXIS 95965 (D.D.C. June 7, 2018) ........................ 33

*In re Papandreou,*
    139 F.3d 247 (D.C. Cir. 1998) .............................................................................. 31

*John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers,*
    913 F.2d 544 (8th Cir. 1990) ................................................................................ 17

\*   *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
    364 F.3d 274 (5th Cir. 2004) ......................................................................... passim

*Laminoir-Trefileries-Cableries de Lens, S.A. v. Southwire Co.,*
    484 F. Supp. 1063 (N.D. Ga. 1980) ......................................................................... 33

*Maritime Int'l Nominees Establishment v. Republic of Guinea,*
    693 F.2d 1094 (D.C. Cir. 1982) ...................................................................... 23, 24, 25, 28

*Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.,*
    722 F. Supp. 1032 (S.D.N.Y. 1989) ......................................................................... 29

*Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine,*
    158 F. Supp. 2d 377 (S.D.N.Y. 2001) ....................................................................... 29

*Ohntrup v. Firearms Ctr., Inc.,*
    516 F. Supp. 1281 (E.D. Pa. 1981) .......................................................................... 28

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier,*
    508 F.2d 969 (2d Cir. 1974) ................................................................................ 32

*Philippines v. Pimentel,*
    553 U.S. 851 (2008) ........................................................................................ 31

*Phoenix Consulting, Inc. v. Republic of Angola,*
    216 F.3d 36 (D.C. Cir. 2000) ............................................................................... 13

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    389 F.3d 192 (D.C. Cir. 2004) .............................................................................. 31

*Princz v. Fed. Republic of Germany,*
   998 F.2d 1 (D.C. Cir. 1993) ............................................................................ 31

*Princz v. Federal Republic of Germany,*
   26 F.3d 1166 (D.C. Cir. 1994) ..................................................................... 24

*Qi-Zhou v. Meissner,*
   70 F.3d 136 (D.C. Cir. 1995) ....................................................................... 30

*Rein v. Socialist People's Libyan Arab Jamahiriya,*
   162 F.3d 748 (2d Cir. 1998) ......................................................................... 31

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic,*
   877 F.2d 574 (7th Cir. 1989) ....................................................................... 31

*S & Davis Int'l, Inc. v. Yemen,*
   218 F.3d 1292 (11th Cir. 2000) ................................................................... 26

*Seetransport Wiking Trader v. Navimpex Centrala,*
   989 F.2d 572 (2d Cir. 1993) ......................................................................... 25

*Segni v. Commercial Office of Spain,*
   816 F.2d 344 (7th Cir. 1987) ....................................................................... 13

*Shapiro v. Republic of Bolivia,*
   930 F.2d 1013 (2d Cir. 1991) ...................................................................... 24

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
   559 U.S. 662 (2010) ...................................................................................... 32

*Strategic Techs. PTE, Ltd. v. Republic of China,*
   No. 05-cv-2311 (RMC), 2007 U.S. Dist. LEXIS 34258 (D.D.C. May 10, 2007) ................... 26

\* *TermoRio S.A. E.S.P. v. Electranta S.P.,*
   487 F.3d 928 (D.C. Cir. 2007) .......................................................... 15, 16, 17, 18

*United States v. Menasche,*
   348 U.S. 528 (1955) ...................................................................................... 30

*United States v. Moats,*
   961 F.2d 1198 (5th Cir. 1992) ..................................................................... 31

*Verlinden B.V. v. Central Bank of Nigeria,*
   488 F. Supp. 1284 (S.D.N.Y. 1980) ............................................................ 29

*Verlinden B.V. v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) .............................................................................. 12, 13

*Volt Info. Scis., Inc. v. Bd. of Trs.*,
    489 U.S. 468 (1989) ............................................................................. 18

*World Wide Minerals, LTD. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) .......................................................... 23

*Yukos Capital S.A.R.L. v. Samaraneftegaz*,
    963 F. Supp. 2d 289 (S.D.N.Y. 2013) ................................................ 33

*Zdanok v. Glidden Co., Durkee Famous Foods Div.*,
    327 F.2d 944 (2d Cir. 1964) ............................................................... 17

**Statutes**

28 U.S.C. § 1330 ....................................................................................... 1

28 U.S.C. § 1603 ..................................................................................... 12

28 U.S.C. § 1605(a)(1) ..................................................................... passim

28 U.S.C. § 1605(a)(6) ..................................................................... passim

9 U.S.C. § 1 *et seq* ............................................................................... 12

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................. 1

Fed. R. Civ. P. 12(b)(2) ............................................................................. 1

**Legislative History**

131 Cong. Rec. 10455 (1985) ................................................................. 29

Foreign Sovereign Immunities Act of 1976,
    Pub. L. No. 94-583, 90 Stat. 2891 (1976) .......................................... 28

H.R. Rep. No. 94-1487 (1976) ............................................................... 25

*Hearing before the Subcomm. on Admin. L. & Governmental Relations of the H. Comm. on the
    Judiciary*, 100th Cong. 94 (1987) ...................................................... 29

*Hearing before the Subcomm. on Admin. L. & Governmental Relations of the H. Comm. on the
    Judiciary*, 99th Cong. 94 (1986) ........................................................ 29

**International Treaties**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
    June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ........................... passim

**Foreign Law**

*IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.,*
    [2015] EWCA (Civ) 1144 (England) ........................................................... 3

*IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.,*
    [2017] UKSC 16 (England) ...................................................................... 3

Nigerian Arbitration and Conciliation Act (2006) Cap. (A18) ................................ 8, 9

*The Minister of Petroleum Resources v. Process and Industrial Developments Limited BVI,*
    No. FHC/L/CS/264/2016 (F.H.C. May 24, 2016) (Nigeria) ................................ 10, 17, 18, 22

**Treatises**

2 Gary B. Born, *Int'l Commercial Arbitration* 1540 (2d ed. 2014) .............................. 20

Restatement (Third) of Foreign Relations Law § 487 (Am. Law Inst. 1987) ................... 27

Restatement (Third) of Int'l Commercial Arbitration § 5-12
    (Am. Law. Inst. 2010) ................................................................... 16, 19, 21, 22

The Federal Republic of Nigeria (the "Republic") and the Ministry of Petroleum

Resources of the Federal Republic of Nigeria (the "Ministry of Petroleum," and together with the

Republic, "Nigeria" or "Respondents") submit this memorandum of points and authorities in

support of their motion to dismiss the petition to confirm a foreign arbitral award (the "Petition")

filed by Process and Industrial Developments Limited ("P&ID" or "Petitioner") for lack of

jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et*

*seq.*, pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure.  Nigeria

reserves all rights and defenses and does not waive any of its defenses or its sovereign immunity.

## PRELIMINARY STATEMENT

Nigeria is immune from this Court's jurisdiction unless P&ID can satisfy an exception to

immunity under the FSIA.  Under the controlling law of the D.C. Circuit, the only exception that

could possibly apply here is the arbitration exception, section 1605(a)(6)(B), which confers

jurisdiction over actions to confirm foreign arbitral awards that are governed by an applicable

treaty such as the New York Convention.  But that provision contains two additional substantive

requirements, not the least of which is the existence of an enforceable award.  As the D.C.

Circuit has held, if there is "no award to enforce," a foreign state is entitled to sovereign

immunity and the court must dismiss the case for lack of jurisdiction under the FSIA.  That is the

proper course in this case.

Under D.C. Circuit precedent, P&ID's award "does not exist to be enforced" because it

has been "lawfully set aside" by a competent court in Nigeria, the country "under the law of

which, that award was made" in accordance with the New York Convention.  The judgment of

the Nigerian court is now final and binding, and this Court "is obliged to respect it" unless that

judgment offends the United States' "fundamental notions of what is decent and just."  Nothing

in the record warrants refusing recognition of the Nigerian court's judgment.

- 1 -

On the contrary, a closer look at the events giving rise to the award makes apparent why a competent court would set it aside.  The award arose from a dispute between Nigeria and P&ID over Nigeria's supposed breach of an agreement involving, on the one side, P&ID's commitment to build a gas processing facility in the Niger Delta and, on the other side, Nigeria's obligation to supply that facility with "Wet Gas" from third parties in exchange for "Lean Gas" that it could then use to power electric plants.  The governing law of that agreement was Nigerian law.  When third parties refused to supply the Wet Gas, the project broke down.  P&ID had allegedly invested about $40 million mostly in preliminary expenses, but never put a shovel in the ground to build the facility.

P&ID then commenced arbitration against Nigeria pursuant to their express agreement to arbitrate "under the Rules of the Nigerian Conciliation and Arbitration Act."  In the end, a majority of the tribunal applied English law, rather than Nigerian law, the governing law of the contract, to award more than $6.6 billion in damages for the full twenty-year term of the agreement plus seven percent pre- and post-award interest, in manifest disregard of P&ID's obligation under Nigerian law to mitigate its damages.  P&ID claims it is now owed around $9 billion in compensation for Nigeria's supposed breach of contract – an irrational and unconscionable amount that can only be understood as punitive.

Even though P&ID's award is infected with obvious infirmities and should be denied confirmation on the merits, a decision on the merits will not be necessary here.  Nigeria is entitled to invoke its sovereign immunity as an initial defense – and obtain a conclusive and authoritative determination of that threshold issue – before presenting its substantive defenses on the merits.  Because the judgment of a competent authority rendered the award a nullity, P&ID

does not have an award to enforce and Nigeria is entitled to sovereign immunity.  Therefore, this

Court must dismiss the case for lack of jurisdiction under the FSIA.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     The Underlying Dispute Giving Rise to the Arbitration**

P&ID is a British Virgin Islands company owned and controlled by two Irish nationals

(the "Principals").  (Pet. ¶ 1, ECF No. 1.)  The Principals have a long history of doing business

and investing in numerous projects in Nigeria.  (Andrew Decl. Ex. 5, ¶ 13.2, ECF No. 3-5.)[1]

According to the witness statement submitted in the underlying arbitration by one of the

Principals, Mr. Michael Quinn, P&ID was incorporated in mid-2006 for purposes of exploring a

natural gas project in Nigeria (the "Gas Processing Project" or "Project").  (*Id.* ¶ 17.)

Specifically, P&ID would obtain so-called "Wet Gas" for free from the Nigerian government and

convert it into "Lean Gas," which Nigeria could use to power electric plants.  (*Id.* ¶ 43.)  P&ID

would not charge Nigeria for converting the Wet Gas.  Rather, in exchange for the Wet Gas,

P&ID would have the right to keep certain by-products ("NGLs") and sell them on the open

market.  (*Id.* ¶ 65.)

Beginning in mid-2006, the Principals and their team began exploring the feasibility of

the Project and commissioned various studies and engineering plans.  (*Id.* ¶¶ 47-48.)  At the

same time, the Principals and their team were pursuing a number of other "substantial

opportunities," including a mining project that, according to P&ID, secured mining licenses in

---

[1] One of those endeavors is the "Bonny Island Export Terminal" project for Nigeria National Petroleum Company ("NNPC").  That project resulted in an arbitration between NNPC and another of the Principals' investment vehicles, IPCO (Nigeria) Limited.  While IPCO obtained an arbitral award in excess of $150 million against NNPC, NNPC has challenged that award in Nigeria "on the basis that [IPCO] procured it in substantial part by fraudulent inflation of the quantum of its claim using fraudulently created documentation."  *See IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.* [2017] UKSC 16 [3] (discussing *IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.* [2015] EWCA (Civ) 1144).  The English courts have recognized "that the fraud challenge was made bona fide, that NNPC has a good prima facie case that IPCO practised a fraud on the tribunal and that NNPC has a realistic prospect on that basis of proving that the whole award should be set aside," and thus the English courts may refuse to enforce it.  *Id.*

Nigeria for tenements covering nearly 1,700 square miles, and produced an Information Memorandum to secure financing for that project.  (*Id.* ¶¶ 136-40.)  Mr. Quinn explained that these opportunities were placed on hold as the Project progressed.  (*Id.* ¶¶ 136, 140.)

P&ID finally approached the Nigerian government about its idea in August 2008 and continued to solicit Nigeria's participation in the Project for well over a year.  (*Id.* ¶ 57.)  On January 11, 2010, P&ID and the Ministry of Petroleum executed a Gas Supply and Processing Agreement (the "GSPA").  (Andrew Decl. Ex. 1, ECF No. 3-1.)  Under the GSPA, P&ID was obligated to build a gas processing facility in the Niger Delta, and Nigeria was to supply that facility with Wet Gas from two oil mining leases operated by Addax Petroleum and Exxon Mobil.  (GSPA §§ 3(a), 3(c); Andrew Decl. Ex. 8, ¶ 37(f), ECF No. 3-8.)  P&ID was required to process the Wet Gas into Lean Gas for Nigeria free of charge in exchange for the right to retain and sell the resulting NGLs.  (GSPA § 3(d).)  Neither Addax nor Exxon were parties to the GSPA.

In March 2011, Addax informed the Principals that it was unwilling to supply P&ID with the amount of Wet Gas envisioned by the GSPA.  (Andrew Decl. Ex. 8, ¶ 38(a).)  P&ID attempted to negotiate a compromise, which Addax initially supported but ultimately rejected in June of 2012.  (*Id.* ¶¶ 38(c)-(d).)  At this point, the Project fell apart.  According to Mr. Quinn, P&ID had spent approximately $40 million on the Project – and the majority of those expenses were incurred prior to the execution of the GSPA.  (Andrew Decl. Ex. 5, ¶ 47.)  P&ID had never started construction of the processing facility.

## II.     The Arbitration Proceedings Resulting in a Liability Award

On August 22, 2012, P&ID commenced arbitration against Nigeria.  P&ID filed for arbitration pursuant to section 20 of the GSPA, which contains a choice of law clause and an arbitration clause (the "Arbitration Agreement").  That provision states, in relevant part:

> <u>The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.</u>
>
> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of <u>arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement.</u>
>
> \*     \*     \*
>
> The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language.

(GSPA § 20) (emphasis added).  Pursuant to that agreement, P&ID served notice of the arbitration on Nigeria "[i]n accordance with the provisions of Article 3 of Schedule 1 of the Nigerian Arbitration and Conciliation Act."  (Andrew Decl. Ex. 2 at 3, ECF No. 3-2.)

The tribunal was then constituted with two English arbitrators and a Nigerian arbitrator (the "<u>Tribunal</u>").  P&ID appointed Sir Anthony Evans, Q.C., and Nigeria appointed Chief Bayo Ojo, S.A.N, a former Attorney General of Nigeria.  Those two arbitrators then appointed the third and Presiding Arbitrator, Lord Leonard Hoffman.  (Pet. ¶ 18; Andrew Decl. ¶ 9, ECF No. 3.)  Shortly thereafter, the Presiding Arbitrator issued Procedural Direction No. 1 on behalf of the Tribunal "In the Matter of an Arbitration Under the Rules of the Arbitration and Conciliation Act of Nigeria."  (Andrew Decl. Ex. 11 at 35, ECF No. 3-11.)  No other procedural law was identified in that order, and there was no mention of any place or seat of the arbitration.  The order directed P&ID to "serve a Statement of Claim complying with Article 18 of the Rules of the Nigerian Arbitration and Conciliation Act," and noted that, for purposes of "Article 2 of the Rules," the schedule for the arbitration would comport with London time.  (*Id*.)  Over the following year, the Presiding Arbitrator issued Procedural Orders Nos. 2 through 4, in which the

Tribunal continued to style the proceedings as "In the Matter of an Arbitration Under the Rules of the Arbitration and Conciliation Act of Nigeria," making no reference to any other country's procedural law.  (*Id*. at 36-43.)  For instance, on September 14, 2013, following Nigeria's delay in serving a Statement of Defense, the Presiding Arbitrator issued an order directing Nigeria to comply with Article 19 of the Rules of the Nigerian Arbitration Act.  (*Id*. at 37.)  And, in the event that Nigeria failed to comply, he noted that the Tribunal "shall be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act."  (*Id*.)

Nigeria then lodged its preliminary objections to the Tribunal's jurisdiction.  (*Id*. at 38.)  In a letter dated October 11, 2013, P&ID wrote to Nigeria's arbitration counsel to "invite you to agree" that the preliminary objections raised by Nigeria be decided "pursuant to Section 31 (4) of the Arbitration Act 1996," the law governing arbitrations in England.  (*Id*. at 44.)  In a letter dated October 14, 2013, Nigeria declined that invitation and responded that it would proceed "as contemplated by the parties under the Nigerian Arbitration and Conciliation Act."  (*Id* at 46.)  In a response letter dated October 24, 2013, P&ID acknowledged that the parties had agreed to arbitrate under the Rules of the Nigerian Arbitration Act, but asserted for the first time that it had referenced England's "Arbitration Act of 1996" because it believed "the juridical seat of this arbitration is London."  (*Id*. at 47.)  The parties having stated their positions, the arbitral proceedings continued.  In subsequent procedural orders, the Tribunal of its own accord began to style the matter with reference to both the Nigerian and English procedural law: "In the Matter of the Arbitration Act 1996 (England and Wales) and In the Matter of an Arbitration Under the Rules of the Nigerian Arbitration and Conciliation Act 1988."  (*Id*. at 107.)

The Tribunal divided the arbitration into three parts relating to jurisdiction, liability, and damages (or "quantum"). On July 3, 2014, the Tribunal issued its decision on jurisdiction. (Andrew Decl. Ex. 7, ECF No. 3-7.) Despite the fact that the GSPA explicitly states that the arbitration was governed by the Nigerian Arbitration and Conciliation Act, the Tribunal decided to apply the English Arbitration Act in concluding that it had jurisdiction. (*Id.* ¶ 36.) The arbitration proceeded to the liability phase.

On July 17, 2015, the Tribunal issued an award on liability (the "liability award"). (Andrew Decl. Ex. 8.) The Tribunal held that the GSPA was valid and authorized, and that Nigeria was liable for breaching the GSPA. (*Id.* ¶¶ 54, 80.) While the GSPA identifies specific concessions held by Addax and Exxon as the source of the Wet Gas, the Tribunal held that the GSPA was not limited to these sources and that Nigeria was required to obtain Wet Gas from other sources when Addax and Exxon refused to supply P&ID. (*Id.* ¶ 58.) The Tribunal further held that Nigeria had an obligation to obtain and deliver Wet Gas to P&ID's facility despite the fact that P&ID had never even broken ground on the facility and thus there was no "plant to receive it." (*Id.* ¶¶ 63-66.)

## III.   **The Judicial Proceedings to Set Aside the Award and Enjoin the Arbitration**

Following the Tribunal's decision on liability, and before it rendered its decision on quantum, Nigeria sought judicial assistance to have the arbitration proceedings enjoined and the liability award set aside. Given the parties' express agreement to arbitrate "under the rules of the Nigerian Arbitration and Conciliation Act," a Nigerian court was the competent authority to supervise the arbitration and annul any award made pursuant to that agreement. However, P&ID and the Tribunal had created ambiguity as to the proper supervisory courts by persistently referencing the English Arbitration Act in disregard of the parties' express agreement that

Nigerian procedural law would apply.  Thus, out of an abundance of caution, Nigeria applied for judicial assistance in the courts of both England and Nigeria.

Nigeria first applied for annulment of the liability award in the Commercial Court in London in December 2015.  (Pet. ¶ 22.)  As in any foreign judicial matter, Nigeria retained local counsel in England to present that application.  In a witness statement, Nigeria noted that, "given the differing headings on the various procedural orders and the Part Final Award," there was some confusion as to the seat of the arbitration and the jurisdiction of the English courts. (Andrew Decl. Ex. 11 at 154.)  The English court denied the application as untimely.  (*Id*. at 162.)

Nigeria then applied for an order setting aside the liability award in the Federal High Court in Lagos, Nigeria, in February 2016.  (*Id*. at 2-4.)  The motion stated that the parties had agreed to arbitrate under the Nigerian Arbitration and Conciliation Act (2006) Cap. (A18) and therefore had "effectively agreed that the seat of the arbitration is Nigeria."  (*Id*. at 3.)  It further stated that "Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings," and that "London is not the seat of the arbitration."  (*Id*.)  It explained that London was "only the venue for hearings in the arbitration; a geographically convenient place," and thus the "High Court of England [could] not exercise supervisory or any jurisdiction in relation to the arbitration proceedings."  (*Id*.)  Nigeria also moved for an order enjoining the parties from continuing the arbitral proceedings pending resolution of the set aside motion.  On April 20, 2016, the Presiding Judge of the Federal High Court granted the injunction.  (Andrew Decl. Ex. 16 at 44-46, ECF No. 3-16.)  Nigeria informed the Tribunal of the court's order the following day.  (*Id*. at 48.)

P&ID chose not to participate in the Nigerian proceedings.  (Andrew Decl. Ex. 16 at 38; Pet. ¶ 25.)  Instead, it asked the Tribunal to determine the seat of the arbitration.  (Andrew Decl. Ex. 12, ECF. No. 3-12.)  Nigeria opposed the request because it did "not believe" that the "determination of the seat" was "in controversy."  (Andrew Decl. Ex. 16 at 36.)  Nigeria asserted that the seat of the arbitration was Nigeria because the GSPA was governed by Nigerian law and because the parties had expressly agreed to arbitrate under the rules of the Nigerian Arbitration and Conciliation Act.  (Andrew Decl. Ex. 12 at 6.)  The Tribunal considered the seat of the arbitration to be an open question and, on April 26, 2016, it issued Procedural Order No. 12, in which it purported to resolve this "dispute."  (*Id*. ¶ 1.)  In its analysis, the Tribunal noted that the relevant provision for deciding this question was section 16 of the Nigerian Arbitration Act.  (*Id*. ¶ 5.)  It then observed that the Nigerian Arbitration Act was based upon the United Nations' Model Law on International Commercial Arbitration (the "UNCITRAL Model Law"), which had been adopted across jurisdictions and was intended to create uniformity in international arbitration.  (*Id*. ¶ 7.)  The Tribunal then proceeded to interpret section 16 of the Nigerian Arbitration Act by reference to "the general international understanding" of the UNCITRAL Model Law and analogized the selection of a place for the arbitration under those rules to the concept of the juridical "seat" of the arbitration under English law.  (*Id*. ¶¶ 7-17.)  It concluded that, by designating London as the "venue," the parties had selected London as the only seat of the arbitration, notwithstanding their express agreement to arbitrate under the Nigerian Arbitration Act.  (*Id*. ¶ 40.)

Shortly thereafter, on May 24, 2016, the Nigerian court issued an order setting aside the liability award, *The Minister of Petroleum Resources v. Process and Industrial Developments*

*Limited BVI*, No. FHC/L/CS/264/2016 (F.H.C. May 24, 2016) (the "Nigerian Judgment").

(Andrew Decl. Ex. 13, ECF No. 3-13.)  The Nigerian Judgment is now final and binding.

**IV.     The Tribunal Continues the Arbitration and Issues a Damages Award**

        In disregard of the Nigerian Judgment, the Tribunal proceeded to the quantum phase.

Although Nigeria agreed to participate, it was clear in "its position" that the liability award had

been set aside in Nigeria.  (Pet. ¶ 26; Andrew Decl. Ex. 14, ECF No. 3-14; Andrew Decl. Ex. 15,

ECF No. 3-15.)

        On January 31, 2017, the Tribunal issued its decision on quantum (the "damages award").

The English arbitrators issued a majority decision.  (Andrew Decl. Ex. 17, ECF No. 3-17.)  The

majority held that P&ID was entitled to recover lost profits for the entire twenty-year term of the

GSPA minus the capital expense of building the facility and the expense of operating that

facility.  (*Id*. ¶ 110.)  In calculating these expenses, the majority rejected Nigeria's contention

that the Tribunal had to account for the well-known security risks associated with operating an

oil and gas facility in the Niger Delta, where rebels and oil thieves have attacked and looted oil

and gas facilities.  (*Id*. ¶ 84.)  That security crisis has been widely covered by news outlets

throughout the world, and Nigeria submitted evidence demonstrating that any facility constructed

by P&ID would very likely experience significant downtime as a result of those security issues.

(Andrew Decl. Ex. 18, ¶¶ 39-40, ECF No. 3-18.)  Nevertheless, the majority accepted P&ID's

argument that the facility would not experience any disruptions from the Niger Delta crisis and

would operate at 93 percent uptime during the twenty-year term of the GSPA.  (*Id*. ¶ 90.)

        The majority also rejected Nigeria's argument that the price of NGLs had to account for

the precipitous drop in oil prices that occurred following the supposed breach of the GSPA.  (*Id*.

¶¶ 99-103.)  While the parties agreed that the price of the NGLs would correlate with oil prices,

the majority adopted P&ID's argument that average price of NGLs should be based on an

average oil price in excess of $100 per barrel over the twenty-year life of the venture.  (*Id*. ¶ 103; Andrew Decl. Ex. 18, ¶ 35, ECF No. 3-18.)  Next, the majority held that these lost profits had to be discounted to present value to account for the benefit of early payment.  It applied a discount rate of 2.65 percent, the interest rate paid on U.S. Treasury notes.  (Andrew Decl. Ex. 17, ¶¶ 106-108, ECF No. 3-17.)  In the majority's view, that rate was appropriate because it reflects a "risk free" investment and represents only the time value of money.  (*Id*.)  In other words, the majority picked a discount rate that valued P&ID, a start-up company that never broke ground but planned to operate in the midst of the Niger Delta crisis, as a "risk free" investment.  Finally, although the GSPA explicitly mandates the application of Nigerian law, the majority decided to apply English law in deciding that P&ID had no obligation to mitigate its damages.  (*Id*. ¶ 109.)

The Nigerian arbitrator issued a separate dissenting decision.  (Andrew Decl. Ex. 18, ECF No. 3-18.)  Unlike the majority, the dissent remained faithful to its obligation to apply Nigerian law.  It explained that, under governing Nigerian law, including decisions of the Nigerian Supreme Court and Court of Appeals, the plaintiff has the burden of proving that it has mitigated its damages.  (*Id*. ¶¶ 2, 8-10, 12-14.)  The dissent reasoned that P&ID could have mitigated its damages because it had other opportunities that it placed on hold in order to pursue the Project.  (*Id*. ¶ 13.)  In its view, it was "inconceivable, untenable and indefensible for Claimant to fold its hands and ask for damages for twenty years." (*Id*. ¶ 15.)  Thus, the dissent made clear that the majority was improperly awarding windfall damages in excess of their mandate to apply Nigerian law.

The dissent also concluded that the majority was simply wrong to find no evidence of the significant and well known security risks of building and operating a natural gas facility in the Niger Delta, stating that it would be a "travesty to ignore the evidence" relating to those security

issues.  (*Id.* ¶¶ 21, 26-29.)  The dissent found that the security issues in the Niger Delta would have led to significantly greater downtime than the seven percent downtime accounted for by P&ID and the majority.  (*Id.* ¶¶ 31-32.)  In addition, the dissent found that the majority was wrong in applying an estimated NGL price based on $100 per barrel average oil prices, stating that it would "be inappropriate for me to close my eyes to the evidence that the price of oil has fallen significantly and that the future outlook may not be as positive as it was in 2013." (*Id.* ¶ 37.)  The dissent concluded that P&ID's damages should be limited to $250 million.  (*Id.* ¶¶ 44-46.)  Nevertheless, the majority ultimately awarded P&ID $6,597,000,000 plus seven percent pre- and post-award interest as compensation for a breach of contract.  (Andrew Decl. Ex. 17, ¶ 12, ECF No. 3-17.)

More than a year later, on March 16, 2018, P&ID filed the instant Petition seeking to confirm the award pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. (the "<u>FAA</u>"), the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "<u>New York Convention</u>" or "<u>Convention</u>"), and the FSIA. P&ID alleges that, as of the date of the Petition, approximately $9 billion is due on the award. (Pet. ¶¶ 27-28.)  Nigeria now moves to dismiss the Petition for lack of jurisdiction under the FSIA.

## <u>ARGUMENT</u>

Nigeria is a foreign state as defined in the FSIA.  28 U.S.C. § 1603(a).  And the FSIA is the "sole basis" for establishing jurisdiction over a foreign state with respect to any claim for which it is not entitled to sovereign immunity.  *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 203 (D.C. Cir. 2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989), and citing *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488-89 (1983)).  A foreign state is entitled to "virtually absolute immunity" from suit unless the

"substantive requirements" of any one of the exceptions to immunity are satisfied.  *Verlinden*, 461 U.S. at 486, 489; *accord Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017) ("*Helmerich & Payne*").  "If no exception applies, a foreign sovereign's immunity under the FSIA is complete," and the district court lacks jurisdiction over the case.  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

A court is obligated to make the sovereign immunity determination at the outset, and a foreign state is <u>not</u> required to assert its substantive defenses against confirmation of an award until that "threshold determination of FSIA immunity" has been conclusively and authoritatively resolved.  *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 80 (2d Cir. 2013); *Segni v. Commercial Office of Spain*, 816 F.2d 344, 347 (7th Cir. 1987) (Posner, J.) ("A foreign government should not be put to the expense of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amendability to suit at the earliest possible opportunity.").  *See also Helmerich & Payne*, 137 S. Ct. at 1317, 1319, 1324.

I.     **The Court Lacks Jurisdiction as Nigeria Is Entitled to Immunity under the FSIA**

P&ID invokes two exceptions to immunity for its action to confirm the award against Nigeria under the FSIA: the arbitration exception, 28 U.S.C. § 1605(a)(6), and the waiver exception, 28 U.S.C. § 1605(a)(1).  Neither of these two exceptions applies.

A.     <u>The Arbitration Exception Does Not Apply</u>

In *Chevron v. Ecuador*, the D.C. Circuit established a three-part test that a petitioner must satisfy for the arbitration exception to apply.  795 F.3d at 204.  The first step is determining that the award is or may be "governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards."  *Id*.  The New York Convention is such a treaty. A district court must then make two additional findings: (1) the existence of a valid arbitration agreement, and (2) the existence of an enforceable award.  *Id*.  A "non-frivolous claim involving

an arbitration award" is not enough to sustain jurisdiction; the Court must determine that each of these requirements has actually been met. *Id*. Although these jurisdictional questions may overlap with a foreign state's defenses under the New York Convention, *id*. at 207, a court must still answer them before it takes jurisdiction. *Id*. 205 n.3. *Accord Helmerich & Payne*, 137 S. Ct. at 1317, 1319 (applying the same standard under the expropriation exception, because it is "consistent with foreign sovereign immunity's basic objective, namely, to free a foreign sovereign from *suit*") (emphasis in original). Here, P&ID does not have an existing award and therefore cannot satisfy all the requirements to abrogate Nigeria's immunity under the arbitration exception.

In *Chevron*, the D.C. Circuit considered whether a valid arbitration agreement existed for purposes of satisfying the arbitration exception, even though that argument was "largely coextensive" with Ecuador's defenses "against confirmation of the award under the New York Convention." 795 F.3d at 207. *See also* New York Convention, art. V(1)(a) (providing that a court may refuse to enforce an award if the respondent proves that the arbitration agreement "is not valid"). The district court asserted jurisdiction merely because the proceedings involved confirmation of an arbitral award under the New York Convention, but "eschewed" the question of whether a valid arbitration agreement existed for purposes of satisfying the arbitration exception to immunity, 795 F.3d at 205 n.3, reasoning that Ecuador could not have "two bites at the apple of the merits of its dispute," i.e., one under the FSIA and another under the New York Convention, *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 63 (D.D.C. 2013). The court of appeals held that "this was error," and that the district court had to decide whether the parties had in fact agreed to arbitrate "as part of its jurisdictional analysis." 795 F.3d at 205 n.3. Likewise, the "existence of an award" is an issue that the Court "must resolve in order to

maintain jurisdiction." *Id*. at 204.  If there is "no award to enforce," then the Court "lacks

jurisdiction over the foreign state and the action must be dismissed." *Id*.

Here, jurisdiction is unavailable under the arbitration exception because there is no award

to enforce.  The question of whether an award exists, like the question of whether a valid

arbitration agreement exists, is "largely coextensive" with one of the grounds for resisting

enforcement under the New York Convention.  *Id*. at 207.  Under Article V(1)(e), an award

"does not exist to be enforced" if it has been "lawfully 'set aside' by a competent authority" at

the seat of the arbitration, i.e., the primary jurisdiction for annulling the award.  *TermoRio S.A.*

*E.S.P. v. Electranta S.P.*, 487 F.3d 928, 936 (D.C. Cir. 2007) (refusing to enforce an award that

had been set aside in Colombia) (citing *Baker Marine (Nigeria) v. Chevron (Nigeria)*, 191 F.3d

194 (2d Cir. 1999) (denying confirmation of an award that had been set aside in Nigeria)).

Article V(1)(e) states, in relevant part:

> Recognition and enforcement of the award may be refused, at the
> request of the party against whom it is invoked, only if that party
> furnishes . . . proof that . . . [t]he award . . . has been set aside . . .
> by a competent authority of the country in which, or under the law
> of which, that award was made.

New York Convention, art. V(1)(e).  The Convention "provides two tests for determining which

country has primary jurisdiction over an arbitration award: a country in which an award is made,

and a country under the law of which an award is made." *Karaha Bodas Co., L.L.C. v.*

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 308 (5th Cir. 2004).

### 1.   *Nigeria is the Country "under the Law of which" the Award Was Made*

The phrase "under the law of which" points to "the procedural law governing the

arbitration." *Belize Soc. Dev., Ltd. v. Government of Belize*, 668 F.3d 724, 731 (D.C. Cir. 2012)

(citing *Karaha Bodas*, 364 F.3d at 289 (noting that the phrase "under the law of which" refers to

the "procedural law under which the arbitration was conducted"), and RESTATEMENT (THIRD) OF

INT'L COMMERCIAL ARBITRATION § 5-12 (Am. Law. Inst. 2010) ("RESTATEMENT")).  *See also*
RESTATEMENT § 5-12(d) ("For purposes of this Section [Article V(1)(e) of the NY Convention],
a Convention award is deemed to be made under the law of the country whose arbitration law
governed the arbitral proceedings.").  In *Belize Social Development*, the D.C. Circuit found that a
court in London was a competent authority to set aside the award where the parties' agreement
stated that any disputes would be "resolved by arbitration under the London Court of
International Arbitration (LCIA) Rules."  668 F.3d at 728.  Similarly, in *Baker Marine*, a
Nigerian court was considered to be the competent authority to set aside the award under the
parties' arbitration agreement, which provided that any dispute would be "settled by arbitration
in accordance with the Arbitration Rules of the United Nations Commission on International
Trade Law (UNCITRAL)" and "specified that the arbitration 'procedure (insofar as not governed
by said UNCITRAL rules . . .) shall be governed by the substantive laws of the Federal Republic
of Nigeria.'"  191 F.3d at 195 (ellipsis in original).

Here, P&ID and Nigeria expressly agreed on Nigerian law as the procedural law that
would govern the arbitration by agreeing to arbitrate "under the rules of the Nigerian Arbitration
and Conciliation Act."  (GSPA § 20.)  *Cf. Dixilyn-Field Drilling, Ltd. v. Mobil Oil Corp.*, No. 83
CIV 9308 (LBS), 1984 U.S. Dist. LEXIS 17992, at *2, *4 (S.D.N.Y. Apr. 2, 1984) (compelling
arbitration "under Nigerian law" where the arbitration clause stated that any disputes would be
settled by arbitration "according to Arbitration Act of Nigeria").  Thus, under Article V(1)(e), a
Nigerian court is a "competent authority" with "primary jurisdiction" to annul any award made
pursuant to that agreement.  *TermoRio*, 487 F.3d at 935.  That is what the Nigerian court did here
when it set aside the liability award.

Furthermore, because the liability award was "lawfully set aside" by a Nigerian court, 487 F.3d at 935, there is no finding of liability on which the damages award can rest.  *Cf. John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*, 913 F.2d 544, 562 (8th Cir. 1990) (affirming annulment of an arbitral award that was rendered in disregard of a contrary liability determination in a prior judicial proceeding, and holding that that the liability ruling precluded the losing party from presenting further evidence and "barred" the arbitrator "from reconsidering the issue"); s*ee also Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 955 (2d Cir. 1964) (Friendly, J.).  This result cannot be avoided because the Tribunal and P&ID chose to ignore the Nigerian court's judgment, and its injunction, and to proceed to the damages phase of the case.  In short, the Nigerian Judgment left the arbitrators with nothing to decide and the subsequent damages award is a nullity.

### 2. This Court is "Obliged to Respect" the Nigerian Court's Judgment Setting Aside the Award

This Court is "obliged to respect" the Nigerian Judgment.  *TermoRio*, 487 F.3d at 930 (citing *Baker Marine*). There is no basis to "second-guess" that judgment, *id*. at 937, unless the petitioner can marshal evidence that shows that it has been "tainted," or is anything "other than authentic," *id*. at 935, or unless enforcing that judgment would offend "fundamental notions of what is decent and just in the State where enforcement is sought," *id.* at 938 (internal quotation marks and citations omitted).

In *TermoRio*, the award had been set aside by a competent court in Colombia, a primary jurisdiction under the New York Convention.  *Id*. at 935.  Since there was no cause for questioning the Colombian judgment, the D.C. Circuit ruled that the award had been "lawfully set aside."  *Id*.  The court of appeals further noted that this was a "peculiarly Colombian affair," insofar as it concerned "a dispute involving Colombian parties over a contract to perform

services in Colombia which led to a Colombian arbitration decision and Colombian litigation" in accordance with the parties' agreement "to be bound by Colombian law." *Id*. at 939.  The D.C. Circuit thus concluded that it was "in no position to pronounce the decision of [the Colombian court] wrong." *Id*.

The Second Circuit reached a similar conclusion in *Baker Marine*.  There, the court of appeals also affirmed the district court's decision refusing to enforce an award that had been set aside by a Nigerian court, citing Article V(1)(e) and "principles of comity."  191 F.3d at 196.  In rejecting the argument that the judgment of the Nigerian court should be ignored, the Second Circuit reasoned that it was "sufficient answer that the parties contracted in Nigeria that their disputes would be arbitrated under the laws of Nigeria." *Id*. at 197.  It added that the "primary purpose" of the FAA is "ensuring that private agreements to arbitrate are enforced according to their terms." *Id*. at 197 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 479 (1989)).  It further explained that the petitioner had "made no contention that the Nigerian courts acted contrary to Nigerian law." *Id*.  Finally, it held that the Convention's permissive language under Article V – providing that a court "may" refuse enforcement – did not afford the court any leeway to enforce an award annulled in Nigeria, as the petitioner had "shown no adequate reason for refusing to recognize the judgments of the Nigerian court." *Id*.

The same analysis applies here.  Petitioner acknowledges that the Nigerian court granted Nigeria's motion to set aside the liability award (*see* Pet. ¶ 26).  Absent substantial evidence that the Nigerian Judgment was tainted by any irregularities that would offend the United States' "fundamental notions of what is decent and just," this Court is bound to respect, uphold and apply it. *TermoRio*, 487 F.3d at 936, 938.  Moreover, as in *TermoRio* and *Baker Marine*, this case involves a particularly foreign affair: the Nigerian state and a foreign company entered into

a contract in Nigeria to perform services in Nigeria, which led to an arbitration award rendered under the arbitration law of Nigeria and then a Nigerian judgment setting aside that award in accordance with the parties' agreement to be bound by the laws of Nigeria.  There are zero ties to the United States.  Like the D.C. Circuit in *TermoRio*, this Court should decline any invitation to find error in the judgment of the Nigerian court.

       3.       *The Choice of an Arbitral "Venue" Does Not Affect the Nigerian Court's Judgment*

The parties' choice of a procedural law to govern the arbitration proceedings is the determinative factor in establishing the primary jurisdiction or seat for purposes of the New York Convention.  *Karaha Bodas*, 364 F.3d at 309-10.  The fact that the parties chose London as the "venue" for the arbitration proceedings does not affect the Nigerian court's primacy as a competent authority under Article V(1)(e).  The selection of a geographic location for the hearings creates a presumption as to the seat of the arbitration only "in the absence of any express statement making another country's procedural law applicable."  *Id*.  Here, the parties expressly agreed that the arbitration would be conducted "under the rules of the Nigerian Arbitration and Conciliation Act," negating any presumption that they agreed on English procedural law by naming London as the "venue."  (GSPA § 20.)

Indeed, it is possible for parties to choose one country to be the physical location for the arbitral proceedings, but choose a different country as the "seat" of the arbitration "in the legal sense."  *Karaha Bodas*, 364 F.3d at 292 (finding that the award was "made in" Geneva in accordance with the parties' presumptive agreement that Swiss procedural law applied, notwithstanding the fact that the proceedings "physically occurred in Paris"); RESTATEMENT § 5-12 cmt. b. ("[A]n award will be deemed to have been made at the arbitral seat regardless of where the hearings were actually held or the award was actually prepared or signed.").  Had the

parties intended to choose London as the "legal" seat of the arbitration, they would have used the term "seat" or "site," rather than "venue" or any other variation, to avoid ambiguity. *See Karaha Bodas*, 364 F.3d at 288, 291 (finding that Switzerland was the "legal" seat where the parties had agreed that "the *site* of the arbitration shall be Geneva") (emphasis added); 2 Gary B. Born, *Int'l Commercial Arbitration* 1540 (2d ed. 2014) ("The term 'seat' is distinctly preferable to either 'forum' or 'venue'; these latter terms imply that the designated location will be where meetings or hearings must be conducted . . . ."). In short, the parties did not agree on English procedural law by designating London as the "venue." Rather they chose London as the location for the arbitration hearings and meetings.

Even if the selection of London as the "venue" were construed to be an agreement as to the legal seat of the arbitration, that conclusion still does not divest the Nigerian court of jurisdiction to annul the award under Article V(1)(e) of the New York Convention. By its terms, the Convention "suggests the potential for more than one country of primary jurisdiction." *Karaha Bodas*, 364 F.3d at 308. For instance, in *Karaha Bodas*, the Fifth Circuit found that a Swiss court was the only competent authority under Article V(1)(e) because the parties had contractually designated the "site of the arbitration as Switzerland," and had "not otherwise expressly identif[ied] the procedural law that would apply to the arbitration." *Id.* at 290. However, the court recognized that the parties could have agreed that "one country [would] be the site of the arbitration but the proceedings [would] be held under the arbitration law of another country," in which case the courts of both countries could be competent to annul the award. *Id.* at 291, 308-09. The court declined to rule on this issue because, in the case at bar, "both of the New York Convention criteria for the country with primary jurisdiction point[ed] to Switzerland – and only to Switzerland." *Id.* at 309.

Similarly, in *Belize Social Development*, the D.C. Circuit found that an English court was the only competent authority to set aside the award because the arbitration occurred in London *and* the parties expressly agreed to the arbitral laws of England.  668 F.3d at 731 (collecting cases).  In support of that conclusion, the D.C. Circuit cited section 5-12 of the RESTATEMENT, which is crystal clear on the effect of naming one country as the "seat" of the arbitration while at the same time expressly agreeing on the procedural law of another: "In that event, the award will be subject to the primary jurisdiction of authorities in two countries, *both of which will have competence to set it aside*."  RESTATEMENT § 5-12 cmt. b. (emphasis added).  Thus, even under this interpretation of the Arbitration Agreement, the Nigerian court retained primary jurisdiction to enjoin the proceedings and annul the liability award.  Here, application of Nigerian procedural law forecloses any ruling that the United Kingdom and only the United Kingdom can be the competent jurisdiction to set aside the award.

Nothing that happened in the underlying arbitration or judicial proceedings detracts from this analysis.  The Tribunal's decision in Procedural Order No. 12, suggesting that there could only be one seat for the arbitration, is not binding on this Court.  That question is one of interpretation of the New York Convention, a treaty to which the United States is a party.  As the Fifth Circuit explained in *Karaha Bodas*, there are two tests for identifying a primary jurisdiction under Article V(1)(e) of the New York Convention, and a court in the enforcing state may make its own determination for purposes of refusing enforcement.  364 F.3d at 308.  Moreover, the Tribunal's decision, purporting to apply English procedural law and recognizing London as the only seat of the arbitration, is not entitled to deference because it "manifestly disregarded the parties' agreement [and] the law."  *Id.* at 290.  Again, the parties expressly agreed to conduct the arbitration "under the rules of the Nigerian Arbitration and Conciliation Act," and the GSPA

makes no reference whatsoever to English law. *See id.* at 309 (finding that an express agreement on the procedural law rebuts any presumption that a different country's procedural law applies); s*ee also Belize Soc. Dev.*, 668 F.3d at 728 (finding that London was competent authority where the parties expressly agreed to "arbitration under the London Court of International Arbitration (LCIA) Rules"); *Baker Marine*, 191 F.3d at 195 (applying Nigerian arbitration law pursuant to the parties' express agreement)*; Dixilyn-Field Drilling*, 1984 U.S. Dist. LEXIS 17992, at *4 (same).

Nor does Nigeria's decision to apply for annulment both in England and Nigeria conflict with its rights under the Arbitration Agreement or the New York Convention. Considering that the parties expressly agreed on Nigerian procedural law, the only relevant decision on annulment is the Nigerian Judgment. Nevertheless, because P&ID and the Tribunal persistently disregarded the parties' express agreement on the applicable procedural law, it made sense for Nigeria to seek relief in the courts of both England and Nigeria. Even if London were ultimately accepted as one of the seats of the arbitration, the Nigerian court would nevertheless retain "primary jurisdiction" as a competent authority in the country "under the law of which, that award was made." *See Karaha Bodas*, 364 F.3d at 308-09; RESTATEMENT § 5-12 cmt. b. Thus, Nigeria always had a right to seek annulment in the Nigerian courts, and that right did not dissipate when it filed to set aside the liability award in England.

In sum, because the liability award on which the damages awards is premised was lawfully set aside by a court in Nigeria, a competent authority under Article V(1)(e), P&ID has no award to enforce and this Court lacks jurisdiction under the arbitration exception, 28 U.S.C. § 1605(a)(6)(B).

B.  <u>The Waiver Exception Does Not Apply</u>

P&ID cannot establish jurisdiction under the waiver exception.  Under that exception,

jurisdiction is only available where the foreign state has waived immunity from suit in the

"courts of the United States" either "explicitly or by implication."  28 U.S.C. § 1605(a)(1).

Neither of those two paths is open to P&ID under the binding precedent of the D.C. Circuit.

P&ID does not contend that Nigeria has "explicitly" waived immunity, nor could it.  "A

foreign sovereign will not be found to have waived its immunity unless it has clearly and

unambiguously done so."  *World Wide Minerals, LTD. v. Republic of Kazakhstan*, 296 F.3d

1154, 1162 (D.C. Cir. 2002) (citing *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179

F.3d 1279, 1292 (11th Cir. 1999) (internal quotation marks omitted) ("An express waiver under

section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of

the sovereign's intent to waive its immunity."), and *Maritime Int'l Nominees Establishment v.*

*Republic of Guinea*, 693 F.2d 1094, 1100 n.10 (D.C. Cir. 1982) ("*MINE*") (holding that under

the FSIA, Congress contemplated waivers of a "specific and explicit nature"), *cert. denied*, 464

U.S. 815 (1983)).

In *World Wide Minerals*, the D.C. Circuit found that Kazakhstan intended to waive

immunity in the United States where two of the underlying agreements "contain[ed] express

waivers of sovereign immunity—the latter referring specifically to the FSIA."  *Id*. at 1162.

However, the court of appeals reversed the district court's decision insofar as it had found a

waiver of immunity for claims brought under other agreements that did not contain express

waivers, especially since other provisions in those contracts "suggest[ed] Kazakhstan did *not*

contemplate that disputes over those agreements would be resolved in United States courts, but

rather by arbitration in Kazakhstan and Sweden."  *Id*. at 1163 (emphasis in original).

- 23 -

Likewise here, the GSPA does not contain any waivers of immunity.  Rather, Nigeria's agreement to arbitrate outside the United States under Nigerian law makes clear that it never intended to waive its sovereign and jurisdictional immunity in the United States courts.  *See also Creighton v. Qatar*, 181 F.3d 118, 127 (D.C. Cir. 1999) (rejecting the argument that Qatar, by agreeing to arbitrate under Qatari law outside the United States, "should reasonably have anticipated the risk of being haled into court here" for an action to enforce the resulting award); *MINE*, 693 F.2d at 1103-1104 (finding no implied waiver of immunity where the arbitration agreement did not expressly contemplate a role for courts in the United States).  Thus, Nigeria has not explicitly waived immunity.

Nor has Nigeria implicitly waived its sovereign immunity in the courts of the United States.  There is "virtually unanimous" consensus that the FSIA's "implied waiver provision" must be construed "narrowly."  *Creighton*, 181 F.3d at 122 (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (observing that "cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed") (quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985)).  Furthermore, the D.C. Circuit has held that, even for implied waivers, section 1605(a)(1) requires a showing that the foreign state "intended to waive its sovereign immunity."  *Creighton*, 181 F.3d at 122 (citing *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) ("[A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit."), and *Foremost-McKesson*, 905 F.2d at 444 ("[C]ourts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended")).

In *Creighton,* the D.C. Circuit ruled that an agreement to arbitrate outside the United

States – even in a state party to the New York Convention – does not constitute an implicit

waiver of immunity from actions to enforce the resulting award in the United States.  181 F.3d at

122-23 (citing *Frolova*, 761 F.2d at 377).  Qatar had agreed to arbitrate under the Conciliation

and Arbitration Rules of the International Chamber of Commerce in Paris, and Creighton

obtained an award pursuant to that arbitration agreement.  *Id*. at 120.  Creighton then brought an

action to confirm the award in the United States, arguing that jurisdiction was proper under the

waiver exception because Qatar had agreed to arbitrate in France, a state party to the New York

Convention.  The D.C. Circuit disagreed.  It explained that the "closest" Creighton came to

arguing that Qatar "intended to waive its sovereign immunity" was to point to a statement in the

FSIA's legislative history: "'[C]ourts have found [implicit] waivers in cases where a foreign

state has agreed to arbitration in another country.'"  *Id*. at 122 (brackets in original) (quoting

H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617) (the "<u>House

Report</u>").  The D.C. Circuit joined other circuits in "rejecting such a broad reading of the

'implicit waiver' exception."  *Id*.  It reasoned:

> If the language of the legislative history [were] applied literally, a
> foreign government would be subject to the United States's
> jurisdiction simply because it agreed to have the contract governed
> by another country's laws, or agreed to arbitrate in a country other
> than itself, even though the agreement made no reference to the
> United States. Such an interpretation of § 1605(a)(1)'s "implicit
> waiver" exception would vastly increase the jurisdiction of the
> federal courts over matters involving sensitive foreign relations.

*Id*. (brackets in original) (quoting *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d

572, 577 (2d Cir. 1993)).  *See also MINE*, 693 F.2d at 1102 n.13 (noting that "Congress did not

endorse the literal wording of the House Report")).  Instead, the court found that the proper basis

for maintaining jurisdiction over Creighton's action was the arbitration exception – the New

York Convention governed, the arbitration agreement was not challenged, and the French courts had rejected the application to annul the award. *Creighton*, 181 F.3d at 120. In effect, the D.C. Circuit held that the waiver exception cannot apply solely on the basis that a foreign state agreed to arbitrate outside the United States even in a state party to the Convention; jurisdiction in that situation is only proper under the arbitration exception. *Accord S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1301 (11th Cir. 2000) (finding no implied waiver from agreement to arbitrate in London under the rules of the Grain and Feed Trade Association). *See also Strategic Techs. PTE, Ltd. v. Republic of China*, No. 05-cv-2311 (RMC), 2007 U.S. Dist. LEXIS 34258, at *10 (D.D.C. May 10, 2007) ("*Creighton* is clear – the election to arbitrate in another country alone does not demonstrate the intent to waive sovereign immunity.").

The same outcome is warranted here. There is no indication that Nigeria intended to waive its immunity in the United States courts by agreeing to London as the "venue" for the Arbitration, much less by agreeing to arbitrate "under the rules of the Nigerian Arbitration and Conciliation Act." (GSPA § 20.) Even if the designation of London as the "venue" were construed to mean the legal seat of the arbitration for purposes of the New York Convention, that is still not enough to infer a waiver under *Creighton*. Nor does it matter that Nigeria is a party to the Convention. *See Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 31 (D.D.C. 2014) (finding no implied waiver by the Czech Republic where it had agreed to arbitrate in its own territory under its own procedural law, even though it was also a party to the Convention), *rev'd on other grounds,* 824 F.3d 131, 137 (D.C. Cir. 2016) (finding jurisdiction under the arbitration exception only). Although some district courts in this circuit have relied on *dicta* in *Creighton* to find implied waivers where the foreign state itself is a signatory to the

Convention, that conclusion belies the *Creighton* court's own reasoning and well-established canons of statutory construction.

In *Creighton*, the court speculated that being a party to the Convention – which Qatar was not – might result in an implied waiver.  181 F.3d at 121.  But acceding to the Convention has nothing to do with a state's intention to waive its sovereign immunity.  The only significance is that the state has undertaken an obligation to recognize and enforce arbitral awards rendered in the territory of other signatories.  As the *Creighton* court observed, "the critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award."  *Id*. (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 487 cmt. b (Am. Law Inst. 1987)).  *Accord Belize Soc. Dev.*, 668 F.3d at 731 n.3 (noting that Belize's status as a non-signatory was "irrelevant," because what matters for purposes of enforcement is that the award was made in the territory of a contracting state) (citing *Creighton*, 181 F.3d at 121).

Hence, it was "undisputed" that the award the petitioner obtained in France was enforceable in the United States, because France and the United States are both parties to the Convention.  *Creighton*, 181 F.3d at 121.  Yet, the *Creighton* court ruled that Qatar's agreement to arbitrate in France was not enough to infer a waiver of immunity from enforcement in the United States under section 1605(a)(1), even though the United States had a treaty obligation to enforce the award under the New York Convention.  That is why the arbitration exception exists. *Creighton*, 181 F.3d at 126 (noting that, unlike section 1605(a)(1), "[s]ection 1605(a)(6) reflects the decision of the Congress to deny a foreign state immunity from suit in the United States if

that state has agreed to arbitrate in any country that is party to a treaty (such as the New York

Convention)").[2]

A review of the history of sections 1605(a)(1) and 1605(a)(6) sheds more light on this

point.  The FSIA, as originally enacted in 1976, included the waiver exception, section

1605(a)(1), but not the arbitration exception, section 1605(a)(6).  *See* Foreign Sovereign

Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (1976) (prior to 1988 amendment).

Congress did not add the arbitration exception until 1988.  *See Creighton*, 181 F.3d at 125-26.  In

the intervening years between 1976 and 1988, courts split on the interpretation of the waiver

exception based on disagreements over the significance of the statement in the House Report.

By 1985, the Seventh Circuit summarized the majority view as follows: "[M]ost courts have

refused to find an implicit waiver of immunity to suit in American courts from a contract clause

providing for arbitration in a country other than the United States."  *Frolova*, 761 F.2d at 377,

377 n.10 (collecting cases).  *See also MINE*, 693 F.2d at 1103 n.15 (D.C. Cir. 1982) (emphasis in

original) (observing that some "courts have found it necessary to hold that only an agreement to

arbitrate in *this* country will waive a sovereign's immunity in United States courts") (citing

*Ohntrup v. Firearms Ctr., Inc.*, 516 F. Supp. 1281, 1285 (E.D. Pa. 1981) and *Verlinden B.V. v.*

_____

[2] Unlike the D.C. Circuit, the Second Circuit has found that a foreign state's agreement to arbitrate under an applicable treaty calling for recognition and enforcement of arbitral awards in the United States amounts to an implied waiver.  *See Blue Ridge*, 735 F.3d at 83-85 (finding jurisdiction under both the waiver and arbitration exceptions in an action to confirm an award rendered under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("ICSID Convention")).  The court reasoned that, by signing the treaty, the foreign state must have foreseen enforcement proceedings in all other signatory states.  *Id.* at 84.  *Contra MINE*, 693 F.2d at 1102 (reversing the district court's decision to exercise jurisdiction under the waiver exception, even though Guinea was a party to the ICSID Convention and had agreed to ICSID arbitration).  Again, the *dicta* in *Blue Ridge* does not comport with the significance of signing a treaty calling for the recognition and enforcement of awards, as opposed to agreeing to arbitrate under such treaty.  By acceding to the ICSID Convention or the New York Convention, states are only undertaking the obligation to recognize and enforce awards rendered pursuant to an agreement to arbitrate in accordance with the convention's terms; they are not consenting to arbitration or waiving immunity from enforcement proceedings anywhere.  The D.C. Circuit in *Creighton* acknowledged as much when it stated that it could not "see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States."  181 F.3d at 123 (quoting *Amerada Hess*, 488 U.S. at 442-43.

*Central Bank of Nigeria*, 488 F. Supp. 1284, 1301-02 (S.D.N.Y. 1980)).  This divergence of

opinion was at the center of Congress's decision to add the arbitration exception to the FSIA, as

reflected in the legislative history of the 1988 amendments.  *See Hearing before the Subcomm.*

*on Admin. L. & Governmental Relations of the H. Comm. on the Judiciary*, 99th Cong. 94 (1986)

(statement of Mark Feldman, Chair of the ABA's FSIA Comm.) ("[T]here is uncertainty whether

the United States courts have jurisdiction to enforce an arbitral award made against a foreign

state in a third country even where the United States has a treaty obligation to enforce such an

award."); *Hearing before the Subcomm. on Admin. L. & Governmental Relations of the H.*

*Comm. on the Judiciary*, 100th Cong. 94 (1987) (same).

 In recognition of this uncertainty, Congress enacted the arbitration exception to "'fill the

gaps' in the FSIA and 'perfect the jurisdiction of the court.'"  *Monegasque de Reassurances*

*S.A.M. v. Nak Naftogaz of Ukraine*, 158 F. Supp. 2d 377, 384 (S.D.N.Y. 2001) (quoting the 1988

amendments' legislative history, 131 CONG. REC. 10455 (1985) (statement of Senator Mathias)),

*aff'd*, 311 F.3d 488 (2d Cir. 2002).  Had Congress believed that section 1605(a)(1) was sufficient

to encompass agreements to arbitrate outside the United States, it would not have needed to add

the arbitration exception.  *See Creighton*, 181 F.3d at 126; *Maritime Ventures Int'l, Inc. v.*

*Caribbean Trading & Fid., Ltd.*, 722 F. Supp. 1032, 1037 n.3 (S.D.N.Y. 1989) (concluding that

Congress enacted section 1605(a)(6) to codify the legislative history of section 1605(a)(1),

suggesting that the statement in the House Report did not reflect the law before the enactment of

the arbitration exception).[3]

 Finally, mandatory rules of statutory construction preclude a finding that section

1605(a)(1) can apply in this case.  If the waiver exception were interpreted to encompass claims

---

[3] Ever since the 1988 amendments, no court has asserted jurisdiction under the waiver exception to enforce an award rendered outside the United States that did not also meet the arbitration exception's substantive requirements.

involving New York Convention awards that did not meet all the requirements of the arbitration exception, then the relevant provision dealing specifically with enforcement of awards under an applicable treaty – subsection 1605(a)(6)(B) – would become superfluous.  *See Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 20 n.7 (D.D.C. 2007) ("[T]he only theory of waiver advanced by the plaintiff is the defendant's supposed agreement to arbitrate any disputes arising out of the Contract in another country, which essentially collapses any inquiry under § 1605(a)(1) into the Court's analysis under § 1605(a)(6)(B)."), *aff'd*, 304 F. App'x 872 (D.C. Cir. 2008) (applying only the arbitration exception).  That is an untenable result because courts must interpret "two distinct subsections" of the same statute "in a manner that gives meaning to both."  *Qi-Zhou v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) (citing *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (internal citation and quotations omitted) ("The cardinal principle of statutory construction is to save and not to destroy.  It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires.")).

In brief, the waiver exception does not and cannot save P&ID's claim involving a nullified award for which there is no jurisdiction under the arbitration exception.  Because neither the waiver nor the arbitration exception applies, Nigeria is immune from suit and this Court lacks jurisdiction under the FSIA.  The Petition should therefore be dismissed.

## II.    Nigeria Is Entitled to a Conclusive Determination of Its Sovereign Immunity Without Waiving Its Substantive Defenses on the Merits

This Court is required to decide Nigeria's sovereign immunity defense before reaching the merits of the Petition, and Nigeria is entitled to an interlocutory appeal from that threshold immunity determination without waiving any substantive grounds for opposing the Petition.

Foreign sovereign immunity is not only a "defense to liability," but also a shield "from trial and the attendant burdens" of having to defend against a claim on the merits. *Foremost-McKesson*, 905 F.2d at 443 (quoting *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 576 n. 2 (7th Cir. 1989)); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("A sovereign that is required to litigate a case on the merits before it can appeal the assertion of jurisdiction over it has not been afforded the benefit of the immunity to which it is entitled."). *See Helmerich & Payne*, 137 S. Ct. at 1317 (explaining that "foreign sovereign immunity's basic objective" is "to free a foreign sovereign from *suit*") (emphasis supplied); *Philippines v. Pimentel*, 553 U.S. 851, 865 (2008); *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004). *Cf. In re Papandreou*, 139 F.3d 247, 254-56 (D.C. Cir. 1998) (granting extraordinary mandamus relief to protect a foreign state's jurisdictional immunity).

The protections afforded by sovereign immunity are so important that courts of appeals have unanimously held that a foreign state is entitled to an immediate, interlocutory appeal from a denial of a motion to dismiss under the FSIA pursuant to the collateral order doctrine. *See, e.g., Princz v. Federal Republic of Germany*, 998 F.2d 1, 1 (D.C. Cir. 1993) (R.B. Ginsburg & Wald, JJ.) (per curiam) (citing *Foremost-McKesson*, 905 F.2d at 443 (collecting cases)). *See also Helmerich & Payne*, 137 S. Ct. at 1323 (recognizing that foreign states "enjoy a right to take an immediate appeal" from denials of immunity under the FSIA before the merits are decided); *EM Ltd. v. Banco Cent. De La República Argentina*, 800 F.3d 78, 87 n.38 (2d Cir. 2015); *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1281 (3d Cir. 1993); *United States v. Moats*, 961 F.2d 1198, 1201 (5th Cir. 1992). Indeed, district courts are "divest[ed] . . . of control" during an appeal of that "threshold issue" of foreign sovereign immunity. *Princz*, 998 F.2d at 1.

Nothing in the FSIA suggests that actions to enforce an arbitral award should be treated any differently. *Blue Ridge*, 735 F.3d at 80-81.  In *Blue Ridge*, Argentina moved to dismiss a petition to confirm an ICSID award for lack of jurisdiction under the FSIA.  The district court denied the motion, and Argentina appealed that decision pursuant to the collateral order doctrine. Blue Ridge challenged Argentina's right to an immediate, interlocutory appeal on the grounds that the "justifications for the [collateral order] doctrine – *e.g.*, allowing a foreign sovereign to avoid trial and the attendant burdens of litigation – [were] not relevant here insofar as the underlying proceeding only involve[d] confirming the Award." *Id*. at 80.  The Second Circuit disagreed, and upheld the well-settled rule that a foreign state is entitled to an immediate, interlocutory appeal from a decision denying its sovereign immunity before proceeding to the merits of the case. *Id*. at 80-81 (citing *Figueiredo Ferraz E Engenharia de Projeto Ltda v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) (ruling that a denial of sovereign immunity in an award confirmation proceeding is immediately appealable under the collateral order doctrine)). The fact that the action involved confirmation of an award "did not factor into [the] analysis." *Blue Ridge*, 735 F.3d at 81.

In summary, under the FSIA, Nigeria is entitled to raise sovereign immunity as a threshold defense without waiving any of its substantive defenses for opposing the Petition.[4]

---

[4] For the avoidance of doubt, Nigeria has several non-jurisdictional grounds for defending against confirmation of the Award under the New York Convention, and will properly raise and develop these defenses, if necessary, once its immunity defense has been conclusively resolved.  By way of preview, but not limitation, confirmation should be refused because the Tribunal exceeded its powers and the Award violates United States public policy under Articles V(1)(c) and V(2)(b) respectively.  First, the Tribunal exceeded its powers by disregarding the governing Nigerian law on damages in deciding to award approximately $6.6 billion in lost profits for the full twenty-year term of the contract on the grounds that English law did not require P&ID to mitigate losses.  (Andrew Decl. Ex. 17, ¶¶ 109-10, ECF No. 3-17.) *See Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier*, 508 F.2d 969, 976 (2d Cir. 1974); *cf. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-72 (2010); *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 564 (7th Cir. 2008).  Second, the Award is unenforceable in view of the well-settled United States public policy prohibiting punitive damages against foreign states, because the grossly disproportionate damages award of nearly $9 billion – based in large part on an irrationally low "risk free" discount rate of 2.65 percent for an investment in a developing economy such as Nigeria (Andrew Decl. Ex. 17, ¶ 108, ECF No. 3-17) – amounts to a blatant penalty for a breach of contract involving a

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Petition for lack of jurisdiction under the FSIA.  Nigeria reserves all rights and defenses and does not waive any of its defenses or its sovereign immunity.

Dated: Washington, D.C.
       August 27, 2018

Respectfully submitted,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:  _/s/ Joseph D. Pizzurro_____
Joseph D. Pizzurro
(D.C. Bar No. 468922)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.:  (202) 452-7373
Fax:  (202) 452-7333
Email:  jpizzurro@curtis.com

-and-

Kevin A. Meehan (*pro hac vice* pending)
Juan O. Perla (*pro hac vice* pending)
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax:  (212) 697-1559
Email: kmeehan@curtis.com
Email: jperla@curtis.com

*Attorneys for Respondents Federal*
*Republic of Nigeria and Ministry of*
*Petroleum Resources of the Federal*
*Republic of Nigeria*

---

project that never even broke ground.  *See Hardy Expl. & Prod. (India) v. Government of India*, Civ. No. 16-140 (RC), 2018 U.S. Dist. LEXIS 95965, at *31, *46-47 (D.D.C. June 7, 2018); *see also Yukos Capital S.A.R.L. v. Samaraneftegaz*, 963 F. Supp. 2d 289, 300 n.8 (S.D.N.Y. 2013); *Laminoir-Trefileries-Cableries de Lens, S.A. v. Southwire Co.*, 484 F. Supp. 1063, 1069 (N.D. Ga. 1980).  In short, the award suffers from several irremediable infirmities and cannot withstand judicial scrutiny.