**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,

                              Petitioner,

                v.                                                    Case No. 18-cv-00594-CRC

FEDERAL REPUBLIC OF NIGERIA AND                   ORAL ARGUMENT REQUESTED
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,

                              Respondents.

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF RESPONDENTS' RENEWED MOTION TO**
**DISMISS FOR LACK OF JURISDICTION UNDER THE FSIA**

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
Joseph D. Pizzurro
(D.C. Bar No. 468922)
Kevin A. Meehan
(D.C. Bar No. 1613059)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.:  (202) 452-7373
Fax:  (202) 452-7333
Email:  jpizzurro@curtis.com
Email: kmeehan@curtis.com

*Attorneys for Respondents Federal*
*Republic of Nigeria and Ministry of*
*Petroleum Resources of the Federal*
*Republic of Nigeria*

Dated: Washington, D.C.
          August 12, 2020

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................................. 3

    A.    The Underlying Dispute Giving Rise to the Arbitration.......................................... 3

    B.    The Arbitration Proceedings Resulting in a Liability Award ................................. 5

    C.    The Judicial Proceedings to Set Aside the Award and Enjoin the Arbitration....... 8

    D.    The Tribunal Continues the Arbitration and Issues Damages Awards................. 11

        1.    The Majority Decision on Damages ........................................................... 11

        2.    The Dissenting Decision on Damages ........................................................ 13

    E.    P&ID Commences This Enforcement Proceeding ............................................... 14

        1.    Nigeria's Original Motion to Dismiss under the FSIA ............................... 15

        2.    The D.C. Circuit Denies P&ID's Motion to
            Dismiss and Vacates the Order ................................................................... 15

ARGUMENT........................................................................................................................ 17

   I.    The FSIA's Arbitration Exception Does Not Apply........................................... 18

    A.    The Award Was Set Aside in Nigeria – the Country
        "under the Law of which" the Award Was Made ................................................. 20

    B.    This Court Is "Obliged to Respect" the Nigerian
        Court's Judgment Setting Aside the Award........................................................ 26

   II.    The FSIA's Waiver Exception Does Not Apply.................................................. 27

   III.    The Complaint Must Be Dismissed for Lack of Personal Jurisdiction.......................... 35

CONCLUSION.................................................................................................................... 36

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Agrocomplect, AD v. Republic of Iraq*,
  524 F. Supp. 2d 16 (D.D.C. 2007) .......................................................................... 33

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) .............................................................................. 17, 30, 32, 34

\**Baker Marine (Nigeria) v. Chevron (Nigeria)*,
  191 F.3d 194 (2d Cir. 1999) ......................................................................... passim

\**Belize Soc. Dev., Ltd. v. Government of Belize*,
  668 F.3d 724 (D.C. Cir. 2012) .............................................................. 20, 23, 24

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017) ............................................................................... 17, 18

*Cabiri v. Gov't of Ghana*,
  165 F.3d 193 (2d Cir. 1999) ................................................................................. 28

\**Chevron Corp. v. Republic of Ecuador*,
  795 F.3d 200 (D.C. Cir. 2015) ........................................................................ 18, 19

*Chevron Corp. v. Republic of Ecuador*,
  949 F. Supp. 2d 57 (D.D.C. 2013) ....................................................................... 19

\**Creighton v. Qatar*,
  181 F.3d 118 (D.C. Cir. 1999) ..................................................................... passim

*Diag Human S.E. v. Czech Republic-Ministry of Health*,
  64 F. Supp. 3d 22 (D.D.C. 2014), *rev'd on other grounds*, 824 F.3d 131 (D.C. Cir. 2016)..... 32

*Dixilyn-Field Drilling, Ltd. v. Mobil Oil Corp.*,
  No. 83 CIV 9308 (LBS), 1984 U.S. Dist. LEXIS 17992 (S.D.N.Y. Apr. 2, 1984) ........... 21, 24

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ....................................................................... 28, 30

*Frolova v. Union of Soviet Socialist Republics*,
  761 F.2d 370 (7th Cir. 1985) ..................................................................... 28, 29, 34

*Holland v. Williams Mt. Coal Co.*,
  No. 96-1405 (CKK), 2004 U.S. Dist. LEXIS 29199 (D.D.C. May 24, 2004)........................ 31

*In re Grant*,
  635 F.3d 1227 (D.C. Cir. 2011) ........................................................................... 31

*Jackson v. People's Republic of China*,
  794 F.2d 1490 (11th Cir. 1986) ........................................................................... 31

*John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*,
  913 F.2d 544 (8th Cir. 1990) ........................................................................... 25

\**Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  364 F.3d 274 (5th Cir. 2004) ...................................................................... passim

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
  693 F.2d 1094 (D.C. Cir. 1982) .................................................................. 29, 34

*Phoenix Consulting, Inc. v. Republic of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) .......................................................................... 17

*\*Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*,
  962 F.3d 576 (D.C. Cir. 2020) ................................................................. passim

*Qi-Zhou v. Meissner*,
  70 F.3d 136 (D.C. Cir. 1995) .......................................................................... 33

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  132 S. Ct. 2065 (2012) ................................................................................... 33

*Rodriguez v. Transnave Inc.*,
  8 F.3d 284 (5th Cir. 1993) .............................................................................. 28

*Seetransport Wiking Trader v. Navimpex Centrala*,
  989 F.2d 572 (2d Cir. 1993) ........................................................................... 29

*Shapiro v. Republic of Bolivia*,
  930 F.2d 1013 (2d Cir. 1991) .......................................................................... 28

*Smith v. Robinson*,
  468 U.S. 992 (1984) ........................................................................................ 33

*Strategic Techs. PTE, Ltd. v. Republic of China*,
  No. 05-cv-2311 (RMC), 2007 U.S. Dist. LEXIS 34258 (D.D.C. May 10, 2007) ................... 32

*Tatneft v. Ukraine*,
  771 F. App'x 9 (D.C. Cir. 2019) ................................................................. passim

*\*TermoRio S.A. E.S.P. v. Electranta S.P.*,
  487 F.3d 928 (D.C. Cir. 2007) ................................................................... passim

*United States v. Menasche*,
  348 U.S. 528 (1955) ........................................................................................ 33

*Verlinden B.V. v. Central Bank of Nigeria*,
  461 U.S. 480 (1983) ........................................................................................ 17

*Volt Info. Scis., Inc. v. Bd. of Trs.*,
  489 U.S. 468 (1989) ........................................................................................ 27

*Zdanok v. Glidden Co., Durkee Famous Foods Div.*,
  327 F.2d 944 (2d Cir. 1964) ........................................................................... 25

**Statutes**

28 U.S.C. § 1330 ......................................................................................................... 1, 35

28 U.S.C. § 1603 ............................................................................................................... 17

28 U.S.C. § 1605(a)(1) ................................................................................................. passim

28 U.S.C. § 1605(a)(6) ................................................................................................. passim

9 U.S.C. § 1 *et seq.* ........................................................................................................ 14

**Federal Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................................................... 1

Fed. R. Civ. P. 12(b)(2) ................................................................................................. 1, 35

Fed. R. Civ. P. 69(a)(1) ..................................................................................................... 16

**Treaties**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ............................................... passim

**Legislative History**

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ..................................... 29

**Foreign Cases**

*Enercon India Ltd v Enercon Gmbh*,
(2014) 2 SCR 891 ...................................................................................................... 24

*Garuda Indonesia v. Birgen Air*,
[2002] SGCA 12 ......................................................................................................... 24

*IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.*,
[2015] EWCA (Civ) 1144 (England) ............................................................................ 3

*IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.*,
[2017] UKSC 16 (England) ......................................................................................... 3

*Nigerian National Petroleum Corporation v Lutin Investments Ltd.*
(2006) 2 NWLR (Pt.965) 506) .............................................................................. 10, 24

*The Minister of Petroleum Resources v. Process and Industrial Developments Limited BVI*,
No. FHC/L/CS/264/2016 (F.H.C. May 24, 2016) (Nigeria) ........................... 11, 25, 27

**Other Authorities**

2 Gary B. Born, *Int'l Commercial Arbitration* 1540 (2d ed. 2014) ........................................... 22

Letter from Jack B. Tate, Acting Legal Adviser, Department of State,
to Acting Attorney General Philip B. Perlman (May 19, 1952), .............................. 30

Moore's Federal Practice § 104.12[1][a] (3d ed. 1998) ........................................................ 28

Restatement (Third) of Int'l Commercial Arbitration
§ 5-12 (Am. Law. Inst. 2010) ................................................................. 20, 22, 23, 25

Pursuant to this Court's minute order, dated July 29, 2020, the Federal Republic of Nigeria (the "Republic") and the Ministry of Petroleum Resources of the Federal Republic of Nigeria (the "Ministry of Petroleum," and together with the Republic, "Nigeria") submit this memorandum of points and authorities in support of their renewed motion to dismiss the petition to confirm a foreign arbitral award (the "Petition") filed by Process and Industrial Developments Limited ("P&ID") for lack of jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case is on remand from the D.C. Circuit, which held that Nigeria is presumptively immune from this Court's jurisdiction under the FSIA and that Nigeria's immunity defenses must be adjudicated before Nigeria can be compelled to address the merits of P&ID's Petition. *Process and Industrial Developments Ltd. v. Federal Republic of Nigeria ("P&ID")*, 962 F.3d 576 (D.C. Cir. 2020).  The D.C. Circuit's decision greatly simplifies this case because this Court need not address at this stage of the litigation the many red flags in both the arbitration and the underlying contract.  Thus, for purposes of the present motion, this Court need not question how P&ID obtained one of the largest awards of damages in the history of international arbitration when P&ID never even broke ground on the underlying project.  Nor does this Court need question how P&ID's founder – Michael "Mick" Quinn, a notorious music promoter and weapons dealer – was able to obtain the underlying contract to build a gas processing plant without any legitimate experience in the oil and gas industry and despite a troubling track record that includes at least one instance in which English courts found *prima facie* evidence of procuring an arbitral award through forgery and fraud.  Nor does this motion require this Court to address the numerous egregious flaws in the award that render it unenforceable.  The only

question presently before this Court is whether P&ID can establish jurisdiction under one of the FSIA's exceptions to immunity despite the undisputed fact that the award was set aside in Nigeria, the country under whose law the award was made and thus a primary enforcement jurisdiction under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention" or "Convention").

Nigeria is indisputably a foreign state and therefore presumptively immune from the jurisdiction of this Court unless one of the FSIA's enumerated exceptions to immunity apply. The only exception that could conceivably apply here is the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6), which confers jurisdiction over actions to confirm foreign arbitral awards that are governed by an applicable treaty such as the New York Convention. But that exception contains two additional substantive requirements, not the least of which is the existence of an enforceable award. As the D.C. Circuit has held, if there is "no award to enforce," a foreign state is entitled to sovereign immunity and the court must dismiss the case for lack of jurisdiction under the FSIA. That is the proper course in this case.

Under D.C. Circuit precedent, P&ID's award "does not exist to be enforced" because it has been "lawfully set aside" by a competent court in Nigeria, the country "under the law of which, that award was made" in accordance with the New York Convention. The judgment of the Nigerian court is now final and binding, and this Court "is obliged to respect it" unless that judgment offends the United States' "fundamental notions of what is decent and just." Nothing in the record warrants refusing recognition of the Nigerian court's judgment. Thus, the Petition must be dismissed for want of jurisdiction under the FSIA.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Underlying Dispute Giving Rise to the Arbitration

P&ID is a British Virgin Islands company owned and controlled by two Irish nationals (the "Principals").  Pet. ¶ 1, ECF No. 1.  The Principals have a long and checkered history of doing business in Nigeria (and elsewhere) with a laundry list of deals ending in allegations of fraud and criminal probes.[1]  For example, the Principals apparently acquired an interest in IPCO (Nigeria) Limited for purposes of bringing an arbitration against Nigeria National Petroleum Company ("NNPC") in connection with the "Bonny Island Export Terminal" project in Nigeria.[2]  While the Principals obtained an arbitral award in excess of $150 million against NNPC, English courts found *prima facie* evidence that the award was procured by fraud because the Principals' company, IPCO, submitted falsified documents in that arbitration.[3]  Despite this apparent fraud and other blemishes on their records (including criminal indictments), the Principals continued to seek out projects in Nigeria.

According to one of the Principals, Mr. Quinn, P&ID was incorporated in mid-2006 for purposes of exploring a natural gas project in Nigeria (the "Project").  *See* Witness Statement of Michael Quinn, Andrew Decl. Ex. 5, ¶ 17, ECF No. 3-5 (hereinafter the "Quinn Statement").  In July 2006, P&ID allegedly incorporated a Nigerian subsidiary, Process and Industrial

---

[1] *See* Kit Chellel, *et al.*, *Is One of the World's Biggest Lawsuits Built on a Sham?*, Bloomberg Businessweek (Sept. 4, 2019), *available at*, https://www.bloomberg.com/news/features/2019-09-04/is-one-of-the-world-s-biggest-lawsuits-built-on-a-sham (hereinafter the "Bloomberg Article").

[2] *See* Bloomberg Article; *see also* Witness Statement of Michael Quinn, Andrew Decl. Ex. 5, ¶ 13.2, ECF No. 3-5 (acknowledging the Principals' interest in the "Bonny Island Export Terminal" project that gave rise to the IPCO arbitration).

[3] NNPC challenged that award in England "on the basis that [IPCO] procured it in substantial part by fraudulent inflation of the quantum of its claim using fraudulently created documentation."  *See IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.* [2017] UKSC 16 [3] (discussing *IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petroleum Corp.* [2015] EWCA (Civ) 1144).  The English courts have recognized "that the fraud challenge was made bona fide, that NNPC has a good prima facie case that IPCO practised a fraud on the tribunal and that NNPC has a realistic prospect on that basis of proving that the whole award should be set aside."  *Id.*

Developments (Nigeria) Ltd., in order to do business in Nigeria.  *Id.* ¶ 18.  P&ID's plan was to obtain so-called "Wet Gas" for free from the Nigerian government and convert it into "Lean Gas," which Nigeria could use to power electric plants.  *Id.* ¶ 43.  P&ID would not charge Nigeria for converting the Wet Gas.  Rather, in exchange for the Wet Gas, P&ID would have the right to keep certain by-products ("<u>NGLs</u>") and sell them on the open market.  *Id*. ¶ 65.

The Principals began exploring the feasibility of the Project and allegedly commissioned various studies and engineering plans beginning in mid-2006.  *Id.* ¶¶ 47-48.  At the same time, the Principals were pursuing a number of other "substantial opportunities," including a mining project for which P&ID claims to have secured mining licenses in Nigeria for tenements covering nearly 1,700 square miles, and produced an Information Memorandum to secure financing for that project.  *Id.* ¶¶ 136-40.  Mr. Quinn explained that these opportunities were placed on hold as the Project progressed.  *Id.* ¶¶ 136, 140.

P&ID finally approached the Nigerian government about its idea in August 2008 and continued to solicit Nigeria's participation in the Project for well over a year.  *Id.* ¶ 57.  On January 11, 2010, P&ID and the Ministry of Petroleum executed a Gas Supply and Processing Agreement (the "<u>GSPA</u>").  *See* GSPA, Andrew Decl. Ex. 1, ECF No. 3-1.  Under the GSPA, P&ID was obligated to build a gas processing facility in the Niger Delta, and Nigeria was to supply that facility with Wet Gas from two oil mining leases operated by Addax Petroleum and Exxon Mobil.  *See id.* §§ 3(a), 3(c); Part Final Award on Liability, Andrew Decl. Ex. 8, ¶ 37(f), ECF No. 3-8 (hereinafter "<u>Liability Award</u>").  P&ID was required to process the Wet Gas into Lean Gas for Nigeria free of charge in exchange for the right to retain and sell the resulting NGLs.  GSPA § 3(d).  Addax and Exxon were not parties to the GSPA.

In March 2011, Addax informed the Principals that it was unwilling to supply P&ID with the amount of Wet Gas envisioned by the GSPA.  Liability Award, ¶ 38(a).  P&ID attempted to negotiate a compromise, which Addax initially supported but ultimately rejected in June of 2012. *Id*. ¶¶ 38(c)-(d).  At this point, the Project fell apart.  Mr. Quinn claimed that P&ID had spent approximately $40 million on the Project – most of which was spent prior to the execution of the GSPA and, in fact, may have been paid by third-parties, not P&ID.[4]  Quinn Statement ¶ 47. P&ID never started construction of the processing facility.

### B.     The Arbitration Proceedings Resulting in a Liability Award

On August 22, 2012, P&ID commenced arbitration against Nigeria.  P&ID filed for arbitration pursuant to section 20 of the GSPA, which contains a choice of law clause and an arbitration clause (the "Arbitration Agreement").  That provision states, in relevant part:

> The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.
>
> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement.
>
> \*          \*          \*
>
> The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language.

GSPA § 20 (emphasis added).  Pursuant to that agreement, P&ID served notice of the arbitration on Nigeria "[i]n accordance with the provisions of Article 3 of Schedule 1 of the Nigerian

---

[4] Billionaire Theophilus Danjuma claims that the $40 million was spent by his company, Tita-Kuru Petrochemicals Ltd., and not P&ID.  Mr. Danjuma further claims that Mr. Quinn and P&ID stole the Project out from under Tita-Kuru and later misrepresented Danjuma's $40 million investment as P&ID's.  *See* Bloomberg Article.

Arbitration and Conciliation Act" (the "<u>Nigerian Arbitration Act</u>").  Notice of Arbitration, Andrew Decl. Ex. 2 at 3, ECF No. 3-2.

The tribunal was then constituted with two English arbitrators and a Nigerian arbitrator (the "<u>Tribunal</u>").  P&ID appointed Sir Anthony Evans, Q.C., and Nigeria appointed Chief Bayo Ojo, S.A.N, a former Attorney General of Nigeria.  Those two arbitrators then appointed the third and Presiding Arbitrator, Lord Leonard Hoffman.  Pet. ¶ 18; Andrew Decl. ¶ 9, ECF No. 3. Shortly thereafter, the Presiding Arbitrator issued Procedural Direction No. 1 on behalf of the Tribunal "In the Matter of an Arbitration Under the Rules of the Arbitration and Conciliation Act of Nigeria."  Andrew Decl. Ex. 11 at 35, ECF No. 3-11.  No other procedural law was identified in that order, and there was no mention of any place or seat of the arbitration.  The order directed P&ID to "serve a Statement of Claim complying with Article 18 of the Rules of the Nigerian Arbitration and Conciliation Act."  *Id*.  Over the following year, the Presiding Arbitrator issued Procedural Orders Nos. 2 through 4, in which the Tribunal continued to style the proceedings as "In the Matter of an Arbitration Under the Rules of the Arbitration and Conciliation Act of Nigeria," making no reference to any other country's procedural law.  *Id*. at 36-43.  For instance, on September 14, 2013, following Nigeria's delay in serving a Statement of Defense, the Presiding Arbitrator issued an order directing Nigeria to comply with Article 19 of the Rules of the Nigerian Arbitration Act.  *Id*. at 37.  And, in the event that Nigeria failed to comply, he noted that the Tribunal "shall be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act."  *Id*.

Nigeria then lodged its preliminary objections to the Tribunal's jurisdiction.  *Id*. at 38.  In a letter dated October 11, 2013, P&ID wrote to Nigeria's arbitration counsel to "invite you to agree" that the preliminary objections raised by Nigeria be decided "pursuant to Section 31 (4) of

the Arbitration Act 1996," the law governing arbitrations in England.  *Id.* at 44.  In a letter dated October 14, 2013, Nigeria declined that invitation and responded that it would proceed "as contemplated by the parties under the Nigerian Arbitration and Conciliation Act."  *Id.* at 46.  In a response letter dated October 24, 2013, P&ID acknowledged that the parties had agreed to arbitrate under the Rules of the Nigerian Arbitration Act, but asserted for the first time that it had referenced England's "Arbitration Act of 1996" because it believed "the juridical seat of this arbitration is London."  *Id.* at 47.  The parties having stated their positions, the arbitral proceedings continued.  In subsequent procedural orders, the Tribunal of its own accord began to style the matter with reference to both the Nigerian and English procedural law: "In the Matter of the Arbitration Act 1996 (England and Wales) and In the Matter of an Arbitration Under the Rules of the Nigerian Arbitration and Conciliation Act 1988."  *Id.* at 107.

The Tribunal divided the arbitration into three parts relating to jurisdiction, liability, and damages (or "quantum").  On July 3, 2014, the Tribunal issued its decision on jurisdiction.  Part Final Award on Jurisdiction, Andrew Decl. Ex. 7, ECF No. 3-7.  Despite the fact that the GSPA explicitly states that the arbitration was governed by the Nigerian Arbitration Act, the Tribunal ignored that agreement and decided to apply the English Arbitration Act in concluding that it had jurisdiction.  *Id.* ¶ 36.

On July 17, 2015, the Tribunal issued the Liability Award.  *See* Liability Award (ECF No. 3-8).  The Tribunal held that the GSPA was valid and authorized, and that Nigeria was liable for breaching the GSPA.  *Id.* ¶¶ 54, 80.  While the GSPA identifies specific concessions held by Addax and Exxon as the source of the Wet Gas, the Tribunal held that the GSPA was not limited to these sources and that Nigeria was required to obtain Wet Gas from other sources when Addax and Exxon refused to supply P&ID.  *Id.* ¶ 58.  The Tribunal further held that Nigeria had an

obligation to obtain and deliver Wet Gas to P&ID's facility despite the fact that P&ID had never even broken ground on the facility and thus there was no "plant to receive it." *Id.* ¶¶ 63-66.

      **C.**    **The Judicial Proceedings to Set Aside the Award and Enjoin the Arbitration**

Following the Tribunal's decision on liability, and before it rendered its decision on quantum, Nigeria sought judicial assistance to have the arbitration proceedings enjoined and the liability award set aside. Given the parties' express agreement to arbitrate "under the rules of the Nigerian Arbitration and Conciliation Act," a Nigerian court was the competent authority to supervise the arbitration and annul any award made pursuant to that agreement. However, P&ID and the Tribunal had created ambiguity as to the proper supervisory courts by persistently referencing the English Arbitration Act in disregard of the parties' express agreement that Nigerian procedural law would apply. Thus, out of an abundance of caution, Nigeria applied for judicial assistance in the courts of both England and Nigeria.

Nigeria first applied for annulment of the liability award in the Commercial Court in London in December 2015. Pet. ¶ 22. As in any foreign judicial matter, Nigeria retained local counsel in England to present that application. In a witness statement, Nigeria noted that, "given the differing headings on the various procedural orders and the Part Final Award," there was some confusion as to the seat of the arbitration and the jurisdiction of the English courts. Andrew Decl. Ex. 11 at 154, ECF No. 3-11. The English court denied the application as untimely because it was filed outside the 28-day statute of limitations for filing a set-aside application under English law. Andrew Decl. Ex. 10 ¶ 1, ECF No. 3-10.

Nigeria then applied for an order setting aside the liability award in the Federal High Court in Lagos, Nigeria, in February 2016. Andrew Decl. Ex. 11 at 2-4, ECF No. 3-11. The motion stated that the parties had agreed to arbitrate under the Nigerian Arbitration Act and therefore had "effectively agreed that the seat of the arbitration is Nigeria." *Id*. at 3. It further

stated that "Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings," and that "London is not the seat of the arbitration." *Id*.  It explained that London was "only the venue for hearings in the arbitration; a geographically convenient place," and thus the "High Court of England [could] not exercise supervisory or any jurisdiction in relation to the arbitration proceedings." *Id*.

P&ID had notice of the Nigerian proceedings, but intentionally chose not to participate in those proceedings. *Id.* at 38; Pet. ¶ 25.  Instead, on March 8, 2016, P&ID asked the Tribunal to determine the seat of the arbitration and to do so prior to the hearing in the Nigerian proceedings that had been scheduled for April 20, 2016.  Andrew Decl. Ex. 16 at 38.  Nigeria opposed the request because it did "not believe" that the "determination of the seat" was "in controversy." *Id.* at 36.  Nigeria asserted that the seat of the arbitration was Nigeria because the GSPA was governed by Nigerian law and because the parties had expressly agreed to arbitrate under the rules of the Nigerian Arbitration and Conciliation Act.  Procedural Order 12, Andrew Decl. Ex. 12 at ¶ 6, ECF. No. 3-12 (hereinafter "P.O. 12").

On April 5, 2016, Nigeria filed a motion in the Nigerian court seeking an order enjoining the parties from continuing the arbitral proceedings pending resolution of the set aside motion.  Andrew Decl. Ex. 16 at 44, ECF No. 3-16.  A hearing was held in the Nigerian proceedings on April 20, 2016.  P&ID's Nigerian counsel was present at the hearing, but was instructed by P&ID not to participate in the proceedings. *Id.* at 47.  That same day, the Presiding Judge of the Federal High Court granted Nigeria's motion and issued an injunction prohibiting the parties from proceeding with the arbitration pending the resolution of Nigeria's application to set aside the liability award, which the Nigerian court calendared for May 23, 2016. *Id.* at 44-46.  On April 21, 2016, Nigeria informed the Tribunal of the Nigerian court's injunction. *Id.* at 48.

The Tribunal ignored the Nigerian court's injunction and issued P.O. 12 on April 26, 2016, in which it purported to resolve the parties' "dispute" over the seat of the arbitration.  P.O. 12 ¶ 1.  The Tribunal noted that the relevant provision for deciding this dispute was section 16 of the Nigerian Arbitration Act, which deals with the "place" of the arbitration.  *Id*. ¶ 5.  The Tribunal further acknowledged that, as a matter of Nigerian law, Nigeria is the seat of an arbitration where the parties' agreement specified that the arbitration would be governed by the Nigerian Arbitration Act even if the arbitrator conducts hearings elsewhere.  P.O. 12 ¶ 13.  In fact, the Tribunal quoted the Supreme Court of Nigeria as holding that, under section 16, "an arbitral tribunal has the power and discretion to decide as regards where it holds its meetings, conduct hearings, take evidence etc." but "such ***place*** as decided by the arbitrator or arbitral tribunal may be different from the ***seat*** of the arbitration …."  *Id.* (quoting *Nigerian National Petroleum Corporation v Lutin Investments Ltd.* (2006) 2 NWLR (Pt.965) 506) (emphasis added).  Despite the clear distinction between the place of the hearings and the seat of the arbitration under governing Nigerian law, the Tribunal chose, instead, to apply the United Nations' Model Law on International Commercial Arbitration (the "UNCITRAL Model Law") to reach the exact opposite conclusion of the Nigerian Supreme Court.  *Id*. ¶ 7.  Based on what it perceived as a "general international understanding" of the UNCITRAL Model Law, the Tribunal analogized the selection of a place for the arbitration under those rules to the concept of the juridical "seat" of the arbitration under English law.  *Id*. ¶¶ 7-17.  It concluded that, by designating London as the "venue," the parties had selected London as the "place of the arbitration" and therefore the "seat of the arbitration," notwithstanding their express agreement to arbitrate under the Nigerian Arbitration Act.  *Id*. ¶ 40.  In fact, the Tribunal went even further by completely rewriting the parties' agreement to arbitrate under the Nigerian Arbitration Act by

concluding that the selection of London as the "venue" of the arbitration required the Tribunal to apply the mandatory rules of the English Arbitration Act of 1996. *Id.* ¶¶ 16-17.

On May 24, 2016, the Nigerian court issued an order setting aside the liability award, *The Minister of Petroleum Resources v. Process and Industrial Developments Limited BVI*, No. FHC/L/CS/264/2016 (F.H.C. May 24, 2016) (the "Nigerian Judgment"). Andrew Decl. Ex. 13, ECF No. 3-13. The Nigerian Judgment is now final and binding.

### D.     The Tribunal Continues the Arbitration and Issues Damages Awards

The Tribunal disregarded the Nigerian Judgment and the injunction, and proceeded to the quantum phase. Nigeria maintained its position that the liability award had been set aside in Nigeria, but continued to participate in the arbitration in order to preserve its rights. Pet. ¶ 26; Andrew Decl. Ex. 15, ECF No. 3-15. On January 31, 2017, the Tribunal issued a split decision on quantum.

#### 1.     The Majority Decision on Damages

The two English arbitrators issued a majority decision awarding P&ID $6,597,000,000 plus seven percent pre- and post-award interest as compensation for a breach of the GSPA – one of the largest awards of damages in the history of international arbitration. Majority Award on Damages, Andrew Decl. Ex. 17, ¶ 12, ECF No. 3-17 (hereinafter "Majority Op.").

The majority held that, even though P&ID never performed its obligations under the GSPA, it was entitled to recover lost profits for the entire twenty-year term of the GSPA minus the capital expense of building the facility and the expense of operating that facility. *Id.* ¶ 110.

The majority rejected Nigeria's argument that P&ID had an obligation to mitigate its damages as a matter of Nigerian law. *Id.* ¶ 109. While the GSPA explicitly mandates the application of Nigerian law, the majority decided to apply English law instead. *Id.* It held that, under English law, the breaching party has the burden of proving that the non-breaching party

- 11 -

could have mitigated its loss.  *Id.*  The majority then concluded that there was no evidence that P&ID could have mitigated its losses during the 20-year term of the GSPA.  *Id.*

Because P&ID was a shell company with no revenue, the majority decided to calculate the Project's estimated revenues by projecting the average yield and price of NGLs over the 20-year term of the GSPA  *Id.* ¶ 76.  While the parties agreed the yield of NGLs would depend on the amount of downtime experienced by the facility, the parties significantly diverged in their estimates of downtime.  The Project was to be built in the Niger Delta, where rebels and oil thieves have routinely and consistently attacked and looted oil and gas facilities.  The security crisis in the Niger Delta has been widely covered by news outlets throughout the world, and Nigeria submitted evidence demonstrating that any facility constructed by P&ID would very likely experience significant downtime as a result of those security issues.  *See* Dissenting Final Award on Damages, Andrew Decl. Ex. 18, ¶¶ 20, 28, 39-40, ECF No. 3-18 (hereinafter "Dissent").  Nevertheless, the majority adopted P&ID's speculative view that the Project would miraculously avoid the disruptions from the Niger Delta crisis that plague other operators in the region and would somehow operate at 93% uptime during the twenty-year term of the GSPA. Majority Op. ¶ 90.

While the parties agreed that the price of the NGLs would correlate with oil prices, the majority rejected Nigeria's argument that the price of NGLs had to account for the precipitous drop in oil prices that occurred following the supposed breach of the GSPA.  *Id*. ¶¶ 99-103.  The majority acknowledged that the price of oil had been fluctuating between $48 and $55 per barrel between the filing of  P&ID's expert report in 2015 and the issuance of the award on damages in 2017.  *Id.* ¶ 96 n.39.  Nevertheless, the majority adopted the argument of P&ID's expert that

average price of NGLs should be based on an average oil price in excess of $100 per barrel over the twenty-year life of the venture. *Id.* ¶ 103; Dissent ¶ 35.[5]

The majority then held that its projected cash flows had to be discounted to present value to account for the benefit of early payment. It applied a discount rate of 2.65 percent, the interest rate paid on U.S. Treasury notes. *Id.* ¶¶ 106-108. In the majority's view, that rate was appropriate because it reflects a "risk free" investment and represents only the time value of money. *Id.* In other words, the majority picked a discount rate that valued P&ID, a start-up shell company that never broke ground but planned to operate in the midst of the Niger Delta crisis, as a "risk free" investment.

The majority further awarded 7% pre- and post-award interest running from the alleged date of repudiation of the GSPA, March 20, 2013. *Id.* ¶¶ 108, 112. The majority concluded that 7% interest was appropriate because that would have been the borrowing rate set by the market – a rate that the majority acknowledged reflects the inherent risks of investing in Nigeria. *Id.* ¶ 108. In other words, the majority concluded that the Project was a "risk-free" investment for purposes of determining the discount rate but also a risky investment for purposes of determining the rate of interest on the award. The only consistency between these decisions is that both had the effect of increasing the amount of damages awarded to P&ID.

2.    The Dissenting Decision on Damages

The Nigerian arbitrator issued a separate dissenting decision. Unlike the majority, the dissent remained faithful to its obligation to apply Nigerian law. It explained that, under governing Nigerian law, including decisions of the Nigerian Supreme Court and Court of Appeals, the plaintiff has the burden of proving that it has mitigated its damages. Dissent ¶¶ 2,

---

[5] The European Brent price relied on by the majority has not topped $100 since September 4, 2014 and has averaged less than $57 ever since – *i.e.* roughly half the price estimated by the majority.

8-10, 12-14.  The dissent reasoned that P&ID could have mitigated its damages because P&ID claimed to have had other opportunities that it placed on hold in order to pursue the Project.  *Id.* ¶ 13.  The dissent explained that it was "inconceivable, untenable and indefensible for Claimant to fold its hands and ask for damages for twenty years." (*Id.* ¶ 15.)  Thus, the dissent made clear that the majority was improperly awarding windfall damages in excess of their mandate to apply Nigerian law.

The dissent also concluded that the majority was simply wrong to find no evidence of the significant and well known security risks of building and operating a natural gas facility in the Niger Delta, stating that it would be a "travesty to ignore the evidence" relating to those security issues.  *Id.* ¶¶ 21, 26-29.  The dissent found that the security issues in the Niger Delta would have led to significantly greater downtime than the seven percent downtime accounted for by P&ID and the majority.  *Id.* ¶¶ 31-32.  In addition, the dissent found that the majority was wrong in applying an estimated NGL price based on an average oil price of $100 per barrel, stating that it would "be inappropriate for me to close my eyes to the evidence that the price of oil has fallen significantly and that the future outlook may not be as positive as it was in 2013."  *Id.* ¶ 37.  The dissent concluded that P&ID's damages should be limited to $250 million – a fraction of the nearly $6.6 billion awarded by the majority.  *Id.* ¶¶ 44-46.

E.     **P&ID Commences This Enforcement Proceeding**

On March 16, 2018, P&ID filed the instant Petition seeking to confirm the award pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") and the New York Convention, and asserting jurisdiction under the FSIA.  P&ID alleges that, as of the date of the Petition, approximately $9 billion was due on the award.  Pet. ¶¶ 27-28.

1.      Nigeria's Original Motion to Dismiss under the FSIA

On August 27, 2018, Nigeria moved to dismiss the Petition for lack of jurisdiction under the FSIA.  ECF No. 28.  Instead of responding to Nigeria's motion to dismiss, P&ID moved this Court for an order compelling Nigeria to brief the merits of the Petition prior to the resolution of Nigeria's immunity defenses under the FSIA.  ECF No. 31.  On October 1, 2018, this Court issued an order (the "Order") granting P&ID's motion and directing Nigeria to file a consolidated opposition asserting both jurisdictional defenses under the FSIA as well as any substantive defenses to enforcement of the award.  ECF. No. 34.  Nigeria appealed.

P&ID first asked this Court to certify Nigeria's appeal as invalid or frivolous.  ECF No. 37.  That motion was denied.  ECF No. 40.  P&ID then filed a motion in the D.C. Circuit to either dismiss Nigeria's appeal as frivolous or summarily affirm the Order.  *See* Motion to Dismiss, *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria, et al.*, No. 18-7154, Doc. No. 1762525 (D.C. Cir. Nov. 30, 2018).  The D.C. Circuit denied P&ID's motion for summary affirmance and deferred ruling on the motion to dismiss.  *See* Order, *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria, et al.*, No. 18-7154, Doc. No. 1773659 (D.C. Cir. Feb. 15, 2019).  P&ID then filed its appellate brief arguing that, if the appeal is not dismissed, the D.C. Circuit should not only affirm the Order but also hold that Nigeria is not entitled to immunity under the FSIA.  *See* P&ID Opposition Br., *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria, et al.*, No. 18-7154, Doc. No. 1785558, at p. 15 (D.C. Cir. May 1, 2019) (hereinafter "P&ID Appellate Br.").

2.      The D.C. Circuit Denies P&ID's Motion to Dismiss and Vacates the Order

On June 19, 2020, the D.C. Circuit issued its decision denying P&ID's motion to dismiss the appeal, vacating the Order and remanding the case for a threshold resolution of Nigeria's immunity defenses under the FSIA.  *P&ID*, 962 F.3d at 586-87.

- 15 -

The D.C. Circuit denied P&ID's motion to dismiss the appeal because it concluded that it had jurisdiction to review the Order under the collateral order doctrine. *Id.* at 582-83. While the D.C. Circuit declined P&ID's invitation to conclusively resolve Nigeria's immunity defenses under the FSIA, it rejected P&ID's argument that Nigeria's appeal should be dismissed as frivolous. *Id.* at 583. The D.C. Circuit recognized that the FSIA's arbitration exception requires a confirmable award and that the liability award had been set aside by the courts in Nigeria. *Id.* It therefore held that Nigeria had a colorable argument that "a confirmable 'award' under the arbitration exception cannot include an award set aside by a court with supervisory jurisdiction over the arbitration—just as, for example, an executable 'judgment' under Federal Rule of Civil Procedure 69(a)(1) presumably could not include a judgment reversed by the appropriate court of appeals." *Id.*

The D.C. Circuit dismissed P&ID's argument that the Nigerian courts lacked authority to set aside the liability award under the New York Convention. It explained that "the New York Convention recognizes that an award may be 'set aside or suspended' by courts of the sovereign whose substantive law governs the arbitration, as well as by courts of the sovereign where the arbitration takes place. Here, that rule would seem to include the courts of Nigeria." *Id.*

The D.C. Circuit was also unmoved by P&ID's argument that, under *Creighton v. Qatar*, 181 F.3d 118 (D.C. Cir. 1999) and *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019), Nigeria had implicitly waived its immunity under the FSIA's waiver exception by acceding to the New York Convention. The D.C. Circuit held that *Creighton* was inapposite because, in that case, the foreign state was not a signatory to the New York Convention. The D.C. Circuit was equally unimpressed with P&ID's reliance on *Tatneft* – explaining that *Tatneft* was an unpublished decision and therefore not binding precedent. *See P&ID*, 962 F.3d at 583-84.

Next, the D.C. Circuit vacated the Order on the grounds that it constituted an infringement of Nigeria's presumptive immunity under the FSIA.  It held that "the 'basic objective' of foreign sovereign immunity is 'to free a foreign sovereign from suit'" and therefore an assertion of foreign sovereign immunity "must be decided '[a]t the threshold of every action'" before a foreign state can be compelled to present a defense on the merits.  *Id.*  (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co. ("H&P")*, 137 S. Ct. 1312, 1317 (2017)  and *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983)).  It held that the FAA did not alter this paradigm.  *See P&ID*, 962 F.3d at 585.  Furthermore, while P&ID argued that consolidating the merits and jurisdictional inquiry would reduce Nigeria's litigation burden, the D.C. Circuit held that FSIA "affords a complete protection 'from suit'' and that "one of the 'basic objectives' of the FSIA is to 'respect the independence and dignity' of foreign sovereigns, not simply to ameliorate their litigation burdens."  *Id.* at 586 (quoting *H&P*).

The D.C. Circuit remanded the case back to this Court for further proceedings.

## ARGUMENT

Nigeria is a foreign state as defined in the FSIA.  28 U.S.C. § 1603(a).  And the FSIA is the "sole basis" for establishing jurisdiction over a foreign state.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  A foreign state is presumptively immune from suit unless the substantive requirements of one of the FSIA's enumerated exceptions to immunity are satisfied.  *See H&P*, 137 S. Ct. at 1316-17; *Verlinden*, 461 U.S. at 486, 489.  "If no exception applies, a foreign sovereign's immunity under the FSIA is complete," and the district court lacks jurisdiction over the case.  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  P&ID invokes two exceptions to immunity for its action to confirm the award

against Nigeria: the arbitration exception, 28 U.S.C. § 1605(a)(6), and the waiver exception, 28 U.S.C. § 1605(a)(1).  Neither of these two exceptions apply.

## I.    **The FSIA's Arbitration Exception Does Not Apply**

The D.C. Circuit has established a three-part test that a petitioner must satisfy for the arbitration exception to apply.  *Chevron Corp. v. Republic of Ecuador,* 795 F.3d 200, 204 (D.C. Cir. 2015).  The first step is determining that the award is or may be "governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards."  *Id*.  The New York Convention is such a treaty.  A district court must then make two additional findings: (1) the existence of a valid arbitration agreement, and (2) the existence of an enforceable award.  *Id*.  A "non-frivolous claim involving an arbitration award" is not enough to sustain jurisdiction; the Court must determine that each of these requirements has actually been met.  *Id*.  Although these jurisdictional questions may overlap with a foreign state's defenses under the New York Convention, *id*. at 207, a court must still answer them before it takes jurisdiction.  *Id*. at 205 n.3. *Accord H&P*, 137 S. Ct. at 1317, 1319 (applying the same standard under the expropriation exception, because it is "consistent with foreign sovereign immunity's basic objective, namely, to free a foreign sovereign from *suit*") (emphasis in original).

Here, P&ID does not have an existing award and therefore cannot satisfy all the requirements to abrogate Nigeria's immunity under the arbitration exception.  Indeed, the D.C. Circuit above recognized that the arbitration exception may be inapplicable in light of the fact that the award has been set aside by the courts in Nigeria.  *See P&ID*, 962 F.3d at 583.  That conclusion is consistent with the D.C. Circuit's decision in *Chevron v. Ecuador.*

In *Chevron*, the district court found jurisdiction merely because the proceedings involved confirmation of an arbitral award under the New York Convention, but "eschewed" the question of whether a valid arbitration agreement existed for purposes of satisfying the arbitration

exception to immunity, 795 F.3d at 205 n.3, reasoning that Ecuador could not have "two bites at the apple of the merits of its dispute," i.e., one under the FSIA and another under the New York Convention, *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 63 (D.D.C. 2013).  The D.C. Circuit held that "this was error," and that the district court had to decide whether the parties had in fact agreed to arbitrate "as part of its jurisdictional analysis."  795 F.3d at 205 n.3. It further explained that the "existence of an award" is also an issue that courts "must resolve in order to maintain jurisdiction."  *Id*. at 204.  Thus, the D.C. Circuit held:  "If there is no arbitration agreement or no award to enforce, the District Court lacks jurisdiction over the foreign state and the action must be dismissed."  *Id*.

Here, jurisdiction is unavailable under the arbitration exception because there is no award to enforce.  An award "does not exist to be enforced" if it has been "lawfully 'set aside' by a competent authority" pursuant to the New York Convention.  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 936 (D.C. Cir. 2007) (refusing to enforce an award that had been set aside in Colombia) (citing *Baker Marine (Nigeria) v. Chevron (Nigeria)*, 191 F.3d 194 (2d Cir. 1999) (denying confirmation of an award that had been set aside in Nigeria)).  Article V(1)(e) of the New York Convention provides that an award can be "set aside" (*i.e.* vacated or annulled) "by a competent authority of the country in which, ***or*** under the law of which, that award was made." New York Convention, art. V(1)(e) (emphasis added).  Thus, as the D.C. Circuit stated above: "[T]he New York Convention recognizes that an award may be 'set aside or suspended' by courts of the sovereign whose substantive law governs the arbitration, as well as by courts of the sovereign where the arbitration takes place."  *P&ID*, 962 F.3d at 583.  *See also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 308 (5th Cir. 2004) ("[T]he Convention provides two tests for determining which country has

primary jurisdiction over an arbitration award: a country in which an award is made, and a country under the law of which an award is made.").

A.      The Award Was Set Aside in Nigeria – the Country "under the Law of which" the Award Was Made

The D.C. Circuit above stated that a "competent authority" to set aside the award in this case under Article V(1)(e) "would seem to include the courts of Nigeria." *P&ID*, 962 F.3d at 583. Indeed, the phrase "under the law of which" in Article V(1)(e) points to "the procedural law governing the arbitration." *Belize Social Development v. Government of Belize ("Belize")*, 668 F.3d 724, 731 (D.C. Cir. 2012) (citing *Karaha Bodas*, 364 F.3d at 289 (noting that the phrase "under the law of which" refers to the "procedural law under which the arbitration was conducted"), and RESTATEMENT (THIRD) OF INT'L COMMERCIAL ARBITRATION § 5-12 (Am. Law. Inst. 2010) ("RESTATEMENT")). *See also* RESTATEMENT § 5-12(d) ("For purposes of this Section [Article V(1)(e) of the NY Convention], a Convention award is deemed to be made under the law of the country whose arbitration law governed the arbitral proceedings.").

In *Belize*, the D.C. Circuit found that a court in London was a competent authority to set aside the award where the parties' agreement stated that any disputes would be "resolved by arbitration under the London Court of International Arbitration (LCIA) Rules." 668 F.3d at 728. Similarly, in *Baker Marine*, a Nigerian court was considered to be the competent authority to set aside the award under the parties' arbitration agreement, which provided that any dispute would be "settled by arbitration in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)" and "specified that the arbitration 'procedure (insofar as not governed by said UNCITRAL rules . . .) shall be governed by the substantive laws of the Federal Republic of Nigeria.'" 191 F.3d at 195 (ellipsis in original).

Here, P&ID and Nigeria expressly agreed on Nigerian law as the procedural law that would govern the arbitration by agreeing to arbitrate "under the rules of the Nigerian Arbitration and Conciliation Act."  GSPA § 20.  *Cf. Dixilyn-Field Drilling, Ltd. v. Mobil Oil Corp.*, No. 83 CIV 9308 (LBS), 1984 U.S. Dist. LEXIS 17992, at *2, *4 (S.D.N.Y. Apr. 2, 1984) (compelling arbitration "under Nigerian law" where the arbitration clause stated that any disputes would be settled by arbitration "according to Arbitration Act of Nigeria").  Thus, under Article V(1)(e), a Nigerian court is a "competent authority" with "primary jurisdiction" to annul any award made pursuant to that agreement.  *TermoRio*, 487 F.3d at 935.  That is what the Nigerian court did here when it set aside the liability award.

The parties' choice of the Nigerian Arbitration Act as the procedural law to govern the arbitration proceedings establishes Nigeria as the primary jurisdiction or seat for purposes of the New York Convention.  *See Karaha Bodas*, 364 F.3d at 309-10.  That proposition is self-evident. Nigerian law was the governing law of the GSPA as well as the governing law of the arbitration. Nigerian courts are uniquely qualified to construe and apply both substantive Nigerian contract law as well as the Nigerian Arbitration Act, and Nigeria has a paramount interest in ensuring that its law is properly construed and that such arbitrations are conducted in accordance with the Nigerian Arbitration Act.

The fact that the parties chose London as the "venue" for arbitration proceedings conducted under the Nigerian Arbitration Act (and Nigerian substantive law) does not affect the Nigerian court's primacy as a competent authority under Article V(1)(e).  The selection of a geographic location for the hearings creates a presumption as to the seat of the arbitration only "in the absence of any express statement making another country's procedural law applicable." *Karaha Bodas*, 364 F.3d at 309-10.  Here, the parties expressly agreed that the arbitration would

be conducted "under the rules of the Nigerian Arbitration and Conciliation Act," thus precluding any finding that England was the "seat" of the arbitration.  GSPA § 20.

Indeed, it is possible for parties to choose one country to be the physical location for the arbitral proceedings, but choose a different country as the "seat" of the arbitration "in the legal sense."  *Karaha Bodas*, 364 F.3d at 292 (finding that the award was "made in" Geneva in accordance with the parties' presumptive agreement that Swiss procedural law applied, notwithstanding the fact that the proceedings "physically occurred in Paris"); RESTATEMENT § 5-12 cmt. b. ("[A]n award will be deemed to have been made at the arbitral seat regardless of where the hearings were actually held or the award was actually prepared or signed.").  Had the parties intended to choose London as the "legal" seat of the arbitration, they would have used the term "seat" or "site," rather than "venue" or any other variation, to avoid ambiguity.  *See Karaha Bodas*, 364 F.3d at 288, 291 (finding that Switzerland was the "legal" seat where the parties had agreed that "the *site* of the arbitration shall be Geneva") (emphasis added); 2 Gary B. Born, *Int'l Commercial Arbitration* 1540 (2d ed. 2014) ("The term 'seat' is distinctly preferable to either 'forum' or 'venue'; these latter terms imply that the designated location will be where meetings or hearings must be conducted . . . .").  In short, the parties did not agree on English procedural law by designating London as the "venue."  Rather they chose London as the location for the arbitration hearings and meetings.

In any event, even if the selection of London as the "venue" were construed to be an agreement as to the legal seat of the arbitration, that conclusion still does not divest the Nigerian court of jurisdiction to annul the award under Article V(1)(e) of the New York Convention.  By its terms, the Convention "suggests the potential for more than one country of primary jurisdiction."  *Karaha Bodas*, 364 F.3d at 308.  For instance, in *Karaha Bodas*, the Fifth Circuit

found that a Swiss court was the only competent authority under Article V(1)(e) because the parties had contractually designated the "site of the arbitration as Switzerland," and had "not otherwise expressly identif[ied] the procedural law that would apply to the arbitration." *Id*. at 290. However, the court recognized that the parties could have agreed that "one country [would] be the site of the arbitration but the proceedings [would] be held under the arbitration law of another country," in which case the courts of both countries could be competent to annul the award. *Id.* at 291, 308-09.

Similarly, in *Belize*, the D.C. Circuit found that an English court was the only competent authority to set aside the award because the arbitration occurred in London *and* the parties expressly agreed to the arbitral laws of England. 668 F.3d at 731 (collecting cases). In support of that conclusion, the D.C. Circuit cited section 5-12 of the RESTATEMENT, which is crystal clear on the effect of naming one country as the "seat" of the arbitration while at the same time expressly agreeing on the procedural law of another: "In that event, the award will be subject to the primary jurisdiction of authorities in two countries, *both of which will have competence to set it aside*." RESTATEMENT § 5-12 cmt. b. (emphasis added). Thus, even under this interpretation of the GSPA's arbitration clause, the Nigerian court retained primary jurisdiction to enjoin the proceedings and annul the liability award. Here, application of Nigerian procedural law forecloses any ruling that the United Kingdom and only the United Kingdom can be the competent jurisdiction to set aside the award.

Nothing that happened in the underlying arbitration or judicial proceedings detracts from this analysis. The Tribunal's decision in Procedural Order No. 12, suggesting that there could only be one seat for the arbitration, is not binding on this Court. That question is one of interpretation of the New York Convention, a treaty to which the United States is a party. As the

Fifth Circuit explained in *Karaha Bodas*, there are two tests for identifying a primary jurisdiction under Article V(1)(e) of the New York Convention, and a court in the enforcing state may make its own determination for purposes of refusing enforcement.  364 F.3d at 308.  Moreover, the Tribunal's decision, purporting to apply English procedural law and recognizing London as the only seat of the arbitration, is not entitled to deference because it "manifestly disregarded the parties' agreement [and] the law."  *Id.* at 290.  Again, the parties expressly agreed to conduct the arbitration "under the rules of the Nigerian Arbitration and Conciliation Act," and the GSPA makes no reference whatsoever to English law.  *See id*. at 309 (finding that an express agreement on the procedural law rebuts any presumption that a different country's procedural law applies); s*ee also Belize*, 668 F.3d at 728 (finding that London was competent authority where the parties expressly agreed to "arbitration under the London Court of International Arbitration (LCIA) Rules"); *Baker Marine*, 191 F.3d at 195 (applying Nigerian arbitration law pursuant to the parties' express agreement*); Dixilyn-Field Drilling*, 1984 U.S. Dist. LEXIS 17992, at *4 (same).  And the Nigerian Supreme Court has held that, where the parties have agreed to arbitrate under the Nigerian Arbitration Act, the Nigerian courts have primary jurisdiction over the arbitration regardless of whether arbitral hearings occurred elsewhere.  P.O. 12 ¶ 13 (discussing *Nigerian National Petroleum Corporation v Lutin Investments Ltd.* (2006) 2 NWLR (Pt.965) 506).[6]

    Nor does Nigeria's decision to apply for annulment both in England and Nigeria conflict with its rights under the GSPA or the New York Convention.  Considering that the parties

---

[6] Courts in other jurisdictions have reached the same conclusion.  *See Enercon India Ltd v Enercon Gmbh*, (2014) 2 SCR 891 (Indian Supreme Court held that India was the "seat" of the arbitration because the parties agreed that the arbitration would be governed by the Indian Arbitration Act notwithstanding that fact that their agreement designated London as the "venue"); *Garuda Indonesia v. Birgen Air*, [2002] SGCA 12 (The Court of Appeals of Singapore held that Indonesia was the seat of the arbitration because the parties' agreement provided for arbitration under Indonesian law notwithstanding the fact that the hearings were held in Singapore – explaining that the arbitral seat is distinct from "the place where the arbitral tribunal carries on hearing witnesses, experts or the parties, namely, the 'venue of hearing.'").

expressly agreed on Nigerian procedural law, the only relevant decision on annulment is the

Nigerian Judgment.  Nevertheless, because P&ID and the Tribunal persistently disregarded the

parties' express agreement on the applicable procedural law, it made sense for Nigeria to seek

relief in the courts of both England and Nigeria.  Even if London were ultimately accepted as one

of the seats of the arbitration, the Nigerian court would nevertheless retain "primary jurisdiction"

as a competent authority in the country "under the law of which[] that award was made."  *See*

*Karaha Bodas*, 364 F.3d at 308-09; RESTATEMENT § 5-12 cmt. b.  Thus, Nigeria always had a

right to seek annulment in the Nigerian courts, and that right did not dissipate when it filed to set

aside the liability award in England.

Finally, because the liability award was "lawfully set aside" by a Nigerian court, 487

F.3d at 935, there is no finding of liability on which the damages award can rest.  *Cf. John*

*Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*, 913 F.2d 544, 562

(8th Cir. 1990) (affirming annulment of an arbitral award that was rendered in disregard of a

contrary liability determination in a prior judicial proceeding, and holding that the liability ruling

precluded the losing party from presenting further evidence and "barred" the arbitrator "from

reconsidering the issue"); s*ee also Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d

944, 955 (2d Cir. 1964) (Friendly, J.).  This result cannot be avoided because the Tribunal and

P&ID chose to ignore the Nigerian court's judgment, and its injunction, and to proceed to the

damages phase of the case.  The Nigerian Judgment left the arbitrators with nothing to decide

and the subsequent damages award is a nullity.

In sum, because the liability award on which the damages awards is premised was

lawfully set aside by a court in Nigeria, a competent authority under Article V(1)(e), P&ID has

no award to enforce and this Court lacks jurisdiction under the arbitration exception, 28 U.S.C.
§ 1605(a)(6)(B).

**B.      This Court Is "Obliged to Respect" the Nigerian
          Court's Judgment Setting Aside the Award**

This Court is "obliged to respect" the Nigerian Judgment. *TermoRio*, 487 F.3d at 930
(citing *Baker Marine*). There is no basis to "second-guess" that judgment, *id*. at 937, unless the
petitioner can marshal evidence that shows that it has been "tainted," or is anything "other than
authentic," *id*. at 935, or unless enforcing that judgment would offend "fundamental notions of
what is decent and just in the State where enforcement is sought," *id.* at 938 (internal quotation
marks and citations omitted).

In *TermoRio*, the award had been set aside by a competent court in Colombia, a primary
jurisdiction under the New York Convention.  *Id*. at 935.  Since there was no cause for
questioning the Colombian judgment, the D.C. Circuit ruled that the award had been "lawfully
set aside."  *Id*.  The court of appeals further noted that this was a "peculiarly Colombian affair,"
insofar as it concerned "a dispute involving Colombian parties over a contract to perform
services in Colombia which led to a Colombian arbitration decision and Colombian litigation" in
accordance with the parties' agreement "to be bound by Colombian law."  *Id*. at 939.  The D.C.
Circuit thus concluded that it was "in no position to pronounce the decision of [the Colombian
court] wrong."  *Id*.

The Second Circuit reached a similar conclusion in *Baker Marine*.  There, the court of
appeals also affirmed the district court's decision refusing to enforce an award that had been set
aside by a Nigerian court, citing Article V(1)(e) and "principles of comity."  191 F.3d at 196.  In
rejecting the argument that the judgment of the Nigerian court should be ignored, the Second
Circuit reasoned that it was "sufficient answer that the parties contracted in Nigeria that their

disputes would be arbitrated under the laws of Nigeria." *Id.* at 197.  It added that the "primary purpose" of the FAA is "ensuring that private agreements to arbitrate are enforced according to their terms." *Id.* at 197 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 479 (1989)).  It further explained that the petitioner had "made no contention that the Nigerian courts acted contrary to Nigerian law." *Baker Marine,* 191 F.3d at 197.  Finally, it held that the Convention's permissive language under Article V – providing that a court "may" refuse enforcement – did not afford the court any leeway to enforce an award annulled in Nigeria, as the petitioner had "shown no adequate reason for refusing to recognize the judgments of the Nigerian court." *Id.*

The same analysis applies here.  P&ID acknowledges that the Nigerian court granted Nigeria's motion to set aside the liability award.  Pet. ¶ 26.  Absent substantial evidence that the Nigerian Judgment was tainted by any irregularities that would offend the United States' "fundamental notions of what is decent and just," this Court is bound to respect, uphold and apply it.  *TermoRio*, 487 F.3d at 936, 938.  Moreover, as in *TermoRio* and *Baker Marine*, this case involves a particularly foreign (Nigerian) affair: the Nigerian state and a foreign company entered into a contract in Nigeria to have the company's Nigerian subsidiary perform services in Nigeria, which led to an arbitration award and a subsequent Nigerian judgment setting aside that award in accordance with the parties' agreement to arbitrate under the Nigerian Arbitration Act.  *TermoRio*, 487 F.3d at 939.  There are zero ties to the United States.  Like the D.C. Circuit in *TermoRio*, this Court should decline any invitation to find error in the Nigerian Judgment.

## II.    <u>The FSIA's Waiver Exception Does Not Apply</u>

P&ID cannot establish jurisdiction under the FSIA's waiver exception.  The waiver exception only applies where the foreign state has waived immunity from suit in the "courts of the United States" either "explicitly or by implication."  28 U.S.C. § 1605(a)(1).  P&ID does not contend that Nigeria has "explicitly" waived immunity, nor could it.  The GSPA does not contain

any waivers of immunity.  Instead, P&ID asserts that Nigeria implicitly waived its immunity under the GSPA simply because that contract provided for arbitration and Nigeria is a party to the New York Convention.  *See* Pet. ¶ 6; P&ID Appellate Br. at p. 15.

The FSIA's "implied waiver provision" must be construed "narrowly."  *Creighton*, 181 F.3d at 122 (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (observing that "cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed") (quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985)).  "[Section] 1605(a)(1) requires that the plaintiff demonstrate proof of a subjective intent to waive immunity."  *Cabiri v. Gov't of Ghana,* 165 F.3d 193, 201 (2d Cir. 1999).  Indeed, the D.C. Circuit and other courts of appeals have uniformly held that a waiver under section 1605(a)(1) should not be implied absent "strong evidence" that the foreign state intended to waive its sovereign immunity.  *See Creighton*, 181 F.3d at 122 (quoting *Foremost-McKesson*, 905 F.2d at 444 ("[C]ourts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended")); *see also Cabiri,* 165 F.3d at 201 (same); *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 (5th Cir. 1993) (same); *Frolova*, 761 F.2d at 377 (same); Moore's Federal Practice § 104.12[1][a], at 104-33 (3d ed. 1998) (same).  Here, P&ID has no evidence – let alone strong evidence – that Nigeria intended to waive its immunity.

The arbitration clause in the GSPA does not establish an implied waiver.  That clause provides for arbitration outside of the United States under Nigerian law.  Courts have held that an agreement to arbitrate outside the United States does not constitute an implicit waiver of immunity from actions to enforce the resulting award in the United States.  *See Creighton,* 181

F.3d at 122-23; *see also Frolova*, 761 F.2d at 377; *Maritime Int'l Nominees Establishment v. Republic of Guinea ("MINE")*, 693 F.2d 1094, 1103 n.15 (D.C. Cir. 1982).

      For example, in *Creighton,* the D.C. Circuit held that Qatar did not implicitly waive its immunity in an action to enforce an arbitral award simply because the parties agreed to arbitrate in France.  *See* 181 F.3d at 122-23.  While it acknowledged a statement in the FSIA's legislative history that "courts have found [implicit] waivers in cases where a foreign state has agreed to arbitration in another country," the D.C. Circuit joined other circuits in "rejecting … a broad reading of the 'implicit waiver' exception" that would apply anytime a foreign state agreed to arbitration outside of its borders.  *Id*. at 122 (quoting H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617) (the "House Report").  It reasoned:

> If the language of the legislative history [were] applied literally, a foreign government would be subject to the United States's jurisdiction simply because it agreed to have the contract governed by another country's laws, or agreed to arbitrate in a country other than itself, even though the agreement made no reference to the United States. Such an interpretation of § 1605(a)(1)'s "implicit waiver" exception would vastly increase the jurisdiction of the federal courts over matters involving sensitive foreign relations.

*Id*. (brackets in original) (quoting *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 577 (2d Cir. 1993)).  *See also MINE*, 693 F.2d at 1102 n.13 (noting that "Congress did not endorse the literal wording of the House Report")).[7]  The court found that the proper basis for maintaining jurisdiction over Creighton's enforcement action was the arbitration exception – the New York Convention governed, the arbitration agreement was not challenged, and the French courts had rejected the application to annul the award.  *Creighton*, 181 F.3d at 120.

---

[7] The House Report states that the FSIA was intended to effectively provide a federal long-arm statute over foreign states and was, in fact, modeled after the long-arm statute that Congress enacted for Washington, D.C.  The House Report also states that the immunity provisions of the FSIA were crafted so as to ensure that jurisdiction would be exercised only where the foreign state has sufficient contacts with the United States.  H.R. Rep. No. 94-1487, at 9, 13.  Thus, it is clear that the House Report's discussion of the waiver exception in the context of arbitration is referring to agreements to arbitrate in the United States.

P&ID's argument that Nigeria waived its immunity by acceding to the New York Convention runs headlong into the Supreme Court's decision in *Amerada Hess* that a foreign state does not waive its immunity under the FSIA by signing a treaty that is silent on the issue of immunity.  *See* 488 U.S. at 441-43.  Here, the New York Convention does not mention immunity.  It merely imposes a treaty obligation on contracting states to recognize and enforce arbitral awards rendered in other contracting states.  It does not address the enforcement of arbitral awards against contracting states or any other foreign states.  The Convention does not require contracting states to waive their immunity or otherwise consent to jurisdiction with respect to any awards rendered against them.  Therefore, under *Amerada Hess*, the New York Convention cannot be construed as *sub silentio* waiving the immunity of all 164 signatory states.

Nothing in the New York Convention supplies the requisite "strong evidence" that the signatories to the Convention intended to waive their immunity.  *See Creighton*, 181 F.3d at 122; *Foremost-McKesson*, 905 F.2d at 444.  Had the New York Convention been intended to implicitly waive the immunity of contracting states, that would have been a radical departure from the theory of absolute immunity that prevailed in many countries when the Convention was being drafted and negotiated in the 1950's.[8]  *See* Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dept. of State Bull. 984-985 (1952) (explaining that, at the time, Great Britain, Czechoslovakia, Poland, Estonia, Brazil, Chile, China, Hungary, Japan, Luxemburg, Norway, Portugal and Germany all adhered to an absolute theory of sovereign immunity).  If that was the intention, one would have expected the issue of immunity to have been explicitly addressed in the Convention.  But, again, the Convention is silent on immunity.  In the face of such deafening

---

[8] The New York Convention originated out of a draft convention put forward by the International Chamber of Commerce in 1953.  That draft was followed by meetings in New York in March 1955, which, in turn, was followed by additional period of commenting leading up to the issuance of the final text in 1958.

silence, it is unreasonable to assume that countries intended to waive their immunity when they signed the New York Convention.[9]

Nevertheless, P&ID asked the D.C. Circuit above to either dismiss Nigeria's appeal or conclude that the waiver exception applied based on *Tatneft v. Ukraine*, 771 Fed. Appx. 9 (D.C. Cir. 2019), which held that the Ukraine impliedly waived its immunity by signing the New York Convention.  *See* P&ID Notice of Supplemental Authority, *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria, et al.*, No. 18-7154, Doc. No. 1808441 (D.C. Cir. Sept. 27, 2019).  However, the D.C. Circuit was unimpressed with P&ID's reliance on *Tatneft* and declined P&ID's invitation to dismiss the appeal or apply the waiver exception based on *Tatneft*.  *See P&ID*, 962 F.3d at 583-84.  The D.C. Circuit explained that *Tatneft* was an unpublished decision and is therefore not binding authority.  *Id.* (citing *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) (explaining that unpublished opinions are frequently announced in a way that makes them not "suitable for governing future cases")).  *See also Holland v. Williams Mt. Coal Co.*, No. 96-1405 (CKK), 2004 U.S. Dist. LEXIS 29199, *6 (D.D.C. May 24, 2004) (recognizing that a D.C. Circuit's unpublished opinion lacks precedential value, and distinguishing the unpublished decision's reasoning in reaching a different conclusion in another case).  Thus, *Tatneft* is not binding on this Court.

This Court is, however, bound by the Supreme Court's holding in *Amerada Hess* – a holding that cannot be reconciled with *Tatneft*.  To be sure, *Tatneft* recognized the Supreme Court's holding in *Amerada Hess* but misread *Creighton* as distinguishing *Amerada Hess* and holding that the waiver exception applies where the foreign state signed the New York Convention because signatories "must have contemplated" that they would be subject to

---

[9] For example, the People's Republic of China was still asserting absolute immunity from suit in foreign courts when it signed the New York Convention.  *See Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986).

enforcement actions in the United States. *Tatneft*, 771 F. App'x at 10. Because the panel in *Tatneft* believed that it was bound by this misreading of *Creighton*, it held that the Ukraine had implicitly waived its immunity by signing the New York Convention. *Id.* But the panel in *Creighton* did not distinguish *Amerada Hess*. Rather, it stated that *Amerada Hess* read Section "1605(a)(1) to require an intention to waive immunity in the United States" and that such an intent could not be inferred from the foreign state's signing of "an international agreement that contains no mention of a waiver of immunity to suit in United States courts[.]" *Creighton*, 181 F.3d at 123 (quoting *Amerada Hess*). The panel in *Creighton* then refused to infer an intent to waive immunity under the New York Convention where the respondent, Qatar, was not even a signatory to that treaty but merely agreed to arbitration in France, which is a party to the Convention. *Id.* Thus, as the D.C. Circuit explained in this case, *Creighton* did not decide the issue of whether a foreign state waives its immunity for purposes of Section 1605(a)(1) by acceding to the New York Convention. *See P&ID*, 962 F.3d at 583; *see also Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 31 (D.D.C. 2014) (finding no implied waiver by the Czech Republic where it had agreed to arbitrate in its own territory under its own procedural law, even though it was also a party to the Convention), *rev'd on other grounds,* 824 F.3d 131, 137 (D.C. Cir. 2016) (finding jurisdiction under the arbitration exception only); *Strategic Techs. PTE, Ltd. v. Republic of China*, No. 05-cv-2311 (RMC), 2007 U.S. Dist. LEXIS 34258, at *10 (D.D.C. May 10, 2007) ("*Creighton* is clear – the election to arbitrate in another country alone does not demonstrate the intent to waive sovereign immunity.").

P&ID's argument that the waiver exception applies in actions to enforce arbitral awards under the New York Convention even where, as here, the substantive requirements of the arbitration exception are not satisfied would run afoul of mandatory rules of statutory

construction by impermissibly rendering the later enacted and more specific arbitration exception

superfluous.  The Supreme Court has repeatedly held that, when construing two statutory

provisions, courts must give effect to the later enacted and more specific statute.  *See RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank,* 132 S. Ct. 2065, 2071 (2012) ("[I]t is a

commonplace of statutory construction that the specific governs the general.  That is particularly

true where … Congress has enacted a comprehensive scheme and has deliberately targeted

specific problems with specific solutions."); *Smith v. Robinson*, 468 U.S. 992, 1024 (1984)

("[C]onflicting statutes should be interpreted so as to give effect to each but to allow a later

enacted, more specific statute to amend an earlier, more general statute only to the extent of the

repugnancy between the two statutes.") (abrogated by statute on other grounds); *United States v.*

*Menasche*, 348 U.S. 528, 538-39 (1955) ("The cardinal principle of statutory construction is to

save and not to destroy.  It is our duty to give effect, if possible, to every clause and word of a

statute, rather than to emasculate an entire section, as the Government's interpretation requires.")

(internal citation and quotations omitted); *see also Qi-Zhou v. Meissner*, 70 F.3d 136, 139 (D.C.

Cir. 1995) (holding that courts must interpret "two distinct subsections" of the same statute "in a

manner that gives meaning to both"); *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16,

20 n.7 (D.D.C. 2007) ("[T]he only theory of waiver advanced by the plaintiff is the defendant's

supposed agreement to arbitrate any disputes arising out of the Contract in another country,

which essentially collapses any inquiry under § 1605(a)(1) into the Court's analysis under

§ 1605(a)(6)(B)."), *aff'd*, 304 F. App'x 872 (D.C. Cir. 2008) (applying only the arbitration

exception).

 *Tatneft* dismissed the notion that applying the waiver exception in actions to enforce

arbitral awards under the New York Convention would impermissibly swallow the arbitration

exception.  *Tatneft,* 771 F. App'x at 9-10.  It reasoned that the two exceptions did not entirely overlap because the waiver exception requires an intentional waiver of immunity whereas, in its view, the arbitration exception contains no intentionality requirement.  *Id.* at 10.  But the *Tatneft* panel goes on to construe the intentionality requirement of the waiver exception as being satisfied where a foreign state signs a treaty on the enforcement of arbitral awards.  That interpretation not only conflicts with *Amerada Hess* – it impermissibly strips the later enacted and more specific arbitration exception of its effectiveness.  It is hard to imagine a case that would fall within the arbitration exception but not the waiver exception as broadly construed by *Tatneft.*

     *Tatneft* also ignores the history of the FSIA.  As originally enacted in 1976, the FSIA included the waiver exception, section 1605(a)(1), but not the  arbitration exception, section 1605(a)(6).  The arbitration exception was not enacted until 1988.  *See Creighton*, 181 F.3d at 125-26.  In the intervening years between 1976 and 1988, courts split on whether the FSIA (and more specifically the waiver exception) conferred jurisdiction in actions to enforce arbitral awards against foreign states.  By 1985, the Seventh Circuit summarized the majority view as follows: "[M]ost courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States."  *Frolova*, 761 F.2d at 377, 377 n.10 (collecting cases).  *See also MINE*, 693 F.2d at 1103 n.15 (D.C. Cir. 1982) (emphasis in original) (observing that some "courts have found it necessary to hold that only an agreement to arbitrate in *this* country will waive a sovereign's immunity in United States courts").  Congress brought clarity to the issue when it enacted the arbitration exception in 1988.  In doing so, it was no doubt aware that a small minority of cases asserted jurisdiction over actions to enforce arbitral awards under the waiver exception.  It could have

simply amended the waiver exception under section 1605(a)(1) to apply whenever a foreign state agreed to arbitrate outside of its borders.  It did not.  Congress could have amended the waiver exception to state that a foreign state's ratification of a treaty providing for the enforcement of arbitral award, such as the New York Convention, constitutes a waiver of immunity.  It did not. Instead of embracing such broad waiver theories, Congress created the arbitration exception *sui generis* and prescribed specific substantive requirements for abrogating a foreign state's immunity in actions to enforce arbitral awards.  Accordingly, this Court should not ignore the substantive requirements of the arbitration exception in favor of the broad waiver theory proposed by P&ID.

In brief, the waiver exception does not and cannot save P&ID's claim involving a nullified award for which there is no jurisdiction under the arbitration exception.  Because neither the waiver nor the arbitration exception applies, Nigeria is immune from suit and this Court lacks jurisdiction under the FSIA.  The Petition should therefore be dismissed.

## III.   The Complaint Must Be Dismissed for Lack of Personal Jurisdiction

Under the FSIA, a court can only acquire personal jurisdiction over a foreign state if one of the FSIA's exceptions to immunity has been established and there is effective service of process.  28 U.S.C. § 1330(b).  Because, as discussed above, none of the FSIA's exceptions to immunity apply, this case must also be dismissed for lack of personal jurisdiction under Rule 12(b)(2).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss the Petition for lack of jurisdiction under the FSIA.  Nigeria reserves all rights and defenses and does not waive any of its defenses or its sovereign immunity.

Dated: Washington, D.C.
    August 12, 2020

         Respectfully submitted,

         CURTIS, MALLET-PREVOST,
         COLT & MOSLE LLP

         By:  */s/ Joseph D. Pizzurro*
         Joseph D. Pizzurro
         (D.C. Bar No. 468922)
         Kevin A. Meehan
         (D.C. Bar No. 1613059)
         1717 Pennsylvania Avenue, N.W.
         Washington, D.C. 20006
         Tel.:  (202) 452-7373
         Fax:  (202) 452-7333
         Email:  jpizzurro@curtis.com
         Email: kmeehan@curtis.com

         *Attorneys for Respondents Federal*
         *Republic of Nigeria and Ministry of*
         *Petroleum Resources of the Federal*
         *Republic of Nigeria*