UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,                    :

                Plaintiff,            :

v.                                       :            Civil Action No. 18-cv-00594-CRC

FEDERAL REPUBLIC OF NIGERIA and          :
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,         :

                Defendants.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PETITIONER'S MEMORANDUM OF
POINTS & AUTHORITIES IN OPPOSITION TO RESPONDENTS'
MOTION TO DISMISS FOR LACK OF JURISDICTION UNDER THE FSIA**


KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036
Tel. +1 202 664 1900

*Attorneys for Petitioner Process and
Industrial Developments Limited*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................4

I.      Nigeria enters into the Agreement with P&ID, pursuant to which the Tribunal renders three awards in P&ID's favor, including the Final Award. ...................................5

II.     The English High Court rejects Nigeria's request to set aside the Liability Award as untimely and having "no merit." ..........................................................8

III.   After losing in the English High Court, Nigeria turns to its own courts. ...........................9

IV.   The Tribunal interprets the Agreement and determines that the arbitration is seated in London and thus subject to the English courts' exclusive supervisory jurisdiction. ...........................................................................................10

V.     Despite the Tribunal's decision, the Nigerian court purports to set aside "and/or" remit for further consideration "all or part of" the Liability Award. ...............................12

VI.   The English High Court concludes that the Final Award is enforceable and that it has exclusive jurisdiction over the London-seated arbitration. ...........................................14

ARGUMENT .......................................................................................................................16

I.      This Court has jurisdiction under the FSIA's arbitration exception. ...............................16

      A.     The Petition seeks to enforce an award issued pursuant to an agreement to arbitrate governed by the New York Convention, thus satisfying the arbitration exception. .......................................................................18

      B.     Set-aside orders do not divest jurisdiction that otherwise exists under the FSIA's arbitration exception, and Nigeria cites no case to the contrary. .............20

      C.     The Final Award has not been set aside, and Nigeria's reliance on its own court's order is not to the contrary. ...................................................26

      D.     Nigeria's courts lack the power to set aside the Final Award. .............................28

      E.     Even if the Nigerian Order could lawfully set aside the Final Award, the Court should follow the English High Court Judgment rather than the Nigerian Order. .....................................................................................40

II.     The FSIA's waiver exception applies because Nigeria, a party to the New York Convention, agreed to arbitrate in the United Kingdom, which is also a party. ...............42

CONCLUSION ....................................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989)...................................................................................................... 44

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991)...................................................................................................... 25

*Baker Marine (Nigeria) Ltd. v. Chevron (Nigeria) Ltd.*,
  191 F.3d 194 (2d Cir. 1999) ............................................................................... 30, 39, 42

*BCB Holdings Ltd v. Gov't of Belize*,
  110 F. Supp. 3d 233 (D.D.C. 2015)............................................................................... 41

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  668 F.3d 724 (D.C. Cir. 2012)............................................................................. 25, 35, 38

*\*BG Group, Plc v. Republic of Argentina*,
  572 U.S. 25 (2014)...................................................................................................... 29, 30

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017)................................................................................................... 24

*\*Chevron Corp. v. Ecuador*,
  795 F.3d 200 (D.C. Cir. 2015).............................................................................. passim

*Chromalloy Aeroservices v. Arab Republic of Egypt*,
  939 F. Supp. 907 (D.D.C. 1996)............................................................................. 23, 41

*Continental Transfert Technique Ltd v. Fed. Gov't of Nigeria*,
  697 F. Supp. 2d 46 (D.D.C. 2010)................................................................................ 40

*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v.*
  *Pemex-Exploracion Y Produccion*,
  832 F.3d 92 (2d Cir. 2016) ...............................................................................22-23, 25, 41

*\*Creighton Ltd. v. Gov't of the State of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999)............................................................................. 4, 21, 44

*Dean v. United States*,
  556 U.S. 568 (2009)...................................................................................................... 20

*Dixylin-Field Drilling, Ltd. v. Mobil Oil Corp.*,
  No. 83 Civ. 9308 (LBS), 1984 WL 137 (S.D.N.Y. Apr. 2, 1984)........................... 30

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,
  474 F. Supp. 2d 19 (D.D.C. 2007)............................................................................. 33

*Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*,
  763 F. Supp. 2d 12 (D.D.C. 2011) ................................................................. 32

*Ipitrade Int'l S.A. v. Fed. Republic of Nigeria*,
  465 F. Supp. 824 (D.D.C. 1978) .................................................................... 43

*John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*,
  913 F.2d 544 (8th Cir. 1990) ........................................................................ 27

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  364 F.3d 274 (5th Cir. 2004) ................................................................. passim

*Karaha Bodas Co.,L.L.C.  v. Perusahaan Pertambangan Minyak Dan Gas*,
  335 F.3d 357 (5th Cir.2003) .......................................................................... 22

*Kurke v. Oscar Gruss & Son, Inc.*,
  454 F.3d 350 (D.C. Cir. 2006).................................................................. 31-32

*M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago*,
  725 F. Supp. 52 (D.D.C. 1989) ............................................................... 43, 44

*Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*,
  962 F.3d 576 (D.C. Cir. 2020)............................................................ 14, 25, 45

*Roe v. Wilson*,
  365 F. Supp. 3d 71 (D.D.C. 2019) ................................................................ 14

*Salini Costruttori S.p.A. v. Kingdom of Morocco*,
  233 F. Supp. 3d 190 (D.D.C. 2017) .............................................................. 41

*Salzman v. Islamic Republic of Iran*,
  No. CV 17-2475 (RDM), 2019 WL 4673761, (D.D.C. Sept. 25, 2019) ................ 27

*Sanders v. Washington Metro. Area Transit Auth.*,
  819 F.2d 1151 (D.C. Cir. 1987) .................................................................... 32

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v.*
  *Navimpex Centrala Navala*,
  989 F.2d 572 (2d Cir. 1993) ......................................................................... 43

*Stati v. Republic of Kazakhstan*,
  199 F. Supp. 3d 179 (D.D.C. 2016)............................................................... 43

*Stewart v. Nat'l Educ. Ass'n*,
  471 F.3d 169 (D.C. Cir. 2006)....................................................................... 14

*Tatneft v. Ukraine*,
  301 F. Supp. 3d 175 (D.D.C. 2018)......................................................... 43, 44

*Tatneft v. Ukraine*,
  771 F. App'x 9 (D.C. Cir. 2019) ................................................................... 4, 43, 44

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
  487 F.3d 928, 934 (D.C. Cir. 2007) ................................................................. passim

*United States v. Sosa*,
  608 F. App'x 464 (9th Cir. 2015) ................................................................... 14

**Treaties**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
  June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ........................................... passim

**Statutes**

9 U.S.C. § 207 ...................................................................................... 20, 22

28 U.S.C. § 1605 ...................................................................................... passim

**Rules**

Fed. R. Ev. 201 ...................................................................................... 15

**Foreign Authorities**

Arbitration Act 1996 c. 23 (Eng.) ................................................... 8, 11, 12, 31

Arbitration and Conciliation Act 2004 Cap. (A18) (Nigeria) ................... 11, 27, 31, 34

*Process & Industrial Developments Ltd v. Federal Republic of Nigeria*
  [2019] EWHC 2241 (Comm), 2019 WL 03848529 ........................................ passim[*]

Order of Flaux LJ, *Process & Industrial Developments v. Fed. Republic of Nigeria*,
  A4/2109/2601/Y (EWCA (Civ) Nov. 26, 2019) .............................. 15, 33, 35, 42[†]

**Legislative History**

*Foreign Sovereign Immunities Act: Hearing on H.R. 1149, H.R. 1689, and H.R. 1888
  before H. Subcomm. on Admin. L. & Govern. Rel. of the H. Comm. on the Judiciary,*
  100th Cong. (1987) ...................................................................................... 45

---

[*] Attached to the Stafford Declaration as Exhibit 2.
[†] Attached to the Stafford Declaration as Exhibit 6.

**Secondary Sources**

Gary B. Born, INT'L COMMERCIAL ARBITRATION (2d ed. 2014)........................................passim‡

RESTATEMENT (FIRST) OF JUDGMENTS (Am. Law. Inst., 1943) ..................................................... 25

RESTATEMENT (SECOND) OF JUDGMENTS (Am. Law Inst., 1982) ..................................... 27, 32, 33

RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION (Am. Law Inst., Tentative Draft No. 1, 2010).........................................................................................36-37

RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL AND INVESTOR-STATE ARBITRATION (Am. Law Inst., Proposed Final Draft, 2019) ............................................... 23, 37

RESTATMENT (THIRD) OF FOREIGN RELATIONS LAW (Am. Law Inst., 1987)............................... 21

---

‡ Relevant excerpts attached to the Stafford Declaration as Exhibit 7.

Petitioner P&ID[1] submits this brief in opposition to Nigeria's motion to dismiss P&ID's Petition to Confirm the Final Award (Dkt. No. 43, the "Motion") and the accompanying memorandum of law (Dkt. No. 43-1, hereinafter "Brief" or "Br.").

## INTRODUCTION

The Foreign Sovereign Immunities Act ("FSIA") enumerates two exceptions to Nigeria's sovereign immunity that apply to this Petition to confirm the Final Award:  the arbitration exception and the waiver exception.  *See* 28 U.S.C. § 1605 (a)(1), (a)(6).

Nigeria does not dispute that it entered into a binding agreement to arbitrate with P&ID, nor does it dispute the authenticity of the Final Award.  That is all that is needed to satisfy the arbitration exception:  this "action is brought . . . to confirm an award made pursuant to" an arbitration agreement between a foreign state (Nigeria) and a private party (P&ID) that "is or may be governed by" the New York Convention.  28 U.S.C. § 1605 (a)(6)(B).

Nigeria's only argument that the arbitration exception does not apply is that the Final Award "no longer exists," but this is flatly contradicted by reality:  P&ID has provided a copy of the Agreement and a certified copy of the Final Award, which is all the FSIA requires.  Further, The Final Award was found to be enforceable as an English arbitration award just one year ago. Although Nigeria fails to mention it, the High Court of Justice of England and Wales (the "English High Court") issued a carefully reasoned, 28-page judgment in August 2019 holding—just as the Tribunal had—that the juridical seat of the arbitration was England, not Nigeria, and that therefore the English courts have exclusive jurisdiction over challenges to awards in the arbitration, otherwise known as "supervisory jurisdiction."  The Final Award thus is very much in existence.

---

[1]    Except as otherwise defined herein, this brief uses the same defined terms and citing conventions as P&ID's Petition to Confirm Arbitration Award against Federal Republic of Nigeria, Ministry of Petroleum Resources of the Federal Republic of Nigeria.  *See* Dkt. No. 1.

Nigeria's argument to the contrary rests entirely on a three-page order issued by the Federal High Court of Nigeria in Lagos relating to the Tribunal's earlier award on liability.  Without any reasoning, the order ambiguously purported to "set[] aside and/or remit[]" "all or part" of the Liability Award for "further consideration."  Neither the FSIA itself nor the interpreting case law holds that, under these circumstances, the Final Award "no longer exists" such that the arbitration exception to immunity does not apply.  Nigeria's argument relies on several mischaracterizations of the law and the record, each of which is independently fatal to Nigeria's Motion.

First, the plain language of the arbitration exception requires only a showing that an arbitration award has been issued under an agreement to arbitrate that "is or may be" governed by a treaty such as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention" or "Convention").  That is plainly the case here.  Insofar as Nigeria argues that the Nigerian court's order provides a discretionary basis under the New York Convention for this Court to refuse recognition of the Final Award, the New York Convention analysis is irrelevant to the FSIA's arbitration exception.  Nigeria does not cite a single decision holding that an order that purportedly sets aside a foreign arbitration award divests a court of jurisdiction under the arbitration exception.  To the contrary, U.S. courts regularly find jurisdiction over—and grant—petitions to recognize arbitration awards against foreign sovereigns which have been set aside.  Indeed, under the New York Convention the setting aside of an award is only a *discretionary*, not a *mandatory*, ground on which to refuse recognition, a feature of the treaty that would be undermined if the FSIA were read to deprive U.S. courts of jurisdiction where there has been a set-aside order.

In any event, Nigeria's Motion still fails because the Nigerian court's order does not have the effect that Nigeria claims it does.  The May 2016 Nigerian court order did not even purport to

set aside the *January 2017* Final Award, and Nigeria did not challenge the Final Award in either Nigeria or London when it was rendered.  In fact, the Nigerian order did not even conclusively set aside the Liability Award but simply cut-and-pasted contingent language from Nigeria's motion— that "all *or part*" of the Liability Award be "set aside *and/or remitted*" for further proceedings— leaving the order incomplete and hopelessly ambiguous.  Particularly given the Nigerian court's lack of reasoning, it is unsafe to make any assertion as to what the order actually did regarding the Liability Award, nor does Nigeria's Brief even address this ambiguous language.  Because both P&ID and Nigeria continued to litigate the damages phase of the arbitration, which resulted in the Final Award that has now been enforced by the English court, one cannot logically conclude that the Liability Award has been set aside, let alone that the Final Award no longer exists.

Further, the Nigerian courts lack the authority validly to set aside awards of the London-seated Tribunal.  The parties' Agreement determines which country's courts may lawfully set aside awards for purposes of the New York Convention.  Here, P&ID and Nigeria agreed that the arbitration would be seated in London using Nigerian procedures for the internal conduct of the arbitration, but only to the extent not displaced by English arbitration law.  As sophisticated parties who agreed to arbitrate their disputes in accordance with this provision, the Court should not rewrite that Agreement.  Nor should the Court interpret it *de novo*.  The parties agreed that the Tribunal could determine its own jurisdiction and interpret the Agreement, and indeed the Tribunal *has already interpreted* that Agreement and found the Nigerian court's order to have no effect. That decision is entitled to deference and should be given preclusive effect.  Moreover, two English courts have rejected Nigeria's arguments here, and those decisions should likewise be followed as a matter of comity and issue preclusion.  Even were the Court were to resolve this issue on a blank slate, however, it should reach the same conclusion.

Finally, the FSIA's waiver exception also applies here because Nigeria is a party to the New York Convention and agreed to arbitrate its dispute with P&ID in a country that is also a party to the New York Convention, namely England. This Court should follow the D.C. Circuit's recent well-reasoned decision in *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019), which is consistent with that court's binding precedent in *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).

Accordingly, Nigeria's Motion should be denied.

## BACKGROUND

Nigeria concedes all of the facts necessary to deny its Motion, which are set forth in P&ID's Petition and supporting documents. Specifically:

- *Nigeria and P&ID entered into an agreement to arbitrate*: "On January 11, 2010, P&ID and the Ministry of Petroleum executed a Gas Supply and Processing Agreement [i.e., the Agreement]," Br. at 4, "which contains a choice of law clause and an arbitration clause," Br. at 4. *See also* Dkt. No. 3-1.[2] Nigeria does not dispute that this was a valid agreement to arbitrate by Nigeria with or for the benefit of P&ID, a private party, and thus governed by the New York Convention.

- *The Tribunal issued the Final Award pursuant to the Agreement*: "On January 31, 2017, the Tribunal issued a split decision on quantum. . . . . The two English arbitrators issued a majority decision awarding P&ID $6,597,000,000 plus seven percent pre- and post-award interest as compensation for a breach of the GSPA." Br. at 11. Nigeria does not dispute that the majority decision—the Final Award—is an award issued by the Tribunal pursuant to the Agreement.

Instead, Nigeria makes a slew of assertions that are irrelevant to its Motion. For instance, Nigeria suggests that it should not have been found liable to P&ID, Br. at 3-5, but the Tribunal unanimously rejected these arguments in the Liability Award, *see generally* Dkt. No. 3-8. Nigeria likewise disagrees with the Final Award, Br. at 11-14, but a majority of the Tribunal rejected the

---

[2]    For all citations to evidence filed along with the Petition—the attachments to Dkt. No. 3—page references correspond to the page numbers assigned by the electronic case filing system.

very arguments Nigeria repeats here, *see generally* Dkt. No. 3-17.  In any event, Nigeria cannot and does not argue in its Motion that this Court should second-guess the Tribunal's Liability Award or Final Award, and thus P&ID need not address each of Nigeria's mischaracterizations.[3]

Nigeria's novel theory—that a purported set-aside order would divest this Court of jurisdiction under the FSIA's arbitration exception—relies on a selective and misleading recitation of Nigeria's unsuccessful efforts to set aside the Liability Award, which are addressed here.

## I.   Nigeria enters into the Agreement with P&ID, pursuant to which the Tribunal renders three awards in P&ID's favor, including the Final Award.

In January 2010, P&ID and Nigeria executed the Agreement that is at the center of this dispute. *See* Dkt. No. 3-1.  The Agreement required Nigeria to supply specified quantities of associated (or "wet") natural gas for a period of 20 years, during which P&ID would operate a refining facility to convert the wet gas into non-associated (or "lean") gas suitable for electricity generation. P&ID and Nigeria agreed to arbitrate any dispute "concerning the interpretation or performance of [the] Agreement."  The arbitration clause in the Agreement provided:

> [A] Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, ***except as otherwise provided herein***, shall apply to any dispute between such Parties under this Agreement. . . .  The

---

[3]   P&ID also does not address Nigeria's attempts to smear P&ID and its founders, other than to say that they are unfounded.  Before negotiating the Agreement with the Nigerian government, P&ID's founders, Michael Quinn and Brendan Cahill, spent decades in Nigeria developing and managing large engineering projects, including the construction of pressurized gas-storage tanks and the conversion of Nigerian army tanks from one fuel source to another.  Dkt. No. 3-3 ¶ 27. Nigeria's uncited reference to criminal indictments, Br. at 3, is particularly misleading given that Nigeria seems to be alluding to indictments issued by the Nigerian government itself as part of a politically motivated investigation into P&ID and its founders and associates, which it launched immediately after the English High Court ruled in August 2019 that the Final Award was enforceable.  Nigeria's discussion of the arbitration between the Nigerian National Petroleum Corporation ("NNPC") and IPCO (Nigeria) Limited ("IPCO"), Br. at 3 n.3, is likewise both false and irrelevant to this Motion.  For present purposes, P&ID notes only that: (i) its principals never had any stake in IPCO; (ii) the English courts found only that NNPC could proceed with its attempts to set aside the IPCO award, not that its allegations were correct; and (iii) the parties ultimately settled that dispute amicably before trial.

> arbitration award shall be final and binding upon the Parties. . . .
> **_The venue of the arbitration shall be London, England_** or
> otherwise as agreed by the Parties.

Dkt. No. 3-1 § 20 (emphasis added).  This Agreement, entered into by sophisticated, represented parties, reflected the considered decision of the parties to submit any disputes to an arbitration in England, and not to Nigeria's own courts.

Nigeria failed to satisfy its obligations to "ensure that all necessary pipelines and associated infrastructure [were] installed" and to put in place "all requisite arrangements with agencies and/or third parties . . . to ensure the supply and delivery" of the agreed-upon quantities of wet gas.  Dkt. No. 3-1 § 6(b); Dkt. No. 3-2 (notice of arbitration).  As a result of Nigeria's failures, no gas was ever delivered.  Dkt. No. 3-3 ¶¶ 16, 88.  After negotiating with Nigeria for two years to try to make the project happen, P&ID referred the matter to arbitration on August 22, 2012.  Dkt. No. 3-2.

Through a procedure set forth in the Agreement, three eminent arbitrators were appointed: (i) Sir Anthony Evans, Q.C., a former justice of the Court of Appeal of England and Wales and former chief justice of the Dubai International Financial Centre Courts; (ii) Chief Bayo Ojo, S.A.N., a former Attorney General of Nigeria; and (iii) Lord Leonard Hoffmann, a former Lord of Appeal in Ordinary (which, during Lord Hoffmann's tenure, was the highest judicial position in the United Kingdom).  *See* Dkt. No. 3 ¶ 9.  Lord Hoffmann served as the presiding arbitrator.  *Id*. Consistent with the Agreement, the arbitration was conducted in London and administered through the London Court of International Arbitration.  Nigeria raised no objection to the composition of the Tribunal, to the procedures according to which the Arbitration would proceed, or to conducting the arbitration in London.  *See* Dkt. No. 3-4 at 3, 4.

The Tribunal then issued three awards:

*1. The unanimous Part Final Award* (July 3, 2014), Dkt. No. 3-7:  The Tribunal rejected Nigeria's preliminary objections to the arbitration, holding that there was a valid agreement to

arbitrate, that the Tribunal could determine its own jurisdiction, and that the Tribunal had jurisdiction to adjudicate the dispute.

2. *The unanimous Liability Award* (July 17, 2015), Dkt. No. 3-8:   After the parties submitted three rounds of written arguments, accompanying witness statements, and expert reports, and after a hearing at which the Tribunal considered evidence and arguments presented by both parties, the Tribunal rejected a panoply of defenses raised by Nigeria, concluded that Nigeria had repudiated the Agreement, and found that P&ID was entitled to damages.  *See, e.g.*, Dkt. No. 3-8 at 17-18 (finding that failure to obtain wet gas from Addax Petroleum and Exxon Mobil did not extinguish Nigeria's obligations, and that Nigeria's obligations were not contingent on P&ID's completion of gas processing facility); *contra* Br. at 4-5.

3. *The Final Award* (January 31, 2017), Dkt. No. 3-17: After Nigeria's unsuccessful attempt to set aside the Liability Award—discussed in detail below—Nigeria and P&ID participated in the damages phase of the arbitration.  Dkt. No. 3-15 at 2.  As in the liability phase, the parties made extensive written submissions, including competing economic expert reports, and presented arguments to the Tribunal over two days in August 2016.  Each party cross-examined the expert witness of the other party.  The Tribunal then issued the Final Award dated January 31, 2017.  Dkt. No. 3 ¶ 27; *see* Dkt. No. 3-17.  A majority of the panel ordered Nigeria to pay P&ID $6,597,000,000 plus 7 percent interest, to be calculated from March 30, 2013, which was the date on which P&ID accepted Nigeria's repudiation of the Agreement.  Dkt. No. 3-17 ¶ 112.  Contrary to what Nigeria suggests, the Tribunal applied Nigerian law and accounted for the risks inherent in the project.  Dkt. No. 3-17 ¶ 45 (noting "principles" of calculating damages "clearly established in the laws of both Nigeria and England") & Dkt. No. 3-17 ¶¶ 107-08 (explaining "calculation of future income" discounted for risks).

II.     **The English High Court rejects Nigeria's request to set aside the Liability Award as untimely and having "no merit."**

After the Tribunal issued its unanimous Liability Award in July 2015, Nigeria applied five months later to the English High Court to set it aside.  Dkt. No. 3-9.  Nigeria sought relief under several provisions of England's Arbitration Act under which English courts can review *domestic* arbitration awards.   Arbitration Act 1996 c. 23, §§ 68, 70 (Eng.) ("English Arbitration Act").  Nigeria thus sought an order "setting aside and/or remitting for further consideration all or part of the [Liability Award] . . . under section 68(d)(2), alternatively under section 68(2)(f) of the Arbitration Act 1996."  Dkt. No. 3-9 at 4 ¶ 2.

To support the application, Nigeria submitted a witness statement from Folakemi Adelore, the Director of Legal Services of the Ministry of Petroleum Resources, which sought to explain Nigeria's delay in filing this set-aside application.  Dkt. No. 3-9 at 18.   According to Ms. Adelore, one factor contributing to that delay was the Ministry's understanding "that in order to challenge the Award, it would need to instruct a firm of solicitors in the U.K. given that any such challenge ***would have had to be before the English courts*** under the English Arbitration Act 1996."  Dkt. No. 3-9 at 21 (emphasis added).  Ms. Adelore's vocabulary acknowledges Nigeria's considered conclusion that it was *required* to bring any challenge in England: "The issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered."  Dkt. No. 3-9 at 22-23.

On February 10, 2016, the English High Court dismissed Nigeria's application.  Dkt. No. 3-10.  While Nigeria correctly notes that the English High Court found that the application was filed more than four months too late, Br. at 8, Nigeria fails to mention that the court also held that the arguments for setting aside the Liability Award had "***no merit***."  *Id.* ¶ 3 (emphasis added).

**III.    After losing in the English High Court, Nigeria turns to its own courts.**

Two weeks after Nigeria lost in the English High Court, Nigeria filed a similar set-aside application in the Federal High Court of Nigeria in Lagos.  Dkt. No. 3-11 (dated 24 February, 2016).  In this application, Nigeria completely reversed its position concerning the seat of the arbitration.  Nigeria's counsel explained that, after learning that the English court had denied the set-aside application, they had a "series of brainstorming sessions," after which they concluded that the seat was actually Nigeria.  Dkt. No. 3-11 at 9.  Significantly, Nigeria's application did not ask the Nigerian court to decide the issue of seat.  Instead, Nigeria simply misrepresented to the Court that the parties had "effectively agreed that the seat of arbitration is Nigeria" notwithstanding the fact that P&ID and even Nigeria itself had previously accepted London as the seat.  *See* Dkt. No. 3-11 at 3.  Nigeria now asserted that "Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings."  Dkt. No. 3-11 at 3.

P&ID did not participate in the Nigerian proceedings.  Rather, in light of Nigeria's sudden and cynical reversal of course after years of arbitration—brazenly asserting for the first time that its own courts, not those of England, had exclusive supervisory jurisdiction—P&ID notified the Tribunal of the Nigerian proceedings and requested that the Tribunal make a ruling on the seat of the arbitration.  *See* Dkt. No. 3-16 at 38.  Given that the Tribunal had found that it had authority to determine its own jurisdiction and to interpret the parties' arbitration agreement, Dkt. No. 3-7, the Tribunal's ruling on the seat would therefore determine the significance, if any, of a Nigerian court's orders.  *See also* Dkt. No. 3-12 ¶ 2.

The parties made their submissions to the Tribunals by letters and e-mails in March 2016.  Dkt. No. 3-12 ¶ 2; *see also* Dkt. No. 3-16 at 34-43.  Meanwhile, as the parties awaited the Tribunal's ruling, the Nigerian court issued a provisional order on April 5, 2016 purporting to "restrain[] the parties in this suit . . . from seeking and or [sic] continuing with any step, action,

and or [sic] participate [sic] directly or indirectly in the arbitral proceedings pending the hearing and determination" of Nigeria's set-aside motion.  Dkt. No. 3-16 at 46.

## IV.    The Tribunal interprets the Agreement and determines that the arbitration is seated in London and thus subject to the English courts' exclusive supervisory jurisdiction.

On April 26, 2016, the Tribunal resolved the parties' dispute over the seat in Procedural Order No. 12, finding in P&ID's favor that England was the seat and the English courts had exclusive authority to supervise the arbitration.  Dkt. No. 3-12.  Given that arbitration is a matter of the parties' agreement, The Tribunal based its decision on two independent grounds: the text of the Agreement and the parties' conduct throughout the arbitration.

As the Tribunal explained, Nigeria and P&ID disagreed "as to whether the Nigerian courts are entitled to exercise such supervisory or 'curial' jurisdiction over the arbitration," which would determine which courts not only would "supervise the proceedings and award," but also would determine enforceability of the Tribunal's awards under the New York Convention.  Dkt. No. 3-12 ¶ 1.  The Tribunal rejected the same argument that Nigeria makes here, namely that the seat of the arbitration was Nigeria because the "parties have agreed that 'except as otherwise provided herein' the rules of the Nigerian Arbitration and Conciliation Act 1988 shall apply to any dispute," and thus the Nigerian courts had authority to supervise the arbitration and set aside any award made by the Tribunal.  *See* Dkt. No. 3-12 ¶ 6; *see also* Br. at 5, 7, 8, 9, 10, 21, 22, 24, 27.  Instead, the Tribunal agreed with P&ID that the parties' agreement that "the venue of the arbitration shall be London, England" had the effect of "mak[ing] London the seat of arbitration and [of] invok[ing] the supervisory jurisdiction of the English courts, to the exclusion of the Nigerian courts."  Dkt. No. 3-12 ¶ 6.  The Tribunal also noted that, if the parties had not agreed on the seat, the arbitral tribunal had the authority to determine "the place of arbitration."  Dkt. No. 3-12 ¶ 2.

The Tribunal held that "the parties' selection of London as 'the venue *of the arbitration*' rather than of any particular steps (such as hearings) *in the arbitration* indicates that London was selected under section 16(1)" of the Nigerian Arbitration and Conciliation Act "as the place of the arbitration in the juridical sense, invoking the supervisory jurisdiction of the English court, rather than in relation to any particular events in the arbitration."  Dkt. No. 3-12 ¶ 15 (emphasis in original); *cf.* Arbitration and Conciliation Act (2004) Cap. (A18), § 16(1)) (Nigeria) (hereinafter, "Nigerian Arbitration Act").  The Tribunal reached this decision after considering Nigerian case law (Dkt. No. 3-12 ¶ 13), scholarship on international arbitration (Dkt. No. 3-12 ¶¶ 10-12), and the UNCITRAL Model Law on which the Nigerian Arbitration Act "is based" (Dkt. No. 3-12 ¶¶ 7-9). The Tribunal also considered the Agreement's "choice of the procedural rules of the Nigerian Arbitration Act," but held that this could not "displace the express choice of the place of arbitration."  Dkt. No. 3-12 ¶¶ 16-17.

The Tribunal went on to find that this construction was consistent with the informed, considered intent of the parties to select London as the seat.  The Tribunal explained that "the choice of England as the place of arbitration carries with it the application of certain mandatory rules of the England Arbitration Act 1996 (such as the right to challenge an award in an English court under sections 67 and 68)."  *Id*. ¶ 16.  The English Act also expressly permits "the parties to make their own arrangements by agreement" as to all other aspects of the internal conduct of the arbitration.  *Id.* (quoting English Arbitration Act § 4(2).  The English Arbitration Act anticipates precisely the language in the Agreement, providing: "The choice of a law other than the law of England and Wales or Northern Ireland as the applicable law in respect of a matter provided for by a non-mandatory provision . . . is equivalent to an agreement" that those rules will apply ***except where inconsistent*** with the mandatory provisions of the English Arbitration Act.  *Id.* (quoting

English Arbitration Act § 4(5)).  This statutory backdrop supported the Tribunal's interpretation that the parties selected London as the seat, as the reference to the "Nigerian procedural rules" was not an attempt to dislodge the jurisdiction of the English courts to supervise the arbitration.  Dkt. No. 3-16 ¶ 17.  Rather, the parties simply chose to apply a different set of internal procedural rules to the extent consistent with the mandatory provisions of the governing law: the English Arbitration Act.  *Id*.  The Tribunal therefore concluded that the seat of the arbitration was London, and that the Nigerian set-aside proceedings would have no effect on the ongoing arbitration.

As part of its analysis, the Tribunal also considered the parties' and the Tribunal's course of conduct with respect to the seat of the arbitration.  Most significantly, in an October 24, 2013 letter to Nigeria, P&ID took the position that "the juridical seat of this arbitration is London" but that "the rules governing the internal procedure of the arbitration are those to be found in the" Nigerian Arbitration Act.  Dkt. No. 3-12 ¶ 23.  The Tribunal noted that there "was no contradiction" of this position by Nigeria, Dkt. No. 3-12 ¶ 24, and indeed Nigeria proceeded with the arbitration without disputing this distinction for the next two and a half years.  The Tribunal's awards thus "stated that the place of the arbitration was London."  Dkt. No. 3-12 ¶ 25.

Nigeria could have challenged Procedural Order No. 12 in the English courts, but it chose not to do so.  And while Nigeria initially sought to have Procedural Order No. 12 reviewed by the Nigerian court, "the [Nigerian] court struck out Suit No. FHC/L/CS/624/2016 for lack of appearance of counsel for Nigeria" in November 2016.  Dkt. No. 3 ¶ 26.

## V.   Despite the Tribunal's decision, the Nigerian court purports to set aside "and/or" remit for further consideration "all or part of" the Liability Award.

One month after the Tribunal issued Procedural Order No. 12, the Nigerian court on May 24, 2016, granted Nigeria's request to "enlarge[e] the time within which" Nigeria could apply to set aside the Liability Award and "granted" an order:

> setting aside ***and/or*** remitting for further consideration ***all or part of the arbitration award*** of Lord Leonard Hoffman, Chief Bayo Ojo, SAN and Sir Anthony Evans ***and for such further or other orders*** as this Honourable Court may deem fit to make in the circumstances.

Dkt. No. 3-13 at ¶ 2 (emphasis added) (hereinafter "the Nigerian Order").  P&ID had not appeared in that action, and Nigeria's application was thus uncontested.  The three-page Nigerian Order contains no analysis or reasoning explaining why it granted this relief, nor does it shed any further light on its impact—if any—on the Liability Award.  Instead, the Nigerian court simply adopted verbatim Nigeria's proposed order, which had clearly been intended to give the court several possible options:  either setting aside *or* remitting the award, and doing so as to either all of the award *or* only a part of it.  *Compare id., with* Dkt. No. 3-11 at 2.  But the Nigerian court made no decisions, leaving a hopelessly ambiguous order.  Nigeria's Brief identifies no "further or other orders" clarifying the scope of the Nigerian Order, and P&ID is not aware of any.  *See* Dkt. No. 3 ¶ 29.

Notwithstanding the Nigerian court's orders, the Tribunal and both parties continued with the Arbitration.  Although Nigeria purported to "maintain[] its position" that the unanimous Liability Award was set aside, it fully participated in the damages phase of the arbitration.  *See* Dkt. No. 3-15 at 2.  If there were any doubts as to the effect of Procedural Order No. 12, Lord Hoffman made it abundantly clear that the Nigerian court had no supervisory jurisdiction over the arbitration.  After Nigeria informed the Tribunal of the Nigerian Order, Lord Hoffman responded, noting his capacity as "Presiding Arbitrator," that "[a]s the parties will be aware from Procedural Order No. 12, the Tribunal has decided that the seat of the arbitration is in England.  It follows that the Federal High Court [of Nigeria] had no jurisdiction to set aside its award."  Dkt. No. 3-14 at 2.

**VI.    The English High Court concludes that the Final Award is enforceable and that it has exclusive jurisdiction over the London-seated arbitration.**

In 2018, after the Final Award was issued, P&ID initiated both this recognition action and a similar recognition proceeding in England.  This action returns to this Court after an interlocutory appeal to the D.C. Circuit, which, while "not . . . determin[ing] whether Nigeria will ultimately prevail on" the question of jurisdictional immunity, has instructed this Court to decide the immunity issue before requiring Nigeria to brief its defenses to confirmation.  *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (cited as "*P&ID*").  The only issue now before the Court is whether P&ID's petition falls within an exception to Nigeria's general immunity from jurisdiction under the FSIA.

The enforcement proceedings in England have reached a more advanced stage.  In August 2019, Mr. Justice Christopher Butcher of the English High Court of Justice granted P&ID's application for an order permitting enforcement of the Final Award in England and Wales.  *Process & Industrial Developments Ltd v. Federal Republic of Nigeria* [2019] EWHC 2241 (Comm), 2019 WL 03848529 (hereinafter, the "*English High Court Judgment*").[4]  In granting P&ID permission to enforce the Final Award, Mr. Justice Butcher found that the Nigerian Order was no bar to enforcement.  Emphasizing "the consensual nature of arbitration, and the importance to be accorded to respecting the integrity of the parties' choice," Mr. Justice Butcher found it inappropriate to "revisit[]" the Tribunal's "ruling on seat, which has not been successfully

---

[4]     A true and correct copy of the *English High Court Judgment* is attached to the August 26, 2020 Declaration of Andrew Stafford Q.C. ("Stafford Decl.") as Exhibit 2.  *See also* Rule 28(j) Letter, *P&ID*, No. 18-7154 (D.C. Cir. Aug. 17, 2019) (Dkt. No. #1803926) (providing *English High Court Judgment* to D.C. Circuit).  On a motion to dismiss, the Court may consider "matters of which it may take judicial notice."  *Roe v. Wilson*, 365 F. Supp. 3d 71, 78 (D.D.C. 2019) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006)).  The issuance of the English decisions can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Ev. 201; *see also United States v. Sosa*, 608 F. App' x 464, 468 (9th Cir. 2015) (taking judicial notice of Guatemalan convictions).

14

challenged in any court." *English High Court Judgment* ¶ 55.  On this basis, Mr. Justice Butcher concluded that the Tribunal's ruling in Procedural Order No. 12 "create[d] an issue estoppel which precludes" Nigeria from relitigating the issue.  *Id.* ¶ 83.  Mr. Justice Butcher also explained that he would have independently "reach[ed] the same conclusion" as the Tribunal based on both the text of the Agreement and the parties' conduct during the Arbitration.  *Id.* ¶¶ 84–87.

Following the English High Court Judgment, Nigeria sought permission to appeal on several grounds.  Mr. Justice Butcher granted Nigeria permission to appeal on some but not all of those grounds.  Stafford Decl. ¶¶ 7-10.  As relevant here, Mr. Justice Butcher denied Nigeria permission to appeal on the grounds that he had "wrongly failed to take into account the fact that the Liability Award on which the Final Award was predicated had been set aside by a court of competent jurisdiction in the country under the law of which that award was made (Nigeria)," which is to say the Nigerian Order.  See *id.* ¶ 12 & Ex. 5 ¶ 3.  Nigeria appealed Mr. Justice Butcher's refusal to grant permission to appeal on this ground, but the English Court of Appeal upheld Mr. Justice Butcher's ruling.  Writing for the Court of Appeal, Lord Justice Julian Flaux was unequivocal that Nigeria's ground of appeal was "***totally without merit***," explaining that:

> The English Court has exclusive supervisory jurisdiction over the award which is a domestic arbitration award where the seat of the arbitration is London. ***The Nigerian Court had no jurisdiction*** to purport to set aside the Liability Award.

Order of Flaux LJ, *Process & Industrial Developments v. Fed. Republic of Nigeria*, A4/2109/2601/Y (EWCA (Civ) Nov. 26, 2019) (hereinafter, the "*English Court of Appeal Order*") at 1 (emphasis added).[5]

---

[5]    A true and correct copy of the *English Court of Appeal Order* is attached to the August 26, 2020 Declaration of Andrew Stafford Q.C. ("Stafford Decl.") as Exhibit 6.  Nigeria's appeal from Mr. Justice Butcher's judgment on the other grounds is pending before the Court of Appeal.  *Id.* ¶¶ 11-14.  Mr. Justice Butcher granted Nigeria's request that execution of the Final Award against

In December 2019, nearly three years after the Final Award was issued, Nigeria filed another application in England, seeking permission to apply to set aside the Final Award as well as the other two awards on the basis that the Agreement and all the awards in the arbitration were procured by fraud and corruption. *Id.* ¶¶ 15-16. P&ID denies the allegations and views Nigeria's application as a last-ditch attempt to avoid having to pay the debt it owes to P&ID. The English High Court has yet to accept Nigeria's application, as it must first decide whether to excuse Nigeria's years-long delay in bringing the application. As it stands, neither the courts of England nor those of any other country have set aside, suspended, or modified the Final Award in any way.

## ARGUMENT

Although Nigeria is generally immune from the jurisdiction of U.S. courts, the Foreign Sovereign Immunities Act enumerates two exceptions to Nigeria's sovereign immunity that apply in this case: the arbitration exception and the waiver exception. *See* 28 U.S.C. § 1605 (a). Because these exceptions apply, this Court has both subject matter and personal jurisdiction. *Cf.* Br. at 35.

## I.  This Court has jurisdiction under the FSIA's arbitration exception.

The arbitration exception to jurisdictional immunity under the FSIA requires only that "the action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate" that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605 (a)(6)(B). Rather than addressing the text of the statute, however, Nigeria claims that "P&ID does not have an existing award" because the Nigerian Order set aside an earlier award. Br. at 18. Nigeria rests this argument on *dicta* from one appellate decision that erroneously conflates the jurisdictional inquiry of the arbitration exception with a permissive ground for denying recognition of an arbitral

---

Nigeria's assets be stayed pending the outcome of the appeal, but only on the condition that Nigeria post security equal to US $200 million. Stafford Decl. Ex. 5.

award under Article V of the New York Convention, namely where the award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  New York Convention, art. V(1)(e).

While Nigeria argues at length that the Nigerian courts have authority to set aside the Tribunal's awards—otherwise known as "supervisory jurisdiction"—the Court need not even reach that issue because Nigeria' argument fails for two independent reasons.  *First*, no set-aside order from *any* court can affect the Court's subject matter jurisdiction if the textual requirements of the FSIA's arbitration exception are satisfied.  While a lawful set-aside order provides a discretionary basis to decline recognition of an arbitral award under the New York Convention, Nigeria's contention that a set-aside order *also* renders inapplicable the FSIA's arbitration exception is without support in statute or case law, and it is betrayed by the very authorities on which Nigeria relies.  *Second*, even if a lawful set-aside order could affect this Court's jurisdiction, the Nigerian Order does not even purport to set aside the Final Award, and its text is hopelessly ambiguous regarding the Liability Award.  The Nigerian Order thus fails to meet Nigeria's own test for when an arbitration award may cease to exist.

But even if the Nigerian Order did purport to set aside the Final Award, and even if such an order could affect jurisdiction under the FSIA, Nigeria's courts lack authority to set aside the award.  Because arbitration is a matter of contract, the Agreement is paramount.  And here, England is the "country in which," *and* "under the law of which," the Final Award was made, as both the Tribunal and the English courts held in well-reasoned decisions after analyzing the Agreement.  The parties agreed that London was the juridical seat, and mandatory provisions of English law necessarily applied to the arbitration regardless of the choice to use the rules of the Nigerian Arbitration Act for internal procedures.  This vested the English courts with exclusive

authority to supervise the arbitration and, if appropriate, to set aside the Tribunal's awards; the Nigerian courts thus lack authority to set aside the arbitrators' decisions.

This Court could reach this conclusion by interpreting the Agreement *de novo*, but it need not and should not do so.  The Tribunal and the English courts each issued well-reasoned, persuasive decisions after contested proceedings, and the Court should follow them as a matter of deference under U.S. arbitration law, comity as to foreign judgments, and issue preclusion. Nigeria's unprecedented contention that *both* the English courts and the Nigerian courts have supervisory jurisdiction has been rejected by the Tribunal and the English courts, and it rests on a principle that has never been followed by a U.S. court and that has been widely criticized as unworkable because it could result in conflicting judgments about the enforceability of an award. In fact, the academic authority on which Nigeria primarily relies—a 2010 tentative draft of the Restatement of U.S. law on international arbitration—has since *rejected* Nigeria's position in the 2019 proposed final draft.

Finally, even if the Nigerian court did have jurisdiction to set aside the award, the Court should follow the Tribunal and the English Court, and not the unreasoned, uncontested Nigerian Order obtained by Nigeria from its own courts only *after* losing the English set-aside application.

### A.  *The Petition seeks to enforce an award issued pursuant to an agreement to arbitrate governed by the New York Convention, thus satisfying the arbitration exception.*

To establish jurisdiction under the arbitration exception to the FSIA to confirm an award, a petitioner need only make "a prima facie showing" as to two factual predicates: (i) "the existence of an arbitration agreement" that "is or may be" governed by a treaty such as the New York Convention and (ii) "the existence of an award."  *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015); *contra* Br. at 18 (inserting "enforceable" into "existence of an award").  Once the petitioner has made this initial showing, the "burden of persuasion" shifts to—and remains

with—the sovereign respondent, which must demonstrate "by a preponderance of the evidence" that one or both of these factual predicates is absent. *Id.*

By attaching certified copies of the Agreement and the Final Award to its Petition, P&ID has made this prima facie showing that the arbitration exception applies. Dkt. No. 3-1; Dkt. No. 3-17. Nigeria fails to meet its burden to show the absence of these factual predicates: Nigeria does not dispute that the Agreement includes an arbitration clause that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards," namely the New York Convention. Dkt. No. 1 ¶¶ 4-6. Nor does Nigeria dispute the authenticity of the Agreement or the authenticity of the Final Award. *Id.* ¶ 29. Nor does Nigeria claim that the Tribunal itself has modified, reconsidered, or revoked the Final Award.

Importantly, the D.C. Circuit in *Chevron* recognized that, for purposes of the FSIA's arbitration exception, "the existence of an award is a *factual question* that the District Court must resolve in order to maintain jurisdiction." *Chevron*, 795 F.3d at 204 (emphasis added, internal citation omitted).

As a *factual* matter, the Final Award plainly exists, regardless of the *legal* effect of the Nigerian Order on the enforceability of the Final Award. This is underscored by the August 16, 2019 English High Court Judgment. In granting P&ID permission to enforce that Final Award as if it were an English judgment, the English High Court necessarily accepted the reality that there is, in fact, a Final Award issued by the Tribunal pursuant to the Agreement. *See English High Court Judgment* ¶ 96. Nigeria's decision to file, in December 2019, an application in the English High Court to set aside the Final Award (as well as the earlier awards) further demonstrates the Final Award's continued existence as a factual matter.

Thus, the elements of the FSIA's arbitration exception are satisfied and the Court has jurisdiction to decide P&ID's petition.  Nigeria's Motion can be denied on this basis alone.

### B. Set-aside orders do not divest jurisdiction that otherwise exists under the FSIA's arbitration exception, and Nigeria cites no case to the contrary.

Nigeria suggests that the Court cannot exercise jurisdiction until P&ID conclusively demonstrates "the existence of an *enforceable* award."  Br. at 18 (emphasis added).  Under Nigeria's theory, the Court must determine whether or not an award has been set aside by a competent authority with supervisory jurisdiction under Article V(1)(e) of the New York Convention; if it has, then it no longer "exists" for purposes of the arbitration exception to the FSIA.  This argument—which runs contrary to the D.C. Circuit's decision in *Chevron*—requires that the Court add words to the FSIA's arbitration exception, adopt an approach never before used by any court (and implicitly rejected by the authority on which Nigeria relies), and contravene the very legal framework—the New York Convention—on which Nigeria purports to rely.

The arbitration exception of the FSIA requires only that there be "an award made" pursuant to an agreement to arbitrate that "is or may be" governed by a treaty such as the New York Convention.  28 U.S.C. § 1605(a)(6)(B); *see also Chevron*, 795 F.3d at 204 ("existence of an award").  The plain text of the statute does not require that the court find the award in question be enforceable in order for subject matter jurisdiction to exist.  *See Dean v. United States*, 556 U.S. 568, 572 (2009) (relying on principle that courts "ordinarily resist reading words or elements into a statute that do not appear on its face").  To the contrary, whether an award is "enforceable" is a question that is resolved under the New York Convention as implemented by the Federal Arbitration Act.  9 U.S.C. § 207.  Had Congress intended for subject matter jurisdiction to depend on whether an award *would be* recognized by a U.S. court, it could have easily done so.  But rather than vesting jurisdiction if the award *is or will be enforced* under a treaty calling for the recognition

and enforcement of arbitral awards, the statute requires only that "*the agreement or award is or may be governed*" by such a treaty.  28 U.S.C. § 1605(a)(6)(B).  The immunity determination thus does not rely on the enforceability of the award, but rather on an agreement to arbitrate that constitutes the waiver of immunity.  If a foreign sovereign enters into such an agreement, U.S. courts have jurisdiction to enforce an award issued pursuant to that agreement.  *See Chevron*, 795 F.3d at 204 n.2 (arbitration exception "does not require that the District Court determine that the award *is* governed by a treaty" only that there is award made under a foreign state's agreement to arbitrate that "is *or may be*" governed by a treaty (emphases added)).

Nigeria's reliance on the New York Convention is thus misplaced.  "The basic understanding of the New York Convention is that 'each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the articles' of the Convention.'"  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 934 (D.C. Cir. 2007) (citing Convention, art.  III).  The "critical" question for applying the New York Convention is the "place of the award":  If the award is made in the territory of a party to the Convention, "all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration."  *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999) (quoting Restatement (Third) of Foreign Relations Law § 487 cmt. b (Am. Law Inst., 1987)).

There are only a few limited, discretionary grounds on which a court may decline to recognize an award under the Convention.  As relevant here, the Petition "*may* be refused . . . if" the Final Award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  New York Convention, art. V(1)(e) (emphasis

added); *see also* 9 U.S.C. § 207 (providing that a court "shall confirm" awards "unless it finds one of the grounds for refusal" under the New York Convention).  While theoretically an award could be issued "in" one jurisdiction, but "under the law" of another—as discussed infra Point I.D.—they are almost universally the same.  An award that is issued "in" the seat of the arbitration is subject to that country's arbitration laws absent extraordinary and all but unheard of circumstances. And given that arbitration is a matter of contract, it is the parties' agreement—as interpreted by the arbitrators—that determines the applicable law.  As explained by a renowned commentator on international arbitration, Gary Born (also cited by Nigeria), the arbitrators' "choice-of-law determination" as to procedural law is thus "entitled to substantial deference and, therefore, that a de novo judicial choice-of-law analysis is inappropriate."  Gary B. Born, INT'L COMMERCIAL ARBITRATION 1615 (2d ed. 2014)  (collecting cases).[6]  However, the discretionary New York Convention grounds for refusing recognition have no bearing on the arbitration exception, and thus federal courts do not address Article V(1)(e) in determining sovereign immunity.

Because courts in the United States "have discretion under the Convention to enforce an award despite annulment in another country," federal courts can and do exercise jurisdiction over foreign sovereigns when an award-creditor petitions to confirm an arbitration award that has been putatively set aside.  *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 369 (5th Cir. 2003); *see, e.g.*, *TermoRio S.A. E.S.P. v. Electranta S.P.,*487 F.3d 928, 936 (D.C. Cir. 2007).  And, in some instances, U.S. courts will confirm such awards, even after concluding that the award had indeed been set aside by a court of the supervisory jurisdiction under Article V(1)(e) of the New York Convention.  *See, e.g.*, *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92,

---

[6]    Relevant excerpts from this source are attached to the Stafford Declaration as Exhibit 7.

107 (2d Cir. 2016) (hereinafter "*Pemex*"); *Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F. Supp. 907, 912 (D.D.C. 1996); *see also* RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL AND INVESTOR-STATE ARBITRATION § 4.14 cmt. b (Am. Law Inst., Proposed Final Draft, 2019) ("Even if a Convention award has been set aside by a competent authority, a court of the United States may confirm, recognize or enforce the award . . . .").

Nigeria does not and cannot reconcile its interpretation of the FSIA's arbitration exception with these decisions. In fact, Nigeria has not cited a single decision where a U.S. court found a foreign sovereign to be immune from jurisdiction because an arbitration award that otherwise satisfied the arbitration exception had been set aside.

Instead, Nigeria relies on *dicta* from *TermoRio S.A. E.S.P. v. Electranta S.P.*, where the D.C. Circuit suggested that "an arbitration award does not exist to be enforced in other Contracting States if it has been lawfully 'set aside' by a competent authority in the State in which the award was made."  487 F.3d 928, 936 (D.C. Cir. 2007) (quoted at Br. at 19).  But in fact *TermoRio* undermines Nigeria's position:  it was a decision on the merits and not a jurisdictional ruling.  As this Court previously observed, the *TermoRio* "district court had found that it had subject matter jurisdiction over the arbitration claim notwithstanding Colombia's invocation of the FSIA."  Dkt. No. 34 at 3.  The *Termorio* district court explicitly found that, notwithstanding the Colombian court's order setting aside the award, "***the court [had] subject matter jurisdiction over the . . . arbitral award enforcement claim.***" 487 F.3d at 932 (emphasis added).  If Nigeria's interpretation were correct, of course, the trial court would have dismissed the action on grounds of sovereign immunity, or the D.C. Circuit would have corrected its failure to do so.  Instead, both decisions confirm that set-aside orders do not affect jurisdiction under the FSIA's arbitration exception.

Moreover, Nigeria's argument relies on a fundamental error that the D.C. Circuit unambiguously rejected in *Chevron*: conflating the jurisdictional question under the FSIA with the question of whether to confirm an award under the New York Convention.  There, Ecuador claimed that its dispute with Chevron fell outside the scope of a bilateral investment treaty between Ecuador and the United States, such that there was no valid agreement to arbitrate and, in turn, no jurisdiction under the FSIA's arbitration exception.  795 F.3d at 204–05.  The D.C. Circuit explained that this argument "conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention." *Id.* at 205.  Having determined that Ecuador's treaty constituted an offer to arbitrate accepted by Chevron, the court thus held that "[t]he dispute over whether the lawsuits were 'investments' for purposes of the treaty . . . is properly considered as part of review under the New York Convention," not the jurisdictional determination under the FSIA.  *Id.* at 206.  So too here: the question whether the Final Award is "enforceable" should be part of this Court's analysis of recognition under the New York Convention, not its determination of jurisdiction under the FSIA.  While the Court may address merits issues to the extent necessary to assure itself of jurisdiction, there is no overlap here between the arbitration exception and the grounds for recognition under the New York Convention, and no court has found otherwise.  *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1324 (2017) ("[C]ases in which the jurisdictional inquiry does not overlap with the elements of a plaintiff's claims have been the norm in cases arising under other exceptions to the FSIA.").

That the enforceability of an arbitration award under the New York Convention is a separate inquiry from whether jurisdiction exists is demonstrated by every case in which a U.S. court considers the confirmation of a putatively set-aside award against a foreign sovereign.  These decisions find jurisdiction under the FSIA, and then determine whether the set-aside order is a

basis to decline confirmation of the award.  They may decide that the set-aside order was made by a court *without* supervisory jurisdiction (*e.g.*, *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012)), or they may decide that the set-aside order was made by a court *with* supervisory jurisdiction, in which case they can choose to decline recognition (*e.g.*, *TermoRio,* 487 F.3d 928) or to recognize the award nonetheless (*e.g.*, *Pemex*, 832 F.3d 92).  But in none of those cases did the U.S. court find that it lacked jurisdiction.

Indeed, under Nigeria's interpretation of the FSIA's arbitration exception, the last category of cases—where courts confirmed awards despite a lawful set-aside order, such as *Pemex*—would seem to be impossible.  While Nigeria attempts to elide this issue by suggesting that a "tainted" set-aside order would not divest jurisdiction, Br. at 26 (quoting *TermoRio*), this only confirms that Nigeria's argument has no basis whatsoever in the text of the arbitration exception, which does not include any language suggesting that jurisdiction depends on a set-aside order, let alone whether it may be tainted.

Indeed, to read the FSIA in the way Nigeria proposes would undermine the New York Convention (a binding treaty), which expressly provides that the set aside of an award is only a permissive—not a mandatory—basis for an enforcing court to refuse to recognize the award.  *See* Article V(1)(e); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 105, 111 (1991) (rejecting interpretation that would render statutory provision "essentially without effect").  Thus, while the D.C. Circuit in this case suggested without deciding that an award that has been set aside might be akin to a U.S. district court judgment reversed on appeal (*P&ID*, 962 F.3d at 586-87), an award that has been set aside can still be enforced under Article V of the New York Convention, unlike a reversed judgment.  *See* RESTATEMENT (FIRST) OF JUDGMENTS § 41 cmt. d (Am. Law. Inst., 1943) ("[A] judgment [that] has been vacated by the trial court or reversed by an appellate

court . . . is no longer conclusive between the parties"). Nigeria's attempt to turn the Convention's permissive grounds for nonrecognition into a mandatory basis to deny jurisdiction should be rejected.

### C. The Final Award has not been set aside, and Nigeria's reliance on its own court's order is not to the contrary.

Though Nigeria's Motion hinges *entirely* on the Nigerian Order, its Brief conspicuously neither quotes from nor analyzes it, except to assert that the order "set[] aside the [Liability Award]" and that it is now "final and binding." Br. at 2, 11. Nigeria thus claims that "there is no finding of liability on which the [Final Award] can rest." Br. at 25.

Nigeria has a good reason for avoiding any deeper examination of the Nigerian court's three-page order—namely, that it does not say what Nigeria says it does. The portion of the Nigerian Order that supposedly overturned the Tribunal's finding of liability and nullified the later-issued Final Award provides only:

> That an order is granted to the Applicant setting aside ***and/or remitting*** for ***further consideration*** all ***or part*** of the [Liability Award of] Lord Leonard Hoffman, Chief Bayo Ojo, SAN, and Sir Anthony Evans and for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

Nigerian Order ¶ 2 (emphasis added). The Nigerian Order provides no context from which to divine the relief (if any) it purports to confer: Did the Nigerian court "set[] aside" the Liability Award or "remit[] it for further consideration," and if the latter, to whom and for what purpose? Did the Nigerian court order such relief as to the entire Liability Award or only part of it? And if the latter, which part? Whatever it means, the Nigerian Order can hardly be considered final when it does not answer these questions and expressly contemplates "such further or other orders as this Honourable Court may deem fit to make in the circumstances." The text of the Nigerian Order thus demonstrates that it does not finally and conclusively set aside the Final Award.

While Nigeria says that the Nigerian Order "left the arbitrators with nothing to decide," Br. at 25, that is flatly contradicted by the text that contemplates "remitting" the award, presumably to the arbitrators.  *See* Nigerian Arbitration Act § 29(3) (court may allow tribunal to "resume the arbitral proceedings" or "eliminate the grounds for setting aside of the award").  If the Nigerian court took issue with any part of the Liability Award—which parts are not stated in the unreasoned Nigerian Order—Nigeria brought no issues related to the Liability Award to the Tribunal.  Instead, Nigeria continued to participate in the arbitration, and all three members of the Tribunal relied on the Liability Award in determining the amount of damages owed to P&ID.

But even if the Nigerian Order were an unambiguous, complete, and binding ruling that set aside the Liability Award—and the Nigerian court had the power to enter such an order, as discussed below—such a ruling would not necessarily nullify the ***Final*** Award.  Nigeria suggests that the set-aside order would have preclusive effect, relying on *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*, 913 F.2d 544 (8th Cir. 1990), but P&ID never appeared in the Nigerian court and thus no issues were "actually litigated," nor is it apparent what issues were "necessarily determined" by that order, so it cannot be preclusive.  RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e (Am. Law Inst., 1982) ("none of the issues is actually litigated" in a default judgment, which thus do not have preclusive effect), *accord Salzman v. Islamic Republic of Iran*, No. CV 17-2475 (RDM), 2019 WL 4673761, at *3 (D.D.C. Sept. 25, 2019).  Moreover, contrary to the annulment in *John Morrell & Co*, 913 F.2d at 562*,* the Nigerian Order did not "bar[]" the Tribunal "from reconsidering" some or all of the issues but rather contemplated "remitting" some or all of the Liability Award, presumably to the Tribunal.[7]

---

[7]    The Nigerian Order also did not purport to decide the seat of the arbitration.  Only the Tribunal and the English High Court have done so, and both concluded the seat was England.

In sum, Nigeria offers no arguments or evidence to explain why the Nigerian Order has the effect that it claims.  To the contrary, the Nigerian Order—inscrutably worded, bereft of analysis, and granted in an uncontested proceeding—cannot support the weight that Nigeria places upon it. Nigeria's argument thus flunks the test Nigeria incorrectly divines from *TermoRio*: the Final Award has not been "lawfully 'set aside'" let alone by an authority with supervisory jurisdiction. Br. at 19.

### D.  Nigeria's courts lack the power to set aside the Final Award.

Even if the Nigerian court had set aside the Final Award, such an order would only affect the enforceability of the Final Award **in Nigeria**.  Under Article V(1)(e) of the New York Convention, only a set-aside order by a court in the supervisory jurisdiction—that is, the country "in which" or "under the law of which" the award was made—can be a valid basis for a court in a different jurisdiction to refuse recognition of the award.

England is the supervisory jurisdiction in this case, as Nigeria recognized when it first tried and failed to set aside the Liability Award in the English courts.  Nigeria now contends that its own courts also have supervisory jurisdiction, relying on an out-of-context snippet from the arbitration clause invoking "the rules of the Nigerian Arbitration and Conciliation Act."  Br. at 5, 6, 7, 8, 21, 22, 24.  Nigeria contends that, by invoking the rules of the Nigerian arbitration law, Nigeria was in fact the seat of the arbitration, and—even if London were the seat—Nigeria is the country "under the law of which" the award was made and thus has concurrent supervisory jurisdiction.  Yet the Agreement specifically limits the application of the Nigerian Act's "rules": they apply only "except as otherwise provided herein."  The parties' agreement provided that "the venue of the arbitration shall be London, England, unless otherwise agreed by the parties," which means that the mandatory provisions of the English Arbitration Act apply.  Under English law, the English courts have exclusive supervisory jurisdiction over the arbitration and thus the Final

Award.  Nigeria ignores that the Tribunal and the English courts both *already* interpreted the Agreement, reached this same conclusion, and rejected Nigeria's interpretation of the Agreement.

Nigeria's arguments thus fail for two reasons. First, the Tribunal and the English courts each already interpreted the Agreement, concluding that England is the exclusive supervisory jurisdiction and thus finding that the Nigerian court lacked authority to set aside the Liability Award.  Principles of deference to arbitrators, comity, and issue preclusion favor the Tribunal's and English courts' decisions.  Second, even if the Court were to interpret the parties' agreement on a blank slate, it should reach the same conclusion as the Tribunal's and the English courts' persuasively reasoned decisions:  that the parties agreed to a London-seated arbitration subject to the exclusive supervisory jurisdiction of the English courts.

       1.   *The parties' Agreement, as interpreted by the Tribunal, provides that England is the sole supervisory jurisdiction.*

To determine the effect of the Nigerian Order under the New York Convention, the Court must start with the parties' Agreement.  Arbitration agreements can and do specify the seat of the arbitration and the applicable procedural laws.  Born at 1541 (effect should be given to the parties' agreement on seat); *Id.* at 1621 (determining procedural law is "matter of contract interpretation").  And like any dispute over interpreting an agreement submitted to arbitration, the tribunal's "choice-of-law determination" as to those matters are "entitled to substantial deference."  *Id.* at 1615 (collecting cases); *BG Group, Plc v. Republic of Argentina*, 572 U.S. 25, 34 (2014) (disputes about the "meaning and application" of a contract are presumptively for arbitrators to determine).

Determining which country's courts have supervisory jurisdiction is thus a matter of the parties' agreement to be resolved in the first instance by the arbitrators.  *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 309, 310 (5th Cir. 2004) (analyzing the "parties' arbitration agreement" to determine supervisory jurisdiction); *id.* at

288-93 (analyzing choice of law).  That is particularly the case here, where the parties agreed that the Tribunal could determine its own jurisdiction.  Dkt. No. 3-7 ¶ 51(1)(a).  Indeed, D.C. Circuit precedent requires deference to a tribunal's rulings even when they carry jurisdictional import. *See Chevron*, 795 F.3d at 205 (applying *BG Group* and thus deferring to tribunal's interpretation of whether parties had agreed to arbitrate).

The Tribunal's ruling that England is the seat of the arbitration—and thus the sole supervisory jurisdiction—thus dispenses with Nigeria's argument.  As the Tribunal explained, the parties' choice of London as "'the venue *of the arbitration*' rather than any particular steps (such as hearings) *in the arbitration* indicates that London was selected under section 16(1) [of the Nigerian Arbitration Act] as the place of the arbitration in the juridical sense, invoking the supervisory jurisdiction of the English court . . . ."  Dkt. No. 3-12 ¶ 15 (emphases in original).  By designating London "as the site for the arbitration" this "presumptively designated [English] procedural law as the" law of the arbitration.  *Karaha Bodas*, 364 F.3d at 309-310; *compare with Dixylin-Field Drilling, Ltd. v. Mobil Oil Corp.*, No. 83 Civ. 9308 (LBS), 1984 WL 137, at *1 (S.D.N.Y. Apr. 2, 1984) (agreement calling for "arbitration in Nigeria according to Arbitration Act of Nigeria") *and Baker Marine (Nigeria) Ltd. v. Chevron (Nigeria) Ltd.*, 191 F.3d 194, 195 (2d Cir. 1999)  (arbitration award issued by "panels of arbitrators in Lagos, Nigeria").

But what of the Agreement's command that "the rules of the Nigerian Arbitration and Conciliation Act . . . except as otherwise provided herein, shall apply to any dispute"?  The Tribunal answered this question too: because the parties chose England as "the place of the arbitration" but agreed that the arbitration "should be conducted according to the Nigerian procedural rules, the latter apply ***except so far as inconsistent with the mandatory provisions of the English Act***."  Dkt. No. 3-12 ¶ 17 (emphasis added).  This interpretation tracks the English

Arbitration Act, which permits the parties to set their own rules for the internal conduct of the proceeding without displacing English law as that which governs the arbitration as a whole. Dkt. No. 3-12 ¶ 17 (quoting English Arbitration Act § 4(2)). The distinction between the English procedural law governing the arbitration and the choice of Nigerian procedures is underscored by the reference to the "*rules of* the" Nigerian Arbitration Act, which are set out in the First Schedule to the statute. Nigerian Arbitration Act (First Schedule: Arbitration Rules).

Nigeria tries to deflect this analysis, saying that the question of the supervisory jurisdiction "is one of interpretation of the New York Convention," but that is misleading. *See* Br. at 23-24 (citing *Karaha Bodas*, 364 F.3d at 308). As the *Karaha Bodas* court acknowledged, the New York Convention determines the effect of a set-aside order, but the selection of the supervisory jurisdiction is a matter of the parties' agreement. *Karaha Bodas*, 364 F.3d at 309, 310 (analyzing the "parties' arbitration agreement" to determine supervisory jurisdiction); Born at 1541. Like any dispute about the interpretation of the Agreement, this is a question left to the Tribunal, which is empowered to determine its own jurisdiction. *See English High Court Judgment* ¶ 52 (issue of seat "depended on the proper construction of the GSPA, and upon whether the conduct of the parties had established some other agreement"). Nor can Nigeria suggest that the Tribunal did not consider whether the Liability Award was "under the law" of a country other than England: the Tribunal specifically considered Article V(1)(e), Dkt. No. 3-12 ¶ 1, and Lord Hoffmann confirmed that the Nigerian court "had no jurisdiction to set aside its award," Dkt. No. 3-14 at 2.

Nigeria's contention that the Tribunal's carefully reasoned decision "manifestly disregarded the parties' agreement [and] the law" is thus without merit. *See* Br. at 24 (citing *Karaha Bodas*, 364 F.3d at 290). In any event, "manifest disregard of the law" is an exceptionally high standard under which a U.S. court can vacate a domestic award, *Kurke v. Oscar Gruss & Son,*

*Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006), it is not "a valid basis upon which the Court can deny confirmation of an arbitral award" under the New York Convention, *see Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 30 (D.D.C. 2011).

Additionally, the Tribunal's decision itself has preclusive effect, which means that the question of seat and supervisory jurisdiction has already been determined. RESTATEMENT (SECOND) OF JUDGMENTS § 84(1) (Am. Law Inst., 1982) ("a valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court"); *accord Sanders v. Washington Metro. Area Transit Auth.*, 819 F.2d 1151, 1156-58 (D.C. Cir. 1987) (giving preclusive effect to arbitral award). Nigeria "had remedies for any procedural unfairness" with regard to Procedural Order No. 12— such as challenging that order in the juridical seat determined by the Tribunal (England), or even in jurisdiction where it maintained the Tribunal was seated (Nigeria)—"but it did not utilise them." *English High Court Judgment* ¶ 62.[8]

   2. *The English courts correctly found that England is the sole supervisory jurisdiction.*

As here, Nigeria also argued to the English High Court that the Final Award was a nullity given the Nigerian Order. *English High Court Judgment* ¶¶ 40(1), 40(2) (noting argument that "juridical seat" should be determined by "the law governing the arbitration clause of the GSPA; that this referred to Nigerian law; and that as a matter of Nigerian law the seat of the arbitration was Nigeria"). The English High Court Judgment rejected these arguments, holding *both* that Procedural Order No.12 created an "issue estoppel which precludes an argument as to seat" *and* that its own independent analysis found the "the seat stipulated" in the Agreement "was England." *English High Court Judgment* ¶¶ 83, 87.

---

[8] Nigeria offers no reason why the Nigerian Order would displace Procedural Order No. 12, which was based only on the Agreement and the first Part Final Award, not on the Liability Award.

This Court should give the English High Court Judgment preclusive effect to estop Nigeria from relitigating the issue of which country's courts have supervisory jurisdiction over the arbitration. The English High Court Judgment is entitled to comity and satisfies the requirements for collateral estoppel. *See Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 31-36 (D.D.C. 2007) (discussing requirements for giving preclusive effect to a foreign court judgment). The English High Court rendered its judgment after a full and fair proceeding, in which Nigeria was duly served, and in a judicial system that comports with U.S. standards of due process. *Id.* (discussing standards for granting comity); *see also English High Court Judgment* ¶ 36 (discussing service and Nigeria's grant of relief from sanctions). The English Court of Appeal then confirmed that the "English Court has exclusive supervisory jurisdiction over the award which is a domestic arbitration award where the seat of the arbitration is London. The Nigerian Court had no jurisdiction to purport to set aside the Liability Award." *English Court of Appeal Order* at 1. The issue of supervisory jurisdiction thus was "(1) actually litigated and (2) necessarily determined by a court of competent jurisdiction in the first trial; (3) and [] its use in the second trial did not work an unfairness on the defendant." *Hurst*, 474 F. Supp. 2d at 34 (citation omitted).[9] Thus, the English High Court Judgment creates an issue estoppel.

Even if the Court does not give preclusive effect to the English High Court Judgment, the Court should nonetheless follow its persuasive interpretation of the Agreement. Specifically, the parties' agreement that the "venue 'of the arbitration' as being in London" represented "an anchoring of the entire arbitration to London." *English High Court Judgment* ¶ 85(1). The English

---

[9]  Nigeria does not contend that the Nigerian Order has preclusive effect as to the supervisory jurisdiction of the Nigerian courts. Nor could it. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e (1982) ("none of the issues is actually litigated" in a default judgment) . Moreover, as explained infra Point I.E., the Court has good reason to be skeptical of granting comity to the Nigerian Order.

High Court Judgment thus distinguished the Agreement from one where a Nigerian-seated arbitration "may 'meet' or may 'hear witnesses, experts or the parties" in other locations, as permitted under Section 16(2) of Nigerian Arbitration Act. *English High Court Judgment* ¶ 85(1); *see also* Dkt. No. 3-12 ¶12 (quoting Nigerian Arbitration Act § 16(2)). Thus, the "reference to the 'venue' as being London or otherwise as agreed between the parties, is better read as providing that the seat of the arbitration is to be England, unless the parties agree to change it," which they did not. *English High Court Judgment* ¶ 85(2). Moreover, the incorporation of the "rules of the" Nigerian Arbitration Act is "not inconsistent" with the mandatory provisions of the English Arbitration Act applying. *English High Court Judgment* ¶ 85(3).

> 3. *The parties' Agreement selected England as the sole supervisory jurisdiction.*

Even if this Court did not rely on the Tribunal's and the English courts' decisions at all, the Court can easily interpret the Agreement to dispense with both of Nigeria's arguments that its own courts have supervisory jurisdiction for purposes of Article V(1)(e). These arguments find scant support in any evidence or authority the Court might consult, whether the Agreement's arbitration clause, the parties' pattern of conduct in the arbitration, the New York Convention, or the legal and commercial customs common to international arbitration.

First, Nigeria argues that "the parties' choice of the Nigerian Arbitration Act as the procedural law to govern the arbitration proceedings establishes Nigeria as the primary jurisdiction or seat for purposes of the New York Convention." Br. at 21. As explained above, however, the selection of London as the place of the arbitration meant that it was the seat, which is consistent with the parties' agreement to use the "rules of" the Nigerian Arbitration Act "*except as otherwise provided herein,*" a provision of the Agreement that Nigeria conspicuously fails to address. Dkt. No. 3-1 § 20 (emphasis added). The parties' decision to anchor the arbitration in England thus subjected the Tribunal's awards to the mandatory provisions of the English Arbitration Act, as the

English Court of Appeal Order explained.  A leading treatise explains this commonplace arrangement, noting that "the procedural law of the arbitration is necessarily a more limited concept than the legal regime of the arbitral seat, with the procedural law operating within the framework of the seat's arbitration legislation."  Born at 1534.  And indeed, the internal procedures for the arbitration—the "rules of" the Nigerian Arbitration Act referenced in the Agreement—are even more narrow than the procedural law.  *See* Born at 1603 (distinguishing the "*procedural law* governing the arbitration and the *procedures* applied in the arbitral proceedings" (emphases in original)).[10]

Second, Nigeria argues that even if London were the seat of the arbitration, Nigeria would still have supervisory jurisdiction as the country whose procedural law applies.  As an initial matter, that ignores the fact that the English courts have *exclusive* supervisory jurisdiction—as confirmed by the English High Court Order and the English Court of Appeal Order—and that decision should be accorded comity.

In any event, Article V(1)(e) does not permit two countries to have concurrent supervisory jurisdiction, even as a theoretical matter.  The only courts that can set aside an arbitration award are those of the country with supervisory jurisdiction, which is almost always the law of the seat ("in which" the award is made), although the parties could theoretically agree that another country's laws would be applied to supervise the arbitration (the country "under the law of which" the award is made), provided that this was not prohibited by the local arbitration law of the seat.  *See* Born at 1611-12 (discussing national arbitration laws that limit agreements on choice of procedural law).  Even the judicial authority on which Nigeria primarily relies—the Fifth Circuit's

---

[10]    These types of "procedural law"—internal rules as opposed to laws governing supervision of arbitration—are entirely separate from the choice of substantive law governing a commercial relationship.  *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731 (D.C. Cir. 2012).

decision in *Karaha Bodas*—acknowledges that "the *predominant view* is that the Convention permits only one [supervisory jurisdiction] in any given case."  364 F.3d at 308 (emphasis added). "Although Article V(1)(e) appears to refer to the possibility of annulment by *both* the courts of the state where the award was made and the state 'under' whose laws the award was made, only one of these two possible forums should have competence to annul any single award."  Born at 3002. "Such 'exclusive' primary [i.e., supervisory] jurisdiction in the courts of a single country is consistent with the New York Convention's purpose; facilitates the 'orderliness and predictability' necessary to international commercial agreements; and implements the parties' choice of a neutral forum."  *Karaha Bodas*, 364 F.3d at 309.

Here, of course, Nigeria has acknowledged that the English courts are competent to annul the awards in this case, given that Nigeria applied to the English courts first to set aside the Liability Award (in December 2015) and later to set aside the Final Award (in December 2019).

Nigeria's argument that two courts can have concurrent jurisdiction relies on a tentative draft of a Restatement, but in fact that Restatement has since *rejected* this view.  Nigeria thus quotes "Restatement § 5-12 cmt. b" for the proposition that an award could "be subject to the primary [i.e., supervisory] jurisdiction of authorities in two countries, both of which will have competence to set it aside."  *See* Br. at 23.  While a tentative draft of this Restatement did contain this language, the Proposed Final Draft omits this section altogether and in fact adopts the view that there can only be a single supervisory jurisdiction.  Although Article V(1)(e) suggests that there could be two courts with supervisory jurisdiction—"the courts of the state where the award was made and the state 'under' whose laws the award was made"—the Restatement concludes that "only one of these two possible forums should have competence to annul any single award." *Compare* RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION § 5-12

cmt. b (Tentative Draft No. 1, 2010); *with* RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL AND INVESTOR-STATE ARBITRATION § 4.2 Reporters' Notes c (Am. Law Inst., Proposed Final Draft, 2019).[11]   The only decision that even contemplates the possibility of concurrent jurisdiction, *Karaha Bodas*, notes that this would be an "exceptional circumstance, and indeed it is virtually (and perhaps literally) unheard of.  *Karaha Bodas*, 364 F.3d at 291 (quoting "[a]uthorities on international arbitration" which explain that such circumstances are "almost unknown"; a "purely academic invention"; "almost never used in practice"; a possibility "more theoretical than real"; and a "once-in-a-blue-moon set of circumstances").

No U.S. court has found there to be two concurrent supervisory jurisdictions, and this Court should not be the first.  If all of Nigeria's arguments were accepted, Br. at 23, this would create precisely the conundrum that led commentators to condemn such an arrangement: that the two courts could reach two contrary decisions about whether the award should be confirmed (as in England) or be set aside (as purportedly in Nigeria).

Moreover, the Agreement does not contain the "express designation" of separate procedural law that is necessary to overcome the "strong presumption that designating the place of arbitration [here, London] also designates the law under which the award is made."  *Karaha Bodas*, 364 F.3d at 292 (where agreement specified Geneva, Switzerland as "place of arbitration," references to Indonesian procedural rules fell "far short" of making Indonesia supervisory jurisdiction).  Although Nigeria contends that the reference in the Agreement to the "rules of the

---

[11]   As the Reporter explained, the Restatement "initially took the position that both courts (the court of the seat and the court of the jurisdiction whose arbitration law the parties chose) enjoy concurrent annulment authority," but "upon further reflection" the Restatement rejected that view as it is "a recipe for difficulties," RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL AND INVESTOR-STATE ARBITRATION Reporter's Memorandum (Am. Law Inst., Proposed Final Draft 2019); *see also* Born at 3002 & n.609 (criticizing tentative draft).

Nigerian Arbitration and Conciliation Act" is an "express designation" that Nigerian procedural law governs the arbitration, this misreads the arbitration clause, which continues on to say "which, *except as otherwise provided herein*, shall apply to any dispute between such Parties under this Agreement."  Dkt. No. 3-1 § 20 (emphasis added).

The Agreement thus expressly limits the application of Nigerian law in the Agreement.  By choosing London as the place of arbitration, the parties "provided" a different jurisdiction with supervisory authority over the Arbitration.  Indeed, the English seat is confirmed by the parties' conduct in the arbitration, where the Final Award and all interim awards were "made" in London, where Nigeria did not dispute P&ID's view that London was the seat for more than two years of arbitration, and where Nigeria first applied to set aside the Liability Award in the English court. Dkt. No. 3-12 ¶¶ 19-39, 40.[12]

The situation here is thus similar to the arbitration in *Belize*, which "occurred in London and under the arbitral laws of England."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731 (D.C. Cir. 2012).[13]  While the *Belize* court noted that the parties could have selected a different procedural law other than the seat, that did not occur either in that case or here.  Rather, as the Tribunal correctly concluded, the parties agreed that the Nigerian procedural rules would govern the internal procedures of the arbitration (i.e., the "*rules of the* Nigerian Arbitration and Conciliation Act" (emphasis added)), but that the selection of London as the place of the arbitration

---

[12]   While the term "seat" may be preferable to "venue" in stating the supervisory jurisdiction, Born's treatise acknowledges that an agreement as to "venue" can and has been interpreted as an agreement to the seat.  Born at 2070-72 & n.113.  Here, as the Tribunal explained, the parties chose London as "'the venue *of the arbitration*' rather than any particular steps (such as hearings) *in the arbitration*," (Dkt. No. 3-12 ¶ 12 (emphases in original)), indicating the selection of the seat rather than a mere choice of "where meetings or hearings must be conducted."  Born at 1540.

[13]   While Nigeria suggests that *Belize* adopted the Restatement's view that two courts could have concurrent supervisory jurisdiction, the *Belize* court did not address this issue and did not quote from the since-rejected language in the earlier draft of the Restatement.

meant that the mandatory provisions of English arbitration law applied.  English law is thus "the law of the country whose arbitration law governed the arbitral proceedings."  *See* Br. at 20.  The decision in *Baker Marine (Nigeria) Ltd. v. Chevron (Nigeria) Ltd.*, 191 F.3d 194 (2d Cir. 1999), is not to the contrary.  There, the petitioner did "not contest" that the Nigerian court was a "competent authority in the country in which, and under the law of which, the award was made" (*id.* at 196), nor is it clear what factors led the Second Circuit to conclude that the Nigerian court was a competent authority to set aside the award.  *See id.* at 195 (contracts provided that Nigerian substantive law governed both the arbitration procedure and the contracts, and "the parties submitted to arbitration before panels of arbitrators in Lagos, Nigeria").

Finally, there are commonsense reasons why the Court should be skeptical that the parties intended for the Nigerian courts to have supervisory jurisdiction over the arbitration.  The Tribunal recognized the intuitive appeal of a neutral seat, as well as the absurdity of submitting a dispute involving the Nigerian state to Nigerian courts absent evidence of explicit intent to that effect.  *Cf.* Dkt. No. 3-12 ¶ 15 (noting the "possibility" that the parties desired that "a dispute between the Nigerian government and expatriate businessmen should be determined in a neutral jurisdiction and subject to the supervision of its courts").  As the *Karaha Bodas* court observed in rejecting an Indonesian government-owned company's efforts to avoid recognition of an arbitral award based on an Indonesian court's set-aside order, courts should give effect to "the neutral forum the parties selected."  364 F.3d at 282.

To deny Nigeria's motion to dismiss, however, the Court need not even reach this question of whether the Nigerian courts have supervisory jurisdiction to set aside the Final Award under the New York Convention.  Instead, the Court can simply acknowledge—consistent with every other U.S. court that has addressed a set-aside order in a petition to confirm an arbitration award

against a foreign sovereign—that the FSIA's arbitration exception applies regardless of any purported set-aside order. Or, alternatively, that the Nigerian Order had no such effect. But were the Court to reach the question of whether the Nigerian courts had supervisory jurisdiction under Article V(1)(e) of the New York Convention, it should rule that they do not.

### E. Even if the Nigerian Order could lawfully set aside the Final Award, the Court should follow the English High Court Judgment rather than the Nigerian Order.

Even if the Nigerian Order were a lawful set-aside order, and even if such an order could divest the Court of jurisdiction under the FSIA's arbitration exception, the Court should not give it that effect. As an initial matter, the Court should follow the decisions of the Tribunal and the English High Court that rejected the authority of the Nigerian court to set aside the Liability Award. But if the Court were to reach the merits question of whether this Court should give effect to the Nigerian Order, there are ample reasons to "second-guess that judgment" of the Nigerian court. *See* Br. at 26.

As in another case involving an arbitration award against Nigeria, the "procedural history of this case strongly indicates that the defendants moved to set aside the award in Nigeria only in order to manufacture a defense to [petitioner's] claims before this Court." *See Continental Transfer Technique Ltd v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 60 (D.D.C. 2010). In *Continental Transfer*, Nigeria sought to defeat confirmation of an English award on the basis of an order issued by its own courts. And, like the Nigerian Order here, the order in *Continental Transfer* was "issued *ex parte* without any analysis of the merits of Nigeria's claims that the arbitration award should be set aside," and thus the Nigerian court's order "d[id] not undermine the validity of the award or indicate that the award [wa]s likely to be vacated." *Id.* at 62.

The same analysis applies here, where Nigeria's conduct strongly suggests that it sought relief in the Nigerian courts only to manufacture a defense against enforcement of the impending

Final Award.   Nigeria first tried to set aside the Liability Award in England (thereby acknowledging England as the exclusive supervisory jurisdiction), and it ran to its own courts seeking the same relief only after that failed.  These forum-shopping concerns are only amplified by the facially dubious Nigerian Order, which was issued in an uncontested proceeding, is devoid of analysis, and granted Nigeria's proposed order verbatim—including the ambiguous statement that "all or part" the Liability Award was being set aside "and/or" remitted for further consideration.  Thus while Nigeria suggests that this Court should not "find error in the" Nigerian Order, there is simply no reasoning whatsoever in which to look for error.

U.S. courts have repeatedly—and rightly—rejected efforts by sovereign states to escape arbitral awards by claiming that such awards can be vitiated by the state's own courts.  *See, e.g.*, *Salini Costruttori S.p.A. v. Kingdom of Morocco,* 233 F. Supp. 3d 190 (D.D.C. 2017); *BCB Holdings Ltd v. Gov't of Belize*, 110 F. Supp. 3d 233 (D.D.C. 2015); *Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F. Supp. 907 (D.D.C. 1996).  Indeed, this is the case even where the sovereign's courts were agreed to as the supervisory jurisdiction.  *Pemex,* 832 F.3d at 107.  The legal reasoning of these cases should guide the Court, but the commercial context they illuminate is just as important: commercial parties include arbitration provisions in contracts with sovereign states to place such dispute beyond the reach of the state's own courts.  If commercial parties have faith in a sovereign's rule of law, they can just as easily seek recourse in that state's courts as in a private arbitration (as foreign contractors often do in the courts of the United States).  Indeed, one expert observed that "Nigerian courts will not rule against important government agencies . . . when large amounts of government money are at stake." [14]  Particularly given the dubious

---

[14]   *See* Declaration of Matthew T. Page in Support of Petitioners' Third Amended and Supplemental Petition to Confirm Foreign Arbitral Award and Request for Pre-Judgment Security,

procedural history and commercial context of the Nigerian Order, this appears to be a case that would offend the "fundamental notions of what is decent and just." *TermoRio*, 487 F.3d at 938 (quoted in Br. at 2, 26, 27).[15]

This Court need not scrutinize the propriety of Nigeria's judiciary in order to find that it has subject matter jurisdiction. Indeed, such an inquiry underscores why the grounds for declining recognition of an award under the New York Convention are not elements of the FSIA's arbitration exception. But if the Court is "obliged to respect" any foreign court's judgment, it should be the English High Court Order and the English Court of Appeal Order finding that the Nigerian courts could not set aside the Final Award. Nigeria's conduct weighs against giving effect to the Nigerian Order, and allowing Nigeria to treat everything after the Nigerian Order as a nullity would implicitly approve forum shopping and one-way reliance on judicial and arbitral decisions.

In sum, the arbitration exception applies to the Petition. While this Court can deny Nigeria's Motion on numerous other grounds (as described above), the Court should not endorse Nigeria's forum shopping, which is "tainted" by "irregularities that would offend the United States' 'fundamental notions of what is decent and just.'" Br. at 27 (citing *TermoRio*).

## II.    The FSIA's waiver exception applies because Nigeria, a party to the New York Convention, agreed to arbitrate in the United Kingdom, which is also a party.

The FSIA also grants jurisdiction over sovereign states in cases "in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605 (a)(1). As the statutory text makes clear, such waivers may be either express or implied. In a decision affirmed last year by the D.C. Circuit on strikingly similar facts, a court in this District held that the implied-

---

*Esso Exploration & Production Nigeria Limited, et al. v. Nigerian Nat'l Petroleum Corp.*, 1:14-cv-08445-WHP, 2018 WL 7132507, at ¶¶ 43 (S.D.N.Y. Nov. 16, 2018) (ECF 220).

[15] This case is thus distinguishable from the Second Circuit's decision in *Baker Marine*, where the Nigerian-seated arbitration awards were set aside by "written opinions" from Nigerian courts, setting forth their reasoning. 191 F.3d at 196 (explaining reasoning of set-aside orders).

waiver exception applied to an award-confirmation proceeding against a sovereign respondent that "agreed to arbitrate in the territory of a state . . . that has signed the New York Convention, and [the respondent was] also a signatory to the Convention." *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 192 (D.D.C. 2018), *aff'd*, 771 F. App'x 9 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 901 (2020). Other courts in this District have repeatedly reached the same conclusion since 1976.[16]  And the only other Circuit court to address this issue construed the waiver exception the same way.  *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993) (holding that waiver exception applies because "the signatory State must have contemplated enforcement actions in other signatory States" by acceding to the Convention).

The same elements are present here: Nigeria is a signatory to the New York Convention and, in the Agreement, Nigeria agreed to arbitrate in the United Kingdom, which is also a New York Convention party.  Nigeria is therefore subject to jurisdiction under the waiver exception, even if the Court were conclude that the Final Award were made in Nigeria, which is also a New York Convention party.

Nigeria does not cite a single decision reaching the opposite result.  It instead urges the Court to depart from this uniform interpretation on the theory that every prior case interpreting the waiver exception on these facts was wrongly decided.  Those decisions, Nigeria contends, cannot

---

[16]  *See, e.g.*, *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 187 (D.D.C. 2016) (applying both arbitration and waiver exceptions); *M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago*, 725 F. Supp. 52, 55-56 (D.D.C. 1989) (holding Convention signatory waived immunity because it "must have contemplated" enforcement proceedings in U.S. courts by agreeing to arbitrate under the terms of the Convention); *Ipitrade Int'l S.A. v. Fed. Republic of Nigeria*, 465 F. Supp. 824, 826 (D.D.C. 1978) (holding that Nigeria's agreement to arbitrate "in accordance with Swiss law" in France constituted waiver under FSIA because "United States, France, Nigeria, and Switzerland are each signatories" to New York Convention).

be reconciled with the Supreme Court's decision in *Argentine Republic v. Amerada Hess Shipping Corp.*, which held that a foreign sovereign does not waive immunity "by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts." 488 U.S. 428, 442 (1989) (discussed in Br. at 31–32). But Nigeria's did not waive its immunity merely by signing the New York Convention. Instead, having already acceded to the New York Convention, Nigeria entered into a ***separate*** agreement to arbitrate this dispute "in the territory of a state . . . that has signed the New York Convention." *Tatneft*, 301 F. Supp. 3d at 192. Finding waiver here does not construe the New York Convention as "*sub silentio* waiving the immunity of all 164 signatory states," *contra* Br. at 30, but acknowledges that signatories to the New York Convention are aware of the Convention's effect and therefore "must have contemplated the participation of the United States courts for enforcement" by submitting to arbitration in England. *M.B.L. Int'l Contractors*, 725 F. Supp. at 56.[17]

Nigeria argues that applying the waiver exception to these facts would "impermissibly render[]" the later-enacted arbitration exception "superfluous," Br. at 32–33, but the arbitration exception applies more broadly than the waiver exception, to include awards made against countries that have not acceded to the New York Convention. That is precisely why the D.C. Circuit in *Creighton* applied the arbitration exception but not the waiver exception. 181 F.3d at 123. And that is why the D.C. Circuit considered and rejected this exact argument just last year. *Tatneft*, 771 F. App'x at 10 (explaining that "exceptions partially overlap" but "the waiver exception requires a foreign sovereign to give up its immunity defense intentionally, whereas the

---

[17]   Unlike the maritime treaties in *Amerada Hess* that did not refer to legal proceedings in U.S. courts, 488 U.S. at 442, the Convention deals ***exclusively*** with proceedings in contracting states. *See* New York Convention, arts. I, III. Nigeria should thus expect that courts in other Convention countries "shall recognize arbitral awards as binding and enforce them." *Id.* art. III.

arbitration exception does not").  The legislative history confirms that the arbitration exception did not "replace" but instead supplemented the waiver exception, as "[a] court may still hold that a particular agreement to arbitrate constitutes a waiver of immunity and consent to the jurisdiction of the court."[18]

In its opinion in this case, the D.C. Circuit merely observed that *Tatneft* was an unpublished disposition and that therefore Nigeria's immunity argument was "at least colorable enough to support appellate jurisdiction."  *P&ID*, 962 at 584.  Contrary to what Nigeria would have this Court believe (Br. at 31), the D.C. Circuit did not criticize the decision in *Tatneft*, and indeed that decision and others correctly applied the implied-waiver exception in cases involving New York Convention signatories.  This Court should reach the same result.

## CONCLUSION

While a court order from one country setting aside an arbitration award can sometimes be a grounds for declining to enforce an award under the New York Convention, no court has ever concluded that such an order destroys jurisdiction under the FSIA.  This Court should decline Nigeria's invitation to become the first, as it would be inconsistent with the text of the FSIA's arbitration exception and undermine the New York Convention.  Nor can Nigeria rewrite either the hopelessly ambiguous Nigerian Order or the parties' Agreement, which provides the courts of England—not Nigeria—exclusive supervisory jurisdiction over the Arbitration.  For these reasons and the others set forth above, the Court should deny Nigeria's Motion.

Dated:  August 26, 2020
       Washington, D.C.                                    Respectfully submitted,

                                                           */s/ Michael S. Kim*

---

[18]  *Foreign Sovereign Immunities Act: Hearing on H.R. 1149, H.R. 1689, and H.R. 1888 before H. Subcomm. on Admin. L. & Govern. Rel. of the H. Comm. on the Judiciary*, 100th Cong. 92 (1987) (statement of Mark B. Feldman, Chairman, Committee on Foreign Sovereign Immunity, American Bar Association, Section of International Law and Practice, dated May 20, 1986).

Michael S. Kim
    D.C. Bar No. 1032401
    michael.kim@kobrekim.com

Josef M. Klazen
    D.C. Bar No. 1003749
    josef.klazen@kobrekim.com

KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036
Tel. +1 202 664 1900
Darryl G. Stein
    (*application for admission pending*)
    darryl.stein@kobrekim.com

Christopher Cogburn
    (*admitted pro hac vice*)
    christopher.cogburn@kobrekim.com

KOBRE & KIM LLP
800 Third Ave.
New York, NY 10022
Tel. +1 212 488 1200

*Attorneys for Petitioner Process and Industrial
Developments Limited*