UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**,<br><br>Petitioner,<br><br>v.<br><br>**FEDERAL REPUBLIC OF NIGERIA**, *et al.*,<br><br>Respondents. | Case No. 18-cv-594 (CRC) |

## MEMORANDUM OPINION

Process and Industrial Developments Limited ("P&ID") seeks confirmation of an arbitration award against the Federal Republic of Nigeria and its Ministry of Petroleum Resources (together, "Nigeria") worth roughly $10 billion. Nigeria moves to dismiss, asserting immunity under the Foreign Sovereign Immunities Act ("FSIA"). Meanwhile, the parties are engaged in related litigation in England, where Nigeria claims the award should be annulled because the arbitration and the underlying gas contract were tainted by fraud.

The Court will deny the Motion to Dismiss because Nigeria waived its immunity under the FSIA by signing the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"), then agreeing to arbitrate in the territory of another Convention signatory. The Court also declines to stay the case at this time, without prejudice to any future request for a stay.

Nothing in this Memorandum Opinion should be construed to convey any conclusion on whether P&ID is ultimately entitled to have the arbitral award enforced. The parties will have ample opportunities to litigate that issue—in England and, if necessary, in this Court—prior to

any decision on whether to confirm the award. For now, the Court holds only that it has jurisdiction over the dispute.

## I. Background

### A. Facts

The following facts are undisputed. P&ID is an entity formed by two Irish nationals to pursue a business project in Nigeria. Pet. ¶ 1. In January 2010, Nigeria and P&ID entered a gas supply and processing agreement (the "Agreement"). Agreement, ECF No. 3-1. The Agreement envisioned that Nigeria would supply P&ID with associated natural gas (also known as "wet gas"), which P&ID would refine to produce non-associated natural gas (or "lean gas") for Nigeria and valuable by-products for itself. Id.; Pet. ¶¶ 10-11. The parties agreed that the Agreement would "be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria," and that any dispute under the Agreement would be subject to arbitration. Agreement ¶ 20. The arbitration clause specifies that "the Nigerian Arbitration and Conciliation Act[,] except as otherwise provided herein, shall apply to any dispute" under the Agreement, and that "[t]he venue of the arbitration shall be London, England" unless otherwise agreed. Id.

The Agreement quickly fell apart after Nigeria was unable to secure the amount of wet gas it had agreed to supply P&ID. Part Final Award (July 17, 2015) ¶ 38, ECF No. 3-8. In August 2012, P&ID initiated arbitration against Nigeria in London, and a three-arbitrator panel (the "Tribunal") was formed. Pet. ¶¶ 17-18. The Tribunal ruled in July 2014 that it had jurisdiction over the dispute. Part Final Award (July 3, 2014), ECF No. 3-7.

In July 2015, the Tribunal ruled that Nigeria was liable for breaching the Agreement. Part Final Award (July 17, 2015) ¶ 80. Nigeria then made two attempts to have the liability award judicially annulled. First, Nigeria sought relief from the High Court of Justice in London

in December 2015. The English court denied that application in February 2016 on the ground that the deadline to challenge the liability award had passed and an extension was not warranted. Order and Reasons, ECF No. 3-10. Second, Nigeria filed an application in February 2016 with the Federal High Court in Lagos, Nigeria. Originating Motion, ECF No. 3-11. In May 2016, the Nigerian court issued a brief order, without explanation, "setting aside and/or remitting for further consideration all or part of the arbitration Award" and providing "for such further or other orders as this Honourable Court may deem fit to make in the circumstances." Order (May 24, 2016), ECF No. 3-13.

Nevertheless, the arbitration proceedings continued in London. Even before the Federal High Court handed down its order, the Tribunal issued an order concluding that the Nigerian court lacked authority to set aside the liability award. Procedural Order No. 12 ¶¶ 1, 40, ECF No. 3-12. Then, in January 2017, the Tribunal awarded P&ID almost $6.6 billion in damages, plus seven percent pre- and post-award interest, which continues to accrue. Final Award ¶ 112, ECF No. 3-17.

The High Court of Justice in London ruled in August 2019 that the arbitral award was enforceable. Approved Judgment (Aug. 16, 2019), ECF No. 45-2. In December 2019, Nigeria applied to the High Court of Justice for an extension of its deadline to challenge the award based on what it characterized as newly discovered evidence of fraud in the arbitration and in the underlying contract negotiations. Approved Judgment (Sept. 4, 2020) ¶ 80, ECF No. 48-1. That application was granted in September 2020. Id. ¶ 277. The English court found that Nigeria had "established a strong prima facie case" that the Agreement was obtained by bribery and that one of P&ID's principals perjured himself in the arbitration hearings. Id. ¶ 226. The court further found a prima facie case that Nigeria's attorney in the arbitration was engaged in corruption that

3

compromised Nigeria's defense.  Id.  According to its counsel in this case, Nigeria's challenge to the award is expected to go to trial in England in 2022.  Hearing Tr. 6.

      B.  Proceedings in this Case

P&ID filed the instant Petition to Confirm Arbitration Award in March 2018, seeking to reduce the arbitral award to a judgment.  Pet. ¶ 40.  Nigeria responded with an initial motion to dismiss the petition based on sovereign immunity under the FSIA.  Mot. to Dismiss, ECF No. 28.  P&ID then moved for an order requiring Nigeria to brief the merits of the Petition simultaneously with its jurisdictional arguments.  The Court granted P&ID's motion.

Nigeria took an interlocutory appeal of that order to the D.C. Circuit, arguing that it was entitled to receive a ruling on its sovereign-immunity argument before being forced to present its defense on the merits.  The D.C. Circuit agreed.  It held that Nigeria's immunity argument was at least colorable, and that under the FSIA, a district court "must resolve colorable assertions of immunity before the foreign sovereign may be required to address the merits at all."  Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria ("P&ID"), 962 F.3d 576, 584-86 (D.C. Cir. 2020).

On remand, P&ID again moved to dismiss the Petition for lack of jurisdiction under the FSIA.  Mot. to Dismiss, ECF No. 43.  P&ID filed an opposition brief, to which Nigeria has replied.  The Court held a hearing on Nigeria's motion on November 17, 2020.  In addition to arguing their positions on the Court's jurisdiction, counsel for the parties addressed whether the Court should defer ruling on its jurisdiction and stay the case pending the outcome of the English litigation.  Nigeria's counsel argued that a stay would be appropriate in the interest of streamlining proceedings.  P&ID's counsel disagreed, submitting that a stay would be inefficient and potentially prejudicial to P&ID.  Hearing Tr. 8-11.

Nigeria's renewed Motion to Dismiss is now ripe for decision.

## II. Legal Standards

The Court must dismiss any claim over which it lacks subject matter jurisdiction. Auster v. Ghana Airways Ltd., 514 F.3d 44, 48 (D.C. Cir. 2008). On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff or petitioner bears the burden of establishing jurisdiction. Knapp Med. Ctr. v. Hargan, 875 F.3d 1125, 1128 (D.C. Cir. 2017). The Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the [petitioner's] favor," but need not "assume the truth of legal conclusions" in the petition. Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016) (internal quotation marks omitted). The Court also "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

"The FSIA is the sole basis for obtaining jurisdiction over a foreign state in our courts." Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999) (internal quotation marks omitted). "As a general matter, the FSIA grants foreign states immunity from the jurisdiction of the courts of the United States." Chevron Corp. v. Ecuador, 795 F.3d 200, 203 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604). "In enacting the FSIA, however, Congress enumerated several exceptions to this jurisdictional restriction." Id.

Two exceptions to the FSIA are at issue here. First, the "arbitration exception" provides, as relevant here, that foreign sovereign immunity does not apply in cases brought to confirm awards made pursuant to certain arbitration agreements, "if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). Second, the "waiver exception" abrogates sovereign immunity if "the foreign state has waived its immunity

5

either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." Id. § 1605(a)(1).

### III. Analysis

#### A. The Court declines to stay the case at this time.

Before turning to the substance of Nigeria's Motion to Dismiss, the Court pauses to consider whether this case should be stayed pending the outcome of the related litigation in England. Although a stay may become appropriate in the future, the Court is persuaded that the most prudent course at this juncture is to decide the Motion to Dismiss without staying the case.

The New York Convention provides that the Court "may, if it considers it proper, adjourn the decision on the enforcement of the award" if "an application for the setting aside or suspension of the award has been made to a competent authority"—i.e., an authority "of the country in which, or under the law of which, that award was made." N.Y. Conv. arts. V(1)(e), VI. District courts have stayed arbitration-confirmation cases both before and after ruling on jurisdictional arguments for dismissal of the petition. See Stati v. Republic of Kazakhstan, 199 F. Supp. 3d 179, 181 (D.D.C. 2016) (finding that the court had jurisdiction, then granting stay); Hulley Enters. Ltd. v. Russian Fed'n, 211 F. Supp. 3d 269, 276, 286-88 (D.D.C. 2016) (granting stay without ruling on jurisdiction, but noting that the court issued the stay under its inherent power, not "pursuant to the New York Convention").

When considering whether to grant stays in arbitration-confirmation cases, courts in this district have considered six factors borrowed from the Second Circuit, known as the Europcar factors:

> (1) [T]he general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protected and expensive litigation;

> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
> (4) […] the characteristics of the foreign proceeding including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
> (5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive "suitable security" and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country; and
> (6) any other circumstances that could tend to shift the balance in favor or against adjournment.

Stati, 199 F. Supp. 3d at 192 (quoting Europcar Italia, S.p.A v. Maiellano Tours, Inc., 156 F.3d 310, 317-18 (2d Cir. 1998)); accord Hulley, 211 F. Supp. 3d at 286-87.

Guided by the Europcar factors, the Court will decline to stay the case for now. Nigeria's counsel has explained that a judgment in the English case is currently anticipated approximately two years from now. Hearing Tr. 6. Putting this case on hold would not be the most efficient use of that two-year interval. Instead, for the reasons explained below, the Court will deny Nigeria's Motion to Dismiss today. Because the Court rejects Nigeria's assertion of sovereign immunity, its ruling is immediately appealable to the D.C. Circuit. P&ID, 962 F.3d at 581. Should Nigeria pursue an interlocutory appeal, the D.C. Circuit will almost certainly decide that appeal within two years. If the D.C. Circuit were to affirm this Court's jurisdiction over the action, the Court could then assess the progress of the English litigation and reevaluate whether to stay the case before ruling on the merits. No party will be prejudiced in the meantime. By contrast, if the Court were to wait for the outcome of the English proceeding, *then* assert

jurisdiction over this case (likely triggering an interlocutory appeal in 2022 or 2023), there might be a long and needless delay in adjudicating P&ID's petition. While this delay would not necessarily cause irreparable harm to P&ID, the Court is sensitive to P&ID's legitimate interest in having its award enforced sooner rather than later, if indeed that award is enforceable. See Europcar, 156 F.3d at 317 (recognizing that "the goals of arbitration" are "the expeditious resolution of disputes and the avoidance of protracted and expensive litigation").

In sum, the status of the English proceedings and the balance of hardships weigh against an immediate stay, and none of the Europcar factors weigh strongly in the other direction. The Court therefore declines to stay this case, without prejudice to any future request for a stay.

B. The Court has jurisdiction under the waiver exception to the FSIA.

P&ID argues that this case falls into both the FSIA's arbitration exception and its waiver exception. After careful consideration, the Court agrees that the waiver exception applies and will deny the Motion to Dismiss on that basis. There is no need to resolve whether the arbitration exception also applies.[1]

---

[1] Commenting on the arbitration exception, the D.C. Circuit suggested that Nigerian courts were probably competent to set aside the award. P&ID, 962 F.3d at 583 (finding that the list of competent supervisory jurisdictions "would seem to include the courts of Nigeria"). This Court is inclined to agree with the D.C. Circuit's impression on this point. The Agreement expressly provides that the Nigerian Arbitration and Conciliation Act "shall apply to any dispute" between the parties, unless they agree otherwise. Agreement ¶ 20, ECF No. 3-1. This strongly suggests that the award was made "under the law of" Nigeria, and that Nigerian courts therefore had authority to issue a set-aside order pursuant to the New York Convention. N.Y. Conv. art. V(1)(e); see also Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 731 (D.C. Cir. 2012) ("The phrase 'under the law of which' in Article V(1)(e) . . . refers to the procedural law governing the arbitration[.]"). P&ID's argument to the contrary largely rests on the premise that an arbitration can have only one supervisory jurisdiction, also known as the "seat" of the arbitration. But the D.C. Circuit in P&ID read the text of the New York Convention to contemplate the possibility that up to two jurisdictions could supervise a single arbitration. 962 F.3d at 583 ("[T]he New York Convention recognizes that an award may be 'set aside or suspended' by courts of the sovereign whose substantive law governs the arbitration, *as well as*

The waiver exception applies to any action "in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). The D.C. Circuit has cautioned that the implied-waiver provision should be construed "narrowly," and any waiver of immunity under the FSIA must be intentional. Creighton, 181 F.3d at 122.

P&ID argues that Nigeria waived its sovereign immunity by implication because it entered the New York Convention, then agreed to arbitrate within the territory of another Convention signatory.[2] Opp. 43. There is no settled law in this Circuit either adopting or rejecting this theory of implied waiver. See P&ID, 962 F.3d at 583-84 (finding Nigeria's counterargument to P&ID's implied-waiver theory "colorable" but declining to rule on "whether Nigeria will ultimately prevail" on its immunity defense). However, P&ID's position is logical and supported by very substantial persuasive authority.

The leading case on this issue is Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co, Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572 (2d Cir. 1993).

---

by courts of the sovereign where the arbitration takes place." (quoting N.Y. Conv. art. V(1)(e)) (emphasis added)). On the record now before the Court, it appears likely that both English and Nigerian courts had the power to set aside the award.

Nevertheless, if the Nigerian court did have supervisory jurisdiction, it does not necessarily follow that the FSIA's arbitration exception is inapplicable to this case. P&ID argues with some force that the Nigerian court's cursory order by its terms did not set aside the award, and that even if it did, the set-aside order would be an issue to consider at the merits stage, not as part of the jurisdictional analysis under the arbitration exception. The Court need not reach these complex issues, given its conclusion that the waiver exception applies.

[2] Nigeria acceded to the New York Convention in 1970. See List of Contracting States, New York Arbitration Convention, http://www.newyorkconvention.org/list+of+contracting+states.

There, the Second Circuit faced an action to enforce an award entered in an arbitration in France against Navimpex, a company owned by the Romanian government. Seetransport, 989 F.2d at 574-76. The court found that Navimpex had implicitly waived its immunity under the FSIA because—knowing that Romania, France, and the United States were all New York Convention signatories—it agreed to an arbitration clause with a German company, then participated in the arbitration in France. Id. at 578-79. The court reasoned that "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory States." Id. at 578. Thus, in light of Romania's entry into the New York Convention, Navimpex "had to have contemplated the involvement of the courts of any of the Contracting States in an action to enforce the award." Id. at 579.

The D.C. Circuit has not adopted Seetransport's waiver rule as binding Circuit law, but it has come close. In Creighton, the Circuit opined in dicta that Seetransport's reasoning is "correct[.]" 181 F.3d at 123; see also P&ID, 962 F.3d at 583 (acknowledging that "Creighton contains language supporting [P&ID's] position" on waiver but noting that this language is separate from Creighton's holding). And in a recent unpublished disposition, a D.C. Circuit panel reasoned that by signing the New York Convention, Ukraine "waive[d] its immunity from arbitration-enforcement actions in other signatory states." Tatneft v. Ukraine, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam) (citing Creighton, 181 F.3d at 123).[3]

---

[3] Because Tatneft is an unpublished disposition, the Court is not bound by it. Atlas Brew Works, LLC v. Barr, 391 F. Supp. 3d 6, 21 (D.D.C. 2019) (Cooper, J.). However, the Court may cite Tatneft and look to its reasoning to the extent it is persuasive. See United States v. Bikundi, 73 F. Supp. 3d 51, 55 n.1 (D.D.C. 2014) (noting that unpublished D.C. Circuit decisions "have persuasive value aside from any precedential value or lack thereof").

This line of authority is unbroken, and for good reason. The New York Convention "specifically declares that it 'shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought'" and "further provides that '[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon[.]'" Seetransport, 989 F.2d at 578 (quoting N.Y. Conv. arts. I, III). As the Second Circuit persuasively reasoned in Seetransport, no state could sign such a document without contemplating that it would be subject to actions for enforcement of arbitral awards in the courts of other Convention signatories, including the U.S. Id. at 578; see also Creighton, 181 F.3d at 123 (agreeing in dicta). Nigeria's entry into the Convention, combined with its agreement to arbitrate in the territory of another Convention signatory,[4] is

---

[4] Nigeria argues that it did not agree to "seat" the arbitration in the United Kingdom. Reply 23-24. But this argument is irrelevant to the waiver issue. P&ID's theory of waiver does not depend on the "seat" of the arbitration; instead, it posits that a New York Convention signatory state (such as Nigeria) waives its immunity when it agrees to arbitrate "*in the territory of*" another Convention signatory (such as the U.K.). Opp. 44 (quoting Tatneft v. Ukraine, 301 F. Supp. 3d 175, 192 (D.D.C. 2018), aff'd, 771 F. App'x 9 (D.C. Cir. 2019)) (emphasis added). That theory makes sense because Convention signatories presumably know that, under the Convention, arbitral awards will be judicially enforced if they are "rendered in a state party to the Convention." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 487; see also TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 934 (D.C. Cir. 2007) (noting that if the "place of the award" is "in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration") (citation omitted). As Nigeria itself has argued, the "seat" of an arbitration is not necessarily the same as the "place" where the award was rendered. See Resps.' Mem. 10.
  Insofar as Nigeria contends that the "place" of arbitration was Nigeria and not the U.K., that argument is immaterial. Even if the award was "rendered in" Nigeria as a matter of law, it would still be presumptively enforceable under the New York Convention, since Nigeria is also a Convention signatory. Under the logic of Seetransport, Creighton, and Tatneft, Nigeria would have waived its immunity by agreeing to arbitrate in the territory of *any* Convention signatory state, including the U.K. or Nigeria.

11

strong evidence that Nigeria intended to subject itself to the jurisdiction of U.S. courts in an action such as this one.

Indeed, holding that Nigeria has retained its sovereign immunity in these circumstances would undermine the fundamental policy of the New York Convention.  "The goal of the Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions on the whole." David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 250 (2d Cir. 1991) (citing Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974)).  From the perspective of an individual signatory state, a primary benefit of joining the Convention is the potential for improved access to international markets; foreign investors and trading partners presumably prefer to do business with Convention signatory countries because, in the event of a breach, those countries are bound by uniform standards that make them easier to hold accountable.  Cf. Comm'ns Imp. Exp. S.A. v. Republic of the Congo, 757 F.3d 321, 328 (D.C. Cir. 2014) (noting that the U.S. joined the Convention "for the beneficial effects it [would] produce for the foreign commerce of the United States" (citation omitted)); Scherk, 417 U.S. at 520 n.15 (Convention aims "to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries").[5]  The Convention's effectiveness as

---

[5] See also Jennifer L. Amundsen, Comment, Membership Has Its Privileges: The Confidence-Building Potential of the New York Convention Can Boost Commerce in Developing Nations, 21 WIS. INT'L L.J. 383, 399-400 (2003) ("Standardization should provide a further incentive for the globalization of commerce, since it would provide even greater predictability in dispute resolution, thereby giving parties a greater sense of security in their dealings with member nations.  Meanwhile, that very forecast can only strengthen incentives for developing nations to subscribe to widely-accepted schemes like the New York Convention, since countries that have been struggling to attract commerce are likely to benefit the most from global standardization of arbitration laws.").

a stimulant for international commerce would be reduced if states could avail themselves of the Convention's benefits, then assert immunity from award-enforcement actions that the Convention expressly contemplates.

Nigeria argues that the Seetransport waiver rule is inconsistent with binding Supreme Court and D.C. Circuit precedent.  Resps.' Mem. 30; Reply 23.  But the cases on which Nigeria relies are distinguishable.  In Argentine Republic v. Amerada Hess Shipping Corp., the Supreme Court sustained Argentina's assertion of immunity in a tort action brought in the U.S.  488 U.S. 428, 431 (1989).  The Court rejected the argument that Argentina had waived its immunity by entering certain international agreements that "do not create private rights of action . . . to recover compensation from foreign states in United States courts."  Id. at 442.  The Court explained that it did not "see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States."  Id. at 442-43.  In contrast to the agreements at issue in Amerada Hess, the New York Convention does contemplate the availability of a cause of action in U.S. courts.  The D.C. Circuit recognized this difference in Creighton, where it expressly relied on Amerada Hess but noted its agreement with the Second Circuit that the result would be different if the state asserting immunity were a signatory to the New York Convention.  181 F.3d at 123.

Maritime International Nominees Establishment v. Republic of Guinea ("MINE"), 693 F.2d 1094 (D.C. Cir. 1982), is even farther afield.  There, the D.C. Circuit held that by entering an agreement to arbitrate certain disputes through the International Centre for Settlement of Investment Disputes ("ICSID"), Guinea did not waive its immunity from a subsequent suit to confirm a *non-ICSID* arbitral award.  MINE, 693 F.2d at 1103-04.  The court based this

13

conclusion largely on a concession by the party seeking to defeat Guinea's immunity, and it expressly declined to "decide whether Guinea's signing of the ICSID treaty would thus waive its immunity from proceedings enforcing ICSID awards." Id. at 1103-04, 1103 n.14.  MINE therefore has no bearing on whether Nigeria's entry into the New York Convention caused it to waive immunity from actions to enforce arbitral awards that fall within the Convention's scope.

Next, Nigeria argues that the waiver rule applied in Seetransport and Tatneft would render the arbitration exception superfluous, because "[i]t is hard to imagine a case that would fall within the arbitration exception but not the waiver exception as broadly construed by Tatneft." Resps.' Mem. 34.  Not so.  Creighton is precisely the case that Nigeria claims to have trouble imagining.  There, the D.C. Circuit found that Qatar, a non-signatory to the New York Convention, had not waived its immunity, but that the district court nevertheless had jurisdiction under the arbitration exception.  181 F.3d at 123-24.  Tatneft in no way contradicts Creighton's holding that the arbitration exception supplies jurisdiction in certain cases where the waiver exception does not apply because the sovereign respondent has not signed the New York Convention.  Moreover, Creighton recognizes a second distinction between the arbitration and waiver exceptions that makes the former non-superfluous:  Unlike the waiver exception, the arbitration exception does not require that the sovereign intend to subject itself to the court's jurisdiction.  Creighton, 181 F.3d at 126.

Nigeria's attempt to find support in the history of the FSIA fares no better.  As Nigeria notes, Congress enacted the FSIA in 1976 and added the arbitration exception in 1988.  In the intervening period, most—but not all—courts "refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States."  Resps.' Mem. 34 (quoting Frolova v. Union of Soviet Socialist Republics,

14

761 F.2d 370, 377 (7th Cir. 1985)).  Nigeria suggests that Congress tacitly endorsed this majority rule by deciding to add a discrete arbitration exception, rather than "amend[] the waiver exception under section 1605(a)(1) to apply whenever a foreign state agreed to arbitrate outside of its borders" or "to state that a foreign state's ratification of a treaty providing for the enforcement of arbitral award[s], such as the New York Convention, constitutes a waiver of immunity."  Id. at 34-35.  This argument conflates two distinct legal questions: (1) whether an agreement to arbitrate overseas, by itself, constitutes a waiver of immunity under the FSIA, and (2) whether entering the New York Convention or a similar treaty effects a waiver of immunity in a subsequent proceeding brought in the U.S. to enforce an arbitral award rendered in the territory of a Convention signatory.  See Creighton, 181 F.3d at 122-23 (addressing these questions separately).  Assuming Congress implicitly answered the first question in the negative, it does not follow that Congress expressed any view on the second question, which Seetransport answered in the affirmative.

Finally, it bears emphasis that by applying Seetransport and finding a waiver of sovereign immunity in this case, the Court does not deprive Nigeria of the opportunity to argue as a defense that the award P&ID seeks to enforce has been lawfully set aside by Nigeria's Federal High Court.  The Court's holding means simply that the set-aside issue will be addressed at the merits stage of this litigation, not as part of the jurisdictional analysis under the FSIA.  This approach is faithful to the text of the New York Convention, which expressly grants courts discretion to refuse confirmation at the merits stage if the award has been lawfully annulled.  See N.Y. Conv. art. V(1) ("Recognition and enforcement of the award *may* be refused, at the request of the party against whom it is invoked . . . if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that [the award] has been set aside or suspended by

a competent authority of the country in which, or under the law of which, that award was made." (emphasis added)).  Consistent with the text of the treaty, courts in past award-confirmation cases against Convention signatories have treated purported annulments as a merits issue.  See, e.g., TermoRio, 487 F.3d at 930 (holding that there was "no cause of action" to confirm award that had been "lawfully nullified by the country in which the award was made"); Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción, 832 F.3d 92, 111 (2d Cir. 2016) (upholding district court's exercise of discretion to confirm arbitral award despite a foreign court's set-aside order because that order "offend[ed] basic standards of justice in the United States").  As a Convention signatory, Nigeria was on notice that it might sometimes be subjected to the jurisdiction of U.S. courts in cases that raise the issue of whether an arbitral award has been lawfully set aside.

All told, Nigeria offers no convincing reason to depart from the persuasive reasoning of Seetransport, Creighton, and Tatneft.  The Court will therefore follow those precedents, hold that Nigeria has waived its sovereign immunity as to this case, and assert jurisdiction under the FSIA.

## IV. Conclusion

For the foregoing reasons, the Court will deny Respondents' Motion to Dismiss.  A separate Order shall accompany this Memorandum Opinion.

Date: December 4, 2020                                    CHRISTOPHER R. COOPER
                                                         United States District Judge